UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

MICHAEL ARGENYI,

    Plaintiff,

v.

CREIGHTON UNIVERSITY,

    Defendant.

Case No. 8:09CV341

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY RELIEF**

Plaintiff, Michael Argenyi, is a deaf medical student who is attending Defendant's medical school at Creighton University. Defendant has refused to provide auxiliary aids and services such as real-time captioning and interpreter services to ensure that Mr. Argenyi is able to receive the full benefit of his medical school education granted to other students. During the pendency of this litigation, Mr. Argenyi has taken out loans to pay for his own auxiliary aids and services to ensure that he has the same access to information as his classmates (Filing #26, First Amended Complaint at ¶34.). With these auxiliary aids and services in place, Mr. Argenyi successfully completed his first year of medical school.

During mediation on Saturday, August 21, 2010, however, Defendant informed Mr. Argenyi that it will not even permit him to pay for his own interpreter services for his clinical courses which start this Thursday, August 26, 2010, and that he is prohibited from using an interpreter in his clinical training. (Exhibits #1 and #2, Letters from Scott P. Moore to Dianne DeLair dated August 13 and August 21, 2010). Without interpreting services, Mr. Argenyi will not be able to access the same information as his

1

classmates and will risk failing the clinical courses. Mr. Argenyi informed Defendant that he would seek preliminary relief from the Court in response to the Defendant's written prohibition on the use of interpreters in the clinic. (Exhibit "A"Declaration of Dianne D. DeLair). Hence, Mr. Argenyi has no choice but to file this motion to require Defendant to permit him to provide his own interpreting services during the pendency of this litigation to avoid jeopardizing the significant time and resources he has put in his medical education to date. Given the time-sensitive nature of this issue, Mr. Argenyi respectfully requests that this Court issue a temporary restraining order and/or a preliminary injunction before August 26, 2010.

## STATEMENT OF FACTS

Mr. Argenyi is a deaf individual who was accepted to medical school at Creighton University in March of 2009. (Filing #26, First Amended Complaint at ¶ 11.) To ensure effective communication during medical school, Mr. Argenyi requested that the school provide real-time captioning and interpreters. (Id. at ¶18) Upon the Defendant's request, Mr. Argenyi provided documentation of his disability and need for these particular accommodations. (Id. at ¶¶16-33). Despite this documentation, Defendant refused to provide the requested accommodations – providing only an FM system which actually reduced Mr. Argenyi's understanding of speech (Exhibit #3, Letter of Expert Dr. Thedinger dated May 6, 2009). Nevertheless, Mr. Argenyi tried this accommodation for the first two weeks of medical school and was unable to follow classroom lectures or discussions. (Exhibit #4, E-mail from Mr. Argenyi to Dr. Kavan, authenticated by Declaration of Dianne DeLair and Filing #26 at ¶31). Since Defendant refused to provide effective auxiliary aids and services, Mr. Argenyi took out loans to pay for real-time captioning and interpreting services during the pendency of this lawsuit. (Filing #26 at ¶¶ 34-36). With these auxiliary aids and services in place, Mr.

2

Argenyi successfully completed the first year of medical school because he had access to spoken information.

For the second year of medical school based upon Defendant's ongoing refusal to accommodate, Mr. Argenyi made the same arrangements to provide his own auxiliary aids and services. On August 21, 2010, Defendant, however, issued a letter stating that it will not permit Mr. Argenyi to use interpreters in the clinical setting, even if Mr. Argenyi pays for them himself. (Exhibits # 1 and #2). Clinical rotation commences on Thursday, August 26, 2010, and Mr. Argenyi has filed this motion for a temporary restraining order and/or preliminary relief seeking an order from the Court requiring Defendant to permit him to use interpreter services. Given that his first class is this Thursday, Mr. Argenyi respectfully requests an expedited hearing and decision.

## STANDARD OF REVIEW

The Eighth Circuit has held that there are four factors to be taken into consideration when considering a motion for preliminary injunctive relief: (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm absent the injunction; (3) the probability that granting the injunction will cause substantial harm to other interested parties; and (4) whether the public interest is advanced by the issuance of the injunction. *Database Sys. v. C L Sys.*, 640 F.2d 109, 112 (1981) (en banc). The Eighth Circuit has explained that "[i]n balancing the equities no single factor is determinative." *Id.* at 113. Courts weigh the same factors in determining whether a temporary restraining order should issue. *Baker Elec. Co-op v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994).

# ARGUMENT

Mr. Argenyi addresses in turn the four factors that merit the granting of a temporary restraining order and/or a preliminary injunction. A balancing of the four factors points strongly in favor of granting a temporary restraining order and a preliminary injunction requiring Defendant to permit Mr. Argenyi to use interpreter services for the clinical components of his medical school education.

## A. Likelihood of Success on the Merits

The Eighth Circuit has held that "in the higher education context, a person alleging a failure to accommodate under Title III of the ADA or the Rehabilitation Act must show (1) that the individual is disabled and otherwise qualified academically, (2) that the defendant is a private entity that owns, leases or operates a place of public accommodation (for ADA purposes) or receives federal funding (for Rehabilitation Act purposes), and (3) that the defendant failed to make reasonable modifications that would accommodate the individual's disability without fundamentally altering the nature of the public accommodation." *Merson*, 442 F.3d at 1076-77 (quotation marks omitted). The parties do not dispute that Mr. Argenyi meets the first two elements. The parties dispute the third element, specifically what steps Defendant must take to ensure equal access for Mr. Argenyi.[1]

Title III of the Americans with Disabilities Act ("ADA") was enacted to facilitate disabled individuals' access to places of public accommodation including private universities such as Defendant. 42 U.S.C. § 12181(7)(J) (listing a "postgraduate private school" as a covered entity); 28 C.F.R. § 36.104 (same). Consistent with its goal of integration, the Act states broadly:

---

[1] Mr. Argenyi has also asserted a claim under the Rehabilitation Act, 29 U.S.C. § 794. The elements of this claim differ only in that it applies to recipients of federal financial assistance. *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1074 nn.3&4 (8th Cir. 2004). Defendants concede that they receive federal financial assistance. (Filing #28 Answer to Amended Complaint). For purposes of this motion, the ADA and Rehabilitation Act claims are analyzed 'interchangeably.

4

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a); *see also* 28 C.F.R. § 36.201(a); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676 (2001); *Mershon*, 442 F.3d at 1076.

Title III explicitly defines discrimination. Discrimination occurs when a place of public accommodation denies an individual with a disability the opportunity to "participate in or benefit from [its] goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. § 12182(b)(1)(A)(i); 28 C.F.R. § 36.202(a). Discrimination also occurs when a place of public accommodation arranges for individuals with a disability lesser opportunities to participate in or benefit from its goods, services, facilities, privileges, advantages, and accommodations. 42 U.S.C. § 12182(b)(1)(A)(ii); 28 C.F.R. § 36.202(b). Notwithstanding the existence of separate benefits, individuals with a disability must be provided "the opportunity to participate in such programs or activities that are not separate or different." 42 U.S.C. § 12182(b)(1)(C); 28 C.F.R. § 36.203(b); *see also* 28 C.F.R. § 36.203(c). Places of public accommodation must provide auxiliary aids and services in the most integrated setting appropriate to the needs of individuals with a disability. 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a).

These antidiscrimination provisions place affirmative obligations on places of public accommodation to provide auxiliary aids and services to ensure that an individual with a disability is not "excluded, denied services, segregated or otherwise treated differently." 42 U.S.C. § 12182(b)(2)(A)(iii); 28 C.F.R. § 36.303(a). Places of public accommodation must make reasonable modifications in policies, procedures, and

practices and remove communication barriers to ensure equal access. 42 U.S.C. § 12182(b)(2)(A)(ii), (iii); 28 C.F.R. § 36.304(a).

Places of public accommodation are specifically obligated to provide auxiliary aids and services to ensure effective communication with individuals who are deaf or hard of hearing. 42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.303(c); 28 C.F.R. Pt. 36, App. B (explaining that Title III "requires that appropriate auxiliary aids and services be furnished to ensure that communication with persons with disabilities is as effective as communication with others"). Auxiliary aids and services include, but are not limited to:

> Qualified interpreters, notetakers, computer-aided transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDDs), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments.

28 C.F.R. § 36.303(b)(1); *see also* 28 C.F.R. Pt. 36, App. B ("Transcription services are used to relay aurally delivered material almost simultaneously in written form to persons who are deaf or hard of hearing. This technology is often used at conferences, conventions, and hearings."). The regulations make clear that "aurally delivered materials" include *all* aural information, including even "nonverbal sounds and alarms and computer-generated speech." 28 C.F.R. Pt. 36, App. B.

The Title III statutory and regulatory schemes place clear obligations on places of public accommodations. As a covered entity, Defendant is obligated to provide auxiliary aids and services for deaf and hard of hearing students so that they may share in the "full and equal enjoyment" of all that the university has to offer to its students. 42 U.S.C. § 12182(a); 28 C.F.R. 36.201(a); *see also* 28 C.F.R. § 36.303(c).

Department of Justice regulations are entitled to substantial deference. *See, e.g.*, *Oregon Paralyzed Veterans of Am. v. Regal Cinemas, Inc.*, 339 F.3d 579, 584-85 (D.C. Cir. 1997); *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1060-61 (5th Cir. 1997). 1126, 1131 (9th Cir. 2003); *Botosan v. Paul McNally Realty*, 216 F.3d 827, 833-34 (9th Cir. 2000); *Paralyzed Veterans of Am. v. D.C. Arena, L.P.*, 117 F.3d 579, 584-85 (D.C. Cir. 1997); *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1060-61 (5th Cir. 1997). As described, these regulations require Defendant to provide auxiliary aids and services necessary to ensure effective communication with Mr. Argenyi during his medical school education.

The only reason that Defendant has given for its refusal to even permit Mr. Argenyi to pay for his own interpreters in the clinical setting is that it believes Mr. Argenyi does not need interpreters. However, as Mr. Argenyi's school history has demonstrated, Mr. Argenyi has required precisely the requested accommodations during his undergraduate education and now during his medical education. During the pendency of this lawsuit, Mr. Argenyi has been paying for real-time captioning and interpreting services, the necessary auxiliary aids and services to ensure that he has equal access to the information that his classmates receive. (Filing #26, First Amended Complaint at ¶¶34-36).

Without interpreters, Mr. Argenyi will not have full access to the information provided in the clinical courses, and will be denied all of the learning and other benefits gained from successful performance in the clinical setting. Without access to the same information that his classmates receive, he risks failing these required components of his medical school education. When Mr. Argenyi did not have real-time captioning or interpreter services the first few weeks of medical school before he began arranging for those services, he found that he could not understand lectures and discussions and found

7

himself falling behind his classmates. (Exhibit #4,  E-mail to Defendant from Mr. Argenyi of September 1, 2009)  One year later, Defendant's refusal to permit Mr. Argenyi to even pay for his own interpreters for the clinical course will put Mr. Argenyi in the same position that he was in the first weeks of medical school.

Mr. Argenyi's clinical experiences during his first year of medical school demonstrate his need for interpreter services for the clinical courses which start this week.  Defendant provided Mr. Argenyi with an interpreter during the only clinical component of his first year of medical school – the OSCE.  The OSCE is a clinical examination medical students are required to pass in order to continue on to the second year of medical school.

Also during his first year, Mr. Argenyi attempted to communicate without interpreters at the Magis Clinic during his first year of medical school, a volunteer clinic that provides medical care to homeless residents of the City of Omaha.  Mr. Argenyi found that he was not able to effectively communicate without interpreters.  (Exhibit # Declaration of Mr. Argenyi)  Moreover, Mr. Argenyi is not the first deaf medical student to need interpreter services for clinical courses.  *See, e.g.*, Declaration of Dr. Chris Moreland; Declaration of Gail Peoples, attached as Exhibits #5 and #6) Defendant asserts that Mr. Argenyi does not need interpreter services for the clinical courses based on an allegation that he did not have interpreters when volunteering in a clinic prior to medical school.  In that clinic, however, Mr. Argenyi was not in an educational setting and his participation in the clinic was extremely limited.  In medical school, however, clinical courses impart much more information, and it is essential that Mr. Argenyi have full and equal access to this information.

The limited issue that this motion raises is not whether Defendant must pay for and provide specific auxiliary aids and services to ensure effective communication with

Mr. Argenyi. The only issue that this motion presents is whether Defendant must *permit* Mr. Argenyi to continue paying for his own auxiliary aids and services while the parties litigate which auxiliary aids and services Defendant must provide. Mr. Argenyi thus seeks only the continuation of the status quo, in which he has been paying for his own auxiliary aids and services, an arrangement which permitted him to successfully complete his first year of medical school.[2]

### B. Irreparable Harm

Courts have held that irreparable harm exists when covered entities engage in the "very type of injuries that Congress sought to avert." *E.E.O.C. v. Chrysler Corp.*, 733 F.2d 1183, 1186 (6th Cir. 1984). Courts have presumed irreparable harm when there was a violation of the ADA or the Rehabilitation Act. *E.g.*, *Lonberg v. City of Riverside*, No. EDCV970237SGLAJWX, 2007 WL 2005177, at *7 (C.D. Cal. May 16, 2007) (holding that irreparable harm is presumed because "[t]he passage of the statute is an implied finding by Congress that violations will harm the public"); *Burriola v. Greater Toledo YMCA*, 133 F. Supp. 2d 1034, 1040 (N.D. Ohio 2001) (holding that there is irreparable harm when a person is discriminated against on the basis of disability) (citing *E.E.O.C. v. Chrysler Corp.*); *American Federation of Government Employees, Local 51 v. Secretary of the Dept. of Treasury*, No. C-85-9196, 1986 WL 31596, at *1 (N.D. Cal. Jan. 24, 1986) ("[I]rreparable harm may be presumed from the likelihood that a violation of the Rehabilitation Act has occurred or is threatened."). The goals of the ADA "include assuring that all individuals with disabilities enjoy 'equality of opportunity, full participation, independent living, and economic self-sufficiency.'" *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal.

---

[2] Although Mr. Argenyi seeks permission to provide his own interpreters for the clinical courses, he is not waiving his claims asserted in this case, which are that Defendant is ultimately responsible for paying for these auxiliary aids and services. As a remedy, Mr. Argenyi seeks reimbursement for the expenses he has incurred in providing his own auxiliary aids and services.

9

1997) (quoting 42 U.S.C. § 12101).  Consequently, "[i]njuries to individual dignity and deprivations of civil rights constitute irreparable injury." *Id.*

As a result of Defendant's refusal to provide effective auxiliary aids and services for Mr. Argenyi's medical school education, Mr. Argenyi has had to take out loans to secure his own auxiliary aids and services, which include real-time captioning and interpreters.  With these auxiliary aids and services in place, Mr. Argenyi successfully completed his first year of medical school despite Defendant's refusal to pay for the auxiliary aids and services.  Without auxiliary aids and services for the clinical components, Mr. Argenyi will not have full access to information and will be deprived of equal access to education.

Mr. Argenyi will suffer irreparable harm if he does not have auxiliary aids and services for his clinic.  As described above, he was not able to understand fully what was happening when he participated in a volunteer clinic without interpreter services during his first year of medical school. On the other hand, the use of an interpreter for his OSCE resulted in effective communication he was entitled to under the law. Moreover, as the declarations from Gail Peoples and Dr. Chris Moreland make clear, Mr. Argenyi will miss out on a critical part of his medical school education without full access to information imparted in clinical components. (Exhibits #5-#7, Declaration of Dr. Chris Moreland; Declaration of Gail Peoples, Declaration of Dr. Pollard). The clinic is where Mr. Argenyi will learn how to obtain patient histories, how to assess clinical status, how to take vital signs, how to triage patient needs, and how to begin diagnosing disease states.  His performance in clinic will have irreparable repercussions on his standing in medical school and whether he is able to obtain a positive recommendation from faculty that is required for his application to residency programs.  His learning in clinic will dictate his ability to take and pass the USMLE Step Two, clinical board

exams. Without full access to the same information that his classmates will have, Mr. Argenyi will not have an equal opportunity to learn how to be a doctor and risks failing his clinical courses. Since these clinical courses are a required component of his medical school education, failing these courses would jeopardize his ability to successfully complete medical school. For these reasons, Mr. Argenyi will suffer irreparable harm if he is forced to take the clinical components of his medical school education without auxiliary aids and services.

### C. Substantial Harm to Others

A temporary restraining order and/or a preliminary injunction requiring Defendants to permit Mr. Argenyi to pay for his own interpreter services while the parties litigate whether Defendant must pay for these auxiliary aids will do no harm to Defendant. Should Mr. Argenyi prevail on the merits, Defendant will have to reimburse Mr. Argenyi for the expenses he incurred in providing his own auxiliary aids and services. Should Defendant prevail, Defendant will not be obligated to make any such reimbursement. For these reasons, Defendant cannot plausibly allege that permitting Mr. Argenyi to provide his own interpreters during the pendency of this lawsuit will somehow result in substantial harm to Defendant.

### D. Public Interest

Granting the relief sought would strongly serve the public interest. Mr. Argenyi would be able to continue with his medical school education and become a doctor despite being a person who happens to be deaf. The integration of people with disabilities into professions such as medicine would mean that discrimination against people with disabilities has been eradicated and that they have been included in all aspects of society.

Congress enacted the Americans with Disabilities Act in 1990 "to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674-75 (2001). Congress concluded that there was a "'compelling need to provide a clear and comprehensive national mandate' to eliminate discrimination against disabled individuals and integrate them 'into the economic and social mainstream of American life.'" *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (quoting S. Rep. No. 101-116, at 20 (1989); H.R. Rep. No. 101-485, at 50 (1990)).

Accordingly, the relief sought would fulfill the goals of the Americans with Disabilities Act in remedying widespread discrimination against individuals with a disability and ensure that individuals with a disability, including individuals who are deaf or hard of hearing, can partake fully in higher education and obtain degrees permitting them to work in any profession and contribute to society as highly qualified individuals.

### E.  Balancing of the Factors

The four factors, taken together, point strongly in favor of granting the relief sought. Mr. Argenyi has demonstrated a strong likelihood of prevailing on the merits. Without effective auxiliary aids and services, Mr. Argenyi struggled during his first few weeks of medical school. Since he began providing his own auxiliary aids and services, Mr. Argenyi has done well, successfully completing his first year of medical school. Now, Defendant wants Mr. Argenyi to risk failure again without auxiliary aids and services when his own experience and the reports of his experts and physicians show

that he needs auxiliary aids and services for the clinical components of his medical school education. (Exhibit # ). As described, when he attempted to communicate without interpreters in the volunteer clinic during his first year of medical school, Mr. Argenyi found that he did not have full access to information. Since Mr. Argenyi merely seeks an order permitting him to continue to pay for his own interpreters for the clinical courses during the pendency of this lawsuit, there will be no substantial harm to Defendant in continuing the status quo. Finally, an injunction would serve the public interest in carrying out Congress' goal of integrating individuals with a disability into society, including individuals who are deaf or hard of hearing.

## CONCLUSION

For the foregoing reasons, this Court should enter a temporary restraining order and/or a preliminary injunction before August 26, 2010 which requires Defendant to permit Mr. Argenyi to pay for his own auxiliary aids and services for his clinical courses while the parties litigate whether Defendant must pay for such accommodations.

s/Dianne DeLair
Nebraska Advocacy Services, Inc.
*The Center for Disability Rights, Law and Advocacy*
Federal Trust Building
134 S. 13th Street, Suite 600
Lincoln, NE 68508
(402) 474-3183
Fax (402) 474-3274
Email: Dianne@nas-pa.org

Marc Charmatz, #09358 (District Court of MD)
National Association for the Deaf Law and Advocacy Center
Legal Department
8630 Fenton Street, Suite 820
Silver Spring, MD 20910

13

       (301)587-7732
       Email:  Marc.Charmatz@nad.org

       Mary C. Vargas, #14135 (District Court)
       Stein & Vargas, LLP
       P.O. Box 522
       Emmitsburg, MD  21727
       (240)793-3182
       Email:  Mary.Vargas@steinvargas.com

## CERTIFICATE OF SERVICE

     I hereby certify that a true and correct copy of the above and foregoing have been served upon Scott P. Moore of Baird Holm LLP, 1500 Woodmen Tower, Omaha, Nebraska  68102-2068 via e-mail on the _____ day of August, 2010.


       s/Dianne D. DeLair