## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MICHAEL S. ARGENYI, | ) | CASE NO. 8:09CV341 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| CREIGHTON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the cross Motions for Summary Judgment filed by Defendant Creighton University (Filing No. 183) and Plaintiff Michael S. Argenyi (Filing No. 186).  The Motions have been fully briefed (Filing Nos. 184, 187, 198, 202, 204, 210, 212), and the Court also has considered the evidence the parties submitted in support of their respective positions (Filing Nos. 185, 188, 189, 193, 199, 200, 203, 205, 211).  For the reasons discussed below, Plaintiff Argenyi's Motion (Filing No. 186) is denied, and Defendant Creighton's Motion (Filing No. 183) is granted.

### UNDISPUTED FACTS

Based on the Court's review of the parties' briefs and the evidentiary record, the following facts are not in dispute.

Argenyi has suffered from significant hearing loss and has used hearing aids since he was one year old.  Even with hearing aids, he has had difficulty distinguishing between many sounds.  Despite this difficulty, Argenyi's parents raised Argenyi in a way that emphasized the spoken language as his primary means of communication.  As a result, Argenyi learned to read lips, but still can be confused by certain sounds that look the same on a person's lips.  Due to this limitation in using lip reading to communicate, Argenyi began to use "cued speech," a way to communicate where hand signals represent sounds,

to enhance his lipreading.  Prior to attending Creighton's medical school, Argenyi also used Communications Access Real Time Transcription ("CART"), stenographic equipment that transcribes what is said verbatim, to aid his ability to understand oral communication.  In 2009, after receiving his first cochlear implant in 2004, Argenyi received a bilateral cochlear implant.  A cochlear implant is a device that creates an illusion of sound by directly stimulating nerve cells found in the cochlea.  These implants have improved Argenyi's hearing, but he still has trouble distinguishing between certain sounds.

While at Seattle University for his undergraduate education, Argenyi decided to apply to medical school.  Argenyi visited Creighton for an admission interview.  Argenyi did not request accommodations or auxiliary aids or services for the interview, or at any time during the application process.  During this visit, Argenyi interviewed with Dr. Eugene Barone and discussed his hearing loss.  Creighton accepted Argenyi in the spring of 2009 based on the strength of his academic fitness and credentials, and admitted him into its medical school.

After his acceptance, Argenyi submitted a request for auxiliary aids and services in which he requested CART services and interpreters.  Accompanying his request, he submitted documentation from his audiologist that detailed his hearing impairment and his prior history of using CART and cued speech transliterators.  Dr. Michael G. Kavan, Associate Dean of Medical Education at the time, responded to Argenyi's request for accommodations asking for "more specific information on [his] cochlear implant and the nature of [his hearing disability[,]" and "[a] letter from a physician documenting [his] impairment along with a specific request for accommodation."  (Filing Nos. 185-2, ex. A6,

2

200-6, A13.)  In response, Argenyi submitted a letter from his Otolaryngist, Dr. Douglas

Backous.  In this letter, Dr. Backous stated:

> [Argenyi] is doing quite well and is now in the process of undergoing a
> bilateral cochlear implant with the device being placed on the left side.  He
> has worked in a nursing home environment over the last 3 years and is
> communicating well with patients.  I believe in medical school he would
> benefit from closed captioning, and he has not tried an FM system, but that
> could also improve his communication strategies significantly.  I have read
> your technical standards for communication and believe that he would do
> quite well. The FM system would be very important in rotations such as
> surgery.  When he gets his bilateral cochlear implant this may significantly
> improve his communication ability irrespective of accommodations.  We
> would have to see that to determine where indeed he improves or not.

(Filing Nos. 185-2, ex. A7, 200-4, ex. A9.)  Argenyi also sent an email to Dr. Kavan that

made specific requests for accommodation.  Argenyi requested CART for lectures, an

interpreter for labs, and an FM system[1] or interpreter for small group sessions.

Dr. Kavan sent a letter to Argenyi requesting additional information.  Specifically, Dr.

Kavan sought additional information on the progress of Argenyi's bilateral cochlear implant

surgery and informed Argenyi that he would need to get an updated evaluation and submit

an updated request for accommodations once his cochlear implant surgery was complete.

(Filing Nos. 185-2, ex. A10, 200-8, ex. A21.)  Dr. Kavan also informed Argenyi that any

requested accommodations had to be supported by a diagnostic assessment and

documentation relating to a specific request for accommodations.  Dr. Kavan explained

that Dr. Backous's letter was insufficient because it was not a direct request for

accommodations and did not match the accommodations Argenyi had requested.  (*Id.*) Dr.

Kavan also indicated that Creighton was still determining whether Argenyi's requested

---

[1]An FM system is a microphone that transmits sound directly into Argenyi's cochlear implant.

accommodations were reasonable and whether Argenyi could meet Creighton's technical standards with those accommodations.  (*Id.*)

Argenyi wrote back to Mr. Kavan, indicating that he believed he would be "able to function in a medical setting" and "fulfill the technical standards for communication" as evidenced by how he was able to perform all of his duties "effectively without accommodations, with the exception of a text pager" when he worked as a Certified Nurse's Assistant.  (Filing Nos. 185-2, ex. A11, 200-8, ex. A23.)  Argenyi provided that he has "been able to obtain clinical information in a clinical setting, without significant accommodation."  (*Id.*)

Argenyi also informed Dr. Kavan that he had used CART and cued speech interpreters when attending prior educational institutions, and invited Creighton to contact those institutions for more information on the accommodations Argenyi had previously received.  (*Id.*)  Argenyi noted that although he did not use an FM system at his undergraduate institutions, he did "have prior experience with FM system [sic]", and that he "believe[d] that an FM system would be useful for [his] medical studies."  (*Id.*)  However, Argenyi requested an FM system only in regards to small group settings.  Finally, Argenyi stated that CART and interpreters "are generally considered interchangeable, based on client's preference and availability.  The largest fundamental difference between the two rests on the capacity to change locations quickly."  (*Id.*)

Creighton received a letter dated May 27, 2009,  from Dr. Backous's office, signed by Dr. Backous and Stacey Watson, a cochlear implant audiologist.  (Filing No. 185-1, ex. A2.)  This letter stated that an FM system, CART, and a cued speech interpreter would be

4

"appropriate" for Argenyi.  (*Id.*)  However, Argenyi admitted that Ms. Watson and Dr. Backous were not in a position to know what accommodations Argenyi actually needed and that Dr. Backous and Ms. Watson wrote the letter to Dr. Kavan after Argenyi simply told Dr. Backous and Ms. Watson which accommodations he requested.  (Filing No. 185-1, ex. A1, Dep. of Michael S. Argenyi, at 128:19-129:25)

On June 23, 2009, Dr. Kavan sent Argenyi a letter that explained he met with Creighton's Medical Education Management Team ("MEMT") to determine the accommodations Argenyi would receive.  (Filing No. 185-3, ex. A14.)  In that letter, Dr. Kavan stated that the MEMT considered the documents received from Dr. Backous and Ms. Watson, as well as Creighton's technical standards which require a medical degree candidate be capable of performing in a reasonably independent manner.  (*Id.*)  Dr. Kavan noted the accommodations Argenyi would receive for lectures, small groups, and laboratories.  For lectures, Argenyi would sit in the first row directly in front of his instructor, receive an FM system and copies of all power point presentations, and have access to a note taker's notes.  For small groups, Argenyi would have access to an FM system that would work with a table-top microphone that would pick up sounds in a fifteen to thirty foot radius.  For laboratories, Argenyi would also have access to an FM system that would work with two microphones that could also pick up sounds in a fifteen to thirty foot radius, one suspended from the ceiling, the other worn by the faculty instructor.  (*Id.*)  Argenyi replied to Dr. Kavan, "I will give [the accommodations outlined in your letter] a wholehearted try." (Filing No. 185-3, ex. A15.)  Creighton and Argenyi then exchanged emails so that Creighton could purchase an FM system compatible with Argenyi's cochlear implants. (Filing No. 185-3, ex. A16.)

5

Just before classes began, Argenyi's attorney contacted Creighton to discuss Argenyi's circumstances.  On August 12, 2009, Dr. Kavan, Creighton's in-house counsel Amy Bones, and Creighton's director of disability accommodations Wade Pearson, met with Argenyi and his attorney.  At this meeting, Argenyi again asked Creighton to provide him with the accommodations he originally requested.  On August 27, 2009, Ms. Bones sent Argenyi's attorney a letter stating that Argenyi had to submit additional documentation that explained why additional accommodations were necessary if he desired more or different accommodations.

About two weeks into the semester, Argenyi sent Dr. Kavan an email indicating that the accommodations Creighton provided were inadequate.  Argenyi complained of a delay in note-taking services, and informed Dr. Kavan that he decided to obtain CART and other auxiliary services himself.  Argenyi borrowed money from his parents to pay for CART, transliterators, and interpreters.  Although Argenyi does not know sign language, he hired sign supported oral transliterators because no cued speech transliterators were available in Nebraska.  These sign supported transliterators were able to mouth words clearly for Argenyi to make what was said in class easy to lipread.

 On September 15, 2009, Dr. Kavan sent Argenyi an email offering enhanced note taking services.  Argenyi never responded to Dr. Kavan's email.  On September 16, 2009, Creighton received another letter from Dr. Backous, dated September 10, 2009, explaining Argenyi's hearing loss.  (Filing Nos. 185-3, ex. A20, 200-1, ex. A1.)  In this letter, Dr. Backous stated:

> "[t]he longer [Argenyi] uses his cochlear implant systems the better he will become at using the sound to his advantage.

6

> It is imperative that [Argenyi] have access to visual cues for everyday communication and education. Visual cues include, but are not limited to closed captioning on videos and films, real time captioning for lectures and discussions, and speech reading cues for one-on-one interactions. Without visual cues, cochlear implant user [sic] experience more difficulty understanding speech in demanding listening situations. [Argenyi] is no exception. With these accommodations in place, [Argenyi] has proven himself to do quite well.

(*Id.*) On September 21, 2009, Ms. Bones sent a letter to Argenyi's attorney to request clarification regarding the information in Dr. Backous's letter. Ms. Bones, seeking permission from Argenyi's attorney, offered to call Dr. Backous herself. Without offering further clarification from Dr. Backous, however, Argenyi brought this action against Creighton, alleging that Creighton violated Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794. (Filing No. 26, Am. Compl.)

On May 6, 2010, Dr. Britt Thedinger evaluated Argenyi. (Filing No. 185-3, ex. A23.) Dr. Thedinger's report provided that "[i]t does appear that the FM system does not provide any significant benefit and today's results show that it actually reduces his discrimination ability." (*Id.*) On July 13, 2010, Creighton's legal counsel sent Argenyi's attorney the second year medical school course schedule, asking if Argenyi needed accommodations for his second year. On July 28, 2010, Argenyi's attorney sent a letter to Creighton requesting sign-supported oral interpreters for clinics and CART for classes. (Filing No. 200-11, ex. A36.)

On August 13, 2010, just before the second-year clinics started, Creighton's legal counsel sent Argenyi's attorney a letter detailing the accommodations Creighton would provide for Argenyi after taking into account Dr. Thedinger's report. (Filing Nos. 185-3, ex.

7

A28, 188-7, ex. A15.)  The letter stated that, for large group lectures, Creighton would provide Argenyi an oral interpreter with sign support so long as Argenyi sat in one of the first two rows of class, in addition to access to notes from a class note taker.   The letter also stated that Creighton would provide Argenyi an oral interpreter with sign support for his Infectious Disease and Hemetology/Oncology labs.  However, the letter stated that Creighton would not provide Argenyi an interpreter for his Physiology lab, the Cardiology portion of the ECG lab, or his renal lab because they "do not involve significant didactic instruction and involve small groups with some individualized instruction for students," they would allow the instructor to provide Argenyi with visual cues, there would be written instructions, and "[a]ll instructions are provided on the computer screen."  With respect to small groups, Creighton's letter stated that Argenyi would not receive an interpreter because he was expected to read the material in advance and would receive visual cues relating to the discussion by sitting next to the faculty member discussion leader.  With respect to clinical instruction, the letter stated that Creighton would not offer interpreters or allow Argenyi to use an interpreter in the clinic, even if he paid for the interpreter himself.

On August 23, 2010, Argenyi filed a motion for a temporary restraining order, seeking to force Creighton to allow him to use–and pay for–his own interpreters.  (Filing No. 59.)  The Court denied Argenyi's motion, and Argenyi participated in the clinics without interpreters. Despite not having an interpreter present, Argenyi received a passing grade in his clinics (Filing No. 188-2, ex. A1, Decl of Michael S. Argenyi, at ¶ 42), as well as his

8

Objective Structured Clinical Examinations ("OSCE")–short exercises involving mock patients that do not represent clinical classes.[2]

**DISPUTED FACTS**

Based on the Court's review of the parties' briefs and the evidentiary record, the following facts are in dispute.

Argenyi claims he is not able to rely solely on lipreading to understand what people are saying. (Filing No. 188-2, ex. A1, at ¶ 4.) Creighton contends that Argenyi's healthcare providers indicated that when Argenyi "is able to take advantage of visual cues and context, his performance improves to nearly 100%."  (Filing No. 185-1, ex. A2.)

Argenyi also claims that Richard Okamoto, Seattle University's disability services coordinator, determined that cued speech transliterators and CARTS were necessary for Argenyi to have full and equal access to communication for his undergraduate education. (Filing No. 188-4, ex. A3, at 8-9.)  Creighton asserts that Mr. Okamoto admitted in his deposition that he did not make a determination as to whether CART was necessary in order to accommodate Argenyi's disability.  (Filing No. 203-2, ex. B1, Dep. of Richard Okamoto, at 143:19-144:14, 146:5-11.)  Mr. Okamoto states in his report "I suggested the use of Computer Assisted Real-time Transcription (CART) because I was not sure whether a solo interpreter would be enough to fulfill Michael's interpreting needs. . . . Once Michael had completed his first quarter, we discussed how this went.  He had not used CART before, and was happy with the results." (Filing No. 188-4, ex. A3, at 9, 10.)  The transcript of Mr. Okamoto's deposition states, "Q. . . . you didn't make an assessment whether CART

---

[2]Although Argenyi was allowed an interpreter for some of his OSCEs, he passed all of his OSCEs, including those where an interpreter was not used.

9

was necessary for [Argenyi's] hearing impairment.  You just believed that [it] would assist

him, and that [it] was related to his disability so you provided it.  A. Yes."  (Filing No. 203-2,

ex. B1, at 143:20-24.)  Argenyi also stated in his declaration:

> I met with Seattle University's disability services coordinator, Richard
> Okamoto, who also reviewed my academic records and past record of using
> auxiliary aids and services.  I determined that, on the basis of my hearing
> impairment and past record of academic achievement using cued speech
> transliterators and CART, Seattle University would provide cued speech
> transliterators and CART for my classes.

(Filing No. 188-2, ex. A1, at ¶ 10.)

Creighton asserts that it believes Argenyi can succeed in the clinical setting without

interpreters and he would be better prepared for his professional career if he completed

his clinics without the aid of an interpreter.  (Filing No. 185-3, ex. A27, Decl. of Dr. Thomas

J. Hansen, at ¶ 14.)  Argenyi's argues that this belief is not objectively reasonable.

## STANDARD

Summary judgment is only proper when the Court, viewing the evidence in the light

most favorable to the nonmoving party and drawing all reasonable inferences in the

nonmoving party's favor, determines the evidence "show[s] that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter of law."

*Semple v. Federal Express Corp.*, 566 F.3d 788, 791 (8th Cir. 2009) (quoting Fed. R. Civ.

P. 56(c)).[3]  "[W]here the nonmoving party will bear the burden of proof at trial on a

---

[3]"When deciding or reviewing cross-motions for summary judgment, the approach is only slightly modified." *Williams v. City of Omaha*, 2004 WL 390929, at *1 n.1 (D. Neb. Mar. 2, 2004); *accord. Nuzum v. Chlorella*, 2006 WL 3825111, at *5 n.5. (D. Neb. Dec. 27, 2006).  As explained in *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 403, 404 (7th Cir. 2002):

> The usual Rule 56 standard of review applies to cross-motions for summary judgment, and our review is de novo ... To the extent that [the losing party] challenges the court's decision to grant summary judgment in favor of the [prevailing party], we construe the record in the

dispositive issue, . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact."  *Id.*  Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that its claim should proceed to trial."  *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009), *cert. denied,* 130 S. Ct. 1074 (2010) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  The nonmoving party is required to demonstrate a "genuine issue of material fact" that is outcome determinative–"a dispute that might 'affect the outcome of the suit under the governing law.'" *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1029 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A "genuine issue" is more than "'some metaphysical doubt as to the material facts,'"  *Nitro,* 565 F.3d at 422 (quoting *Matsushita*, 475 U.S. at 586), and "'the mere existence of some alleged factual dispute between the parties will not defeat an

---

light most favorable to [the losing party]. . . . To the extent that [the losing party] asserts that the court erred in refusing to grant its own motion for summary judgment, the record is evaluated in the light most favorable to [the prevailing party]. . . . Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law under the familiar standards of Fed. R. Civ. P. 56(c).

11

otherwise properly supported motion for summary judgment.'" *Bloom*, 440 F.3d at 1028-29 (quoting *Anderson*, 477 U.S. at 247-48).

"[A] plaintiff may not merely point to unsupported self-serving allegations" to substantiate his allegations or to "establish a genuine issue of material fact." *Smith v. Int'l Paper Co.*, 523 F.3d 845, 848 (8th Cir. 2008) (quotations omitted). Further, "[i]n ruling on a motion for summary judgment, the district court is not obligated to wade through and search the entire record for some specific facts which might support" a party's claim. *Holland v. Sam's Club*, 487 F.3d 641, 644 (8th Cir. 2007) (quotations omitted).

In other words, in deciding "a motion for summary judgment, [the] 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).  Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"–where there is no "genuine issue for trial"–summary judgment is appropriate. *Matsushita*, 475 U.S. at 587.

## DISCUSSION

### I.  Statutory Framework

Title III of the Americans with Disabilities Act ("ADA") prohibits "any person who owns . . . or operates a place of public accommodation" from discriminating against any individual "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public

accommodation."[4]   42 U.S.C. § 12182(a).   For purposes of the ADA, discrimination includes:

> (ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations; [and]

> (iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

*Id.* at § 12182(b)(2)(A)(ii), (iii).   The regulations implementing the ADA provide that "a public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c). "Use of the most advanced technology is not required," 28 C.F.R. pt. 36, App. C, but "[i]n order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 36.303(c)(ii).   "[T]he ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication."   *Id*.

Like the ADA, the Rehabilitation Act requires a recipient of federal funding to provide "reasonable accommodations when an 'otherwise qualified' disabled student, 29 U.S.C.

---

[4]Creighton does not contest the assertion that it is a place of public accommodation. *See* 42 U.S.C. § 12181(7)(J) (providing "postgraduate private school[s], or other place[s] of education" are "public accommodations for purposes" of the ADA).

§ 794(a), would otherwise be denied meaningful access to a university," *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076-77 (8th Cir. 2006) (quotations and citation omitted),  or would "be subjected to discrimination."  29 U.S.C. § 794(a).

Thus, a plaintiff asserting a claim for failure to accommodate under Title III of the ADA or under the Rehabilitation Act, in the higher education context, bears the burden of showing that (1) the plaintiff, although disabled, is otherwise qualified academically, (2) "the defendant is a private entity that owns . . . or operates a place of public accommodation (for ADA purposes) and receives federal funding (for Rehabilitation Act purposes)," and (3) the defendant has discriminated against the plaintiff based on the plaintiff's disability. *Mershon*, 442 F.3d at 1076-77; *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027, 1028 (8th Cir. 1999).  "A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor."  *Mershon*, 442 F.3d at 1078.  "When the accommodation involves an academic decision, '[courts] should show great respect for the faculty's professional judgment.'" *Amir*, 184 F.3d at 1028 (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)).

Although there are slight differences between the ADA and Rehabilitation Act, they are "otherwise similar in substance  . . ., and cases interpreting either are . . . interchangeable." *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 450 F.3d 338, 344 (8th Cir. 2006) (citing *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998)) (quotations omitted). While the ADA applies when the defendant "owns, leases or operates a place of public

14

accommodation,"[5] 42 U.S.C. § 12182(a), the Rehabilitation applies when the defendant receives federal funding.  29 U.S.C. § 794(a).  Also, the Rehabilitation act requires the disabled "'person's disability serve as the *sole* impetus for [the] defendant's adverse action against the plaintiff.'"  *Wojewski*, 450 F.3d at 344 (emphasis in original) (quoting *Amir*, 184 F.3d at 1029 n.5).

Both allow a defendant to assert the affirmative defense that providing a requested accommodation would result in an undue burden or a fundamental alteration to the nature of the public accommodation.  42 U.S.C. § 12182(b)(2)(A)(ii), (iii); *Mershon*, 442 F.3d at 1076-77 ("a person alleging a failure to accommodate under [the ADA] or the Rehabilitation Act must show . . . 'that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation'") (quoting *Amir*, 184 F.3d at 1027); *Timothy H. v. Cedar Rapids Cmty. Sch. Dist.*, 178 F.3d 968, 971 (8th Cir. 1999) (undue burden defense applies to Rehabilitation Act claim); *Gorman*, 152 F.3d at 911 (citing 29 U.S.C. § 794a(a)(1)) (undue burden defense applies to Rehabilitation Act claim).  Finally, the ADA allows a plaintiff to obtain injunctive relief but not compensatory damages, *Pona v. Cecil Whittakers, Inc.*, 155 F.3d 1034, 1039 (8th Cir. 1998) (Panner, J., concurring); *see also Power v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004) (citing *Newman v. Piggie Park Enters.*, 390 U.S. 400, 402 (1968)), whereas the Rehabilitation Act allows a plaintiff to recover compensatory damages, but only if the plaintiff shows the defendant acted with "deliberate

---

[5]A "public accommodation for purposes of" the ADA includes "postgraduate private school[s], or other place[s] of education."  42 U.S.C. § 12181(7)(J).

15

indifference" when he discriminated against the plaintiff.  *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011).

Creighton does not dispute that Argenyi is disabled and otherwise qualified academically to attend its medical school.  Likewise, Creighton does not dispute that it is a place of public accommodation.  (Filing No. 184, at 28.)  Creighton asserts that Argenyi's claim must fail because it provided him the "necessary" reasonable modifications and the auxiliary aids and services to ensure "effective communication" that the ADA and the Rehabilitation Act require.  Argenyi, on the other hand, claims that Creighton violated the ADA and Rehabilitation act by failing to provide him with the necessary auxiliary aids and services[6] during his first year of medical school and by refusing to provide him with, or permit him the use of, an interpreter during his second year clinic.  Argenyi also asserts that Creighton violated the ADA and Rehabilitation Act by refusing to provide CART during his second year of medical school, although he does not argue that issue in his Motion. (Filing No. 187, at 2 n.1.)

---

[6]The regulations implementing the ADA have defined "auxiliary aids and services" as "(A) qualified interpreters and other effective methods of making aurally delivered materials available to individuals with hearing impairments; . . . (C) acquisition or modification of equipment or devices; and (D) other similar services and actions," 42 U.S.C. § 12103(1), as well as

"Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of notes; telephone handset amplifiers; assistive listening devices; telephone comparable with hearing aides; close caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing.

28 C.F.R. § 36.303(b).

Both the ADA and the Rehabilitation Act, and their respective implementing regulations, provide that the defendant must do only that which is "necessary" to avoid discriminating against the plaintiff.  *See* 42 U.S.C. § 12182(b)(2)(A)(ii), (iii); 28 C.F.R. § 36.303(c); 34 C.F.R. § 104.44(d); 45 C.F.R. § 84.44(d); 45 C.F.R. § 605.44(d).  Although the United States Supreme Court's decision in *PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001), did not turn on the issue of whether an accommodation or modification is "necessary" under Title III of the ADA, it did shed light on the issue.

In *Martin*, a professional golfer, Martin, had a disability that prohibited him from walking an eighteen-hole golf course without causing him significant pain and health risks such as "hemorrhaging, developing blood clots, and fracturing his tibia so badly that an amputation might be required".  *Id.* at 668.  PGA Tour, a non-profit entity that sponsors professional golf tournaments, refused to waive its rule that required all golfers to walk all eighteen holes of its tournaments and let Martin drive a golf cart despite Martin's request that was supported by detailed medical records.  *Id.* at 669.  Martin successfully sued PGA Tour under Title III of the ADA.[7]  *Id.*  On the issue of when an accommodation is "necessary," the Supreme Court noted that PGA Tour did "not contest that a golf cart is necessary if Martin is to play in its tournaments. Martin's claim thus differs from one that might be asserted by players with less serious afflictions that make walking the course uncomfortable or difficult, but not beyond their capacity.  In such cases, an accommodation might be reasonable, but not necessary."  *Id*. at 682.  Other courts have found *Martin* to

---

[7]Although previously mentioned, the Court notes again that although there are slight differences between the ADA and Rehabilitation Act, they are "'otherwise similar in substance . . ., and cases interpreting either are . . . interchangeable.'" *Wojewski*, 450 F.3d at 344 (citing *Gorman*, 152 F.3d at 912 (quotations omitted)).

stand for the proposition that a modification or accommodation is "necessary" only if the disabled person can show the failure to provide it would effectively exclude the disabled person from the place of public accommodation.[8]

## II. Argenyi's Motion for Summary Judgment

### A. First Year of Medical School

Argenyi's healthcare providers indicated that when Argenyi "is able to take advantage of visual cues and context, his performance improves to nearly 100%."  (Filing No. 185-1, ex. A2.)  During his first year of medical school, Creighton provided Argenyi with preferential seating so Argenyi could more easily receive visual cues from the lecturer, an FM system that Creighton and Argenyi worked together to purchase so that it would be compatible with Argenyi's cochlear implants, copies of all power point presentations used in class, and access to notes from a class note taker.  After Argenyi notified Creighton that he had issues with the note taking services Creighton provided, Creighton offered enhanced note taking services.  However, two weeks into class and without having submitted documentation from his doctors stating that CART or interpreters were necessary for him to attend medical school, Argenyi complained to Creighton that the

---

[8]*See Logan v. Am. Contract Bridge League*, 173 Fed. App'x 113, 117 (3d Cir. 2006) (discussing *Martin* and stating that plaintiff has failed to state a meritorious claim because similar to the plaintiff in *Martin*, "[the plaintiff] admits that the Logan deck is not *necessary* to give him access to ACBL competitive bridge; he merely claims that without it, he can't play to the maximum of his potential.") (emphasis in original) (quotations omitted)*; Murphy v. Bridger Bowl*, 150 Fed. App'x 661, 663 (9th Cir. 2005) (providing plaintiff's ADA claim failed for failure to show accommodation was necessary because  even though accommodations would enhance plaintiff's ability to learn, plaintiff's doctor did not suggest that the accommodation were "necessary" for plaintiff to learn); *Lentini v. California Center for the Arts, Escondido*, 370 F.3d 837, 845 (9th Cir. 2004) ("The modification is therefore necessary because, but for the modification, Lentini would be effectively excluded from future performances at the Center"); *Baughman v. Walt Disney World Co.*, 691 F. Supp. 2d 1092, 1095 (C.D. Cal. 2010) ("For a requested modification to be necessary, a plaintiff must show that she would be effectively excluded from the public accommodation without the modification"); *Barron v. PGA Tour, Inc.*, 670 F. Supp. 2d 674, 685-86 (W.D. Tenn. 2009) (citing *Martin*, 532 U.S. at 687) (providing reasonable accommodation is not "necessary" just because it makes plaintiff less competitive).

accommodations provided were not satisfactory and informed Creighton that he obtained his own CART services and interpreter for the remainder of his first year.

These facts do not establish that Creighton failed to provide the modifications, accommodations, or auxiliary aids and services that were "necessary" for Argenyi to attend its medical school.  The burden is on Argenyi to establish that Creighton failed to provide *necessary* accommodations, modifications, and auxiliary aids.  *Mershon*, 442 F.3d at 1076-77; *Amir*, 184 F.3d at 1027, 1028.  A plaintiff's "unsupported self-serving allegations" by themselves are not enough to establish a claim.  *Mershon*, 442 F.3d at 1078.  Although Argenyi used CART and interpreter services for his undergraduate education, the record shows that no determination was made that these accommodations and services were *necessary*, but that they were offered due to some uncertainty regarding whether other services were sufficient.

Although Argenyi's doctors states that he would "benefit" from CART and that CART and interpreters would be "appropriate" for him, the doctors did not state or suggest that Argenyi "needed" those services and accommodations to attend medical school.  Argenyi's doctors did state that it was "imperative" that visual cues be made accessible to Argenyi, but not that it was imperative that Argenyi have CART services or interpreters, and the record shows that Creighton did make visual cues available to Argenyi by means of note taking services, preferential seating, and access to power point slides.

Argenyi points to nothing in the record other than "self-serving allegations" to show he would have been effectively excluded from Creighton's medical school during his first year if he had been provided only with the auxiliary aids and services that Creighton offered.  Had he not used the auxiliary aids and services he demanded and supplied on

19

his own, his medical school experience may have been more "uncomfortable or difficult," but he points to nothing to show that medical school would have been "beyond [his] capacity." *Martin*, 532 U.S. at 682. Therefore, as it relates to Argenyi's first year of medical school, his Motion for Summary Judgment is denied, and Creighton's Motion for Summary Judgment is granted.

### B.  Second Year of Medical School

For Argenyi's second year of medical school, after receiving documentation from an expert indicating that an FM system did not provide effective communication, Creighton agreed to provide Argenyi with an interpreter for lectures and some of his labs, but not for small groups or clinics. Creighton also agreed to provide enhanced note taking services from a class note taker for lectures. Despite not having access to an interpreter in his clinics, Argenyi passed his clinical courses.

Argenyi's Motion asserts that Creighton discriminated against him by refusing to provide or permit the use of interpreters during his second year clinic. However, the record indicates that Argenyi was not effectively excluded from Creighton's medical school due to the lack of an interpreter. In other words, the lack of an interpreter did not make medical school clinics "beyond [Argenyi's] capacity." *Martin*, 532 U.S. at 682. Indeed, the record indicates that Argenyi passed his clinics without the aid of an interpreter. Further, "[w]hen the accommodation involves an academic decision, '[courts] should show great respect for the faculty's professional judgment[,]'" *Amir*, 184 F.3d at 1028 (quoting *Regents of Univ. Of Mich*, 474 U.S. at 225), and Creighton indicates that it believes Argenyi's education is better served if he completes his clinics without the aid of an interpreter. The Court "will

20

not invade a university's province concerning academic matters in the absence of compelling evidence" that it "is a pretext for discrimination."  *Amir*, 184 F.3d at 1029.  As a result, Argenyi's Motion, as it relates to Creighton's refusal to provide or permit the use of interpreters during second year clinics, is denied.

### III.  Creighton's Motion for Summary Judgment

Creighton asserts, in general, that it provided Argenyi with the accommodations, modifications, auxiliary aids and services that were "necessary" under the ADA and Rehabilitation Act.  Although Argenyi passed his courses using CART and interpreters, suggesting that those accommodations were helpful in providing him with access to effective communication, it does not follow that those aids and services were "necessary" under the ADA and Rehabilitation Act.  Argenyi's doctors have merely indicated that  the services and accommodations he requested would be "appropriate" and that Argenyi would "benefit" from them.  The doctors failed to confirm, after more than one request for documentation supporting Argenyi's demands, that his preferred accommodations were "necessary."  It is Argenyi's burden to prove his claim under the ADA and Rehabilitation Act, *Mershon*, 442 F.3d at 1076-77; *Amir*, 184 F.3d at 1027, 1028, and he has pointed to nothing other than self-serving allegations that medical school would be "beyond [his] capacity" despite the accommodations, modifications, and auxiliary aids and services Creighton provided.  Since Creighton has shown "that there is an absence of evidence to support" Argenyi's claim, *Celotex*, 477 U.S. at 325, Creighton's Motion is granted.

**CONCLUSION**

The Court finds that, based on the evidence the parties point to in the record,  no reasonable trier of fact could find that Argenyi would be effectively excluded from Creighton's medical school despite the accommodations, modifications, and auxiliary aids and services Creighton provided. As a result, the Court need not reach the issues of whether providing the accommodations, modifications, and auxiliary aids and services Argenyi requested would result in an undue burden to Creighton, or would result in a fundamental alteration to the medical school curriculum.  Accordingly,

IT IS ORDERED:

1.      The Plaintiff's Motion for Summary Judgment (Filing No. 186) is denied;

2.      The Defendant's Motion for Summary Judgment (Filing No. 183) is granted;

3.      Defendant's Motion in Limine (Filing No. 180), Plaintiff's Objection to Magistrate Judge's Order (Filing No. 214), and Plaintiff's Motion for Leave to File Sur-Reply Brief (Filing No. 215) are denied as moot;

4.      This action is dismissed, with prejudice; and

5.      The Court will file a separate Judgment in accordance with this Memorandum and Order.


DATED this 22nd day of September, 2011.

                                        BY THE COURT:


                                        s/Laurie Smith Camp
                                        United States District Judge


22