UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

MICHAEL ARGENYI,
Plaintiff,

v.

CREIGHTON UNIVERSITY,
Defendant.

Case No. 8:09CV341

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR DECLARATORY, EQUITABLE, AND INJUNCTIVE RELIEF**

On September 4, 2013, the jury entered a verdict in favor of Plaintiff, Michael Argenyi, a young man with a promising future who has persevered through a four-year legal battle simply to secure the full and equal educational access guaranteed him by section 504 of the Rehabilitation Act and Title III of the Americans with Disabilities Act. This Court presided over an exhaustive presentation of evidence during the course of a two-week trial, resulting in the verdict in Argenyi's favor. Specifically, the jury found that Defendant, Creighton University, violated two federal laws in denying Argenyi the auxiliary aids and services he needed -- CART in lectures and didactic settings, and qualified interpreters in small groups and clinical settings. The jury also found that Defendant failed to meet its burden of proof on the affirmative defense of undue burden.

The relief Argenyi seeks following the jury verdict is simply stated but important. Argenyi seeks three things. First, Argenyi seeks declaratory relief: a declaration from this Court that Defendant's refusal to provide and allow necessary auxiliary aids and services to Argenyi violates Title III and section 504.

Second, Argenyi seeks equitable relief: reimbursement of the funds he was forced to pay in violation of federal law for auxiliary aids and services during his first two years of medical school. The jury found these auxiliary aids and services were, as Argenyi has maintained for four years, necessary. The jury also found that the cost of providing these auxiliary aids and services did not present an undue burden during his first two years. Therefore, Plaintiff requests that the Court order Defendant to reimburse to Argenyi the $133,595.11 that Argenyi incurred in paying for CART and interpreters during this time period. The obligation to pay these bills was Defendant's according to the jury, yet it was Argenyi who took out loans and continues to carry this financial burden. For the reasons explained in this brief, reimbursement is equitable relief that does not require any showing of intentional discrimination, and is awarded by this Court not the jury.

Third, Argenyi requests entry of a specific order requiring Defendant to provide him with the very auxiliary aids and services that the jury found to be necessary and not an undue burden – CART for lectures and didactic settings and qualified interpreters for small groups and clinical training – in his third and fourth years of medical school.

## I. Factual Background

The jury found that Defendant violated Title III of the Americans with Disabilities Act and section 504 of the Rehabilitation Act by failing to provide CART in didactic settings and interpreters in small groups and clinical settings. This verdict establishes that (1) CART is necessary for effective communication in lectures and similar settings; (2) interpreters are necessary for effective communication in clinics and similar settings; and (3) paying $110,721.62 for two years for auxiliary aids and services is not an undue burden. Argenyi's hearing abilities and communication needs for the third and fourth years of medical school are no

different than his needs for the first and second years of medical school, therefore entry of an Order requiring these same auxiliary aids for the third and fourth years is appropriate.

### A. The Jury Found that CART Is Necessary for Effective Communication in Lectures and Similar Settings

At trial, the jury found that Creighton failed to provide the auxiliary aids and services necessary for effective communication during Argenyi's first and second years of medical school. Because Creighton offered to provide an FM system and interpreters during lectures, instead of providing CART as Argenyi had requested, the jury's verdict necessarily established that the FM system and interpreters do not result in effective communication during lectures; rather, CART is necessary for effective communication during lectures and other similar settings. The same evidence that the jury relied on demonstrates that CART is necessary for didactic settings during the third and fourth years of medical school.

Indeed, the conclusion that CART is necessary for didactic settings is consistent with determinations made by other community colleges and universities Argenyi attended prior to Creighton. Cascadia Community College, Shoreline Community College, Seattle University, University of Washington, and Bellevue Community College all provided Argenyi with CART in didactic settings. Ex. A1, Letter from Esther Argenyi to Dr. Zetterman with attachment Letter from Esther Argenyi to Michael Kavan, Pl.'s Trial Ex. 33 at 2 and Letter from Okamoto to Bones dated October 30, 2009, Pl.'s Trial Ex.13. Even now, as Defendant has refused to provide CART for Argenyi, Boston University is providing CART for him to ensure that he has meaningful access to its joint masters' degree program in public health and social work. Ex. A2, Declaration of Michael Argenyi at ¶¶ 2-4.

On March 23, 2009, immediately after his acceptance into Creighton Medical School's class of 2013, Argenyi submitted a letter to Michael Kavan, Associate Dean for Student Affairs

at Creighton, stating that he was "hearing impaired," used a cochlear implant, and would require "accommodation during my enrollment, probably similar to what I had used in the past, which has been primarily interpretation or captioning services during lectures and teaching sessions." Ex. A3, Letter from Michael Argenyi to Michael Kavan March 23, 2009, Pl.'s Trial Ex. 1 at 1. To reinforce his need for these services, between the beginning of April and the end of September, Argenyi's otolaryngologists and treating audiologist sent Creighton four separate letters explaining Argenyi's need for these services. Ex. A4, Letter from Dr. Backous and Stacey Watson to Michael Kavan April 10, 2009, Pl.'s Trial Ex. 16, Letter from Dr. Backous and Stacey Watson to Michael Kavan May 27, 2009, Pl.'s Trial Ex. 17, Letter from Dr. Backous and Stacey Watson to Michael Kavan September 10, 2009, Pl.'s Trial Ex. 18, Letter from Dr. Backous and Stacey Watson to Michael Kavan September 28, 2009, Pl.'s Trial Ex. 19.

During his first year of medical school, Creighton refused to provide CART for lectures, opting instead to provide an FM system for all of Argenyi's lectures, labs, and discussion courses. [Doc. 188-2] at ¶ 16; Ex. A5, Letter from Michael Kavan to Michael Argenyi June 23, 2009, Pl.'s Trial Ex. 6. Argenyi tried the FM system, but could not understand his courses through listening alone. Ex. A6, Email from Michael Argenyi to Dr. Kavan et al. September 1, 2009, Pl.'s Trial Ex. 9 at 1; Affidavit of Michael Argenyi, [Doc. No. 188-2] at ¶ 20. He found himself "drowning in a sea of indistinguishable sounds" as the FM system amplified background noise in addition to amplifying speech. [Doc. No. 188-2] at ¶ 20. In fact, the FM system made his speech recognition worse. *Id.*; Ex. A7, Letter from Dr. Britt Thedinger May 6, 2010, Pl.'s Trial Ex. 20 at 1. He began experiencing debilitating headaches and extreme fatigue from his attempts to distinguish sounds during lengthy lectures involving complex language. Ex. A6, Email from Michael Argenyi to Dr. Kavan et al. September 1, 2009, Pl.'s Trial Ex. 9 at 1; Ex.

A1, Letter from Esther Argenyi to Dr. Kavan at al September 7, 2009, Pl.'s Trial Ex. 33 at 1-4; Ex. A8, Email from Michael Argenyi to Dr. Kavan September 15, 2009 with Attached Letter from Esther Argenyi, Pl.'s Trial Ex. 10 at pp. 1-5; [Doc. No. 188-2] at ¶ 20. Instead of learning new material like his peers, Argenyi spent all his time trying to get access to what had been said in lectures by piecing together notes from other students. *Id.* Argenyi told Creighton about his difficulties but Creighton still refused to provide CART services. As a result Argenyi began scheduling his own CART providers for lectures and other didactic settings, and interpreters for small groups and clinical exams. Ex. A9, Email from Michael Argenyi to Michael Kavan, September 24, 2009, Pl.'s Trial Ex. 12 at p. 1.; Ex. A10, Charts of Auxiliary Aids Provided by Michael Argenyi for M1, Pl.'s Trial Ex. 36. Argenyi also took out loans to pay for these necessary services. Ex. A2, Declaration of Michael Argenyi at ¶¶ 7, 9.

Creighton offered no further auxiliary aids and services throughout Argenyi's first year of medical school. [Doc. No. 188-2] at ¶ 28. In February 2010, Creighton consulted with an audiologist, Dr. Britt Thedinger, telling him "that there was a new medical student down at Creighton who had cochlear implants, who was still having trouble in the lecture hall classrooms, being able to hear the professors, or being able to hear adequately, and was requesting additional services." Deposition of Britt Thedinger, [Doc. 211-2] at pg. 3, 6:16-21. At about the same time, Argenyi retained Dr. Thedinger as an expert, and Dr. Thedinger tested the FM system on Argenyi. *Id.* at 3:24; Ex. A7, Pl.'s Trial Ex. 20 at 1. Dr. Thedinger concluded that with the FM system in place Argenyi had only 38% speech discrimination with background noise. Ex. A7, Pl.'s Trial Ex. 20. He further found that "the FM system does not provide any significant benefit and today's results show that it actually reduces his discrimination ability." *Id.* Creighton did not offer the FM system for the second year of medical school, but neither did Creighton offer

the auxiliary aids and services that Argenyi had needed, requested, and ultimately provided himself.

Instead, for lectures and didactic labs, Defendant offered interpreters. Argenyi tried what Defendant offered, attempting unsuccessfully to follow medical school lecture content by lipreading the interpreter. [Doc. No. 200-1] at pgs. 21-22 at ¶ 34. After finding that he could not lipread the complex vocabulary being taught for the first time in a large, dark lecture hall by watching the oral interpreter, Argenyi again took out loans to pay for CART for lectures and other didactic settings and interpreters in other labs and small groups. *Id.* at ¶¶ 29-30, 34. The jury verdict in Argenyi's favor establishes conclusively that just as the FM system did not provide effective communication; neither did Creighton's offer of some interpreters and special seating provide effective communication.

### B. The Jury Found Interpreters Are Necessary for Effective Communication in the Clinical Setting

The jury's verdict, finding that Creighton did not provide the necessary auxiliary aids and services, by definition includes a finding that interpreters are necessary for effective communication in small group and clinical settings. The same evidence that the jury relied on demonstrates that interpreters are necessary for the clinical components of the final two years of medical school.

During his second year of medical school, Argenyi tried the clinic without interpreters after Creighton refused to permit interpreters in the clinical setting. Declaration of Michael Argenyi, [Doc. No. 188-2] at ¶¶ 33-34. Argenyi immediately began encountering problems. On September 21, 2010, Argenyi wrote to Dr. Hansen, renewing his request for interpreters in the clinic, stating:

> At clinic on 8/26, Dr. Townley inquired whether an interpreter is coming to assist in communication. You asserted that was not possible. I met with patients with Dr. Townley, and found that I could not understand all of what patients and others at the clinic said. With some patients I understood very little of what was said. I know that you said I only have to show up to pass, but I want to learn how to be a doctor and I think it is important to understand what the patients are saying to me…
>
> Would you reconsider the decision to prohibit the use of interpreters in the clinical setting. Could you explain why I cannot pay for an interpreter myself?

Ex. A11, Email Chain Michael Argenyi and Thomas Hansen, September 21, 2010, Pl.'s Trial Ex. 22 at 1. On October 8, 2010, Argenyi wrote another email to Dr. Hansen, in which he described in detail the communication problems that he encountered with patients. Argenyi explained:

> I am also missing information when the patient is not directly available to lip-read, such as when they are behind a door or curtain (before I enter the room) or when they are laid down and I am directly observing a pap smear…
>
> I would like to ask again, might I please bring my own interpreter at my own cost? If not, may I please have an explanation? I did not receive an answer to my last e-mail. This a very intense year and the longitudinal clinic is well worth my time if I can successfully access it equal to my peers…

Ex. A12, Pl.'s Trial Ex. 23. Argenyi restated his request for interpreters in the clinic to Dr. Hansen on December 6, 2010:

> Now that I've had the opportunity to be at the pediatrics clinic twice as well as continue the adult clinic, I truly enjoy both practices for different reasons. However, I'm still having the same communication difficulties in both clinics. One difficulty is that in both clinics, there are frequently multiple people participating in a conversation which causes greater communication difficulties. For example, in a consult on a two-week old, with multiple people participating in the conversation, I was not able to see all of the faces present, much less lipread. I continue to find that I need accommodation to confidently and effectively communicate in the clinic setting. Without accommodation, I don't have full access to develop the thought process of a physician nor enough foundation for me to confidently proceed from the history taking to the physical examination. It

> is slowing my development as a physician as well as hampering the development of my relationship with the patient.
>
> Once again, would you please consider allowing me to bring an interpreter? This interpreter solely functions as a conduit of information for me to then make my own clinical judgment.

Ex. A13, Email from Michael Argenyi to Thomas Hansen December 6, 2010, Pl.'s Trial Ex. 25.

In January and February 2011, as the result of settlement talks, Creighton agreed to provide CART for lectures and interpreters for labs, small groups, and clinic. Declaration of Michael Argenyi, [Doc. No. 188-2] at ¶ 37; *See* Letter from Scott Moore to Dianne DeLair February 23, 2010, Pl.'s Trial Ex. 65 at 1. Argenyi found that with the interpreter in the clinic, he could benefit fully from the hands-on training, he could obtain patient histories without repeatedly asking the patient to restate information and without guessing what patient and physician communication he could not hear, and he could learn from observing physician interaction with patients. Ex. A14, Pl.'s Trial Ex. 26; Declaration of Michael Argenyi, [Doc. No. 188-2] at ¶ 37; Declaration of Rhonda Rankin, [Doc. No. 200-8] at ¶ 7. During this clinical training, Argenyi used one interpreter at a time. Ex. A2, Declaration of Michael Argenyi at ¶ 6.

In February 2011, settlement talks ended. [Doc. No. 188-9 at pg 10-11]. Thereafter, Creighton ordered the interpreter it had provided to Argenyi to leave the clinic. Decl. of Rhonda Rankin, [Doc. 200-8] at ¶ 11; Ex. A14, Email from Michael Argenyi to Thomas Hansen April 7, 2011, Pl.'s Trial Ex. 26. Creighton also asked Argenyi to refrain from making any further requests for auxiliary aids and services. [Doc. No. 188-9 at pg 10-11]. On April 7, 2011, Argenyi contacted Dr. Hansen, writing:

> I am writing to let you know once again, that I need interpreters in clinical settings for effective communication. As you know, during January and February, Creighton University agreed to provide interpreters. During that time, I could communicate reliably and effectively with patients, residents, and Dr.

> Townley. On February 24, 2011, Creighton ordered my interpreters to leave. My need for interpreters has not changed. While the interpreters were in the clinic, I could access 100% of communication with my patients, and I could then communicate the details of their histories to my attending.
>
> After the interpreters were ordered out of the clinic, I no longer had effective communication. For the remainder of that clinic, I saw one patient with the resident also present, as this patient had a complicated case presentation. It was a difficult conversation, where I would estimate that I could access about 65% of what was said, especially after the resident stepped in to direct the patient interview because of mismatches in the patient history. This involved also having a private conversation with the neurologist and the medical student with her. With multiple persons present, I estimate that I got only about 50% of the communication.
>
> During the clinic on March 17th, I saw two patients. Luckily, the first of those patients was relatively easy for me to lipread. She was articulate and I picked up on her lip movements quickly, understanding nearly 90%. With the second patient, I understood only about 80% of communication. When I met with her alone, she mumbled her words and covered her mouth often, breaking sentences into chunks. When the infectious disease specialist was present, my understanding dropped sharply, as adding a third participant to communication reduces my ability to communicate without an interpreter.
>
> In the following clinic on March 31st, I saw three patients. Notably, one had a previously broken jaw and mumbled, and despite asking numerous times to repeat himself, I still struggled, getting only 45% independently, and even less when Dr. Townley performed her exam.
>
> I need to be able to understand all of what is said in clinic, which includes overhead announcements such as the shooting this past Wednesday had I been present. I don't understand why Creighton decided I needed interpreters and provided them, and then suddenly ordered interpreters out of the clinic. With all due respect, I am asking you to reconsider the decision to remove interpreters from the clinic.

Ex. A14, Pl.'s Trial Ex. 26.

During trial, Dr. Hansen conceded that communication was ineffective:

Q. Can you please read aloud the paragraph about Mr. Argenyi's communication in the clinic with the first patient he calls Patient One without an interpreter?

A. "Patient One: When it was one-on-one, I understood about 70 percent, despite constant repeating and summary. When Dr. Townley performed her attending evaluation, it dropped to 40 percent. And during the procedure, Pap smear, it was virtually zero percent."

Q. Is understanding 70 percent of communication in a clinical setting, is that effective communication?

A. It is not ideal.

Q. I didn't ask if it was ideal, I asked if it was effective. We're talking about patients here. Is it effective communication to only be able to –

A. It is not effective.

Q. And I assume you would agree that understanding zero percent of a patient who is having a Pap smear in a clinical setting, that's not effective communication either, is it?

A. No.

Q. Could you please read aloud the paragraph about Patient Number Two?

A. "Patient Two: I understood 85 percent, which dropped to about 60 percent when Dr. Townley came in and I had to do follow both individuals."

Q. Was understanding 85 percent in a clinical setting of what a patient has to tell you, is that effective communication?

A. No, it is not.

Q. And 60 percent in a clinical setting, is that effective communication?

A. No, it is not.

Q. Could you please read aloud the paragraph about the third patient, Patient Number Three?

A. "Patient Three: I talked with the parents of a medically complex child also present and a very frustrated father proceeded to give me a ten-minute lecture on the role of a physician and their lack of availability. I understood probably 70 percent, before I was interrupted by medical staff. I then came back in later with Dr. Townley and followed about 50 percent between three people."

> Q. So, was understanding 70 percent, like Mr. Argenyi reports to you, of patient communication, was that effective communication?
>
> A. No, it was not.
>
> Q. And was understanding 50 percent effective communication?
>
> A. No, it is not.

Trial Tr. of Dr. Thomas Hansen's Testimony, [Doc. No. 393] 10:4-11:24 (referring to Ex. A12, Pl.'s Trial Ex. 23). On the basis of Argenyi's testimony, his email correspondence with Dr. Hansen, and Dr. Hansen's admission that the communication in the clinic without interpreters was ineffective, the jury found that interpreters were necessary for effective communication.

### C. The Jury Found that it Would Not Have Been an Undue Burden for Creighton University to Pay $110,721.62 for Argenyi's Auxiliary Aids and Services During the First Two Years of Medical School

The parties stipulated before trial that the total cost paid by Argenyi for the auxiliary aids and services he requested for the first year of medical school was $51,002.50, and that the total cost paid by Argenyi for the auxiliary aids and services he requested for the second year of medical school was $59,719.12. [Doc. No. 286]at pg. 2 ¶¶ 6-7. The total for the first two years was $110,721.62. The jury found that Creighton did not meet its burden of proving that paying this amount for the necessary auxiliary aids and services would result in an undue burden for Creighton. [Doc. No. 387].

### D. The Third and Fourth Years of Medical School

Since the third- and fourth years of medical school are largely clinical in nature and Defendant refused to permit Argenyi to use interpreters in that setting, Argenyi was forced to take a leave of absence after the second year of medical school pending the outcome of this lawsuit. [Doc. No. 188-2] at ¶ 48. Argenyi's communication needs in educational and clinical

settings have not changed since then. Just as the jury agreed that Argenyi needed CART in lectures and didactic labs, and interpreters in other labs, small groups and clinics, Argenyi needs those same auxiliary aids and services going forward. These are, in fact, the exact auxiliary aids and services he is currently being provided by Boston University as a Boston University graduate student in public health and social work. Ex. A2, Declaration of Michael Argenyi at ¶¶ 4, 5.

For the third and fourth years, Creighton medical students have the option of doing their studies in Omaha or at Creighton University's satellite campus in Phoenix. *See*, http://medschool.creighton.edu/medicine/oma/clinicalcampus/index.php (last visited on October 15, 2013). The curriculum is the same at both locations. *Id*. Argenyi is choosing the option of completing his studies at the Phoenix location. *Id.*, Ex. A2, Declaration of Argenyi at ¶ 27. With this in mind, and consistent with the jury's verdict, Argenyi requests the following auxiliary aids and services for his third and fourth years of medical school, based on the information that Defendant's counsel provided Argenyi's counsel following the trial. Ex. A15, Declaration of Mary C. Vargas at ¶ 2.

The third year of medical school includes six clinical rotations: IDC 301 Ambulatory Primary Care (8 weeks); MED 301 Inpatient Medicine (8weeks); PBS 301 Psychiatry (8 weeks); SUR 301 Surgery (8 weeks); PDT 301 Pediatrics (8 weeks); and OBG 301 Obstetrics and Gynecology (8 Weeks). Ex. A16, Email from Scott P. Moore to Mary C. Vargas dated September 15, 2013, with attached Syllabi. The clinical rotations generally involve clinical or patient care, grand rounds (which are didactic presentations in lecture format), patient rounds (which are part of clinical care), observed patient evaluations, and content lectures. *Id*. In addition to these clinical rotations, students must attend several orientations and a class called DCM 301 Dimensions of Clinical Medicine, a course that covers various clinically important

topics based on the six competencies. *Id*. The third year also includes curricular activities such as clinical skills training, mid-rotation review, observed examinations, and patient simulations. *Id*.

The fourth year or medical school prepares students for residency and provides a chance for students to explore their own interests in specialized areas of medical practice. Like all other students in the fourth year of medical school, Argenyi must take at least 36 weeks of clinical rotations, including one 4-week surgical elective, one 4-week critical care elective, one 4-week primary care elective (or a second 4-week critical care elective), and an additional 24 weeks of clinical electives with no more than 8 weeks of non-clinical electives. The electives will have didactic elements that include orientation, lectures, and grand rounds. The electives will also have clinical elements that include clinical work, teaching rounds, and mid-term review. Ex. A16.

These didactic and clinical settings pose communication barriers that are as challenging as those that Argenyi faced during the first two years of medical school – the lectures will feature technical vocabulary that Argenyi cannot lipread and does not know the signs for, and the clinics will require Argenyi to communicate with patients who he may not be able to understand without an interpreter present.

**E. Defendant's Abundant Financial Resources**

For the year ending June 30, 2012, the latest period for which Defendant disclosed a financial report, Creighton had net operating revenues of approximately $419,000,000. Ex. A17, Creighton University Financial Report 2012 at 3. Creighton's endowment was approximately $300,000,000. *Id.* at 22. Creighton also accepts considerable federal financial assistance, accepting more than $20,000,000 in federal funding each year that Argenyi was providing his

own accommodations. Ex. A18, Federal Funds Accepted by Creighton, 2009-2011, Pl.'s Trial Ex. 53.

## II. This Court Should Award Declaratory, Equitable, and Injunctive Relief

This motion for declaratory, equitable, and injunctive relief comes after a jury finding that Creighton violated Title III and section 504 by refusing to provide CART for lectures and didactic labs, and sign-supported oral interpreters for other labs, small groups, and clinics.

A court's ruling on declaratory, equitable, and injunctive relief must be consistent with the jury verdict. *E.g.*, *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1101 (8th Cir. 1982) ("Although the court below retains its discretion to consider all the circumstances in this case when it determines what equitable relief may be appropriate, it cannot base its decision on its own factual findings that conflict with those expressly made by the jury"); *see also, e.g.*, *Burton v. Armontrout*, 975 F.2d 543, 544-45 (8th Cir. 1992), *reh'g en banc denied*, 1992 U.S. App. LEXIS 27922, *cert. denied*, 508 U.S. 972 (1993). Consequently, the jury's determination that Defendant did not provide the necessary auxiliary aids and services to ensure effective communication is dispositive with respect to Defendant's obligations pursuant to section 504 and ADA.

Courts have held that plaintiffs may obtain injunctive and equitable relief without having to demonstrate intentional discrimination – the requirement to show intent is limited strictly to compensatory damages only. *See, e.g.*, *Ferguson v. City of Phoenix*, 157 F.3d 668, 674-75 (9th Cir. 1998). Accordingly, Argenyi need only establish that the auxiliary aids and services are necessary for effective communication in order to obtain injunctive and equitable relief, and may obtain such relief absent a finding of intentional discrimination. *See id.*

In addition to declaratory relief, Argenyi seeks: (1) reimbursement for auxiliary aids and services during the first two years of medical school; and (2) an order requiring Defendant to provide the auxiliary aids and services necessary to ensure effective communication during the third and fourth years. These issues are taken up in turn.

**A. Argenyi is Entitled to Reimbursement for the Auxiliary Aids and Services that He Provided during His First and Second Years of Medical School**

The jury found that Defendant violated section 504 and ADA by failing to provide CART for lectures and sign-supported oral interpreters for clinics and labs. The jury's finding came after Argenyi had to pay for his own CART and interpreter services during the first two years of medical school, when Defendant should have been the party paying those expenses. *See, e.g.*, 28 C.F.R. § 36.303(c)(1) (requiring public accommodations to provide necessary auxiliary aids and services); 34 C.F.R. § 104.44(d) (same). An order of reimbursement is necessary to ensure that Defendant does not pass on the cost of auxiliary aids and services to Argenyi in violation of ADA regulations. *See* 28 C.F.R. § 36.301(c)(2) ("A public accommodation may not impose a surcharge on a particular individual with a disability...to cover the cost of measures, such as the provision of auxiliary aids..."). This Court should order Defendant to reimburse Argenyi for his costs – a contrary holding would permit Defendant to hold on to illegally gotten gains from violating the law.

*1. Reimbursement Is a Form of Equitable Relief*

As Argenyi has briefed numerous times over the past several years, reimbursement is a form of equitable relief. Pl.'s Opposition to Def.'s Motion for Summary Judgment [Doc. No. 204] at 72; Pl.'s Opposition to Def.'s Motion for Motion in Limine [Doc. No. 298] at 3 n.1; Pl.'s Trial Brief [Doc. No. 326] at 44. Defendant has erred in characterizing reimbursement as a form

of damages. Defendant's assertion ignores well-established Supreme Court precedent on this point. The Supreme Court explained the distinction between legal remedies and equitable remedies as follows:

> Our cases have long recognized the distinction between an action at law for damages -- which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation -- and an equitable action for specific relief -- which may include an order providing for the reinstatement of an employee with backpay, or for "the recovery of specific property *or monies*, ejectment from land, or injunction either directing or restraining the defendant officer's actions." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688 (1949) (emphasis added). The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as "money damages."

*Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (emphasis in original). The Supreme Court accordingly held that the federal government's failure to reimburse a state for Medicare expenses constituted an equitable form of relief. *Id.* at 892.

In another Supreme Court case, *School Comm. of Burlington v. Dept. of Education*, the Supreme Court unanimously held that reimbursement for educational expenses incurred as a result of Defendant's failure to comply with federal law constitutes equitable relief. 471 U.S. 359, 370-71 (1985); *see also Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15-16 (1993) (unanimously reaffirming the holding of *Burlington*). Pursuant to the Supreme Court's decision in *Burlington*, and consistent with the logic in *Bowen*, courts may order a school "to belatedly pay expenses that it should have paid all along" as a form of equitable relief. *Id.* at 370-71; *see also, e.g.*, *J.B. v. Avilla R-XIII Sch. Dist.*, 721 F.3d 588, 593-94 (8th Cir. 2013) (citing *Burlington*). .

In so holding, the Supreme Court distinguished reimbursement as an equitable remedy distinct from compensatory damages. The Supreme Court noted that litigation can take several years and explained that "it would be an empty victory to have a court tell [plaintiffs] several

years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials." *Burlington*, 471 U.S. at 370. Courts have applied *Burlington* to claims brought under the ADA and Rehabilitation Act. *See, e.g.*, *Jennifer B. v. Chilton County Bd. of Education*, 891 F. Supp. 2d 1313, 1325 (M.D. Ala. 2012) (holding that section 504 and the ADA offer the same remedy of equitable reimbursement as the IDEA); *Millay v. State of Maine Dept. of Labor*, 1:11-cv-00438-NT, 2012 U.S. Dist. LEXIS 173239, at *14-*15 (D. Me. Sept. 21, 2012) (holding that reimbursement is available as a form of equitable relief under the Rehabilitation Act).

*2. Argenyi Is Entitled to Reimbursement of Expenses Plus Interest*

The case law is thus clear: reimbursement to plaintiff for expenses it incurred when Defendant should have paid those expenses is equitable in nature. *See Bowen*, 487 U.S. at 893; *Burlington*, 471 U.S. at 370-71. This is exactly what reimbursement would accomplish in this case: it would reimburse Argenyi for the expenses that he was forced to incur in providing his own auxiliary aids and services when Defendant refused to provide those auxiliary aids and services. The reimbursement is not to "substitute for a suffered loss," "but an attempt to give [Argenyi] the very thing to which he was entitled" – auxiliary aids and services at Defendant's expense. *Bowen*, 487 U.S. at 895. Defendant must "belatedly pay [the] expenses that it should have paid all along." *Burlington*, 471 U.S. at 370-71. A contrary holding would permit Defendant to profit from violating the statute at Argenyi's expense.

Courts applying *Burlington*, including the Eighth Circuit, have held that the equitable form of reimbursement is broadly construed, *see generally J.B.*, 721 F.3d at 593-94 (collecting cases), and includes not just the expenses that the school should have paid but also the interest paid on loans taken out to pay for the services that the school should have provided in the first

instance. *Morales v. Puerto Rico Dept. of Education*, NH Civil No. 05-ds-114-JD, PR Civil No. 04-17560, 2006 U.S. Dist. LEXIS 67200, at *10 (D.P.R. Sept. 15, 2006). Accordingly, this Court should award reimbursement for both the cost of CART and interpreter services and the interest that Argenyi had to pay on the loans that he had to take out to pay these costs.

The parties stipulated that the cost of auxiliary aids and services paid by Argenyi was $51,002.50 for the first year of medical school, and $59,719.12 for the second year of medical school, or a total of $110,721.62. This Court should order Defendant to pay $110,721.62 plus interest to reimburse Argenyi for the expenses paid for auxiliary aids and services that should have been paid by Creighton. Argenyi incurred interest expenses as a result of the loans he had to take out to pay for the auxiliary aids and services.

Argenyi's loan for the auxiliary aids that were necessary for his first year of medical school had an initial interest rate of 5% for the first year, increasing to a fixed 8% interest rate thereafter with no fees. Ex. A2, Declaration of Michael Argenyi at ¶ 7. As of October 1, 2013, this interest totals $14,952.14. *Id.* at ¶ 8. For loans Argenyi took out for his second year of medical school, he had a fixed interest rate of 5% with no fees. *Id.* at ¶ 9. To date, interest on this second loan totals $7,921.35. *Id.* at ¶ 10. The total amount of interest to date for the two loans is $22,873.49. *Id.* at ¶ 11.[1]

Argenyi should be reimbursed for this amount because it is a related expense that he incurred as a direct result of Defendant's failure to provide the necessary auxiliary aids and

[1] These loans were well below market rate. This Court may take judicial notice that private educational loans for graduate students typically range between 5.75% and 15.74% with fixed interest rates, and often have additional origination and other fees totaling up to an additional 10.5% of the loan principal, according to the SmartStudent Guide to Financial Aid maintained by an award winning and comprehensive public service program that provides information on education loans. *See* SmartStudent Guide to Financial Aid, Private Student Loans, *at* www.finaid.org/loans/privatestudentloans.phtml (last visited on October 15, 2013).

services. Reimbursing Argenyi for interest ensures that Defendant disgorges the financial benefit that it reaped from holding on to these funds for several years.

Since the total amount that Argenyi spent on auxiliary aids and services and interest is $133,595.11, this Court should order Defendant to reimburse Argenyi in this amount as any other result impermissibly results in Defendant forcing Argenyi to pay for his own auxiliary aids and services that are necessary, in violation of Title III and section 504.

**B. This Court Should Issue a Permanent Injunction Requiring Defendant To Provide the Necessary Auxiliary Aids and Services for the Third and Fourth Years of Medical School**

Argenyi seeks to return to Creighton to complete his third and fourth years of medical school. He took a leave of absence after Defendant refused to provide the necessary auxiliary aids or permit him to use interpreter services in the clinical setting even if he paid for the interpreter himself. The jury has now found that CART and interpreters were the auxiliary aids and services necessary to make the classroom and clinical components of medical school accessible to Argenyi. His needs for effective communication have not changed and he seeks a permanent injunction to ensure that Defendant provides those same auxiliary aids and services for the third and fourth years of medical school. To the extent that each year of medical school may differ from the last one, the content of lectures and the demands of patient interactions do not become simpler. If anything, they become more complex. Therefore, the jury's finding that Argenyi needed CART for lectures and didactic labs during his first and second year establishes that he needs CART for lectures, didactic labs, and their equivalents during his third and fourth year.

The Eighth Circuit has held that the standard for determining whether a permanent injunction should issue "is essentially the same as the familiar standard for a preliminary

injunction." *Randolph v. Rogers*, 170 F.3d 850, 857 (8th Cir. 1999). When determining whether to grant a preliminary injunction, the court must balance four factors: the likelihood of success on the merits; the threat of irreparable harm; the balance between this harm and the harm to the nonmoving party should the injunction issue; and the public interest. *Id.* "The standard is the same for permanent injunctions except that the movant must show actual success on the merits." *Id.* (quotation marks omitted); *see also, e.g.*, *Oglala Sioux Trible v. C & W Enters.*, 542 F.3d 224, 229 (8th Cir. 2008); *United States v. Green Acres Enters.*, 86 F.3d 130, 132-33 (8th Cir. 1996). These factors are taken up in turn.

*1. Argenyi Has Demonstrated Actual Success on the Merits*

The jury concluded that Creighton University violated Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181, *et seq,* and section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by failing to provide Argenyi with CART for lectures and didactic labs, and qualified interpreter services for other labs, small groups, and clinical courses. This jury verdict is consistent with the regulations implementing these statutes that require Defendant to provide the auxiliary aids and services necessary to ensure effective communication with Argenyi. 28 C.F.R. § 36.303(c)(1) (ADA regulation stating that public accommodations "shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities"); 28 C.F.R. § 36.309(c) (ADA regulation requiring educational entities to provide auxiliary aids and services necessary to make courses accessible); 34 C.F.R. 104.44(d) (section 504 regulation stating that universities "shall take such steps as are necessary to ensure that no handicapped student is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination because of the absence of educational auxiliary aids for students with impaired sensory, manual, or speaking skills").

Just as Argenyi needed CART for didactic settings and interpreters for small group and clinical settings for his first two years of medical school, he needs the same auxiliary aids for his last two years of medical school. Argenyi's ability to understand speech has not changed since leaving Creighton University. Argenyi is currently in masters' degree programs at Boston University, which like every university Argenyi has ever attended except Creighton, has provided CART for all of his didactic classes. Boston University has also provided interpreters for patient interaction at Boston Children's Hospital where he performs social work with the families of sick children. Ex. A2, Declaration of Michael Argenyi at ¶¶ 4, 5.

a. <u>CART Is Necessary for Effective Communication During the Didactic Elements of the Third and Fourth Years</u>

The third and fourth years of medical school have didactic elements that include orientation, lectures, conferences, and grand rounds.[2] Consistent with the jury verdict, CART is necessary for Argenyi to have meaningful access to new and highly technical material, particularly in settings where communication is one way, acoustics are poor, and there are few opportunities to seek clarification. In such settings, Argenyi cannot use context to help him distinguish words that otherwise look the same on the lips and he does not know the signs for such highly complex terminology in American Sign Language.

Argenyi's ability to understand speech has not changed since taking a leave of absence. During this leave of absence, he has pursued joint master's degrees in public health and social work at Boston University, and Boston University has provided CART for all of his classes. Ex. Ex. A2, Declaration of Michael Argenyi at ¶ 4. As Argenyi's audiologist noted, Argenyi

[2] Grand rounds are listed in third year syllabi as "didactic lectures." Unlike patient rounds where a medical student follows a preceptor from patient bedside to patient bedside learning on the move in the clinical setting, grand rounds are topical lectures given by medical faculty. Ex. A16, Syllabi, *infra*.

remains deaf whether or not he uses his cochlear implants. Ex. A4, Letter from Backous/Watson to Kavan dated September 10, 2009, Pl.'s Trial Ex. 18.

Didactic settings such as lectures and grand rounds, just like the lectures and grand rounds that took place during the first two years of medical school, will require CART. In these settings, Argenyi found that the FM system worsened his ability to comprehend speech and that he could not use an interpreter because he could not lipread the technical vocabulary and did not know the signs for these words. CART proved to be the only auxiliary aid that resulted in effective communication. For the same reasons that the jury found that CART was necessary for lectures during the first two years of medical school, Argenyi will need CART for the third- and fourth-year lectures and the grand rounds. CART will also be necessary for the presentations, orientations and conferences that introduce new concepts in a lecture-type setting and where Argenyi does not yet have the context for lipreading or which use technical vocabulary.

Since CART remains necessary for effective communication during the final two years of medical school, this Court should order Defendant to provide CART for all didactic settings.[3]

b. <u>Qualified Interpreters Are Necessary for Effective Communication During the Clinical Elements of the Third and Fourth Years</u>

The third and fourth years have clinical components that enable hands-on experience working with colleagues and interacting with patients and their family members. Argenyi found that during the second-year clinic without an interpreter, he missed significant chunks of what patients were saying and what other treating clinicians were saying about diagnosis and treatment. As a result, he sometimes did not know what the problems were that his patients were having or what the suggested follow-up care was. In emails to Dr. Hansen, he repeatedly

[3] Since Argenyi cannot understand videos without captioning, captioning is necessary for any videos shown during the final two years of medical school.

described what he was missing, and – as described above – Dr. Hansen admitted during trial that communication in the clinic without interpreters was not effective. Given Argenyi's experiences in clinic during medical school, he will need qualified interpreters to ensure that he can follow what is being said in the clinical setting. This includes interpreters for all clinical work during the third year during rotations and when visiting the Magis Clinic.

An injunction is necessary because Defendant prohibited Argenyi from using interpreters in the clinical setting, even if he paid for the interpreters himself. Ex. A19, Letter from Scott P. Moore to Dianne D. DeLair dated August 13, 2010, Def.'s Trial Ex. 214 at p. 3; [Doc. No. 126] at TRO Transcript at 65:3-8. The result was that Argenyi could not understand many of his patients, and understood even less when other individuals such as treating physicians and family members were in the room. Dr. Hansen admitted during trial that Argenyi could not communicate effectively with patients without an interpreter present. It was only when Defendant briefly permitted an interpreter in the clinic that he could follow what patients and the treating physician were saying.

The third and fourth years of medical school will present even more challenging listening environments for Argenyi. Whereas the second-year clinic took place in a doctor's office, many of the third- and fourth-year clinical rotations will take place in a hospital setting with far greater responsibility on Argenyi. He will be responsible for patient information that is passed verbally and will need to communicate with many members of the healthcare team both jointly and separately. In addition, hospital settings typically involve constant background noise that will make it even more difficult for Argenyi to identify who is speaking, let alone understand the content of the communication.

For these reasons, this Court should order Defendant to provide qualified interpreter services for the clinical portions of the third and fourth years of medical school to ensure effective communication with Argenyi.[4]

c. CART Is Necessary for Effective Communication in the Operating Room

Much of the language used in an operating room is highly specialized and technical. For example, instructions to use one kind of scalpel or suture versus another, or instructions to make a particular type of incision through a particular muscle or tissue is a kind of highly specialized and precise communication unique to the operating room. There are no signs in American Sign Language for this kind of critical terminology, and Argenyi cannot rely on lipreading alone to understand the technical vocabulary. Therefore, CART is necessary.

*2. Argenyi Will Suffer Irreparable Harm Absent a Permanent Injunction*

Courts have held that irreparable harm exists when covered entities engage in the "very type of injuries that Congress sought to avert." *E.E.O.C. v. Chrysler Corp.*, 733 F.2d 1183, 1186 (6th Cir. 1984). Courts have presumed irreparable harm when there was a violation of the ADA or the Rehabilitation Act. *E.g.*, *Burriola v. Greater Toledo YMCA*, 133 F. Supp. 2d 1034, 1040 (N.D. Ohio 2001) (holding that there is irreparable harm when a person is discriminated against on the basis of disability) (citing *E.E.O.C. v. Chrysler Corp.*); *American Federation of Government Employees, Local 51 v. Secretary of the Dept. of Treasury*, No. C-85-9196, 1986 U.S. Dist. LEXIS 30051, at *3-*4 (N.D. Cal. Jan. 24, 1986) (collecting cases for the holding that

[4] The third and fourth years also includes curricular activities such as clinical skills training, mid-rotation review, observed examinations, and patient simulations. Interpreters rather than CART will be sufficient to ensure effective communication in these settings which typically involve fewer participants, greater mobility, closer physical proximity, less technical vocabulary, opportunities for clarification, better sound to noise ratios, and settings that are more conducive to lipreading with sign support.

"irreparable harm may be presumed from the likelihood that a violation of the Rehabilitation Act has occurred or is threatened"). The goals of the ADA "include assuring that all individuals with disabilities enjoy 'equality of opportunity, full participation, independent living, and economic self-sufficiency.'" *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997) (quoting 42 U.S.C. § 12101). Consequently, "[i]njuries to individual dignity and deprivations of civil rights constitute irreparable injury." *Id.* Argenyi was forced to take a leave of absence as a result of Defendant's decision to bar him from using interpreters in the clinical setting. If Defendant continues to refuse to provide these necessary auxiliary aids and services, Argenyi will experience the "very type of injuries that Congress sought to avert," *Chrysler Corp.*, 733 F.2d at 1186 -- a lack of effective communication during his third and fourth years of medical school.

Further, without CART and interpreters, Argenyi cannot continue his education and will not be able to enter his chosen profession of medicine. *See Enyart v. National Conf. of Bar Exam'rs*, 630 F.3d 1153, 1166 (9th Cir. 2011) (holding that the denial of the ability to enter one's chosen profession is irreparable harm). Should the Court decline to award injunctive relief, Defendant will not provide these necessary auxiliary aids and services. Instead, Argenyi will face the Hobson's choice of forever abandoning his quest to become a doctor or enrolling in a school where he has no hope of understanding the education he is paying for. These are the types of injuries that Congress has sought to avert, and cannot be repaired after the fact through any remedy that is within the Court's power to award. Without a permanent injunction, Argenyi will suffer irreparable harm.

*3. The Balance of Harms Points Towards Granting a Permanent Injunction*

There is no risk to Defendant in ordering that it provide what the jury has deemed necessary, but there is grave risk to Argenyi in the absence of such an order. As found by the jury and as explained above, Argenyi needs CART and interpreters to access his third and fourth years of medical school. If Defendant does not provide these services, then Argenyi will suffer irreparable harm because he would be denied the meaningful opportunity to become a doctor. Without meaningful access to information, he will not learn the important clinical skills and surgical and other techniques that he is paying tuition to learn.

In contrast, Defendant can point to no serious harm that would accrue from providing these services because it would only be ordered to do what the law requires and *what the jury has already deemed to be necessary and not an undue burden*. Defendant generates more than $400 million in revenues and has an endowment that is approximately $300 million. In light of Defendant's wealth of financial resources, the jury rejected Defendant's assertion of undue burden for the first two years of medical school, when Argenyi spent more than $110,000 on auxiliary aids and services plus interest.

Moreover, every other school that Argenyi attended, including five colleges and a graduate program, has provided the CART services and interpreter services necessary for Argenyi to have meaningful access to higher education. Defendant's financial resources show that it, like every one of these other institutions of higher education, has the financial resources to pay for the necessary auxiliary aids and services.

In light of the foregoing, this factor weighs heavily in favor of Argenyi who has already suffered great harm as the result of the Defendant's violations of law.

#### 4. *The Public Interest Favors Ensuring that Medical School Is Accessible to Deaf Students*

Congress enacted the Americans with Disabilities Act in 1990 "to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2); *PGA Tour*, 532 U.S. at 674-75. Congress concluded that there was a "'compelling need to provide a clear and comprehensive national mandate' to eliminate discrimination against disabled individuals and integrate them 'into the economic and social mainstream of American life.'" *PGA Tour*, 532 U.S. at 675 (quoting S. Rep. No. 101-116, at 20 (1989); H.R. Rep. No. 101-485, at 50 (1990)).

Last year, four institutions – the University of Rochester, Gallaudet University, the National Technical Institute for the Deaf, and Rochester General Hospital – issued a report noting that deaf individuals are underrepresented in the medical profession and issuing recommendations that include greater access for deaf medical students. *See generally* Ex. A20, Final Report Task Force on Healthcare Careers for the Deaf and Hard of Hearing Community, March 2012. The lack of auxiliary aids and services for deaf patients has resulted in reduced access to preventive care and emergency care with devastating results. *Id.* at 1, 9, 16.

Accordingly, a permanent injunction would both fulfill the goals of the Americans with Disabilities Act in remedying widespread discrimination against individuals with a disability and ensure that individuals with a disability, including individuals who are deaf or hard of hearing, can partake fully in higher education and obtain degrees permitting them to work in the medical profession and contribute to society as highly qualified individuals.

5. *This Court Should Grant a Permanent Injunction Requiring Defendant To Provide Qualified Interpreters and CART Services for the Third and Fourth Years of Medical School*

The four factors discussed above each point strongly in favor of granting a permanent injunction. Argenyi has demonstrated actual success on the merits and his communication needs have not changed for the final two years of medical school. The failure to enter a permanent injunction requiring Creighton to provide the auxiliary aids the jury found to be necessary would also send a chilling message to students with disabilities throughout the United States and a major university will have found an end run around compliance with the federal statutory mandate that Congress enacted to ensure access for individuals with disabilities. Further, a permanent injunction is necessary to ensure that Argenyi receive necessary services without the need to continually re-litigate his rights or to choose between initiating yet another costly legal battle and giving up on the goal he has fought so hard to attain. A permanent injunction serves multiple purposes – it effectuates the jury's verdict, it ensures Argenyi can continue the education that was interrupted as the result of Creighton's violation of federal law, and it can prevent this matter from playing out in the federal courthouse over the next two years and beyond. This case needs to end. The jury has spoken.

**CONCLUSION**

For the foregoing reasons, Plaintiff requests that this Court order declaratory, equitable, and injunctive relief consistent with the jury's verdict. This Court should issue an Order declaring that Creighton must provide the auxiliary aids and services that are necessary to ensure effective communication for Argenyi in his third and fourth years of medical school, namely CART for didactic settings and interpreters for other settings including clinical training. This Court should also grant equitable relief in the form of reimbursement of the costs of the necessary auxiliary aids for the first two years of medical school including interest totaling

$133,595.11. Finally, this Court should grant injunctive relief requiring Creighton to provide these same necessary auxiliary aids and services for Argenyi for the third and fourth years of medical school. Specifically, Argenyi requests this Court enter an Order requiring Creighton University to provide him with the following:

| **THIRD YEAR** | |
|---|---|
| **IDC 301: Ambulatory Primary Care** | |
| Clinical supervised practice | Interpreter |
| Case Presentations/Grand Rounds | CART |
| Didactic lectures | CART |
| Independent learning | None |
| Case Logger in Oasis | Interpreter for meeting with preceptor, captioning if aural content in Case Logger |
| Online Modules | Captioning if aural content |
| Magis Clinic | Interpreter |
| | |
| **MED 301: In-patient Medicine** | |
| Clinical Supervised Practice at preceptor site | Interpreter |
| Student Morning Report | CART or Interpreter |
| Department Noon Conferences (Clinical Pathology Conference, Department Grand Rounds, Resident Didactics) | CART |
| Mid-Rotation Review | Interpreter |
| Observed History and Physical | Interpreter |
| Didactic lectures | CART |
| Professor Rounds | Interpreter |
| Patient simulations/catheter lab visit | Interpreter |

| | |
|---|---|
| EBM Presentation – Inpatient (student presentations) | CART |
| Case Logger | Captioning if aural content |
| | |
| **SUR 301: Surgery** | |
| Didactic activities (lectures, topic presentations, professor rounds), orientation, core curriculum, departmental conferences (morning report if didactic in nature) | CART |
| Case, office, clinic hours, rounds | Interpreter |
| Clinical interactions, clinical skills, call, delivery room, observed history and physical (morning report if clinical in nature) | Interpreter |
| Surgery | CART |
| Orientation video | Captioning |
| Skill video | Captioning |
| Online case modules | Captioning if aural content |
| Mid-term review | Interpreter |
| Case Logger | Captioning if aural content |
| | |
| **OBG 301: Obstetrics/Gynecology** | |
| Rounds | Interpreter |
| Didactic lectures | CART |
| Student presentations | CART |
| Clinical care | Interpreter |
| Operating room | CART |
| On call/observed physical/mid-rotation review | Interpreter |

| | |
|---|---|
| Conferences | CART |
| uWise v.2 (exam) | Captioning if aural content |
| Case Logger | Captioning if aural content |
| Observed History and Physical | Interpreter |
| Mid-Rotation Review | Interpreter |
| | |
| **PDT 301: Pediatrics** | |
| Didactic lectures | CART |
| Grand Rounds | CART |
| Clinical care, on call, history and physicals, teaching rounds | Interpreter |
| Conferences (Noon Conference, Clerkship Director Conference, Patient Management Conference) | CART |
| Mid-Rotation Review | Interpreter |
| Case Logger | Captioning if aural content |
| CLIPP cases | Captioning if aural content |
| | |
| **PBS 301: Psychiatry** | |
| Orientation | CART |
| Clinical supervised practice | Interpreter |
| Didactic lectures | CART |
| Student presentations | CART |
| Required extracurricular activities (i.e., 12-step program, commitment hearing, electroconvulsive therapy) | Interpreter |
| Focused Observed Clinical Interview (exam) | Interpreter |
| Observed History | Interpreter |

| | |
|---|---|
| | |
| **DCM 301: Dimensions of Clinical Medicine** | |
| Didactic elements | CART |
| Clinical elements | Interpreter |
| | |
| **Additional Curricular Requirements** | |
| Junior Orientation Sessions | CART |
| IDC 342: Physicians Lifestyle Management Course | CART |

| **FOURTH YEAR** | |
|---|---|
| **Critical Care Elective** | |
| Clinical care/rounds/on call | Interpreter |
| Didactic elements | CART |
| Grand Rounds | CART |
| Orientation | CART |
| Mid-term review | Interpreter |
| | |
| **Primary Care Elective** | |
| Clinical care/rounds/on call | Interpreter |
| Didactic elements | CART |
| Grand Rounds | CART |
| Orientation | CART |
| Mid-term review | Interpreter |
| | |
| **Surgical Elective** | |

| | |
|---|---|
| Clinical care/rounds/on call | Interpreter |
| Operating room | CART |
| Didactic elements | CART |
| Grand Rounds | CART |
| Orientation | CART |
| Mid-term review | Interpreter |
| | |
| **Other Electives** | |
| Clinical care/rounds/on call | Interpreter |
| Didactic elements | CART |
| Grand Rounds | CART |
| Orientation | CART |
| Mid-term review | Interpreter |

Lastly, while Argenyi hopes that Defendant will work cooperatively with him in addressing any changes to the above auxiliary aids made necessary by curriculum changes or other unexpected circumstances, Argenyi requests that this Court retain jurisdiction so that any disputes the parties are not able to resolve themselves might be readily resolved.

The time has come for this litigation to end, for Argenyi to pursue his delayed dream, and for Defendant to come into compliance with federal law and with its obligations.

DATED this 15th day of October 2013.

FOR THE PLAINTIFF,
s/Dianne D. DeLair, #21867
Disability Rights Nebraska
Federal Trust Building
134 S. 13th Street, Suite 600
Lincoln, NE 68508
Phone: (402) 474-3183
Fax: (402) 474-3274

Email: dianne@drne.org

Mary C. Vargas, Esq. #14135 (D. Md.)
Michael S. Stein, Esq.
Stein & Vargas, LLP
5100 Buckeystown Pike, Suite 250
Frederick, MD 21704
Phone: (240)793-3185
Fax: (888) 778-4620
Email: mary.vargas@steinvargas.com

Marc Charmatz, #09358 (D. Md.)
Caroline Jackson
National Association for the Deaf
Law and Advocacy Center
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
Phone: (301)587-7732
Fax: (301) 587-1791
Email: marc.charmatz@nad.org

**CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Scott P. Moore
Chris Hedican
Allison Balus

s/Dianne D. DeLair