**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

Michael S. Argenyi,

Plaintiff,

v.

Creighton University,

Defendant.

CASE NO. 8:09cv341

**BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR DECLARATORY, EQUITABLE, AND INJUNCTIVE RELIEF**

## I.
## INTRODUCTION

Plaintiff, Michael Argenyi ("Argenyi"), made the strategic decision to waive his claim for relief for his third and fourth year of medical school to ensure Defendant Creighton University ("Creighton") was precluded from presenting its undue burden affirmative defense to his claim for relief for those years. Argenyi successfully objected to the Creighton's offer of evidence of the cost of auxiliary aids and services for M3 and M4, which if admitted, could have changed the outcome of this case. The Court recognized that to sustain Argenyi's objection to this evidence meant he would have to waive his claim for relief for M3/M4. Indeed, the Court specifically warned Argenyi at trial that if the Court sustained his objection to the admissibility of this evidence, Argenyi was making a "knowing and voluntary" wavier of his claim for relief for those years. Knowingly full well that he waived his claim for relief for M3/ M4 and, as a consequence, stripped Creighton of the ability to present its undue burden defense, Argenyi now attempts to deceive the Court by seeking relief for the very claims he waived.

Argenyi specifically seeks declaratory and injunctive relief for his M3/M4 years claiming that his communication needs, which were the basis of his claim for M1 and M2, are the same for M3/M4. While his communication needs for M3/M4 may indeed be the same, the cost of providing auxiliary aids and services for M3/M4 are not. In fact, the cost of the aids and services for M3/M4 could amount to over three times the cost incurred for aids and services M1 and M2. Because Argenyi's trial tactics prevented the jury from hearing evidence of the costs of aids and services for M3/M4, the jury did not have the opportunity to determine if Creighton actually violated the ADA and Rehabilitation Act when it denied Argenyi aids and services for M3/M4. Argenyi must now live with the consequences of his trial maneuver.

As explained below, Argenyi's claim for declaratory and injunctive relief for M3/M4 are barred because: (1) he waived his claim for relief for M3/M4; (2) the Court has no basis on which to grant the relief he is requesting; (3) his claim is barred by judicial estoppel; and (4) his claim is barred by the doctrine of law of the case.

With respect to Argenyi's request to be reimbursed for the auxiliary aids and services he provided for himself during M1/M2, as Creighton has briefed several times in the past, such relief is not equitable in nature but rather constitutes compensatory damages. The jury found that Argenyi was not entitled to compensatory damages, including the amount Argenyi now seeks from the Court as equitable relief. In fact, Argenyi is judicially estopped from now taking the position that this request for reimbursement is equitable in nature when he included these costs in his plea to the jury during closing arguments for "direct damages." For all of these reasons, Argenyi's motion for declaratory, equitable, and injunctive relief should be denied in its entirety.

## II.
## STATEMENT OF FACTS

At all times prior to his objection at trial to Creighton's evidence regarding the costs of auxiliary aids and services for M3/M4, Argenyi claimed that he took a leave of absence because he was unable to complete his M3/M4 years because Creighton denied him these very auxiliary aids and services.

Before trial, Argenyi offered his declaration in support of his motion for partial summary judgment, in which he testified, "[s]ince the third and fourth years of medical school are oriented around the clinical experience, I was forced to take a leave of absence pending the outcome of this lawsuit. As a result, I will be unable to graduate on time with my classmates." (Declaration of Argenyi, Filing No. 188-2, at CM/ECF p. 10). He also argued in his brief in support of his motion for partial summary judgment that "[s]ince the third and fourth years are oriented around the clinical experience and Defendant will not permit him to use interpreters in clinic during the pendency of this lawsuit, Argenyi was forced to take a leave of absence pending the outcome of this lawsuit. As a result, Argenyi will be unable to graduate on time with his classmates." (Brief in Support of Motion for Partial Summary Judgment, Filing No. 187, at CM/ECF p. 16).

On appeal of this Court's decision granting Creighton summary judgment, Argenyi asserted that the Court committed reversible error because "Argenyi explained [to this Court] that since [sic] the third and fourth years of medical school are oriented around the clinical experience and Creighton continues to refuse to permit interpreters in clinic, he was taking a leave of absence pending the outcome of this lawsuit." (Opening Appellant Brief at 38-39, attached hereto as Ex. A1).

After the Eighth Circuit remanded the case, Argenyi continued to argue Creighton violated the ADA and Rehabilitation Act by refusing to provide him auxiliary aids and services for his M3/M4 years. In his Findings of Facts and Conclusions of Law for trial, Argenyi again claimed that Creighton refused to provide him interpreters for his M3/M4 year and, therefore, "he sought and was granted a leave of absence pending the outcome of this litigation."

> 78. As Argenyi's third year of medical school approached, Defendant had not changed its position of prohibiting Argenyi from providing his own interpreters in the clinical setting, even if he paid for them himself. Unlike the first and second year where clinic was only a few hours every other week, the third and fourth years of medical school consist almost entirely of clinical courses.
>
> 79. Clinical education during the third and fourth year of medical school builds on the skills learned in the clinical program offered during the second year of medical school [Doc. No. 126] at pp. 61-62. During the third year, students participate in six, eight-week rotations in different medical disciplines, such as surgery, ambulatory primary case, and pediatrics. [Doc. No. 185-3] at pg. 29, ¶23. And in the fourth year, students are required to work in clinical settings for at least 1,440 hours over a 36-week period. *Id.*
>
> 80. As in his second-year clinic, Argenyi would require an oral interpreter to access his third- and fourth-year clinics.
>
> 81. Because Creighton refused to permit Argenyi to have interpreters in clinic, even if he paid for them himself, and because Argenyi could not communicate effectively in clinic without interpreters, he sought and was granted a leave of absence pending the outcome of this litigation. [Doc. No. 188-2] at ¶ 48.

(Plaintiff's Proposed Findings of Fact and Conclusions of Law, Filing No. 336, at CM/ECF p. 18).

During Opening Statement, Argenyi's counsel appealed to the jury that Argenyi had no choice but to take a leave of absence because "Creighton University said he couldn't have an interpreters in the clinical setting even if he paid for it himself."

> So, at the end of that second year, he faced the third and fourth year of medical school. The third and fourth year of medical school is almost all clinical. And still, Creighton University said he couldn't have an interpreter in the clinical setting even if he paid for it himself. What else could he do? He took a leave of absence from Creighton University pending your decision in this case.

(Plaintiff's Opening Statement, Trial Transcript (Filing No. 406) at CM/ECF 14:20-15:1).

During direct examination at trial, Argenyi testified:

> Q. So what did you do at the end of M2, your second year of medical school?
>
> A. Since I was not allowed to have an interpreter, I didn't have a choice. I had to find an alternate plan so I requested a leave of absence.
>
> Q. Can you tell me about what the third and fourth year of medical school is like?
>
> A. The third and fourth year of medical school are just about entirely clinical, there's a little bit of lecture, but the majority of your time -- I mean, 90, 95 percent of your time, I don't know exactly, is spent doing clinical work. You go through, I believe if I recall correctly, six different rotations during your third year such as internal medicine, family medicine, pediatrics, surgery, and I can't recall the other two. And then during your fourth year, you do a couple of -- that you get to choose what you would like. So you might choose ones that teach you skills that are completely opposite of what you're going into or you might choose ones that are dedicated to the field that you're interested in.
>
> Q. Did you want to leave Creighton after you completed the second year of medical school?
>
> A. No.

(Argenyi Trial Direct Examination on August 23, 2013, Trial Transcript (Filing No. 409, at CM/ECF 137:15-138:12). Later in his direct examination, he added:

> Q. When you had to take a leave of absence, did you tell your mother?
>
> A. Yes.
>
> Q. How did that feel?

> A. It was hard. You know, I got through two years here. I mean, coming through school in and of itself was hard every day because I didn't know -- the more it went on, the more I really couldn't trust anybody. I couldn't even talk to my classmates about it because my Creighton University experience wasn't their experience, and that's not their -- that's not for me to take that away from them.
>
> So I felt really isolated and I still went. I still did everything that I could. I still made the best out of it. I went in planning to become a doctor. And when I got – when it got to the end of second year and I was stuck, you know, I told my mom. And she immediately said, "Are you sure you don't want to try without interpreters," and I said, "Mom, you know I can't." And she said, "I know. I just hate to see you give up."
>
> And, you know, hearing that from my mom is like -- I felt like a failure having to tell everybody that I couldn't go on. They understood why I was doing it, but -- why I couldn't but it just feels -- you know, I explained to people I went to medical school for two years, and they say, "Why didn't you continue," and I say, "I can't." And even when you explain the story, people are -- it's different. You feel like a failure even if they don't see it that way.

(Argenyi Trial Direct Examination on August 23, 2013, Trial Transcript (Filing No. 409, CM/ECF at p. 141:4-142:5).

During trial Creighton provided Argenyi and his counsel with a copy of a demonstrative exhibit showing the costs Creighton would incur by providing interpreters to him during his M3/M4 clinical education years. (Demonstrative Exhibit, attached as Ex. A2). Creighton intended to use the demonstrative exhibit in connection with witness testimony to show that the costs of providing interpreters for those two years could amount to as high as $320,000. Despite the fact that Argenyi had argued pre-trial and to the jury that Creighton had refused him auxiliary aids and services for his M3/M4 year and, as a result, he was forced to take a leave of absence, Argenyi suddenly objected to the demonstrative exhibit and any testimony regarding the cost of auxiliary aids and services for his M3/M4 years. Argenyi's counsel argued "[t]he question of the cost of

auxiliary aids and services for the M3/M4 year is an issue not within the purview of the jury. M3/M4 is what happens going forward. So that is within your Honor's discretion to address after the jury's decision." (August 28, 2013, Trial Transcript (Filing No. 408, CM/ECF at p. 9:9-13).

In response to this objection, the Court correctly stated the following:

> But, we're going to be asking the jury to determine whether the defendant [*sic*] needs certain auxiliary aids and accommodations. And that determination would go to M3/M4 because I think the jury, as the finder of fact, gets to decide whether the plaintiff needs the accommodations. And then once the jury decides, yes, the plaintiff needs those accommodations, then my duty to determine injunctive relief kicks in.

(*Id*. at 10:6-13).

Creighton's counsel responded to the objection by stating the following:

> First of all, throughout the plaintiff's evidence, they've indicated, "I wanted interpreters for the M3/M4 year. I didn't get those, so I took a leave of absence."
>
> So number one, it goes to he's already made the request. The question for the jury is he made that request, it was denied, is that discrimination under the ADA and Rehab Act. There's no question that's within the purview of the jury.
>
> More importantly within the purview of the jury is to decide whether -- if Creighton provided those auxiliary aids that he demands, whether it is an undue burden. That is squarely within the jury -- that's a jury question. And that goes to whether indeed the defendant discriminated against him. If it was an undue burden, then it's not discrimination because Creighton University School of Medicine only needs to provide the accommodations, auxiliary aids and services, that are necessary if it is not an undue burden. So that goes squarely to the question of discrimination.
>
> The jury needs to know how much that costs. And we're going to present evidence on that cost so they can determine whether it's an undue burden.
>
> I fully agree with the opposing counsel that the Court would decide if there is liability, if there's discrimination, what the prospective injunctive relief would be. But that's an entirely separate question from did Creighton

> deny him his request for accommodations for M3/M4, which would include the undue burden. And that -- and the numbers that are in these -- in these demonstrative exhibits are nothing new. They were presented to the Court in the summary judgment motion.

(*Id*. at 13:9-14:13).

The Court ultimately made the following ruling:

> And as I've noted, the M3/M4 information regarding the undue burden on Creighton would be irrelevant if the jury is instructed only to consider years M1 and M2 and that the plaintiff is not claiming any damages related to anything that happened after he ended his M2 year. And I'm willing to instruct the jury that way.

(*Id*. at 17:21-18:1).

Later that day in trial, Creighton's counsel again raised the issue of whether it could offer testimony of the cost of providing auxiliary aids and services to Argenyi for his M3/M4 year. Creighton stated that the consequence of the Court prohibiting Creighton from offering evidence on the costs of providing Argenyi auxiliary aids and services for M3/M4 was to deny Creighton the ability to present its undue burden defense for M3/M4. This meant the jury would not be able to decide whether Creighton violated the ADA and Rehabilitation Act by denying Argenyi's requested aids and services for M3/M4 and, as a result, Argenyi would be unable to seek affirmative relief for M3/M4. In response the Court stated:

> And I'm not sure I really understand or appreciate the plaintiff's objection to information coming in regarding what the costs would likely be to Creighton for the M3, M4 years. The plaintiff appeared to be so adamant about the objection to that information and appeared to be willing to waive relief regarding the M3, M4 years that I thought if the plaintiff feels so strongly and is willing to waive claims regarding the M3, M4 years, we'll just focus on M1, M2. Mr. Moore raises some very legitimate concerns. And I want to make sure that the plaintiff's waiver is knowing and voluntary and was not something just made on the spur of the moment under the pressure of the Court's ruling.

(*Id*. at 174:4-15). Argenyi nonetheless maintained his objection so the Court stated, "I will stand by my earlier ruling and the legal consequences of that ruling may be briefed later by the parties." (*Id*. at 176:11-13). Consistent with this ruling, before the case was presented to the jury, the Court instructed the jury:

**INSTRUCTION NO. 8**

> When considering whether Creighton discriminated against Michael Argenyi based on his disability by failing to provide necessary auxiliary aids and services, you should only consider Creighton's conduct related to Michael Argenyi's M1 and M2 years. You should not consider Creighton's conduct regarding potential auxiliary aids and services for Michael Argenyi's M3/M4 years, or his taking of a leave of absence.

(Filing 369, at CM/ECF p. 10). Creighton, therefore, was prohibited from offering any evidence as to whether providing Argenyi interpreters and CART for his M3/M4 years was an undue burden or whether interpreters and CART were necessary for his M3/M4 years.

## III.
## LEGAL ANALYSIS

In his motion, Argenyi seeks the following declaratory, equitable, and injunctive relief:

1) Declare that Creighton University must provide Michael Argenyi with auxiliary aids and services to ensure effective communication in the third and fourth years of medical school, including communication access realtime transcription (CART) in didactic settings and interpreters in small groups and clinical settings, as required by Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et. seq*. and section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

2) Order Creighton University to reimburse Michael Argenyi $133,595.11, for the auxiliary aids and services for which he paid and that the jury found to be necessary in order to ensure effective communication for him in the first and second years of medical school as required by Title III of the Americans with Disabilities Act and section 504 of the Rehabilitation Act;

3) Order Creighton University to provide the auxiliary aids and services necessary for effective communication for Michael Argenyi during his third and fourth years of medical school, including CART in didactic settings and interpreters in small group and clinical settings, so that he can return to Creighton University and complete his medical school education.

(Motion, Filing No. 394).

Argenyi is not entitled to the declaratory nor the injunctive relief he seeks because: (1) he waived his claim for relief for his M3/M4 years of medical school; (2) the jury did not find Creighton liable for denying him auxiliary aids and services for his M3/M4 year and, therefore, the Court has no authority to grant the declaratory or injunctive relief Argenyi seeks; (3) he is judicially estopped from seeking relief for his M3/M4 years; and (4) he is prohibited from resurrecting his claim by the doctrine of law of the case. What is more, Argenyi is not entitled to costs he incurred for the auxiliary aids and services for which he paid because: (1) the costs are compensatory damages to which he is not entitled because the jury did not find that Creighton engaged in intentional discrimination; and (2) Argenyi is judicially estopped from seeking the costs after he sought them from the jury as compensatory damages at trial.

## A. ARGENYI WAIVED HIS CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF FOR M3/M4

Argenyi waived his right to declaratory and injunctive relief for his M3/M4 years of medical school as a strategic move to ensure the Court excluded evidence from which the jury could have concluded the Creighton would have suffered an undue burden by providing him auxiliary aids and services for those years. His waiver is fatal to his claim for declaratory and injunctive relief.

"Waiver requires (1) the existence at the time of the waiver a right, privilege, advantage or benefit that may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit." *Youngdale & Sons Const. Co., Inc. v. United States*, 22 Cl. Ct. 345, 347 (Claim Ct. 1991) (quoting *Matter of Garfinkle*, 672 F.2d 1340, 1347 (11th Cir. 1982)). Waiver is "a voluntary and intentional relinquishment of a known right." *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 659 (8th Cir. 1992) (citation omitted). What is more, a party may not re-assert a claim that he has previously knowingly and voluntarily waived. *See e.g., MHC Financing Limited Partnership v. City of San Rafeal*, 714 F.3d 1118, 1132-33 (9th Cir. 2013) (party who waived claim for damages in previous lawsuit in order to have a bench trial was barred from raising claim for damages in separate suit).

1. Argenyi Was Actually Aware of His Right to Seek Relief for His Claim That Creighton Unlawfully Denied Him Auxiliary Aids and Services for M3/M4

Argenyi had a right to seek relief under the ADA and Rehabilitation Act for Creighton denying him auxiliary aids and services for his M3/M4 year, and his claim for relief was ripe for the jury to decide. Argenyi was undoubtedly aware of this right, as evidenced by his conduct before and during trial of his claims.

Argenyi has claimed throughout this litigation that he was forced to take a leave of absence after his M2 year because Creighton refused his requests for CART and interpreters for M3/M4. Before trial, Argenyi sought partial summary judgment claiming that "[s]ince the third and fourth years are oriented around the clinical experience and Defendant will not permit him to use interpreters in clinic during the pendency of this lawsuit, Argenyi was forced to take a leave of absence pending the outcome of this lawsuit. As a result, Argenyi will be unable to graduate on time with his classmates." On

appeal of this Court's decision granting Creighton summary judgment, Argenyi asserted that the Court committed reversal error because he "explained [to this Court] that since [sic] the third and fourth years of medical school are oriented around the clinical experience and Creighton continues to refuse to permit interpreters in clinic, he was taking a leave of absence pending the outcome of this lawsuit."

After the Eighth Circuit remanded the case, Argenyi continued to argue Creighton violated the ADA and Rehabilitation Act by refusing to provide him auxiliary aids and services for his M3/M4 years. In his proposed findings of fact and conclusions of law for trial, Argenyi stated "[b]ecause Creighton refused to permit Argenyi to have interpreters in clinic, even if he paid for them himself, and because Argenyi could not communicate effectively in clinic without interpreters, he sought and was granted a leave of absence pending the outcome of this litigation." During trial, his counsel made a plea to the jury in opening statement that Argenyi was forced to take a leave of absence saying, "What else could he do? He took a leave of absence from Creighton University pending your decision in this case." Argenyi maintained this argument at trial testifying on the stand that during his M3/M4 years he would spend 90-95 percent of his time in clinical rotations which without interpreters was a denial of meaningful access to his medical education. He also testified of the embarrassment he felt when he had to tell his mother that he was forced to take a leave of absence after Creighton refused his request for auxiliary aids and services.

Creighton formed its defense of this case around Argenyi's allegations. In support of summary judgment, Creighton explained that it denied Argenyi's requests for the M3/M4 years because he had not shown a necessity for the interpreters and paying

for auxiliary aids and service during those years would impose an undue burden. Creighton offered evidence at trial of the number of hours Argenyi would need for interpreters for his M3/M4 clinical classes and the cost of providing interpreters.

The record unequivocally shows that Argenyi had a claim for relief for Creighton's denial of his requested auxiliary aids and services for his M3/M4 years of which he was fully aware and which was ripe for determination by the jury.

2. Argenyi Intended to Waive His Claim for Relief for M3/M4 in Exchange for Precluding the Jury From Hearing Evidence of the Costs of Auxiliary Aids and Services for Those Years

Argenyi also clearly intended to waive his right to relief for M3/M4 as a strategic move to preclude the jury from hearing evidence of the cost of interpreters and CART for those years. Under both the ADA and Rehabilitation Act, Creighton need not provide Argenyi auxiliary aids and services for his medical education if providing them "would result in an undue burden, *i.e.*, significant difficulty or expense." 28 C.F.R. § 36.303(a); *Roberts v. KinderCare Learning Centers, Inc.*, 86 F.3d 844, 846 (8th Cir. 1996). Creighton raised this affirmative defense, and the jury was instructed that if Argenyi met his burden of proving that Creighton failed to provide him necessary auxiliary aids and services, the jury must find for Creighton if they believed providing the aids and services constituted an undue burden. (Jury Instruction No. 13, Filing No. 369, CM/ECF p. 16). However, when Creighton sought to offer evidence of the costs of interpreters and CART for M3/M4, Argenyi's counsel objected to its admission and requested an instruction that the jury should not consider any evidence regarding the M3/M4 years. Argenyi's counsel made a strategic decision to prevent the jury from learning of the extremely high costs of aids and services for those years because they feared the jury would conclude the costs imposed an undue burden on Creighton.

What is more, the Court clearly informed Argenyi that if the Court sustained his objection and instructed the jury not to consider evidence regarding M3/M4, he would have to waive his claims for relief for those years because he could not have it "both ways."

> I think if you want to say that the Court can instruct the jury to look just at M1 and M2 when deciding the issue of undue burden and the accommodations that the plaintiff needed and the plaintiff's damages, I can instruct them that way.
>
> But, if you're saying that the jury should also consider the defendant's denial of certain accommodations that the plaintiff requested for his M3/M4 years and that that was the reason why he quit and that the jury should consider that as part of his damages, the fact that he went to medical school for two years, he quit, it was humiliating, he now sees people who are practicing medicine who have their residencies, he would have been there but for the defendant's refusal, then I think the M3/M4 stuff comes in.

(Trial Transcript for August 28, 2013 (Filing 408, CM/ECF p. 15:7-20). The Court then correctly instructed Argenyi's counsel that the jury in this case was asked to decide liability on all issues in this case, "[a]nd then once the jury decides, yes, the plaintiff needs those accommodations, then my duty to determine injunctive relief kicks in." (*Id.* at 10:10-13). At this point it was clear to Argenyi that the Court would not be able to grant injunctive relief without the jury first determining liability for M3/M4. *See Braverman v. Penobscot Shoe Co.*, 859 F.Supp. 596, 605 (D. Me. 1994) (In ADA employment case, the jury decides liability for disability discrimination claims and, if the jury rules in favor of plaintiff on liability, court determines equitable issues); *Fogg v. Gonzales*, 407 F.Supp.2d 79, 84-85 (D. D.C. 2005) ("Although a district court has 'considerable discretion' in fashioning a remedy, *Lander v. Lujan*, 888 F.2d 153, 156 (D.C. Cir. 1989), it must 'follow the jury's factual findings with respect to a plaintiff's legal

claims when later ruling on claims for equitable relief.") (quoting *Fogg v. Ashcroft*, 254 F.3d 103, 110 (D.C. Cir. 2001)).

Then, proceeding with an abundance of caution, the Court asked Argenyi's counsel if Argenyi understood that by sustaining his objection and instructing the jury that it may not consider any evidence regarding M3/M4, he was "knowingly and voluntarily" waiving his claim for relief for M3/M4 years.

> The plaintiff appeared to be so adamant about the objection to [the costs of auxiliary aids and services for M3/M4] and appeared to be willing to waive relief regarding the M3, M4 years that I thought if the plaintiff feels so strongly and is willing to waive claims regarding the M3, M4 years, we'll just focus on M1, M2. Mr. Moore raises some very legitimate concerns. And I want to make sure that the plaintiff's waiver is knowing and voluntary and was not something just made on the spur of the moment under the pressure of the Court's ruling.

(emphasis added). After this warning, Argenyi's counsel affirmed that Argenyi would maintain his objection, which the Court upheld. Argenyi also offered the instruction to the jury that when considering whether Creighton discriminated against Argenyi, it should only consider evidence regarding his M1 and M2 year.

Argenyi had a known right to relief for his M3/M4 years. His counsel made the strategic decision to waive that right in exchange for ensuring that the jury would never hear the costs of auxiliary aids and services for the M3/M4 year. Argenyi's decision to seek relief solely for M2/M2 was hedging against the risk of losing his entire case because the jury may consider the costs of providing auxiliary aids and services for his M3/M4 years unduly burdensome on Creighton. Argenyi intentionally waived his known right to relief for his M3/M4 years and that waiver is fatal to his claim for declaratory and injunctive relief.

3. Allowing Argenyi To Reassert His Waived Claim Would Unduly Prejudice Creighton

A plaintiff may not revive a waived claim because to do so unduly prejudices the defendant who, as a result, was unable to mount a defense to the waived claim. In *Flannery v. Carroll*, 676 F.2d 126, 128 (5th Cir. 1982), the plaintiff included only a claim under § 12(2) of the Securities Act of 1933 in the pretrial order. Moreover, before the case went to the jury, plaintiffs' counsel stated to the Court that the only claim they were to present to the jury was the federal Securities Act claim. *Id.* Although the jury found for plaintiffs, it also found that the Security Act's one-year statute of limitations had run so plaintiffs were not entitled to relief. Plaintiffs subsequently filed a motion for judgment on the verdict under the Texas Securities Act. The court denied the motion holding:

> To permit plaintiffs to switch causes of action after the trial had ended would mean that defendant would be facing the possibility of being held liable under a claim it had no opportunity to evaluate and defend against. Under the federal act, the plaintiffs had the burden of proving their lack of knowledge; under the Texas act, the defendant had to prove, as an affirmative defense, that plaintiffs had the knowledge. Because defendant believed that only the federal claim was in issue, it did not attempt to prove that plaintiffs knew of the untruths or omissions. We simply cannot know how the trial would have proceeded had the Texas claim been included and we cannot presume that its inclusion would have made no difference in the way defendant tried its case.

*Id.* at 131 (citing *Seymour v. Coughlin Co.*, 609 F.2d 346 (9th Cir. 1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed. 2d 815 (1980) (when issue was raised for the first time after the trial ended, court refused to allow addition of issue if there was a chance that the opposing party might have tried its case differently))." *See also Walker v. Anderson Electrical Connectors*, 944 F.2d 841, 844 (11th Cir. 1991) ("We agree with this reasoning and find that the district court did not abuse its discretion in following the

pre-trial order. Walker pursued a damages trial and got just that. It would be unfair to Anderson Electrical to give Walker relief which she did not request; relief for which Anderson Electrical was never permitted to establish a defense.").

Here, Creighton was stripped of its ability to present its undue burden defense to Argenyi's claims for the M3/M4 years as a direct result of Argenyi's strategic decision to withdraw his claim for relief. Similar to *Flannery*, this Court cannot know how allowing the jury to hear evidence on the undue burden Creighton would have incurred for M3/M4 may have changed the verdict in this case. The only reason Creighton was not allowed to present the evidence was Argenyi's strategic decision to keep it out by waiving his claim for relief for M3/M4. The Court cannot revive Argenyi's waived claim, which Creighton had no opportunity to defend, and for which the jury was not given the opportunity to determine if Creighton established its undue burden defense.

### B. <u>THE COURT HAS NO BASIS TO GRANT RELIEF FOR M3/M4 BECAUSE THE JURY DID NOT FIND CREIGHTON LIABLE FOR DENYING ARGENYI'S REQUESTS FOR AUXILIARY AIDS AND SERVICES FOR THOSE YEARS</u>

Notwithstanding the fact that Argenyi waived his claim for relief for M3/M4, the Court has no basis to grant relief for M3/M4 because the jury did not find Creighton engaged in discrimination by denying Argenyi's requested auxiliary aids and services for those years. Plaintiff argues that the Court can grant the equitable relief he seeks based on the jury's verdict, but Instruction No. 8 makes clear that the verdict was based solely on Argenyi's requests for auxiliary aids and services for M1 and M2. The jury was never allowed to consider nor did the jury provide a verdict regarding whether the auxiliary aids and services Argenyi requested for M3 and M4 were necessary and whether they would have imposed an undue burden on Creighton.

In fact, the jury verdict is not even as clear on Argenyi's M1 and M2 claims as Argenyi has suggested. Argenyi claims that the jury "found that CART is necessary for effective communication in lectures and similar settings" and that "interpreters are necessary for effective communication in the clinical setting." (Argenyi's brief, Filing No. 395, CM/ECF pp. 3 and 6). However, the jury verdict form only states that the jury found that Argenyi had met his burden of proof "with respect to Michael Argenyi's ADA/Rehabilitation Act claim as submitted in Instruction No. 7…." (Jury Verdict, Filing No. 386, CM/ECF p. 1). Instruction No. 7 required the jury to determine "whether Creighton discriminated against Michael Argenyi based on his disability by failing to provide him with necessary auxiliary aids and services"—not whether *all* of the auxiliary aids and services Argenyi requested were necessary. (Jury Instruction No. 7, Filing No. 369, CM/ECF p. 9). Thus, the jury could have found in favor on Argenyi on question one of the verdict form by finding that CART was necessary for Argenyi in lectures but not interpreters in clinics, or vice versa. There is no way to determine based on the instructions or the verdict form which specific auxiliary aids and services the jury found to be necessary, and Argenyi objected to neither the instructions nor the verdict form on these grounds.

Similarly, the jury verdict does not explain the basis for the jury's finding that Creighton had not met its burden of proof with respect to its affirmative defense of undue burden. Instruction No. 13 only required the jury to determine whether providing "necessary auxiliary aids and services" would have resulted in an undue burden on Creighton. If the jury found only CART to be necessary but not interpreters, they would not have had to even consider Creighton's undue burden arguments on the interpreters.

Again, it is impossible to tell from the instructions or the verdict form what was the basis for the jury's verdict, and Argenyi did not object to the instructions or verdict form on these grounds. Therefore, the Court cannot assume that the jury found that either CART or interpreters were specifically necessary in M1 or M2, let alone M3 and M4, which they jury was never allowed to consider.

In addition, the jury was to decide *all* issues of liability, not simply those which Argenyi seeks to pick and choose in his favor. Federal Rule of Civil Procedure 38 provides the following:

> **(b) Demand.** Any party may demand a trial by jury of any issue triable of right by a jury by (1) serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue, and (2) filing the demand as required by *Rule 5(d)*. Such demand may be indorsed upon a pleading of the party.
>
> **(c) Same: Specification of Issues.** In the demand a party may specify the issues which the party wishes so tried; otherwise the party shall be deemed to have demanded trial by jury for all the issues so triable. If the party has demanded trial by jury for only some of the issues, any other party within 10 days after service of the demand or such lesser time as the court may order, may serve a demand for trial by jury of any other or all of the issues of fact in the action.

Section 38(d) provides that a "demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties." Under Rule 38, if a party seeks both monetary damages and equitable relief which arise out of the same set of facts, and demands a trial by jury on all issues, the court has the authority to grant injunctive relief only if the jury finds the plaintiff established liability. *Shelby Cnt'y Jail Inmates v.* Westlake, 798 F.2d 1085, 1092 (7th Cir. 1986).

In *Wells v. State Manufactured Homes, Inc.*, Case No. 04-169-P-DMC, 2006 U.S. Dist. LEXIS 20314, * 7 (D. Me. Apr. 14, 2006), the plaintiff brought claims of

discrimination in violation the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and the Maine Human Rights Act seeking both monetary and equitable relief. *Id.* In her complaint, the plaintiff alleged, "Jury Trial Demanded and injunctive Relief Requested." *Id.* The day after the jury returned a verdict in favor of the defendant, the plaintiff requested equitable relief from the court. The plaintiff claimed that the court had the authority to grant injunctive relief notwithstanding the jury's verdict because the plaintiff "envisioned a bifurcated proceeding during which the jury was to decide whether the defendants were liable for the commission of housing discrimination in 2003 (the time frame during which the plaintiff requested an accommodation) and the court was to decide – independently – whether the defendants were liable for housing discrimination currently." *Id.* at * 5.

The court denied the motion holding that once the plaintiff demanded a trial by jury on all issues, the jury must enter a verdict in favor of the plaintiff on liability before the court has the authority to grant injunctive relief. Therefore, the "only appropriate course of action, in the circumstances, was for [the court] to deny injunctive relief in accordance with the jury's verdict on liability." *Id.* at * 8-10. (citing *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.,* 883 F.2d 1101, 1106 (1st Cir. 1989*)* ("In a case of this sort, involving prayers for both damages and injunctive relief, a jury finding of liability is ordinarily a prerequisite to the court's equitable consideration of injunctive relief."); *Shelby County Jail Inmates v. Westlake,* 798 F.2d 1085, 1092 (7th Cir. 1986*)* ("Plaintiffs try to argue that what the jury decided was that the defendants were not liable for monetary damages. They then argue that the district court should have re-decided every claim raised by plaintiffs to decide whether

equitable relief was warranted. This argument is meritless, because it improperly attempts to combine the separate issues of liability and relief. The jury found, as a preliminary matter, that the plaintiffs had failed to prove liability, (*i.e.*, that the defendants had violated the plaintiffs' constitutional rights). Thus, the jury never had to reach the issue of legal relief (monetary damages). Plaintiffs do not suggest a single *liability* issue on the equitable claims which was not common to the legal issues decided by the jury. Therefore, it is clear that Judge Barker did not abdicate her responsibility as judge by applying the jury's verdicts on the legal issues to identical equitable issues.") (emphasis in original); *Moore v. Sun Oil Co. of Pa.,* 636 F.2d 154, 157 (6th Cir. 1980) ("Since Moore's claim for legal relief and equitable relief are both based on alleged racial discrimination and since Moore was entitled to a jury trial with respect to his legal claims, he was entitled to have a jury determine liability (i.e. whether he had been a victim of racial discrimination). If the jury so determined that there was liability, it would be for the court to determine whether Moore was entitled to back pay.")).

In his First Amended Complaint, Argenyi alleged, "Plaintiff demands a trial by jury." (Filing No. 26, CM/ECF p. 8 (¶50). Argenyi did not limit the issues to be tried to a jury nor did Creighton consent to withdrawing any issue from the jury. Like *Wells*, Argenyi sought to have liability decided by the jury and, if the jury found that Creighton violated the ADA and Rehabilitation Act, the court could then grant appropriate injunctive relief.[1] After withdrawing his claim for relief for M3/M4, the jury was only able to decide whether Creighton discriminated against him by denying him auxiliary aids

[1] Further evidence that Argenyi was aware that the jury must find liability before he is entitled to injunctive relief is found in the pretrial order. Argenyi submitted in the Joint Statement of Controverted Issues: "If liability is found against Defendant under Title III of the ADA and Section 504, what injunctive relief, if any, should be awarded (to be determined by the Court)." (Filing No. 286, CM/ECF p. 2).

and services during his M1 and M2 years. Argenyi's claims for M1/M2, however, are separate and distinct from M3/M4 because the facts and circumstances surrounding his needs changed. For that reason, Creighton's evidence of undue burden for M3/M4 auxiliary aids and services was different from the evidence it presented regarding M1 and M2 in a couple ways. First, the monetary costs it projected for such auxiliary aids and services were much greater. Creighton would have presented evidence that the cost could have reached $380,000—more than three times what Argenyi paid for his auxiliary aids and services in M1 and M2. In addition, Creighton could have presented evidence that there were significant administrative expenses that accompany arranging for interpreters for clinical shifts in M3 and M4 that sometimes last for 12 to 16 hours or are scheduled at all times of the day and night. In his motion, Argenyi also requests that he spend his M3 and M4 years in Phoenix, rather than Omaha, causing an even further administrative burden. Although the jury found that the costs of the necessary auxiliary aids and services for M1 and M2 were not an undue burden, if the jury heard testimony of the cost of the requested aids and services for M3/M4 (and the evidence of the administrative burden imposed in M3/M4) its verdict certainly could have changed. In fact, the jury did not even get the chance to determine if Argenyi's request for M3/M4 imposed an undue financial and administrative burden. While not a verdict favor of Creighton, Argenyi's withdrawal of his claim for relief for M3/M4 has the same effect—the jury did not find that Creighton violated the ADA and Rehabilitation Act by denying Argenyi auxiliary aids and services for his M3/M4 and, therefore, the Court has no basis on which to grant relief for those years.

Argenyi's belief that he can withdraw his claim during trial and reassert it to the Court is analogous to the plaintiff's belief in *Wells* that the court could bifurcate the proceeding and have the court independently decide whether the defendants were liable for the "current" housing discrimination. Argenyi demanded a trial by jury for all issues alleged in his complaint and raised the issue both before and during trial that Creighton denied him auxiliary aids and services for M3/M4 forcing him to take a leave of absence. Once Argenyi demanded a trial by jury for all issues (and raised the M3/M4 issues before and during trial), whether he was entitled to injunctive relief rested on a favorable verdict from the jury that Creighton unlawfully denied him auxiliary aids and services for his M3/M4 years. Argenyi made the strategic decision to withdraw his claims for M3/M4 hoping the exclusion of the costs of auxiliary aids and services for those years would increase his chances of a victory. While his tactical move appeared to help him secure a verdict for M1 and M2, he must now live with the consequences of his decision to forego relief for M3 and M4 to secure that verdict.

## C. <u>ARGENYI IS JUDICIALLY ESTOPPED FROM SEEKING RELIEF FOR M3/M4</u>

Argenyi's request for the same relief for claims he waived in trial is barred by judicial estoppel. "[T]he doctrine of judicial estoppel 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 679 (8th Cir. 2012) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n. 8, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000)). Judicial estoppel protects the integrity of judicial process by preventing litigants from playing "fast and loose" with the court to gain an unfair advantage. *See Cook v. Union Pac. R. R. Co.*, Case No. 4:07CV3241,

2008 U.S. Dist. 80005, * 23-24 (D. Neb. Oct. 7, 2008), affirmed on appeal, *Cook v. Union Pac. R. R.*, Case No. 08-3609, 2010 U.S.App. LEXIS 1131 (8th Cir. Jan. 20, 2010).

As discussed above, in determining whether to apply judicial estoppel, courts generally consider the following factors:

> (1) whether a party's later position is clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Schaffart v. ONEOK, Inc.*, 686 F.3d 461, 469 (8th Cir. 2012) (quoting *Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 981 (8th Cir. 2009)). All of these factors are present here.

First, Argenyi's attempt to revive his claim for relief for M3/M4 is clearly inconsistent with his withdrawing of the same claim at trial. Argenyi's counsel objected to Creighton's offer of M3/M4 evidence and requested an instruction directing the jury not to consider any evidence regarding M3/M4. Argenyi maintained this position even after repeated warnings from the Court that the Court could only sustain his objection and deliver his requested jury instruction if he withdrew his claim for relief for M3/M4. Argenyi clearly and unequivocally withdrew his claim for relief for M3/M4 during trial. In this motion, Argenyi now makes the very claim that he withdrew during trial.

Second, Argenyi succeeded in persuading this Court to accept his position at trial. The Court sustained Argenyi's objection and prohibited Creighton from offering testimony of the cost of providing auxiliary aids and services for M3/M4. The Court also

instructed the jury not to consider evidence regarding M3/M4. Sustaining the objection and delivering the jury instruction deprived Creighton of its ability to prove its affirmative defense that the costs of the auxiliary aids and services for M3/M4 imposed an undue burden. As explained above, Creighton's evidence of undue burden for M3 and M4 auxiliary aids and services was different from the evidence it presented regarding M1 and M2 in a couple ways. Given these different facts, which included a significantly higher financial and administrative burden for M3/M4, the jury could likely have come to a different verdict. Indeed, it was for this reason that Argenyi made the strategic decision to forego his claim for relief for M3/M4. Granting him the relief he previously abandoned would also allow him to mislead this Court. Certainly, in sustaining his objection, the Court informed Argenyi that he could not have it "both ways." Argenyi succeeded in persuading this Court to accept his objection to Creighton's offer of evidence in exchange for the withdrawal of his claim for relief for M3/M4. Reasserting his claim now is nothing more than his continued attempt to have it "both ways."

Finally, granting Argenyi's motion would give him an unfair advantage to the detriment of Creighton. As thoroughly discussed herein, Creighton was not given the opportunity to present evidence of the undue burden it faced in providing Argenyi's requested auxiliary aids and services for his M3/M4 years. The Court would not have sustained Argenyi's objection to offering this evidence unless Argenyi withdrew his claims for those years. It is patently unfair to deny Creighton the opportunity to offer evidence of undue burden, which may have changed the liability verdict in this case, only to grant Argenyi relief for the very claim Creighton did not have an opportunity to defend.

This case is a textbook example of why judicial estoppel is necessary to preserve the integrity of the court. It is ironic to say the least that Argenyi seeks "equitable" relief on the back of a theory which shatters for very notion of equity. Argenyi's withdrawal of his claim for M3/M4 during trial to serve his purpose of securing a liability verdict for M1 and M2 and attempting to revive his claims to serve his purpose of securing relief for M3/M4 is the type of "fast and loose" behavior judicial estoppel is intended to prohibit. Argenyi withdrew his claim for relief for M3/M4 and judicial estoppel prevents him from seeking relief for that claim now.

### D. LAW OF THE CASE PREVENTS ARGENYI FROM OBTAINING RELIEF FOR M3/M4

The law of the case doctrine "provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Little Earth of United Tribes, Inc. v. U.S. Dep't of Hous. and Urban Dev.*, 807 F.2d 1433, 1441 (8th Cir. 1986) (quoting *Arizona v. California*, 460 U.S. 605, 618, 103 S. Ct. 1382, 75 L. Ed. 2d 318 (1983)). "The doctrine prevents the relitigation of settled issues in a case, thus protecting the settled expectations of parties, ensuring uniformity of decisions, and promoting judicial efficiency." *Id.* (citations omitted). Argenyi's withdrawal of claims for M3/M4 and the Court's decision to prevent Creighton from asserting its undue burden defense to those claims as a direct result of the withdrawal is law of the case. Argenyi is not entitled to re-litigate his claim for relief for his M3/M4 years because his claim for relief for those years has already been decided by his waiver of the same.

### E. ARGENYI IS NOT ENTITLED TO REIMBURSEMENT FOR THE AUXILIARY AIDS AND SERVICES HE PROVIDED DURING HIS FIRST AND SECOND YEARS OF MEDICAL SCHOOL

Argenyi seeks reimbursement for the amounts he paid to secure CART and interpreters during his M1 and M2 classes. However, contrary to his assertions, such costs constitute compensatory damages—to which the jury found he was not entitled—not equitable relief. In fact, Plaintiff is judicially estopped from arguing that such costs are not compensatory damage after he asked the jury to include such costs in a damages award during closing arguments.

1. <u>The Costs Argenyi Paid For CART and Other Auxiliary Aids and Services During M1 and M2 Constitute Compensatory Damages</u>

Compensatory damages are damages that "will compensate the injured party for the injury sustained, and nothing more; such as will simply make good or replace the loss caused by the wrong or injury." *FAA v. Cooper,* 132 S.C. 1441, 1457 (2012) (quoting Black's Law Dictionary at 467); see also Black's Law Dictionary at 270 (Abr. 6th ed. 1991) (defining "compensatory damages" as "Damages awarded to a person as compensation, indemnity, or restitution for harm sustained by him."). In *St. Paul Fire & Marine Ins. Co. v. Compaq Computer Corp*., Civil No. 03-5471, 2004 U.S. Dist. LEXIS 31035, 16-17 (D. Minn. Oct. 13, 2004), the court questioned whether the damages sought by the plaintiffs were "compensatory." The plaintiffs sought "to be reimbursed for the loss of their expectation under their warranty agreements with Compaq." *Id*. The court ultimately found that the damages sought were compensatory because they were to reimburse the plaintiffs for a loss they suffered. *Id*. Argenyi also seeks to be reimbursed for a loss he suffered—the amount he spent on CART and interpreter services.

Argenyi cannot claim that his request for reimbursement constitutes equitable restitution. The Eighth Circuit Court of Appeals has explained the distinction between equitable restitution and compensatory damages:

> The basic distinction between equitable restitution and compensation focuses on the genesis of the award sought by the plaintiff. A restitutionary award focuses on the defendant's wrongfully obtained gain while a compensatory award focuses on the plaintiff's loss at the defendant's hands. Restitution seeks to punish the wrongdoer by taking his ill-gotten gains, thus, removing his incentive to perform the wrongful act again. Compensatory damages on the other hand focus on the plaintiff's losses and seek to recover in money the value of the harm done to him.

*Kerr v. Charles F. Vatterott & Co*., 184 F.3d 938, 944 (8th Cir. 1999) (citing Dan B. Dobbs, Law of Remedies § 4.1(1), at 369-71 (Abr. 2d ed. 1993)). In *Kerr,* the court ultimately found the plaintiff's claim was not a claim for restitution. *Id*. ("What [Kerr] in fact seek[s] is nothing other than compensatory damages—monetary relief for all losses [he] sustained as a result of the alleged breach of fiduciary duties.") (quoting *Mertens v. Hewitt Associates*, 508 U.S. 248, 255 (1993)). *See also*, *Knieriem v. Group Health Plan*, 434 F.3d 1058, 1064 (8th Cir. 2006) ("Merely re-labeling the relief sought as 'restitution' or 'surcharge' does not alter the nature of a remedy from monetary to equitable."); *Contos v. Anheuser-Busch Cos.*, Case No. 4:09CV998 JCH, 2009 U.S. Dist. LEXIS 88360, 10-11 (E.D. Mo. Sept. 25, 2009) ("the Court finds the requested relief in the instant case is in the nature of legal relief, 'because it seeks to impose personal liability on the defendant, is measured by the plaintiff's loss, and does not involve traceable funds that belong to the plaintiff and are being unlawfully held by the defendant.'") (quoting *Calhoon v. Trans World Airlines, Inc*., 400 F.3d 593, 598 (8th Cir. 2005)).

Similarly, Argenyi's requested reimbursement is not a claim for equitable restitution. What he seeks is monetary relief for losses he claims to have sustained as a result of Creighton's alleged violations of the ADA and Section 504. The funds he seeks are measured by what he paid in loans and interest and are not traceable funds that belong to him but are being unlawfully held by Creighton. Therefore, his request for reimbursement for the costs he incurred in securing CART and interpreters for his classes at Creighton constitute compensable damages, to which he is not entitled.

Argenyi's reliance on *School Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359 (1985) in seeking such damages is misplaced. *Burlington* addressed a claim brought by the parents of an elementary school child, pursuant to the Education of the Handicapped Act, 20 U.S.C. § 1401 *et seq.* ("EHA"), for reimbursement of tuition the parents paid to enroll their child in a state-approved special education school. The parents enrolled their child in the school after the public school failed to provide the child a "free appropriate public education" as required by the EHA. The Court addressed the issue of whether the EHA statutory language that allowed courts to "grant such relief as the court determines is appropriate" included reimbursing the parents for the tuition they paid to enroll their child in the alternative school. *Id.* at 369. In holding that the statutory language allowed such relief, the Court focused on the fact that the statute required a "free" appropriate education and a cash payment to parents who enrolled their children in an alternative school. The Court highlighted that the EHA required the school district to provide:

> special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school

> education in the State involved, and (D) are provided in conformity with [an] individualized education program.

*Id. at* 368 (citing 20 U. S. C. § 1401(18)). The Court then noted that "[t]o accomplish this ambitious objective, the Act provides federal money to state and local educational agencies that undertake to implement the substantive and procedural requirements of the Act." *Id.* (citing *Hendrick Hudson District Bd. of Education v. Rowley, 458 U.S. 176, 179-184 (1982)*). The Court held that the EHA entitled the parents to a cash entitlement from the government that they were denied as a result of the school district's failure to follow the EHA. Because the parents were seeking money to which they were entitled under the EHA, the reimbursement they sought was equitable in nature. In other words, the cash entitlement was a traceable amount of funds that belonged to the parents but was being unlawfully held by the school district. This is consistent with the case law defining equitable restitution cited above.

Secondly, the Court focused on the fact that the EHA contains administrative exhaustion requirements that substantially delay an aggrieved person's right to challenge the decision of the school district in federal court.

> If the administrative and judicial review under the Act could be completed in a matter of weeks, rather than years, it would be difficult to imagine a case in which such prospective injunctive relief would not be sufficient. As this case so vividly demonstrates, however, the review process is ponderous. A final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by that IEP has passed. In the meantime, the parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement. If they choose the latter course, which conscientious parents who have adequate means and who are reasonably confident of their assessment normally would, it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials. If that were the case, the child's right to

> a *free* appropriate public education, the parents' right to participate fully in developing a proper IEP, and all of the procedural safeguards would be less than complete. Because Congress undoubtedly did not intend this result, we are confident that by empowering the court to grant "appropriate" relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case.

*Id.* at 370.

*Hubbard v. Administrator, E.P.A.*, 982 F.2d 531 (D.C. Cir. 1992), is also instructive. *Hubbard* analyzed the impact of *Burlington* on claims for monetary damages outside of the EHA context. *Hubbard* explained that there is a difference between "damages," which are "'sum[s] of money used as compensatory relief,'" and "specific remedies," which "'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" *Id.* at 536 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988)). *Hubbard* went on to distinguish *Burlington* from a claim for back pay.

> In the [*Burlington*] case, the parents were statutorily entitled to the cost of the special education their child never received, and for which they expended their own money. Unlike Hubbard, they, like the State of Massachusetts in *Bowen*, met all the pre-existing legal obligations to receive cash entitlement from the government, at the time they were denied it.

*Id.* at 538 (*citing Burlington*, 471 U.S. at 369, "noting that the Education for the Handicapped Act, 20 U.S.C. § 1401 *et seq.*, provides for public payment of private school expenses when an appropriate public education cannot be provided."). The other cases cited by Argenyi in support of his argument that the reimbursement he seeks constitutes equitable relief also involved cash entitlements from statutes that the plaintiffs were unlawfully denied. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) ("In the present case, Maryland is seeking funds to which a statute allegedly entitles it,

rather than money in compensation for the losses, whatever they may be, that Maryland will suffer or has suffered by virtue of the withholding of those funds. If the program in this case involved in-kind benefits this would be altogether evident."); *Morales v. Puerto Rico Dept. of Education*, NH Civil No. 05-ds-114-JD, PR Civil No. 04-17560, 2006 U.S. Dist. LEXIS 67200, at *5-6 (D.P.R. Sept. 15, 2006) (citing *Burlington* and explaining that parents are entitled to reimbursement for tuition from the Department of Education when a free and appropriate public education is not available); *J.B. v. Avilla R-XIII Sch. Dist.*, 721 F.3d 588, 593-94 (8th Cir. 2013) (citing *Burlington* for the proposition that the IDEA "includes reimbursement to parents for private school tuition and related expenses").

Argenyi's claim is distinguishable from the EHA claim asserted in *Burlington,* the Medicare claim in *Bowen*, and the IDEA claims asserted in *Morales* and *J.B.* First, Argenyi is not seeking reimbursement of a cash entitlement from the government. The Rehabilitation Act protects Argenyi from discrimination and requires that Creighton provide necessary auxiliary aids and services to access Creighton's educational programs. Unlike the EHA and IDEA, the federal government does not provide money to Creighton to implement any portion of the Rehabilitation Act. So in contrast to statutes that guarantee individuals cash payments for the cost of special education or some other guaranteed payment from the government, the Rehabilitation Act does not entitle Argenyi to a cash payment from Creighton. There is no amount of traceable funds from the government to which he was entitled but which Creighton unlawfully held. Second, unlike the EHA, which imposes burdensome and delayed exhaustion of administrative remedies, which were emphasized by the Court in *Burlington*, the Rehabilitation Act allows Argenyi to file his claim at any time. Indeed, Argenyi could

have sought a temporary restraining order or preliminary injunction from this Court to require Creighton to provide CART and the other auxiliary aids and services he secured for himself at any time during this litigation, but he chose not to pursue those remedies.[2] Finally, Argenyi has previously asserted that Creighton could have secured the auxiliary aids and services that he arranged for himself at a much lower cost than he paid. Though inaccurate, this assertion further enforces the position that Argenyi is seeking more than equitable relief, but rather compensatory monetary damages for Creighton's alleged failure to abide by the Rehabilitation Act.

2. <u>Plaintiff Is Judicially Estopped From Asserting That the Reimbursement He Seeks Is Not Compensatory Damages</u>

Though Argenyi now claims that his request for reimbursement does not constitute compensatory damages, he took a very different position during trial. During closing arguments, Plaintiff's counsel asked the jury to award $241,000 in direct damages. (Tr. of Closing Arguments at 22:13-20). During closing arguments, Plaintiff's counsel made the following statements:

> Michael Argenyi paid $51,000 for one year of his auxiliary aids and services. (Tr. at 18:3-4).
>
> …does it make sense that he would borrow $111,000 for something he doesn't need… (*Id*. at 16:6-7)
>
> Today Michael carries approximately $130,000 in loans from the first two years of his medical education from tuition with the increasing interest every day. Michael carries loans which, as a social work student, he is trying to pay back on a monthly basis, in the amount of roughly $111,000.
>
> That's roughly $241,000 in debt for his two years at Creighton University. You may decide that $241,000 is the appropriate measure of direct damages. (*Id*. at 22:13-20)

---

[2] Argenyi was obviously aware of these rights in that he sought a temporary restraining order to require Creighton to provide him interpreters in his M2 clinical course.

Thus, Argenyi's request for $241,000 in direct damages was computed by adding $130,000 that Argenyi had in student loans for tuition to the $111,000 Argenyi had borrowed from his parents to pay for the auxiliary aids and services he paid for during his M1 and M2 years. (*Id*.; *see also* Jury Instruction No. 5 at ¶¶ 6-7 (Filing No. 369) stipulating that Argenyi paid approximately $110,721.62 for auxiliary aids at Creighton during his M1 and M2 years). This is the same $111,000 that he is now seeking as equitable relief. (*See* Argenyi's brief at 18 (seeking "$110,721.62 plus interest to reimburse Argenyi for the expenses paid for auxiliary aids and services"). Because Argenyi took the position during trial that the money he paid for auxiliary aids and services during his M1 and M2 years was an "appropriate measure of direct damages," he should be judicially estopped from now arguing that this amount of money is not "a form of damages." (*Id*. at 15-16).

Creighton has explained above the standard that applies to the decision whether to invoke judicial estoppel. (*See supra* at 23). All of the factors involved in such a question weigh in favor of the application of judicial estoppel to Argenyi's position on the nature of the reimbursement he seeks. First, the position he took before the jury was clearly inconsistent with the position he is taking now. He sought the $111,000 as a form of direct damages. Now, he claims that such reimbursement is not a form of damages but rather is equitable in nature—something the Court may award but the jury could not have. Second, Argenyi was successful in persuading the Court to accept that position as he was allowed to submit to the jury the $111,000 amount in requesting a damages award. The Court allowed Argenyi to make the plea to the jury for the costs he paid as evidence of his direct damages. Third, allowing Argenyi to take his current

inconsistent position would create an unfair advantage for Argenyi because the jury found that Argenyi was not entitled to any damages, including the $111,000 he sought in reimbursement for the auxiliary aids and services he purchased during his M1 and M2 year. Argenyi now seeks a second bite at the apple—to request from the Court that to which the jury determined he was not entitled. Judicial estoppel precludes Argenyi from taking this inconsistent position.

## CONCLUSION

For the reasons set forth above, Creighton respectfully requests that the Court deny Argenyi's motion for declaratory, equitable, and injunctive relief.

DATED this 18th day of November, 2013

CREIGHTON UNIVERSITY , Defendant,

By: s/Scott P. Moore

Scott Parrish Moore (NE# 20752)
Allison D. Balus (NE# 23270)
of BAIRD HOLM LLP
1500 Woodmen Tower
1700 Farnam St
Omaha, NE 68102-2068
Phone: 402-344-0500
spmoore@bairdholm.com
abalus@bairdholm.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Dianne D. DeLair
Marc Charmatz
Mary C. Vargas

and I hereby certify that I have mailed by United States Postal Service, postage prepaid, this document to the following non CM/ECF participants:

None.

s/Scott P. Moore

DOCS/1222143.5