1                   IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF NEBRASKA
2

3      MICHAEL S. ARGENYI,          )
                                    )
4              Plaintiff,           )           8:09CV341
                                    )
5          vs.                      )        Omaha, Nebraska
                                    )        August 22, 2013
6      CREIGHTON UNIVERSITY,        )
                                    )
7              Defendant.           )

8

9

10                            VOLUME II
                        TRANSCRIPT OF PROCEEDINGS
11          BEFORE THE HONORABLE LAURIE SMITH CAMP
          CHIEF UNITED STATES DISTRICT JUDGE AND A JURY
12

13

14

15

16

17

18

19

20     COURT REPORTER:            Ms. Brenda L. Fauber, RDR, CRR
                                  111 S. 18th Plaza
21                                Suite 3122
                                  Omaha, NE 68102
22                                (402) 661-7322

23

24
       Proceedings recorded by mechanical stenography, transcript
25     produced with computer.

```
 1                          A-P-P-E-A-R-A-N-C-E-S

 2

    FOR THE PLAINTIFF:            Ms. Mary C. Vargas
 3                                Mr. Michael S. Stein
                                  Stein Vargas Law Firm
 4                                P.O. Box 522
                                  Emmitsburg, MD 21727
 5

 6                                Ms. Dianne D. DeLair
                                  Nebraska Advocacy Services
 7                                134 South 13th Street
                                  Suite 600
 8                                Lincoln, NE 68508

 9
                                  Ms. Caroline E. Jackson
10                                NAD and Advocacy Center
                                  8630 Fenton Street
11                                Suite 820
                                  Silver Springs, MD 20910
12

13  FOR THE DEFENDANT:            Mr. Scott P. Moore
                                  Ms. Allison D. Balus
14                                Baird Holm Law Firm
                                  1700 Farnam Street
15                                Suite 1500
                                  Omaha, NE 68102
16

17

18

19

20

21

22

23

24

25
```

1          (At 9:10 a.m. on August 22, 2013, with counsel for the

2     parties, the plaintiff, and the defendant's representative

3     present, and the jury NOT present, the following proceedings

4     were had:)

5          THE COURT:  Good morning.

6          MS. VARGAS:  Good morning, your Honor.

7          MR. MOORE:  Good morning.

8          THE COURT:  I'm sorry for the delay.  I understand we

9     had one juror who was running late.

10        Is there anything that we need to discuss before we bring

11    the jury in and we hear opening statements?

12        MR. MOORE:  We have something, but go ahead.

13        MS. VARGAS:  Thank you, Mr. Moore.

14        Yes, your Honor.  We'd like to make a motion to redact

15    the name of a professor on one of our exhibits.  This has

16    already been discussed with counsel.  The reason for this is

17    the professor who authored the exhibit is one of the Creighton

18    University colleges [*sic*] who was murdered.  And it seems it

19    would be grossly inappropriate.

20        And at the same time, I'd also move any mention of those

21    matters not be made during the course of this trial because it

22    would be highly prejudicial.

23        THE COURT:  Any objection to the redaction?

24        MR. MOORE:  We'll have an objection to the exhibit,

25    but no objection to the redaction, your Honor.

 1            THE COURT:  All right.  The request for the redaction

 2       is granted, and I will leave it to counsel to effect that

 3       redaction on the document.

 4            And the motion as it relates to any mention of the

 5       Creighton physicians and members of their families who were

 6       murdered is granted.  There will be no mention of those

 7       incidents in front of the jury.

 8            MS. VARGAS:  If I may, there's one more matter, your

 9       Honor.

10            I'd like to make a motion, to be completely clear, that

11       counsel will not raise issues that have been waived in

12       briefing.

13            And I'm specifically referring to arguments that

14       interpreters, incident to patient care, create safety concerns

15       or mediate judgment as third-parties.  And I move that those

16       issues not be brought into evidence or raised in argument or

17       opening statements.

18            THE COURT:  Well, as we all know, I've ruled on a

19       very wide variety of motions in limine.  I've issued several

20       orders, and those orders addressed up to 15 issues each.

21       Sometimes I ended up saying the same thing more than once

22       because it was brought to my attention more than once.  And I

23       think that I have issued orders ad nauseam on motions in

24       limine.

25            If there is a violation of an order in limine, I expect I

 1    will hear an objection.  I expect we will have a sidebar.  I

 2    expect you will bring to my attention the order that I issued

 3    and point directly to the applicable part of that order.  And

 4    I will take appropriate action.

 5        But the current motion you are presenting to me is too

 6    broad, too vague, and it asks me to do once again what I've

 7    already done.

 8        So, that motion is denied.

 9            MS. VARGAS:  Thank you, your Honor.

10            THE COURT:  Anything further before the jury comes

11    in?

12            MR. MOORE:  Yes, your Honor, a couple things.

13        First of all, this morning -- I guess I'm not sure if it

14    was this morning or this afternoon, the plaintiffs have

15    indicated that they will be calling Dr. Christopher Moreland

16    and Dr. Peter Seiler.

17        For both of those witnesses, defendants would like the

18    opportunity to conduct voir dire in that with regard to

19    Dr. Moreland, he was excluded as an expert witness, but the

20    Court, because he was disclosed as a fact witness, deemed that

21    it would be appropriate that he have the opportunity to

22    testify if he has relevant evidence.

23        As we understand it, your Honor, the only relevant

24    evidence or firsthand knowledge he would have are

25    conversations that he had with Mr. Argenyi.  And for that

1    reason, we believe the Court needs to allow the defense to

2    have an opportunity to voir dire him to make sure that his

3    testimony is indeed relevant, not hearsay, that he has any

4    testimony to offer as a fact witness.

5        So we'd like that opportunity outside the presence of the

6    jury.

7            THE COURT:  And we will have an opportunity, outside

8    the presence of the jury, to address that matter and to

9    discuss what testimony of Dr. Moreland the plaintiff

10   anticipates introducing that is not in conflict with the

11   earlier order in limine.

12       And it may be this can be handled just through proffer of

13   counsel.  And if not, you may be given an opportunity to voir

14   dire.

15       And in the meantime, I'll go back and I'll look at the

16   order that was issued regarding Dr. Moreland.  And I generally

17   remember how I had phrased the order limiting his testimony.

18           MR. MOORE:  Thank you, your Honor.

19           THE COURT:  We'll get there.

20           MR. MOORE:  Okay.  Well -- my second issue is very

21   similar.  It's somewhat related to the motion that the

22   plaintiff just made with regard to mediating judgment.  The

23   Court has ruled that the medical school cannot raise the issue

24   of mediating judgment.

25       Quite frankly, we've withdrawn that issue with regard to

1      mediating judgment.

2          Dr. Seiler testified in his deposition that the only

3      opinion he would be providing in this case is with regard to

4      whether interpreters mediate judgment.

5          That again is an issue that we'd like to make outside the

6      presence of the jury, either by a proffer or an opportunity to

7      conduct voir dire, to have the Court hear that testimony and

8      ensure that he's within the confines of the expert opinion

9      that he was -- said he was going to give because we believe he

10     does, again, not have any relevant testimony based upon the

11     Court's pretrial orders.

12          THE COURT:  And I'll say one thing before I hear from

13     Ms. Vargas on this.

14          As I recall, the defense did waive any argument or

15     opportunity to present testimony or other evidence to the

16     effect that having an interpreter in the clinical setting

17     would mediate medical judgment.

18          But, the defense reserved the right to rebut evidence

19     introduced by the plaintiff if the plaintiff should wish to

20     present testimony or other evidence to the effect that

21     interpreters used in the clinical setting do not mediate

22     judgment.

23          And I left it there, indicating that I was not willing to

24     try to try this case on motions in limine.  As much as you

25     might want me to do so, I just can't.

1          I have to wait to see what the plaintiffs introduce, what

2    testimony and other evidence they present.  And then if they

3    present testimony to the effect that interpreters in the

4    clinical setting do not mediate judgment, then it would appear

5    to be fair game for the defense to present testimony or other

6    evidence to contradict that proposal.

7          But it's up to the plaintiff whether they go there in the

8    first place.

9          Does that --

10              MR. MOORE:  That makes sense, your Honor.

11              THE COURT:  -- answer your question?

12              MR. MOORE:  Yes.  Very good, thank you.

13              THE COURT:  Anything further, Ms. Vargas?

14              MS. VARGAS:  If I could just respond, your Honor, I

15    think I can resolve that issue for today.  Plaintiff does not

16    intend to call Dr. Seiler today.  We would reserve the right

17    to call him on rebuttal, if necessary.

18              THE COURT:  Very good.  That may resolve that issue.

19              MR. MOORE:  That takes care of that.

20              THE COURT:  You're always welcome to talk with each

21    other.

22              MR. MOORE:  He's on the list, your Honor.  I

23    apologize.  So I apologize.  Thank you.

24          One last issue, your Honor, upon further reflection, this

25    is a delicate issue, I realize.  But I want to understand the

1    extent of the Court's ruling.

2        After voir dire, the plaintiffs made a motion that I

3    couldn't talk about my disability.  And quite frankly, as I

4    was preparing my opening statement and preparing for this

5    case, I thought the motion was abject and unfair.  I don't

6    think counsel would say that I couldn't talk about the fact

7    that I was a man or a woman.  I don't think counsel would

8    raise the fact that if I was an African American, I couldn't

9    talk about that.

10       I think quite frankly, it was abjectly unfair to say that

11   I cannot reflect upon my personal experiences, as any other

12   lawyers would, being the fact that I've had a disability since

13   the age of 18.

14       I want to make sure that I understand that and that it's

15   fair, because to me, trying cases in my life, like any other

16   lawyer, I rely on my personal experiences.  And I want to make

17   sure that -- quite frankly I want a clarification and I want

18   to make sure that I'm not being singled out here because of my

19   disability.

20           THE COURT:  And first, as I said after the voir dire,

21   I think that you did nothing inappropriate in mentioning to

22   the jury that you were in an automobile accident when you were

23   19 years old and that resulted in the paralysis that has put

24   you in a wheelchair.  And of course, it's obvious to the jury

25   that you are in a wheelchair.

1          I often hear lawyers make statements about their personal

2     experiences and their lives and their families and their

3     children and their spouses during opening statement and during

4     closing -- not opening statement -- well, excuse me, sometimes

5     during opening statement, during voir dire, and during closing

6     argument.  And I think that it is a normal and natural thing

7     and it tends to help the lawyers connect with the jury.  And

8     there is nothing wrong about that.  There is nothing

9     objectionable about that.

10          We don't want the lawyers to make themselves witnesses or

11     evidence in the case.  When we reach the point of closing

12     argument, before closing argument we may revisit this issue.

13     And if you think your own experience is something that you

14     want to be able to touch on in closing argument, let's talk

15     about that before closing argument.

16          In the meanwhile, during the presentation of the evidence

17     in the case, I don't know why you would need to refer to your

18     own disability or your own personal hardships or tragedies.  I

19     don't think that's necessary.

20          And I guess I have never had a case before where counsel

21     on the other side objected to something like that.  And this

22     is an unusual case, and we're going to have some firsts that

23     we're dealing with in this case.

24          And so I am, perhaps, acting out of an abundance of

25     caution, trying to make sure that the jury is not swayed by

1    sympathy or prejudice on either side.  I want them to listen

2    to the facts, the relevant evidence, and apply the law to that

3    evidence.

4         That's why I granted the motion by Ms. Vargas that you

5    not refer to the facts or circumstances surrounding your own

6    disability, at least during the presentation of the evidence

7    in the case.

8         Does that help clarify?

9              MR. MOORE:  That does, your Honor, thank you.  I

10   appreciate that.  Thank you.

11             THE COURT:  Anything further?

12             MR. MOORE:  Nothing for the defendant, your Honor.

13             MS. VARGAS:  No.

14             THE COURT:  Please bring in the jury.

15        I just want to ensure that there aren't any witnesses in

16   the courtroom at this time; and if there are, that both

17   counsel don't object to the witnesses being present during

18   opening statement.

19             (Jury in at 9:24 a.m.)

20             THE COURT:  Please be seated.  Good morning.  And

21   welcome back.

22        As you recall, I had told you on Tuesday that we would be

23   starting this morning with the opening statements of counsel.

24   And then you will begin to the hear the evidence in the case.

25             So, we will proceed with opening counsel -- opening

 1      statements by counsel for the plaintiff.

 2           And Ms. Vargas, will you be presenting the opening?

 3           MS. VARGAS:  Yes, your Honor.

 4           THE COURT:  You may proceed.

 5           MS. VARGAS:  Thank you.

 6      Good morning, ladies and gentlemen.  My name again is

 7      Mary Vargas, and I represent the plaintiff, Michael Argenyi,

 8      in this case against Creighton University.

 9           The Americans with Disabilities Act requires

10      universities, like Creighton University, to the provide full

11      and equal access to students with disabilities.  The

12      Rehabilitation Act requires recipients of federal financial

13      assistance to provide meaningful access for students with

14      disabilities.

15           Together, these laws require that universities, like

16      Creighton, provide deaf students with the tools that are

17      necessary to ensure effective communication.

18           And that's what this case is about:  What was necessary

19      for this young man to have effective communication in medical

20      school?

21           Now, there's much that the parties agree on.  For

22      example, the parties agree that Creighton University is

23      required to comply with the ADA and also with the

24      Rehabilitation Act.

25           The parties also agree that Mr. Argenyi is qualified to

1    be at Creighton University School of Medicine.

2         Third, the parties agree that Mr. Argenyi has a

3    disability.  He's deaf.

4         But what's necessary for effective communication in

5    medical school for this student, that's the question that you

6    will be asked to decide after weighing all the evidence you'll

7    see over the next few days.

8         But first to understand what's effective for Mr. Argenyi,

9    you have a right to know a little bit more about his

10   disability and a little bit more about how he communicates.

11        He was diagnosed at the age of eight months old with a

12   severe to profound sensorineural hearing loss.  He wore

13   hearing aids as a child.  And as a young adult, he received

14   cochlear implants, which you may see implanted in his head

15   right behind his ears.

16        The cochlear implants aren't a cure.  They improve his

17   ability to perceive sound.  So they improve his ability to

18   hear a siren, to hear a TV, to hear a book drop on the floor,

19   to hear a door slam.

20        What the cochlear implants don't do is they don't improve

21   his ability to understand speech.  So even after he received

22   the cochlear implants, he still can't watch television without

23   captioning.  He still can't listen to the radio.  No matter

24   how loud he turns it up, it's still staticky.  It's just

25   louder static.

1      So, how does he communicate?  This is the really

2   important part:  It depends on the setting.

3      In one-on-one conversations, when the speaker faces him

4   in a quiet environment, when the lighting is good, when the

5   content is predictable, when it's more like a conversation, he

6   can sometimes get by pretty well.

7      When a host of other factors interfere, he can't get by

8   at all; things like a speaker who has an accent; a speaker who

9   has a mustache; a speaker who is upset, nervous, frightened,

10  emotional.  And of course, in a group conversation, he gets

11  lost, because in a group conversation, the communication is

12  kind of like a bouncing ball.  It bounces from person to

13  person to person to person.  And he's the person who can never

14  catch up with that ball of conversation to find out where it's

15  coming from.

16     So, given -- he does have some ability to lip-read, I

17  should say that.  And that's what he uses in those one-on-one

18  conversations.  He uses lip-reading.  He uses the sound

19  perception that he has.  But he can't use the sound perception

20  to understand the words, to understand the speech.

21     So as I said, he was born -- he was diagnosed when he was

22  eight months old as being profoundly -- severely to profoundly

23  deaf.  And his parents chose to raise him using something

24  called cued speech.  This is not the same thing as sign

25  language.  He didn't learn sign language as a child.  And

1    although he's tried to learn as an adult, he still doesn't

2    know all of the necessary vocabulary, particularly when it

3    gets to be technical vocabulary, complicated vocabulary, and

4    complex topics.

5         So, you will also hear when Mr. Argenyi testifies that he

6    can speak pretty clearly for himself.  And the reason for that

7    is it's the result of more than a decade of effort, of

8    intensive speech therapy where he learned how to speak sounds

9    that he never before heard.

10        Now, one thing I should have mentioned and I skipped is

11   that when a person is a really good lip-reader, even the

12   really best of lip-readers, certain sounds simply aren't

13   visible on the lips.  What cued speech does for Mr. Argenyi is

14   it makes those hidden sounds that don't show up on the lips at

15   all, things far inside your mouth, it makes those show up

16   visibly.

17        So, you're going to hear the term "auxiliary aids" a lot

18   over the next few days.  Auxiliary aids is a legal term.  It

19   basically means visual cues, tools that a person who is deaf

20   uses to communicate effectively.  And in Michael's case,

21   that's captioning and cued speech interpreters.

22        So, in college, Michael began to think about a career in

23   health care and to figure out whether that was something that

24   was really a viable option for him.  Mr. Argenyi will testify

25   that he went to a conference of the Association of Medical

1      Professionals with Hearing Loss.  He met a speaker there whose

2      name is Dr. Christopher Moreland.  He was a deaf doctor

3      himself.  And you may get to hear him testify this morning.

4          He got to talk to Dr. Moreland about the kind of

5      technologies deaf doctors use in order to receive all the

6      information that a hearing doctor would receive in their

7      practice.  And when he came away from that conference, he knew

8      that his goal was achievable.

9          So, from the time Michael Argenyi entered school, all the

10     way through elementary school, all the way through middle

11     school, all the way through high school, in community

12     colleges, and at universities, he asked for and received the

13     exact same auxiliary aids and services.  What were they?  They

14     were what worked:  Captioning and cued speech interpreters.

15         Now, in some settings, captioning worked for him; and in

16     some settings, cued speech worked for him.  Remember I said it

17     depends on the context, it depends on the setting.

18         And in a lecture setting, for example, in a complex class

19     involving computer terminology and math and subscript

20     notations and all those kinds of complex communication, a cued

21     speech interpreter wouldn't work and didn't work for

22     Mr. Argenyi.  In those settings he used captioning.

23         I'm just going to tell you a little bit about what that

24     captioning is like because we're going to have an expert today

25     who is much more qualified than I am to explain what it is and

 1   how it works.

 2       Basically captioning, which is sometimes called CART --

 3   you'll probably hear us say CART a lot -- it's a lot like the

 4   captioning you see on TV.  It's every word that a person

 5   speaks appears on a laptop.  Sometimes it appears on an iPad.

 6   It's just a word-for-word translation of exactly what's said.

 7   So whatever, for example, a student who is hearing would get

 8   through their ears, a student who is deaf would get through

 9   the captioning.

10       So, with a 3.87 grade point average and commitment to

11   prove himself worthy, Mr. Argenyi applied to Creighton

12   University School of Medicine because of its reputation.  And

13   he was accepted on merit, on the basis of his academic record,

14   his volunteer work, the fact that he worked through college as

15   a certified nurse's assistant in a nursing home, in a

16   children's hospital.  On the basis of that, he was accepted

17   and found qualified, unconditionally.

18       After Michael was accepted, he did what he'd done at

19   every school he had attended since the time he was a little

20   child.  He asked for the auxiliary aids and services he

21   needed.  He asked for captioning, he asked for CART.  He

22   provided a copy of his audiogram proving his disability.

23       But unlike every single other school he has ever

24   attended, something different happened.  And what happened is

25   he received a written communication from Dr. Kavan telling him

1    that his admission to medical school was conditional and he

2    better think carefully about whether he could meet Creighton

3    University's standards as a deaf person.

4        And Michael was scared because he thought this meant it

5    was the end of his goal.  He thought this meant he wasn't

6    going to get to stay at that school before it even started, he

7    wasn't going to get his foot in the door.

8        So he did everything they asked.  He provided

9    documentation from his ear specialist, an otolaryngologist

10   named Dr. Backous.  He provided documentation from his

11   audiologist in the same letter.  Her name is Stacey Watson.

12   You'll hear her testify in the coming days.

13       And they provided all this documentation that he was deaf

14   and that he needed captioning and interpreters to understand,

15   and that he had this history of using the same accommodations

16   at every university he attended.  And Creighton University

17   said no.

18       Instead, they pick one line in his letter where it said

19   in an FM system, something that makes sounds louder, pulls it

20   directly into your ear, a little device, that an FM system

21   might be beneficial.  But what Michael Argenyi said was that

22   an FM system might be helpful if a group had fewer than eight

23   students and it was held in a quiet environment.

24       After receiving Michael Argenyi's documentation,

25   Dr. Kavan at Creighton University sent a letter to Mr. Argenyi

1    telling him that they weren't going to provide the captioning,

2    they weren't going to provide the interpreters, they would

3    provide the FM system.  Michael was scared.  And he agreed to

4    give it a wholehearted try.  That's what he did.

5         He started Creighton University School of Medicine in the

6    fall of 2009.  And for three weeks with the FM system, he

7    struggled and strained to try and understand the words that

8    everybody else was hearing in lectures, and he couldn't do it.

9    He couldn't hear in the lecture hall.  He couldn't hear in the

10   labs.  He couldn't hear in the small groups.

11        I want to read you -- I'm going to have to read it

12   because I can barely pronounce it -- some of the kinds of

13   vocabulary that he was expected to lip-read and understand

14   through hearing in these large lecture halls filled with 126

15   other students, typing and rustling papers, words like

16   pyruvate dehydrogenase complex and alpha-ketoglutarate

17   dehydrogenase.  I don't know if I even pronounced that

18   correctly but I can tell you that Mr. Argenyi could not

19   understand those words; not because he wasn't smart, not

20   because he wasn't willing to do the work, but because he

21   couldn't hear them.  And he couldn't lip-read them either.

22        So September 1, 2009, Mr. Argenyi sent an e-mail to

23   Dr. Kavan at Creighton University and told him:  I can't

24   understand.  The FM system isn't working.  I'm missing chunks

25   of lectures.  The strain of listening to the sound and trying

1    to find meaning hidden in all that static is causing headache

2    and fatigue.  And I'm not talking about the kind of fatigue

3    you have when you're tired at the end of the day.  I'm talking

4    about the kind of fatigue that our expert will testify to,

5    something altogether different, from trying to find meaning in

6    sounds you just can't hear.

7         He didn't receive a response.  So he sent another e-mail.

8    And he sent another e-mail.  And he finally received a

9    response from Dr. Kavan that said:  We'll offer you access to

10   note-taking.  But note-taking isn't an opportunity to attend

11   medical school.  That's something less than a correspondence

12   course.  It's a summary.  It's someone else's experience,

13   someone else's experience reduced to paper.  And it wasn't all

14   the information he needed.

15        Mr. Argenyi offered to put Creighton University in touch

16   with other medical schools that had successfully educated deaf

17   doctors.  He offered to sit down with them.  He offered them

18   access, unfettered access to Dr. Backous, to Ms. Watson.  The

19   evidence will show that they never even called.

20        The evidence will also show that from September 1st,

21   2009, when Creighton definitively knew that Michael Argenyi

22   couldn't understand, all the way through the end of that first

23   year of medical school, the only access that Michael Argenyi

24   had is the access he provided himself.

25        Because at the end of September when he was falling

1     behind and missing all of the content, he finally told

2     Creighton he would pay for the accommodations.  And he took

3     out a loan, on top of the loans he took out to pay tuition.

4     He took out a loan and he paid for the services he needed.  He

5     paid for CART in the lectures and the settings with complex

6     terminology, and he paid for what I'll call oral sign-

7     supported interpreters in settings that were more

8     conversational, more like a one-on-one conversation, more

9     basic kinds of vocabulary.  And he told them he was doing this

10    in writing.  And he told them why.  And they didn't respond.

11    Through the entirety of that first year, they provided no

12    other auxiliary aid or service; nothing.

13         Instead, what they did was they assigned one of their

14    faculty members, Dr. Knoop, to follow Mr. Argenyi.  They

15    assigned Professor Knoop to check in with every single one of

16    his classes, to keep detailed calendars of where he was and

17    how he communicated for every day for the entire first year of

18    medical school.  And you know where those documents went.

19    They went back to counsel.

20         Although Creighton may tell you they didn't know that the

21    FM system wasn't working, that Mr. Argenyi couldn't

22    understand, Dr. Thedinger, a local ear specialist and expert,

23    will testify this morning.  And he'll tell you that they told

24    him that Mr. Moore, Amy Bones, who is the general counsel for

25    Creighton University at the time, and another employee from

 1   Creighton University, went and met with him in February of

 2   2010, the first year of medical school, when they supposedly

 3   didn't know.  And they told him that there's this student at

 4   Creighton who is having trouble understanding in the

 5   classroom.  They knew.  And they did nothing.

 6        As he entered into his second year, now he again asked

 7   for the accommodations he needed.  He asked for CART for

 8   complex communications like lectures and highly complex labs.

 9   He asked for interpreters for the mobile smaller settings that

10   used conversation or vocabulary that he could understand.  And

11   now there was a clinical component; now there were patients

12   involved.

13        Every other week, for three hours a day, he was meant to

14   go to the clinical training and learn what it is to be a

15   doctor, how to interact with a patient.  And for that --

16   because that was important -- he asked that they provide an

17   interpreter.  And they made a very deliberate choice.

18        For the settings where he asked for captioning, they

19   offered an interpreter.  And for the settings where he asked

20   for an interpreter, they offered nothing.  And for the clinic,

21   they told him you can't have an interpreter in the clinic even

22   if you pay for it yourself.  That's what they did.

23        And so he did his best.  He took out another loan.  He

24   again paid for the CART and the interpreters that he needed.

25   He did his best in clinic, but he couldn't understand.  When

 1    patients came in and were emotional -- there was a patient

 2    with a broken jaw.  How can you lip-read a patient with a

 3    broken jaw?

 4         And in the clinic, there were multiple people around a

 5    patient.  It wasn't just one-on-one.  There was Dr. Townley,

 6    the physician who was supposed to be teaching him how to be a

 7    doctor.  There were residents, there were specialists, there

 8    were family members.  And again and again, in his group

 9    conversation, the bouncing ball of communication went around

10    and around without him.  And he didn't understand.  And he

11    told them in writing, in detail, patient by patient that he

12    couldn't understand and what he couldn't understand.

13         But he also told them what he could understand.  Some of

14    it he could.  He wasn't trying to make it worse; he wasn't

15    trying to say he couldn't understand something.  He was

16    telling them what he needed.  And again, they did nothing.

17    Again, they did nothing.

18         And so, he finished the first and second year of classes.

19    And guess what, he passed the clinic.  He passed the clinic

20    with no interpreters.

21         But of course, you'll also hear testimony that they told

22    him not to worry, you'll pass just for showing up.  He didn't

23    want to pass just for showing up.  He wanted to learn how to

24    be a doctor.  He wanted to do the work.

25         So, at the end of that second year, he faced the third

1    and fourth year of medical school.  The third and fourth year

2    of medical school is almost all clinical.  And still,

3    Creighton University said he couldn't have an interpreter in

4    the clinical setting even if he paid for it himself.

5        What else could he do?  He took a leave of absence from

6    Creighton University pending your decision in this case.

7        While he's on leave, he's attending Boston University,

8    and he's studying for a master's degree in social work and

9    public health.  He's doing well.  But he hasn't given up on

10   the goal.  He still wants to be a doctor.

11       Creighton may tell you that it acted reasonably in

12   considering all the documentation that Mr. Argenyi submitted.

13   Creighton may say that they think he doesn't need CART,

14   captioning.  But watch.  They won't offer a single expert to

15   support their claims, not one doctor to say he could hear

16   because he couldn't.  And they knew it.

17       Check the dates on the e-mails that Creighton shows you

18   to support the decisions that they made.  I suspect the

19   letters they'll show you were all written before Michael

20   Argenyi ever set foot in a lecture hall at Creighton

21   University, when he was guessing what he would need based on

22   his past needs.  And they were pretty good guesses.

23           THE COURT:  Ms. Vargas, I'll just mention that your

24   time ran out a little bit ago, so if you'll just go ahead and

25   take another minute or so to wrap up.

1          MS. VARGAS:  Thank you.

2          Creighton may also say that they couldn't afford to pay

3      for the auxiliary aids that Mr. Argenyi needed.  He did take

4      out a loan to pay about $110,000 for the services he needed

5      himself.

6          What Creighton will not tell you is that it's a multi-

7      million dollar institution; that even in the darkest days of

8      the financial crash, it was generating net revenues of more

9      than $400 million a year; and its endowment was increasing in

10     the darkest of financial times, exceeding $300 million.  And

11     every year, it was getting more than $20 million in federal

12     financial assistance based on a promise that when a student

13     with a disability showed up at the door, they would provide

14     meaningful access, full and equal opportunity to benefit.  And

15     you will get to decide if they did that.

16         Thank you.

17             THE COURT:  Thank you, Ms. Vargas.

18         We'll now hear opening statement from the defendant.

19         Mr. Moore, will you be presenting that?

20             MR. MOORE:  Yes, your Honor.  Thank you.

21             THE COURT:  You may.

22             MR. MOORE:  Your Honor, counsel, ladies and gentlemen

23     of the jury; the law requires Creighton Medical School to take

24     reasonable steps to provide what Mr. Argenyi needs to

25     successfully complete medical school and become a doctor.

1          The law doesn't require that Creighton provide everything

2     he demands.  The law doesn't require we provide everything he

3     wants.  Reasonable steps to provide what he needs to give him

4     an opportunity to complete his medical education and become a

5     doctor.

6          The evidence in this case will show undoubtedly that

7     Creighton took those reasonable steps.  Creighton did provide

8     him the accommodations that he needed, the benefits that he

9     needed that no other student receives, to ensure he could

10    become a doctor.

11         In fact, you'll hear had Mr. Argenyi stuck around and not

12    voluntarily taken a leave of absence, he'd be a doctor right

13    now.  He'd be a resident right now.

14         Now, Mr. Argenyi is a bright, intelligent guy.  You're

15    going to hear from him that for two and a half years before he

16    came to Creighton Medical School, he worked as a certified

17    nursing assistant in the emergency room of the University of

18    Washington's Children's Hospital in Seattle.  He'll tell you

19    that as a CNA -- and what he told Creighton, as a CNA, he

20    successfully assisted patients, communicated with doctors.  He

21    successfully participated in IV placement.  He successfully

22    participated in putting down nasogastric tubes, those awful

23    tubes that go up your nose and down your throat.

24         He successfully was required to communicate verbally with

25    a multidisciplinary team at the hospital; the doctors, the

1    nurses, the phlebotomists, the techs; all those health care

2    professionals at the hospital, he communicated with

3    successfully.

4         You're going to hear that he communicated successfully in

5    patient care with the parents of the children who were at that

6    hospital.  You're going to hear that he successfully

7    communicated with patients as he transported them around the

8    hospital to surgeries where oftentimes they have questions,

9    what's going on, what am I doing, where am I going?  And he

10   was rightly proud of this and told Creighton he was proud of

11   this.

12        And importantly, for two and a half years, he did this

13   without one single accommodation other than a text pager; no

14   CART, no interpreters, no captioning; just him.

15        You're going to hear that he was interested in becoming a

16   doctor.  So he applied to several medical schools, including

17   Creighton.  Creighton looked at his application, was excited

18   about his application, and invited him on campus for an

19   interview.  He came to campus for the interview without

20   requesting an accommodation, without having an accommodation.

21   He participated in that interview without anything; no

22   captioning, no interpreter, just him.

23        He toured the medical facilities.  He participated in

24   several presentations that day without requesting any

25   accommodations, without having any accommodations; no CART, no

1    interpreters, just him.

2        He did well; so well, that Creighton admitted him into

3    medical school.

4        Now, you're going to hear testimony from him that that

5    wasn't necessarily his experience with the other medical

6    schools.  In fact, he'll tell you at one medical school, he

7    was skeptical of the reasons they gave when they denied his

8    application, believing it wasn't because of his application

9    but perhaps because of his hearing impairment.  In fact, of

10   all the medical schools he applied to, only Creighton accepted

11   him.

12       Now, ladies and gentlemen, after he was accepted into

13   medical school, he received a form that all incoming students

14   receive.  And it asks:  Do you need a reasonable accommodation

15   from the medical school's technical standards?

16       He checked on that form:  Yes, I do need a reasonable

17   accommodation.  I need a reasonable accommodation from the

18   technical standards, and he sent that form back in.

19       Well, what are the technical standards?  What does that

20   mean?

21       You'll hear that the technical standards are the

22   foundation of the medical school.  They explain what someone

23   needs to do physically, mentally, and communication ability to

24   be not only a successful student in the classroom as they were

25   in undergraduate, but to be a successful physician; to be able

1    to do surgical procedures, to do medical procedures, to be

2    able to communicate with a patient, to effectively diagnose

3    them, know what's going on, to be able to do those things that

4    a physician can do.

5         These technical standards are so important to the medical

6    school that they do not waive them for anyone, except in one

7    narrow circumstance:  If a person has a disability and needs

8    an accommodation because of their disability, then they'll

9    provide those extra benefits that they don't provide other

10   students.  They'll allow exceptions from those technical

11   standards.

12        But if I'm a student and I say, "You know what,

13   Dr. Kavan?  I don't really want to do it this way, I think I

14   should do it this way."  The medical school says, "No, we have

15   these technical standards, you've got to comply with them."

16   "Well, I don't want to do that."  "Too bad, you've got to do

17   it that way."  The only time they make exceptions is if

18   someone has a disability.

19        And you'll hear these technical standards are

20   substantially the same as every other medical school in the

21   country.  Every medical school has technical standards.  Every

22   medical school treats them that way.

23        So you have to be able to show that you have a disability

24   and you need something because of that disability; not just

25   you want it, but you need it.

1        Now, you're going to hear testimony -- this is very

2    important.  You're going to hear testimony today, I believe,

3    they've listed Dr. Thedinger as a witness, their expert

4    witness.  You're going to hear him say something that I want

5    you to pay attention to:  That, yes, without Mr. Argenyi's

6    cochlear implants, he's deaf.  No question.

7        But with his cochlear implants, he's hearing impaired.

8    And before he had his cochlear implants, he had hearing aids.

9    Sure, he's diagnosed as deaf.  But when he has his cochlear

10   implants, that's what we need to look at.  How does he

11   communicate when he has those cochlear implants, not if he

12   didn't have them, because he has them.  We can't pretend like

13   he doesn't have them, and say, "Oh, he's deaf, we've got to

14   deal with him that way."  No.  How does he communicate with

15   his cochlear implants?  And how does he do?  That's what we

16   have to focus on.

17       Now, after Mr. Argenyi returned the request for

18   reasonable accommodation, Dr. Kavan's responsibility for the

19   medical school is to gather the information that he needs to

20   make a determination, okay, if we're going to give him an

21   exception to the technical standards or an extra benefit that

22   other students don't get, he's got to establish that he has a

23   disability, that he needs it because of his disability, and

24   that it's reasonable.

25       But he didn't do it on his own.  You're going to meet

1       another person, a man by the name of Wade Pearson.  Now, Wade

2       Pearson retired from Creighton a couple months ago, so he

3       doesn't work for us anymore; he's retired.  But for 20 years

4       before that, he was the director of Creighton's Office of

5       Disability Accommodations, an office that Creighton has that

6       is specifically tasked with, number one, doing disability

7       awareness; bringing in speakers, having symposiums, educating

8       the campus about students with disabilities, affirmatively

9       reaching out to make sure Creighton accommodates students.  It

10      doesn't have to have this office under the law.  The law

11      doesn't say you have to have this office.  It has this office

12      because it wants students with disabilities.  It wants to

13      educate students with disabilities.

14          Now, Wade's responsibility primarily is to determine what

15      accommodations undergraduate students should get.  So if I'm a

16      freshman coming in, and I need an accommodation as an

17      undergraduate, Wade makes that decision.

18          Wade also consults with the professional schools at

19      Creighton, the law school, the pharmacy school, the dental

20      school, the medical school, to assist them in making decisions

21      on accommodations.  Wade doesn't make those decisions because

22      professional schools are very specialized.  They're worlds

23      away from the undergrad.

24          For example, in medical school, the curriculum is

25      entirely different.  You're learning not only to learn the

1    materials that are in books as you do in medical school, but

2    how to be a doctor, how to work in a clinic.  And because

3    that's so specialized, Wade needs to rely on the professionals

4    at those professional schools to determine what accommodations

5    may be appropriate.

6          But Wade consults with them.  So Wade and Dr. Kavan

7    talked, figured, okay, what do we need, and determined what

8    they needed from Mr. Argenyi.  And they requested information.

9          And you will hear something very important; that

10   Mr. Argenyi, when he received this request, was surprised,

11   even offended, that Creighton asked for this information.

12         Nobody's going to argue that the law doesn't allow

13   Creighton to do that or in some cases require Creighton to

14   request information.  The law allows that, requires it in

15   certain situations.  But Mr. Argenyi was offended by that.

16         Why?  Because this was the first time anyone said,

17   "Mr. Argenyi, do you need it?  Mr. Argenyi, is this the

18   appropriate benefit?  Is this the appropriate extra benefit

19   you need in this educational setting?  Is this the best way to

20   go about making you a doctor?"

21         In elementary school, in middle school, in high school,

22   in college, alls he did, he showed the audiogram, "Look, I'm

23   hearing impaired," made his demands and he got everything he

24   wanted.  No questions asked.

25         So even though the law allows it, he was offended.  How

1    dare Creighton ask me for this information?

2         But he did cooperate.  And he did provide letters from

3    his treating physicians, from his supervisor at Seattle

4    Children's Hospital, and from himself.  And I want you to pay

5    close attention to those letters, close attention to those

6    letters, because I think those letters that you'll have, that

7    Creighton had, will show you what Mr. Argenyi is capable of.

8    And it's a lot.

9         But it will also show you what Creighton relied upon in

10   making its decisions, decisions as to what Mr. Argenyi needs,

11   not just what he wants.

12        Now, Dr. Kavan brought that -- he didn't make the

13   decision by himself.  Dr. Kavan brought that information to

14   the Medical Education Management Team.  And we'll talk about

15   that a lot, we'll talk about the MEMT.  Like any other good

16   professional schools, there's a lot of acronyms, right?  MEMT.

17        And the MEMT is a special committee set up by the medical

18   school to deal with requests for accommodations from students

19   in the medical school.  It's set up to comply with the law,

20   make sure that we're complying with the law when someone

21   requests an accommodation, to provide it when they need it.

22        And the MEMT reviewed all of the information, the letters

23   from Mr. Argenyi, from his physicians, from his supervisor

24   that you will see.  They know what the curriculum of the

25   medical school is, they applied their professional knowledge,

 1   and they came up with accommodations they would offer Mr.

 2   Argenyi.

 3        They determined, based upon that information, that they

 4   were going to offer him an FM system.  Now, an FM system,

 5   you'll hear, is a special system that Creighton had to

 6   implement that the professor wears a microphone and that FM

 7   system has a special receiver that hooks right into

 8   Mr. Argenyi's cochlear implants; an FM system that both his

 9   treating physician recommended and he requested as part of his

10   accommodations.

11        They also offered him preferred seating in the front

12   because Mr. Argenyi said, "I read lips.  I rely on visual

13   cues.  And outside of school, I don't use CART and

14   interpreters, I rely on lip-reading.  That's how I

15   communicate."

16        They offered him note-takers so he could focus on the

17   slides, focus on the PowerPoints, and not have to write

18   everything down that's said.  And you'll hear Dr. Kavan say

19   how important that is because medical school is very visual,

20   lot of slides, cells and body parts and those things, that

21   they want students to pay attention to, not staring at a

22   screen the whole time.

23        They also offer him PowerPoints in advance of the

24   lectures.  The big words, which I agree are complicated

25   because I didn't go to medical school, he had the PowerPoints

1    in advance.  And he was also required, like every other

2    student, to read the text and be familiar with the subject

3    matter before he came in.  It wasn't like he walked into the

4    lecture and, "Oh, that's the first time I've seen that word."

5    No.  He had the PowerPoints in advance, he had the textbooks

6    in advance, and he was required to be prepared like every

7    other student.

8        Even though he communicated very well, as he told us and

9    as his doctor said, on one-on-one close communication, in

10   small groups and in lab where that went on, even though he

11   likely didn't need it, they offered him an FM system in those

12   settings as well.

13       But that wasn't enough.  Because Mr. Argenyi said,

14   "That's not what I demanded.  I demanded Communication Access

15   Real Time Transcription, CART," the captioning that you'll

16   see.  That's when a court reporter would sit right by

17   Mr. Argenyi in class typing up everything that's said in a

18   lecture.  And he would look at the screen.  He also wanted

19   interpreters.  Where he didn't have CART, he wanted

20   interpreters.

21       Now, Creighton didn't provide all those things because

22   they weren't necessary.  But it didn't matter, because that

23   wasn't enough.

24       Now, as plaintiff's counsel said, after the medical

25   school offered him these accommodations, Mr. Argenyi sent them

1    a letter saying, "I'll give it a wholehearted try.  I'll give

2    it a wholehearted try."

3        The medical school was excited.  Michael's a bright

4    student.  Glad we were able to work and work this out.  They

5    worked with Mr. Argenyi specifically, and his physicians, to

6    pick out the FM system that worked.  He said, "Here's the FM

7    system I need."  Creighton purchased that, implemented it,

8    installed it.  It was all ready to go for the first year.

9    They thought they were set.

10       What plaintiff's counsel didn't tell you is something

11   happened in between that time and when he started class.  Two

12   days before class, Creighton got a phone call, a phone call

13   from Mr. Argenyi's lawyer, Dianne DeLair; said, "We need to

14   meet about Mr. Argenyi's demands."  Surprise.  They said,

15   "Okay.  We'll meet."

16       So, Creighton attended this meeting with Dr. Kavan, Wade

17   Pearson, who they had been working with in the accommodations

18   office, and Creighton's in-house lawyer.  They sat down in

19   this meeting.  Mr. Argenyi showed up to this meeting with

20   Ms. DeLair, his lawyer, and a deaf advocate, who was provided

21   to him by the Nebraska Commission for the Deaf and Hard of

22   Hearing.

23       And they didn't talk about this meeting, but I want you

24   to listen to what happened at this meeting.  Listen to what

25   was said at this meeting, because this meeting wasn't about,

1    "Well, tell us how you came to this decision."  This meeting

2    wasn't, "Here's some more information about Mr. Argenyi."

3    This meeting was about, "You have to give him what he

4    originally demanded.  And if you don't, it's not enough.

5    Either give it to him or it's not enough."

6         A wholehearted try?  Lawyer up two days before school and

7    say, "Either give him everything or it's not enough."

8         At that point, Creighton, surprised, said, "We've

9    reviewed the information.  And based upon the information that

10   we had that he provided himself, we're providing these

11   accommodations that we think will provide effective

12   communication."

13        So Mr. Argenyi started class.  He started class with the

14   FM system.  He started class with the front row seat.  He

15   started class with the note-takers.  He started class with the

16   PowerPoints.

17        And only two weeks later, he sends an e-mail to Dr. Kavan

18   saying, "I'm stressed, I'm fatigued, I'm falling behind."

19   Dr. Kavan will tell you what he said in that e-mail is no

20   different than what any other medical student in first year

21   would tell you.  They describe the first year of medical

22   school like trying to take a drink out of a fire hose.

23        You got a bunch of high achievers, they've always done

24   well; wow, I'm trying to drink out of a fire hose here.  I'm

25   tired, I'm fatigued, I'm overwhelmed.

 1          Mr. Argenyi didn't say, "Well, I'm a first year medical

 2    school student, I should expect that.  The reason I feel like

 3    this has got to be because I didn't get everything I want.

 4    What other reason would it be?"

 5          Mr. Argenyi, in that e-mail, also listed three specific

 6    things he was having trouble with.  And Dr. Kavan is going to

 7    tell you how he addressed each of those three concerns.

 8          But that wasn't enough, because two weeks later he sends

 9    another e-mail saying, "I told you I wanted all these things,

10    you're not providing everything I'm demanding, so I'm going to

11    provide CART, the Communication Access Real Time

12    Transcription, and interpreters for myself.  Oh, and by the

13    way, I'm suing you."  And here we are.

14          I want you to pay attention because plaintiff's counsel

15    talks a lot about him not hearing things and being confused

16    about things.

17          Here's what I want you to look at:  In between the time

18    he started medical school until September 28th of 2009, he had

19    the accommodations Creighton provided.  He took a lot of

20    quizzes.  He took a lot of tests.  Look at his grades.  See if

21    you think those grades are someone who can't hear anything and

22    has failed.

23          Look at his grades after he got those.  In some classes,

24    he did better; in some classes, he did worse.  Look at the

25    grades.

1          THE COURT:  Mr. Moore, your time has also run out.

2     Please take another minute or so to wrap up.

3          MR. MOORE:  Thank you.

4          You're also going to hear about his second year.  And he

5     requested the same accommodations and a little bit extra.  But

6     you also heard about Dr. Thedinger's letter that we'll talk

7     about today.

8          Dr. Thedinger did provide a letter that said an FM system

9     was ineffective.  But they didn't provide it to Creighton

10     Medical School until after Mr. Argenyi had already finished

11     his first year.  Why did they wait?  I don't know.  Why did

12     they wait when they could have gotten that letter before to

13     show independent third-party documentation that he needed

14     something other than an FM system?

15          And why is that important?  Because at that point,

16     Creighton changed its mind, based upon that letter, and

17     offered him interpreters instead of an FM system; changed what

18     they were offering, based upon that letter.

19          And when the interpreters showed up for Mr. Argenyi that

20     second year, the same interpreter he had used during the first

21     year, who he had used in lectures, what did he do when

22     Creighton offered him the interpreter?  He refused to even

23     look at that interpreter.  He said, "I've got CART, you might

24     as well leave."

25          Folks, if we didn't give him everything he wanted, he

 1    wasn't going to be happy, even though he himself had used that

 2    interpreter in the past.

 3        Now, we're also going to talk about the clinical setting

 4    and the fact that we didn't allow him to have an interpreter.

 5    But again, I want you to look at his evaluations, his

 6    evaluations and how well he did without an interpreter.

 7            MS. VARGAS:  Objection, your Honor.  May we approach

 8    the bench?

 9            THE COURT:  All right.

10        (Bench conference on the record.)

11            MS. VARGAS:  No evaluations were listed on the

12    exhibit list at any time.  No evaluations were disclosed to

13    plaintiff in discovery.  We had no opportunity to evaluate

14    those, to conduct depositions about those, to do anything with

15    them.

16        About a week ago Mr. Moore discovered them and e-mailed

17    them to us.  And at this point, we're prejudiced and unable to

18    conduct any discovery at all.

19        Furthermore, they weren't listed on the exhibit list.

20    They should not be allowed to be disclosed.  They should not

21    be admitted into evidence.  They're not relevant.  They should

22    be precluded because they're prejudicial to us.

23            THE COURT:  Response?

24            MR. MOORE:  Sure.  Dr. Townley is going to testify.

25    She'll testify about her evaluations, how she evaluates him,

1   and he did just as well with interpreters as without an

2   interpreter.

3            THE COURT:  Okay.

4            MR. MOORE:  Whether we get the documents in or not,

5   she's going to testify to it, it doesn't matter.

6            THE COURT:  Generally when something is mentioned in

7   opening statement, if counsel indicates that something is

8   going to come into evidence and then it does not, then it's

9   certainly fair for opposing counsel to point out in closing

10  argument, well, counsel for the defense told you you were

11  going to see X, Y, and Z, and you didn't see it, so they

12  didn't prove what they said they were going to prove.

13       So, I'm going to overrule the objection.

14       But your time is up.

15           MR. MOORE:  I'd like to at least close.

16           THE COURT:  Take another 30 seconds.  Both of you ran

17  over a minute or two, and I waited until I stopped you, and

18  I've done the same with Mr. Moore.

19       I don't want to be too strict along those lines, there's

20  no point.  But wrap it up.

21           MR. MOORE:  I just need two more things, and I'm

22  done.

23           THE COURT:  All right.  Thank you.

24       (End of bench conference.)

25           MR. MOORE:  Sorry about that.

 1          Again I want you to pay attention to how he was

 2    evaluated.

 3          Now, folks, you're also going to hear about how much --

 4    what Mr. Argenyi demanded cost.  We're not talking about

 5    10,000, we're not talking about 20,000, we're not even talking

 6    about 50,000.

 7          What he demanded costs hundreds of thousands of dollars.

 8    And you, as the jury, get to demand -- excuse me.  You, as the

 9    jury, get to determine is that too much for one student or, as

10    the law said, is that too much of an undue burden?

11          Now folks, I'm going to come in front of you at the end

12    of this trial, and I'm going to ask you to return a verdict

13    for Creighton University Medical School.  And I am confident

14    that if you see what we saw, if you look at the information we

15    saw, that you will undoubtedly conclude that Creighton took

16    reasonable steps to provide Mr. Argenyi what he needs to

17    complete medical school and become a doctor.

18          And I'm also confident that you will conclude spending

19    hundreds of thousands of dollars for one student in medical

20    school is an undue burden.

21          Thank you.

22          THE COURT:  Thank you, Mr. Moore.

23          Ms. Vargas, before we decide when to take the morning

24    break, can you tell me the name of your first witness.

25          MS. VARGAS:  Yes, your Honor.  We intend to call

 1    Dr. Chris Moreland to the stand.

 2            THE COURT:  All right.  I am going to let the jury

 3    take the mid-morning break at this point in time.

 4        You will have a 20-minute break -- plan on 20 minutes

 5    anyway.  You're going to get at least 20 minutes because I

 6    have to discuss a few things with the lawyers and then we need

 7    a little break too.

 8        So please reconvene in the jury room at 10:35, and we

 9    will either bring you in then or tell you if we need a few

10    more minutes.

11        The jury is excused.

12        (Jury out at 10:16 a.m.)

13            THE COURT:  I've turned to the order that I did on

14    the defendant's motion in limine that appears at filing -- the

15    order appears at filing 330.  And on page 8, I am addressing

16    Dr. Christopher Moreland's testimony.

17        And I noted that Dr. Moreland, of course, was not

18    designated as an expert and so I noted he will not be

19    permitted to testify about his own experiences as a deaf

20    physician or hearing impaired physician and his opinions along

21    those lines.

22        But I said, at the very end:  If he, that being

23    Dr. Moreland, had communications with Argenyi or Creighton

24    that are relevant to issues in this case, and otherwise

25    admissible, he may be permitted to testify about such

1   communications.

2       And the reason that I put that sentence in there at that

3   time is I thought, well, perhaps Dr. Moreland had had some

4   communications with Creighton about what he thought Creighton

5   ought to be doing, and that might go to the question of

6   deliberate indifference, which is something that is going to

7   be presented to the jury on the issue of compensatory damages.

8       If he had communications with Mr. Argenyi -- and I'm just

9   telling you my thoughts here first, and then you're both going

10  to get a chance to speak -- and if he told Mr. Argenyi about

11  his own experiences as a deaf physician and what he thought

12  would be helpful to Mr. Argenyi to have in the way of

13  accommodations in medical school, that is the type of thing

14  that I would think Mr. Argenyi could testify to because

15  Mr. Argenyi could tell us what Dr. Moreland told him.

16      It would not be hearsay because it's not being offered

17  for the truth of the matter asserted, it's being offered to

18  show why Mr. Argenyi made the requests Mr. Argenyi made.  And

19  that may be fair game.

20      But I don't know why Dr. Moreland is otherwise

21  testifying.

22      So, with that background, Ms. Vargas, would you tell me

23  what you anticipate asking of Dr. Moreland.  And I'm hoping

24  it's not going to be necessary to go through some voir dire

25  process with Dr. Moreland.  If you will just proffer to the

1    Court why you're calling Dr. Moreland and what you anticipate

2    eliciting from him in his testimony, then I may be able to

3    rule.

4            MS. VARGAS:   Your Honor, we're mindful of the Court's

5    order.  We expect Dr. Moreland -- we don't intend to offer any

6    testimony that's been prohibited or precluded.

7        Instead, as you said, it is relevant what Mr. Argenyi and

8    Mr. Moreland -- how they interacted.  They did have at least

9    two interactions relevant to the facts and circumstances in

10   this case.

11       The first fact and circumstance was that they met at The

12   Association of Medical Professionals With Hearing Loss

13   meeting.  And at that meeting, Mr. Argenyi was considering

14   whether he should enter into medical school.

15       Mr. Moreland served something of an informal mentor to

16   him.  And after Mr. Argenyi began running into difficulties

17   with Creighton University, Mr. Argenyi went back to him and

18   asked if Mr. -- Dr. Moreland would be willing to assist

19   Creighton University in overcoming any challenges that they

20   saw with respect to his deafness and his communication needs.

21       Dr. Moreland will testify that he was more than willing

22   to do that; and that relevant to this and relevant to

23   deliberate indifference, Creighton University never contacted

24   him.  So that information, that they never so much as picked

25   up the phone, is highly relevant to the story in this case.

1          And the fact that Mr. Argenyi could make that testimony

2     himself shows that it's relevant.  If it's relevant for

3     Mr. Argenyi to make that testimony, it's also relevant for

4     Dr. Moreland to make that testimony.  And it's for the

5     plaintiff to choose to present their case and which witnesses

6     to the offer the testimony through.

7               THE COURT:  Response?

8               MR. MOORE:  Yes, your Honor.

9          First of all, we question the relevance of any statements

10    that Dr. Moreland made to Mr. Argenyi.  Again Mr. Argenyi did

11    not -- Dr. Moreland did not contact Creighton at any time.

12    There was no conversation between the two.  He didn't offer

13    anything in the way of a letter or anything, any information

14    to Creighton with regard to this particular case.

15         Creighton did not consider anything from Dr. Moreland,

16    nor was anything presented.

17         The fact that the conversation occurred out of court, we

18    would object on the basis of hearsay, in that what

19    Dr. Moreland said out of court to him, number one, is

20    irrelevant.  An out-of-court statement proved to -- offered to

21    prove the truth of the matter asserted within the statement

22    itself, this is what I told him, this is why I told him it was

23    important, those kind of things, it's not just to give notice

24    of any kind.

25         Also, there is -- as far as what's been presented to us,

1     your Honor, the conversations were one conversation at a

2     conference before he went to medical school.  And after he

3     filed suit, the two exchanged e-mails.  And we would say that

4     based upon the e-mails and what they said, he was reaching out

5     trying to find an expert for the case.

6         There is also no way, your Honor, that he can be called

7     up there without having the testimony elicited from him that

8     this Court has said is inadmissible.  He can't speak about his

9     own experience as a physician, his own experience as a deaf

10    person.  That's what he's going to testify to.

11        He's going to say, yeah, I told him about my experiences

12    as a deaf doctor, my experience as a physician, and here's how

13    you do it.  That's sneaking expert testimony through the back

14    door.  There is no way for him to testify without giving that

15    information.

16        MS. VARGAS:  Your Honor, we have no intention of

17    violating the Court's order on this matter.  Our questioning

18    of Dr. Moreland will be limited and brief, but it is relevant,

19    and it goes directly to notice.  And that's one of the

20    elements of plaintiff's case.

21        THE COURT:  Well, I'm not going to preclude

22    Dr. Moreland from taking the stand and being questioned.

23        If he is asked questions that would elicit expert

24    testimony and opinions, there will be an objection, I will

25    rule on that objection, and I will sustain that objection.

1          I had anticipated that certain testimony would come in

2     from various witnesses who had communicated with Mr. Argenyi

3     at times relevant to the time frame of the facts of this case.

4     And it appears that Dr. Moreland is one person who observed

5     Mr. Argenyi at a time when Mr. Argenyi was preparing to go to

6     medical school.  And he may be able to the testify about how

7     Mr. Argenyi communicated.

8          I also recognize that some of the things that plaintiff's

9     counsel may attempt to elicit from Dr. Moreland are things

10    that Mr. Argenyi could testify to.  But I am not sure that a

11    hearsay objection is going to be sustained based upon the

12    theory that defense counsel proffered to the Court.

13         So I just have to see how the testimony is presented and

14    rule on objections as they come.

15         But I'll just caution you, as you've already been made

16    aware, I'm not going to let Dr. Moreland testify as an expert.

17    And so if he starts offering opinions on matters, objections

18    will be sustained.

19              MS. VARGAS:  Understood.  Thank you, your Honor.

20              THE COURT:  And you look quizzical.

21              MR. MOORE:  I just want to make sure.  I'm not sure

22    how he gets up on the stand and doesn't start talking about

23    how he's a deaf doctor and what he does, and that was

24    specifically what was excluded under your order, your Honor.

25         So I mean, unless he just gets up and says, "Hi, I'm

1   Chris Moreland and I talked with Mr. Argenyi," I don't -- I

2   guess the fact that they get him up there and try to get it

3   out would be enough to violate the order.

4       And I understand that we're -- we're required to object.

5   But offering the testimony that we know is going to violate

6   the order, I have a big concern with that.  And I think that's

7   in contradiction to the Court's order.

8           THE COURT:  I think it's likely that the plaintiff

9   will be able to get into evidence the fact that Dr. Moreland

10  is a doctor and the fact that he's deaf.  I think that will

11  come in.

12      As I said, I can't try this case on motions in limine.  I

13  have to wait until a witness gets on the stand and rule on

14  objections.  I've done everything I can do to try to clear off

15  the issues that I can clear off and provide as much guidance

16  as I can provide before the witnesses are called.

17      So let's take our break.  And let's take a 10-minute

18  break anyway.  Please come back at 10:40.

19      Thank you.

20      (Recess taken at 10:27 a.m.)

21      (At 10:45 a.m. on August 22, 2013, with counsel for the

22  parties, the plaintiff, and the defendant's represent present,

23  and the jury NOT present, the following proceedings were had:)

24          MR. MOORE:  Can we deal with any preliminary issues

25  at this time?

```
 1              THE COURT:  Yes.

 2              MR. MOORE:  Your Honor, I would request the Court

 3    that we allow Dr. Moreland to come up outside of the presence

 4    of the jury to do the examination so we have a better

 5    understanding.  I think that would alleviate our concerns so

 6    we can bring the jury in right afterwards so we know what

 7    would be admissible and what wouldn't.

 8              THE COURT:  Well, I don't know if that is going to

 9    expedite things or delay things.  But I can't imagine that

10    Dr. Moreland's testimony is going to be very lengthy.

11         So I will agree to that.  Let's go ahead and ask

12    Dr. Moreland to step forward.

13              MS. VARGAS:  Thank you, your Honor.

14              THE COURT:  Dr. Moreland, if you will please come

15    forward and take the stand, the courtroom deputy will swear

16    you in.

17              COURTROOM DEPUTY:  State your full name for the

18    record and spell your last, please.

19              THE WITNESS:  Christopher Moreland, last name is

20    spelled M-o-r-e-l-a-n-d.

21         CHRISTOPHER MORELAND, PLAINTIFF'S WITNESS, SWORN

22              MR. MOORE:  Your Honor, we'll reserve our objections

23    at this time.

24              THE COURT:  Well, I'm not sure that that does us any

25    good.
```

```
 1              MR. MOORE:  Okay.  That's fine.

 2              THE COURT:  I think the only way we're going to

 3     accomplish something at this juncture is if we hear the

 4     questions, I rule on the objections, and then we know what's

 5     going to be presented in front of the jury.

 6              MR. MOORE:  Thank you, your Honor.

 7              MS. VARGAS:  I may have missed it, I was talking to

 8     Mr. Stein.  I'm concerned that the interpreters maybe haven't

 9     been sworn in.

10              THE COURT:  And that's an excellent question because

11     usually we have certified interpreters in the federal system,

12     and they're always sworn in as a matter of course.

13              INTERPRETER ELKER:  And I am, your Honor.

14              THE COURT:  Let's have you please state your name for

15     the record so that we can make a record of that fact.

16              INTERPRETER ELKER:   Jami Elker, J-a-m-i, E-l-k-e-r.

17              THE COURT:  Just so we make a record in the case, I

18     appreciate the fact that you're certified and you are sworn,

19     but for purposes of this trial, do you swear that you will

20     interpret accurately the testimony of the witnesses?

21              INTERPRETER ELKER:  I do.

22              THE COURT:  Very good.  Thank you.

23          And your name, please?

24              INTERPRETER DUNCAN:  My name is Pamela Duncan, and

25     I'm a certified interpreter.
```

```
1              THE COURT:  You are as well?  Excellent.  Do you also

2     swear for purposes of this trial that you will accurately

3     interpret the statements of the witnesses?

4              INTERPRETER DUNCAN:  I will.

5              THE COURT:  Excellent.  Thank you both very much.

6        We're not going to bring in the jury yet, we're going to

7     wait a little bit.

8        Ms. Vargas, you may proceed.

9              MS. VARGAS:  Thank you, your Honor.

10                        DIRECT EXAMINATION

11    BY MS. VARGAS:

12    Q.   Good morning.  Could you please tell us your name.

13    A.   Sure.  My name is Dr. Christopher Moreland.  Do you want

14    me to spell that?

15    Q.   No, that's fine.  Where do you live?

16    A.   I reside in a small town called New Braunfels, a small

17    town near the city of San Antonio, which is where I work as a

18    physician.

19    Q.   Have you ever met Michael Argenyi?

20    A.   Yes, I have.

21    Q.   When did you meet him?

22    A.   We met for the first time, I believe, in April of 2008.

23    Q.   Where did you meet him?

24    A.   We met in Utah at a conference that was taking place

25    there.
```

1    Q.   And how did you come in contact with him at that

2    conference?

3    A.   I was a presenter there.  I was invited there to speak at

4    the conference, which is provided by an organization called

5    the Association of Medical Professionals with Hearing Loss.

6    This organization is comprised of deaf and hard-of-hearing

7    health care professionals, including doctors, veterinarians,

8    doctors and the like.

9         The mission in that is mentoring and counseling of

10   students or deaf, hard of hearing --

11            MR. MOORE:  Objection, your Honor, beyond the scope

12   of the question.

13            THE COURT:  It's become narrative.  Sustained.

14   A.   Okay.

15   BY MS. VARGAS:

16   Q.   Did Mr. Argenyi attend your presentation?

17   A.   Yes.  I provided a presentation that he attended.  And

18   that presentation was about how to effectively work with

19   accommodations during medical school and residency.

20   Q.   Did you have a conversation with Mr. Argenyi at any point

21   during that meeting?

22   A.   Yes, that same day -- the same day as my presentation.

23   Q.   And what topics did you discuss?

24            MR. MOORE:  Objection, hearsay.

25            THE COURT:  Overruled.  He may answer.

1    A.   I don't recall all of the details of that conversation

2    because it was quite a while ago, but I do remember that we

3    introduced ourselves to each other.  That was the first time

4    we had met.  And I also remember his asking me general

5    questions about how I was able to successfully -- how I --

6             MR. MOORE:  Objection, beyond the scope of the order

7    to the extent he talks about how he performs as a resident,

8    how he performs as a physician with a hearing impairment.

9             THE COURT:  Well, and because we're outside the

10   presence of the jury, I'll note that if the witness were to

11   get into those areas, that would be infringing on the Court's

12   order -- violating the Court's order.

13   BY MS. VARGAS:

14   Q.   When was the next time you communicated with Michael --

15   did you communicate with Michael Argenyi again?

16   A.   We -- he contacted me via e-mail in 2009, I believe it

17   was late summer, maybe early fall of 2009.

18   Q.   And why did he contact you?

19            MR. MOORE:  Objection, foundation.

20   BY MS. VARGAS:

21   Q.   If you know.

22            THE COURT:  He may answer, if he knows.  Go ahead.

23   A.   I can describe what he described -- asked me in his

24   e-mails and his reasonings for contacting me.

25            MR. MOORE:  Objection, hearsay.

 1              THE COURT:  Overruled.  He may answer.

 2     A.   In that e-mail he described that it was approximately one

 3     to two months into his training as a medical student, and he

 4     was -- had requested accommodations from Creighton University

 5     and that Creighton University declined to provide the various

 6     accommodations.  He had asked me for any assistance or

 7     resources that I could provide for further help.

 8     BY MS. VARGAS:

 9     Q.   And how did you respond?

10     A.   I responded to that e-mail with four different elements.

11              MS. VARGAS:  Your Honor, if I could -- I'm sorry to

12     interrupt.  I want to make sure we're not violating the

13     Court's order.

14     BY MS. VARGAS:

15     Q.   If you could --

16              MS. VARGAS:  Your Honor, if I could provide some

17     guidance to the witness, I don't want him to cross over the

18     line.

19              THE COURT:  Dr. Moreland, you may be aware that I've

20     ruled that because you were not designated as an expert in

21     this case, you are not going to be allowed to offer opinions

22     about what accommodations should have been provided to

23     Mr. Argenyi.  And you're not going to be able to offer

24     information about your own experiences as a medical student

25     and as a physician.

1          So we are outside the presence of the jury.  I don't know

2     what the witness's answer was going to be.  I don't know if it

3     would have violated that order or not.

4     BY MS. VARGAS:

5     Q.   Dr. Moreland, how did you respond to Mr. Argenyi's

6     request or his e-mail?

7     A.   In my e-mail response to his e-mail, I described four

8     things within that e-mail.  And I remember mentioning that one

9     of my classmates, who was also deaf in medical school --

10          MR. MOORE:  Objection.  Again to the extent he's

11    going to talk about another student getting accommodations, I

12    think that violates the order.

13          THE COURT:  And it very well may.  I don't know at

14    this point in time what he said in the e-mail, what the four

15    things were.

16          And so your objection's preserved.  We'll hear what he

17    had to say.  And then that may help us later on when the jury

18    comes in.

19          Go ahead.

20    BY MS. VARGAS:

21    Q.   How did you respond to Mr. Argenyi's e-mail?

22    A.   I recall the four things.  The first I mentioned was

23    related to another student who I had observed using an

24    interpreter.  The second item was that I had offered -- and I

25    had also mentioned that the program at the University of

1    California where I had trained as a resident, there was

2    another deaf student there who worked with an interpreter.

3         I offered contact information for the medical school

4    administrator and the resident program administrator who had

5    experience with those particular issues, and maybe they would

6    be able to assist Michael in his situation.

7         I offered, with his permission, to give that contact

8    information to Michael so that he could pass that along.

9         I also described within that e-mail my experience of

10   submitting a complaint to the Office of Civil Rights.

11              MR. MOORE:  Objection, relevance, 403, hearsay.

12              THE COURT:  The objection's noted for the record.

13   I'm going to hear the rest of what he had to say about the

14   four comments that he made to Mr. Argenyi.

15   A.   And the final thing was the complaint that I had

16   suggested to the Office of Civil Rights in the fourth year of

17   my medical school and my training.  And that was submitted --

18   as I had described in the e-mail, that was submitted because I

19   had requested interpreting accommodations from the medical

20   school for the electives during my fourth year.  And those

21   accommodations were denied.

22        And because I had disagreed with the position, I went

23   ahead and proceeded with a complaint to the Office of Civil

24   Rights.  And eventually that decision -- well, that office

25   agreed with my position within my complaint.

1          Those were the four things that I had described in my

2     e-mail responding to Michael.

3     BY MS. VARGAS:

4     Q.   Did you make any other suggestions to Mr. Argenyi of

5     anything that you would do to assist him?

6     A.   Pointedly I just offered the information, and I offered

7     to put him in touch with the administrators that I had

8     mentioned.

9          And I also made it clear that I was available to provide

10    feedback or comments or just be available to be a contact --

11    in contact by Creighton University or anyone else in this

12    matter and provide my perspective.

13    Q.   And did Creighton University ever contact you?

14    A.   No.

15              MS. VARGAS:  That's all, your Honor.

16              THE COURT:  Well, the information that Dr. Moreland

17    provided in the e-mail in the four various categories is

18    objectionable, and I will sustain the objection to that

19    information.  And so that information is within the scope of

20    the Court's order in limine, and it cannot come in in front of

21    the jury.

22         If you want this witness to testify that he talked with

23    Mr. Argenyi and that he provided Mr. Argenyi with some

24    additional contact information, I'll let that in.  But, that's

25    all that I heard that is admissible.  And it's of very little

1    help really to the jury in deciding the issues that are in

2    front of the jury.

3              MS. VARGAS:  Just to clarify, may Dr. Moreland

4    testify that he offered to have Creighton University contact

5    him and that Creighton University never did?

6              THE COURT:  Well, I understand Dr. Moreland also

7    never contacted Creighton University, so this was just a

8    communication from Mr. Argenyi.  And of course, Mr. Argenyi

9    can testify to that as well.

10         Yes, I'll let you get that in if you want to get that in.

11             MR. MOORE:  We'll maintain our objection to that,

12   your Honor.

13             THE COURT:  That's fine.

14         All right.  Let's bring in the jury.

15         You may stay seated.  We will be swearing you in once

16   more in front of the jury.

17             THE WITNESS:  Yes, your Honor.

18         (Jury in at 11:01 a.m.)

19             THE COURT:  Please be seated.

20         As you can see, we have a witness who has already taken

21   the stand.  And for the record, Ms. Vargas, will you call this

22   witness on behalf of the plaintiff?

23             MS. VARGAS:  Thank you, your Honor.  The plaintiff

24   calls Dr. Christopher Moreland to the stand.

25             THE COURT:  Very good.  And Dr. Moreland, the

1     courtroom deputy will swear you in.

2              COURTROOM DEPUTY:  Please state your full name for

3     the record and spell your last.

4              THE WITNESS:  Christopher Moreland, spelled

5     M-o-r-e-l-a-n-d.

6          CHRISTOPHER MORELAND, PLAINTIFF'S WITNESS, SWORN

7              THE COURT:  You may inquire.

8                         DIRECT EXAMINATION

9     BY MS. VARGAS:

10    Q.   Could you please state your name for the record.

11    A.   My name is Dr. Christopher Moreland.

12    Q.   And where do you live?

13    A.   I live in a small town in Texas called New Braunfels,

14    which is close to San Antonio, which is the town where I work.

15    Q.   Have you ever met Michael Argenyi?

16    A.   Yes, we have met in the past.

17    Q.   When did you meet Mr. Argenyi?

18    A.   We met, I believe, in April of 2008.

19    Q.   Where did you meet?

20    A.   We met at a conference of deaf health professionals in

21    Utah.

22    Q.   And what was the name of that conference?

23    A.   The conference was provided by an organization called the

24    Association of Medical Professionals with Hearing Loss.  And

25    that is an organization of deaf and hard-of-hearing

1      professionals, for example, physicians, veterinarians and

2      nurses, and those in those fields.

3      Q.   And how did you cross paths with Mr. Argenyi at this

4      conference?

5      A.   Well, I was at that conference, I was a presenter.  I was

6      presenting about working effectively as a medical school --

7                MR. MOORE:  Objection, your Honor, to the extent he's

8      talking about his own personal experience, beyond the Court's

9      order.

10               THE COURT:  All right.  Sustained.

11     BY MS. VARGAS:

12     Q.   Did you have an opportunity to communicate with

13     Mr. Argenyi?

14     A.   Yes, that day I did.  We met and we did have an

15     opportunity to talk.

16     Q.   And what did you discuss?

17     A.   Well, what I recall -- I don't recall all of it because

18     that was quite a while ago, but we had met for the first time.

19     We introduced each other -- we introduced ourselves to each

20     other.  We talked about a couple of things.  He had some

21     questions for me concerning how I was able to function as a

22     deaf physician and --

23               MR. MOORE:  Objection, your Honor, instead he's

24     talking about his personal experience.  That's beyond the

25     scope of the order in this court.

 1              THE COURT:  We'll stop at that juncture.  Sustained.

 2              MS. VARGAS:  Your Honor, I would just note the

 3      plaintiff's objection.  Mr. Moreland needs to be able to

 4      establish the nature of his communication with Mr. Argenyi.

 5      And we're mindful of the Court's order, but the testimony that

 6      we seek to offer is the nature of their communication, which

 7      goes directly to some of the issues in this case.

 8              THE COURT:  The witness said, "He had a couple of

 9      questions for me concerning how I was able to function as a

10      deaf physician."

11          You may proceed from there.

12              MS. VARGAS:  Thank you, your Honor.

13      BY MS. VARGAS:

14      Q.   Was that the last time that you saw Mr. Argenyi?

15      A.   That was the last time that we met in person, yes, that

16      week.

17      Q.   Did you have any further contact with him after that

18      week?

19      A.   Yes.  He did contact me by e-mail, I believe, either that

20      summer or early in the fall of 2009.

21      Q.   And if you know, why did he contact you?

22      A.   His e-mail to me was requesting some information.  He was

23      going to plan to attend Creighton University, they had denied

24      some accommodations.  He asked for some information about

25      resources and other information I could provide to him.

 1    Q.   Did you offer to have contact with Creighton University

 2    on his behalf?

 3    A.   I did not offer to contact Creighton University for him.

 4    I did offer to be available if Creighton University or anyone

 5    else was interested in getting in touch with me to obtain my

 6    perspective.

 7    Q.   And did Creighton University ever contact you?

 8    A.   No, ma'am.

 9              MS. VARGAS:  No more questions, your Honor.

10              THE COURT:  Cross-examination?

11              MR. MOORE:  Thank you, your Honor.

12                              CROSS-EXAMINATION

13    BY MR. MOORE:

14    Q.   Good morning, Dr. Moreland.

15    A.   Good morning, sir.

16    Q.   Did Mr. Argenyi ever ask you to contact Creighton?

17    A.   No, sir.

18    Q.   And he never asked you to write a letter to Creighton on

19    his behalf, correct?

20    A.   No, sir, not that I recall.

21    Q.   He never asked you to affirmatively try to make any

22    communication with Creighton; is that correct?

23    A.   That is correct.

24    Q.   And of course, you didn't do that, correct?

25    A.   Are you asking if I contacted Creighton University?

1    Q.   Yes.  Did you make any attempt to contact Creighton

2    University?

3    A.   No, I did not.

4         MR. MOORE:  I have nothing further, your Honor.

5         THE COURT:  Redirect?

6         MS. VARGAS:  No further questions, your Honor.

7         THE COURT:  Thank you, Dr. Moreland.  You may stand

8    down, and you are excused.

9         THE WITNESS:  Thank you.

10        INTERPRETER:  We are asking to be excused as well,

11   your Honor.

12        THE COURT:  Yes.  And my sincere thanks to both of

13   the interpreters for your presence here today.  Thank you.

14      And the plaintiff may call its next witness.

15        MS. VARGAS:  The plaintiff calls Dr. Britt Thedinger

16   to the stand.

17        THE COURT:  Dr. Thedinger, if you will please come

18   forward to the courtroom deputy, she will swear you in.

19        COURTROOM DEPUTY:  State your full name for the

20   record and spell your last.

21        THE WITNESS:  Britt Ashley Thedinger, it's

22   T-h-e-d-i-n-g-e-r.

23         BRITT THEDINGER, PLAINTIFF'S WITNESS, SWORN

24        THE COURT:  You may inquire.

25                         DIRECT EXAMINATION

1    BY MS. VARGAS:

2    Q.   Good morning, Dr. Thedinger.  Can you please state your

3    full name for the record.

4    A.   Britt Ashley Thedinger.

5    Q.   What is your occupation?

6    A.   I'm an ear doctor.

7    Q.   Do you have an office?

8    A.   I do.

9    Q.   Where is your office located?

10   A.   9202 West Dodge Road, Omaha.

11   Q.   What position do you hold at that office?

12   A.   I'm in private practice, and I'm in the office of Ear

13   Specialists of Omaha.  We specialize in the medical and

14   surgical treatment of ear, hearing, balance disorders in both

15   children and adults.

16   Q.   Do you have any specializations within your area of

17   study?

18   A.   Yes.

19   Q.   What are they?

20   A.   I'm a board certified otolaryngologist or ear, nose and

21   throat physician.  And in the ENT workload, there's been

22   further subspecialization.  So I went off and did additional

23   training or a fellowship in doing nothing but ear problems

24   called -- it's the field of otology and neurotology.

25   Q.   Where did you attend medical school?

1    A.    The University of Kansas.

2    Q.    What did you do after medical school?

3    A.    I did a one-year general surgery internship at St. Luke's

4    Hospital in Kansas City, Missouri, and did an ear, nose,

5    throat or otolaryngology head and neck residency in Boston at

6    the Massachusetts Eye and Ear Infirmary for Harvard

7    University; and then -- that was four years, and then an

8    additional year of ear specialty training, an ear fellowship

9    or otology fellowship in Nashville, Tennessee, at the Ear

10   Foundation or the Otology Group of Nashville.

11   Q.    Thank you.  Do you hold any licenses?

12   A.    Yes.

13   Q.    What licenses do you hold?

14   A.    To practice medicine in the state of Nebraska.

15   Q.    How long have you held that license?

16   A.    Twenty-two years.

17   Q.    How long have you practiced in otolaryngology?

18   A.    Twenty-two years.

19   Q.    Do you have any other certifications other than your

20   board certification?

21   A.    No.

22   Q.    What positions have you held since you completed your

23   formal education?

24   A.    When I first moved to Omaha back in 1990, I was employed

25   by Boys Town National Research Hospital and Creighton

1    University for approximately a year and a half to two years.

2    And then I started my own private practice.

3    Q.   And what did you do when you worked for Boys Town and

4    Creighton University?

5    A.   I was a staff otologist, neurotologist, an ear doctor at

6    Boys Town.

7    Q.   In human words, what did you do?

8    A.   I was an ear doctor.  I took care of children and adults

9    who couldn't hear or had balance issues, other ear problems.

10   Q.   How long were you in that position?

11   A.   A little less than two years.

12   Q.   And what did you do after that position?

13   A.   Then I started my own private practice called Ear

14   Specialists of Omaha.

15   Q.   Have you conducted personal examinations of individuals

16   who are deaf and hard of hearing?

17   A.   Yes.

18   Q.   How many, would you say, you conducted?

19   A.   Frequently.  This is what I do for a living.  And I take

20   care of people that are hearing impaired.  So every day I'm

21   dealing with people that are of varying degrees of hearing

22   impairment, whether it's mild or if they don't have a hearing

23   loss, to they can't hear at all.

24   Q.   Are you a member of any membership or professional

25   organizations?

 1    A.    Yes.

 2    Q.    And what organizations are those?

 3    A.    For example, the American Academy of Otolaryngology,

 4    which is our national academy; the American Neurotologic

 5    Society, which is our subspecialty organization, just the

 6    people that have done the fellowship in ear training; the

 7    Otologic Society, the AMA, the Nebraska Medical Association,

 8    the Metro Omaha Medical Association.

 9    Q.    And have you received any honors or awards for your work?

10    A.    Yes, but I can't think off the top of my head what that

11    would be, unless you have reference from my CV.

12    Q.    I do have a copy of your CV.  If I could show that to

13    you, would that refresh your recollection?

14    A.    Sure.

15          MS. VARGAS:  May I approach, your Honor?

16          THE COURT:  Yes, you may.

17    A.    Under honors, awards, there's various things as far as

18    Best Doctors in America, that kind of thing.  I was in the AOA

19    which is the honorary medical society in medical school; been

20    active in the state and local medical organizations.  I was

21    the past president of the Metro Omaha Medical Society and

22    currently on the board of the Nebraska Medical Society.

23    BY MS. VARGAS:

24    Q.    Do you have any publications?

25    A.    Yes.

1    Q.    And what's the subject of those publications generally?

2    A.    They're all related to various ear problems.

3    Q.    Do any of those studies relate to cochlear implants?

4    A.    Yes.

5    Q.    Could you tell us a little about those.

6    A.    Basically most of the publications relate to treatment of

7    acoustic tumors which are skull-based tumors, tumors that grow

8    on the hearing balance nerve; other tumors called glomus

9    tumors.  There was a paper about a very unusual thing called a

10   cholesterol granuloma, surgery related to Meniere's disease,

11   cutting balance nerves to keep people from spinning; wrote a

12   little textbook, The Vertigo Handbook.  There was one about

13   bony tumors of the ear canal.

14   Q.    Have you testified before today as an expert in otology

15   and neurotology?

16   A.    Yes.

17   Q.    How many times have you testified?

18   A.    In an actual courtroom, maybe four or five times.

19   Q.    And what is your rate for your time here today?

20   A.    I don't know specifically, but I would think that it

21   would be approximately $1,000 an hour.

22   Q.    And were you deposed in this case?

23   A.    I was.

24   Q.    Do you know what the defense paid you for your time?

25   A.    It was $1,000 for the deposition.

1    Q.   And how long did the deposition last?

2    A.   About an hour.

3    Q.   And does your testimony here today depend on the

4    compensation you receive?

5    A.   No.

6         MS. VARGAS:  Your Honor, pursuant to Federal Rule of

7    Evidence 702, at this time I'd like to tender Dr. Thedinger as

8    a qualified expert witness in the field of otolaryngology with

9    a subspecialty in otology and neurotology.

10        MR. MOORE:  No objection.

11        THE COURT:  And I recognize him as such an expert.

12    I just want to correct one comment in that you had asked

13    the witness, "Does your testimony here today depend on the

14    compensation you receive?"  And I think you may have meant

15    does your compensation depend upon the testimony you offer; is

16    that fair to say that was the nature of the question?

17        MS. VARGAS:  Yes, thank you, your Honor.

18        THE COURT:  Okay.  I think I understand now.

19    Go ahead.

20    BY MS. VARGAS:

21    Q.   I'm going to ask you some questions about hearing and

22    sound.  Could you explain how a person detects sound?

23    A.   Can we start with the board so I can draw some pictures

24    which makes it --

25        MS. VARGAS:  Your Honor, may I move the chart?

1              THE COURT:  Yes.  We just need to make sure that

2      Dr. Thedinger stays near a microphone.

3              MS. VARGAS:  Yes, your Honor.

4          (Off-the-record discussion had.)

5              THE WITNESS:  Can everybody hear me?

6      A.   These are three main -- three parts of the ear.  There's

7      the outer ear, which is your ear canal, your middle ear, and

8      your inner ear.

9          And inside your middle ear, there are three little ear

10     bones.  And most of us refer to them as the hammer, anvil and

11     stirrup bones, or the malleus, incus and stapes.  So we have

12     your outer ear canal, the middle ear, and the inner ear which

13     is the cochlea.  And then you have three balance canals and a

14     central portion of the inner ear which controls your

15     equilibrium.

16         So sound is mechanical energy.  So if you put your hand

17     in front of your mouth, you can actually feel vibrations

18     coming out.  So the mechanical energy is essentially

19     vibrations that come out, hit the eardrum, it vibrates -- the

20     three little ear bones vibrate.  And then that fluid inside

21     the inner ear, corresponding to that pitch, stimulates little

22     nerve endings in the inner ear.  That sends the information

23     down the nerve, back into your brain.

24         So that electrical impulse, the mechanical energy comes

25     down, turns into an electrical impulse which goes down the

1    electrical wire which goes in the lower part of the brain.

2    And then it goes up into your temporal lobe in your brain

3    which processes the sound.

4        So inside the inner ear, if you make your cross-section

5    of the inner ear, you have these little cells that look like

6    this (indicating), that have little projections, little

7    hairlike projections.

8        And when the vibration comes in, if it's higher pitched,

9    it will be in the lower part of the cochlea.  So it goes from

10   high pitches, down to the lower pitches.

11       So these cells inside the inner ear, we call them outer

12   and inner nerve cells.  And the outer cells -- so the

13   vibration, the fluid starts vibrating and the membrane

14   vibrates.  And at that pitch, these cells send off

15   information.

16       The outer ear nerve cells determine volume, pitch.  The

17   inner ear nerve cells are there for understanding ability.  So

18   there's two parts of hearing.  There's volume where I make

19   things a lot louder, but then there's clarity or

20   discrimination.  It's your understanding ability.

21       So in hearing tests, what we'll do is we'll have two

22   parts, the volume part and the clarity part.

23   Q.   And how well can an average person detect sound?

24   A.   Well, with normal hearing, you'd be able to hear me speak

25   probably pretty much without a microphone.

1    Q.   Could you explain what an audiogram is?

2    A.   An audiogram is a hearing test.  And it's a graph.  And

3    along the top part, there are the frequencies.  So low pitch

4    sounds, frequency.  So it would be like 500 hertz and 1,000

5    hertz -- a thousand K, so 2K, 4K, 8K.  So 8,000.

6         And along this line is what we call decibels or the

7    amount of sound loudness.  And normal hearing is above 25

8    decibels.  So it goes 0, 10, 20, 30, 40, 50, 60, 70, 80, 90.

9         The important speech frequencies are between 500 and

10   4,000 hertz.

11        So, for example, in the higher pitches, it's going to

12   correlate the speech sounds like S, TH, P and F.  We describe

13   hearing loss in degrees of mild from 25 down to, let's say,

14   45; 45 down to 65 would be moderate; 65 down to 90 is severe;

15   and below 90 is called profound.  So we have mild hearing

16   loss, moderate hearing loss, severe and profound.

17        So if your hearing started out normal and then dropped

18   off, we would say that the patient would have a normal to,

19   let's say, severe sensorineural hearing loss.

20        For reference purposes, a whisper is 25 decibels,

21   conversational speech is 50 to 60 decibels, and a lawnmower

22   would be 90 decibels.

23   Q.   What impact does background noise have on hearing?

24   A.   Background noise -- so when I'm sure -- and when we do a

25   hearing test, it's in a soundproof room is the ideal

1    situation.

2        But remember, when we put you in a soundproof room and do

3    your hearing test, that information -- those sounds are picked

4    up by the little cells starting with the electrical impulse.

5    They go down the nerve, and then they go up in the brain to be

6    processed.

7        So some people do better in background noise processing

8    sounds.  So if I go to a noisy restaurant, I have a very hard

9    time hearing people across the table from me.  I don't do very

10   well with a lot of background noise.  If my 19-year-old is in

11   the back seat of the car and he's talking to me, he just looks

12   out the window and the radio is on, I just can't hear him with

13   the background noise.

14   Q.   How does a baby learn to make sense of sound?

15   A.   Well, when we're born, our brains are not fully

16   developed.  And most of us have -- learn our speech and

17   language by the first 18 to 24 months of age.

18       So that portion of your brain is absorbing all that

19   sound.  That's why it's very important to be talking to a

20   baby, giving them vocabulary and sound.  That's where they

21   learn the language.

22       After about two years, that temporal lobe portion of the

23   brain that absorbs the sound and makes sense of it starts to

24   close up.  So it's very important to be able to have that

25   hearing as early as possible.

1    Q.   Can you explain, what is a hearing aid?

2    A.   A hearing aid is basically a device that increases

3    vibrations or sounds, so it's acoustical sounds.  When you put

4    a hearing aid in somebody's ear, it's increasing the amount of

5    vibration that's hitting the eardrum or hitting those little

6    ear bones to increase the vibrations that get into the inner

7    ear.

8         So if you have a hearing loss, all you're doing is

9    driving the vibration, more of it into the inner ear to

10   stimulate those cells that are remaining.

11        So with a hearing loss -- first of all, a hearing loss

12   can be one of two ways -- or a third:  If you plug up your ear

13   and put your finger over your ear, that's a conductive hearing

14   loss.  Sound can't get to the inner ear.

15        Or if the little ear bone is stuck, let's say the stapes

16   bone is stuck with some calcification, that doesn't allow the

17   vibration to get into the inner ear.  So that's a conductive

18   hearing loss.

19        I can do surgery to fix the little ear bones so they can

20   vibrate better.  But if it's a nerve loss in the inner ear, I

21   can't go in and surgically fix those cells and bring them

22   back.  So if the cells are dying inside the inner ear, that's

23   a nerve loss.

24        I mean, there's a combination -- you could have a

25   combination of a conductive loss and a nerve loss.

1    Q.   How does a hearing aid impact a person with a mild

2    hearing loss?

3    A.   It's all very subjective.  And in our practice or in the

4    hearing world, hearing aids are done on a trial basis.

5         So if you have a mild hearing loss, for some people, they

6    come in and say, "I'm not really having that much difficulty.

7    I don't think I want to take that next step."

8         So when people come in with those types of losses, they

9    feel like they're struggling.  And a lot of it depends on what

10   you do and how active you are.  If they're feeling that it's

11   affecting their hearing and their quality of life, then we

12   say, "Here's a type of hearing aid technology you should try."

13   And they try it for a month or two and see if they like it and

14   if it's going to be a benefit.  And if not, they can return

15   it.

16   Q.   How does a hearing aid help a person with a severe to

17   profound hearing loss?

18   A.   Again it's just increasing the sound.  It gets into the

19   inner ear to give those cells the ability to send that

20   information to your brain.

21   Q.   What is the impact of background noise on hearing aid

22   users?

23   A.   Again, it's processing.  So when that sound gets up into

24   your brain, if there's a lot of background noise, sometimes

25   it's harder for people to understand those words.  So

1    background noise does affect the ability to hear.

2    Q.   And can you explain what a cochlear implant is?

3    A.   Yes.  The reason why people start losing -- when we make

4    that cross-section through the inner ear, those little cells

5    that take the vibration and turn it into electrical impulse

6    which goes back to the brain, the more cells you lose, the

7    more hearing loss.

8        So when people have a complete loss or a lot of loss of

9    these cells that pick up the vibration, it determines the

10   severity of their hearing loss.

11       So, these cells, remember they send information and they

12   start the electrical impulse.  And it goes down a nerve and it

13   goes to a nerve body right here (indicating) which then sends

14   the information up to your temporal lobe.

15       So what a cochlear implant is, there's two parts:  The

16   internal part, which I'll show you in just a second, is

17   something that's actually put into the inner ear.  And they

18   have these little electrodes.  So it's a tail with electrodes

19   on them.  There's typically 22 to 24, depending on the maker.

20       And so the tip that goes in -- so if we draw our cochlea,

21   if we sink this in the inner ear, these electrodes, they go

22   along the way here, send an electrical impulse which goes to

23   that nerve body.  So it's not stimulating those cells, they're

24   gone.  That's why you're hearing impaired.  It's just sending

25   an electrical impulse that goes to the nerve body which then

1    starts the electrical impulse going up to the brain to be

2    understood.

3    Q.    Who is eligible to get a cochlear implant?

4    A.    You have to have a severe to profound hearing loss.

5          So typically the patients with a cochlear implant -- so

6    if this (indicating) is the severe level, they have to be

7    somewhere below 70, 80 decibels.  And their understanding

8    ability, if you give them a list of words, typically they get

9    less than 40 percent.

10         So if we give you a list of words in a soundproof room

11   and you only get 30 percent, and you have the severe loss,

12   then most likely you would benefit from a cochlear implant.

13   Q.    Now, suppose you have a person who's lost his or her

14   hearing as an adult and then gets the cochlear implant.  How

15   would that person's ability to detect sound compare to a

16   person with normal hearing?

17   A.    Well, patients that I see that have a -- hearing loss

18   progresses.  And now hearing aids are not helpful.  They're no

19   longer able to really communicate on the telephone.  And you

20   put in a cochlear implant, they're going to have improved

21   hearing.  It won't be normal hearing, but it will be much

22   better.

23         And the improvement depends upon a couple factors,

24   whether the patient has been wearing hearing aids and

25   stimulating those electrical pathways.  So if somebody comes

1    in 20, 30 years with a bad hearing loss and has not been

2    stimulating that electrical wire, those cells of the brain

3    start to atrophy.  And the electrical wire stops working.  So

4    the patients wearing hearing aids, the hearing is getting

5    hearing worse; and stimulating the pathways, they'll do

6    better.

7         We also think that there's some people that do better

8    than others, depending upon the nerve bodies that remain.

9         So if you have a lot of these nerve bodies remaining, you

10   have more cells or more of the electrical wire alive that's

11   sending information up to your brain.

12   Q.   What is the difference between a person who receives a

13   cochlear implant when they're very young versus a person who

14   receives cochlear implants when they're 18, 19, 20 years old?

15   A.   Well, depends on when you lost your hearing.  If you're

16   born hearing impaired or born deaf, then we want to find those

17   children as early as possible so that we can provide hearing

18   aids and auditory stimulation, hearing stimulation as quickly

19   as possible.  And if there's truly a severe profound hearing

20   loss, we will advocate that we put a cochlear implant by 11 to

21   12 months of age.

22   Q.   Why is that?

23   A.   Because again your brain is developing and it's absorbing

24   that.  That's when we learn how to hear and speak.  So if we

25   can find a child very early -- and pretty much every hospital

1    in the country, we have a thing called newborn hearing

2    screening where every child who is born gets the hearing

3    screening typically before they leave the hospital.  We want

4    to find them as early as possible to give them every

5    capability to hear and speak.  So the sooner you find them and

6    treat them with the cochlear implants, the better their

7    hearing and speech will be.

8    Q.   And how does the sensation of hearing through a cochlear

9    implant compare with the sensation of normal hearing?

10   A.   Right.  So a cochlear implant is electrical stimulation.

11   So a patient will come in and say at the very beginning it

12   sounds very electrical, kind of a Donald Duck type of thing.

13   And then over the course of time, their brain starts to

14   relearn it; again, using electrical stimulation rather than

15   the auditory or vibratory mechanisms going through those

16   cells.  So with time people say it starts to sound more and

17   more normal, more and more natural.

18        So there's a learning process that goes on when you get

19   the implant.  People continue to improve.  We used to think

20   that they improved the first three to six months; then

21   improvement tends to be gradual over the years.

22   Q.   And what's the impact of background noise, the ability of

23   a person with a cochlear implant to hear and understand

24   speech?

25   A.   Typically background noise will reduce your ability to

1    hear well.

2    Q.   Why is that?

3    A.   Because it's competing sound.  So if you're trying to

4    hear one's speech and there's a lot of ambient noise, it's

5    hard to hear those words in competition with the background

6    noise.

7    Q.   I'd like to ask you some questions specifically about

8    Mr. Argenyi.  Do you know Mr. Argenyi?

9    A.   I met Mr. Argenyi once.

10   Q.   Okay.  And actually let me back up for a second.  Before

11   you met Mr. Argenyi, did you have any contact with Creighton

12   University?

13   A.   Yes.

14   Q.   And what was the nature of that contact?

15   A.   In my recollection, it was a fact-finding sort of meeting

16   to get information about what a cochlear implant is, how it

17   works.  Here's a medical student, we got this information or

18   here's his history, the fact that he's got bilateral cochlear

19   implants, so he's -- they're coming to get information about

20   how a cochlear implant patient would function in a classroom

21   setting, a lecture hall setting, what kind of accommodations

22   should be made, how he should be performing.

23   Q.   Who was present at that meeting?

24   A.   Scott Moore and two other people, and I don't know their

25   names.

1    Q.    Do you know who they work for?

2    A.    It's in my chart.

3    Q.    If it will refresh your recollection...

4    A.    It would be Amy Bones -- it would be a woman and another

5    gentleman.

6    Q.    It's okay if you don't know his name.

7          And what did they tell you?

8    A.    They just told me they had a student at Creighton Medical

9    School who had bilateral cochlear implants, was requesting

10   additional accommodations to help hear in the classroom and in

11   the medical school arena.

12   Q.   Did they say anything about his ability to understand the

13   content of the medical education?

14   A.    I think something was -- how would he perform in a

15   lecture hall, would he be able to understand what was going

16   on.

17   Q.   Did they say anything to you about his current

18   performance in terms of understanding what was going on?

19   A.    I really couldn't comment because I didn't have all the

20   facts as far as what his ability -- what his performance was

21   with the cochlear implants in place.

22          THE COURT:  I'm going to interrupt for just a moment.

23   If the witness is done with this exhibit or this demonstrative

24   stand, let's go ahead and get it out of the way.  Let's get

25   Dr. Thedinger back up on the stand where it will be much

1    easier for everyone to hear him and see him and for the

2    reporter to make a record.

3    BY MS. VARGAS:

4    Q.    Dr. Thedinger, what is it that you're holding in your

5    hand?

6    A.    This is what a cochlear implant looks like.  So there's

7    the internal portion that we make a small incision, and we

8    drill out the mastoid bone.  And then this one tail gets

9    placed into the inner ear, so it's got a little curve to the

10   end of it.  And it's those -- it's that tail that has the

11   electrodes on it that stimulate those nerve bodies we were

12   talking about.

13       The other little wire is just a grounding electrode.  So

14   there's a magnet that holds the external portion in place over

15   the skin.  This is the receiver inside the internal device.

16   So the outer part is basically a microphone that picks up the

17   sound and a computer chip and some batteries.

18       So the sound is picked up.  It's analyzed.  The

19   information is then sent down this wire to the transmitter,

20   which sends the information and the power to the receiver,

21   which says which electrodes -- what's the pitch of the sound

22   so that you can discern what the sound is.

23   Q.   When you met with Mr. Moore and Ms. Bones and the other

24   individual in February of 2009, did they give you any

25   documentation from Mr. Argenyi?

1    A.   No, I don't think so.

2    Q.   Did they give you copies of his audiograms?

3    A.   I don't recall, but I don't think so.

4    Q.   Did they give you any copies of any letters from his

5    treating physician?

6    A.   I don't think so.

7    Q.   Did they give you copies of any letters from his treating

8    audiologist?

9    A.   No.

10   Q.   What did you advise them?

11   A.   I think I tried to educate them on what a cochlear

12   implant is and how people perform and what may be the

13   challenges that he would have in the classroom in a medical

14   school setting.

15   Q.   What kind of challenges would those be?

16   A.   It would be actually hearing the lectures in a lecture

17   hall and being able to communicate with people.  And at one

18   point I think I suggested if I was really going to make some

19   comments, I'd have to -- I mean, I'd have to see some data to

20   say what's his performance with his cochlear implants.

21   Q.   Did they give that documentation to you?

22   A.   No.  I think that's what led to a meeting on May 6th of

23   2010 where I met Mr. Argenyi.

24   Q.   And did Creighton University ever ask you to evaluate

25   Mr. Argenyi?

1    A.    I don't think so, no.

2    Q.    Who asked you to evaluate Mr. Argenyi?

3    A.    I thought it was from the Nebraska Advocacy Services,

4    Dianne DeLair.

5    Q.    And when -- so you testified that you assessed

6    Mr. Argenyi's hearing.

7    A.    Correct.

8    Q.    And when was that?

9    A.    That was May 6, 2010.

10   Q.    And where did you test him?

11   A.    At my office at 92nd and Dodge.

12   Q.    And was he wearing his cochlear implant?

13   A.    Yes.

14   Q.    Was it turned on?

15   A.    Yes.

16   Q.    Was --

17   A.    Both of them were on.

18   Q.    Was this assessment that you did done in the same manner

19   that you would assess any other patient?

20   A.    Yes.

21   Q.    And what documents did you review?

22   A.    I was given a letter at one point from Dr. Backous out in

23   Seattle of May 27, 2009, which kind of outlined his history

24   and his recommendations to Creighton.

25        And then we basically went ahead with our own testing of

1    his performance with his cochlear implants in place, on.

2              MS. VARGAS:  Your Honor, may I approach the witness?

3              THE COURT:  Yes, you may.

4    BY MS. VARGAS:

5    Q.   I'm showing you what's been marked as Plaintiff's Exhibit

6    21.  Can you explain what this is.

7    A.   These are the audiometric results of our testing on

8    May 6, 2010.  And the first sheet is simply an audiogram.  And

9    with his cochlear implants in place, we give him sounds at the

10   various pitches.  And then he tells us when he can hear that

11   sound at that level of loudness in decibels.

12        So on the right side, he's close -- he's what we would

13   call normal borderline hearing loss with his cochlear implant

14   in place on the right, and a borderline-to-mild loss with his

15   cochlear implant on the left.

16        The Freedom is the name of the device, the Freedom

17   Processor.  And 3G is the third generation.  It designates

18   what type of cochlear implant he has.

19   Q.   So --

20   A.   And then actually the solid dots, it's with the cochlear

21   implants, his responses with both of his cochlear implants in

22   place.

23   Q.   And under what conditions was this test performed?

24   A.   This is in a soundproof booth.

25   Q.   What does that mean?

1    A.   It's a eight-by-eight large looking refrigerator box.

2    It's got thick walls with insulation.  It's kind of off the

3    ground.  It's not attached to any walls so there's no

4    vibration coming into this booth.

5         There's one side where the patient sits.  On the other

6    side there's a wall with a window where the audiologist is,

7    presenting the sounds and the words to assess his speech

8    understanding.

9    Q.   Okay.  Is this a test that's widely used in your

10   profession to test hearing?

11   A.   This would be a standard test around the world.

12   Q.   And if you turn to the second page, pages 2 through 4 --

13   let me ask you one more question about the first page.  That

14   first page, what kind of sound is it testing for?

15   A.   Well, as you can see, where the Cs are and the solid

16   dots, so at 500 hertz, which is a low pitch sound, he could

17   actually detect the sound at 30 -- at 25 decibels.

18        Then at 1,000 hertz -- so we go up a little bit in a

19   higher pitch and we give him tones, and he tells us when he

20   can actually hear that beep go off into his implant.

21   Q.   So this test -- would this test play beeps --

22   A.   Yes.

23   Q.   -- for him to respond to?

24   A.   Beeps at particular frequencies.

25   Q.   Are there any words in that test on that first page?

1    A.    No.

2    Q.    And does the test on the first page tell you how well he

3    can understand speech in the real world?

4    A.    No.

5    Q.    Why is that?

6    A.    We're just giving him beeps at frequencies of sound.

7    Q.    All right.  Now if you could turn, I guess, to page 2 to

8    4 and tell us what that represents.

9    A.    This is what we call a hearing and noise test, which is a

10   pretty standardized test in the country where we actually have

11   ten sentences that we read to them.  For example, the first

12   sentence is, "A neighbor's boy has black hair."

13        And then he has to repeat that sentence word for word.

14   And out of that sentence, he got four out of six words

15   correct.

16   Q.    Is this test widely used by professionals in your field

17   as well?

18   A.    Yes.

19        MS. VARGAS:  Your Honor, at this point I'd like to

20   move to enter Exhibit -- Plaintiff's Exhibit 21 into evidence.

21        MR. MOORE:  No objection.

22        THE COURT:  Exhibit 21 is received.

23   BY MS. VARGAS:

24   Q.    And can you explain what these results show for

25   Mr. Argenyi?

1    A.   So on the right side, his right processor at 55 decibels

2    of sound, he gets 79 percent of the words correct.  On the

3    left side, again at 55 decibels, he gets 55 percent of the

4    words correct.

5    Q.   And how many of the words does he miss?

6    A.   45 percent on the left and 21 percent on the right.

7    Q.   And under what conditions is this test given?

8    A.   This again is done in the soundproof booth where the

9    audiologist is hooked up to his implant and the sound goes

10   into his implant.

11   Q.   And what does the second page show?

12   A.   So it says received at 55 decibels, so essentially we

13   take his pure tone thresholds -- I don't want to confuse you,

14   but on the first graph, you can kind of see where the results

15   are down about 25 decibels in both ears, or a little worse on

16   the left.

17        And then we typically add a certain amount of decibels,

18   20 decibels, to that baseline to get to 55.  And when we give

19   him the sentences with both implants in place, he gets 67

20   percent of the words correct.

21   Q.   So what does that mean if you understand 67 percent of

22   one of these sentences?

23   A.   Well, like the first line there, list 15, "the house has

24   nine bedrooms," he gets three of the five words correct.  So

25   if you don't hear "nine bedrooms," the house has (descriptive

1    sound).  He's missing a third of the sentence on average.

2    Q.   Okay.  And how would you expect his performance, meaning

3    his understanding of speech, to change in a real world

4    setting?

5    A.   Well, that will be when we go to the next one, which

6    we -- well, that's with the FM system.  So you take that 67

7    percent.  In a perfect world, we throw in some background

8    noise or somebody looks away -- these people in the real world

9    have visual cues.  You look at people, and you can kind of

10   read their lips.

11        So in the real world, that 67 percent's not going to be

12   probably what he's actually hearing.  It would be less,

13   probably.

14   Q.   So you testified that Mr. Argenyi had his cochlear

15   implants on when you tested him.  Did you test him with the FM

16   system that Creighton provided?

17   A.   Then on list 16, that's with the FM system only.

18   Q.   And what does that show?

19   A.   That shows he gets 62 percent.  But we do this with

20   what's called a signal-to-noise ratio.  So the signal, with

21   the FM system we set it at a certain level, throw in a little

22   background noise so there's a lot of signal, a lot of sound

23   going to the implant, a little background noise; he gets 62

24   percent.  If we sort of decrease the signal, keep the noise

25   level, the background noise level, then he drops down.  That

 1    next page is 38 percent.

 2         So if we give him the list of words with both implants,

 3    the FM system, things are fairly quiet -- quieter, there's not

 4    as much background noise, or we have a stronger signal, he has

 5    62 percent.  If we decrease the amount of signal going to the

 6    cochlear implants, his understanding ability goes down to 38

 7    percent.

 8    Q.   And based on your testing of Mr. Argenyi, did you form an

 9    opinion about the effectiveness of the FM system that was

10    provided?

11    A.   That he actually kind of did worse with the FM system in

12    place.

13    Q.   And why would that be?

14    A.   That's just the way he performs.

15    Q.   Would that be a surprising result to you?

16    A.   Yes and no, because it's again fairly subjective.  And

17    some people do better with an FM system than others.

18    Q.   How does the language in these tests compare to the

19    language in a medical school lecture, if you know?

20    A.   Well, for example, if you look at list 25 where it says

21    38 percent, "his father will come home soon," that's a little

22    bit different language than when you go to medical school.

23         So there's -- there's -- I would say there are more

24    complex or more specific things that are being discussed in a

25    lecture in medical school.

1     Q.   And how would that complexity impact his ability to

2     understand?

3     A.   Well, I think it would make it more difficult.

4     Q.   What impact would you expect the environment to have on

5     Mr. Argenyi's ability to hear, for example, in a lecture hall

6     versus a sound booth?

7     A.   He'd have much more difficulty in a lecture hall or a big

8     room with poor acoustics.

9     Q.   What other factors would make it more difficult for him

10    to understand in the real world?

11    A.   Ambient background noise; if people are talking in the

12    lecture halls, a lot of things going on, people messing with

13    things.  In the old days when I was in a medical school

14    there's a big audiovisual, there's the humming of a slide

15    projector, those types of issues.

16    Q.   And how would you expect Mr. Argenyi to perform, say, in

17    an anatomy lab with a microphone suspended up in the air and

18    the FM system connected to his cochlear implant?

19    A.   I would expect him to have again more difficulty because

20    he's not actually seeing the professor speak or can't read

21    lips.  So he's going to be dependent strictly on auditory

22    hearing.

23              MS. VARGAS:  May I approach, your Honor?

24              THE COURT:  You may.

25    BY MS. VARGAS:

1    Q.   I'm showing you what's been admitted into evidence as

2    Plaintiff's Exhibit 20.  Do you recognize this document?

3    A.   Yes.

4    Q.   What is it?

5    A.   It's a letter that I wrote to Dianne DeLair down at the

6    Nebraska Advocacy Services regarding Michael Argenyi after my

7    assessment on May 6, 2010.

8         (Off-the-record discussion had.)

9    BY MS. VARGAS:

10   Q.   I'm sorry.  Can you tell us about that letter?

11   A.   The first paragraph talks about meeting Michael and his

12   age and a little bit of his history.  His examination was very

13   normal.  He had well healed incisions behind his ears.

14        And I talked about the audiological results that we just

15   discussed.  And I make the statement that it does appear that

16   the FM system does not provide any significant benefit.  And

17   today's results show it actually reduces his discrimination

18   ability.

19        It's important to have your implants programmed -- put

20   this on the computer and make sure that you're hearing as well

21   as possible.  And we talk about needing to have them

22   reprogrammed and adjusted as needed on a fairly frequent basis

23   to make sure they're working as well as possible.  And I'd be

24   happy to address any other questions as they arose.

25   Q.   And did Creighton University contact you ever again?

 1    A.   I don't think so.

 2    Q.   The percentages of Mr. Argenyi's hearing, you testified

 3    about understanding 67 percent.  How would that impact

 4    understanding in an ongoing lecture of an hour or two hours or

 5    three hours?

 6    A.   Well, it all builds on itself.  So they're building

 7    blocks.  And you learn about certain things, and it's

 8    important to have those basic facts.  So if you're missing

 9    things along the way, those gaps start getting wider and

10    wider.

11    Q.   When a person receives a cochlear implant, can you talk a

12    little bit about what kind of impact listening and discerning

13    sound would have on that person physically?

14    A.   So we spend a lot of time with patients about realistic

15    expectations, what -- most people think I'm going to come in,

16    put this thing inside your ear, and you're going to wake up

17    and hear normally.  And that's not the case.  There's a

18    learning curve.

19         So we try to temper their enthusiasm about hearing again.

20    So we -- when we do the surgery, we wait a week, let the

21    swelling go down.  And then we turn on the device, and we turn

22    it on fairly gradually.  We don't want to overwhelm them with

23    sound because they haven't heard many of these sounds at that

24    level for quite a while.

25         So there is this learning of what sounds are.  And so we

1     actually have the patients go home and get the newspaper and

2     read out loud so they actually see the word and they start to

3     hear it from their own voice.

4         And so we actually work with families and say, "Here are

5     some speech therapy type of things that you can do at home to

6     help your ability to discriminate sound."

7     Q.   What impact does this speech discrimination have on

8     fatigue and general physical well-being?

9     A.   Well, many of my patients who are hearing impaired,

10    whether it be moderate or severe, someone can get very

11    frustrated because when you don't hear well, it's difficult to

12    communicate with your wife, your spouse, your boss, your

13    coworkers, whatever.  You have to expend a fair amount of

14    energy to hear what the heck is going on.

15        So my hearing aid patients or my hearing loss patients

16    will come in and say, "I just feel exhausted at the end of the

17    day because I'm really working at hearing," where most of us

18    take that -- this sense for granted.

19             THE COURT:  Ms. Vargas, it is noon, and so we're

20    going to break now.  And we will be in the noon recess.

21        Let's take an hour and 15 minutes.  Please reconvene in

22    the jury room at 1:15 and we'll begin again.

23        Thank you.

24        (Recess taken at 12:01 p.m.)

25        (At 1:19 p.m. on August 22, 2013, with counsel for the

1    parties, the plaintiff, and the defendant's representative

2    present, and the jury NOT present, the following proceedings

3    were had:)

4          THE COURT:  Dr. Thedinger, you may go ahead and

5    retake the stand before the jury comes out.  Thanks very much.

6        BRITT THEDINGER, PREVIOUSLY SWORN, RESUMED THE STAND

7          THE COURT:  Anything else that we have to talk about

8    before the jury comes in?

9          MR. MOORE:  Nothing from the defendant.

10         THE COURT:  All right.  Please bring in the jury.

11         (Jury in at 1:21 p.m.)

12         THE COURT:  Please be seated.

13       Ms. Vargas, you may continue with your direct

14   examination.

15         MS. VARGAS:  Thank you, your Honor.

16                  DIRECT EXAMINATION (Cont'd.)

17   BY MS. VARGAS:

18   Q.   Dr. Thedinger, did you have your deposition taken in this

19   case?

20   A.   Yes.

21   Q.   And who conducted that deposition?

22   A.   Scott Moore.

23         MS. VARGAS:  May I approach, your Honor?

24         THE COURT:  Yes, you may.

25   BY MS. VARGAS:

DR. THEDINGER - DIRECT                                    141

1    Q.   Is that the testimony that you gave in deposition in this

2    case?

3    A.   Yes.

4    Q.   And could you begin reading on line 5, please, through

5    the bottom of the page?

6            MR. MOORE:  Objection, hearsay, your Honor.

7            THE COURT:  Can you tell me what purpose the

8    deposition is being offered for, Ms. Vargas?

9    BY MS. VARGAS:

10   Q.   Dr. Thedinger, you testified earlier that you were --

11           MR. MOORE:  Can we have a sidebar, your Honor?

12           THE COURT:  Okay.

13           MR. MOORE:  Thank you.

14       (Bench conference on the record.)

15           THE COURT:  The reason I asked you about the purpose

16   is I'm unsure whether you're attempting to impeach something

17   he said or whether you're trying to refresh his recollection.

18           MS. VARGAS:  Refresh his recollection.

19           THE COURT:  Okay.  Then I don't want him to read out

20   loud to the jury --

21           MS. VARGAS:  Okay.  Sure.

22           THE COURT:  -- at this juncture.  If you would tell

23   him the page and the lines you want him to read, and then ask

24   him if that refreshes his memory.

25           MS. VARGAS:  Okay.

1          THE COURT:  And then go on with your questioning,

2     then that will be fine.

3          MS. VARGAS:  Sure.

4          THE COURT:  Okay?  Thank you.

5      (End of bench conference.)

6     BY MS. VARGAS:

7     Q.   Dr. Thedinger, you testified earlier about a meeting that

8     took place between Mr. Moore and Amy Bones and another

9     individual in February of 2009.

10         If you look at the page that I handed you, line 5 through

11    19, does that refresh your recollection of what happened at

12    that meeting?

13    A.   Yes.

14    Q.   And what happened at that meeting?

15    A.   As I mentioned in the deposition, it was -- from my

16    recollection, they were trying to get information about how a

17    cochlear implant works, what type of hearing would this

18    patient have with bilateral cochlear implants, and how it

19    would affect his ability to be in medical school.

20    Q.   And what did they say to you about his ability to

21    communicate in medical school?

22    A.   My understanding is he was having difficulties hearing in

23    the lecture halls and what kind of other accommodations, would

24    this be reasonable, what other kind of technology would he

25    require.

1    Q.   All right.  Thank you.

2              MS. VARGAS:  May I approach, your Honor?

3              THE COURT:  Yes, you may.

4         (Off-the-record discussion had.)

5    BY MS. VARGAS:

6    Q.   Dr. Thedinger, I'm showing you what's been entered into

7    evidence as Plaintiff's Exhibit 18.  Have you seen this

8    document before?

9    A.   Yes.

10   Q.   And did you rely on this document in forming the opinions

11   about Mr. Argenyi's ability to hear and understand?

12   A.   Yes.

13   Q.   And in looking at this -- can you describe what this

14   document is?

15   A.   This is a letter by Stacey Watson who is an audiologist

16   and Doug Backous who is the otologist -- neurotologist at

17   Virginia Mason which is up in Washington state.  And it's

18   addressed to Creighton University School of Medical, to whom

19   it may concern.

20        And it's clarifying certain information with regards to

21   Mr. Argenyi and his hearing loss, as well as what a cochlear

22   implant is, how it works, the status of Michael's deafness,

23   whether he's using his cochlear implants or not.

24   Q.   Can you look -- I'm sorry to interrupt.

25        Can you look at the bottom paragraph of the first page

DR. THEDINGER - DIRECT                                    144

1   and read that aloud?

2   A.   "Michael remains to be deaf regardless if he is or is not

3   using his cochlear implants.  He is able to detect sound in

4   the mild hearing loss category, but this does not mean Michael

5   has a mild hearing loss.  He does not understand or use sound

6   like someone with a mild hearing loss.  Michael has a

7   bilateral profound sensorineural hearing loss.  His hearing

8   loss requires Michael to concentrate at a much higher level

9   than someone with mild hearing loss.  This can be stressful in

10  a difficult listening environment."

11  Q.   And did you agree or disagree with the information

12  contained in that paragraph?

13  A.   I think this would apply to anybody with cochlear

14  implants.

15  Q.   And if you turned to the next page, read the top

16  paragraph.

17  A.   "Making use of the electrical stimulation through the

18  cochlear implant systems is not an easy task.  Factors that

19  affect the quality of sound Michael receives include, but are

20  not limited to neural survival and placement of the electrode

21  array, auditory processing of the sounds received, duration of

22  use with the implant, cause of hearing loss, and duration of

23  auditory deprivation.  The longer Michael uses his cochlear

24  implant systems the better he will become at using the sound

25  to his advantage."

1    Q.   And do you agree or disagree with the information

2    contained in that paragraph?

3    A.   It's very well stated.

4    Q.   And moving on to the next paragraph, would you read that,

5    please?

6    A.   "It is imperative that Michael have access to visual cues

7    for everyday communication and education.  Visual cues

8    include, but are not limited to closed captioning on videos

9    and films, real-time captioning for lectures and discussions,

10   and speech reading cues for one-on-one interactions.  Without

11   visual cues, cochlear implant users experience more difficulty

12   understanding speech in demanding listening environments.

13   Michael is no exception.  With these accommodations in place,

14   Michael has proven himself to do quite well.  For specific

15   requests, please see our letter dated 27 May, 2009."

16   Q.   And did you agree or disagree with the information

17   contained in that paragraph?

18   A.   I would agree with this.

19   Q.   And the last paragraph?

20   A.   "Michael is adept at identification of what he needs in

21   order to be successful in spite of his hearing loss.  He is

22   motivated to do well.  Please feel free to contact our Center

23   should you have further questions or concerns related to the

24   topics discussed in this letter."

25   Q.   And based on your interactions with Mr. Argenyi, do you

1    agree or disagree with the information contained in that

2    paragraph?

3    A.   Remember I only met Michael once, but I would presume

4    that he is motivated to do well.

5    Q.   And if you could turn back to the first page, could you

6    tell us what the date is of this letter?

7    A.   September 10, 2009.

8    Q.   Thank you.

9         MS. VARGAS:  May I approach, your Honor?

10        THE COURT:  Yes, you may.

11   BY MS. VARGAS:

12   Q.   Dr. Thedinger, have you seen this before?

13   A.   Yes.

14   Q.   What is it?

15   A.   A letter from Stacey Watson the audiologist and Doug

16   Backous the ear doctor at Virginia Mason.  And it's addressed

17   to Creighton University School of Medicine, September 28,

18   2009.

19   Q.   And did you review this document --

20   A.   I read this document --

21   Q.   -- before you --

22   A.   -- yes.

23   Q.   And if you could read the first full paragraph on the

24   first page, please?

25   A.   "Michael -- oh.  "This letter is in response to your

1    letter dated 12 September, 2009."

2         "Michael does require visual cues for communication in

3    order to be successful with speech understanding.  The scores

4    reported in an earlier report were achieved during a focused

5    evaluation session in which Michael is listening for everyday

6    phrases in a structured quiet listening environment (sound

7    test booth).  His speech understanding for new and difficult

8    vocabulary may decrease in the real world."

9    Q.   And did you agree or disagree with the opinions expressed

10   in that paragraph?

11   A.   I would agree with that.

12   Q.   Could you please read the next paragraph?

13   A.   "In the real world, there is much more noise present even

14   in a controlled classroom environment.  There may be noises

15   from people moving around in the room, turning pages in a

16   notebook, or typing on a computer keyboard during note-taking

17   not to mention room ventilation system noise.  All of these

18   sounds make it more difficult for Michael to understand what

19   is being said.  During his last evaluation session, in a

20   signal-to-noise ratio of plus 10, Michael's speech

21   understanding drops to 57 percent and in a signal-to-noise

22   ratio of plus 5, his speech perception further decreases to 25

23   percent."

24   Q.   And did you agree or disagree with the opinions addressed

25   in that paragraph?

 1    A.   I would agree with those comments.

 2    Q.   And then, if you wouldn't mind turning to the last page,

 3    please, and if you could go ahead and read the first

 4    paragraph?

 5    A.   "In the clinical setting, Michael will need visual cues

 6    to help him understand.  Other assistance may be necessary,

 7    but Michael is the best person to judge what that may be since

 8    no one else can really understand what he is hearing through

 9    his cochlear implant systems."

10    Q.   And did you agree or agree with that?

11    A.   I would agree with that.

12    Q.   And what is your opinion on the effectiveness of the FM

13    system that Creighton University provided to Mr. Argenyi?

14    A.   It was limited, and he did more poorly using the FM

15    system.  So our numbers -- that paragraph where it talks about

16    57 percent, the plus 10 signal-to-noise and going to 25,

17    correlates to our numbers that we talked about earlier this

18    morning, 62 percent and 38 percent.  So the FM system doesn't

19    really help him much, if at all.

20    Q.   Thank you.

21              MS. VARGAS:  No further questions, your Honor.

22              THE COURT:  Cross-examination?

23              MR. MOORE:  Thank you, your Honor.

24                            CROSS-EXAMINATION

25    BY MR. MOORE:

1    Q.   Good afternoon, Dr. Thedinger.  I just have a few

2    questions to follow up here.

3         A quick question.  Those last two letters that you just

4    reviewed --

5    A.   Yes.

6    Q.   -- from Dr. Backous and Stacey Watson, you didn't review

7    those before your May exam of Mr. Argenyi, did you?

8    A.   No, I did not.

9    Q.   And when did you review those?

10   A.   About a month ago.

11   Q.   After they were provided to you by the lawyers to prepare

12   for today?

13   A.   Yes.

14   Q.   When they asked you did those go into your consideration

15   with the evaluation letter you provided way back in May of

16   2010, those didn't come into play, correct?

17   A.   No.

18   Q.   Now, you talked about the testing that you conducted with

19   regard to Mr. Argenyi.  Before Dianne DeLair, his lawyer,

20   contacted you, were you his physician?

21   A.   No.

22   Q.   Had you ever met him before?

23   A.   No.

24   Q.   Had you ever treated him before?

25   A.   No.

1    Q.   And as I understand, she called you to do an evaluation

2    and be an expert in this case, correct?

3    A.   I think to get more information.  I didn't know if this

4    was -- what was going to happen to this.

5    Q.   Okay.  Very good.  I understand.

6         And when did Ms. DeLair contact you?  I believe it was

7    February of 2010; is that correct?

8    A.   Yes.

9    Q.   This was about the same time we talked to you, correct?

10   A.   Correct.

11   Q.   Do you recall having any conversations about Ms. DeLair

12   objecting to us talking to you?

13   A.   I just recall there was some concern as to who contacted

14   me first.  And I really can't honestly say who it was.  I

15   thought it was probably you, but it was very, very close to --

16   when we were talking and the discussion was well, are you

17   going to be -- how are you going to go on this case or on what

18   the opinions are.

19   Q.   And from that point on, you just talked to Ms. DeLair

20   regarding this case, correct, not Creighton University?

21   A.   Correct.

22   Q.   Now, the testing that you conducted with regard to

23   Mr. Argenyi, you indicated that was in a sound booth; is that

24   correct?

25   A.   Correct.

1    Q.   And is it fair for me to say that someone like

2    Mr. Argenyi who has had hearing loss his whole life relies

3    heavily on visual cues on his day-to-day communications?

4    A.   Yes.

5    Q.   And you did not test him that day of how he performed

6    with speech discrimination with visual cues, did you?

7    A.   No.

8    Q.   And earlier you talked about some difficulty that

9    Mr. Argenyi may have in the anatomy lab, correct?

10   A.   Correct.

11   Q.   And I believe you said that that may be more difficult

12   because there's background noise and he's not near the

13   professor to get those visual cues, correct?

14   A.   Correct.

15   Q.   So if Creighton would have responded to his concern by

16   moving him right next to the professor in that lab, and it

17   assigned a TA to help with visual cues for those

18   communications, would that help him communicate in that class?

19   A.   That would have helped, yes.

20   Q.   In fact, if he has a long history of relying on the

21   lip-reading and visual cues, that would help him quite a bit,

22   correct?

23   A.   Correct.

24   Q.   In addition to visual cues, when you do the sound booth

25   testing, there's no context, correct?

1    A.    No.

2    Q.    You're just reading him a sentence that he doesn't know

3    and doesn't expect, correct?

4    A.    Correct.

5    Q.    And with someone with cochlear implants who's relied on

6    context and visual cues his entire life, would you expect him

7    to perform better if he had context?

8    A.    Yes.

9    Q.    With regard to class, if he read his assignment before he

10   went to class and understood what they were going to talk

11   about, would that help?

12   A.    Yes.

13   Q.    If he had the PowerPoints in advance of the class with

14   the big words that she talked about on there, that would help,

15   correct?

16   A.    Yes.

17   Q.    So he would know what those words were going to be when

18   he went to the lecture, correct -- well, if he studied.

19   A.    Yes, but it's still -- he's still in a classroom setting

20   and it's still somewhat difficult hearing what the

21   professor's --

22   Q.    Sure.

23   A.    He'll catch some of the words.  But in the context of how

24   they are put together, he'd still have some challenges.

25   Q.    Okay.  Well, what if he was -- sat in the front row,

1    right in front of the professor, and the professor spoke to

2    the class facing him, would that be a context and visual cue

3    that would be beneficial to him?

4    A.   Yes.  But when you're in medical school or any lecture

5    hall, as you all could imagine, there's the board with the

6    PowerPoint -- or the slides, when I was going.  And they would

7    look up and turn away.  And sometimes the light is down.

8         So, it would -- there would be decreased visual cues in

9    that setting, no matter what.

10   Q.   Depending on how the lecture was conducted.

11   A.   That's right.  And if he was sitting in the front row and

12   professor talking directly or straight ahead and never veered

13   off from side to side, he would do better.

14   Q.   Sure.  Okay.

15        Now in doing your testing, you rely on what Mr. Argenyi

16   tells you what he hears, correct?

17   A.   Yes.

18   Q.   If he hears a sound, he has to tell you that he hears it,

19   correct?

20   A.   Yes.

21   Q.   If he hears a word, he has to tell you what he hears and

22   what he believes that word is.

23   A.   Yes.

24   Q.   There's not an objective way, without getting the

25   patient's feedback, of measuring what someone hears in this

1    context, correct?

2    A.   Yes.  But the audiologist can get a very good idea as to

3    whether someone is telling us the truth or not.  So there's an

4    art to doing audiology and doing hearing tests that -- in

5    fact, you'll even see on an audiogram, it says "reliability".

6         Now Jill did not comment on reliability here, but when

7    something doesn't smell right, doesn't act right, doesn't fit

8    right, this is -- immediately the audiologists come to me and

9    say, "Things just don't add up here."  That was never the case

10   with our testing.

11   Q.   At least she didn't mark that down.

12   A.   No, she didn't mark it down.

13   Q.   Now, were you aware that Mr. Argenyi wore hearing aids

14   until 2004 in one ear and then until 2009 in the other ear?

15   A.   Yes.

16   Q.   And that hearing aid again would help stimulate -- and

17   forgive me, I got a little bit lost there, but would stimulate

18   that part of the brain that recognizes speech, correct?

19   A.   Correct.

20   Q.   And if there was no nerves or no way to stimulate that,

21   the hearing aid wouldn't do any good, correct?

22   A.   Correct.

23   Q.   Now, I would like to take you back to your testimony

24   where you were speaking -- you were talking about speaking

25   with myself, Amy Bones who was the in-house counsel, lawyer

1    for Creighton, and Wade Pearson.  Do you recall that

2    conversation?

3    A.    Somewhat.

4    Q.    I believe you said in your deposition with vague

5    generalities you remember that, correct?

6    A.    Correct.

7    Q.    There's been an assertion here that someone, me, Amy,

8    Wade, said that we believed that Mr. Argenyi was having

9    difficulty in his class.

10        Do you recall that conversation?  Do you recall that

11   statement?

12   A.    In vague terms.  But I kind of recollect that because

13   you're coming to my office and seeking some advice or opinions

14   as to cochlear implants and hearing loss.

15   Q.    Okay.  And do you recall anybody saying that at that time

16   he filed a lawsuit and was alleging he was having difficulty

17   in class?

18   A.    I presumed there was something legal going on since I had

19   three people from Creighton University in my office on an

20   afternoon in February 2010.  So I kind of smelled that there

21   was something going on there.

22   Q.    So is it fair to say --

23   A.    Never should have taken the phone call.

24   Q.    You've regretted it ever since.

25   A.    No, not at all.

1    Q.   Is it fair to say you don't recall exactly what was said,

2    whether it was this guy's alleging this in his complaint

3    versus we believe he's having hearing loss?

4    A.   Yes.

5    Q.   Okay.

6         Now, I believe -- well, let me ask you this:  As you sit

7    here today, can you provide an opinion as to what auxiliary

8    aids and services Mr. Argenyi needs in medical school?

9    A.   I don't think I'm the expert to say exactly what he

10   needs.  I think Michael is somewhat the expert.

11        In my practice, I rely upon what patients tell me.  And

12   if they say, "I'm still having trouble," and the level of his

13   performance by the numbers -- the results that we were given,

14   I could see where he would say, "I would like to have some

15   additional technology to help me hear better in the classroom

16   with patients in a clinical setting."

17   Q.   And with regard to additional help, interpreters would be

18   one way that Creighton could offer something to augment that

19   rather than the FM system, correct?

20   A.   Yes.

21   Q.   Were you aware after Creighton received your letter, they

22   did indeed offer interpreters; were you aware of that?

23   A.   No.

24   Q.   Now, I would like to refer your attention back to Exhibit

25   18.

 1          Now, this is the letter dated September 10th from

 2     Dr. Backous and Amy -- excuse me, Stacey Watson, excuse me, to

 3     Creighton.  And you indicated that you had only seen this

 4     letter about a month ago when the lawyers gave it to you,

 5     correct?

 6     A.   Correct.

 7     Q.   Now, if we could, please, turn to page 2 of that exhibit.

 8     I'd like to focus --

 9          MR. MOORE:  And if we could enlarge the second

10     paragraph.

11     BY MR. MOORE:

12     Q.   Now, in this particular paragraph, I believe this letter

13     that was sent to Creighton indicates, "For a specific request

14     [*sic*], please see our letter of 27 May, 2009."

15     A.   Yes.

16     Q.   Had you reviewed that letter?

17     A.   Yes.

18     Q.   Okay.

19          MR. MOORE:  I'd like to pull up Exhibit 17, please.

20     BY MR. MOORE:

21     Q.   And this is the letter that you saw, correct?

22     A.   Yes.

23     Q.   If I could focus your attention to the second paragraph.

24          MR. MOORE:  And if you could zoom in on that, for the

25     jury?

1    BY MR. MOORE:

2    Q.   I'd like to look at -- well, let me ask you this,

3    Dr. Thedinger.  It appears that in this particular letter,

4    which was sent before Mr. Argenyi started his first year of

5    medical school, that Dr. Kavan did some testing with visual

6    cues; is that correct?

7    A.   Yes.

8    Q.   That's testing you didn't perform in your office,

9    correct?

10   A.   Correct.

11   Q.   And it appears Dr. Backous comes to the conclusion that,

12   "his ability to understand speech in an auditory only

13   condition is quite good at 81 percent (sentence level

14   materials without contextual cues).  When he is able to take

15   advantage of visual cues and context, his performance improves

16   to nearly 100 percent."  Do you see that?

17   A.   Yes.

18   Q.   Would you agree with that conclusion?

19   A.   Those are the numbers and that's what they identified.

20   Q.   So when he had visual cues and context, his speech

21   discrimination, at least according to Dr. Backous, his

22   treating physician, was nearly 100 percent, correct?

23   A.   It says it is nearly 100 percent, and again that would be

24   in a soundproof room.

25   Q.   Okay.  But again, that's taking advantage of visual cues

 1    and context, correct?

 2    A.   Correct.

 3    Q.   Something you didn't do in your testing.

 4    A.   No, we were not asked to.

 5    Q.   You weren't asked to --

 6    A.   We were asked how does he do with his cochlear implants

 7    in place.

 8    Q.   Yeah.  In fact, they didn't even ask you to do it with

 9    visual cues, correct?

10    A.   Yes, because...

11    Q.   Sir, did you see -- the first letter that Dr. Backous

12    sent to Creighton, which is dated April 10th of 2009, were

13    you --

14              MS. VARGAS:  Objection, your Honor, sidebar.

15              THE COURT:  All right.

16         (Bench conference on the record.)

17              MS. VARGAS:  Mr. Moore asked a question -- testified

18    that was the first letter that Mr. Argenyi sent to Creighton

19    University, that was not the first letter.

20              MR. MOORE:  That he --

21              MS. VARGAS:  I heard you say that it was the first

22    letter he sent to Creighton University.

23              MR. MOORE:  I apologize, I'll correct it.  It was the

24    first letter that came from Dr. Backous to Creighton

25    University.

1              MS. VARGAS:  Okay.  Thank you.

2              THE COURT:  I don't recall what was said without

3      looking, but if you'll correct it.

4              MR. MOORE:  Sure.

5          (End of bench conference.)

6      BY MR. MOORE:

7      Q.  Again, Dr. Thedinger, did you see the first letter that

8      Dr. Backous had sent to Creighton University which was dated

9      April 10th of 2000 --

10     A.  I don't know.  I'd have to see that letter to know if

11     I've seen that.

12             MR. MOORE:  Do you need to make it larger?

13             THE COURT:  Just a moment.  This is Exhibit...

14             MR. MOORE:  16.

15     BY MR. MOORE:

16     Q.  I'll direct your attention, Dr. Thedinger, to Exhibit 16.

17     Were you ever provided that letter?

18     A.  I don't think I've ever technically seen that letter.

19     Q.  When you say "technically"...

20     A.  Because I saw something very similar recently addressed

21     to Michael Kavan, PhD.  But I don't know if there's -- there

22     was a short letter like this that I saw earlier today, but I

23     don't know if it's the same letter.

24     Q.  Okay.

25     A.  If you give me one second to read this real quick...

1    Q.   Sure.  Absolutely.  Take your time.

2    A.   I don't think I've seen that letter before, but I

3    understand what he's saying.

4    Q.   Okay.  But plaintiff's counsel never showed you that

5    letter, correct?

6    A.   I don't think so.

7    Q.   And that -- so the letters that they showed you about a

8    month ago were just the two letters that were sent in

9    September of 2009, correct?

10   A.   Yes.

11   Q.   And were you aware that Dr. Backous had indeed sent two

12   letters before Michael started law school?

13   A.   Medical school.

14   Q.   Law school.  Sorry.  Medical school.  Thank you.

15   A.   Big difference.

16   Q.   Yeah, I know.  Your eyes were piercing --

17   A.   I --

18   Q.   My question is, did they tell you that Dr. Backous had

19   actually sent two letters to Creighton University before he

20   started his M1 year?

21   A.   I knew there were some letters before, but I don't know

22   if it was one or two or three.  But I knew there was some

23   communication before he arrived.

24   Q.   Okay.

25        As I understand it, even though Ms. DeLair contacted you

1    in February of 2010, you didn't evaluate Mr. Argenyi until May

2    of 2010; is that correct?

3    A.    Correct.

4    Q.    And the first letter that you sent regarding your

5    evaluation of Mr. Argenyi was on the same day you evaluated

6    him; is that correct?

7    A.    Yes.

8    Q.    And you provided that to counsel that day, correct?

9    A.    I dictated it, it was typed and probably faxed down or

10   sent down to Ms. DeLair.  So they received it probably the

11   next day or within a week.

12   Q.    And what date would that have been?

13   A.    I dictated it on May 6, 2010.

14   Q.    So it could have been May 6, May 7?

15             MS. VARGAS:  Objection, calls for speculation.

16             THE COURT:  Overruled.

17   BY MR. MOORE:

18   Q.    What was your regular practice in sending out letters

19   like this?

20   A.    I normally dictate the day I see the patient, and then my

21   transcriptionist will do it the next day or within several

22   days.

23   Q.    And the transcriptionist puts the date the letter was

24   sent or the --

25   A.    I --

1    Q.   I'm sorry, go ahead.

2    A.   I apologize.

3    Q.   That's okay.

4    A.   The day I dictate it.

5    Q.   But as far as you know, they receive it a few days after

6    you dictate it, correct?

7    A.   Correct.

8    Q.   Now, we talked a little bit in your deposition about

9    Mr. Argenyi with cochlear implants and without cochlear

10   implants.

11        And as I understand that if Mr. Argenyi was not using his

12   cochlear implants, he would be deaf, correct?

13   A.   Yes.

14   Q.   And with the cochlear implants, he's hearing impaired,

15   correct?

16   A.   Yes.

17   Q.   At the time you did your testing, do you recall how long

18   Mr. Argenyi had his left side cochlear implant?

19   A.   Well, from my understanding he had it back in 2009, so I

20   thought he'd had it at least -- it was June of 2009.  I saw

21   him in May, so it was a little less than a year.

22   Q.   And do you know how long he had his right side cochlear

23   implant at that time?

24   A.   He had had it for six years.

25   Q.   And as I understand your testimony, the performance with

1     cochlear implants improves over time or could improve over

2     time; is that correct?

3     A.   Yes.

4     Q.   We also had a conversation in your deposition regarding

5     if a patient came to you who was a student, and I asked you,

6     other than the patient telling you what he or she needs in the

7     classroom, is there any objective way to measure what a

8     patient actually needs as an auxiliary aid and service.

9     A.   No, because everyone's different.

10    Q.   At this time I'd like to direct your attention -- well,

11    you recall me taking your deposition, correct?

12    A.   Yes.

13    Q.   And you recall that you were under oath that day?

14    A.   Yes.

15    Q.   Sworn to tell the truth, correct?

16    A.   Yes.

17             MR. MOORE:  I'd like to look at his deposition at

18    page 26, line 18 through 24.

19    BY MR. MOORE:

20    Q.   And I asked in that deposition:  Sir, isn't it correct,

21    would you know of any way in your experience to determine what

22    may be necessary as an auxiliary aid or service for a patient

23    outside of a patient telling you what they may need?

24             And your answer was:  Perhaps an objective measure would

25    be his test scores in class.

1        Is that correct?

2    A.   Yes.

3            MR. MOORE:  I have nothing further, your Honor.

4    Thank you.

5            THE COURT:  Redirect?

6            MS. VARGAS:  Thank you, your Honor.

7                      REDIRECT EXAMINATION

8    BY MS. VARGAS:

9    Q.   Dr. Thedinger, when Mr. Moore and Amy Bones and Wade

10   Pearson met with you in February of 2010, did Mr. Moore

11   provide you with a copy of Dr. Backous's letters?

12   A.   No.

13   Q.   Did Amy Bones provide you with a copy of any of

14   Dr. Backous's letters?

15   A.   I don't recall those letters.

16   Q.   I'd like to show you what's been admitted into evidence

17   as Plaintiff's Exhibit 16.

18        Looking at this letter now, does it refresh your

19   recollection of having ever seen it before?

20   A.   Didn't we just sort of see this a few minutes ago?

21   Q.   Is it possible that plaintiff's counsel provided this to

22   you during the summer?

23   A.   During this summer?  Yes, that's --

24   Q.   And if you would read the portion of this letter, about

25   the two, three -- fourth sentence in, that starts with "he has

1    worked"?

2    A.   "He has worked in a nursing home environment over the

3    last three years and is communicating well with patients.  I

4    believe in medical school he would benefit from closed

5    captioning.  And he has not tried an FM system, but that could

6    also improve his communication strategies significantly."

7    Q.   Thank you.

8         When the attorneys from Creighton and Mr. Pearson came to

9    meet with you in February of 2010, did any of them ask you to

10   perform any testing on Mr. Argenyi?

11   A.   I don't believe so.

12   Q.   You testified earlier about the September 10th letter of

13   Dr. Backous.  It's Plaintiff's Exhibit 18.

14             MS. VARGAS:  May I approach?

15             THE COURT:  You may.

16   BY MS. VARGAS:

17   Q.   And if you could turn to the second page, please, and

18   read the first two sentences of the middle paragraph.

19   A.   "It is imperative that Michael have access to visual cues

20   for everyday communication and education.  Visual cues

21   include, but are not limited to closed captioning on videos

22   and films, real-time captioning for lectures and discussions,

23   and speech reading cues for one-on-one interactions."

24   Q.   Thank you.

25        And could you tell me in "doctor speak" what does it mean

1    when a doctor says something is imperative?

2    A.   It's pretty important, and it sounds like he should have

3    this.

4    Q.   In your opinion, does that mean that he needs it?

5                MR. MOORE:  Objection, foundation.

6                THE COURT:  Sustained.

7                MS. VARGAS:  No further questions, your Honor.

8                THE COURT:  All right.  Thank you, Dr. Thedinger.

9    You may stand down, and you are excused.

10               THE WITNESS:  Thank you.

11               THE COURT:  Plaintiff may call its next witness.

12               MS. DeLAIR:  Our next witness has a demonstration for

13   the jury, and it will take her about three or four minutes to

14   set up her equipment.

15               THE COURT:  Let's take a 10-minute break, and we will

16   reconvene at 10 minutes after 2.

17          We are in recess.

18          (Jury out and recess taken at 2:02 p.m.)

19          (At 2:13 p.m. on August 22, 2013, with counsel for the

20   parties, the plaintiff, and the defendant's representative

21   present, and the jury NOT present, the following proceedings

22   were had:)

23               THE COURT:  Ms. DeLair, I understand that the

24   plaintiff's next witness will be an individual who you would

25   like to have seated in a location other than the witness

1    stand; is that correct?

2            MS. DeLAIR:  Your Honor, we'll start off with some

3    direct testimony with her in the witness chair.  And then

4    she'll provide a short demonstration, come down to the

5    equipment that's set up at defense counsel's rear table.

6            THE COURT:  Very good.

7        Anything else we need to talk about?

8        Please bring in the jury.

9        (Jury in at 2:14 p.m.)

10           THE COURT:  Please be seated.

11       Ms. DeLair, the plaintiff may call his next witness.

12           MS. DeLAIR:  Your Honor, plaintiff calls Margaret

13   Tyska Heaney to the stand.

14           THE COURT:  Is she present in the courtroom?

15       Ms. Tyska Heaney, you may approach the courtroom deputy,

16   and she will swear you in.

17           COURTROOM DEPUTY:  Please state your full name for

18   the record and then spell your last.

19           THE WITNESS:  Margaret Tyska Heaney, H-e-a-n-e-y.

20           MARGARET HEANEY, PLAINTIFF'S WITNESS, SWORN

21           THE COURT:  You may inquire.

22                           DIRECT EXAMINATION

23   BY MS. DeLAIR:

24   Q.  Please state your full name and spell it for the record,

25   please.

1   A.   Margaret Tyska Heaney; M-a-r-g-a-r-e-t, Tyska, T-y-s-k-a;

2   Heaney, H-e-a-n-e-y.

3   Q.   Where do you live?

4   A.   I live in Omaha, Nebraska.

5   Q.   What is your occupation?

6   A.   I am a CART provider and court reporter.

7   Q.   How long have you been a court reporter?

8   A.   I have been a court reporter since 1990.

9   Q.   What training did you receive to become a court reporter?

10   A.   I went to a technical school to receive my training as a

11   CART -- as a court reporter.  And then I passed the national

12   exam in order to be able to practice, and I've been performing

13   that since.

14   Q.   Are there any other certifications required in order to

15   become a court reporter?

16   A.   It depends upon the state in which you live.  In the

17   state of Louisiana where I received my training, you had to

18   have the national certification in order to work.  In other

19   states, such as Illinois, Tennessee, and Arkansas, it was not

20   required that you had -- I'm sorry, in Illinois you had to

21   have the state certification.  In Tennessee and Arkansas and

22   Nebraska you don't have to have state certification, but you

23   have to have national.  In Iowa, you have to pass their state.

24   So it varies over the years.

25   Q.   Are there any confidentiality requirements in the

1    profession of court reporting?

2    A.   Yes.  All proceedings are confidential.  We are held to

3    the high standards of not discussing the cases that we report,

4    the depositions we take, the court proceedings that we

5    participate in.  It's part of the standard of practice.

6    Q.   Are you a member of any societies?

7    A.   Yes.  I'm a member of the National Court Reporters

8    Association, the Nebraska Court Reporters Association, the

9    Iowa Certified Shorthand Reporters Association.

10   Q.   As a court reporter, are you required to obtain

11   continuing education?

12   A.   Yes, there is a certain yearly requirement.  And it has

13   been that way since 1990.

14   Q.   Do you hold any other certificates?

15   A.   Yes.  I have held -- beyond the national certification,

16   the National Court Reporters Association has several optional

17   certifications a reporter can work towards.  I've obtained the

18   Registered Merit Reporter certification, the certified real

19   time writer certification and the certified CART provider

20   certification.

21   Q.   Do you attend any conferences?

22   A.   Yes, annually I'll attend the Nebraska Court Reporters

23   Association.  There are conferences that are built around our

24   court reporting software that I've attended.  And there are

25   national conferences that I attend.

TYSKA HEANEY - DIRECT                              171

1    Q.   Who conducts the conferences?

2    A.   The National Court Reporters Association sponsors the

3    national conferences.  And they bring in speakers from around

4    the United States.  They bring in various vendors of court

5    reporting equipment, court reporting software.

6        The Nebraska Court Reporters Association does the same

7    thing here locally.  And the software companies host the court

8    reporting and software ones, wherever they might be.

9            MS. DeLAIR:  Your Honor, may I approach?

10           THE COURT:  Yes, you may.

11           MS. DeLAIR:  Your Honor, may I take a moment to grab

12   a class of water for Ms. Heaney?

13           THE COURT:  For the witness?  Sure, we have that

14   here.

15   BY MS. DeLAIR:

16   Q.   Ms. Heaney, I just handed you a document.  I'm showing

17   you it's marked as Plaintiff's Exhibit No. 28.

18   A.   Yes.

19   Q.   Do you recognize this document?

20   A.   Yes, I do.

21   Q.   What is it?

22   A.   This is a -- my resume as of May of 2011.

23   Q.   Is this an accurate copy?

24   A.   Yes, it is.

25           MS. DeLAIR:  Your Honor, at this time I offer

1     Plaintiff's Exhibit No. 28 into evidence and it is

2     Ms. Heaney's resume.

3              MS. BALUS:  Your Honor, we object to this document as

4     hearsay.

5              THE COURT:  Overruled.  Exhibit 28 is received.

6     BY MS. DeLAIR:

7     Q.   Ms. Heaney, you're here to provide testimony today about

8     CART and court reporting; is that correct?

9     A.   Yes, it is.

10    Q.   And what is your rate for your testimony today?

11    A.   $95 an hour.

12    Q.   Does your compensation depend on your testimony?

13    A.   No.

14             MS. DeLAIR:  Your Honor, pursuant to the Federal

15    Rules of Evidence Rule 702, plaintiff tenders Margaret Heaney

16    as an expert in court reporting with a specialization in CART.

17             MS. BALUS:  No objection.

18             THE COURT:  And I recognize her as such.

19    BY MS. DeLAIR:

20    Q.   Ms. Heaney, what does CART stand for?

21    A.   CART is an acronym for communication access real time

22    translation.

23    Q.   And what equipment does CART use?

24    A.   CART uses a stenographic machine, a laptop, and court

25    reporting software.

TYSKA HEANEY - DIRECT                                      173

1    Q.    When was this equipment invented?

2    A.    The stenographic machine was first invented in the late

3    1900s, around 1879.  The machine that most closely resembles

4    what we have today was developed in the early 1900s, about

5    1915.

6          The machine keyboard itself has not undergone any

7    changes.  The machines have eventually become electronic and

8    now computerized.

9    Q.    How can a person learn more about the history of this

10   equipment?

11   A.    There's many things online about it.  And if you visited

12   the Stenograph Corporation in Illinois, they have a large

13   display case with every machine that they invented from the

14   very first one to the ones that they produce now.  And there's

15   a stenographic museum in New York, I believe.

16   Q.    Can you describe to us how this equipment works?

17   A.    Yes.  The stenographic machine is connected to the

18   laptop.  The laptop contains the software.  And as the

19   reporter or writer presses on the keys of the machine, the

20   software recognizes the combination of keys and then

21   translates it into English.

22   Q.    And Ms. Heaney, could you provide a demonstration of how

23   CART works for the jury today?

24   A.    Sure.

25              MS. DeLAIR:  Your Honor, may I approach the witness

TYSKA HEANEY - DIRECT                                174

1    back in this area?  Is that permissible?

2            THE COURT:  As long as you're near a microphone and

3    you both can be heard.

4    A.   Would you like me to explain as I set this up?

5    BY MS. DeLAIR:

6    Q.   Yes.

7    A.   This is my stenograph machine connection to my laptop.

8    This is the computer software that I use.  It happens to be

9    called Eclipse.  So in a setting where I am one to one with a

10   person providing CART services, I will open up a document for

11   them.  And this is what they will see.

12        Once we're up, I expand the window to full screen so

13   there's very little distraction.

14        Then, in the environment the -- let's say the instructor

15   will start speaking.  And I will start writing, and the words

16   come out on the screen.  It is hard to talk and write at the

17   same time.

18        Would you like me to continue?

19   Q.   Could you show us what it looks -- what the screen looks

20   like when you continue to type?

21   A.   Sure.  While I am writing, I will talk about how the

22   keyboard is constructed.

23        The keyboard is constructed in four parts.  The left-hand

24   side of the keyboard represents the beginning sounds of words.

25   The right-hand side of the keyboard represents the ending

1    sounds of words.

2        The bottom keyboard part represents vowels.  And the bar

3    across the top represents numbers.

4    Q.   Thank you, Ms. Heaney.

5        MS. DeLAIR:  Your Honor, may I approach the witness?

6        THE COURT:  You may.

7    BY MS. DeLAIR:

8    Q.   Ms. Heaney, I just dropped off what's been marked

9    Plaintiff's Exhibit No. 29.

10   A.   Yes.

11   Q.   Can you take a look at that document?

12   A.   Yes.

13   Q.   What is it?

14   A.   This is a copy of my report on what CART reporting is, a

15   little bit of my history.  This also contains my fee schedule

16   and invoice, the NCRA Code of Professional Ethics.  It

17   contains an example of a PowerPoint lecture that I utilized at

18   Creighton University.

19   Q.   Is that an accurate copy?

20   A.   Yes.

21       MS. DeLAIR:  Your Honor, I offer Plaintiff's Exhibit

22   No. 29 into evidence.

23       MS. BALUS:  We have various objections to this, it's

24   kind of a piecemeal objection.

25       Number one, we object to the admission of an expert

1    report.  Expert reports are typically considered by courts to

2    be hearsay.  We have a pocket brief on this if it would help,

3    your Honor, but the case law overwhelmingly says expert

4    reports are inadmissible hearsay.

5         We don't object to submitting her fee schedule and

6    invoice.

7         But the -- and we don't object to the PowerPoint that she

8    used in medical school with Mr. Argenyi.  We do, however,

9    object to the articles attached to her report which she was

10   not the author of.  So those are also inadmissible hearsay.

11        THE COURT:  If plaintiff's counsel will segregate the

12   PowerPoint report and the fee schedule, I will receive those

13   into evidence, if you wish to mark them, for example, as

14   Exhibit 29A.  The other objections are sustained.

15        MS. DeLAIR:  Okay.  Plaintiff's counsel will do so.

16        THE COURT:  All right.  Thank you.  29A as indicated

17   and described is received.

18        MS. DeLAIR:  Thank you, your Honor.

19   BY MS. DeLAIR:

20   Q.   Ms.Heaney, can you turn to page 3 of your report and

21   review the fifth paragraph?

22   A.   Yes.

23   Q.   Can you summarize that paragraph for us today?

24        MS. BALUS:  Objection, your Honor.  It's an improper

25   question.  It's calling for a narrative and for her to read

1    her report.

2            THE COURT:  Sustained as the question is worded.  If

3    you would pose a question to her asking her something related

4    to that topic, your question might not be objectionable.

5        But, as stated, it's objectionable.

6            MS. DeLAIR:  Thank you, your Honor.

7            MS. BALUS:  Your Honor, I also object to -- it looks

8    like the exhibit is being put on the screen.  I believe the

9    jury can see that.

10           THE COURT:  And I'll ask the courtroom deputy, is

11   that accessible to the jury right now?

12           COURTROOM DEPUTY:  Yes.

13           THE COURT:  We need to black that out for the jury

14   because it's not in evidence.  Thank you.

15           MS. BALUS:  Thank you, your Honor.

16   BY MS. DeLAIR:

17   Q.  Can you tell us a little bit more about how you prepare

18   for a CART job?

19   A.   Sure.  Wherever I am supposed to be, whether it's a

20   classroom setting or some kind of a conference, I will obtain

21   material regarding that subject matter that will be presented

22   ahead of time.

23       I will go through that material and make sure that the

24   words that will be spoken will translate correctly.  So that

25   would mean programming it into my software so that the next

1    day, or whenever I used that particular word and wrote it on

2    my machine, it would translate correct.

3        I would show up at the job early, set up my equipment

4    just as it is here, and then write the job, when it got

5    started.

6    Q.   Now, you mentioned that -- you referred to some slides

7    earlier.

8    A.   Yes.

9    Q.   Can you turn your attention to those slides, Exhibit 29A,

10   please.

11   A.   Okay.

12   Q.   Now, how would you prepare for something like this, with

13   these slides for a CART job?

14   A.   This set of slides was taken from a pathology lecture.

15   It was entitled Toxic or Metabolic Nervous System Disease.

16       It went through different portions of the brain,

17   different types of diseases and syndromes.  And it contained

18   several words that I was not familiar with.

19       So what I would do would be to go one slide at a time and

20   read through it.  And if I came across a word I was unfamiliar

21   with, I would hand write out the steno keys that I would

22   depress on the machine and program into the computer so that

23   when I then pressed those same combinations, the words would

24   translate immediately into English without a mistake.  So

25   that's what I would do.

TYSKA HEANEY - DIRECT                                      179

1          And I usually did it by phonetics.  And if I didn't quite

2     know how to pronounce the word, I tried to do it by suffix,

3     prefix, root word.

4     Q.   I kind of want to back up a little bit and ask you about

5     CART and the different settings that you provided CART in.

6     A.   Since 19 -- about 1999, I have provided CART on-site in

7     academic settings here locally at Creighton University, Metro

8     Community College, for presentations of cochlear implants and

9     for large conferences from different organizations.

10         I've also provided CART in many different settings, but

11    it was from a remote location, meaning I was at my home and my

12    CART services were provided over the Internet to somebody in

13    another state.

14    Q.   Have you provided CART in medical settings?

15    A.   Outside of medical school at Creighton and a couple of

16    other schools -- medical schools, no.

17    Q.   Have you provided CART to patients?

18    A.   Not on-site.  I have had one job assignment where I

19    provided CART to a person who was hearing their loss -- losing

20    their hearing, and he was going to a counselor.

21    Q.   Now, you testified that you routinely provide CART in the

22    academic setting.

23    A.   Yes.

24    Q.   What about for businesses?

25    A.   Yes.  I provided CART, from a remote location once again,

1    for businesses such as Microsoft, Pfizer, Dow Jones, BMO, and

2    HUD.

3    Q.   What about in legal settings, have you provided CART in

4    legal settings, in courtrooms?

5    A.   Not CART, no.

6    Q.   Have you provided CART at Creighton before?

7    A.   Yes, I have.

8    Q.   How did you learn the specifics of your assignment when

9    providing CART at Creighton for the first time?

10   A.   I am associated with a court reporting firm locally.  And

11   they routinely -- to get my job assignments as an independent

12   contractor, they would contact me, tell me where the

13   assignment was, what time it was, and the details.

14        That same firm contacted me and said they had received an

15   inquiry about providing CART for a deaf medical student at

16   Creighton University, and would I be interested in taking it

17   on.

18   Q.   Do you know Mr. Argenyi?

19   A.   Yes, I do.

20   Q.   How did you come to have contact with him?

21   A.   I met him at Creighton University in class.

22   Q.   And why did he contact you?

23   A.   I was not contacted directly by Mr. Argenyi.  I was

24   contacted by my court reporting firm, told where I was

25   supposed to go for the first day of class, and Mr. Argenyi was

TYSKA HEANEY - DIRECT                                    181

1     there in class waiting for me to arrive.

2     Q.   And when did you start providing CART for Mr. Argenyi?

3     A.   I started providing CART approximately four to six weeks

4     into his first year of medical school.

5     Q.   Who paid for those services?

6     A.   As far as I know, Mr. Argenyi did.

7     Q.   I want to talk a little bit about the different types of

8     settings that you provided CART to Mr. Argenyi --

9     A.   Sure.

10    Q.   -- at Creighton, while he was attending school.

11         Can you talk a little bit about the lecture setting.

12    A.   Yes.  I provided most often CART services for Mr. Argenyi

13    in the lecture hall.  I've also provided CART services when

14    they broke up into individual groups on a regular basis.  And

15    they were to discuss certain cases, case studies that they

16    were provided.  And then they would come together and have a

17    discussion with the doctor, professor moderating the

18    discussion.

19         I provided CART services for his pathology lab class in

20    which we would go into a large computer room -- or a large

21    room with several computers.  And pathology slides were placed

22    on the screen for all the students to see.  And I would

23    provide CART services for the lecture part of that.

24         I also provided CART services for grand rounds in his

25    second year, which consisted of going to the Creighton

TYSKA HEANEY - DIRECT                                          182

1   University Hospital.  They would put on a presentation of a

2   particular disease or syndrome.  There would be a doctor

3   presenting it.  They would have a patient there, and the

4   students were allowed to interact with that process.

5   Q.   Going back to the lectures, about how often did you

6   provide CART for lectures, how many days per week?

7   A.   Average, the lectures were 8 to noon, Monday through

8   Friday for the school year.

9   Q.   What type of communication happens during those lectures?

10  A.   What the kind of -- between whom?

11  Q.   Between the professor and the students.

12  A.   It was a typical lecture setting.  The professor would

13  lecture.  Oftentimes they would elicit questions -- the

14  students would have questions that the professor would answer;

15  the professor would then periodically ask questions of the

16  students.  There was some times where the students were the

17  presenters, and the same kind of interaction might take place.

18  Q.   Where did the professor usually stand?

19  A.   More often than not, the professor is at the very front

20  of the classroom.

21  Q.   Are they moving around?

22  A.   Some professors did.  Some professors like to walk up and

23  down the aisles and pace back and forth.  It was -- I mean --

24  but, generally they were in the front.

25  Q.   Now, what was the level of vocabulary like during the

TYSKA HEANEY - DIRECT                                      183

1    lectures?

2    A.    Compared to what?

3    Q.    Compared to maybe your deposition work.

4    A.    Unless I had a very high level professor, I very rarely

5    encountered this kind of vocabulary.  It certainly is not the

6    type of vocabulary you would encounter in your day-to-day

7    life.  I think it would be unusual to encounter this kind of

8    vocabulary unless you were rather ill.

9    Q.    Going back to the lecture setting, can you describe the

10   setup in the lecture hall when you were providing CART

11   services for Mr. Argenyi?

12   A.    The classroom was an auditorium style classroom.  It had

13   three separate sections of rows that raised as it went farther

14   back towards the back of the room.

15         Instead of individual desks, there was a very long table

16   with a certain number of permanently placed seating, you know,

17   according to -- in front of each table.

18         So I would set my machine up -- my computer up and sit to

19   the left of it, and Mr. Argenyi would sit in front of the

20   laptop so that he had a line of sight to the front of the

21   classroom.

22   Q.    Can you tell me a little bit more about what you mean by

23   line of sight?

24   A.    Yes.  Line of sight, meaning when I look out at

25   something, I can see all of you at the same time.  If I had a

1    screen off to my right, like this, and I had to look at that

2    screen, you would no longer be in my line of sight.

3         So line of sight meaning that Michael had it set up so

4    that the screen, his notes, and the front of the classroom

5    were within his line of sight.

6    Q.   So during a lecture, what did you see Mr. Argenyi look

7    at?

8    A.   He would alternate between the screen, his notes, the

9    front of the classroom if there was some demonstration or

10   PowerPoint going on at the front of the classroom.  It varied.

11   He didn't look at any one thing the whole time.

12   Q.   Now, I want to go back to the labs, you mentioned that

13   briefly.  How often did you provide CART for Mr. Argenyi's

14   labs?

15   A.   I no longer remember the amount of time we were in there.

16   It was not a daily or even weekly event.  They happened in

17   small pockets that I remember.  That's the most I can

18   remember.

19   Q.   Now, what type of communication tended to happen during

20   the labs?

21   A.   Between whom?

22   Q.   Was it more of a lecture type of presentation or can you

23   describe the setup of the labs as far as the conduct?

24   A.   Yes.  The computer pathology lab mostly consisted of

25   lecture, but the students very often would ask questions or be

TYSKA HEANEY - DIRECT                                    185

1    asked where something is and to describe it on the slide.

2    Q.   Now, during the labs, what did you see Mr. Argenyi look

3    at?

4    A.   He would look at the provided computer with the pathology

5    slide on it and my screen.  He would sit immediately to the

6    right or left, depending upon where he sat that day.  And he

7    would look at that, as well as the professor in the front of

8    the room.

9    Q.   Now, I want to jump ahead a little bit to Mr. Argenyi's

10   second year of medical school.  Do you remember the first day

11   of Mr. Argenyi's second year of medical school?

12   A.   Yes, I do.

13   Q.   What happened?

14   A.   It was early in the morning.  And from what I could tell,

15   the majority of the classmates were there.  People were

16   standing around socializing, their first day back at school,

17   how-was-your-summer kind of conversations going on.

18        At one point a gentleman that I know was a faculty member

19   or associated with the medical school, I don't remember his

20   name any longer, was coming up the steps.  And at some point I

21   could tell he wanted Mr. Argenyi's attention.  Mr. Argenyi was

22   talking to somebody behind him, so his back was turned to the

23   man approaching.

24        I tapped on his shoulder to get his attention,

25   Mr. Argenyi's attention, at which time he turned around.  And

TYSKA HEANEY - DIRECT                                186

1    the Creighton member said to him something along the lines of,

2    "According to -- we agreed in our agreement we will have an

3    interpreter who is here.  We expect you to sit in the center

4    or towards the front of the classroom.  And if you want to

5    keep that girl here, then you are welcome to."

6          He then turned around and started to walk away.  And

7    Michael -- sorry, Mr. Argenyi turned to me with a confused

8    look on his face, so I repeated what was said.

9          And I tried to call after the man because I think he

10   didn't understand.  But he was too far away, and it was too

11   noisy and I don't believe he heard me.  I called "sir" because

12   I didn't know his name.  And he departed.  He didn't hear me,

13   I don't think.

14   Q.   And what did the Creighton University professor mean when

15   he said "your girl"?

16          MS. BALUS:  Objection, speculation.

17          THE COURT:  Sustained.

18   BY MS. DeLAIR:

19   Q.   What was your impression?

20   A.   When he said "that girl," he motioned towards me.  I was

21   standing right next to Mr. Argenyi.

22   Q.   What was Mr. Argenyi's reaction?

23   A.   Well, he was confused.  I don't know how much of it he

24   heard or did not hear, which is why I repeated to him what I

25   heard and then tried to call after the gentleman who was

TYSKA HEANEY - DIRECT                                187

1    departing.  And so it was just kind of a confusing

2    uncomfortable situation.

3    Q.  We're in the second year.  How many hours a day did you

4    provide CART?

5    A.  It was about the same.  It was approximately four hours a

6    day, five days a week.  There were some days when they had

7    individual group discussion studies, which would be another

8    hour after the lunch break.  So we would go until two o'clock,

9    I think.

10   Q.  And what were the settings that you provided CART?

11   A.  The lectures all took place in the auditorium classroom.

12   The individual group discussions were in smaller like

13   conference rooms with about eight to ten students and a

14   moderator.

15       The pathology computer lab was, like I said, in a

16   computer lab type of a setting.  And the grand rounds were in

17   an auditorium setting also inside Creighton University

18   Hospital.

19   Q.  Now, during the grand rounds, what did Michael look at?

20   A.  Those were individual desks, and so he placed the small

21   laptop that we used on the desk and he looked towards the

22   front of the room.

23   Q.  Now, did you provide CART for all of Mr. Argenyi's

24   classes?

25   A.  No.

TYSKA HEANEY - DIRECT                                      188

1    Q.   Why not?

2    A.   I was not asked to.

3    Q.   Were there times when you couldn't be there?

4    A.   There was less than a handful of times that I was unable

5    to be there.

6    Q.   Was there a replacement for you?

7    A.   On one class for the first year, before I accepted this

8    assignment I had a trip planned out of state.  So when I found

9    out that there was a conflict, I had a colleague of mine

10   attend the group discussion class for that day.  So she

11   covered that and a couple of other classes, but that was the

12   only time.

13   Q.   Who paid for the CART services that you provided to

14   Mr. Argenyi, if you know?

15   A.   As far as I know, Mr. Argenyi did.

16   Q.   And did he pay you directly?

17   A.   No.  I receive my compensation from Thomas & Thomas Court

18   Reporters.

19   Q.   Do you set those rates?

20   A.   No.

21   Q.   Now, have you had other students who paid for your CART

22   services?

23   A.   I have never had a student that paid for my services

24   directly.  I've always gone through Thomas & Thomas or another

25   company as an independent contractor.  So the company -- the

1    institution would pay -- the company would pay me, not the

2    client or the student.

3    Q.   Now, for how long did you provide CART services for

4    Mr. Argenyi?

5    A.   For his first two years.

6    Q.   And why did you stop after this time period?

7    A.   Well, we were done mostly with all of the lecture that

8    was going to be taking place.  And he didn't request any more

9    services at that point.

10             MS. DeLAIR:  I have no further questions, your Honor.

11             THE COURT:  Cross-examination?

12             MS. BALUS:  Thank you, your Honor.

13                          CROSS-EXAMINATION

14   BY MS. BALUS:

15   Q.   Good afternoon, Ms. Tyska Heaney.

16   A.   Hello.

17   Q.   There were occasions in which Mr. Argenyi chose to have

18   an interpreter during a lecture rather than CART, correct?

19   A.   Correct.

20   Q.   Now, you can't say exactly how often Mr. Argenyi looked

21   at the CART screen because you're focused on listening and

22   paying attention to the class and you're not keeping your eyes

23   on Mr. Argenyi, correct?

24   A.   That's correct.

25   Q.   During the first semester of the M1 year with

1    Mr. Argenyi, providing him CART services, in the lectures you

2    and Mr. Argenyi sat maybe four or five rows from the front?

3    A.   Approximately.

4    Q.   And then around the second semester, you moved halfway up

5    the rows?

6    A.   Let me think.  The very first -- I'm sorry, say that one

7    more time.

8    Q.   The second summer of M1 year, you moved halfway up in the

9    rows of the lecture auditorium, correct?

10   A.   I believe so.  I don't remember the -- my hesitation is I

11   don't remember exactly at which point we changed seats.

12   Q.   Fair enough.

13        The people that Mr. Argenyi socialized in medical school

14   sat in the area that you moved up to, correct?

15   A.   In both areas, yes.

16   Q.   So he moved up to sit closer to his friends.

17   A.   I don't know that.  He spoke to people no matter where we

18   sat.

19   Q.   Is Mr. Argenyi the only medical school student you

20   provided CART for?

21   A.   He was the first, but I have since supplied CART services

22   to other medical students.  And I am in the process of getting

23   a new assignment starting Monday for another student, medical

24   student.

25   Q.   Now, CART is sometimes also known as live event

1    captioning; is that correct?

2    A.   I've never heard that phrase used.

3    Q.   Okay.

4    A.   But it makes sense.

5              MS. BALUS:  May I approach, your Honor?

6              THE COURT:  You may.

7              THE WITNESS:  Oh, of course.

8    BY MS. BALUS:

9    Q.   Ms. Heaney, I've handed you an article that you had

10   relied on in making your report, correct -- or you attached to

11   your report?

12   A.   I had attached it, yes.

13   Q.   Okay.  And it called -- it says that CART is also known

14   as live event captioning.

15   A.   Yes, it does.

16   Q.   And that's distinguished from closed captioning, correct?

17   A.   That is correct.

18   Q.   Closed captioning is on television and videos.

19   A.   It is live captioning that you see on television, closed

20   captioning.

21   Q.   It's called closed because it's there, but you might have

22   to turn it on in your television as opposed to open

23   captioning, correct?

24   A.   That is correct.

25   Q.   Now, do you agree that to get effective translation

1    through your CART that you should have people in the classroom

2    speaking one at a time?

3    A.   Not always.

4    Q.   But it's preferred.

5    A.   I don't understand that question.  Preferred when?

6    Q.   Is it easier for you to transcribe the conversation if

7    there's one person talking at a time?

8    A.   If it is in a lecture setting or a presentation setting,

9    yes.

10        If we are just -- if there's just socializing going

11   around, I'm not going to ask people to speak one person at a

12   time.

13   Q.   Noisy conditions can also have an adverse effect on

14   producing accurate text through CART, correct?

15   A.   Occasionally.

16   Q.   Preferably the instructor faces the CART provider so you

17   can hear him best.

18   A.   It's not necessary, no.

19        MS. BALUS:  May I approach, your Honor?

20        THE COURT:  Yes, you may.

21   BY MS. BALUS:

22   Q.   Ms. Heaney, I've handed you another article that you

23   attached to your report; is that correct?

24   A.   Yes.

25   Q.   If you'll turn to the page that's marked 20 in

1    handwriting at the bottom --

2    A.   Yes.

3    Q.   -- and do you see where it says "control of the

4    classroom"?

5    A.   I do.

6    Q.   And is this an article you relied on in preparing your

7    report?

8    A.   I provided it, but I -- I didn't rely on it.

9    Q.   You wouldn't have provided it if you hadn't agreed with

10   most of what it said, correct?

11   A.   That's correct.

12   Q.   In this article you'll see on the second sentence of that

13   paragraph says:  To ensure an effective real time translation,

14   students should speak one at a time.  Noisy conditions can

15   have an adverse effect on the production of accurate texts by

16   the CART provider.  Do you agree with that?

17   A.   Yes.

18   Q.   And that's in a classroom setting, correct?

19   A.   That would be an ideal setting, yes.

20   Q.   If you'll turn to the page marked 21 at the bottom --

21   A.   Yes.

22   Q.   -- did you see the paragraph called Think Communication?

23   A.   Yes.

24   Q.   It says, "When possible, the instructor should write

25   announcements, assignments, proper names, technical

1    vocabulary, formulas, solutions, and foreign terms on the

2    blackboard."  Do you see that?

3    A.   Yes.

4    Q.   Do you agree with that?

5    A.   That would be ideal.

6    Q.   And this was written -- relied on in 1998, so now it's

7    probably PowerPoint instead of blackboard, right, or a white

8    board?

9    A.   Correct.

10   Q.   In addition, it says, "The instructor should not, quote,

11   talk to the blackboard and have his or her back turned to the

12   class at all times.  When using overheads or referencing

13   material on the blackboard, the instructor should be specific

14   when explaining concepts, formulas or equations."  Do you see

15   that?

16   A.   I do see that.

17   Q.   So that's what's best in a classroom setting when you're

18   trying to provide CART services; is that correct?

19   A.   That would be very ideal.

20   Q.   Now, you talked about preparing in advance for these

21   lectures, right?

22   A.   Yes.

23   Q.   And we saw the PowerPoints that you relied on to learn

24   the terminology before classes.

25   A.   Right.

1    Q.   And you got those PowerPoints from Mr. Argenyi, right?

2    A.   Yes.

3    Q.   He would e-mail them to you in advance of class?

4    A.   More often than not.

5         MR. MOORE:  Can we have a moment, your Honor?

6         THE COURT:  You may.

7         (Off-the-record discussion had.)

8    BY MS. BALUS:

9    Q.   During that first lecture during Mr. Argenyi's M2 year

10   that you talked about, where the person from Creighton

11   approached you, do you recall that?

12   A.   Yes.

13   Q.   Do you recall Mr. Argenyi saying anything to the

14   interpreter that was there?

15   A.   I don't remember.

16   Q.   There was an interpreter there.

17   A.   Yes, there was.

18   Q.   And you don't recall Mr. Argenyi saying, "I have CART,

19   I'm not going to watch you, you can leave," to the

20   interpreter?

21   A.   I have no recollection of that.

22   Q.   Okay.  You don't remember him saying, "You're wasting

23   your time here, I have CART here so you can just leave"?

24   A.   I have no recollection of that.

25   Q.   As you mentioned, you're charging $95 for your expert

1    testimony today.

2    A.   Yes.

3    Q.   And that's how much you charged Mr. Argenyi for the CART

4    services.

5    A.   I believe that's what the rate was set by my court

6    reporting firm.

7    Q.   And you charge -- or the court reporting service charges

8    not only for your time in the classroom but prep time and down

9    time.

10   A.   Yes.

11   Q.   And that's charged at around $50 an hour, correct?

12   A.   I believe so.  I don't remember exactly.

13   Q.   And generally there's a one-to-one ratio for prep time

14   meaning if you're going to be in class for an hour, you spend

15   about an hour preparing?

16   A.   Yes.

17   Q.   That's charged by Thomas & Thomas, the court reporting

18   firm you work for.

19   A.   Yes.

20   Q.   And you get a percentage of that.

21   A.   Yes.

22   Q.   And that's around 72 percent?

23   A.   I believe that's what it was.

24   Q.   When you're doing court reporting jobs, your hourly rate

25   is a little bit lower, right?

1    A.   Oh, yes.

2    Q.   You don't charge prep time when you're doing court

3    reporting jobs.

4    A.   That's correct.

5    Q.   And as you said, most of the classes for which

6    Mr. Argenyi had CART, you provided those CART services in M1

7    and M2, right?

8    A.   I can't tell you the percentage.

9    Q.   But it was the majority.

10   A.   I can't tell you the percentage.  I never compared the

11   number of classes I took as opposed to the ones that I didn't.

12   Q.   He used you often.

13   A.   I would say often, yes.

14   Q.   At least once a week?

15   A.   It was approximately five days a week, 8 to noon.

16   Q.   For how many weeks?

17   A.   For the school year.

18   Q.   And you would expect that if Mr. Argenyi needs CART

19   services again at Creighton, that you would likely be

20   contacted to provide those services.

21   A.   I wouldn't mind.

22   Q.   Thank you.

23            MS. BALUS:  I have nothing further.

24            THE COURT:  Redirect?

25                        REDIRECT EXAMINATION

TYSKA HEANEY - REDIRECT                                    198

1    BY MS. DeLAIR:

2    Q.   Ms. Heaney, as far as you know, when you provided CART to

3    other universities, was it the university or the student who

4    paid Thomas & Thomas?

5              MS. BALUS:  Objection, beyond the scope, your Honor.

6              THE COURT:  Sustained.

7    BY MS. DeLAIR:

8    Q.   Now, Ms. Heaney, when you were in the lectures, were you

9    able to hear the lectures for which you provided captioning

10   for Mr. Argenyi?

11   A.   I would say the majority of the time, yes.  Of course

12   there were occasions where there would be a professor that was

13   difficult to understand, who spoke rapidly, who had an accent.

14   There was a wide variation.

15   Q.   Now, why did you get the PowerPoints from Mr. Argenyi

16   rather than Creighton itself?

17   A.   I got them from Mr. Argenyi because I had put in a

18   request to have access to the student software that they have

19   where students can access things that the school wants them to

20   know, PowerPoints that the professors put up there.

21        And it was my thought that if I could get access to --

22   have the student access, then I could access the PowerPoints

23   as soon as they were posted.

24   Q.   Now, back to this prep time, do all CART reporters charge

25   for prep time?

1    A.   As far as I know, yes.  But, I can't speak for every CART

2    reporter.

3         (Off-the-record discussion had.)

4    A.   I don't think I completed my answer.  So I got the

5    PowerPoints from Mr. Argenyi because I had requested access to

6    the student software program, to access them; and after two

7    requests, was told no.  So that's why they were e-mailed to me

8    as soon as he was able to get them to me.

9    BY MS. DeLAIR:

10   Q.   Who told you no?

11   A.   I don't know who made the decision to be no.  The no

12   answer was relayed to me by a woman named Jackie Foster, I

13   believe.

14   Q.   Is that an employee of Creighton University, if you know?

15   A.   I believe she is.

16   Q.   Now, in the year after you stopped providing CART for

17   Michael, was your salary reduced?

18            MS. BALUS:  Objection, beyond the scope.

19            MS. DeLAIR:  She testified -- they just asked her

20   questions about her salary changes and whether or not she made

21   more money.

22            THE COURT:  Overruled.  She may answer.

23   A.   Could you repeat the question, please?

24            MS. DeLAIR:  Sure.

25   BY MS. DeLAIR:

1    Q.   In the year after you stopped providing CART for Michael,

2    was your salary reduced?

3    A.   No.  It was in keeping with the income that I had made a

4    couple years before and a couple years after actually.

5          MS. DeLAIR:  I have no further questions.

6          THE COURT:  Thank you, Ms. Heaney.  You may stand

7    down.  And you are excused.

8          THE WITNESS:  Thank you, your Honor.

9          THE COURT:  We will have one more break this

10   afternoon.  And so, would you like to call your next witness

11   at this time or do you prefer to take the break now?

12         MS. DeLAIR:  We'll go ahead and take the break, your

13   Honor.

14         THE COURT:  All right.

15      We'll take a 15-minute break.  Please reconvene in the

16   jury room at 3:20.

17      We're in recess.

18      (Jury out and recess taken at 3:07 p.m.)

19      (At 3:22 p.m. on August 22, 2013, with counsel for the

20   parties, the plaintiff, and the defendant's representative

21   present, and the jury NOT present, the following proceedings

22   were had:)

23         THE COURT:  Is there anything we need to discuss

24   before the jury comes in?

25         MR. MOORE:  Nothing from the defendant, your Honor.

 1                MS. VARGAS:  Nothing from the plaintiff, your Honor.

 2                THE COURT:  Please bring in the jury.

 3           (Jury in at 3:23 p.m.)

 4                THE COURT:  Please be seated.

 5           Ms. Jackson, will you be calling the next witness for the

 6      plaintiff?

 7                MS. JACKSON:  Yes, your Honor.

 8                THE COURT:  You may.

 9                MS. JACKSON:  The plaintiff will call Ms. Ronda

10      Rankin.

11                THE COURT:  Ms. Rankin, if you'll please come forward

12      to the courtroom deputy, she'll swear you in.

13                COURTROOM DEPUTY:  Please state your full name for

14      the record and please spell it as well.

15                THE WITNESS:  Ronda Rankin, R-o-n-d-a R-a-n-k-i-n.

16                RONDA RANKIN, PLAINTIFF'S WITNESS, SWORN

17                THE COURT:  You may inquire.

18                          DIRECT EXAMINATION

19      BY MS. JACKSON:

20      Q.   Good afternoon.

21      A.   Good afternoon.

22      Q.   Please state your name for the record.

23      A.   Ronda Rankin.

24      Q.   What city do you live in?

25      A.   I live in Omaha in the Dundee area.

 1    Q.   What is your occupation?

 2    A.   I'm a sign language interpreter.

 3    Q.   How long have you been a sign language interpreter?

 4    A.   Eight years.

 5    Q.   And where have you been living while being a sign

 6    language interpreter?

 7    A.   The same area.

 8    Q.   How did you learn sign language to become a sign language

 9    interpreter?

10    A.   I went to college for two years.

11    Q.   Where did you go?

12    A.   I went to Iowa Western Community College in Iowa.

13    Q.   And what kind of degree did you get?

14    A.   I have an associate's of applied science in sign language

15    interpreting.

16    Q.   How many classes did you take to get that degree?

17    A.   I don't know how many classes, but it's a two-year

18    full-time program.

19    Q.   Do you hold any certifications?

20    A.   I do.  I hold a national certification which is through

21    the Registry of Interpreters for the Deaf.  I also hold a

22    state license which is a class level 4 and an Iowa license.

23    Q.   What is the significance of level 4?

24    A.   Level 4 -- there's five testing levels.  And I tested at

25    a level 4, which is on the higher end of the skill range.

1    Q.   Congratulations.

2    A.   Thank you.

3    Q.   What did you have to do -- focusing strictly on the

4    national certification, what did you have to do to get that

5    certification?

6    A.   That certification, you have to take a very difficult

7    test which tests your signing and voicing skills.

8    Q.   And do you have to do anything to maintain that

9    certification?

10   A.   Yes.  I have to get continuing education units, CEUs. I

11   have to maintain those.

12   Q.   And where do you receive these CEUs?

13   A.   Through workshops offered through RID or through Nebraska

14   Registry of Interpreters for the Deaf or online.

15   Q.   And what did RID stand for?

16   A.   Registry of Interpreters for the Deaf.

17   Q.   What is that?

18   A.   It's a national organization for interpreters.

19   Q.   And do you belong to any professional interpreting

20   organizations?

21   A.   I belong to RID.  And I'm also a copresident of NE RID

22   which is the affiliate chapter of RID.

23   Q.   And what does the NE stand for?

24   A.   Nebraska, so it's Nebraska Registry of Interpreters for

25   the Deaf.

1    Q.    Copresident?  Congratulations.

2    A.    Thank you.

3    Q.    In what settings have you provided interpreting services?

4    A.    I've provided interpreting services in a variety of

5    settings; some medical, secondary education, colleges.  I'm an

6    independent contractor.  So if I get a request, it's very

7    variable, whatever I do.

8    Q.    And as an independent contractor, do you bill directly or

9    do you bill through an agency?

10   A.    I bill directly.

11   Q.    And you mentioned that you have interpreted at schools.

12   Which schools have you interpreted at?

13   A.    I've interpreted at UNO, University of Nebraska Omaha;

14   I've interpreted at UNMC, University of Nebraska Medical

15   Center; I interpreted at Metro Community College and Bellevue

16   University.

17   Q.    And who was your primary service recipient in these

18   settings?

19   A.    Just different recipients, different deaf individuals.

20   Q.    What was usually the role of the deaf individual?

21   A.    Students.

22   Q.    Student?

23         And for students at universities, were you interpreting

24   for courses?

25   A.    Yes.

1    Q.   Would it be the full course typically or just one class?

2    A.   It would be a full semester or quarter, whatever they

3    had.

4    Q.   And have you ever interpreted multiple courses for the

5    same student?

6    A.   Yes.

7    Q.   At the same college or university?

8    A.   Yes.

9    Q.   You mentioned the University of Nebraska Medical Center.

10   A.   Yes.

11   Q.   Was that also a student?

12   A.   Yes.

13   Q.   Have you met Mr. Argenyi?

14   A.   Yes.

15   Q.   Where did you meet him?

16   A.   I met him when he was in Omaha starting his second year.

17   Q.   And what was discussed at that meeting?

18   A.   We had a meeting before classes started to discuss -- it

19   was kind of a different situation than I was used to.  I would

20   be sending my invoicing bills directly to him.  And he needed

21   to work out who the -- the schedule of interpreters that he

22   was going to be using, which we had to -- we met to discuss

23   that.

24   Q.   You described that as unusual.  How so?

25   A.   I have never had to send bills to a student before.

1    Q.   Who do you usually send bills to?

2              MS. BALUS:  Objection, your Honor; it's irrelevant,

3    403(b), and she's not been designated as an expert.

4              THE COURT:  Sustained.

5    BY MS. JACKSON:

6    Q.   Have you ever sent invoices directly to a student before?

7    A.   No.

8    Q.   How did you communicate with Mr. Argenyi at this meeting?

9    A.   I signed, as well as did oral interpretation.

10   Q.   What is oral interpretation?

11   A.   Basically you're pronouncing -- more pronounced movement

12   of your mouth to say your interpretation.

13   Q.   Do you have any training in oral interpretation?

14   A.   I do.  When I was in college, we had specialized training

15   in oral interpretation.

16   Q.   And what do you do differently in oral interpretation

17   than sign language interpretation?

18   A.   In oral interpretation, again you just have to really

19   pronounce -- you have to enunciate and make sure the

20   production of the words on the mouth are much clearer,

21   overexaggerated almost.

22   Q.   How does that differ from just looking at a hearing

23   person talk?

24   A.   I don't think we're focusing on that when we're talking

25   on an everyday language.  We're not focusing on making sure

1    that part of our words are clear and enunciated.

2    Q.   What kind of interpreting did you provide for

3    Mr. Argenyi?

4    A.   Sign-supported speech or sign-supported oral support.

5    Q.   What does that mean?

6    A.   It means that again I would do oral interpretation or

7    mouthing, but I would also use sign language.

8    Q.   When you're interpreting for Mr. Argenyi or anyone else,

9    do you monitor if that person can understand you?

10   A.   Yes.

11   Q.   How do you do that?

12   A.   I would just look at them and, you know, if they're

13   looking at me, and, you know, you can tell right away if

14   somebody is not getting something by their facial expression,

15   that kind of thing.

16   Q.   With Mr. Argenyi or anyone else, do you monitor if the

17   person is listening to you -- that's the wrong word to use --

18   using your services in that moment?

19   A.   I watch.  I look at them and check in.

20   Q.   And what cues do you look for?

21   A.   Just eye contact, if they're looking at me; you can check

22   that way.

23   Q.   If they're looking at you, they're listening to you?

24   A.   Yes.

25   Q.   Do you know cued speech?

1    A.    I do not.

2    Q.    Do you know any interpreters in Nebraska who know cued

3    speech?

4    A.    No.

5    Q.    And in -- so you met with Mr. Argenyi to provide

6    interpreting services.  Did you eventually provide

7    interpreting services for Mr. Argenyi?

8    A.    I did.

9    Q.    In what kinds of settings did you interpret for

10   Mr. Argenyi?

11   A.    I interpreted some clinics that he was -- he went to.  I

12   interpreted one lab, a lecture, and -- I think there was some

13   group meetings that he had.

14   Q.    And you said one lecture?

15   A.    Uh-huh.

16   Q.    How many -- for that lecture, how many students were in

17   the room?

18   A.    It was a pretty good sized room; probably over a hundred

19   students.

20   Q.    And how long did the lecture last?

21   A.    Probably about an hour, hour and a half.

22   Q.    And what was the seating like in the room?

23   A.    It was auditorium-style seating.

24   Q.    And were there any visual aids used?

25   A.    A PowerPoint presentation.

1    Q.    Were there questions permitted?

2    A.    Yes.

3    Q.    And where were -- who was asking the questions?

4    A.    The students.

5    Q.    And where were the students asking the questions seated?

6    A.    They were in the auditorium setting.

7    Q.    Where was Mr. Argenyi seated?

8    A.    He was seated -- he was on the right side, I remember, in

9    the fourth or fifth row.

10   Q.    Where were they seated in relation to Mr. Argenyi?

11   A.    Since he was more in the front, probably mostly behind

12   him.

13   Q.    And did he look at you the full time?

14   A.    Not the full time because there was a PowerPoint, so he'd

15   have to look at the PowerPoint as well.

16   Q.    What was your experience like interpreting in that

17   setting?

18   A.    It was -- I left feeling that it was very unsuccessful.

19   I actually apologized to Michael because I felt that he

20   wasn't -- I wasn't providing the communication that he needed.

21   Q.    What made you draw that conclusion that you weren't

22   providing him with the communication he needed?

23   A.    Because of how the classroom was -- the pace of the

24   classroom and the information, I just felt that I wasn't able

25   to keep up with that information and give it to him in a way

 1    that he needed it since he didn't understand sign language and

 2    he couldn't really see my mouth, so...

 3    Q.   Tell me -- you said he couldn't really see your mouth.

 4    What made you reach that conclusion?

 5    A.   Just in working -- in a sign language space, you have a

 6    much bigger area, so it's easy to see.  But if somebody's

 7    trying to focus on your mouth only, it's very difficult to see

 8    that.

 9    Q.   Did he attempt to move closer at any point?

10    A.   Huh-uh.

11    Q.   Is there anything that led you to believe that would have

12    helped?

13    A.   Not in that setting.  It was -- I think even in the front

14    row, there was still quite a bit of space separating like the

15    first row and where I would be standing.

16    Q.   And did you interpret for any of Mr. Argenyi's small

17    group courses?

18    A.   I did.

19    Q.   How many of them?

20    A.   I believe like three or four.

21    Q.   In general, how many people would be in the room?

22    A.   I'd say probably maybe 10, 10 to 12.

23    Q.   And how were they arranged?

24    A.   We were seated at an oval conference table.  The room

25    itself was pretty small.

1    Q.   Where would you and Mr. Argenyi seated?

2    A.   I would sit opposite of him, so I would sit across from

3    him at the table.

4    Q.   Did you always sit across from him?

5    A.   Yes.

6    Q.   Why not next to him?

7    A.   He would have to be -- he needs to see my face and see

8    what I'm producing on my mouth.  He needs to see the oral

9    communication clearly.

10   Q.   Why do you have to be across from him to see the oral

11   communication clearly?

12   A.   If I was sitting next to him, it would be very awkward

13   for him to have to keep turning his head, looking at me, if

14   there's stuff going on.  If I'm sitting across from him, he's

15   got a broader gaze to see what's going on.

16   Q.   Do you know why he might want to see what's going on in

17   the room?

18   A.   There's -- it's a turn-taking kind of experience, so

19   there's a white board.  And there was some writing there as

20   well, so he'd need to see that.

21   Q.   Where would you sit in relation to the white board?

22   A.   The white board would be behind me.

23   Q.   So you would be directly in front of the white board?

24   A.   Uh-huh.

25   Q.   Was there a leader of this small group?

1    A.    I think there was.

2    Q.    Would anybody writing on the white board?

3    A.    Yes.

4    Q.    Would they talk while writing on the white board?

5    A.    Yes, they would.

6    Q.    Where would they be facing while talking and writing on

7    the white board?

8    A.    Facing the white board.

9    Q.    Would they face the white board at any other point during

10   the discussion?

11   A.    Not really, I don't think.

12   Q.    And what were they writing on the white board?

13   A.    Most of it was vocabulary, like medications, those kind

14   of things, maybe symptoms.  I remember that kind of

15   vocabulary, medical vocabulary.

16   Q.    You mentioned vocabulary.  How did you handle the

17   vocabulary in this setting?

18   A.    In this setting, I would make sure that I'm enunciating

19   the vocabulary very clearly.  I would also finger spell it.

20   And if they write it on the board, I would also be able to use

21   the board as a visual aid.

22   Q.    Did you prepare for these assignments?

23   A.    If we had the information, yeah.

24   Q.    What information are you referring to?

25   A.    If Michael had information ahead of time, he would make

1   sure he got whatever information he had to us to prepare.

2   Q.   How would you prepare?

3   A.   I would go over the PowerPoint presentation or whatever,

4   and read it and get familiar with the medical terminology that

5   I wasn't familiar with and that kind of thing.

6   Q.   And how did you find interpreting the medical terminology

7   after having already read and familiarized yourself with it?

8   A.   It was, of course, much easier once I familiarized myself

9   with it.  I think if I was in the room to hear it right away,

10  I'd struggle more.  When I became familiar with it, I'd know

11  how to spell it, so it would be much easier.

12  Q.   And how was that experience interpreting the small

13  groups?

14  A.   That experience was much better than interpreting in the

15  auditorium lecture.  There was more successful communication.

16  Q.   What makes you think that?

17  A.   Because Michael was, you know, participating.  And I just

18  felt that I was providing what he needed at that time.

19  Q.   And what was -- how did the vocabulary in that setting

20  compare to the vocabulary in the lecture setting?

21  A.   I think it was -- it just varied.  Some of it was

22  similar, some of it was new.  It just depended on the group

23  and what they were discussing.

24  Q.   And how did the pace compare to the lecture setting?

25  A.   It was much slower paced.

1    Q.   And did that slower pace allow you to interpreter more

2    effectively?

3    A.   Yes.

4    Q.   And did you interpret for Mr. Argenyi in any labs?

5    A.   I did interpret one lab.

6    Q.   Just the one?  How many people were in the room?

7    A.   There was probably about, I think, 30 students maybe.

8    Q.   And how did that go?

9    A.   At first it was difficult.  It was at that phlebotomy lab

10   and they were showing a movie, video, explaining it, and it

11   wasn't captioned.  And interpreting a video is difficult.

12   So -- but once that part was over, they were able to work in

13   smaller groups, and that was more successful.

14   Q.   What makes interpreting a movie difficult?

15   A.   The pace, the pace of the movie, especially with

16   terminology, so...

17   Q.   And did you say anything to Mr. Argenyi about that?

18   A.   Yeah.  Usually if I'm aware that there is a movie that's

19   going to be shown in the classroom, I usually know in advance.

20   And I will explain to the student that it's not captioned,

21   just so you know I'm going to do my best and do what I can, so

22   that there are...

23   Q.   Did you apologize to -- and then when they broke into

24   small groups, you said that was better?

25   A.   Yeah, that was much better.

1    Q.   What made that better?

2    A.   Because we were closer, he could definitely, you know,

3    see my mouth much more clearer and was able to get the

4    information.

5    Q.   And did you have any reason to apologize to Mr. Argenyi

6    after that?

7    A.   No.

8    Q.   Any reason to apologize after the small group?

9    A.   No.

10   Q.   Did you interpret for Mr. Argenyi in clinics where he was

11   meeting with patients?

12   A.   I did.

13   Q.   How many times did you do the clinic?

14   A.   I believe around four or five times, maybe.

15   Q.   And when you were interpreting for a clinic, would he

16   meet with one patient or multiple patients?

17   A.   One patient at a time.

18   Q.   At a time, but more than one --

19   A.   In a setting, yeah.

20   Q.   And describe to me how a typical meeting with a patient

21   would go.

22   A.   Michael would knock on the door and we would enter.  I

23   would stand behind the patient and Michael would stand in

24   front of the patient.

25   Q.   Why would you stand behind the patient?

1   A.   Because I want to make sure that Michael -- I'm in his

2   line of sight, but also the patient is in his line of sight,

3   so he can see both of us.

4   Q.   And how did Mr. Argenyi see both of you?

5   A.   Well, he would look at the patient and ask the questions

6   that he was supposed to ask, and I would be interpreting

7   behind that.  So he would look at the patient and he can also

8   glance at the same time at me, so...

9   Q.   And were there any times during that patient interaction

10  that he was more likely to look at you?

11  A.   There were I think a couple of occasions if someone has

12  like a strong accent, it's difficult.  You know you're not

13  going to be able to -- so there might have been, you know, an

14  issue with that maybe.

15       And sometimes people, when they talk in an everyday

16  setting, they sometimes don't move their mouth as much to

17  enunciate words.  So that would be a couple times he needed

18  support.

19  Q.   And for the patients where he needed less support, did

20  you notice any pattern in the kinds of statements that might

21  prompt Mr. Argenyi to look over at you?

22  A.   No, there's no pattern.

23  Q.   And after Mr. Argenyi would meet with the patient, then

24  what happened?

25  A.   He would meet with the patient and excuse himself and let

1    them know that he was going to go get the doctor.  So we would

2    leave the room.

3    Q.   You would leave with him?

4    A.   Uh-huh.  And go to speak with the doctor.

5    Q.   And what would you discuss with the doctor?

6    A.   Michael would discuss the answers that he got from the

7    patient, discuss that with the doctor in a general way.

8    Q.   And where would Mr. Argenyi be looking while you were

9    interpreting -- excuse me.  Would you interpret that

10   interaction?

11   A.   Yes, I would interpret that interaction.

12   Q.   Where would Mr. Argenyi be looking while you're

13   interpreting that interaction?

14   A.   He's looking at the doctor and at me if he needed

15   support.

16   Q.   Did he look at you very often?

17   A.   Not -- not as often; but, I mean, there were times when

18   he definitely needed support.

19   Q.   Not as often as what?

20   A.   Not as often as -- because he's in a -- it's a one-on-one

21   type situation, so he looked at me but not as often as he

22   would in a small group setting.

23   Q.   And after meeting with the physician, then what would

24   happen?

25   A.   Then the physician, Michael, and myself would go into the

RANKIN - DIRECT                                                  218

1    room.

2    Q.   And where would you stand in the room?

3    A.   I would stand where I stood before, behind the patient

4    and behind -- near the exam table.

5    Q.   And why would you stand there again?

6    A.   Again, it's just so that I am in Michael's vision, so if

7    he's needing to speak to the patient, I'm right there, so it's

8    not obvious that I'm there.

9    Q.   And where -- and would you be interpreting that?

10   A.   Yes.

11   Q.   And where would Mr. Argenyi look as you were

12   interpreting?

13   A.   In that situation, he would look more at me just because

14   there's some, you know, conversation going on, so...

15   Q.   Can you explain that more, conversation going on?

16   A.   Well, the doctor would talk to the patient.  And then the

17   patient, you know, they're responding, so they're having a

18   conversation.

19        And then they would, you know, check in with Michael.  So

20   there are three people involved in the conversation, so there

21   was more support from me at that point.

22   Q.   And how did you regard the vocabulary used in that

23   setting?

24   A.   It was not as technical as in the classroom or lectures.

25   It's more when you're working -- he's asking the patient

1    questions, it's going to be more basic terminology, I guess,

2    basic words.

3    Q.   And even without this basic stuff, he still has to look

4    at you.

5    A.   Yes.

6    Q.   Have you ever interpreted for Michael in an exam

7    situation?

8    A.   Yes.

9    Q.   Can you describe what happened?

10   A.   There was one exam, it was a proctored exam.  And there's

11   like a little waiting area, probably five or six students in

12   this waiting area.  And then the proctor would call the

13   students.

14        And there were several rooms, and she would assign the

15   student to a room for their test.  And so we were probably

16   waiting in that room probably about 10 or 15 minutes before

17   she started, you know, assigning rooms.

18        After she had assigned several students a room, she had

19   pulled Michael and myself aside to say that he wasn't going to

20   be allowed to take the test.

21   Q.   Do you remember her giving any reason?

22   A.   No.

23   Q.   Do you remember her giving any way that Mr. Argenyi would

24   be allowed to take the test?

25   A.   I don't believe so.

1    Q.   And did you ever interpret a test?

2    A.   No.

3    Q.   And what was the mood like in the room while they were

4    working?

5    A.   It was a pretty stressful environment because it was a

6    big deal.  Testing in medical school is a big deal, so they

7    were very stressed.  You could notice the students were

8    ringing their hands, they weren't talking very much.  They

9    were focused, heads down.

10   Q.   Did you ever have any direct interaction with Creighton

11   employees?

12   A.   One time.

13   Q.   What was -- describe that for me, please.

14   A.   We were asked -- the interpreters that were working with

15   Michael were asked to come to Creighton and sign a privacy --

16   a confidentiality or privacy contract.

17            MS. JACKSON:  May I approach, your Honor?

18            THE COURT:  You may.

19   BY MS. JACKSON:

20   Q.   Do you recognize this document?

21   A.   Yes.

22   Q.   What is it?

23   A.   Confidentiality acknowledgment.

24   Q.   Is your signature on it?

25   A.   Yes.

1    Q.   And is this the document that you signed during that

2    meeting?

3    A.   Yes.

4    Q.   Describe generally the contents of the document.

5    A.   Generally it's stating that we're being retained by

6    Michael to provide interpretation to students -- or

7    interpreting services while the student is in rotation

8    clinics.  It's talking about confidentiality laws, and by

9    signing this we're acknowledging the need to protect the

10   confidentiality of the confidential information.

11           THE COURT:  Ms. Jackson, is this an exhibit that's

12   been marked?

13           MS. JACKSON:  It's been marked as Exhibit 38.

14           THE COURT:  Thank you.

15           MS. JACKSON:  May we introduce Exhibit 38 into

16   evidence?

17           THE COURT:  Any objection to Exhibit 38?

18           MS. BALUS:  No objection.

19           THE COURT:  Exhibit 38 is received.

20   BY MS. JACKSON:

21   Q.   So this was a confidentiality agreement?

22   A.   Yes.

23   Q.   Did you believe yourself able to abide by this agreement?

24   A.   Yes.

25   Q.   Why?

1    A.   It's something that I would do anyway.  Confidentiality

2    in a medical situation is imperative, especially in a medical

3    situation.

4    Q.   And going back to the clinic setting, did you ever work

5    with a Dr. Townley?

6    A.   Yes.

7    Q.   Who was she?

8    A.   She was the doctor that Michael worked with in his

9    clinics.

10   Q.   In general, what was her attitude like toward you?

11   A.   She treated me as if I was just one of the staff there.

12   Q.   Just like Michael?

13   A.   Just like Michael.

14   Q.   Tell me about the last day you interpreted in the clinic.

15   A.   The last day we interpreted there, Michael and I were

16   standing in a general area, a waiting area, I guess.

17        And he was getting ready to go into a room.  And

18   Dr. Townley had asked us to come with her to go into another

19   room.

20        So we went into the room, and she closed the door.  And

21   she explained to Michael that he would not be able to stay and

22   he'd have to leave.

23   Q.   What did you observe her doing during that conversation?

24   A.   After working with Dr. Townley a few times, she seemed --

25   it seemed to bother her that she was having to relay that

1    information.

2    Q.   And how did -- what did you observe of Mr. Argenyi's

3    reaction?

4    A.   He -- you know, he responded and then we left.  But it

5    bothered him.  He was upset.

6    Q.   Have you ever been asked to leave an assignment before?

7    A.   Never.

8    Q.   Have you ever been asked to leave an assignment since?

9    A.   No.

10   Q.   Did she give you any reason why you had to leave?

11   A.   No.

12   Q.   Did you ever see Mr. Argenyi after that?

13   A.   After that?  Yes, but not in an interpreting situation.

14   Q.   And how did you communicate with him then?

15   A.   We just -- I think I communicated with him the way I did,

16   signing, supported speech.

17   Q.   You seem to have a very clear memory of things that

18   happened several years ago.  Is that normal for you?

19   A.   No.  This was a very unique situation, so there were

20   things that stood out.

21   Q.   Like what?

22   A.   The fact that Michael was scheduling his own

23   interpreters.  I thought that was pretty odd when most

24   colleges I work for --

25           MS. BALUS:  Objection, your Honor, same objection as

1   before.

2              THE COURT:  Sustained.

3              MS. JACKSON:  No more questions.

4              THE COURT:  Cross-examination?

5              MS. BALUS:  Thank you, your Honor.

6                          CROSS-EXAMINATION

7   BY MS. BALUS:

8   Q.   Good afternoon, Ms. Rankin.

9   A.   Good afternoon.

10  Q.   You testified that you only interpreted for one lecture

11  for Mr. Argenyi, correct?

12  A.   Correct.

13  Q.   And so you don't know how that lecture compares to the

14  other lectures that he sat through, correct?

15  A.   No.

16  Q.   You don't know if the setting was the same, you don't

17  know if the pace of the information was the same, correct?

18  A.   Correct.

19  Q.   Now, when you interpreted for the small group class, you

20  said the small group leaders would sometimes turn their back

21  and write on the blackboard or white board.  Was that your

22  testimony?

23  A.   Yes.

24  Q.   They knew you were there interpreting for Mr. Argenyi,

25  correct?

1    A.    Correct.

2    Q.    Let me back up to the lecture setting again because I

3    forgot a question.  How far would the professor actually stand

4    from the front row of the lecture hall?

5    A.    In the lecture hall?

6    Q.    In the lecture you attended.

7    A.    The one that I attended, he was standing closer to the

8    wall where the PowerPoint was.

9    Q.    Do you have an estimation of about how far that was?

10   A.    I don't know.

11   Q.    You don't know if other professors stood closer or

12   farther, correct?

13   A.    I don't know.

14   Q.    The exam that you proctored -- excuse, the proctored exam

15   that you went to interpret for, you mentioned that the

16   atmosphere was stressful.  It was all the students that were

17   stressed, correct?

18   A.    Correct.

19   Q.    Because they were all about to take an exam, right?

20   A.    Yes.

21         MS. BALUS:  May I have just a moment to confer with

22   counsel, your Honor?

23         THE COURT:  You may.

24       (Off-the-record discussion had.)

25         MS. BALUS:  I have no further questions.

```
 1                    THE COURT:  Redirect?

 2                    MS. JACKSON:  Yes, your Honor.

 3                          REDIRECT EXAMINATION

 4      BY MS. JACKSON:

 5      Q.   Going back to the examination, you said that all the

 6      students were nervous.  Did Mr. Argenyi appear more nervous

 7      than any of the other students?

 8      A.   No, he seemed just as nervous as any of the other

 9      students.

10      Q.   Did you see any indication he knew you were about to get

11      kicked out?

12      A.   No.

13      Q.   And in terms of where the professor was standing during

14      the lecture, was the professor facing the students the entire

15      time he spoke?

16      A.   No.

17      Q.   Where else would the professor be looking?

18      A.   He would be turned looking at the PowerPoint as well at

19      times.

20                    MS. JACKSON:  No more questions, your Honor.

21                    THE COURT:  Thank you, Ms. Rankin.  You may stand

22      down, and you are excused.

23                    THE WITNESS:  Thank you.

24                    THE COURT:  Plaintiff may call his next witness.

25                    MS. DeLAIR:  Your Honor, plaintiff calls Esther
```

```
 1    Argenyi to the stand.

 2              THE COURT:  Ms. Argenyi, you may approach the

 3    courtroom deputy and she will swear you in.

 4              COURTROOM DEPUTY:  Please state your full name for

 5    the record and then spell your last.

 6              THE WITNESS:  My name is Esther Argenyi,

 7    A-r-g-e-n-y-i.

 8              ESTHER ARGENYI, PLAINTIFF'S WITNESS, SWORN

 9              THE COURT:  You may inquire.

10                        DIRECT EXAMINATION

11    BY MS. DeLAIR:

12    Q.   Could you please state your name and spell it for the

13    record, please?

14    A.   My name is Esther Argenyi, A-r-g-e-n-y-i.

15    Q.   Where do you live?

16    A.   I live in the greater Seattle area.

17    Q.   What is your profession?

18    A.   I am a radiologist.

19    Q.   What is your relationship to Michael Argenyi?

20    A.   Michael is my son.

21    Q.   When was Michael born?

22    A.   Michael was born in 1986.

23    Q.   How did you find out Michael was deaf?

24    A.   When Michael was a baby, we had a baby-sitter who was

25    experienced with children.  And she raised a concern that she
```

E. ARGENYI - DIRECT                                                228

1    felt that Michael was not responding to sounds the normal way.

2    We had Michael tested and indeed we found out he had a severe

3    to profound hearing loss.  He was approximately eight months

4    old.

5    Q.   What was your reaction to this news?

6    A.   Well, at first we were shocked as anybody is when a life-

7    altering situation like that comes up; then realized that

8    Michael really did not change, he was the same child as

9    before, so that helped us get through the process.

10        We tried to study as much as possible, research our

11   options, and figure out how to raise a hearing-impaired child.

12        I was also fortunate enough I could attend a week-long

13   camp for parents of hearing-impaired children in Council

14   Bluffs, Iowa at the Iowa School for the Deaf.

15        And in that camp I first met other deaf children.  I'd

16   never actually met a deaf person before.  So I could talk to

17   other parents, I could see children of similar ages and older.

18   And I also learned about the different modes of communication

19   that people use to raise deaf children.

20   Q.   Did you learn about cued speech?

21   A.   Yes.  There was -- cued speech was one of the methods

22   that was explained to us during that camp, and that's how I

23   learned about cued speech first.

24   Q.   And can you give us an example of cued speech?

25   A.   Cued speech is a system of communication that is based on

 1    the sound.  It basically uses eight different hand shapes and

 2    four different hand positions.  The hand shapes help to

 3    recognize the consonants and the hand positions the vowels.

 4    When you use it in the normal spoken language, then it would

 5    supplement lip-reading.

 6        A good example would be the simple words like pop, mom,

 7    and Bob.  When I'm saying these words, then all of you can

 8    hear it because they sound different.  For a hearing-impaired

 9    person, when I just mouth it, they all look the same.  You

10    have no idea which one I just said.

11        So cued speech uses hand shapes.  In this example, this

12    (indicating) would be for pa (phonetic), and this (indicating)

13    would be for ma (phonetic), and this (indicating) would be for

14    ba (phonetic).

15        So when I'm not saying it, but you can hear it from me

16    when I'm saying, that I said pa (phonetic), there is no

17    question about it.

18    Q.   Why did you go with cued speech?

19    A.   At that time we lived in Iowa City, which is a relatively

20    small city.  And the resources for a hearing-impaired child in

21    Iowa City were somewhat limited.  And by that I mean that it

22    is not a vibrant deaf community where you can just immerse

23    your child, pick up sign language, go to sign language

24    classes, and have a lot of opportunities to be part of the

25    deaf community.

1          We also wanted Michael to be an integral part of our

2     family, our smaller college town community, and also be able

3     to easily mainstream into the school district, the local

4     mainstream school district; and really decided that cued

5     speech for us as a family was the best option to achieve those

6     goals.

7     Q.   Now is cued speech the same thing as American Sign

8     Language?

9     A.   No.  Cued speech is very different from American Sign

10    Language.  As I said, cued speech is based on the sound.  So

11    basically it breaks down the language into syllables.  So

12    similar syllables would look exactly the same and you cue them

13    in different words.

14         Sign language, on the other hand, is a meaning based

15    system and every word has its own sign.  So you would have to

16    learn the signs for every single word that you would like to

17    teach your child or when you want to communicate with other

18    deaf people.

19    Q.   Growing up, did Michael wear hearing aids?

20    A.   Yes.  Michael was -- almost immediately after Michael was

21    diagnosed with his hearing impairment, he was fitted with two

22    hearing aids.  And he used those hearing aids until later when

23    he received cochlear implants -- not the same ones, of course,

24    but similar.

25    Q.   And approximately what age did he start using the hearing

E. ARGENYI - DIRECT                                     231

 1    aids?

 2    A.   I would say he was less than a year old, and I don't have

 3    an exact recollection.  Probably needed a couple of months to

 4    test them, figure out what exactly is the best for him, so ten

 5    months, give or take.

 6    Q.   What did you notice about him when he did get the hearing

 7    aids?

 8    A.   At that time, the most noticeable change was that once we

 9    found out Michael was hearing impaired, we tried to bang, make

10    loud noises, and he would just not turn around.

11         When he was fitted with the hearing aids, he started

12    responding to very loud noises and just started being aware of

13    noises at all.

14    Q.   Now, how did he learn to talk?

15    A.   Michael -- which is very common for basically most

16    hearing-impaired children -- had therapy in terms of speech

17    that has been throughout his life.  It also started almost

18    immediately after he was diagnosed with hearing impairment.

19         In babies, they start with play things like blowing

20    bubbles, just to help them have the motion of speaking.  They

21    also start with very basic sounds.  And then as they progress,

22    the speech therapists have their own method to figure out what

23    sound comes next and how to teach them.

24         He had speech therapy again starting in very early

25    infancy and throughout his life.

1    Q.   Now, how do you communicate with Michael at home?

2    A.   At home, cued speech; I use cued speech with Michael.

3    Q.   Now, what was Michael like as a child?

4    A.   Michael -- after we learned how to develop Michael's

5    language skills using cued speech, it was very delightful

6    because it was very hard work being the mother of a hearing

7    impaired child, but everything just came back multifold.  It

8    was just really a very rewarding experience to be able to see

9    when you put in, then you get so much back.

10        Michael was always very inquisitive.  He was interested

11   in practically everything around him.  He wanted to know about

12   everything.  He also was always very independent.  "I'll do it

13   for myself.  I'll do it for myself."

14        And also goal oriented, determined, if he set his mind on

15   something, there was no way of stopping Michael.

16        Later on when Michael was older, he developed quite a bit

17   of social interests, his years in high school, and also quite

18   a sense of social justice.

19   Q.   What were your hopes and dreams for him?

20   A.   Well, at the beginning when we just learned that Michael

21   was deaf, we actually had no idea what the hopes and dreams

22   can be for Michael, so it was for a while not knowing.

23        Then I got to know more of Michael as he developed, and I

24   also got to know other deaf children.  And we realized that we

25   can have the same hopes and dreams as any other parent wanting

 1     your child to grow up as an independent, successful person and

 2     develop into that full potential, whatever they want to be.

 3     So those were the hopes and dreams.  And I think over the

 4     years, we realized that was highly possible.

 5     Q.   Where did Michael attend school?

 6     A.   Michael attended school at the public school district of

 7     Iowa City.

 8     Q.   And did you tell the school about his deafness?

 9     A.   The school already was aware of the deafness.  In Iowa,

10     special needs children are not served by the school district

11     directly, but first through the area educational agency which

12     coordinates all the special needs services.

13         So as soon as Michael was diagnosed, we were put in

14     contact with our local area educational agency.  So they were

15     very intimately aware and knowledgeable about Michael's needs.

16         We worked with the itinerant teacher of the deaf for

17     several years and also the speech pathologist.  And by the

18     time Michael is school aged, they definitely knew who Michael

19     was and what his needs were.

20     Q.   How did the school respond to Michael's needs?

21     A.   We were fortunate.  We had a wonderful relationship with

22     the school.  They were highly supportive, and I can only say

23     good things about it.  They provided the necessary

24     accommodations for Michael throughout the school years.

25     Q.   Now, what accommodations did Michael have in school

1    growing up?

2    A.   Michael -- the main accommodation during elementary

3    school years was a cued speech interpreter.  He also received,

4    as I mentioned, speech therapy and visits by the itinerant

5    teacher of the deaf who also served as the main contact person

6    for the educational team, the go-to person for the teachers.

7         As Michael entered into junior high, I believe about

8    eighth grade or so, the academic -- the school became more

9    lecture style and academically much more challenging.  So the

10   team reevaluated the situation and decided to also supplement

11   Michael's accommodation with CART or real time captioning.

12   Q.   Now, when did Michael graduate from high school?

13   A.   Michael graduated in 2004.

14   Q.   And what hearing devices does Michael use today?

15   A.   Today Michael has two cochlear implants.

16   Q.   When did you first learn -- when did Michael first tell

17   you that he was wanting to be a doctor?

18   A.   Michael told me about that sometime maybe in the middle

19   of his college years.  I don't exactly remember the timing.

20   But it was somewhere about that time.

21   Q.   What was he like when he talked about wanting to be a

22   doctor?

23   A.   Michael was very enthusiastic about it.  He always loved

24   babies, he wanted to be a doctor and work with babies in every

25   way possible.  He was excited about possibly doing emergency

 1    medicine and hopefully pediatrics, he said.  And he also

 2    expressed some interest in infectious diseases, that he was

 3    very passionate and enthusiastic about his aspirations.

 4    Q.   Now, what did you do when Michael was accepted to

 5    Creighton?

 6    A.   Oh, we were delighted.  I -- having lived in Iowa, I

 7    definitely knew of the reputation of Creighton.  And we were

 8    extremely delighted and very proud of Michael that he had made

 9    it so far, obviously with some obstacles.  So we had a nice

10    dinner and celebration.

11         MS. DeLAIR:  Your Honor, may I approach the witness?

12         THE COURT:  Yes, you may.

13    BY MS. DeLAIR:

14    Q.   Ms. Argenyi, I've just showed you Plaintiff's Exhibit

15    No. 33.  Do you recognize this exhibit?

16    A.   Yes, I do.

17    Q.   And what is it?

18    A.   This is a letter I sent to Creighton University on

19    September 7, 2009.

20    Q.   Why did you write this letter?

21    A.   I wrote this letter because by that time Michael had been

22    in school and actually in classes for approximately four

23    weeks.  And he also had been requesting necessary

24    accommodations from Creighton University for almost six

25    months.

```
1            At this point I was very frustrated because I felt that
2    Michael was in danger of failing because of the lack of
3    necessary accommodations.  And I was just again very concerned
4    about the situation.
5            MS. DeLAIR:  Your Honor, I offer Plaintiff's Exhibit
6    No. 33, please.
7            MS. BALUS:  No objection.
8            THE COURT:  Exhibit 33 is received.
9    BY MS. DeLAIR:
10   Q.   Ms. Argenyi, can you please turn to page 2 of Exhibit 33,
11   please?  And can you read out loud the first three sentences?
12   A.   "I am the mother of Michael Argenyi, a first-year medical
13   school student with hearing loss at your medical school.  I
14   have been following his quest for appropriate accommodations
15   with considerable frustration.  At this time, four weeks into
16   the school year, there is no meaningful solution in sight,
17   therefore I feel that I need to write to you directly."
18   Q.   Why did you use the word "frustration"?
19   A.   I think that was the best expression of my feeling at
20   that time.  I felt that Michael really had to try everything
21   that was within his means to secure his accommodations.
22           By that time Michael was quite skillful in doing so
23   because he had been practicing it for several years at
24   different educational institutions.  And it was just, we felt,
25   a frustrating experience.
```

```
 1              THE COURT:  Let me interject a moment, excuse me.

 2         I understand one of the monitors in the jury box is not

 3    functioning properly.  The members of the jury should feel

 4    free to move in their seats to a monitor that they can see.

 5    So just feel free to scoot down a chair or two if you need to

 6    get to a monitor that you can see.

 7         Thank you very much.

 8         Ms. DeLair, you may proceed.

 9              MS. DeLAIR:  Thank you, your Honor.

10    BY MS. DeLAIR:

11    Q.   Can you please read out loud the third paragraph?

12    A.   "Michael was diagnosed with severe-to-profound

13    sensorineural hearing loss at the age of 8 months (prelingual

14    hearing loss).  He was fitted with hearing aids immediately.

15    At 18 years of age Michael received a unilateral cochlear

16    implant, with a second (now bilateral) implant in June of this

17    year.  Michael received measurable help from the hearing aids

18    and has also received significant benefits from his cochlear

19    implants.  His hearing, however, is far from 'restored' and

20    remains limited in his auditory input.  Significant sound

21    distortion due to sensory nerve damage remains even for sounds

22    that he is now able to 'hear'.  A rough analogy for a hearing

23    person would be listening to a poorly tuned crackling radio

24    station in which turning the volume up will not make the sound

25    clearer.  Intense concentration would be required to discern
```

 1    meaning from this sound."

 2    Q.   You wrote this letter to Creighton University, correct?

 3    A.   Yes.

 4    Q.   Did you get a response to this letter?

 5    A.   I addressed this letter to Dr. Kavan, who was at that

 6    time the associate dean for student affairs.

 7         I also sent copies to Dr. Zetterman, who is the dean --

 8    was the dean -- I don't know if he still is, sorry -- the dean

 9    of the medical school; and also the president of the

10    university, John Schlegel; and the Educational Opportunity

11    Programs Director or Disability Office director, Wade Pearson.

12         I did receive a short reply from Dr. Zetterman which

13    basically said, "I have forwarded your letter to Dr. Kavan,"

14    and that was it.

15    Q.   Were there any other responses?

16    A.   No.

17              MS. DeLAIR:  I have no further questions, your Honor.

18              THE COURT:  Cross-examination?

19              MS. BALUS:  Thank you, your Honor.

20                          CROSS-EXAMINATION

21    BY MS. BALUS:

22    Q.   Good afternoon, Dr. Argenyi.

23         You indicated that you sent this letter to Dr. Kavan

24    because you were afraid that Mr. Argenyi, your son, was in

25    danger of failing; is that correct?

 1   A.   That is correct.

 2   Q.   Had Mr. Argenyi shared with you any of the grades that he

 3   had received before you sent this letter to the medical

 4   school?

 5   A.   I do not have a recollection of the grades, but at that

 6   point of time I understand that most of the information was a

 7   rehearsal of what they learned previously.  So I am not aware

 8   of the grades.

 9        I am aware of the frustrations and the emotional distress

10   that he was going through.

11   Q.   And you didn't provide Creighton any new information in

12   this letter, correct?  All the information that was in here

13   they had already received from Mr. Argenyi himself or from

14   Dr. Backous, correct?

15   A.   That was my intention, yes.  I might have provided a

16   better summary of the historical information, but I -- my

17   recollection is that was not new information.

18             MS. BALUS:  I have no further questions.

19             THE COURT:  Redirect?

20             MS. DeLAIR:  I have no further questions, your Honor.

21             THE COURT:  Very good.  Thank you, Dr. Argenyi.  You

22   may stand down, and you are excused.

23             MS. VARGAS:  Your Honor, may we have a sidebar?

24             THE COURT:  Yes.

25        (Bench conference on the record.)

```
 1            MS. VARGAS:  That's actually the end of the witnesses

 2     that we have scheduled for today.

 3            THE COURT:  Okay.

 4            MS. VARGAS:  So we don't want to put somebody on and

 5     stall.  I heard your message loud and clear.

 6            THE COURT:  This is good news that things are moving

 7     along well.  And we'll start tomorrow at nine o'clock.

 8         As long as we're over here outside the presence of the

 9     jury, do you want to share with me what you anticipate in the

10     way of scheduling tomorrow and your witness lineup?

11            MS. VARGAS:  We provided a witness list.

12            MS. DeLAIR:  I apologize, I did not send you a copy

13     of that witness list.

14            THE COURT:  That's okay.  No, you don't need to.

15     Nobody ever does.  I'm just curious so I know how to plan for

16     tomorrow.  You had mentioned before that you had one witness

17     that you needed to bring in on Tuesday.

18            MS. VARGAS:  I made that very confusing, that was my

19     fault.

20         Dr. Hansen is a former employee of Creighton University.

21     He's a hostile witness.  We would like to call him as a

22     witness, and he's -- Mr. Moore has indicated that he will make

23     him available.

24            MR. MOORE:  He lives in Chicago, just --

25            MS. VARGAS:  He's not available until Tuesday.  So we
```

```
 1    have witnesses that we expect will take up the day tomorrow.

 2    In the event that that doesn't happen, we won't be able to

 3    call Dr. Hansen because he simply isn't in the state.

 4              THE COURT:  That's fine.  And that was my

 5    understanding of what you had told me before.  I just wanted

 6    to confirm, based upon how things had moved along today, if

 7    you still anticipated that you'd be using most of the day

 8    tomorrow.  And that's perfectly fine.

 9              MS. VARGAS:  I think we're right on schedule.

10              THE COURT:  Okay.  Great.

11        I will let the jury know that they are excused until

12    tomorrow morning at nine o'clock, and we'll see you tomorrow

13    at 9.

14              MS. VARGAS:  Thank you.

15              MR. MOORE:  Thank you.

16        (End of bench conference.)

17              THE COURT:  The jury will get to go home a little bit

18    early today.  This is all of the evidence for the day.

19        But we need you back tomorrow morning at nine o'clock in

20    the morning.  So please come into the jury room before nine

21    o'clock.  We'll plan to start promptly at nine o'clock

22    tomorrow morning.

23        And keep in mind that if anybody gets delayed, it delays

24    everyone, which is a lot of people.  So do your best to come

25    before nine o'clock, and we'll see you then.  Thank you.
```

1          We're in recess.

2

3          (Adjourned at 4:24 p.m.)

4

5

6          I certify that the foregoing is a correct transcript from

7     the record of proceedings in the above-entitled matter.

8

9

10

11          /s *Brenda L. Fauber*                    7-21-14

12       Brenda L. Fauber, RDR, CRR                Date

13

14

15

16

17

18

19

20

21

22

23

24

25