1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEBRASKA

2

3    MICHAEL S. ARGENYI,          )
                                  )
4              Plaintiff,         )         8:09CV341
                                  )
5         vs.                     )     Omaha, Nebraska
                                  )     August 23, 2013
6    CREIGHTON UNIVERSITY,        )
                                  )
7              Defendant.         )

8

9

10                          VOLUME III
                     TRANSCRIPT OF PROCEEDINGS
11           BEFORE THE HONORABLE LAURIE SMITH CAMP
           CHIEF UNITED STATES DISTRICT JUDGE AND A JURY
12

13

14

15

16

17

18

19

20   COURT REPORTER:          Ms. Brenda L. Fauber, RDR, CRR
                              111 S. 18th Plaza
21                            Suite 3122
                              Omaha, NE 68102
22                            (402) 661-7322

23

24

     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.

```
1                         A-P-P-E-A-R-A-N-C-E-S

2

3      FOR THE PLAINTIFF:              Ms. Mary C. Vargas
                                       Mr. Michael S. Stein
                                       Stein Vargas Law Firm
4                                      P.O. Box 522
                                       Emmitsburg, MD 21727
5

6                                      Ms. Dianne D. DeLair
                                       Nebraska Advocacy Services
7                                      134 South 13th Street
                                       Suite 600
8                                      Lincoln, NE 68508

9
                                       Ms. Caroline E. Jackson
10                                     NAD and Advocacy Center
                                       8630 Fenton Street
11                                     Suite 820
                                       Silver Springs, MD 20910
12

13     FOR THE DEFENDANT:             Mr. Scott P. Moore
                                       Ms. Allison D. Balus
14                                     Baird Holm Law Firm
                                       1700 Farnam Street
15                                     Suite 1500
                                       Omaha, NE 68102
16

17

18

19

20

21

22

23

24

25
```

1          (At 9:03 a.m. on August 23, 2013, with counsel for the

2     parties, the plaintiff, and the defendant's representative

3     present, and the jury NOT present, the following proceedings

4     were had:)

5          THE COURT:  Good morning.

6          MS. VARGAS:  Good morning.

7          MR. MOORE:  Good morning, Judge.

8          THE COURT:  Is there anything we need to visit about

9     before Ms. Roundtree brings in the jury?

10         MS. VARGAS:  Yes, your Honor.  There are two issues I

11    just wanted to do seek clarification from the Court on.

12        The first is with respect to Mr. Argenyi testifying.  We

13    are going to be calling him first to testify this morning.

14    And we're mindful of the Court's instruction with respect to

15    his use of CART during his testimony.

16        Our concern is if there's a technical problem -- we

17    understand the server was having issues in the courthouse

18    yesterday.  And if his feed freezes, what would you suggest

19    would be an appropriate way to handle that situation?

20         THE COURT:  And this raises a number of good

21    questions.

22        Before we bring in the jury, I would suggest that we let

23    Mr. Argenyi up on the stand, have the laptop set up so that he

24    can read it and also see the person who is asking him

25    questions.

1      If, for some reason, he is unable to read a question, for

2   example, sometimes a word doesn't immediately translate,

3   exactly as we would hear it, on the real time screen.  And so

4   if he has any questions or confusion based upon the real time

5   feed, I would suggest that rather than drawing attention to

6   the real time feed, that he simply ask the attorney to repeat

7   the question.  And chances are, it will come through

8   accurately the next time.

9      If there's a complete breakdown in the real time feed,

10   then I would suggest that he ask for a break in the

11   proceedings.

12      MS. VARGAS:  My concern is that prejudices his

13   testimony.  It suggests he's unable to continue answering if

14   for some reason he's responsible for it.  And I certainly

15   don't want that impression to prejudice the plaintiff's case.

16      THE COURT:  Well, do you have a different suggestion?

17      MS. VARGAS:  My suggestion is that he be permitted to

18   testify as to the truth, that if the feed were to stop for

19   some reason, for him to be able to say that.  I wouldn't want

20   to be in a position of telling him how to testify.

21      THE COURT:  All right.  I don't think that the feed

22   is likely to stop.  And if the feed stops, he can turn to me

23   and say the feed has stopped.

24      MS. VARGAS:  Thank you, your Honor.

25      THE COURT:  All right.

1              Anything else?

2                   MS. VARGAS:  I did have one other question.  I wanted

3       to clarify the Court's order with respect to proceedings that

4       have preceded this trial.

5          My understanding is that neither side is permitted to

6       mention those kinds of pretrial events, things such as the

7       TRO, for example -- the TRO hearing.

8                   THE COURT:  All right.  I did issue an order in

9       response to the defendant's motion in limine indicating that

10      the plaintiff was not to refer to pretrial matters without

11      getting leave of Court to do so.

12         And then the plaintiff asked that that be reciprocal.

13      And that appeared to be fair, and I ordered that that was to

14      be reciprocal.

15         As far as testimony of the plaintiff or others in

16      connection with a different hearing, if someone has given

17      testimony under oath that is inconsistent with testimony that

18      is given on the stand, there may be impeachment of the

19      witness's testimony.

20         And so you're asking me to anticipate that this may

21      happen, and I don't know if you are considering that to be

22      objectionable.

23                  MS. VARGAS:  My concern is that neither party be

24      permitted to say the prior testimony was at a TRO hearing.

25                  THE COURT:  All right.  I don't know why either party

```
 1    would need to refer to it as a TRO hearing.  But the party

 2    attempting to impeach the testimony of a witness could make

 3    reference to prior testimony offered under oath at an earlier

 4    proceeding, just as we've heard done in connection with

 5    depositions.

 6              MS. VARGAS:  Thank you.

 7              THE COURT:  All right.

 8         Let's bring in the jury.

 9         (Jury in at 9:10 a.m.)

10              THE COURT:  Please be seated.  Good morning.

11         As you know, the trial now is at the stage where the

12    plaintiff is presenting his evidence.  And the plaintiff may

13    call his first witness.  And I understand that the plaintiff

14    himself will be the next witness; is that correct?

15              MS. VARGAS:  Yes, your Honor.  We'd call the

16    plaintiff to the stand.

17              THE COURT:  Very good.

18         And Mr. Argenyi, Ms. Roundtree will now administer the

19    oath.

20              COURTROOM DEPUTY:  Please state your full name for

21    the record and spell your last.

22              THE WITNESS:  Michael Argenyi, A-r-g-e-n-y-i.

23              MICHAEL ARGENYI, PLAINTIFF'S WITNESS, SWORN

24              THE COURT:  You may inquire.

25              MS. VARGAS:  Thank you, your Honor.
```

ARGENYI - DIRECT

| | |
|---|---|
| 1 | DIRECT EXAMINATION |
| 2 | BY MS. VARGAS: |
| 3 | Q.   Good morning, Mr. Argenyi.  Could you please state your |
| 4 | name again for the record? |
| 5 | A.   My name is Michael Argenyi. |
| 6 | Q.   And how old are you? |
| 7 | A.   I'm 26 years old. |
| 8 | Q.   How did you learn to speak? |
| 9 | A.   I learned to speak -- when I was diagnosed with my |
| 10 | hearing loss at eight months old, my mom started me |
| 11 | immediately in speech therapy.  So I don't know exactly what |
| 12 | it was like when I was a baby because I don't have that |
| 13 | memory, but from my understanding I was in speech therapy |
| 14 | several times a week.  A speech therapist would come to the |
| 15 | house and would work with me.  And this continued through |
| 16 | kindergarten, through elementary school, through junior high |
| 17 | and high school.  So at least once a week, I was meeting with |
| 18 | somebody for several years, and as needed beyond that point. |
| 19 | So, for example, during high school, I would go practice |
| 20 | my presentations with my speech therapist so that she could |
| 21 | teach me how to pronounce words that I wasn't sure how to say. |
| 22 | Q.   Can you hear yourself speak? |
| 23 | A.   I can hear -- I can hear my voice, but I can't actually |
| 24 | monitor myself.  I can't always tell that I say something |
| 25 | wrong.  People point out when I've said something wrong quite |

1    often.

2    Q.   What factors affect your ability to understand spoken

3    speech?

4    A.   So, when I'm listening to somebody and trying to lip-read

5    them, I have to put what sound I can try to hear together with

6    the movement of their mouth.  Some people, they're clear, they

7    move their lips well.  A lot of people are really difficult to

8    understand.

9         So, for example, some people talk like they've got

10   marbles in their mouth.  They mumble.  They might have facial

11   hair that gets in the way, I can't see their lips clearly.

12        Other factors that come into play are if there's more

13   than one person, I start having trouble following the

14   conversation.

15        Background noise is also difficult.  If there's

16   background noise that impedes with what I can try to lip-read

17   from that person, then I have a harder time even trying to --

18   trying to understand the lip movement that they're giving me.

19   Q.   Can you explain what lip-reading is?

20   A.   Lip-reading is when I look at somebody's face and they

21   move their mouth in certain ways that go with the same kind of

22   sounds.  So depending on the sound, the lips move one way or

23   another.  Some share the same movement, but depending on the

24   context, I try to figure out which one they just say.  And I

25   try to understand the words from looking at their lips.

1    Q.    Are you able to understand speech from lip-reading alone?

2    A.    I can understand much of basic conversation.  If I don't

3    understand something, I ask to repeat.  If I still don't

4    understand, like, with my friends sometimes, you know, I still

5    get stuck on a word.  And I ask them several times.  They'll

6    pull out their phone and they'll type it on their phone like a

7    text message and show it to me.  So I can understand a good

8    amount, but not everything.

9    Q.    What factors influence your ability to lip-read people?

10   A.    What factors?  So, things that influence my ability to

11   lip-read people again are do they have facial hair that cover

12   up their lips, do they have an accent.  So here in America,

13   people tend to speak very openly.  They open their mouths.

14   They show a lot of expression in their faces.

15        When I've talked to people from other countries, a lot of

16   them come from places where their language is more in the back

17   of their throat.  They talk more gutturally.  They don't move

18   their lips as much.

19        Other things are I have a hard time understanding kids

20   because they haven't really developed their palate.  They're

21   also kind of talking all over the place.  They go from topic

22   to topic.  They babble.  They don't understand that they have

23   to face me as a deaf person, so...

24   Q.    Can you give an example of a person who you can lip-read?

25   A.    Probably the person that I have the best time lip-reading

1      is my mom.  I've grown up with her, I've known her for 26

2      years old [*sic*].  She was at every meeting for me.  And

3      because she raised me with cued speech, I got very, very used

4      to her lip movements.

5          The other thing is when I come home, we talk about the

6      same things.  She'd ask me how school was going, how were my

7      dogs.  We'd talk about the same things over and over, how my

8      brother's doing.  The content is predictable.  And even at the

9      time I'm still not catching something, then she has the cued

10     speech.

11     Q.   And can you give an example of a person you have a hard

12     time lip-reading?

13     A.   So, in college I had a professor for my history classes

14     who actually was from Boston, so he had a Bostonian accent.

15     He also had a full beard, and he talked like he had marbles in

16     his mouth.

17         I had a really tough time understanding him.  So when I

18     would go to his lectures, I was completely relying on the

19     transcript I was reading during his lectures.

20     Q.   Are you able to lip-read a conversation when there are

21     two other people involved in that conversation with you?

22     A.   I can try to lip-read a conversation when there's more

23     than one person.  But what happens is I still have to figure

24     out who was talking in that situation.

25         And so, let's say person A is speaking, and I'm facing

1   person A, I can't necessarily predict when person A is going

2   to stop talking and when person B is going to start talking.

3   So by the time I figure out that person B has started talking,

4   I turn my head, and I tend to miss the beginning of the

5   sentence.

6        So it is kind of a ball bouncing back and forth.  And I

7   have a hard time participating in those conversations because

8   I'm just trying to follow that bouncing ball.

9        So what happens over the course of the conversation, I

10  start to lose more and more of what's going on.  So I have a

11  general idea maybe of what's happening, but not all of these

12  details.

13  Q.   In a setting like that, could you ask people to repeat

14  what they're saying?

15  A.   I can, and I often do.  I hang out with my friends in

16  groups, you know.  Most of my friends are hearing people.

17  They talk, they don't sign, they don't know cued speech.  And

18  sometimes I ask them, "Can you repeat yourself?"  "Whoa, I

19  didn't catch that.  Can you back up?"

20       But it's not the same.  They give me a summary or they

21  say it's not important; or even if they repeat themselves,

22  they tend to forget five sentences later.  People talk the way

23  that they're used to.  It's a natural habit.

24  Q.   What happens in larger group settings?

25  A.   In larger groups, it's like that bouncing ball analogy.

1    It goes from person to person to person.  For example, in a

2    classroom setting, maybe you have an undergraduate that is 20

3    students -- 25 students, maybe, in rows.  If I'm sitting in

4    one place, and there's a conversation going on, I don't know

5    where that -- where the other person is talking from.  I have

6    to turn, scan the room, figure out where that person is

7    talking from.  And then by that time they might have finished

8    their comment.

9    Q.   What is cued speech?

10   A.   Hold on.

11       Cued speech is a way of showing what sounds look like.

12   So, when your lips move, some of them look the same.  My mom

13   gave the example yesterday of "mom" and "Bob".  I can't tell

14   the difference between those.

15       Or, for example, I have a hard time telling apart the

16   word "urology" and "neurology".  They look exactly the same to

17   me.  In fact, I had a particular classmate tell me that she

18   was interested in going into urology, and I thought she said

19   neurology.  So I started asking her all these questions about

20   what that was -- you know, what part of the brain she was

21   interested in, what she wanted to do.  And she looked at me

22   with this puzzled face.  And had I been able to use cued

23   speech in that context, I would have caught that there was an

24   "N" at the beginning but I couldn't understand.

25   Q.   With whom do you use cued speech?

1    A.   I use cued speech with my family and -- and I've used it

2    in the educational setting.

3    Q.   Can you hear voices on the radio?

4    A.   I can hear them, I cannot understand them.  It's garbled.

5    Q.   Why can't you understand them?

6    A.   Because I don't know how to understand them.  Growing up

7    I didn't have the ability to discriminate speech, to put those

8    sounds together.

9         So even after the cochlear implant, I do a little bit

10   better, but I can't piece everything together to make sense.

11   I may catch a piece here, but then I can't catch the next

12   piece, so my brain gets stuck.  And I can't put it together.

13   Q.   Did you have accommodations in elementary school?

14   A.   Yes, I had accommodations in elementary school.

15   Q.   What were those accommodations?

16   A.   I started with a cued speech interpreter from first grade

17   through -- on and up.

18   Q.   And who provided those accommodations?

19   A.   The school district did.

20   Q.   Did you have accommodations in middle school?

21   A.   Yes, I had accommodations in middle school.

22   Q.   What accommodations did you have there?

23   A.   In middle school, I started with a cued speech

24   interpreter in seventh grade.  In eighth grade, we started

25   looking for additional accommodations.  The school district

 1    felt that the workload was increasing, the kind of setup in

 2    the school was changing, it was turning more and more into

 3    lectures.  It was turning into -- you know, in elementary

 4    school, it's a lot of interactive activity.  You move around,

 5    you go to music class, you go to gym, you set up stations, you

 6    get into groups and play on the floor.  They try to make it

 7    fun to occupy kids.

 8        By the time you get to eighth grade, they're preparing

 9    you for the setup of high school.  So at that time, they said,

10    "Let's try CART and see how it worked."  We actually

11    originally tried a computer typist who I would sit next to the

12    computer -- the person who was typing on the computer.  And

13    she would try to type up what was going on.  And it wasn't

14    fast enough to keep up.  I wasn't able to participate, so they

15    got rid of that idea pretty quickly.

16        So, next we tried a CART -- we tried CART with somebody

17    who makes a transcript on the screen like you saw yesterday.

18    Q.   So when you were in middle school, who provided the cued

19    speech interpreters?

20    A.   The school district did.

21    Q.   And when you were in middle school, who provided the

22    CART?

23    A.   The school district did.

24    Q.   Did you have accommodations in high school?

25    A.   Yes, I did.

1    Q.   What were those accommodations?

2    A.   The accommodations were the same.  I had a cued speech

3    interpreter and I had CART.  By that time, I used CART for

4    pretty much all of my classes except music and language.  I

5    was taking German at that time, so I used a cued speech

6    transliterator for German.

7    Q.   Why did you use a cued speech transliterator for German?

8    A.   I used a cued speech interpreter for German because it's

9    another language.  It was a way for me to see how these words

10   were pronounced in German.

11         Cued speech can be adaptive to different languages, so it

12   can show you the different sounds like the "c-h" in Bach.  In

13   German, there's a way to cue that on the face to show me

14   that's the sound being used.

15   Q.   Okay.  And these accommodations that you had in high

16   school, who provided them?

17   A.   The school district did.

18   Q.   Did you take any community college courses while you were

19   in high school?

20   A.   Yes.  I took some community college classes.  In

21   Washington state they allow you to take some community college

22   classes while you're still in high school.

23   Q.   And what community college did you attend for those

24   classes?

25   A.   I attended Cascadia Community College.

1    Q.   And did Cascadia Community College provide you any

2    accommodations?

3    A.   Yes, they provided me accommodations.

4    Q.   What did they provide?

5    A.   They provided me CART.

6    Q.   When did you graduate from high school?

7    A.   I graduated from high school in 2004.

8    Q.   And did you go to college?

9    A.   Yes.  I immediately went to Seattle University that fall.

10   Q.   And what was your major when you started at Seattle

11   University?

12   A.   I started off as a history major.  I had a teacher in

13   high school that taught me European and --

14        COURT REPORTER:  I'm sorry, can you repeat that for

15   me?  Can you repeat?

16   A.   Certainly.

17        I started off with a history major.  I had a teacher in

18   high school that had taught me European history, and he had

19   gone to Seattle University.  And so -- and he spoke very

20   highly of the department, so I kind of followed in his

21   footsteps.

22   BY MS. VARGAS:

23   Q.   Does Seattle University have any religious affiliations?

24   A.   Seattle University is a Jesuit school.

25   Q.   When you enrolled in Seattle University, did you request

1    any auxiliary aids and services?

2    A.   I met with the Director of Disability Services and asked

3    for CART and cued speech interpreters, if there was one

4    available in the area.

5    Q.   And why did you request those auxiliary aids and

6    services, those specific ones?

7    A.   I requested those accommodations because they were

8    necessary.  They were what allowed me to get all of the

9    information in high school, and I knew they would allow me to

10   have access to all of the information during college.

11   Q.   Did you provide any documentation?

12   A.   I provided an audiogram.

13   Q.   Did you provide any other documentation?

14   A.   I did not.

15   Q.   Who made the decision what auxiliary aids and services

16   Seattle University would provide?

17   A.   The Office of Disability Services.

18   Q.   And that was Seattle University?

19   A.   (No response.)

20   Q.   Was that Seattle University?

21   A.   Yes, that was Seattle University.

22   Q.   How did Seattle University respond when you asked for

23   CART and cued speech interpreters?

24   A.   I did not have any problem.  They started to schedule

25   CART for my lectures.  And they let me know that there was not

1    a qualified cued speech interpreter in the area, which was to

2    me acceptable because at that time there were no classes that

3    I found explicitly required having the cued speech

4    interpreter.  I was taking lecture classes, as in electrical

5    engineering, and some history classes where -- which were

6    lecture style.  And at that time, they were effective for that

7    setting.

8    Q.   Who paid for the auxiliary aids and services at Seattle

9    University?

10   A.   Seattle University did.

11   Q.   Did they ever ask you to pay for them?

12   A.   No, they did not.

13   Q.   And during your time at Seattle University, during what

14   classes did you use CART?

15   A.   I used a CART for pretty much all of my classes.  I used

16   CART for my history lectures, for my chemistry lectures, for

17   really just about all of my classes.

18   Q.   And for what classes did you use cued speech interpreters

19   at Seattle University?

20   A.   In the second year when I was a sophomore, there was a

21   cued speech interpreter who relocated to the area.  So I had

22   started taking Hebrew at the University of Washington, and I

23   used her for the Hebrew course.

24        Also, when I started the signed classes, there were

25   associated labs.  And in these labs, I used a cued speech

1    interpreter.  We would go into the room and we were moving

2    around.

3    Q.   And what was your experience in using those cued speech

4    interpreters at Seattle University?

5    A.   My experience is that they gave me full access to the

6    labs.

7    Q.   Did you have any other experiences at Seattle University

8    with cued speech interpreters?

9    A.   I did.  I used a cued speech interpreter for my physics

10   course.

11   Q.   Can you describe that experience?

12   A.   That case, it was not as effective as it should have

13   been.  I did not have access to all of the information.

14   Unfortunately, in retrospect that was not the best choice that

15   I had made, but it was something that I was trying.  I wanted

16   to know how it would go.

17        In that situation, I just could not understand all of the

18   technical language from the physics course.  And it was just a

19   blur trying to watch her cues, trying to take down all of that

20   information, trying to comprehend the new -- this vocabulary

21   in that situation.  The course followed a textbook, so it was

22   more predictable content, so I was still able to keep up.

23   Q.   Did you have access to all of the content in the physics

24   class with the cued speech interpreter?

25   A.   No.

1    Q.   At what point in your education did you receive cochlear

2    implants?

3    A.   I got my first cochlear implant when I started at Seattle

4    University.

5    Q.   And at what point in Seattle University did you get the

6    first cochlear implant?

7    A.   I got the second cochlear implant after I had graduated.

8    Q.   The first cochlear implant, at what point during your

9    time at Seattle University did you get the first cochlear

10   implant?

11   A.   I'm sorry, I misread the question.

12        I got the first cochlear implant during the fall at

13   Seattle University, my freshman year.

14   Q.   All right.  And after you got that first cochlear

15   implant, what auxiliary aids did you use at Seattle?

16   A.   I continued to use CART and cued speech interpreters.

17   Q.   Why did you continue to use CART and a cued speech

18   interpreters after that first cochlear implant?

19   A.   I continued to use CART and cued speech interpreters

20   because I still could not understand speech.  I still -- even

21   with lip-reading, I still could not understand everything.  I

22   still missed classroom discussion.  I still could not actively

23   participate if I did not have access to that information

24   there.

25   Q.   When did you graduate from Seattle University?

1    A.    I graduated in 2008.

2    Q.    Did you have any jobs while you were in college?

3    A.    Yes.  I started working as a CNA my sophomore year.

4    Q.    What's a CNA?

5    A.    A CNA is a certified nursing assistant.

6    Q.    And in what state did you work as a CNA?

7    A.    It's not clear.

8    Q.    In what state did you work as a CNA?

9    A.    I worked in Washington state only.

10   Q.    And where did you work as a CNA?

11   A.    I worked as a CNA first in a nursing home and then the

12   longest time I worked at Seattle Children's Hospital.

13   Q.    Did you work anywhere else as a CNA?

14   A.    I worked briefly in an adult hospital.

15   Q.    And generally, what were your responsibilities when you

16   worked as a CNA in Washington state?

17   A.    So my responsibilities generally would have been to help

18   with the activities of daily living for patients or residents

19   of the nursing home.  It depended on the facility that you

20   worked in exactly what you were given.

21   Q.    So, let's talk about the nursing home first.  What kind

22   of responsibilities did you have at the nursing home?

23   A.    So, the first nursing home that I worked at, I had

24   responsibilities of helping the residents get up in the

25   morning, getting them dressed, helping with bathing if they

1    were scheduled for a bath that day.

2          A big part of my day was assisting with meals, handing

3    out food trays, assisting residents who could not feed

4    themselves; so basic activities like that that they needed

5    assistance with.

6    Q.   And at Seattle Children's Hospital, what kind of

7    responsibilities did you have as a CNA there?

8    A.   At the Seattle Children's Hospital, some of my

9    responsibilities included going into the rooms and taking

10   vital signs, taking care of the families and patients that

11   were there.

12         So, for example, when I would enter the room, I might be

13   responsible for changing diapers, giving bottles to the

14   babies, handing out food trays.  I was responsible for

15   transporting to X-ray or other places on the floor.

16   Q.   Did you have any other job responsibilities at Seattle

17   Children's?

18   A.   I had -- there were -- my responsibilities at Seattle

19   Children's Hospital were relatively limited compared to other

20   people, other friends of mine that worked as CNAs.

21         For example, one of my friends worked at the emergency

22   department at another hospital as a CNA, and there he was

23   allowed to do casting and more procedures independently

24   because that's just what their -- that was their policy at

25   that hospital.

1          At Seattle Children's Hospital, anything invasive was

2     overseen by a physician or nurse.  So, my responsibilities

3     were assisting the nurses and those doctors, but I didn't do

4     procedures directly.

5          In fact, for example, when I worked in the emergency

6     department, casting was not even handled by the doctors in the

7     emergency department.  They would specifically call for the

8     orthopedic team to do all of the casting.  That was just the

9     hospital's policies.

10    Q.   How did you feel about your work as a CNA?

11    A.   I loved my work.  I was looking for a job, and people

12    recommended -- I had several friends who were CNAs, so I

13    decided I would try it.  And once I got into that environment,

14    I just absolutely loved it.

15         I got to be the person that provided the comfort,

16    especially in the emergency department.  That was my favorite

17    environment because the patient and the families would come

18    in, they might be really scared what was going on or, you

19    know, just nervous that they're in that situation.

20         And the nurses and the doctors, their role in that

21    situation is to do what they need to do medically.  They're

22    running all over the place, they've got several patients each,

23    and they don't have the ability to be there for the families.

24         And I, as a CNA, was the person that helped everything go

25    smoothly.  I kept everything ready for the doctors and the

 1    physicians.  I was able to be the person that was in the room

 2    to help these families just feel more comfortable, to get them

 3    the warm blanket that they wanted, to get them the water that

 4    they needed, to get through their time in the emergency

 5    department.

 6    Q.   What accommodations did you request at Seattle Children's

 7    Hospital?

 8    A.   I asked for a text pager, a text pager where they could

 9    send me a text or -- letting me know where I should be.  So,

10    in the emergency department, we had two wings.  We had the

11    front emergency department, and then we had a back room where

12    we could open up more rooms if we got busy.

13         So, in that case, they needed to be able to have a way to

14    reach me.  Typically, they would give me a phone so they would

15    be called and told where they needed to go or to grab

16    supplies, but I can't understand a phone.  So instead they

17    would give me a pager, and then I would go to the front desk

18    to follow up.

19    Q.   Were there any times at Seattle Children's where you did

20    use the phone?

21    A.   Yes.  So, because I had a text pager, typically what they

22    did is they would leave the extension for the phone number at

23    the front desk.  So I could go to the phone and I could call

24    back.  And I could say, "This is Michael, I'm busy.  I know

25    that you requested me, but I can't come right now.  Please let

1    somebody know that I'm just not available," and then I would

2    hang up.

3    Q.   Were there any other circumstances where you used the

4    phone at Seattle Children's?

5    A.   I also used the phone in a similar fashion when I would

6    take patients to radiology.  I tried to work with Children's

7    Hospital to change -- because it was frustrating.  What

8    happened is I would take somebody down to the X-ray room, and

9    you had to wait outside the door.  They'd shut the door if

10   there was another patient in there.  But there were other

11   times where it was closed just because they forgot to leave it

12   open.  So you had to call in to let them know that you were

13   there.

14       So, in those situations I would call in, let them know

15   that I was here, and I could tell whether somebody answered or

16   did not answer.

17       But actually, in trying to work with them to have a light

18   system put in where they would put on a light if the room was

19   occupied.

20   Q.   So, when you used the phone to enter the radiology

21   department, what was your ability to understand what the

22   person said to you on the other end of the phone?

23   A.   I didn't have the ability to understand what the other

24   person said.  I think they started to pick up on the fact that

25   they knew it was my voice, and they knew that I was one of the

1     people from the emergency department.  So when they heard me

2     say, "This is Michael," they actually just started hanging up

3     and coming to the door.

4     Q.   How did your ability to use the phone change -- or did

5     your ability to use the phone change when you got your

6     cochlear implant?

7     A.   Yes, it changed.  So, before, when I had the hearing aid,

8     I really couldn't tell what was going on on the phone.  I

9     would pick it up and there would just be, like, static so I

10    would know that somebody had answered.

11         When I got the cochlear implant, I was pretty excited.  I

12    tried to start using the phone, and I could hear that there

13    were voices.  And I was hoping with time that I would be able

14    to actually use it, compared to never being able to use it

15    before.

16    Q.   Could you understand the voices on the phone after your

17    cochlear implant?

18    A.   No.

19    Q.   Did you communicate with patients at Seattle Children's?

20    A.   Yes, I did.

21    Q.   What was your means of communication with them?

22    A.   With the patients at Seattle Children's Hospital, I

23    primarily used speechreading.  If I didn't understand

24    something, I would pull in someone else to help me.  So -- or

25    inform the nurse that I had not gotten the question -- the

 1    answer to the question that I had asked and she needed to

 2    follow up.

 3    Q.   What was the communication like at Seattle Children's

 4    Hospital?

 5    A.   At Seattle Children's Hospital, the communication for me

 6    was pretty basic.  It was a lot of directives.  So I would go

 7    out to the waiting room, call a name, tell them, "Come on

 8    back, we're going to room 3."

 9         We would go into room 3.  I would say, "My name is

10    Michael, I'm your emergency department tech today."  That was

11    our official title.  And, "I'm going to get you settled.  I

12    need to take your vital signs."

13         And then I would take the vital signs, you know, blood

14    pressure using the machine.  I might take their height and

15    weight.  I might take their $O_2$ saturation.  Then I would get

16    them settled, and I would ask them, "Do you need water?  It's

17    there.  Can I get you a warm blanket?"  If they were allowed

18    to have food, I might give what the food choices were and ask

19    if they were interested in any of those.

20    Q.   How much of that communication did you understand?

21    A.   I would say I understood, you know, 70 percent.

22         And then if I didn't understand something because maybe

23    the patient was an immigrant or had a parent who were

24    immigrants with an accent, then I would have somebody that

25    would come in with me.

1    Q.   Why did you apply to medical school?

2    A.   I applied to medical school because my work as a CNA is

3    really what set me off on to that path.  I really enjoyed

4    being in that medical setting, and I loved giving basic

5    patient care.  I loved being there for the patient.

6         But I saw myself -- when I would watch the doctors and

7    how they would look at these patients as a puzzle, you know,

8    the patient would come in, and it's a puzzle.  You want to

9    look at all of this information that they give you, all of the

10   symptoms that they give you, the history that they describe,

11   the family background that they describe.  You have to take

12   all of that information and put it together and figure out

13   what's wrong and what can we do to make this better?  And that

14   just sounded like a perfect role.

15   Q.   I'm going to show you what's been marked as Plaintiff's

16   Exhibit 200 -- I'm sorry, Defendant's Exhibit 200.

17        Do you recognize this document?

18   A.   Yes, I recognize this document.

19   Q.   What is it?

20   A.   This is my application to medical school that I sent to

21   all of the schools that I applied to during 2008-2009

22   application cycle.

23   Q.   Okay.  Is this a true and accurate copy of that

24   application?

25   A.   Yes, it is.

1          MS. VARGAS:  Your Honor, at this point I'd move to

2     have Defendant's Exhibit 200 entered into evidence.

3          MR. MOORE:  No objection.

4          THE COURT:  Exhibit 200 is received.

5          MS. VARGAS:  Thank you, your Honor.

6     BY MS. VARGAS:

7     Q.   Mr. Argenyi, if you could please turn to page 9 to 10 of

8     the application, the personal essay.

9     A.   Got it.

10         (Off-the-record discussion had.)

11     BY MS. VARGAS:

12     Q.   Page 7 is the personal essay, so we're all on the right

13     place.

14         Can you look -- could you look at the second to last

15     paragraph of the second page of your personal comments which

16     is page 8 of the application.  It begins with the words

17     "without medicine".

18     A.   Yes.

19     Q.   Can you tell me about that paragraph?  Why did you

20     mention physicians?

21     A.   I mentioned physicians because when a hearing impaired or

22     deaf child is born, the diagnosis has to start with a medical

23     exam.  When I go in, it's the doctor that tells my mom about

24     what kind of communication strategies are out there, what kind

25     of services I need to get connected with.  It's the doctor

1    that writes the referrals for the audiologist, for speech

2    therapy, for everything.  It all starts with the doctor.

3    Q.   Can you tell me about how the physicians impacted your

4    ability to use the phone?

5    A.   Yes.  So, over time the technology developed from hearing

6    aids to cochlear implants.  As I explained before, with

7    hearing aids, I couldn't use the phone at all.  I could really

8    hear nothing, it was static.

9         With the advent of the cochlear implants, once I got one

10   of those, I was able to use the -- to understand whether I got

11   an answer or not on the phone.

12   Q.   And if you could look at the last paragraph on that page,

13   could you read that paragraph, please?

14   A.   The last paragraph?  "Based on my personal and

15   professional experiences, I have an appreciation of the

16   extensive coordination of the health care team, from

17   physicians to allied health care professionals.  Because of my

18   history training, I also have a strong sense of duty to

19   deliver medical care that incorporates an understanding of the

20   socioeconomic factors behind health issues.  I want to enable

21   people to do what they dream by allowing them maximum physical

22   and health capacity by helping them make appropriate medical

23   decisions for treatment and prevention.  One of those patients

24   might eventually choose to practice medicine like I am right

25   now."

1   Q.   Thank you.

2        And could you turn now, please, to what's marked as page

3   6 of your application -- a few pages previous to that.

4        On the bottom you mention the Association of Medical

5   Professionals with Hearing Loss.  Can you tell us what that

6   is?

7   A.   The Association of Medical Professionals with Hearing

8   Loss is a organization that was started some number of years

9   ago to try to network different health care providers with

10  hearing loss.  So there are veterinarians, physicians, nurses.

11  I know at the time when I joined there was a very active

12  emergency -- EMT.

13       And so it's an organization where they discuss, like, the

14  different challenges in being a successful health care

15  provider with hearing loss.  They discuss different things,

16  such as how to use a stethoscope, the different stethoscopes

17  such as visual stethoscopes and amplified stethoscopes.  They

18  discussed how to use the interpreters, the using of

19  interpreters in the clinic.  They discussed -- they discuss

20  any kind of challenge or barrier -- challenge that comes up.

21  Q.   And it says on page 6 of your application that you

22  attended a conference in April 2008.  Can you tell us about

23  that conference, please?

24  A.   So, at that conference, there was a weekend -- I think it

25  was one full day with a breakfast the next day or something in

1    Utah.  So I flew down and I went to this conference.

2        There were several lectures.  The conference itself was

3    completely accessible.  They had CART providers as well as

4    interpreters for everybody who was there.  They did voice

5    interpretation, so somebody would speak, and somebody else was

6    signing so everybody that was there with different kinds of

7    hearing loss could understand.

8        They covered topics that range from how to sign different

9    medical terminology.  They covered topics such as what medical

10   school residency looked like with interpreters and

11   accommodations.  There were other things on how to maximize

12   the use of technology during medical -- during -- in the

13   medical setting.

14   Q.   And when you say "maximize technology," what was the

15   purpose of -- what do you mean by that term?

16   A.   I mean maximize such as going in -- like what kind of

17   stethoscope to pick which is really the best fit for your kind

18   of hearing loss; how to maybe modify some of the cochlear

19   implant programs.  You can change the program on the cochlear

20   implant.  Some can be better for picking out, like, lower

21   frequency noises, such as breath sounds.  Some of them might

22   be better for picking up higher pitch noises and how to

23   find -- how to work with your audiologist to find the little

24   tweaks that will maximize and give you the most information

25   possible.

1    Q.   At that conference, did they have examples of that kind

2    of technology that you were talking about for you to actually

3    experiment with?

4    A.   They had examples of the stethoscopes.  They had two or

5    three different amplified stethoscopes and they had visual

6    stethoscopes at that time.

7    Q.   Did they have any other type of equipment or any other

8    things that the deaf physicians or deaf nurses used in their

9    medical practice?

10   A.   They covered the different kind of pagers that people

11   used in the medical setting.  Pagers are a pretty common piece

12   of equipment that physicians have.  You know, you're on the

13   floor, you're on call, you get paged, you go to the phone.

14        So in these cases, they showed us a two-way text pager,

15   they showed us voice to text pagers where somebody would speak

16   a message and it could get converted to text for that

17   physician.

18   Q.   Okay.  And do you remember any of the people you met at

19   that conference in particular?

20   A.   I remember several that I met.

21        MR. MOORE:  Your Honor, at this point can we have a

22   sidebar?

23        THE COURT:  Yes.

24      (Bench conference on the record.)

25        MR. MOORE:  I just want to make sure we have a

1    complete understanding that this is not trying to get

2    Dr. Moreland's testimony in through the witness here to the

3    extent she's going to ask what did Dr. Moreland tell you about

4    his own personal experiences, what he used or what other

5    physicians or folks may have used, again that's getting in --

6    they're skirting the back door around your order.

7            MS. VARGAS:  I understand perfectly the boundaries,

8    and I have no intention of skirting around them, as well as

9    Mr. Moore said yesterday it was relevant and Mr. Argenyi could

10   testify about who he met at that conference and what impact

11   that had on his decision to go forward on the medical

12   profession.  Mr. Moore said Mr. Argenyi could testify about

13   that, and I'm trying to ask him about that now.

14           THE COURT:  And I'll just note that as long as

15   Mr. Argenyi is not asked to tell what Dr. Moreland said to

16   him, I think we'll be okay.

17           MS. VARGAS:  That's not the testimony I'm trying to

18   elicit.

19           MR. MOORE:  Very good.

20           THE COURT:  Thank you.

21       (End of bench conference.)

22   BY MS. VARGAS:

23   Q.   Did you meet anyone at that conference who sticks out in

24   your mind?

25   A.   Yes.  I met three people in particular.  When I attended,

1    I knew that I was interested in attending medical school, so I

2    sought out other physicians.  I met three that I kept in touch

3    with, and I remember a fourth that I talked to at that

4    conference.

5        So I talked to Dr. Christopher Moreland.  I talked to

6    Dr. Jessica Dunkley, who was from Canada.  I talked to

7    Dr. Jennifer Lied, and I talked to Dr. Wendy Osterling.

8    Q.   How did you feel after meeting those people and talking

9    to them?

10   A.   I felt very empowered.  These are four physicians who

11   actually had already graduated medical school.  Some of them

12   were independently practicing -- I think two of them at that

13   time, maybe three were still in residency, still in training

14   but had graduated.

15       And at that time, these were all people who had also --

16   were severely to profoundly deaf and had trouble growing up,

17   used interpreters growing up.

18       So after talking to them, it was, like, okay, I can go

19   through -- medical schools do work with people who are deaf.

20   They do provide in those settings, and you can be just as

21   competent as anybody else when you graduate.

22   Q.   So let's turn back to how you ended up in medical school.

23       When did you apply did Creighton University?

24   A.   I applied to Creighton University during the 2008-2009

25   cycle.  So the cycle itself opens up in June of 2008, of that

1    cycle, and then you can work on your application through the

2    summer.  The application itself had to wait for my test

3    scores, so the application did not get submitted until the end

4    of September.

5    Q.    And what was Creighton's response to your application?

6    A.    The response was that I had been invited to an interview.

7    Q.    And did you go for an interview at Creighton University?

8    A.    Absolutely.  So my undergraduate was Jesuit, and

9    Creighton University is a Jesuit school.  We heard about

10   Creighton University a lot.  The other premedical students at

11   Seattle University were also interested in going to Creighton

12   University.  My premedical advisor talked about it.  And I

13   know we had the -- I don't remember the title, but there's a

14   person at the medical school who does, like, outreach, goes to

15   other schools to talk about what their medical school is like.

16   I didn't have an opportunity to meet him, but I know that he

17   came to Seattle University to talk to the school.  So I knew

18   about Creighton.  And the name was prominent in my head.

19        I also grew up in Iowa, so I've been around the Midwest.

20   And I came here as a kid for audiology, like intense audiology

21   exams so I was pretty excited about returning here.

22   Q.    What aspect of a Jesuit education appealed to you?

23   A.    So, what I really liked about my time at Seattle

24   University is they had a really strong commitment to social

25   justice.  When I was growing up, I was always kind of the kid,

1    save the animals, recycle everything.  It was dorky, but that

2    was me.

3    Q.   So turning back to your visit to Creighton for your

4    interview, tell me about that interview.  Where was it held?

5    A.   So when I came for the interview, in medical school

6    you're pretty much required to go to the school to interview.

7    You fly out.  There's an intense interview process.  They want

8    to meet you, kind of see who you are, do you have a good

9    personality, are you accurately representing yourself, you

10   know.  So you're not some crazy person who doesn't really know

11   what you're talking about.

12       So you get to their school, and there's usually a full

13   day with a lunch somewhere in there.  And they walk you

14   through the campus.  They give you a tour, what it looks like.

15   They try to show you what's good about their facility.  Maybe

16   they're building a new gym, they show that; maybe they're

17   building a new hospital, they show that to you.  They talk

18   about the perks and benefits.  They talk about what the

19   overall cost would be.  They give you a deadline -- or

20   timeline, I should say, when you'll hear back about the

21   decision.  And they give you all of this information in

22   packets as well.

23       I get there.  We started off with an introduction in the

24   morning, welcome to Creighton University, congratulations on

25   your interview.  We went through some workshops that I don't

1    really recall at this point.  And then sometime during that

2    day we did an interview.  The interview itself looks a little

3    bit different at each school.  At Creighton University there

4    were two, there was a student interview and there was a

5    faculty interview.

6         So, for the interview we were escorted over to Creighton

7    University Medical Center, and the interviews were held in

8    these mock patient rooms.  There's a clinical assessment

9    center.  It's set up to look like an outpatient clinic with

10   little rooms, with an examination table, and enough room to

11   move around in.  So, it's called a clinical assessment center.

12        So when we got there, we got into the room and we

13   interviewed.  I first interviewed with a student, some girl

14   that I don't really remember her name.  I think she was in her

15   third or fourth year.  And next I interviewed with a faculty

16   member named Dr. Barone.

17   Q.   During the first interview with the student, how many

18   people were present in that interview?

19   A.   Just one person.

20   Q.   Just you and who else?

21   A.   Just me and the student that was interviewing me.

22   Q.   Okay.  And how did you communicate during that first

23   interview?

24   A.   I communicated using speechreading.  This was a -- when I

25   came to the interview, I wanted to be able to build that

1    rapport with the person that I was interviewing with.  I

2    wanted to be able to just be myself with that person.  The

3    content is also really predictable.

4        In general, when you apply to a medical school, you

5    really want to get in, so you prepare for this interview.  You

6    review -- you go on to the Web site.  You learn what you can

7    learn about Creighton University.  You learn what you can

8    learn about the School of Medicine.  You go over the

9    application that you had submitted.  You just kind of review

10   your story.

11       The questions are more or less predictable.  Why do you

12   want to come to Creighton University?  What made you want to

13   become a doctor?  Where do you see yourself when you become a

14   doctor?  If there's surprise questions -- and there are some

15   surprise questions, but in general it's pretty predictable

16   content, and a lot of it is pulled from the application.

17       So, for example, when I talked with the student, I

18   remember that she came in and she said she was so excited to

19   talk to me, that she looked over my application, she wanted to

20   know about my volunteer work with the Alaskan malamutes, with

21   the dogs.

22   Q.   And how was your communication with that student during

23   the first interview?

24   A.   My communication with that -- if I didn't understand

25   something, I could ask and she could repeat it to me.  It was

1    also predictable.  I knew what was likely to come.  It was a

2    conversation, it was a back and forth, it was slow paced.

3    Q.   What about the second interview, who was present for the

4    second interview?

5    A.   At the second interview, it was Dr. Barone, if I can

6    remember, and myself.

7    Q.   And can you tell me about -- how did you communicate in

8    that interview?

9    A.   I communicated in a similar fashion.  I did

10   speechreading.  It was conversational back and forth.  If I

11   didn't understand something, I asked again.  It was just like

12   the other one.

13   Q.   During your interview, did the topic of your deafness

14   come up?

15   A.    It did.  I was open about it in my application which

16   meant that it was okay to talk about it.  I don't exactly

17   remember how the topic came up but Dr. Barone asked me if I

18   saw any problems with being a deaf doctor.  And I said no,

19   there are challenges but I know from other people, they have

20   addressed those challenges, so, it's very possible.  And I

21   really look forward to being able to overcome those.

22   Q.   And after that interview, what happened next?

23   A.    So, after that interview, there was about a month where

24   they take some time, they are a couple of weeks behind.  Their

25   interview cycle is pretty intense.  They interview so many

1     students and then -- so, they have to review those

2     applications so they said it would be a couple of weeks.

3        A couple of weeks later they contacted me saying they

4     wanted more background on my community service.  So I sent an

5     e-mail outlining some other community service that I had done

6     during my undergraduate years.  And then they gave me a time

7     when a decision would be made by.  So they said on so-and-so

8     day, there would be a decision.

9     Q.   And did you get a decision?

10    A.   I did get a decision.

11    Q.   And what happened?

12    A.   So on that day -- you know, I couldn't wait for an

13    official letter in the mail so I actually asked my roommate to

14    call for me.  So I told my roommate -- I asked my roommate --

15    I gave him the number for the office of admissions, and he

16    gets on the phone, he calls them, asks about the status of

17    Michael Argenyi's application.

18       And he keeps a straight face and, you know, he's waiting

19    for the response, and he's like (indicating) -- you know,

20    gives me this really grim look, and I'm just thinking, oh,

21    you've got to be kidding me.  I've been trying so hard and I

22    had such a good feeling when I was at that interview.

23       I remember I walked out of that interview, I was so

24    excited.  I said, I think this is the one I might have just

25    gotten.  He gave me this grim look.  And I'm thinking, What

 1    can I do now.  And he finishes the conversation, gets off the

 2    phone and breaks into a smile and says, "You're in."

 3    Q.   How did that feel?

 4    A.    It was amazing.  I mean, there's really no words to

 5    describe it.  I texted my mom, told her immediately.  Pretty

 6    much told everybody, you know, that I could that I was in.

 7              MS. VARGAS:  May I approach, your Honor?

 8              THE COURT:  Yes, you may.

 9              MS. VARGAS:  I'm going to be showing what's marked as

10    Exhibit -- or accepted into evidence as Plaintiff's Exhibit 1.

11              THE WITNESS:  Do you think I can have some water?

12    Thank you.

13    BY MS. VARGAS:

14    Q.   Do you recognize this document?

15    A.   Yes, I recognize this document.

16    Q.   What is it?

17    A.    So, after I found out that I was officially accepted, I

18    had to wait for the official letter to come in the mail.  You

19    get this nice large envelope.  They tell you if it's a small

20    regular envelope, it's bad news; if it's a large envelope,

21    it's good news.  I get this large packet and it has the

22    official offer of acceptance to the medical school.

23         So, included you have to sign a form that says do you

24    accept our form or do you decline our offer?

25         And then there's another form that was sent called the

1    Technical Standards Request For Accommodations that I had to

2    review and also send back.

3    Q.   And can you read the date on this -- the first page of

4    this exhibit?  It's a very poor copy and I apologize for that.

5    A.   I believe I sent this about March 23rd in 2009.

6    Q.   Okay.  And could you read for me starting with -- the

7    second sentence of that paragraph, second and third sentences,

8    please.

9    A.   "I am hearing impaired and I use a cochlear implant.  I

10   will be requiring some accommodation during my enrollment,

11   probably similar to what I have used in the past, which has

12   been primarily interpretation or captioning services during

13   lectures and teaching sessions."

14   Q.   Why did you request accommodations similar to what you

15   had had in the past?

16   A.   That's what had been effective for me.

17   Q.   And look -- if you could turn to the second page of that

18   application and can you explain what this is?

19   A.   This is the form that I was sent by Creighton University.

20   They send this form to everybody, all the students that they

21   offer a place in the medical school.  So, they also sent it

22   with a copy of the technical standards, and they have you

23   review it.  And then they say will you need accommodations to

24   meet these technical standards, and I say, yes, I will need

25   accommodations and I return this form.

1          MS. VARGAS:  Your Honor, I realize we've made a

2     mistake and introduced something with personal information

3     that should have been redacted, a social security number.

4          THE COURT:  I see.  Well, before this goes to the

5     jury, it should be redacted.

6          (Off-the-record discussion had.)

7     BY MS. VARGAS:

8     Q.   And if you could turn -- I'm sorry, on this second page,

9     could you please read for me paragraph -- the numbered

10    paragraph 2?

11    A.   Sign and return this original document to the Office of

12    Medical Admissions using the business reply envelope provided.

13         Two:  Copy this signed document and enclose an

14    explanation with supporting documentation in an envelope

15    marked personal and confidential to:  Michael Kavan, address.

16    Q.   And then if you could turn to the third page and explain

17    what that is?

18    A.   So this is an audiogram.  I had recently had an audiogram

19    with my audiologist at my primary clinic just before this so I

20    had asked for a copy of my most recent audiogram.  I tried to

21    get a copy of one because so often I'm asked to submit it for

22    documentation.  It shows that I actually have a disability.

23    Q.   And so how did you get a copy of that audiogram?

24    A.   I asked my audiologist to get me one at the end of the

25    clinical session.

1    Q.    And did you give Creighton University everything that she

2    gave you?

3    A.    Yes.

4    Q.    What was Creighton's response to Plaintiff's Exhibit 1?

5    A.    They e-mailed me maybe a week later saying they had

6    gotten my request for accommodation and that they needed

7    further documentation.  They also outlined the technical

8    standards that they thought would be relevant.

9    Q.    And what did you do after you received that?

10   A.    After I received that, I contacted my cochlear implant

11   physician and my audiologist that worked with the cochlear

12   implant physician who was at a different clinic.  So in

13   Seattle, my primary insurance, my primary care was under one

14   provider and that provider does not do cochlear implants.

15         So they sent me to another facility.  So for the cochlear

16   implant-related stuff, I went to that facility.

17         So, I contacted that doctor and I asked him for

18   documentation and to send it on to Creighton.

19   Q.    And what was the name of that doctor?

20   A.    That was Dr. Backous.

21   Q.    And what was the name of the audiologist?

22   A.    The audiologist was Stacey Watson.

23   Q.    Did you contact Stacey Watson?

24   A.    Yes, I did contact Stacey Watson.

25   Q.    What was the purpose of your contact?

ARGENYI - DIRECT                                                    287

1    A.    The purpose of my contact was to get the documentation

2    that Creighton University asked for.

3    Q.    And what happened after you contacted your audiologist?

4    A.    I was told that the letter had been sent and they sent me

5    a copy as well.

6                MS. VARGAS:  May I approach the witness and show him

7    what's been accepted as Plaintiff's Exhibit 3, your Honor?

8                THE COURT:  Yes, you may.

9    BY MS. VARGAS:

10   Q.    Do you recognize this document?

11   A.    Yes, I recognize this document.

12   Q.    What is it?

13   A.    This is a e-mail that I sent to Dr. Kavan where I

14   outlined my understanding of the medical school curriculum at

15   that point and what kind of accommodations would be necessary

16   for me.

17   Q.    Why did you send this e-mail to Dr. Kavan?

18   A.    I sent this e-mail to Kavan because he had asked me to

19   detail the kind of accommodations I would need and to also

20   confirm that medical documentation would be coming to support.

21   Q.    Okay.  And could you please read the last sentence of the

22   second paragraph?

23   A.    I said, "Because I cannot predict all of my possible

24   needs for every situation, I would like to begin this

25   progressive conversation by just looking at the first year

 1    classes."

 2    Q.   And could you please read aloud what you requested for

 3    lectures?

 4    A.   For lectures I said:  Due to fatigue and the general

 5    large size of classrooms, I would like to request real-time

 6    captioning.

 7    Q.   Why did you make that specific request?

 8    A.   I requested that because I used CART for my lectures in

 9    undergraduate at Seattle University and it was effective.  I

10    knew that medical school is -- everybody described it to me

11    like drinking out of a fire hydrant.  It's a lot of

12    information, it's a lot of complex vocabulary.

13         For me to understand all of that language the first time

14    that it's said, for me to know what I was actually hearing or

15    seeing or reading, the way for me to do that was on a screen

16    reading the words itself.

17    Q.   And why did you refer to the general large size of

18    classrooms?

19    A.   I knew that when I was at Creighton University, they had

20    a workshop or presentation where they had shown slides, and

21    they discussed about what their classes were kind of like, and

22    they said they usually accept something like -- I don't

23    remember how many they said they offer acceptances to but they

24    said that the final class size is around 120, 130.

25         And I knew other medical schools -- there's a book that

1    you can buy that outlines all the different medical schools,

2    and it says what the class sizes are, and some are 70

3    students, some are 200, 300.  It's large.

4    Q.   And why did you refer to fatigue?

5    A.   I referred to fatigue because when I'm trying to lip-read

6    or even use an interpreter in these situations, it's very,

7    very hard for me to follow that amount and complexity of

8    information and take it in and actually understand everything

9    that's going on.  I can't necessarily connect what I lip-read

10   on somebody's mouth with the words that I read.

11   Q.   And can you read aloud what you requested for labs?

12   A.   For labs, I said, "I would like to request an interpreter

13   be present.  If available, I specifically request a cued

14   speech interpreter.  If unavailable, I may be able to use an

15   oral interpreter.  I am not used to ASL interpretation, and

16   therefore an ASL interpreter is not sufficient at this point."

17   Q.   Why did you request a cued speech interpreter, if

18   available, for class?

19   A.   Cued speech is really the only kind of interpreter I've

20   ever used.  I've never used an oral interpreter and I did not

21   know sign language.  I said if one is available because from

22   my experiences cued speech has really only been used on the

23   East Coast.  What happened, it started getting more popular,

24   families were adopting it and then the cochlear implant came

25   out at that time.

1        So all of a sudden, the new babies -- I was older, this

2    was mid '90s maybe, late '90s.  So babies at that time, they

3    were getting the cochlear implants and they were pushing them

4    to try to use the cochlear implants like regular hearing.

5        So, at that point, the cued speech kind of -- it just --

6    it lost its momentum.  So it didn't really spread across the

7    U.S.  So, for example, when I was in Seattle, we only had one

8    cued speech interpreter and she hadn't even been there the

9    whole time that I was there.

10   Q.   And what did you mean when you said you were not used to

11   ASL interpretation?

12   A.   I do not know ASL.  And for me to try to use an ASL

13   interpreter in that situation, it would have not been

14   effective.

15   Q.   What did you mean when you said you may be able to use an

16   oral interpreter?

17   A.   So, because I knew that there was a strong possibility

18   that there may not be a cued speech interpreter in the area, I

19   knew I needed some kind of interpreter in that situation.  So

20   I said, you know, we can try the oral interpreter.  That's the

21   next step that I can think of.

22   Q.   Would you please read aloud what you requested for small

23   groups.

24   A.   For small groups:  I would like to request the use of an

25   FM system, if the group size is reasonably small, perhaps

1    eight people or less.  This is likely sufficient without an

2    interpreter.  If the group size is much larger, or the group

3    is constantly moving in busy areas, then I may request an

4    interpreter.

5    Q.   Why did you request an FM system for small groups of less

6    than eight people?

7    A.   I thought that in that situation the FM system would be a

8    way for me to track who was talking so it might help me with

9    that bouncing ball momentum.  So I thought the conversation --

10   it was more conversational, it was slow paced.  I was looking

11   for something that I would be willing to try.

12       And in the previous letter from the -- not in the

13   previous letter, but when I asked my physician for

14   recommendations, he said an FM system might be effective so I

15   thought that would be a good way to try.

16   Q.   Okay.  And why did you say that you might request an

17   interpreter if the group was moving around in busy areas?

18   A.   So, if this moving around is in busy areas, people turn

19   away; there might be background noise, there might be -- just

20   different things get in the way of being able to lip-read and

21   being able to follow the conversation.

22   Q.   And why did you say that you might request an interpreter

23   for classes larger than, say, eight people?

24   A.   Eight people was a number that I thought would be

25   reasonable to start with.  I thought like anything beyond

1    eight, it definitely would be too difficult for me to try to

2    follow that bouncing ball, even with the FM system.

3         Once you get into that many people, you might start

4    having side conversations or more people just start to

5    overlap.  You have more people that you constantly have to ask

6    to repeat or take turns or to not talk over each other.

7    There's just less ways for me to be able to ask people to help

8    me understand what's going on.

9    Q.   And when you actually arrived at Creighton University,

10   how many people were in your small group class?

11   A.   My first year there were 15, and I believe that's the

12   typical class size for small groups.

13   Q.   And what did you mean when you say that you request an

14   interpreter mainly to deter fatigue?

15   A.   So, as I said before, for me to lip-read and try to take

16   in information through lip-reading or even an interpreter in a

17   constant setting where it's a lot of information, that it's

18   just really hard.  It's like trying to -- it's like -- have

19   you ever -- if you have tried to talk under water, you can

20   kind of tell there's speech under there but it's garbled.

21        Maybe some of you have kids who have tried to do that.

22   You talk under water and it's like (descriptive sound) and you

23   try to understand what it is but you can't.  That's what it

24   is.

25   Q.   And could you please read the last paragraph in that

1    e-mail?

2    A.   I said, "Please contact me further if you have any

3    questions or if other documentation and paperwork is needed.

4    If you would like, we can also arrange to meet face-to-face at

5    some point before classes begin."

6    Q.   What response did you receive to this e-mail?

7    A.   I was asked for more documentation.

8    Q.   And what did you do after getting that response?

9    A.   I'm sorry, can you repeat?

10   Q.   You testified that Creighton responded by asking for more

11   documentation.  So what did you do?

12   A.   I contacted Dr. Backous and Stacey Watson again.

13           MS. VARGAS:  If I may approach and show the witness

14   Exhibit No. 5, Judge?  It's already been admitted into

15   evidence.

16           THE COURT:  Yes, you may.

17           MS. VARGAS:  Thank you.

18   BY MS. VARGAS:

19   Q.   Do you recognize this document?

20   A.   Yes, I recognize this document.

21   Q.   What is it?

22   A.   A letter I sent to Dr. Kavan on May 26, 2009.

23   Q.   Why did you write this letter?

24   A.   There seemed to be some concerns about whether that

25   person could become a physician.

1    Q.   Okay.  And would you please review the paragraph that

2    addresses your work as a CNA?  What did you mean when you said

3    that you've been able to obtain -- I'm sorry, your earlier

4    experience is clear proof that you're able to function in a

5    medical setting.  What did you mean by this?

6    A.   I meant that it's possible for that person to be in the

7    medical environment, that I'm comfortable with that

8    environment, that it's not a way for people to -- that it

9    doesn't mean that I can't do it at all as a deaf person.

10   Q.   Okay.  And could you jump to the next paragraph that

11   says -- starts with "every hearing-impaired person".  In that

12   paragraph, you said -- what did you mean when you said you

13   have been able to obtain clinical information in a clinical

14   setting without significant accommodation?

15   A.   So clinical information included some vital signs like

16   blood pressure; the level of $O_2$ saturation, how much oxygen is

17   in your blood; height and weight.

18   Q.   Could you please read the last sentence at the bottom of

19   the page beginning with the word "learning"?

20   A.   "Learning new material without appropriate accommodations

21   results in a high level of fatigue and stress, which would

22   hinder reaching my best performance."

23   Q.   And continuing on to the first sentence at the top of the

24   next page.

25   A.   In order to best represent your school and my own

 1    abilities, I need accommodations in the classroom so I can

 2    absorb the substantial amount of information presented in

 3    medical school, to then present [*sic*] those concepts

 4    clinically.

 5    Q.   Could you read the next paragraph, please?

 6    A.   "Regarding my second bilateral cochlear implant:  It is

 7    the first cochlear implant that is of most significance.  My

 8    current abilities to perform, including at the work situation

 9    at Seattle Children's Hospital, are based on my right-sided

10    implant.  While I am strongly hoping that, as Dr. Backous

11    stated in his letter, the second implant may significantly

12    improve my hearing comprehension, I am also aware of the

13    literature data that show that the added benefits are quite

14    variable and unpredictable.  Therefore, at this time, I would

15    like to plan my accommodations based on my current abilities

16    at this point."

17    Q.   And what were your expectations for your second cochlear

18    implant?

19    A.   Really, I went in for my second cochlear implant because

20    there was some data that said I might have better sound

21    localization.  So with one cochlear implant and even with

22    hearing aids, there was a test that they would do where they

23    would put me in a sound booth, and they would play sounds from

24    different points around me, and I would have to close my eyes

25    and try to point where that sound was coming from, and I had

1    no ability to do that.

2         Some data showed that if you gave a person a second

3    cochlear implant, that their brain might be able to learn how

4    to do -- how to localize sound to be able to tell what

5    direction it's coming from.

6         The other benefit that the research showed was better

7    understanding of background noise.  So you might not

8    understand more overall; but if you put noise in the

9    background, you might do a little bit better.

10        The research at that time was based mostly on two groups,

11   either kids that have been implanted young or adults that had

12   lost their hearing later in life and were pursuing their

13   cochlear implant.

14   Q.   Why did you make your request based on your current

15   abilities at this point?

16   A.   Because I had no idea what the second implant might do

17   and I needed to make sure it would be effective now.

18   Q.   Can you please read aloud the next paragraph?

19            THE COURT:  Let's wait on that until we have our

20   break because it is now 10:30.

21        Let's take the mid-morning break.  Please reconvene in

22   the jury room at 10:45.

23        Thank you.

24        (Jury out and recess taken at 10:30 a.m.)

25        (At 10:50 a.m. on August 23, 2013, with counsel for the

1    parties, the plaintiff, and the defendant's representative

2    present, and the jury NOT present, the following proceedings

3    were had:)

4         MICHAEL ARGENYI, PREVIOUSLY SWORN, RESUMED THE STAND

5         THE COURT:  Anything we need to discuss before the

6    jury comes in?

7         MS. VARGAS:  No, your Honor.

8         MR. MOORE:  Nothing for the defendant.

9         THE COURT:  Please bring in the jury.

10        (Jury in at 10:51 a.m.)

11        THE COURT:  Ms. Vargas, you may continue with your

12   examination.  You may want to restate the last question,

13   please.

14        MS. VARGAS:  Thank you, your Honor.  I'll try to

15   remember it.

16                   DIRECT EXAMINATION (Cont'd.)

17   BY MS. VARGAS:

18   Q.  We've been looking at what's been accepted into evidence

19   as Plaintiff's Exhibit 5 and we're on the second page.  And

20   right below the heading it says, "Regarding the difference

21   between one-on-one, small groups and large groups."  Could you

22   please read the line below that, a few sentences below that?

23   A.  "In general, hearing-impaired individuals function better

24   one-on-one and in small groups and have more difficulty in

25   large groups.  Therefore, there is more need for

1    accommodations in those settings."

2    Q.    And then below that, could you read the section titled

3    "Regarding the requested accommodations"?

4    A.    Okay.  The whole thing?

5    Q.    Well, why don't you read the part about lectures.

6    A.    "Due to fatigue and the general large size of classrooms,

7    I would like to request real-time captioning."

8    Q.    And why did you write that?

9    A.    So as I've explained, in a lecture setting, the language

10   is technical, it's one direction.  It's also a large group so

11   if there's a question from a student, the student could be

12   anywhere in that classroom.  And if I miss what the question

13   is, even if I understand the answer, I don't know what the

14   question was so the answer doesn't make sense.

15        If I have CART, the CART provider can also hear the

16   student ask that question.  And when they ask that question, I

17   have the opportunity for myself to try to think of the answer

18   before the professor gives it and then I can try to match my

19   answer with the professor.  So that's allowing me the full

20   participation there.

21   Q.    And could you read what you requested for labs, please?

22   A.    For labs I stated again that, "I would like to request an

23   interpreter be present.  If available, I specifically request

24   a cued speech interpreter.  If unavailable, I may be able to

25   use an oral interpreter.  I am not used to ASL interpretation,

1   and therefore an ASL interpreter is not sufficient at this

2   point."

3   Q.   Why did you request accommodations that were different in

4   the lecture versus the lab?

5   A.   One second, it hasn't come up.

6   Q.   Let me repeat that.  Why did you request accommodations

7   that were different in the lecture versus the lab?

8   A.   It's delayed.

9            THE COURT:  Well --

10           THE WITNESS:  Okay.  It's up.

11           THE COURT:  All right.

12   A.   So, I requested different accommodations because from my

13   understanding in medical school during the first year, you

14   have anatomy lab.  All medical schools -- some have changed

15   now, but most medical schools have you work on a human body.

16       So you go into the lab, you're looking at this human

17   body, you're dissecting the body, you're learning the

18   different anatomy parts, so you're moving around.

19       And we were also -- if another person or another group

20   finds an interesting detail, you might move over to that body

21   to look at it.  It's just a setting where you're constantly

22   moving around.

23           MR. MOORE:  Your Honor, our real-time is not working.

24           MS. VARGAS:  Your Honor, may we have a sidebar,

25   please?

1           THE COURT:  Yes.

2       (Bench conference on the record.)

3           MS. VARGAS:  This is the plaintiff's first

4    opportunity in four years to tell his story.  His story is

5    about his ability to communicate and the access he needs in

6    order to get that communication.  And it's about CART.  He has

7    been prohibited from making any mention of how he's

8    communicating in this courtroom.

9       Mr. Moore is making a big show of turning his laptop

10   towards the jury and pointing out it's not working, and he's

11   being permitted to make comments that would explain what's on

12   his desk and therefore prejudice what Mr. Argenyi is using.  I

13   think if we're not allowed to talk about it, I think he should

14   not be allowed to talk about it either.  And I make a motion

15   he not be permitted to talk about the real-time feed on his

16   desk.

17          THE COURT:  I'm not sure how the real-time feed going

18   to counsel's desk and counsel's use of real-time has anything

19   to do with the other issue.

20          MS. VARGAS:  The reason they've requested that is so

21   it appears they have the same accommodations Mr. Argenyi has.

22   And instead of looking at the feed, he's had it turned towards

23   the jury.  When the feed just stopped, he turned the computer

24   closer to the jury and pointed at it and shaking his head and

25   stood up to say the feed wasn't working.  And I think the same

1     rules need to apply.

2         I know I'm very careful.  My client is being careful when

3     the feed stopped, saying something other than the truth.  The

4     truth is the feed stopped.  He can't understand what is being

5     said.  But Mr. Moore is making a big show about the feed stops

6     for him.

7             THE COURT:  Mr. Moore, why did you point out that

8     your real-time feed was stopping?

9             MR. MOORE:  Because it's not working.

10            MS. VARGAS:  Why do you need it, Mr. Moore?

11            MR. MOORE:  I'm using -- I've used real-time in

12    probably five or six trials, your Honor.  I think this is --

13            MS. VARGAS:  Why don't you turn it towards yourself

14    rather than the jury?

15            MR. MOORE:  Wait for the judge, please.

16            THE COURT:  I'll tell you what my initial reaction

17    was when you spoke up.  I thought you were suggesting a

18    sidebar because of the plaintiff's --

19            MR. MOORE:  He was violating --

20            THE COURT:  -- plaintiff's feed not working and you

21    were just trying to make it easier for all of us to address

22    that issue at sidebar.  Frankly, nobody cares if your

23    real-time isn't working.  That's between you and the court

24    reporter and --

25            MR. MOORE:  And --

 1          THE COURT:  -- that's nothing for the jury to be

 2     worried about it.  It's nothing for me to be worried about.  I

 3     don't care if your real-time works or doesn't work.  So you

 4     don't need to bring it to my attention, you don't need to

 5     bring it to the jury's attention.  And it's certainly nothing

 6     that is going to be cause for stopping the trial.

 7          MR. MOORE:  We're paying for it, your Honor.

 8          THE COURT:  I don't care.  Ms. Fauber may care, you

 9     may care; I don't care and the jury doesn't care.  So don't

10     tell me about your real-time.  That's your problem.

11        Regarding the plaintiff's feed, I am not sure what to do

12     about it --

13          COURT REPORTER:  It's working now.

14          THE COURT:  If there's a delay, he has said it didn't

15     come up, or there's a delay, and that's fine.  I think the

16     jury sees what's going on.  But we're just not going to draw

17     undue attention to it.  I'm not saying you have to hide it,

18     it's there.  But let's just not talk about it to any extent

19     that's not necessary to talk about it.

20          MS. VARGAS:  We're making every effort not to do that

21     and the plaintiff is I think virtually trying not to state the

22     obvious.

23          THE COURT:  Sure.

24          MS. VARGAS:  So I appreciate it and I will continue

25     to do that.

1          THE COURT:  The plaintiff has been doing everything

2     that could reasonably be expected.  And we're getting along.

3     And I think we have an understanding.  Okay.

4          MS. VARGAS:  Thank you, your Honor.

5        (End of bench conference.)

6          THE COURT:  You may proceed.

7          MS. VARGAS:  Your Honor, could we have the court

8     reporter read back the last question, please?

9          THE COURT:  Yes.

10    Q.   (Repeated by Reporter) Why did you request accommodations

11    that were different in the lecture versus the lab?

12    A.   Am I to answer again?  I thought that was for your

13    reference.  Sorry.

14         I requested the accommodations because, like I explained,

15    I anticipated that in that setting we will be moving around.

16    My experience in undergraduate, I had used a cued speech

17    interpreter in those settings.  And it had been more effective

18    because she was able to accompany me in the different stages

19    in the chemistry lab or the biology lab or physics lab.  So I

20    figured that in medical school it was going to be much the

21    same setup where we were -- we were-- we would being moving

22    around in the anatomy lab and so, an interpreter would be what

23    I needed in that setting.

24    BY MS. VARGAS:

25    Q.   Okay.  And going to the bottom of that same page, could

1    you please read the last two sentences of that page?

2    A.    I did not utilize an FM system during my undergraduate

3    studies because of the nature of my classes, but I do have

4    prior experience with an FM system during elementary school

5    years and high school.  I do believe that an FM system would

6    be useful for my medical studies.

7    Q.    And what was your experience with the FM system in

8    elementary and high school?

9    A.    At that time, the FM system was basically given to one

10   person who was considered the primary person in that

11   situation.  So, for example, if I used an FM system on the

12   soccer team, it was given to the coach.  If I used an FM

13   system in the classroom, it was given to the teacher.  And

14   what happened was the FM system would send a clear signal to

15   my receiver.

16        And in elementary school, if I was in the classroom, you

17   know, we're doing things, we're rustling papers, socializing

18   with my classmates, we might be doing a project at our desk,

19   coloring project, I don't know what we would be doing.  And if

20   I heard all of a sudden a voice that sounded like it was right

21   next to me, I knew it was the person with the FM system with

22   the microphone and it meant that I needed to look up and pay

23   attention.

24   Q.    And why did you write:  I do believe an FM system would

25   be useful for my studies?

1    A.   I wrote that it might be useful in my studies because,

2    one, my doctor had recommended it in one of the letters that

3    he sent, the first letter that he sent; two, I also had gone

4    to that conference and the other deaf doctors at that

5    conference said they used an FM system, especially in things

6    like the surgical rotation.

7    Q.   And why did you also request CART and interpreter

8    services?

9    A.   I also requested CART and interpreter services so I could

10   access all of the information.  That's what I needed to be

11   effective.

12   Q.   If you could turn to the last page, please?  And could

13   you read the -- beginning with the second sentence through the

14   end of that paragraph -- just read the whole paragraph, it's

15   easier.

16   A.   I hope you will find this information helpful and that

17   with the addition of the new letter, you will have all of the

18   documentation you need.  I am very much looking forward to my

19   studies at Creighton University and working with you and your

20   office through *[sic]* the years.  There are many deaf or

21   hearing-impaired physicians working successfully in this

22   country, and I am convinced that your school will be proud of

23   having me as a successful student and graduate.  As always, I

24   am dedicated to my studies with the diligence and the

25   perseverance that will be required for those extra

1    experiences.

2    Q.   Why did you write that?

3    A.   I wrote that because I was showing them that I was

4    absolutely committed to doing what I needed to be able to do.

5    Q.   You mentioned earlier this morning that you got the sense

6    that there were some concerns from Creighton that you were

7    deaf.  What gave you that sense?

8    A.   What gave me that sense is that they kept asking for more

9    and more documentation, and I had sent two letters -- they

10   were asking for one or two letters at this point -- showing

11   that I would be able to be successful in that environment.  I

12   had also given them examples of other students who had been

13   successful in this environment.  And I felt like there was

14   still concerns about whether or not I would be able.

15   Q.   Was there anything else that anyone at Creighton

16   University told you that made you concerned?

17   A.   They also told me that my acceptance was conditional --

18   in a previous letter about my acceptance to Creighton

19   University, that it was conditional based on the technical

20   standards.

21   Q.   When was the very first time that someone from Creighton

22   University told you that your acceptance was conditional?

23   A.   In April 2009.

24   Q.   And what had happened that caused them to say that?

25   A.   I had asked for CART and interpreters in class and -- in

1    class.

2              MS. VARGAS:  May I approach the witness, your Honor?

3              THE COURT:  Yes, you may.

4              MS. VARGAS:  I am showing the witness what has been

5    accepted into evidence as Plaintiff's Exhibit 6.

6    BY MS. VARGAS:

7    Q.   Do you recognize this exhibit?

8    A.   Yes.

9    Q.   What is it?

10   A.   This is the response from Creighton University.  So this

11   is a letter of the offer of accommodations that I got from

12   Dr. Kavan.

13   Q.   And what did Creighton offer in response to your requests

14   for lectures?

15   A.   Creighton offered me a first row seat directly in front

16   of the instructor, an FM system, and access -- like other

17   medical students, access to the podcasts and PowerPoint.  Also

18   they offered me note-taking services.

19   Q.   And what did Creighton offer in response to your requests

20   for accommodation in the small group setting?

21   A.   In the small group, Creighton offered me an FM system.

22   Q.   What did they offer in response to your request in a lab

23   setting?

24   A.   Creighton offered me an FM system also in the lab.

25             MS. VARGAS:  May I approach?

 1              THE COURT:  Yes, you may.

 2              MS. VARGAS:  I'm showing Mr. Argenyi what's been I

 3     believe accepted into evidence Plaintiff's Exhibit 7.

 4              THE COURT:  7 is in evidence.

 5     BY MS. VARGAS:

 6     Q.   Do you recognize this document, Mr. Argenyi?

 7     A.   Yes, I recognize this document.

 8     Q.   What is it?

 9     A.   This is the e-mail I sent to Dr. Kavan in which I said I

10     hope that these will offer me effective communication.  They

11     are different than what I have had in the past but I will give

12     them a wholehearted try.  I will let you know if -- should

13     they be inadequate, I will let you know immediately and work

14     with you and your office.

15     Q.   What did you mean when you said you'd give the

16     accommodation a "wholehearted try"?

17     A.   I meant that I would start the school year with the

18     accommodations that they set out and I would see if they would

19     work.  I had some concerns already it may not be effective

20     because I knew my own ability to understand speech in those

21     settings.

22     Q.   Now, I want to ask you about the start of medical school.

23     What classes did you have that first semester of medical

24     school?

25     A.   In that first semester, I had an anatomy class with a

 1     lab.  I had a molecular cell biology class which were covering

 2     the biology principles, chemical principles, how the body

 3     works.  And I had an interviewing and physical exam class in

 4     which we had a small group as well, which was a class in which

 5     we learned how to approach a patient, how to start to

 6     establish that trust and bond as a doctor with a patient.  And

 7     I had a ethics course.

 8     Q.  And in your lectures in that first semester of medical

 9     school, how many students were in your lectures?

10     A.  Well, the class was for all 126 students so it could be

11     that many students in the class.  Students had the option of

12     listening to the podcast or attending class, and I would say

13     the majority attended class.

14     Q.  Can you describe for me what the lecture hall looked

15     like?

16     A.  The lecture hall is a room that actually occupied two

17     floors so the ceilings were high.  You could enter the room on

18     the lower -- to the first -- the lower level of that room and

19     that was the floor where the podium was.  Next to that podium

20     was the projector screen where you would see the PowerPoints

21     and then the chairs themselves were like a stadium.  It was

22     set up kind of like an auditorium, three sections with rows

23     that ascended.  And then they ascended to the height of the

24     second floor.  So you could go up to the next floor and then

25     enter from the back as well.

1        The lighting was typically pretty dim so you could see

2    the PowerPoint projection.  Sometimes it was turned even

3    darker if they were trying to point out details in the slides.

4        The acoustics of that room were kind of -- were different

5    because part was concrete where the chairs were and parts were

6    carpeted so sound kind of would move around in the room in a

7    way that was difficult to understand.

8    Q.   And what was your experience in the lecture setting in

9    that first month of medical school like?

10   A.   My experience was that I could not understand the

11   professors.  They gave me an FM system so I wore the FM

12   system, and it was like having the professor sit right next to

13   me and talk.  So the signal was there but it didn't help me

14   understand what was being said.

15       Many of those professors moved around.  Even though I was

16   seated in a good place with -- to see that professor, that

17   professor didn't necessarily stand at the podium.  For

18   example, I had one professor for my anatomy class who was

19   quite fond of walking around.  He said he could not stand

20   still, that he could just not stand up there and talk so he

21   would actually walk up and down the steps.  So he could be

22   lecturing from three-fourths up the stairs, walk back down,

23   continuously talking.

24       The other thing, even though I could hear as in perceive

25   the sound of my professor talking, if there was a question, I

1    didn't know what was being said.  During the ethics class, we

2    had open discussions.  So we were assigned case studies, you

3    had to read a case study of a potential ethical issue that

4    might come up in medicine and then discuss how the different

5    approaches -- the different perspectives that people might

6    have.

7        So we would read the case study and then come into class.

8    There might be a little bit of lecture about that.  And then

9    there was an open discussion where the students would give

10   their thoughts and perspective and just kind of build upon

11   each other's opinion to form this overall idea of what the

12   ethical issue might be.

13   Q.   I think you testified a minute ago that it was like the

14   professor was sitting right next to your ear with the FM

15   system.  Can you explain what that means?

16   A.   It means that regardless of where they are, they can be

17   talking into that microphone and the signal is sent to my

18   cochlear implant as if it's right next to me; kind of like how

19   I understand a walkie-talkie to work.

20   Q.   And could you understand what the professor was saying?

21   A.   No, I could not.

22   Q.   What was -- well, was the FM system effective for you in

23   lectures?

24   A.   It was not effective.

25   Q.   I'd like to refer you back to Exhibit 6.  Do you still

1    have that in front of you, Mr. Argenyi?

2    A.   I do now.

3    Q.   Could you please read the last paragraph on the bottom of

4    that exhibit, the first page of that exhibit?

5    A.   "Podcasting," is that what you're referring to?

6    Q.   Yes, please.

7    A.   "Podcasting is a way that *[sic]* students can review

8    lectures to gain a deeper understanding of the information, to

9    revisit specific material in preparation for upcoming lectures

10   and to solidify concepts prior to examinations.  Mastery of

11   the basics can be enhanced to achieve an analysis/synthesis

12   level of knowledge.  Students can use podcasts to clarify

13   discrepancies in their notes and resolve questions about their

14   recall of material presented in lecture.  Podcasting may be

15   especially helpful to you because you mentioned, on several

16   occasions, the fact that you become fatigued when listening to

17   material.  Having access to the podcasts will allow you to go

18   over material, taking breaks when you feel you need to, while

19   reinforcing the materials contained in the lectures."

20   Q.   Was the podcasting especially helpful for you?

21   A.   It was not.

22   Q.   Why is that?

23   A.   Because it's like trying to listen to the radio.  I

24   can't.

25   Q.   Was it captioned?

1    A.    No.

2    Q.    Did you ever try to listen to -- hear and understand one

3    of the podcasts?

4    A.    I did.  I tried -- the first few weeks I tried to listen

5    to the podcasts afterwards and I actually -- what I ended up

6    doing was sending them to some of my friends and having them

7    trying to type up a transcript for me.

8    Q.    Were the podcasts an effective accommodation for you?

9    A.    They were not.

10   Q.    The letter, Exhibit 6, Plaintiff's Exhibit 6, mentions a

11   note-taking service.  What is this?

12   A.    The note-taking service; so the medical school

13   traditionally has a note service which is a program where

14   students can sign up, they pay a little bit of a fee to join

15   this program, and in this program you get a summary of the

16   notes afterwards.

17         What happens is that -- let's say there are ten classes

18   for one class.  And ten people join the note service.  They

19   each get assigned one class for those classes and that student

20   is responsible for attending class that day, listening,

21   condensing the notes into a summary, hitting the major points

22   and then sharing that with the rest of the students.

23   Q.    And what was your experience with the note-taking

24   service?

25   A.    My experience with the note service is that compared

1    to -- that it really was not helpful because it was a summary

2    of what had happened in class.  It gave me the major ideas

3    that I needed to know which was what I was working with, I was

4    doing my best with that.  But it did not give me the

5    information.  It did not give me all of the information that

6    was taught in that class.  It did not allow me to participate

7    in the classroom discussion.  It did not allow me to hear the

8    questions the other students asked the professor.

9    Q.   So, were the note-takers an effective accommodation for

10   you?

11   A.   They were not.

12   Q.   Turning to small groups, on the second page of

13   Plaintiff's Exhibit 6, how many students were in your small

14   group classes?

15   A.   In my small groups, there were 15 people.

16   Q.   And what was your experience in those small groups during

17   that first month of medical school?

18   A.   My experience is that it was like a bouncing ball.  We

19   had a couple of different small groups.  We had a small group

20   associated with our molecular and cell biology class.  It was

21   a class in which we -- it was a small group in which we would

22   be given a case study.

23       It was kind of a introduction in how to start developing

24   how a physician thinks.  They would give us some symptoms,

25   some tests, and then we would go through the steps of figuring

ARGENYI - DIRECT                                                    315

1    out what that might be, how does that relate back to the

2    content that we learned in lectures.  So that one was really

3    difficult because it was a lot of technical language.

4         The room was also darkened because there was a PowerPoint

5    that went with the case study showing enlarged photos of the

6    slides that were in it, such as a slide of the leg that has a

7    rash, so there would be a picture showing that.

8         And the conversation was rapid, there was a lot of back

9    and forth between the instructor and the student.  The

10   instructor also in that case was -- had a very thick Indian

11   accent.  In fact, when he lectured, the first few weeks I did

12   not go to class because I could not understand anything that

13   he was saying so I also had that difficulty in the small

14   group.

15        We had other small groups that were more casual, more

16   back and forth such as our interviewing group and the

17   experience was also difficult.  It was that same bouncing ball

18   analogy that I've been using where I have to try to follow.

19   Q.   Did you try the FM system for small groups?

20   A.   I did.

21   Q.   And what was your experience using the FM system in the

22   small group setting?

23   A.   My experience was that it wasn't helpful.

24   Q.   Why is that?

25   A.   Because I couldn't really tell what people were saying if

1    I could not see them anyway.

2    Q.   Turning to labs, Exhibit 6, the second page talks about

3    labs.  How many people were in your laboratory classes?

4    A.   In my lab class, in anatomy lab, all of the students were

5    there.

6    Q.   So how many is there?

7    A.   126.

8    Q.   And what was your experience in labs during that first

9    month of medical school?

10   A.   My experience in the lab was that it was really tough.

11   So what happened is you would go to the anatomy lab that day.

12   The class was split up into groups of four to five people per

13   body.  So we had an assigned body.  We would go in, there

14   would be a video that had been recorded by the lab assistant

15   and the professor.  This video would be shown on the screens

16   around the room.  And it was -- there were demonstrations of

17   the structures that we were supposed to look for that day.

18       It would show us the dissecting techniques.  It would

19   show us the structures to identify with a voiceover.  This

20   video was not captioned so I could not understand it.

21       After that, I would turn to my classmates -- so I had

22   four other classmates that I worked with on the body.  And I

23   would turn to them and ask for the information that was in the

24   video.  They would give me a summary so I still wasn't sure

25   what we were really doing.  I still didn't know all of the

1   things to look for during the dissection.  And because of that

2   I let them take the lead on doing the work in that class while

3   I would just do what I could do.

4        So, for example, one of the labs, we had to start

5   dissecting the back.  And a large part of that was just simply

6   removing the fat that the body had.  So I was able to do those

7   things because I could see what I was doing but I didn't know

8   what to look for beyond that.

9        Also, the microphones that they had put in for the FM

10  system picked up all of the background noise.  It picked up

11  the shadow of the people next to us and the body to our left.

12  It picked up the noise of the tools.  It picked up the

13  footsteps.  It picked up all of these background noises so the

14  FM system in that case actually confused me more.

15  Q.   So you testified that it picked up all that noise.  Why

16  couldn't you understand what it picked up?

17  A.   Because when you have all of that noise coming into the

18  signal, it just becomes one big confusion of noise.

19  Q.   So was the FM system an effective accommodation for you

20  in the lab setting?

21  A.   It was not.

22  Q.   During the beginning of medical school that first month,

23  how many hours a day did you try the FM system?

24  A.   We had lectures for four hours a day, five days a week.

25  We had lab three days a week for several hours.  We had small

1   groups on a variable schedule.  So I would say I tried the FM

2   system about 100 hours.

3   Q.   And how did you feel after using the FM system?

4   A.   I felt very fatigued, very strained.  I was so -- it's

5   like trying to listen -- it's like trying to understand

6   talking under water.  I couldn't put it together -- even with

7   trying to lip-read, I couldn't always put it together.  I went

8   home and I would just have to try to recover all of that

9   listening, all of that trying to focus all of my energy and

10  understanding.

11       Also, in the lecture halls, the FM system actually gave

12  me a headache because there was static that would come in,

13  especially if I turned my head, there would be static all of a

14  sudden so I would hear that instead of the voice.  And

15  exposure of that would give me a headache through the span of

16  four hours.

17  Q.   In your experience during that first month of medical

18  school, did you see the other medical students in the first

19  year were fatigued or stressed?

20            MR. MOORE:  Objection, foundation.

21            THE COURT:  Overruled.  He may answer based on his

22  observations.

23  A.   I saw that people were stressed out just from the new

24  environment, but I did not see anybody that was as strained as

25  I was.

 1    BY MS. VARGAS:

 2    Q.   Do you think that trying the FM system more would have

 3    helped?

 4    A.   No, because I simply don't have the ability to understand

 5    speech that way.

 6    Q.   Did you tell Creighton about your experiences?

 7    A.   I did.

 8    Q.   I'm sorry, do you have Exhibit 9 in front of you?  Maybe

 9    not.

10         MS. VARGAS:  May I approach, your Honor?

11         THE COURT:  Yes, you may.

12    BY MS. VARGAS:

13    Q.   Exhibit 9 has already been admitted into evidence.

14         Do you recognize this document?

15    A.   I do recognize this.

16    Q.   What is it?

17    A.   This is an e-mail that I sent on September 1, 2009, to

18    Dr. Kavan.

19    Q.   Could you please read the second paragraph of this

20    letter, this e-mail?

21    A.   I said that, "The accommodations are inadequate as

22    evidenced by the level of stress and fatigue I am

23    experiencing, as well as the amount of information I am

24    missing.  I am missing on average a decent chunk of the

25    lectures.  Even when I am able to follow the lecturer, the

1    intensity of listening to the lecturer causes fatigue where I

2    am unable to function properly for the rest of the day,

3    significantly impacting my ability to study.  I am also unable

4    to follow conversations effectively anytime classmates ask

5    questions or there is a full class discussion."

6    Q.   And could you please read the third paragraph?

7    A.   "I am relying on the Note Service which, while very

8    helpful, has been insufficient, and has me at minimum one day

9    behind my peers in my studying, as I have to wait for the

10   notes to come out the next day or even after a full weekend,

11   which is critical.  This was especially noticeable when at the

12   last MDQ I missed questions because it covered material that

13   had not yet been covered by the Note Service and potentially

14   left out of the notes from earlier lectures.  I am also

15   suffering in anatomy lab due to the high noise level.  The FM

16   system only amplifies the general noise level, as well as

17   voices, essentially negating any potential value in

18   amplification.  Finally the videos (Unnatural Causes) in

19   Ethics and the dissection videos in Anatomy are inaccessible

20   because they are not closed captioned, and I have no

21   interpreter to relay the information."

22   Q.   And could you please read the fourth paragraph?

23   A.   "In short, the accommodations currently in place do not

24   provide for meaningful participation nor independence as a

25   student and also put me at a significant disadvantage

1    academically."

2    Q.   Now, the paragraph below that, the fifth paragraph, could

3    you read that, please?

4    A.   "I also want to restate the assertion that *[sic]* I made

5    at the August 12th meeting I do not qualify as having a mild

6    hearing loss, but a severe-to-profound hearing loss.

7    Furthermore, as requested by Amy Bones, I am gathering further

8    medical documentation which will be submitted ASAP.  Please

9    contact Dianne if you have questions."

10   Q.   Who is Amy Bones?

11   A.   Amy Bones is a lawyer for Creighton University at that

12   time.

13   Q.   And how did you come to have interaction with Amy Bones?

14   A.   I had interaction with Amy Bones when we scheduled a

15   meeting to discuss the accommodation and Amy Bones was present

16   at that meeting.

17   Q.   And who else was present with you at that meeting?

18   A.   Dr. Kavan was present, I was present, Dianne, my advocate

19   was present, Amy Bones was present and Wade Pearson from the

20   disability office at Creighton University was present.

21   Q.   And what was the purpose of that meeting?

22   A.   The purpose of that meeting was for me to express my

23   concerns I had about the accommodations and to show them who I

24   was, how I communicated, and what I would need in these

25   settings.

1   Q.   And in that meeting, did Amy Bones tell you anything

2   about your status at medical school?

3   A.   She said that I may not be qualified to be in medical

4   school.

5   Q.   After that meeting -- what happened after that meeting?

6   A.   After that meeting, I started school the next week.

7   Q.   And was that when you used the FM system for the month

8   that we just talked about?

9   A.   Right.  That's when I tried the accommodations that we

10  had set up through the school.

11  Q.   Okay.  So, turning -- let me go back.

12       Plaintiff's Exhibit 9, this e-mail that you sent to

13  Dr. Kavan, did you receive any response from Dr. Kavan?

14  A.   I did not receive a response quickly.

15  Q.   Did you receive a response that week?

16  A.   Not that week.

17  Q.   The next week?

18  A.   I think it was -- I think it was 15 days later.

19  Q.   Did anyone else from the university respond to this

20  e-mail?  Did Wade Pearson respond to that e-mail?

21  A.   No.

22           MS. VARGAS:  May I approach, your Honor?

23           THE COURT:  Yes, you may.

24           MS. VARGAS:  I'm showing the plaintiff what's been

25  marked as Plaintiff's Exhibit 10.

 1    BY MS. VARGAS:

 2    Q.   Do you recognize this document, Mr. Argenyi?

 3    A.   I recognize this document.

 4    Q.   What is it?

 5    A.   It is an e-mail that I sent to Dr. Kavan as well as to

 6    Wade Pearson from the disability office, to Dr. Zetterman, the

 7    dean of the medical school, and John Schlegel, the president

 8    of the university.

 9    Q.   Is this a true and accurate copy of the e-mail you sent?

10    A.   Yes.

11          MS. VARGAS:  Your Honor, at this point I would move

12    to have Plaintiff's Exhibit 10 admitted into evidence.

13          MR. MOORE:  No objection.

14          THE COURT:  Exhibit 10 is received.

15          MS. VARGAS:  Thank you, your Honor.

16    BY MS. VARGAS:

17    Q.   Why did you send this e-mail, Mr. Argenyi?

18    A.   I had not received a response to my September 1st e-mail

19    and my mother had not received a response to the letter that

20    she had sent -- the letter and e-mail she had sent on

21    September 7th.

22          MS. VARGAS:  May I approach the witness?

23          THE COURT:  Yes, you may.

24          MS. VARGAS:  I'm showing the witness what has been

25    marked as Plaintiff's Exhibit 11.

```
 1    BY MS. VARGAS:

 2    Q.   Do you recognize this document?

 3         Let me repeat the question.  Do you recognize this

 4    document?

 5    A.   Yes, I -- repeat -- yes, I recognize this document.

 6    Q.   And what is it?

 7    A.   It is an e-mail that I sent to Dr. Kavan on September 21,

 8    2009.

 9    Q.   Is it a true and accurate copy of that e-mail?

10    A.   Yes, it is.

11         MS. VARGAS:  Your Honor, at this point I would move

12    to have Plaintiff's Exhibit 11 admitted into evidence.

13         THE COURT:  My notes indicate it's already received.

14         MS. VARGAS:  Oh, thank you.  I'm sorry.

15    BY MS. VARGAS:

16    Q.   Why did you send this e-mail?

17    A.   I sent this e-mail because the response to the letter --

18    the response to the September 15th e-mail had been an e-mail

19    later that evening offering me another note-taking service.

20    So it did not address my concern about having equal

21    participation in the classroom.  It did not address my

22    concerns about being able to hear other student questions.  It

23    did not address my concern about getting all of the

24    information.

25         So, I sent another -- I sent this e-mail to again request
```

 1    the accommodation that would be effective.

 2    Q.   So -- I got ahead of myself, let me step back a minute.

 3         After you sent the letter that's been marked as Exhibit

 4    10, did you receive a response from Creighton University?

 5    A.   I got a response indicating that they would offer me a

 6    designated note-taker.

 7    Q.   And who sent you that response?

 8    A.   Dr. Kavan.

 9    Q.   And would a designated note-taker have provided effective

10    communication for you for medical school?

11    A.   No.

12    Q.   Why is that?

13    A.   It's because again I still cannot participate in the

14    classes.  I'm still getting somebody else's summary of the

15    information.  I'm still getting -- I'm still not able to hear

16    the question and have that process of the question and answer

17    reinforce my own understanding of the material in the

18    classroom.

19    Q.   Okay.  And would you please read the first sentence of

20    your e-mail to us.

21    A.   "It is my understanding that you and your attorney, Amy

22    Bones, have received the copy of the third medical document

23    from my otolaryngologist, Dr. Backous."

24    Q.   How many letters did your otolaryngologist write to

25    Creighton University?

1    A.    Altogether, four.

2    Q.    Could you please read paragraph number one -- or the line

3    numbered one in Exhibit 11?  Why don't you read the paragraph

4    beginning with "therefore".

5    A.    Therefore, like in my letter of 4 -- of April 24, 2009, I

6    request the following accommodations to be in place

7    immediately:  One, lectures:  Real-time captioning.

8         Two, labs:  Cued speech interpreter, if available;

9    otherwise, oral/possible ASL interpreter.  Due to people

10   moving around, real-time captioning does not work.  This

11   especially and expressly includes anatomy lab because of the

12   uncaptioned anatomy videos and the high noise level.

13        Three, small discussion groups:  Since the group size is

14   quite large, I request either an interpreter or real-time

15   captioning.  I would prefer real-time captioning for MCB small

16   groups due to the high intensity, but an interpreter is

17   probably better suited to Ethics and IPE small groups because

18   of the mobility.

19   Q.    Was your request for auxiliary aids for the small group

20   discussions the same as your previous request?

21   A.    It was not the same.

22   Q.    Why was that?

23   A.    Because the groups were larger and there was mobility.

24   And as I had stated in the previous requests, the FM system

25   may not be effective.

1    Q.    Okay.  And then how did Creighton respond?  Did Creighton

2    respond to this e-mail?

3    A.    No.

4    Q.    Are you familiar with the Nebraska Commission on the Deaf

5    and Hard of Hearing?

6    A.    My mother had found out about it and put me in contact

7    with them.

8    Q.    What did you -- did you -- what was your communication

9    with them?

10   A.    I was inquiring with them what kind of services were in

11   the area.

12   Q.    And are you familiar with Nebraska Advocacy Services?

13   A.    I am.  That's where I had contacted Dianne.

14   Q.    And why did you contact Nebraska Advocacy Services?

15   A.    I wanted to review my legal rights.  This was a new

16   situation and the accommodations were different than I had

17   used in the past so I just wanted to know what was -- what is

18   my -- what is my ability as a student in this.

19   Q.    And after this e-mail to Dr. Kavan on September 21st

20   which you testified about a moment ago, what did you do next?

21   A.    At that point, because I was not getting the information

22   in the classroom, I started to secure my own accommodations.

23   Q.    And what accommodations did you secure for yourself?

24   A.    I secured CART or real-time captioning for my lectures.

25   I got a oral interpreter with sign support for my small groups

1    and anatomy lab.

2    Q.   And why did you choose CART for the lectures?

3    A.   I chose CART because of the terminology.  Like I have

4    explained before, even if I know the content in that material,

5    for me to understand it the first time around 100 percent is

6    -- is through reading.

7    Q.   Were there assigned readings in advance of your classes

8    at Creighton University?

9    A.   Yes.

10   Q.   Did you do the homework that was required?

11   A.   I did.

12   Q.   All of it?

13   A.   Yeah.

14   Q.   How did you pay for the CART services that you secured

15   for yourself?

16   A.   I secured a personal loan.

17   Q.   And who did you borrow money from?

18   A.   I borrowed from my parents.

19   Q.   How did it feel borrowing money from your parents to pay

20   for your accommodations in medical school?

21   A.   It was uncomfortable.  I-- the idea was that -- when I

22   moved away and went to medical school, the idea was that I was

23   independently -- I was supposed to be independent for myself.

24   They were not assisting me with medical school in the first

25   place.  All of the tuition and everything, I was taking out

1    through loans; anything I wanted on my own, I paid for myself.

2    So for me to have to go back and ask my parents for the loan

3    was -- they understood the situation but it was still -- you

4    know, I was 22 years old and I was trying to be an adult at

5    that point.

6    Q.   How did you find CART services?

7    A.   I contacted several people.  I contacted the Nebraska

8    Commission for the Deaf and Hard of Hearing.  I contacted

9    people in Iowa.  When -- when I had grown up, I had used CART

10   there and I asked them for references.  And, actually, my mom

11   called other universities and asked them whether they had used

12   CART providers and if they had, who were they.

13   Q.   And --

14        MS. VARGAS:  May I approach, your Honor?

15        THE COURT:  Yes, you may.

16        MS. VARGAS:  If I may, I'd like to show Plaintiff's

17   Exhibit 12 which has already been admitted into evidence.

18        THE COURT:  You may.

19   BY MS. VARGAS:

20   Q.   Do you recognize this document?

21   A.   I recognize this document.

22   Q.   What is it?

23   A.   This document is the e-mail that I sent to Dr. Kavan on

24   September 24, 2009.

25   Q.   And why did you send this e-mail?

ARGENYI - DIRECT                                          330

1    A.   I was letting Creighton University know that I had set up

2    my accommodations and that they could anticipate a CART

3    reporter in my lectures.

4    Q.   Did you obtain any auxiliary aids for labs and small

5    groups?

6    A.   Yes.  I also let them know that I had obtained

7    interpreting for my labs and my small groups.

8    Q.   Did Creighton University respond to your e-mail?

9    A.   No.

10   Q.   Did Dr. Kavan respond to your e-mail?

11   A.   No.

12   Q.   What was your experience using CART in the medical school

13   lectures like?

14   A.   It was great.  I had access to all of the information.  I

15   didn't have to second-guess what I was understanding.  I could

16   participate in all of the conversation.  I could participate

17   in the small groups.  I could test my own knowledge when other

18   students asked questions.  I could ask questions and

19   comfortably understand the answer that I was going to get.  I

20   didn't have to guess anymore and I had time to study.

21   Q.   What was --

22   A.   And I had time --

23   Q.   What was-- sorry.

24   A.   That's okay.

25   Q.   What was your experience in labs and small groups using

1     interpreters?

2     A.   So the experience was the same.  Again, I was able to get

3     all of the information, 100 percent.  I was able to

4     participate in the conversation.  I didn't have to focus in

5     trying to figure out who was talking and following that

6     bouncing ball.  I could use the interpreter to help me out.

7          In the anatomy lab, I could have the interpreter

8     communicate the video to me.  And then I could have -- and

9     then if we moved around, the interpreter was able to follow me

10    around.

11    Q.   Why did you select different auxiliary aids and services

12    for lectures versus small groups and labs?

13    A.   So, I chose CART for lectures because of the technical

14    information.  Like I've explained, an interpreter is not

15    effective in that situation because reading is the way that I

16    understand the lecture content.  And -- however, when it comes

17    to the lab and the small groups, it's more conversational,

18    it's a slower pace.  It's also signs that are more basic so I

19    can understand the signs that are used to clarify the oral

20    interpreter.  And it's mobile so that interpreter is able to

21    follow around.

22    Q.   And what was your experience through the remainder of

23    that first year of medical school like in the classrooms and

24    labs and small groups?

25    A.   It was great.  I didn't have any problems getting

1   information for the rest of the year because it was effective.

2   I was able to participate.  I was able to build relationships

3   with my classmates.  I was able to learn the information that

4   I needed.  I was ready for second year when it came.

5   Q.   Have you seen the letter that Dr. Thedinger wrote after

6   examining you?

7   A.   I have seen it.

8   Q.   How did it make you feel when you read that letter?

9   A.   It made me feel like -- like I wasn't wrong about how I

10  perceived the world.  It confirmed that, yes, an FM system

11  really is just not the way for me to understand speech, that I

12  can't understand speech.  It was a letter that said what my

13  daily experience was.

14        MS. VARGAS:  May I approach and show the witness

15  Plaintiff's Exhibit 36?

16        THE COURT:  Yes, you may.

17        MR. MOORE:  No, this isn't in.

18  BY MS. VARGAS:

19  Q.   Do you recognize this document?

20  A.   Yes, I recognize this document.

21  Q.   What is it?

22  A.   This document is the schedule of accommodations that I

23  set up for myself for the first year.

24  Q.   Do you know who created this document?

25  A.   My mother had started it and then I took over keeping up

1    the rest.

2    Q.   And who was responsible for maintaining this document?

3    A.   One second.  I was responsible for maintaining it.

4    Q.   And if you could please look at it carefully and let me

5    know if it's a true and accurate representation of those

6    records that you maintained?

7    A.   It appears accurate to me.

8         MS. VARGAS:  Your Honor, at this point I would move

9    to have Plaintiff's Exhibit 36 admitted into evidence.

10        MR. MOORE:  We have no objection.

11        THE COURT:  Exhibit 36 is received.

12        MS. VARGAS:  Thank you, your Honor.

13        MR. MOORE:  May I have a minute?

14        (Off-the-record discussion had.)

15   BY MS. VARGAS:

16   Q.   Tell us about Plaintiff's Exhibit 36.  What is this?

17   A.   So, this is the schedule of accommodations.  So if you

18   look at the top, that is the time of day.  The medical school

19   was broken up into 50-minute lectures for the most part or

20   one- to two-hour parts for labs and groups.

21        On the right and the left side, the column is the day of

22   the week.  So it was broken up into weeks.  At the beginning,

23   every box has the name of the class, the number of the

24   lecture, and the type of accommodation that I was

25   requesting -- or that I set up for myself.

1        So, for example, for all of the green, I requested CART,

2    and the green meant I had coverage by a certain provider.  You

3    can look at other places that are blue or yellow, that means

4    it was a specific interpreter that had been assigned to that

5    class.

6    Q.   And how did you go about arranging these services?

7    A.   So my mother made the initial contact and then she gave

8    me the contact information.  She focused on getting as much as

9    she could for the first two weeks because scheduling last

10   minute I wasn't able to get full coverage, people had other

11   commitments or other jobs and -- especially because the

12   college -- the colleges had already started.

13       So typically interpreters cover a full class for the

14   semester, they don't cover just a couple of lectures, so they

15   had already made commitments to other universities or other

16   students so we kind of had to figure out whom we could put

17   where.

18       As the -- after the first few weeks, I had all of the

19   contact information.  And so there were several e-mails back

20   and forth asking about their availability and their -- their

21   availability to do all of the -- to do whatever I had asked

22   them, if they were available for it.

23   Q.   Do you recall approximately what tuition you paid to

24   attend Creighton University for your first year?

25   A.   I paid 45,000 for direct -- for tuition itself.

1    Q.    And how much did you pay in tuition plus auxiliary aids?

2    A.    I paid 51,000 for auxiliary aids so, 45 plus 51.  I can't

3    do the math in my head right now.

4    Q.    Me either.  How did you feel about paying that amount of

5    money to access the medical education you paid for?

6    A.    I felt like it was tough but it was worth it because I

7    was there to be a physician.  I needed to be able to attend

8    medical school; and if I couldn't do it without getting

9    accommodations, then I needed to be able to do that.

10   Q.    Let's turn now to your second year of medical school.

11   What was your schedule for the start of the second year of

12   medical school like?

13   A.    So, my schedule for the second year of medical school was

14   relatively similar.  We had four hours of lecture from eight

15   to noon five days a week typically.  Then we'd have small

16   groups or some labs in the afternoon.

17         The new part of second year is that the -- every two

18   weeks we also had a clinic.  This was our first introduction

19   to actually working with patients.  Every two weeks on

20   Thursday afternoon I was required to go to an outpatient

21   family medicine clinic and work with a Creighton faculty

22   member who also saw patients.

23   Q.    Did you request auxiliary aids and services for the

24   second year of medical school?

25   A.    I did.

1    Q.    What auxiliary aids and services did you request?

2    A.    So in a similar fashion, I requested CART for my

3    lectures; I requested an interpreter for the advanced clinical

4    skills course in which we learned how to conduct patient

5    exams; I requested an interpreter for the clinic.  And for the

6    small groups, it depended on which class it was related to.

7    Q.    And did Creighton respond to your request?

8    A.    They did.

9    Q.    What did Creighton -- did Creighton offer you the FM

10   system for the second year?

11   A.    No, they did not.

12   Q.    What did Creighton University respond -- how did

13   Creighton University respond to your request for CART in the

14   lectures during the second year?

15   A.    Creighton University, the day -- the week before classes

16   started, they informed me that they would provide an oral

17   interpreter for classes -- for the lectures; they would

18   provide -- for the small groups, for the labs and for the

19   clinic, I would not be allowed to have an interpreter.

20   Q.    Did they offer you the opportunity of sitting next to a

21   professor as an accommodation?

22   A.    They said that I could sit next to a professor.  That way

23   I would be able to see everything he could say.

24   Q.    Was sitting next to a professor a benefit for you?

25   A.    No, it's not, because when I sit next to a professor, it

1   means that I have to turn toward him like this (indicating)

2   and lip-reading from the side is tougher than lip-reading from

3   the front.  It also means that I can't see the rest of my

4   classmates.  Like right now I can't see any of the lawyers, I

5   can only see you.

6   Q.   So you testified that Creighton offered interpreters for

7   lectures.

8   A.   Yes.

9   Q.   Was that an effective way for you to communicate in

10  lectures?

11  A.   No, it was not, because again for me to access the

12  information in that -- in those lectures was a lot of

13  technical information, I need to be able to read the words

14  because that way I actually know what I'm hearing in the

15  lectures.  With an interpreter I'm still guessing.  There's a

16  lot of advanced terminology in those classes I don't know the

17  sign for that.  So even if I could lip-read the person, if I

18  don't catch what they say, I can't use the sign language to

19  clarify what was said on their lips.

20       So there are words like -- there are words that start

21  with the same thing a lot of times.  So, for example, we could

22  be talking -- we could have an infectious disease class, and

23  we could be talking about differing causes of a disease, and

24  they could be from -- we could be talking about a different

25  germ, and they all have similar names, and I can't catch what

1    they are.  And because it's so fast paced, I don't have a way

2    to ask the interpreter to clarify again.

3              THE COURT:  It is now noon.  Let's go ahead and take

4    our midday break.

5         Please reconvene in the jury room by 1:15 and we'll start

6    again at 1:15.

7         We're in recess.

8         (Jury out and recess taken at 12 o'clock noon.)

9         (At 1:17 p.m. on August 23, 2013, with counsel for the

10   parties, the plaintiff, and the defendant's representative

11   present, and the jury NOT present, the following proceedings

12   were had:)

13        MICHAEL ARGENYI, PREVIOUSLY SWORN, RESUMED THE STAND

14              THE COURT:  Please be seated.

15        I will mention that we will need to stop by about 4:40

16   today.  I'm not sure just how you anticipate that the rest of

17   the day will go, but I'm just making you aware of that.

18        Anything else we need to talk about?

19              MS. VARGAS:  No, your Honor.

20              MR. MOORE:  Nothing from the defendant.

21              THE COURT:  Please bring in the jury.

22        (Jury in at 1:19 p.m.)

23              THE COURT:  Please be seated.

24        Ms. Vargas, you may continue with your direct

25   examination.

 1            MS. VARGAS:  Thank you, your Honor.

 2                      DIRECT EXAMINATION (Cont'd.)

 3     BY MS. VARGAS:

 4     Q.   Mr. Argenyi, I'd like to go back for a moment to

 5     Plaintiff's Exhibit 36.  Do you have that in front of you

 6     still?

 7     A.   The schedule?

 8     Q.   Yes.

 9     A.   Yes.

10     Q.   Could you please turn to the page that's dated 3 --

11     begins 3-22 on the left-hand side to 4-2; March 22nd through

12     April 2nd.

13            Have you found it?

14     A.   Yes.

15     Q.   Can you tell me what auxiliary aids and services you

16     requested on 3-22 from 10 to 11:50?

17     A.   3-22 there was a quiz so I did not request accommodation

18     for that.

19     Q.   Oh, okay.  So we were talking about your second year of

20     medical school and what auxiliary aids and services did you

21     set up for lectures, laboratories and small groups the second

22     year of medical school?

23     A.   I set up CART for my lectures again.  I set up an oral

24     sign-supported interpreter for my clinic, and I set up an oral

25     sign-supported interpreter for my advanced clinical skills

1      class.  I set up an oral sign interpreter for some of the

2      small groups and CART for some of the small groups, depending

3      on how technical it was.

4      Q.   Can you explain a little bit more about why you set up

5      different accommodations in that second year for different

6      settings?

7      A.   When it came to the clinic, what we were supposed to be

8      doing in that clinic is setting up a foundation for some of

9      our basic skills in patient assessment.  So we would go into

10     patient rooms.  At the beginning it was observation.  And then

11     over the course of the year, I was told that if we were

12     comfortable getting a patient history and doing a physical

13     exam, I would be prepared for third year.

14          So, in that situation, it's conversational, it's one --

15     it's with a patient.  So the questions are on their level.

16     I'm asking about what they feel, what have they experienced,

17     what their history is.  In that situation, the context --

18     there's a lot of context and there's also -- when I use a oral

19     sign-supported interpreter, even though I may not know all of

20     the signs, I know the ones that are likely to be used in that

21     setting.

22          Furthermore, it's mobile and there's often another person

23     in the room.  For example, if I would go in at the beginning

24     of the year, my attending doctor was also with me because I

25     was observing.  So it was a good way for me to understand the

 1    conversation that was going on in that situation.

 2         And then the interpreter could follow me in and out of

 3    the room.

 4         When it came to the lectures --

 5    Q.   What was --

 6    A.   -- it was still very technical and --

 7              MR. MOORE:  Objection, narrative.

 8    BY MS. VARGAS:

 9    Q.   Let's -- let's --

10              THE COURT:  We'll stop at this point and we'll have a

11    new question.

12    BY MS. VARGAS:

13    Q.   Let's go back a little bit.

14         Can you tell me about your first day of the second year

15    of medical school at Creighton University?

16    A.   Okay.  So I was in class and I had a CART reporter with

17    me as I had scheduled.  The first lecture at eight o'clock was

18    orientation of second year to medical school.  So it was an

19    overview of the curriculum, what our responsibilities would be

20    for that year, what our goals should be for the year.  And

21    then the rest of the morning were three more -- two or three

22    more lectures on infectious diseases, first class of third

23    year.

24    Q.   And --

25    A.   There were a couple faculty members in the front of the

1    room when I was there at eight o'clock.  They were talking

2    back and forth to each other but nobody approached me yet.

3         Then at some point Wade Pearson came to me and said that

4    they had acquired an interpreter and I said, "Thank you, but I

5    have CART here which is what I need for this class."

6         So he said that was okay and walked away.  There was no

7    interpreter at the eight o'clock lecture.

8    Q.   And then what happened next?

9    A.   So our lectures tend to be 50 minutes so we have ten

10   minutes of a break before the next lecture.  So that ended

11   around 8:50.  And then all of a sudden somebody walked up to

12   me.  That person was Dr. Hansen.  I was turned around, talking

13   to other people and he started talking into my ear.

14        I couldn't understand him so I turned and I asked him to

15   repeat himself and I presume that he repeated himself.  I

16   didn't understand everything.  But he said something about the

17   first row and very hurriedly walked away before I could ask

18   him to repeat again and understand what he was saying.

19   Q.   Who is Dr. Hansen?

20   A.   Dr. Hansen was -- I forgot his official title, but he was

21   the person who managed the clinical component of the second

22   year.

23   Q.   Okay.  So he worked for Creighton University?

24   A.   Yes.

25   Q.   And how many people were present when he approached you?

1    A.   Well, I was in the classroom so my classmates were

2    around.  The classmates that I was sitting with were also

3    there to see it.

4    Q.   How many of your classmates do you think were present?

5    A.   Because of the orientation, it was mandatory, so all of

6    the people that were still enrolled in the program at that

7    point were in the building and most of them were in the room.

8    Q.   Do you remember if your professor was present?

9    A.   I don't remember that.

10   Q.   How did it feel when that interaction happened in front

11   of 120-something of your peers?

12   A.   It was -- at first I was really confused at what had

13   happened.  I didn't know what was going on right away.  I

14   asked my court reporter -- she was right next to me so I asked

15   her what had happened, and I was upset that I didn't

16   understand him and that he had not -- the way that he came up

17   to me, he was not very friendly, he just started talking in my

18   ear and then walked away.  And at first -- it was not

19   respectful of the way that I communicate.

20       And when I -- when my CART reporter explained that what I

21   have been told was that I needed to move to the first row, I

22   felt humiliated because that's not a way other students in the

23   past were treated.  That's not something they're expected to

24   do.  I'm not asking to be treated differently, just to have

25   the information that I need.  And to be asked to move to the

1    front row, that's isolating me, that's -- that's...

2    Q.   Why was that isolating?

3    A.   Because the other students, they can sit where they want

4    to sit; they can sit where it's comfortable, they can sit with

5    people they want to sit with.  And when they asked me to sit

6    in the front row, I couldn't do that.  Where I was was

7    comfortable for me.

8         When I was -- if I would move to the front row, I would

9    have to crane my neck to see the PowerPoint because it's up

10   there (indicating).  And I knew that I had found a comfortable

11   place for me.  I was also with a friend I wanted to be and if

12   I was moved to the front row, then I was being singled out.

13   Q.   Were there any other students sitting in the front rows

14   that day?

15   A.   There were a few students who were in the front row next

16   to the -- near the podium that -- if that's where they chose

17   to sit.  But over by the interpreter, no.

18   Q.   So where did you sit?

19   A.   I was sitting on the left side with a group of friends

20   that were kind of a few rows up, maybe five rows up where I

21   had a good view of the projector, the PowerPoint and the

22   screen and it was comfortable for me.

23   Q.   Can you explain what you mean by a good view of the

24   PowerPoint and the screen?

25   A.   So like it was a place where I could see the PowerPoint

1     as well as the computer screen where I was reading the

2     transcript and I could quickly scan between the two and match

3     up the information with the PowerPoint slide.

4         If I had been sitting in the front row, the transcript

5     would have been here and the PowerPoint up here so the

6     scanning time would have been longer, and it would have

7     been -- it's just -- it's not as seamless.  The interpreter as

8     well, had I been using an interpreter, would have been

9     standing there away from the screen where I also wouldn't have

10    her in the same field of vision.

11    Q.   So then what happened next?

12    A.   So at that point, there was an interpreter present for

13    the nine o'clock lecture.  And because I was -- I felt really

14    embarrassed about what had happened, I didn't move to the

15    first row, I was where I was with the CART reporter and with

16    my friends where I was comfortable.  So the interpreter was by

17    the projectors -- by the PowerPoint screen and that's how the

18    nine o'clock lecture started is there was both an interpreter

19    and a CART provider.

20    Q.   Did you look at the interpreter that morning?

21    A.   I did.  It was our first lecture for the infectious

22    disease class and she was -- it wasn't effective.  I would try

23    for a bit and then watch the CART screen again because I

24    needed to catch what I had just missed while I was trying to

25    watch her.

 1          She was doing a lot of finger spelling for terminology

 2     that I couldn't -- she didn't -- it was too fast to read.  And

 3     having her fall behind and behind; she would try to initialize

 4     and then I couldn't lip-read the words.  Initializing is when

 5     you finger spell the first few letters so you have an idea

 6     what the rest of the word might be.

 7          Some of the signs I just didn't know because they were

 8     beyond the vocabulary that I had at that point so I couldn't

 9     follow, I couldn't contextualize what I was trying to

10     lip-read.  Even in the brief intervals that I tried, I'd have

11     to go back to the CART screen before I lost that information.

12          I tried a few times.  And like the physics class, it just

13     wasn't effective.

14     Q.   Which physics class was that?

15     A.   The one that I took in undergraduate when I had a cued

16     speech interpreter.

17     Q.   If you had moved closer to the front row, would you have

18     been able to understand the lecture with the interpreter?

19     A.   No, because I still didn't know the sign.

20     Q.   What happened after class?

21     A.   After class I went to say hello to the interpreter.  I

22     had worked with her previously so I asked -- so I went down to

23     say hello.  And she asked if I wanted her to leave and I said,

24     "That's really up to you.  I set up CART."  And, I said, "You

25     know, I'm sorry that this happened.  I'm not sure what's going

1   on."  And then I left it at that and I went back to sit down.

2   People were staring at me because during that whole hour

3   people were looking at the interpreter and at me because they

4   could see that both of them were going on and my classmates

5   didn't know what to think.

6   Q.   So what happened in the next lecture class that you had?

7   A.   In the next lecture class, I had CART for my ten o'clock

8   lecture and my eleven o'clock lecture.

9   Q.   And who paid for the CART that you had?

10  A.   I did.

11  Q.   Can you tell me about the communications that happened in

12  the labs and small groups in the second year of medical

13  school?

14  A.   So for the labs, there were different labs for that year.

15  There were a couple of labs that were computer-based where we

16  would go to the computer lab and they would go through the

17  different cell structures.  A lot of -- the word just escaped

18  my head.  When you look at the really small structures in the

19  body and you try to see what's a normal state and what's a

20  diseased state.  So we had several computer-based labs where

21  we learned this new material.

22       And we had other labs such as -- one example we had,

23  during our hematology/oncology class, we had a phlebotomy lab

24  where we watched a video on how to do blood draws and

25  practiced on each other.

1          During the small groups, we had -- small groups, we had

2     one that was connected with the coursework that we were doing.

3     That year our lectures were in block classes where we had one

4     class for a couple of weeks that focused on a part of the

5     body.  So, for example, we started with infectious diseases

6     and what -- some of the next classes we did were hematology,

7     oncology, the cardiovascular, respiratory system.

8          So for each of those, we had some, like, small groups

9     where we needed to base -- to reinforce the material that was

10    in a small group discussion style.  And we also had a case --

11    an advanced clinical skills class with an associated lab.

12         So, for example, we would have a lecture on how to do an

13    abdominal exam, and we would have a lab following that lecture

14    where we would practice on each other the technique included

15    in doing an abdominal exam.

16    Q.   What was your experience using interpreters in some of

17    the labs and small groups in second year?

18    A.   My experience in using the interpreters is that it

19    allowed me to have access to all of the information that was

20    going on and it allowed me to be able to move around the room

21    so I could learn the material that I was going to be using in

22    the clinics.

23    Q.   Why didn't those same interpreters provide access in the

24    lecture setting?

25    A.   Because in the lecture setting, the language was more

1    technical.  The best way to get all that information was by

2    reading it.  If I couldn't understand the sign, then that just

3    wasn't going to be effective.

4    Q.    Okay.  What -- you mentioned earlier there was a clinical

5    element in the second year of medical school for the first

6    time.  Did you request auxiliary aids and services for the

7    clinical element?

8    A.    I did.

9    Q.    What did you request?

10   A.    My request was for an oral sign-supported interpreter.

11   Q.    What was Creighton's response?

12   A.    Creighton's response was that I was not allowed to have

13   an interpreter even if I paid for it myself.

14   Q.    Did Creighton tell you anything else about the clinic --

15   your participation in the clinic in the second year?

16   A.    Yes.  I explained to Creighton that I know that it's a

17   pass/fail clinic and that there's not a grade associated and

18   that's not why I was worried about it.  I was told that --  In

19   the beginning of the first year, we had to get this blue book

20   that's called -- I don't remember the title of it but it's

21   about interviewing patients.

22        And in the introduction to that interviewing patient

23   book, it says about how the majority of case -- the majority

24   of patient diagnoses can be made on a complete history.

25        MR. MOORE:  Objection, Your Honor, hearsay.

1    A.    So you don't even have to do an examination many times.

2          MR. MOORE:  Objection, hearsay.

3          THE COURT:  The jury will accept this information as

4    the basis for the reason the plaintiff did what he did, not

5    for the truth of any information contained in the blue book.

6          Go ahead.

7    A.    So, like I said, in this introduction it says that the

8    majority of patient diagnoses can be made with a very accurate

9    and complete patient history, meaning that you don't even need

10   to go on to the examination.  The examination basically

11   affirmed what you've already figured out through the process

12   of interviewing the patient.

13         And I explained to Creighton that I need all of that

14   information in the clinical phase so that I can learn how to

15   make that diagnosis, so I can make a complete diagnosis, so I

16   can present that to my attending so -- because I don't want to

17   be the one -- I don't want the one word that I'm missing or

18   the two sentences that I'm missing to lead me down the wrong

19   path when I'm working with a patient.

20   BY MS. VARGAS:

21   Q.    And did --

22   A.    And so --

23   Q.    Did Creighton tell you anything about your -- how your

24   performance would be assessed in the second year medical

25   school clinic?

1   A.   I was informed -- when I explained that, I was informed

2   that I only had to show up to pass.

3   Q.   Did you want to only show up to pass?

4   A.   Absolutely not.  This is the foundation that they have

5   for all M2 students to build the skills they're going to need

6   for third and fourth year.  Like I said, I was informed that

7   if I could get through that year and be very comfortable in

8   getting the patient history and applying the examination

9   skills that I had learned, then I would be ready for third

10  year.  And if I'm not going to have access to all of the

11  information and all of the modeling that happened in that

12  clinic, then I'm not going to be as prepared.

13  Q.   So what was your experience on the first day of clinic in

14  the second year?

15  A.   On the first day of clinic, Dr. Hansen wanted to

16  introduce me to my attending.  So the attending is the doctor

17  that oversees what I do in the clinic.  The attending was

18  named Dr. Townley.  I got to the clinic with Dr. Hansen.  He

19  introduced me to Dr. Townley.  We talked a little bit, you

20  know, set up the introductions.  We talked about the fact that

21  I have a hearing loss.  And Dr. Townley asked if I needed

22  interpreters or if one would be coming for me.

23  Q.   What did you respond?

24  A.   And Dr. Hansen said that Creighton had decided that there

25  would not be an interpreter.

1    Q.    What were your responsibilities in the clinic?

2    A.    My responsibilities in the clinic were to enter the

3    patient room; things -- these skills were built upon each

4    other through the year.  So, in the beginning we were

5    responsible just to observe, to learn from the modeling of the

6    physician to see how the process happened and then imitate it.

7          Moving from observation, we started with patient history.

8    We would go into the room, start with the patient, ask about

9    their family background, the history of whatever -- the reason

10   that they came in, ask relevant history, continue that.

11         Through the year as we learned skills on how to do the

12   examination, if we had a feeling of why that patient was there

13   and what kind of examination would be appropriate, we were

14   encouraged to try to do an examination of the patient as well.

15   Q.    Typically during the clinic how often was Dr. Townley

16   present while you were there, with you?

17   A.    At the beginning because it was observation, she was

18   there for all of it while I watched her.

19         Pretty quickly she encouraged me to do interviews and

20   examinations independently.  So starting with the third

21   clinic, I would say she was there very rarely.

22   Q.    And during those first few clinics when you were mostly

23   observing, can you describe how your communication was?

24   A.    It was difficult.  The patient would be on the

25   examination table or on the chair which was up against the

1    wall and then Dr. Townley would be talking with the patient.

2        There was also often a family member.  It was -- probably

3    half the time there was a family member there as well.

4        And so she would be talking with these people, trying to

5    focus on the conversation, get the details of what was going

6    on while I'd be standing there observing, trying to follow

7    this bouncing ball.

8        So I would be missing how the -- the basis of how to

9    imitate her style of approaching the patient.  I would be

10   missing details that the patient would be telling her.  And

11   there was not really -- even if I could reposition myself, I

12   still wouldn't be able to see one or the other person because

13   the rooms were really small and the patient was typically up

14   against the wall.

15   Q.   Did you ever stop the interview and ask for

16   clarification?

17   A.   I tried a few times but in real -- you know, interrupting

18   that patient/physician interaction right there, that means I'm

19   taking away from what's naturally happening.  And if I

20   interrupt constantly because I really don't understand what's

21   going on, then it's not going to proceed the way it actually

22   happens.

23   Q.   Did you ask Dr. Townley -- or tell Dr. Townley about the

24   problems you were having?

25   A.   I did.  We had a meeting early in the fall.

1    Q.   And what happened at that meeting?

2    A.   At that meeting I asked her to meet with me on, I think,

3    September 1st or September 2nd.  And I brought an interpreter

4    with me so we had a conversation during that.  I explained

5    that the clinic on the previous Thursday was really tough for

6    me and that I was missing a lot of information, and it was

7    hard for me to observe because I just was -- I was getting a

8    general idea but not a lot of the details.

9         So, she said that she understood my concern but she said

10   that she didn't have any decision-making capacity so she

11   couldn't change that for me.  She said she would try to repeat

12   things for me but she's also not an interpreter, and she had

13   to be able to -- that she's just not an interpreter and she

14   can't be in that role all the time.

15   Q.   Did you expect her to be in that role?

16   A.   No.  She also identified that there was a patient the

17   previous clinic who had been speaking in Spanish and I hadn't

18   picked up on that.  I thought I was missing everything.  I

19   couldn't identify it was in Spanish.

20             MS. VARGAS:  May I approach, your Honor --

21             THE COURT:  Yes, you may.

22             MS. VARGAS:  -- to show him Plaintiff's Exhibit 22?

23   BY MS. VARGAS:

24   Q.   Do you recognize this document?

25   A.   Yes, I recognize this document.

1    Q.    What is it?

2    A.    It's an e-mail that I sent to Dr. Hansen on

3    September 21st, 2010.

4    Q.    Can you look at it carefully and let me know if it's a

5    true and accurate copy of the e-mail that you sent?

6    A.    Yes, it is.

7              MS. VARGAS:  At this point, your Honor, I'd like to

8    move to have Exhibit 22 into evidence.

9              MR. MOORE:  No objection.

10             THE COURT:  Exhibit 22 is received.

11   BY MS. VARGAS:

12   Q.    Could you please read aloud what this exhibit says

13   starting with "Dear Dr. Hansen"?

14   A.    "Dear Dr. Hansen:  With my third clinic this coming

15   Thursday on September 23rd and in advance of another meeting

16   with you, I wanted to renew my ongoing concerns about

17   communications in the clinic.  I will be in touch with Monica

18   Martin after the quiz for scheduling the meeting, and I will

19   also review my schedule for a good time to come in and check

20   the closed-captioning.

21       "As I explained previously, I am struggling with

22   communication in clinics.  At clinic on August 26, Dr. Townley

23   inquired whether an interpreter was coming to assist in

24   communication.  You asserted that was not possible.  I met

25   with patients with Dr. Townley and found I could not

 1    understand all of what patients and others at the clinic said.

 2    With some patients, I understood very little of what was said.

 3    I know that you said I only had to show up to pass, but I want

 4    to learn how to be a doctor and I think it is important to

 5    understand what the patients are saying to me.

 6         "This past clinic on September 8th, I was asked to

 7    interview patients independently and collect the chief

 8    complaint, past medical history, and attempt a review of

 9    systems.  Without an interpreter, I had no way to clarify

10    misunderstandings.  With the three patients I interviewed, the

11    interview was stressful both for the patient, with constant

12    repeating of information, and for me with losing the flow of

13    the interview and being uncertain whether I was accurately

14    understanding all of the information provided by the patient.

15    As an example of significant chunks I am missing, despite two

16    repeats, I still did not understand the work-related injury of

17    one patient this past clinic visit.

18         "I know that Creighton is not willing to provide an

19    interpreter in the clinic.  Until that issue is resolved, I

20    would renew my request that I be permitted to pay for my own

21    interpreter so that I can communicate effectively with the

22    patient.  Would you please reconsider and allow me to pay for

23    my own interpreter in the interests of patient safety and so

24    that I might learn the lessons of the clinic" --

25              MS. VARGAS:  Your Honor, could we wait until counsel

1    is done with their conversation?

2              THE COURT:  I think that they're done.

3    BY MS. VARGAS:

4    Q.   I'm sorry.  You can continue.

5    A.   "Would you please reconsider and allow me to pay for my

6    own interpreter in the interest of patient safety and so that

7    I might learn the lessons of the clinical program?

8         "The fact is some people are easier to lip-read than

9    others.  For example, there is a distinct difference, facial

10   attributes nonwithstanding *[sic],* between a composed patient

11   who is very easy to lip-read and one who fidgets and becomes

12   emotional.  In those situations my understanding can drop

13   dramatically.  Situations where there is an additional person

14   involved in the communication, such as where a family member

15   participates, are also usually more difficult.  I average, by

16   my own estimate, around 60 to 70 percent confident

17   understanding of patients but with a very wide range, given

18   some of these factors I have managed to describe.  Also, with

19   the constant background noise in the hall, I do not always

20   catch conversations about patients or other clinical concerns.

21   Again, while I understand that Creighton has said it will not

22   fail me if I show up, my primary concern is not in my grade

23   but in providing a positive experience for my patients and in

24   learning what clinic is supposed to teach me.  I have also

25   been unable to understand overhead pages and PA announcements

1   or the telephone.

2      "I am struggling with communication, a struggle that

3   could be entirely alleviated by the use of an interpreter.  I

4   know there are deaf doctors all over the United States who

5   have used interpreters in medical schools and clinics.

6   Similarly, hearing doctors routinely use sign language

7   interpreters to communicate with deaf patients.  As I have

8   explained previously, I am not asking for an interpreter to

9   mediate clinical judgment.  In other words, I am not asking

10  for an interpreter to make decisions for me.  I am asking that

11  I be permitted to use an interpreter so that I can understand

12  my patients and so that I can learn how to be a doctor.  I

13  would not be asking if I didn't need accommodation.

14     "I met with Dr. Townley on September 1st, 2010, to share

15  my concerns about the communication difficulties and see if we

16  could identify any ways to improve communications without an

17  interpreter.  Dr. Townley is not an interpreter and I cannot

18  expect her to function as one for me.

19     "Would you reconsider the decision to prohibit the use of

20  interpreters in the clinical setting?  Could you explain why I

21  cannot pay for an interpreter myself?

22     "I appreciate being able to voice my concerns and I will

23  of course continue attending my longitudinal clinic and

24  working with the patients to the best of my ability.  I am

25  concerned about having the ability to complete my tasks

ARGENYI - DIRECT                                         359

1    appropriately, I am concerned about not being able to

2    communicate with patients and others without accommodation,

3    and I wanted to keep this discussion going.  While I hope the

4    pediatric clinic possibility occurs, I wanted to again state

5    as I said in our September 2nd meeting a pediatric clinic

6    would also present different challenges in communication.  I

7    look forward to your response and am open to more suggestions

8    as well."

9    Q.   Could you explain what you mean about the pediatric

10   clinic?

11   A.   In the pediatric clinic, you have also the added

12   difficulty of more groups, more people in the clinic room.

13   For example, you might have both parents, you might have a kid

14   who's talking that I can't quite understand yet because he

15   doesn't have the formed way of talking yet or he might babble

16   or he may not know how to talk with a deaf person, to face me.

17   Even if I'm doing very basic questions with the kids, I may

18   not get their answers so there's a lot more interactions going

19   on there.

20   Q.   Can you explain, were you doing one clinic or two

21   clinics?

22   A.   I was doing -- I had not started the second clinic at

23   that point, but Dr. Hansen recommended as a way to modify the

24   clinic for me and try to make it more specific to try a

25   different clinic.  And I had explained that it would have its

1    own communication problems but he wanted me to try a second

2    clinic, to rotate every two weeks between the pediatrics

3    clinic and the outpatient clinic with Dr. Townley.

4    Q.   Did you ask for that opportunity?

5    A.   I did not ask for that.

6    Q.   And did that opportunity in any way address your

7    communication concerns in the clinic?

8    A.   It did not.

9         MS. VARGAS:  If I may approach the witness --

10        THE COURT:  You may.

11        MS. VARGAS:  -- and show what's been marked as

12   Plaintiff's Exhibit 23.

13   BY MS. VARGAS:

14   Q.   Do you recognize this document?

15   A.   I do.

16   Q.   What is it?

17   A.   It is an e-mail that I sent to Dr. Hansen.

18   Q.   And could you look at it and let me know if this is a

19   true and correct copy of the e-mail that you sent?

20   A.   It is.

21        MS. VARGAS:  At this point I would move to have it

22   admitted into evidence as Plaintiff's Exhibit 23.

23        MR. MOORE:  No objection.

24        THE COURT:  Exhibit 23 is received.

25   BY MS. VARGAS:

1    Q.   And could you please read Exhibit 23?

2    A.   "Dear Dr. Hansen, I wanted to touch base again.  I

3    scheduled a meeting next week with Monica Martin.  I

4    understand the meeting is later this month than you probably

5    intended but I had many commitments with Cardiovascular this

6    week.  I look forward to reviewing the closed-captioning as

7    well at that time if possible.  I had my fourth clinic today

8    and I am feeling very stressed out and exhausted by the clinic

9    situation.  I am still struggling with communication.  Let me

10   describe what it was like today as I visited with three

11   patients:

12        "Patient one:  When it was one-on-one, I understood 70

13   percent despite constant repeating and summary.  When

14   Dr. Townley performed her attending evaluation, it dropped to

15   40 percent and during the procedure (Pap smear) it was

16   virtually zero.

17        "Patient two:  I understood 85 percent which dropped to

18   about 60 percent when Dr. Townley came in and I had to follow

19   both individuals.

20        "Patient three:  I talked with the parents of a medically

21   complex child, also present, and a very frustrated father

22   proceeded to give me a ten-minute lecture on the role of a

23   physician and their lack of availability.  I understood

24   probably 70 percent before I was interrupted by medical staff.

25   I then came back in later with Dr. Townley and followed about

1     half between three people.

2         "I am also missing information when the patient is not

3     directly available to lip-read, such as when they are behind a

4     door or curtain (before I enter the room) or when they are

5     laid down and I am directly observing a Pap smear.  I am also

6     missing hallway chatter, which includes valuable moments of

7     learning.

8         "I would like to ask again might I please bring my own

9     interpreter at my own cost?  If not, may I please have an

10    explanation?  I did not receive an answer to my last e-mail.

11    This is a very intense year and the longitudinal clinic is

12    well worth my time if I can successfully access it equal to my

13    peers so I can prepare for OSCEs, next year's rotations and my

14    own development as a physician.

15        "I look forward to your response and will see you

16    Tuesday."

17    Q.   Can you explain what you were talking about when you

18    referenced the closed-captioning in that first paragraph?

19    A.   I was referring to a film that was in the phlebotomy lab

20    that introduced a technique for the blood draw and it was not

21    closed-captioned.

22    Q.   Did you receive any response to this e-mail?

23    A.   No.

24             MS. VARGAS:  If I may approach the witness and show

25    the witness Plaintiff's Exhibit 24?

1                    THE COURT:  You may.

2       BY MS. VARGAS:

3       Q.   Do you recognize this document?

4       A.   Yes, I do.

5       Q.   What is it?

6       A.   Just the first page or all?

7       Q.   Is that Plaintiff's Exhibit 24?

8       A.   24.  Yeah.

9                    MR. MOORE:  My 24 is a one-page.

10                   MS. VARGAS:  One moment, please.

11      BY MS. VARGAS:

12      Q.   Looking at the first page of Exhibit 24 -- I'm sorry --

13      do you recognize this document?

14      A.   Yes, I do.

15      Q.   And what is it?

16      A.   This is an e-mail that I sent to Dr. Hansen on October

17      20, 2010.

18      Q.   Okay.  And is this a true and accurate copy of that

19      e-mail?

20      A.   Yes, it is.

21                   MS. VARGAS:  Your Honor, may we have Plaintiff's

22      Exhibit 24 entered into evidence?

23                   MR. MOORE:  Your Honor, we only have one page as 24.

24                   MS. VARGAS:  May I approach the witness and make sure

25      I've given him the correct...

```
 1              THE COURT:  You may.

 2         (Off-the-record discussion had.)

 3              THE COURT:  Just to clarify for my own reference,

 4    Ms. Vargas, is Exhibit 24 only the one page that reflects an

 5    e-mail sent by the plaintiff to Dr. Hansen on October 20,

 6    2010?

 7              MS. VARGAS:  Yes, it is, your Honor.

 8              THE COURT:  Okay.  Thank you.

 9              MS. VARGAS:  And I'm sorry, have we had this admitted

10    into evidence?

11              THE COURT:  24 has not yet been admitted, it's been

12    offered.

13              MR. MOORE:  No objections, your Honor.

14              THE COURT:  Exhibit 24 is received.

15              MS. VARGAS:  Thank you.  I'm sorry about that.

16    BY MS. VARGAS:

17    Q.   Okay.  Can you read this e-mail for us, please?

18    A.   "Dear Dr. Hansen, I'm looking forward to meeting

19    Dr. Hudson and appreciate the organization of this opportunity

20    to explore pediatrics.  However, placing me in another clinic

21    without communication does not resolve the need for

22    accommodation.  As I've said before, I am requesting

23    accommodation in the clinic.  I am not asking for an

24    interpreter to mediate clinical judgment or make decisions for

25    me - the interpreter would translate so that I could
```

1    communicate effectively.  The clinical judgment would be my

2    own.  A pediatric clinic involves communication with both

3    children and their parents.  I would like to be able to

4    participate and communicate effectively in this setting.

5         "While I know that Creighton University has refused to

6    provide an interpreter, I would respectfully request that you

7    reconsider the decision to restrict me from providing an

8    interpreter at my own expense while the case is pending.  I

9    will also see you shortly before the Christmas break to

10   compare clinics as we planned."

11   Q.   Did you receive a response to that e-mail?

12   A.   No.

13          MS. VARGAS:  If I may approach the witness and show

14   him what's marked as Plaintiff's Exhibit 25, your Honor?

15          THE COURT:  You may.

16   BY MS. VARGAS:

17   Q.   Do you recognize this document, Mr. Argenyi?

18   A.   Yes, I do.

19   Q.   What is it?

20   A.   It's two e-mails that I sent to Dr. Hansen.

21   Q.   And does this represent a true and accurate copy of the

22   e-mails that you sent?

23   A.   Yes.

24          MS. VARGAS:  Your Honor, I move that Plaintiff's

25   Exhibit 25 be admitted into evidence.

 1              MR. MOORE:  No objection, your Honor.

 2              THE COURT:  Exhibit 25 is received.

 3              MS. VARGAS:  Thank you.

 4     BY MS. VARGAS:

 5     Q.   Could you please read the e-mail at the top of the page?

 6     A.   December 6, 2010.  I said, "Dear Dr. Hansen, Now that

 7     I've had an opportunity to be at the pediatrics clinic twice,

 8     as well as continue the adult clinic, I truly enjoy both

 9     practice areas for different reasons.  However, I am still

10     having the same communication difficulties in both clinics.

11     One difficulty is that in both clinics there are frequently

12     multiple people participating in a conversation which causes

13     greater communication difficulties.  For example, in a consult

14     on a two-week-old, with multiple people participating in the

15     conversation, I was not able to see all of the faces present,

16     much less lip-read.  I continue to find that I need

17     accommodation to confidently and effectively communicate in

18     the clinic setting.  Without accommodation, I don't have full

19     access to develop the thought process of a physician nor

20     enough foundation for me to confidently proceed from the

21     history taking to the physical examination.  It is slowing my

22     development as a physician as well as hampering the

23     development of my relationship with the patient.

24          "Once again, would you please consider allowing me to

25     bring an interpreter?  This interpreter solely functions as a

1    conduit of information for me to then make my own clinical

2    judgment.

3         "I've also put out an e-mail to Monica for meeting with

4    you soon and will arrange that as soon as I hear back from

5    her."

6    Q.   Did you get a response to that e-mail?

7    A.   I did not.

8    Q.   How did your experience in the clinic without an

9    interpreter compare to your experience as a certified nurse's

10   assistant?

11   A.   It was very different.  As a certified nursing assistant,

12   I was not responsible for diagnosing the patient; I was not

13   responsible for knowing their patient history, for knowing

14   their family background, for knowing all of these details

15   about them.

16        As a doctor in training, I needed to be responsible for

17   getting every word for me to make my own decision, to make a

18   diagnosis, to make a potential plan of treatment.  Even though

19   I was being overseen by an attending, this was the way for me

20   to learn those skills.

21        When I graduate from medical school, I need to be able to

22   know how to do all of that.  And in order to do all of that, I

23   need every word from that patient.  I need to be confident in

24   what I'm doing.  I want to be somebody's doctor but I can't do

25   that without all of the information.

1    Q.   Were there parts of the clinical experience at Creighton

2    that were more difficult than others?

3    A.   There was not an overall pattern.  There were themes such

4    as when I would enter into a patient room, if there was more

5    than one person, that was typically more difficult.  However,

6    I could never predict what patients would be easy to

7    understand and what might not be.

8         MS. VARGAS:  At this point, your Honor, I would ask

9    that we have a sidebar.

10        THE COURT:  All right.

11   (Bench conference on the record.)

12        MS. VARGAS:  We're mindful of the Court's order in

13   the motion in limine with respect to asking about the time

14   that Mr. Argenyi had interpreters in the clinic during the

15   course of settlement discussions and we'd like permission to

16   be able to ask Mr. Argenyi to compare the experience with the

17   interpreters and without the interpreters.

18        And we believe that pursuant to Rule 403(b) we're allowed

19   to have him testify that interpreters were present only

20   because of settlement discussions; not to go to any questions

21   related to the settlement itself so that defendant can't paint

22   that communication as if it offered that out of the goodness

23   of its own heart.  That would prejudice the jury's impression

24   of what actually happened.

25        So we don't intend to offer any testimony of dollars or

1   settlement, how it went wrong or how it went right.  It's for

2   him to be able to explain I had interpreters in the clinic and

3   this is how it happened.

4            THE COURT:  Before I ask for a response, let me ask

5   one question.

6        Without getting into why he had interpreters at one point

7   in time, if you simply asked him if there was a period of time

8   where he was allowed to bring an interpreter into the clinical

9   setting and how that worked, and then just -- and compare it

10   with how it worked when he couldn't have the interpreter but

11   not mention anything about settlement.  Why can you not do

12   that?

13            MS. VARGAS:  The problem with that is one of the

14   elements of the case that we're required to prove in order to

15   be entitled to seek damages from the jury is intent.  And one

16   of the key underpinnings of our intent case is that defendant

17   refused to allow interpreters in the clinic even if they

18   paid -- even if he paid for them himself.

19        They have indicated an intention to assert undue burden.

20   And so the idea that they -- to distort why interpreters were

21   in the clinic would lead to the conclusions that they did

22   allow interpreters in the clinic and our point is that they

23   didn't.

24            THE COURT:  Well, and I think you've already gotten

25   in the fact that they have refused to allow the interpreters

1    in the clinic even if he paid for them himself.  And if you

2    want to talk about the fact that for a period of time he was

3    allowed to have the interpreters in the clinic and how that

4    worked compared to the time that he was not allowed to have

5    interpreters, that's fine, but I don't want you mentioning

6    settlement.

7         MS. JACKSON:  But then the defendant would be

8    prohibited from also talking about the fact that they allowed

9    interpreters in the clinic.

10        THE COURT:  Only in connection with settlement --

11   it's a fact that interpreters were in there for a period and

12   then the defendant said they can't be there.

13        MS. VARGAS:  This falls squarely in the exception of

14   403(b).  We're not offering it to prove settlement, we're not

15   offering it to offer any content of the settlement.  But this

16   testimony coming in suggesting that, oh, they allowed

17   interpreters in the clinic, entirely distorts the facts of our

18   intent case which is they didn't allow interpreters in the

19   clinic even if he paid for them except in settlement.  And

20   that's in 403(b).  And doing otherwise is highly prejudicial

21   to the plaintiff's case.

22        THE COURT:  I disagree.  I think you've already made

23   it clear that the defendant would not allow the plaintiff to

24   bring interpreters into the clinic even if he paid for them

25   himself.  That's been shown.  You have not gotten into the

1     fact that at one point in time he did bring interpreters into

2     the clinic and then was later not allowed to.  You can get

3     into that all you want but not mention that it was in

4     connection with settlement negotiations.

5              MS. VARGAS:  But then --

6              THE COURT:  That's basically -- that was my ruling

7     before; that's still my ruling.

8              MS. DeLAIR:  I guess the concern is, your Honor, we

9     expect defendant to provide testimony that we gave him

10    interpreters in the clinic but he didn't need them.

11             MS. VARGAS:  That's why we removed them.

12             MS. DeLAIR:  And I expect Dr. Townley to provide

13    that.

14             THE COURT:  We're getting ahead of ourselves.  We're

15    trying to anticipate --

16             MS. VARGAS:  He said this in a sidebar yesterday.

17             THE COURT:  Eventually I'll let defense counsel talk.

18    But if defense counsel then were to introduce the evidence

19    with the spin that, gosh, we let him have the interpreters and

20    he didn't need them, and that's why we took them away, then

21    perhaps you can get into the line of questioning that you want

22    to get into but that hasn't happened yet.

23             MS. VARGAS:  Your Honor, my concern is that the

24    defendant doesn't need to put any spin on it because the

25    underpinnings of our intent case, they said he couldn't have

1    them in the clinic even if he paid for them.

2           THE COURT:  You've gotten that in.  You've

3    demonstrated that.  And you can do it again, if you want to.

4    That's already in front of the jury.

5           MS. VARGAS:  Will he be permitted to offer testimony

6    that there were interpreters in the clinic?

7           MR. MOORE:  That's already going to be in.  What do

8    you mean?

9           MS. VARGAS:  It distorts the facts.  It fundamentally

10   distorts the facts and it's expressly permitted by 403(b).

11          MR. MOORE:  So wait a minute -- oh, I'm sorry.

12          THE COURT:  I'm just trying to think through this.

13   So you're anticipating that the defendant will offer evidence

14   that there were interpreters in the clinic at one point in

15   time.

16          MS. VARGAS:  Your Honor, yesterday during Mr. Moore's

17   opening statement he testified -- he offered an opening

18   statement in which he said that they evaluated him with

19   interpreters in the clinic, and I objected.  And we came up

20   and had a sidebar and we talked about that information.  So

21   he's already told the jury that.  And to then allow him to

22   present a difference -- he doesn't have to say anything else.

23       The fact they let interpreters into the clinic takes away

24   the intent of our case.  And it's factually not what happened.

25   That's exactly why 403(b) says evidence of settlement is

 1    allowed in for other purposes as long as we're not seeking to

 2    prove amounts or the settlement itself.

 3           THE COURT:  Well, opening statement is not evidence.

 4    I say that to the jury at several points in the instructions.

 5        If defense counsel gets into the use of the interpreters

 6    in the clinical setting, leaving the impression with the jury

 7    that Creighton concluded the plaintiff didn't need the

 8    interpreters and that's why Creighton stopped offering

 9    interpreting, then on your redirect, you may be able to get

10    into the line of questioning you want to get into.

11        But, right now, my order still stands that you can't talk

12    about settlement.

13           MR. MOORE:  So I guess I'm a little confused right

14    now.  I understood we could never talk about settlement.

15           THE COURT:  That's still my ruling.

16           MR. MOORE:  But I didn't understand there would be no

17    evidence that the interpreters were actually present in the

18    clinic.

19           THE COURT:  And I have not ruled that.

20           MR. MOORE:  So that -- the fact that there were

21    interpreters in the clinic is evidence, it is a fact.  We're

22    not going to say we did it because we wanted to be nice

23    guys --

24           MS. VARGAS:  You don't have to.

25           MR. MOORE:  Can I finish?

```
 1        Or we took it out because we did have an evaluation and

 2   -- but the fact is, is that his preceptor evaluated him

 3   throughout the whole year, and at times he did have

 4   interpreters, at times he didn't.  But we never want to

 5   mention settlement or why we did it, that we were good guys

 6   about anything.  We still stick with the fact that's why we

 7   let all that in.  We -- we refused to provide interpreters

 8   even if he paid for it himself.

 9        THE COURT:  And if you start getting into -- I'm

10   talking to defense counsel now, just for the record.

11        If you start getting into a theory that the reason

12   Creighton stopped providing the interpreters in the clinic was

13   because Creighton concluded Argenyi didn't need them, then --

14        MR. MOORE:  Sure.

15        THE COURT:  -- the plaintiff may be able to come in

16   with the different rationale.

17        MR. MOORE:  We won't do that.

18        THE COURT:  I've said as much as I can say to that.

19        MR. MOORE:  Since we're up here -- well, I'll wait.

20   I'll wait and see if she offers it.

21        (End of bench conference.)

22        THE COURT:  You may continue.

23        MS. VARGAS:  I'm sorry, your Honor.  Could we please

24   have another sidebar?

25        THE COURT:  Yes.
```

1           (Bench conference on the record.)

2              MS. VARGAS:  Your Honor, I now understand what

3       Mr. Moore was about to say at the end of the last sidebar.

4       May I show you the exhibit that we intended to offer next

5       because it addresses -- it raises again all of the issues that

6       we just discussed here and that's Exhibit --

7              THE COURT:  26.

8              MS. VARGAS:  -- 26, excuse me.  It's all copies.

9       It's one page.

10             THE COURT:  All right.  While we're here at sidebar,

11      assuming the plaintiff offers Exhibit 26, what is the

12      defendant's response?

13             MR. MOORE:  Well, a couple responses:  First of all,

14      with regard to the last paragraph, second sentence that starts

15      "I don't understand why Creighton decided I need

16      interpreters" -- and then suddenly ordered them out of the

17      clinic, as you'll see that was sent on April 7th of 2011.

18          I'd like to show the Court what's been previously marked

19      as Exhibit 63 which is dated February 23, 2011, which explains

20      exactly why Creighton took the interpreters out of the clinic.

21          So, obviously, that's a -- we would say a

22      misrepresentation of the facts.  And the only way to impeach

23      him is with that letter.

24             MS. VARGAS:  So now you want to be able to talk about

25      settlement?

```
1            MR. MOORE:  No, I don't think that's admissible is

2       what I'm saying.

3            THE COURT:  Okay.  And so --

4            MR. MOORE:  That's one part.

5            THE COURT:  All right.  You object to Plaintiff's

6       Exhibit 26 on the basis of...

7            MR. MOORE:  I think by offering it, they're offering

8       information that the only way to impeach it is to offer the

9       information regarding settlement which we object to in the

10      first place.

11           So if they're allowed to put on testimony that, you know,

12      he really didn't understand why Creighton had pulled the

13      interpreters out, which this letter clearly shows he did, we

14      would have to introduce that.  I mean, a lot of this is

15      impeachable because the lawyers were talking at this time but

16      that's something else.  I just think that is -- it's

17      prejudicial, it's -- the only way to rebut it would be to

18      violate the Court's order and offer evidence we think is

19      objectionable.

20           Again, we understood that the order was we're not talking

21      about settlement and, quite frankly, not talking about why the

22      interpreters were there and why they left.

23           THE COURT:  Introduction of Exhibit 26 would conflict

24      with my earlier order regarding references to settlement

25      negotiations because it does refer to Creighton University
```

1    agreeing to provide the interpreters and that agreement was in

2    connection with settlement negotiations.

3        The plaintiff can certainly testify that he sent another

4    e-mail to Dr. Hansen on April 7 of 2011 and that he brought

5    certain information to the attention of Dr. Hansen on that

6    date.  And he can summarize what he brought to the attention

7    of Dr. Hansen regarding his inability to communicate in the

8    clinical setting without the use of an interpreter.

9        And then again as we discussed at the last sidebar, if

10   you want to get into the fact that he did at one point use

11   interpreters in the clinical setting and then compare how he

12   functioned with the interpreter, as opposed to working without

13   the interpreter, you can do that.

14       MS. VARGAS:  I just want to make sure I understand.

15   So if we don't offer testimony that he had interpreters in the

16   clinic at one point, will the defendant be allowed to offer

17   that testimony?

18       THE COURT:  He cannot offer it in connection with

19   settlement negotiations.  It is a fact that Mr. Argenyi did

20   have an interpreter in the clinical settings at some point in

21   time and that in itself does not violate the Court's earlier

22   order regarding settlement negotiations.  It's just why he had

23   the interpreter there.

24       MS. VARGAS:  I understand your ruling.

25       THE COURT:  The fact that this e-mail indicates

 1    Creighton University agreed to provide the interpreters, talks

 2    about the rationale for why they were there, that's why I

 3    would find Exhibit 26 to be objectionable and contrary to the

 4    Court's earlier order on the motion in limine.  You know, it's

 5    possible that this could be redacted but I'm not going to go

 6    there for you.  That's up to you.

 7           MS. VARGAS:  At this point respectfully, your Honor,

 8    I would maintain my objection for a few different reasons.

 9    This document goes directly to notice and intent and to a key

10    element of the plaintiff's claim what they knew, what their

11    clients knew and how they acted and why they acted.  It goes

12    to deliberate indifference.

13           THE COURT:  There is no doubt that it's relevant.

14    There's no doubt it has relevant information in here.

15        I'm sorry, I have interrupted you.

16        The problem is just certain content of the e-mail runs

17    contrary to the Court's order in limine regarding settlement

18    negotiations.  If that can be redacted, you can get it in.

19           MS. VARGAS:  Respectfully, 403(b) says evidence of

20    settlement discussions is admissible for other purposes such

21    as notice and intent.  And I maintain the same objection that

22    offering it in any other form would prejudice the plaintiff's

23    case and benefit the defendant's case.

24           THE COURT:  You can make an offer of proof right now

25    if you want to.

 1           MS. VARGAS:  I guess I'm not clear on what you're

 2     suggesting.

 3           THE COURT:  If you want to make an offer of proof of

 4     Plaintiff's Exhibit 26 for the record, you can do that.

 5           MS. VARGAS:  Okay.  I would like to make an offer of

 6     proof with respect to Exhibit 26.  It goes directly to notice

 7     and so far as it shows Creighton University maintained its

 8     policy of not providing interpretation in the clinic even if

 9     Mr. Argenyi paid for them, except that it only allowed him to

10     do so during the course of settlement discussions.

11         We have no intention of discussing the nature of the

12     settlement discussions or to talk about the truth of the

13     settlement discussions or anything to do with that.  We simply

14     want to show that he had -- how he did with the interpreters

15     and without them, and we're unable to offer that testimony

16     because offering that testimony with the key facts that it was

17     only allowed during settlement discussions severely prejudices

18     the plaintiff and entirely alters the truth of the facts in a

19     way that benefits the defendant.

20           THE COURT:  And your offer of proof is preserved for

21     the record with respect to Plaintiff's Exhibit 26, and it will

22     be available for the Eighth Circuit and anyone else to see who

23     looks at the entire record in the case, but it would not be

24     available for the jury to see.

25           MS. VARGAS:  Thank you.

 1            MR. MOORE:  I just want to note for the record that

 2       the defendant would be agreeable to redacting those portions

 3       of this e-mail that refer to settlement.

 4            THE COURT:  Noted.  Thank you.

 5       (End of bench conference.)

 6  BY MS. VARGAS:

 7  Q.   Mr. Argenyi, moving to the very end of the second year of

 8       medical school, April, May of 2011, can you tell me generally

 9       what your experience in the clinic was like without

10       interpreters?

11  A.   My experience was that I could not access information.  I

12       could not get a complete patient history.  I could not

13       confidently go from that history to an examination.  I did not

14       feel like I was ready for second -- for third year.  I felt

15       like I could have had more practice with all of my

16       examinations.  I felt like I could have done a better job had

17       I had access to the information.

18            I felt embarrassed when I went in and I talked with

19       patients and they could tell that I wasn't understanding but

20       they didn't want to point it out.  And I didn't want to -- to

21       me, it's not their burden to make me understand.  It's my

22       burden to make sure that the communication is happening, not

23       theirs.  And every time that happened, I felt embarrassed.

24            I especially felt embarrassed with people who had accents

25       that -- or ailments that -- one person had a history of a

1   broken jaw.  And these people, I think they blamed themselves

2   for me not understanding them, and that's not okay because

3   it's not their fault.

4          MR. MOORE:  Your Honor, at this time I'd object as

5   narrative.

6          THE COURT:  Sustained.  We'll have a new question.

7   BY MS. VARGAS:

8   Q.  Without going into specifics, did you have an opportunity

9   to again contact Dr. Creighton -- I'm sorry, Dr. Hansen about

10  your experiences in the clinic in April of 2011?

11  A.  Yes.  I sent another e-mail where I explained that I was

12  having difficulties in the clinic and they had not improved

13  over the year.

14  Q.  And did Dr. Hansen ever respond to that e-mail?

15  A.  No.

16  Q.  Do you know approximately what the tuition was for the

17  second year -- that you paid for the second year of Creighton

18  medical education?

19  A.  Tuition itself, not including other expenses, was, I

20  think, 46,000.

21  Q.  And how much did you pay on top of that in order to have

22  access to the education you had purchased?

23  A.  I paid about 60,000.

24  Q.  How did you feel about paying for your own auxiliary aids

25  in the second year of medical school?

1    A.   When I started, it was a practical solution.  It's what I

2    needed to be able to go in the clinics.  It was still what I

3    needed; but by the end of the second year, I couldn't see how

4    I was going to continue if I couldn't pay for the interpreter

5    either.

6    Q.   So what did you do at the end of M2, your second year of

7    medical school?

8    A.   Since I was not allowed to have an interpreter, I didn't

9    have a choice.  I had to find an alternate plan so I requested

10   a leave of absence.

11   Q.   Can you tell me about what the third and fourth year of

12   medical school is like?

13   A.   The third and fourth year of medical school are just

14   about entirely clinical, there's a little bit of lecture, but

15   the majority of your time -- I mean, 90, 95 percent of your

16   time, I don't know exactly, is spent doing clinical work.  You

17   go through, I believe if I recall correctly, six different

18   rotations during your third year such as internal medicine,

19   family medicine, pediatrics, surgery, and I can't recall the

20   other two.

21        And then during your fourth year, you do a couple of --

22   that you get to choose what you would like.  So you might

23   choose ones that teach you skills that are completely opposite

24   of what you're going into or you might choose ones that are

25   dedicated to the field that you're interested in.

1   Q.   Did you want to leave Creighton after you completed the

2   second year of medical school?

3   A.   No.

4   Q.   What did you do during your leave of absence?

5   A.   So I found a local solution.  I contacted the Boys Town

6   National Research Hospital next to Creighton and worked with

7   them to try to find a place for me to do research for one

8   year.

9   Q.   And what kind of research did you do?

10   A.   I did research in an auditory lab -- audiology lab that

11   looked at acoustic brain stem responses.

12   Q.   And what did you do after that?

13   A.   After that -- during that year there did not seem to be

14   any kind of solution -- there seemed to be no solution coming.

15   I was still trying to talk to Creighton about having

16   interpreters in the clinic, and there didn't seem to be -- it

17   didn't seem like that was happening so I started looking at

18   alternate plans.

19        And I decided to try to find something that was

20   complimentary to medicine.  So I looked at schools that

21   offered a public health degree.  And during my search I found

22   a dual degree program that includes a social work degree,

23   master's in social work and master's in public health.  And I

24   felt that would be a way to learn the application of

25   population medicine and public health education to my future

1    practice of medicine as well as maintain the clinical side of

2    one-on-one and group interaction through the social work.

3    Q.   I'm sorry, where -- where is that joint degree program?

4    A.   That program is at Boston University in Boston,

5    Massachusetts.

6    Q.   And so that's where you currently are?  That's where

7    you're currently set up?

8    A.   Yes.

9    Q.   How did it feel to have Creighton's lawyers tell you that

10   Creighton thought you might not be qualified to start medical

11   school in August of 2009?

12   A.   It scared me.  I'd just moved from Seattle -- I was in

13   Seattle previously.  And it scared me.  I had just gotten an

14   apartment -- an apartment for the year.  I was here by myself.

15   I had moved everything.  I had -- you know, I had sent all

16   this documentation.  I felt that really we would come to a

17   resolution.

18        And when I -- when I was told that I would not -- that I

19   might not be qualified for everything that I had been working

20   for all this time, did I make a major mistake?  And is there

21   anybody who will support me here at this school of medicine?

22   Q.   What are your medical school classmates doing now?

23        MR. MOORE:  Objection, foundation.

24   BY MS. VARGAS:

25   Q.   If you know.

1          THE COURT:  Overruled.  He may answer.

2    A.   Well, I actually know that several of them started

3    residency last month.  One of them was in the Boston area for

4    her interviews last year.

5    BY MS. VARGAS:

6    Q.   So when should you have graduated from Creighton

7    University as a doctor?

8    A.   I should have graduated this last spring.

9    Q.   Do you have debt from paying medical school tuition?

10   A.   Yes.

11   Q.   How much is that debt today?

12   A.   Around 130,000.

13   Q.   Do you have debt from paying for auxiliary aids and

14   services?

15   A.   Yes.

16   Q.   And how much is that debt today?

17   A.   That's about 110,000 as well.

18   Q.   Have you been making payments?

19   A.   I've made some payments.

20   Q.   When you had to take a leave of absence, did you tell

21   your mother?

22   A.   Yes.

23   Q.   How did that feel?

24   A.   It was hard.  You know, I got through two years here.  I

25   mean, coming through school in and of itself was hard every

1   day because I didn't know -- the more it went on, the more I

2   really couldn't trust anybody.  I couldn't even talk to my

3   classmates about it because my Creighton University experience

4   wasn't their experience, and that's not their -- that's not

5   for me to take that away from them.

6        So I felt really isolated and I still went.  I still did

7   everything that I could.  I still made the best out of it.  I

8   went in planning to become a doctor.  And when I got -- when

9   it got to the end of second year and I was stuck, you know, I

10  told my mom.  And she immediately said, "Are you sure you

11  don't want to try without interpreters," and I said, "Mom, you

12  know I can't."  And she said, "I know.  I just hate to see you

13  give up."

14       And, you know, hearing that from my mom is like -- I felt

15  like a failure having to tell everybody that I couldn't go on.

16  They understood why I was doing it, but -- why I couldn't but

17  it just feels -- you know, I explained to people I went to

18  medical school for two years, and they say, "Why didn't you

19  continue," and I say, "I can't."  And even when you explain

20  the story, people are -- it's different.  You feel like a

21  failure even if they don't see it that way.

22  Q.   Are you currently employed?

23  A.   Yes.

24  Q.   And is that a new job?

25  A.   I had two jobs -- I have two jobs.  I'm a research

1    assistant at Boston's Children's Hospital and I am a program

2    coordinator for the health education called Project Hope at a

3    deaf services agency.

4    Q.   At any point towards the very end of the second year of

5    medical school, were you ever told not to make any other

6    requests for accommodation?

7    A.   Yes.

8    Q.   Who told you that?

9    A.   Dr. Hansen.

10   Q.   You testified that you're currently working at Boston

11   Children's Hospital; is that correct?

12   A.   Yes.

13   Q.   Do you see residents around that facility?

14   A.   Yes.

15   Q.   How does it feel when you see medical residents?

16   A.   It makes me miss everything.

17           MS. VARGAS:  No further questions, your Honor.

18           THE COURT:  Cross-examination.

19           MR. MOORE:  May I have one moment, your Honor?

20           THE COURT:  You may.

21       (Off-the-record discussion had.)

22                       CROSS-EXAMINATION

23   BY MR. MOORE:

24   Q.   Mr. Argenyi, good afternoon.

25   A.   Hello.

ARGENYI - CROSS                                                       388

1    Q.   When you were invited onto Creighton's campus for an

2    interview and a tour, I believe you said that you didn't

3    request any accommodations for the interview; that is correct?

4    A.   Yes.

5    Q.   And I believe that you said that you didn't request any

6    accommodations because you would like to -- I believe you said

7    build a rapport with whoever is interviewing you; is that

8    correct?

9    A.   Yes.

10   Q.   Don't you have that same concern with patients as you saw

11   them as a physician?

12            MS. VARGAS:  Objection, your Honor.

13            THE COURT:  Overruled.  He may answer.

14   A.   No.

15   BY MR. MOORE:

16   Q.   You wouldn't?

17   A.   No.

18   Q.   You don't want to build a rapport with your patients?

19   A.   No, I have to, but the concern is not the same.

20   Q.   Now, you considered your interview a very positive

21   experience; is that correct?

22   A.   I did.

23   Q.   And you had applied to several other medical schools in

24   addition to Creighton, correct?

25   A.   I had.

1    Q.   And am I correct in saying that Creighton was the only

2    one that offered you admittance?

3    A.   Yes.

4    Q.   And you applied to the University of Washington Medical

5    School; is that correct?

6    A.   I did, my home school.

7    Q.   Excuse me, your home school?

8    A.   Yes.  I'm from Seattle.

9    Q.   You really wanted to go there.

10   A.   It was just my home school.

11   Q.   And I believe you said you got a funny feeling when you

12   spoke with people from that law school; is that correct?

13   A.   Not the law school.

14   Q.   Excuse me?

15   A.   Not the law school.

16   Q.   I'm sorry.  I said it again.  I apologize, sir.  Very

17   good.

18   A.   Yes.

19   Q.   When you spoke with individuals from the University of

20   Washington Medical School, you said you got a funny feeling,

21   correct?

22   A.   I did.

23   Q.   And they said some comments that you believe were related

24   to your hearing impairment; is that correct?

25   A.   Yes, they did.

1    Q.   And you believed that perhaps your hearing impairment may

2    have had something to do with them not accepting you; is that

3    correct?

4    A.   It may have.

5    Q.   Now, in the past, before you attended Creighton Medical

6    School, at the elementary school, high school and college

7    level, as I understand your testimony, the only thing that you

8    ever submitted was an audiogram in support of your requests

9    for accommodations; is that correct?

10   A.   I don't know about my elementary school or high school

11   but that was the case for college.

12   Q.   So the college -- the community colleges you just gave

13   them your audiogram, correct?

14   A.   Yes.

15   Q.   And they gave you whatever you asked for, correct?

16   A.   They asked that it be what I requested.

17   Q.   Is that a yes?

18   A.   Yes.

19   Q.   And, in fact, because of that you were surprised when

20   Creighton asked for documentation of the need for the

21   accommodations that you were requesting, correct?

22   A.   Yes.

23   Q.   You're not claiming there was anything inappropriate

24   about them asking for information, are you?

25   A.   No.

1    Q.    So in college, no one asked you for documentation other

2    than your audiogram to establish your need for either CART or

3    interpreters, correct?

4    A.    Correct.

5    Q.    No one ever -- ever evaluated the impact of your use of

6    those in those settings, did they?

7    A.    Not that I'm aware of.

8    Q.    No one ever asked you about the cost or the expense or

9    talked to you about those things, did they?

10   A.    Not to me.

11   Q.    Sir, did you believe your experience as a CNA was

12   something that you wanted to highlight in your application for

13   medical school?

14   A.    Absolutely.

15   Q.    Because that was working in the medical setting,

16   including in an emergency department, correct?

17   A.    Because it was exposure to the medical environment.

18   Q.    And I think you indicated you had assisted in procedures

19   as a CNA at Children's Hospital; is that correct?

20   A.    Right.

21   Q.    Things like punctures, correct?

22   A.    I'm sorry, things like what?

23   Q.    Punctures.

24   A.    I assisted with them.

25   Q.    And IV placement, correct?

1    A.    I assisted with them.

2    Q.    And putting down nasogastric tubes?

3    A.    I assisted with them.

4    Q.    And similar procedures, correct?

5    A.    Yes.

6    Q.    And you observed seizure activity; is that correct?

7    A.    Yes.

8    Q.    And on some occasions you may be the only tech on duty on

9    certain shifts; isn't that correct?

10   A.    Yes.

11   Q.    You were responsible at Seattle Children's Hospital to

12   communicate verbally, correct?

13   A.    Yes.

14   Q.    And working and communicating with members of what's

15   known as the multidisciplinary team, correct?

16   A.    Yes.

17   Q.    So you were required to communicate verbally with

18   physicians, correct?

19   A.    Yes.

20   Q.    Nurses, correct?

21   A.    Yes.

22   Q.    Other techs, correct?

23   A.    Yes.

24   Q.    I believe you helped in the triage process and also

25   negotiated care with families, correct?

1    A.    Yes.

2    Q.    And you took vital signs.

3    A.    Yes.

4    Q.    And you helped settle incoming ambulances.

5    A.    I'm sorry, what?

6    Q.    Helped settle incoming ambulances.

7    A.    Yes.

8    Q.    And when you were transporting patients to maybe get a

9    CAT scan or an X-ray or to surgery, you were required to

10   communicate with those patients, correct?

11   A.    Yes.

12   Q.    And you did that verbally, correct?

13   A.    Yes.

14   Q.    And everything that I've just talked about you're doing

15   at Children's Hospital you did with no accommodation other

16   than a text pager, correct?

17   A.    Yes.

18   Q.    You weren't provided interpreters, correct?

19   A.    Correct.

20   Q.    You were not provided CART, correct?

21   A.    Right.

22   Q.    I'd like to direct your attention to Exhibit 3 which I

23   believe is already in evidence.

24         THE COURT:  It is in evidence.

25         MR. MOORE:  Thank you, your Honor.

1          MS. BALUS:  May I approach the witness, your Honor?

2          MS. VARGAS:  Your Honor, if we could use the exhibit

3   that's been admitted into evidence as the plaintiff's exhibit.

4   Do you have a copy of the plaintiff's exhibit?

5          MS. BALUS:  I don't think so.

6          MR. MOORE:  If it's already up there, that's fine.  I

7   just didn't want to --

8          MS. VARGAS:  Well, I'm not sure the stickers match,

9   that's all.

10          MS. BALUS:  Whatever copy you want me to hand him is

11   fine.

12          THE COURT:  The plaintiff has Exhibit 3 before him.

13   He can use that copy.

14          MR. MOORE:  Okay.

15   BY MR. MOORE:

16   Q.   Sir, you recognize Exhibit 3, correct?

17   A.   Right.

18   Q.   And you talked about this on your direct examination,

19   correct?

20   A.   Yes.

21   Q.   I don't want you to read it.  I know that this has been

22   read to the jury and the jury understands.  These were all the

23   requests that you made for your first year of medical school

24   at Creighton University, correct?

25   A.   Yes.

1    Q.   And you believe that all these accommodations were

2    necessary for you to have effective communication, correct?

3    A.   Yes.

4    Q.   And even as you sit here today, you believe that all of

5    these accommodations, all these auxiliary aids and services

6    were necessary for effective communication, correct?

7    A.   Absolutely.

8    Q.   And Creighton couldn't have provided something less than

9    you were requesting and provided effective communication,

10   right?

11   A.   It would not have been effective.

12   Q.   So it was either this or nothing, correct?

13   A.   What I tried was not effective; so, no.

14   Q.   So you said no.  My question is if Creighton didn't

15   provide all of these accommodations, it would have not -- I

16   withdraw the question, I apologize.

17        If Creighton would not have provided all of these

18   accommodations, then it wouldn't have been effective, correct?

19   A.   Can you restate that a different way?

20   Q.   Sure.  I asked you as you sit here today that you believe

21   that all of these accommodations were necessary for effective

22   communication, correct?

23   A.   Yes.

24   Q.   And if Creighton didn't provide these, it wasn't

25   providing effective communication, correct?

1    A.   Yes.

2         (Off-the-record discussion had.)

3    BY MR. MOORE:

4    Q.   Sir, I'd like to direct your attention to Exhibit No. 16

5    which is already in evidence.  Do you have a copy of that,

6    sir?

7         Mr. Argenyi, we will bring it up on the screen if you can

8    read it in that way.  Would that be sufficient?

9    A.   Yes.

10   Q.   Thank you.

11        Directing your attention to Exhibit 16, that is a letter

12   from Dr. Backous to Michael Kavan.  Do you recognize that

13   document?

14   A.   Yes.

15   Q.   You asked Dr. Backous to submit that letter on your

16   behalf, correct?

17   A.   I did.

18   Q.   And you received a copy of it, correct?

19   A.   I did.

20   Q.   And you never asked him to correct anything in that

21   letter, correct?

22   A.   I did not.

23   Q.   I'd like to direct your attention now to Exhibit 17.

24   Sir, it's on the screen.  Do you recognize that document?

25   A.   I do.

1    Q.   And is that a letter dated May 27th, 2009, that you asked

2    Dr. Backous and Stacey Watson to send to Creighton University

3    on your behalf?

4    A.   Yes.

5    Q.   And you received a copy of that letter, correct?

6    A.   Yes.

7    Q.   And you never asked either Stacey Watson or Dr. Backous

8    to correct anything in that letter, correct?

9    A.   Yes.

10   Q.   I'd like to now bring up on the screen Exhibit 18 which

11   is already in evidence.  Sir, do you recognize that document?

12   A.   I do.

13   Q.    And that's the September 10th, 2009, letter that

14   Dr. Backous and Stacey Watson submitted to Creighton

15   University, correct?

16   A.   Yes.

17   Q.   And you asked them to submit that on your behalf,

18   correct?

19   A.   Yes.

20   Q.   And you received a copy?

21   A.   Yes.

22   Q.   And you never asked them to correct anything in that

23   letter, did you?

24   A.   Right.

25   Q.   I'd like to now direct your attention to Exhibit 19.

1    That's the letter dated September 28 from Dr. Backous and

2    Stacey Watson to Creighton University.  Do you recognize that

3    document?

4    A.   Yes.

5    Q.   And you received a copy of that document, didn't you,

6    sir?

7    A.   Yes.

8    Q.   And am I correct in saying that you never asked them to

9    correct anything in that letter; is that right?

10   A.   Yes.

11   Q.   Sir, I'd now like to direct your attention to Exhibit 5

12   that we'll bring up on the screen.  You recognize Exhibit 5,

13   don't you, sir?

14   A.   Yes.

15   Q.   And that was the letter that you submitted to Creighton

16   dated May 26, 2009, correct?

17   A.   Yes.

18   Q.   And you submitted that in support of your request for

19   accommodations, correct?

20   A.   Yes.

21   Q.   All right.  I'd like to look at the paragraph under

22   "Regarding the technical standards" and we'll blow that up a

23   little bit so you can read it.

24       Now, in this portion of the letter, you indicate that you

25   had been working as a CNA at Children's Hospital, correct?

1    A.    Yes.

2    Q.    And again, you included some of the things that you had

3    been doing in the emergency department like obtaining brief

4    medications, allergy histories, vital signs, communicating

5    with patients and families, team members and members of other

6    departments.  And you had been performing those duties

7    effectively without accommodations with the exception of a

8    text pager, correct?

9    A.    Yeah.

10   Q.    And you said:  I believe this is clear proof that I'm

11   able to function in a medical setting and I fulfill the

12   technical standards for communication, correct?

13   A.    Yeah.

14   Q.    Then you go on to say that your supervisor, who I believe

15   is Amanda Mogg; is that correct?

16   A.    Yes.

17   Q.    That she was going to submit a letter on your behalf as

18   well, correct?

19   A.    Yes.

20   Q.    Okay.  If we can now look at the bottom portion of that

21   letter under "regarding the difference between the technical

22   standards and need for accommodations"?

23         You in this paragraph informed Creighton that visual cues

24   may include lip-reading and body language as well as

25   contextual cues, correct?

1     A.   Yes.

2     Q.   And when you are outside of the academic setting, let's

3     say out with friends or at a restaurant and things, you rely

4     on visual cues such as lip-reading, body language and context;

5     is that correct?

6     A.   Correct.

7     Q.   And you don't normally have a sign language interpreter

8     or CART or something like that when you're going out to a

9     restaurant, correct?

10    A.   Not true always.

11    Q.   You said "not true always"?

12    A.   Right.

13    Q.   Does that mean that you generally don't have them or you

14    generally do have them?

15    A.   Many of my friends know some basic signs.

16    Q.   And again I'll ask you again, sir, when you go out to a

17    restaurant, you go out to dinner, you don't have an

18    interpreter with you or you don't have CART sitting at the

19    table, correct?

20         MS. VARGAS:   Objection, asked and answered.

21         THE COURT:   No, overruled; he may answer.

22    BY MR. MOORE:

23    Q.   Correct?

24    A.   I don't have an official interpreter or CART, no.

25    Q.   And then you say:  Given all these, I've been able to

 1    obtain clinical information in a clinical setting without

 2    significant accommodation.  I may, for example, need some

 3    technological modification for my stethoscope or the phone but

 4    these will still be independently oriented accommodations

 5    applicable in later clinical years.  Do you see that?

 6    A.   Yes.

 7    Q.   Okay.  So, you're saying there, sir, that you obtained

 8    clinical information in the clinical setting without

 9    significant accommodations.  Do you see that?

10    A.   Yes.

11    Q.   And you believe, don't you, that significant

12    accommodation would be having another person there, an

13    interpreter there, correct?  That would be significant

14    accommodations, correct?

15    A.   Yeah.

16    Q.   So what you're saying there is given that I've been able

17    to obtain clinical information in the clinical setting without

18    interpreters, right?  Interpreter's a significant

19    accommodation, correct?

20    A.   Yes.

21    Q.   That you wouldn't need those but you may need some

22    technological modifications of your stethoscope or the phone,

23    right?  That's it.

24    A.   That's not what I said.

25    Q.   That's not what it said?

1    A.    No, it's -- I never stated that I would not need those.

2    Q.    You do say -- and maybe I'm reading it wrong here.  I've

3    been able to obtain clinic information in a clinic setting

4    without significant accommodations, which means without an

5    interpreter.  I may, for example, need some technological

6    modifications for my stethoscope or phone.  You see that?

7    A.    I see that.

8    Q.    That's not what you said?

9    A.    That's what I wrote there.

10   Q.    Okay.  And you wrote that to Creighton, telling them this

11   is support for my accommodations that I need, correct?

12   A.    Yes.

13   Q.    Okay.  Going down to the next paragraph, you say in the

14   second sentence:  I would like to emphasize that I'm

15   requesting accommodations not for -- in clinical assessment

16   but for assistance in learning new material.  Learning new

17   material without appropriate accommodations results in a high

18   level of fatigue and stress which would hinder reaching my

19   best performance.  Do you see that?

20   A.    Yeah.

21   Q.    Okay.  So as I understand it, you're saying that in

22   learning new material, that without the accommodations you're

23   asking for, it's going to hinder you being able to reach your

24   best performance, your highest performance, correct?

25   A.    Yes.

 1    Q.  But you're also saying that your experience -- from your

 2    experience you've been able to understand that you're not

 3    going to be requesting assistance for clinical assessment,

 4    correct?

 5              MS. VARGAS:  Objection, that's not what the witness

 6    testified.

 7              THE COURT:  The witness may respond and clarify;

 8    overruled.

 9    A.   Again, that's not what I stated.  I stated that I had not

10    used accommodations in that clinical setting.  I never stated

11    I would not need accommodations for that setting.  I did say

12    there were improvements in technology that I would use in that

13    setting.

14    BY MR. MOORE:

15    Q.   Did you say:  I would like to emphasize I'm requesting

16    accommodations not for assistance in clinical assessment but

17    for assistance in learning new material?  That's what you

18    said, correct?

19    A.   I testified why I was asking for the accommodations.

20    Q.   But what I'm saying there is that's what you said,

21    correct?

22    A.   That's what I wrote.

23    Q.   You wrote that, correct?

24    A.   Yes.

25    Q.   Nobody else wrote it, not your doctor; you wrote that,

1    correct?

2    A.   Correct.

3    Q.   Turning to the next page on the top...

4         MR. MOORE:  If we could just highlight that first

5    little portion up there, the two sentences.

6    BY MR. MOORE:

7    Q.   And then you go on to say, "I need accommodations in the

8    classroom so I can absorb the substantial amount of

9    information presented in medical school to then apply those

10   concepts clinically."  Correct?

11   A.   Yes.

12   Q.   Now, then in the letter you talk about your cochlear

13   implant and I think you've testified before that you were

14   hoping that would provide some additional assistance but you

15   just weren't sure at that point.

16        And then in the next paragraph you talk about the

17   difference between one-on-one, small groups and large groups.

18        MR. MOORE:  And I'd like to highlight that.  The next

19   paragraph down Kris; no, no -- right there.  Thank you very

20   much.

21   BY MR. MOORE:

22   Q.   You say:  In general, hearing-impaired individuals

23   function better one-on-one and in small groups and have more

24   difficulty in large groups.  Therefore, there is more of a

25   need -- there is more need for accommodations in those

ARGENYI - CROSS                                                    405

 1   settings.

 2       When you say "in those settings," were you referring to

 3   large groups?

 4   A.   Yes.

 5           MR. MOORE:   Okay.   Now, if we can highlight the next

 6   portion where it says "Regarding the requested

 7   accommodations"?

 8   BY MR. MOORE:

 9   Q.   Now, again you repeat what you had requested in the

10   previous e-mail, correct, the accommodations that you were

11   demanding, correct?

12   A.   The accommodations I was requesting.

13   Q.   Okay.   Very good.   And then there's a paragraph down

14   there that says, "I believe these are in accordance with

15   Dr. Backous's recommendation."  And then you say, "Real-Time

16   captioning and interpreting (in my case Cued Speech or oral)."

17   And I'm assuming you're talking about oral interpretation with

18   sign support, correct?

19   A.   At that point I didn't know what I would be using.

20   Q.   But that's what you're referring to there, correct?

21   A.   Yeah.

22   Q.   You knew what oral -- oral interpretation with sign

23   support was, didn't you?

24   A.   Not really.

25   Q.   You didn't know what it was but you said "in my case cued

1     speech or oral"?

2     A.   I know what an oral interpreter is.

3     Q.   You knew what an oral interpreter was, correct?

4     A.   Yes.

5     Q.   So what you were saying, "There's real-time captioning

6     and interpreting (in my case Cued Speech or oral) are

7     generally considered interchangeable, based on the client's

8     preference and availability.  The largest fundamental

9     difference between the two rests on the capacity to change

10    locations quickly."  Now you wrote that, correct?

11    A.   Yes.

12    Q.   It wasn't your doctor, right?

13    A.   Right.

14    Q.   That was you, correct?

15    A.   Yes, that was me.

16          MR. MOORE:  Now, I'd like to highlight the last

17    portion of that letter.

18    BY MR. MOORE:

19    Q.   Now, this is the portion where you're talking about

20    the -- regarding the reasonable nature of the requested

21    accommodations.  Do you see that portion, sir?

22    A.   Yes.

23    Q.   And it appears to me that you are talking about the

24    accommodations that you had received at your previous -- in

25    your previous education, correct?

1      A.    Yes, sir.

2      Q.    And then at the end of the second paragraph there, you

3      say, "I do believe that an FM system would be useful for my

4      medical studies," correct?

5      A.    I did believe it was useful.

6      Q.    And you said that, correct?  That's your statement,

7      correct?

8      A.    Yeah.

9            THE COURT:  If this is a good breaking point, we

10     can --

11           MR. MOORE:  Yes, your Honor.

12           THE COURT:  -- take the mid-afternoon break now.

13     Let's reconvene at 3:25.

14     We're in recess.

15     (Jury out and recess taken at 3:10 p.m.)

16     (At 3:28 p.m. on August 23, 2013, with counsel for the

17     parties, the plaintiff, and the defendant's representative

18     present, and the jury NOT present, the following proceedings

19     were had:)

20     MICHAEL ARGENYI, PREVIOUSLY SWORN, RESUMED THE STAND

21           THE COURT:  Anything we need to discuss before the

22     jury comes in?

23           MS. VARGAS:  Not from the plaintiff, your Honor.

24           MR. MOORE:  Nothing from the defendant, your Honor.

25           THE COURT:  Please bring in the jury.

 1          (Jury in at 3:29 p.m.)

 2              THE COURT:  Mr. Moore, you may continue with your

 3      cross-examination.

 4              MR. MOORE:  Thank you, your Honor.

 5                      CROSS-EXAMINATION (Cont'd.)

 6      BY MR. MOORE:

 7      Q.  Mr. Argenyi, I'd like to direct your attention to Exhibit

 8      No. 6.  And again we'll bring it up on the screen.  And we

 9      talked about this.  I believe this is already in evidence.

10              THE COURT:  It is.

11      BY MR. MOORE:

12      Q.  You talked about this on direct examination.  This is the

13      letter sent to you by Dr. Kavan explaining to you the

14      accommodations that Creighton would provide for your first

15      year of medical school, correct?

16      A.  Yes.

17      Q.  Correct?

18      A.  I said yes.

19      Q.  You received a copy of this letter, correct?

20      A.  Right.

21      Q.  And, sir, if you'd turn to --

22              MR. MOORE:  If we could highlight right in the first

23      paragraph under Lectures, please?

24      BY MR. MOORE:

25      Q.  So as I understand it, Creighton offered you for lectures

1    a first row seat, an FM system, as well as a note-taker,

2    correct?

3    A.   Correct.

4    Q.   And it indicated the university would arrange for you to

5    have a note-taker, giving you a copy of the notes within a

6    reasonable time period after a lecture, correct?

7    A.   Right.

8    Q.   Did you ever reach out to them to identify a specific

9    note-taker?

10   A.   No.

11   Q.   Instead you used just the note-taking service that the

12   university provided, correct?

13   A.   Correct.

14   Q.   And that was available to all students.

15   A.   All students who were in it, yes.

16   Q.   So if a student wanted that service, they could be

17   involved in that, correct?

18   A.   Right.

19   Q.   But in this particular letter, they're offering a

20   note-taker for you, correct?

21   A.   Right.

22   Q.   And we've been over this letter already so I don't want

23   to waste too much time on it but I would like to go to the

24   second page.  And I'd like to go to the second to the last

25   paragraph where it starts --

 1              MR. MOORE:  No, one more down.  Thank you.

 2      BY MR. MOORE:

 3      Q.   Then the last sentence on that letter said, "We will plan

 4      to meet with you periodically to assess these accommodations."

 5      Do you see that?

 6      A.   Yes.

 7      Q.   Now, at that time, on June 23rd, did you have any reason

 8      to question that statement, that they would periodically

 9      assess your accommodations?

10      A.   No.

11      Q.   Now, if I could direct your attention, sir, to Exhibit

12      No. 7?  And this is the e-mail that you sent to Dr. Kavan on

13      July 15th in response to his June 23rd letter, correct?

14      A.   That is correct.

15              MR. MOORE:  And if we could blow up the second and

16      third paragraph, the larger paragraphs, both of them.

17      BY MR. MOORE:

18      Q.   Now, you indicate there, as you said before, that you

19      noted that they were different than what they [sic] were used

20      to but you would give them a wholehearted try, correct?

21      A.   Absolutely.

22      Q.   And should they be inadequate, you would let Dr. Kavan

23      know immediately and would work with him and his office to

24      devise an adequate solution, correct?

25      A.   Uh-huh.

1  Q.  So was this your intent at that point to try the

2  accommodations offered by Creighton University, and then if

3  they weren't working to work with Dr. Kavan to come up with

4  some alternative accommodations that may work?

5  A.  Absolutely.

6  Q.  So that was your intent on July 15th of 2009, correct?

7  A.  Yes.

8  Q.  Now, also in that letter you specifically indicate that

9  you are wondering whether the FM system would be purchased by

10  Creighton, correct?

11  A.  Yes.

12  Q.  And you got an answer to that, that Creighton would be

13  paying for it?

14  A.  Correct.

15  Q.  You also identified a specific FM receiver that can be

16  ordered that would work specifically with the cochlear implant

17  that you had.

18  A.  I recommended one that my audiologist had found.

19  Q.  You identify your audiologist in here and said she'd be

20  happy to help in ordering and education on how to use it,

21  correct?

22  A.  Yes.

23        MS. BALUS:  Your Honor, may I approach the witness?

24  Exhibit 210.  This is not in evidence.

25        THE COURT:  What is the number for identification

1    purposes?

2              MS. BALUS:  210.

3              THE COURT:  And you may approach.

4              MS. BALUS:  Thank you.

5    BY MR. MOORE:

6    Q.   Mr. Argenyi, do you recognize Exhibit 210?

7    A.   I do.

8    Q.   And what do you recognize this as?

9    A.   I recognize it as the FM system that I identified and

10   gave the information to Dr. Kavan.

11   Q.   So these are e-mails you exchanged with Dr. Kavan

12   regarding the specific FM system that would work with your

13   cochlear implant?

14   A.   Correct.

15             MR. MOORE:  At this time, your Honor, I would like to

16   offer Exhibit 210.

17             MS. VARGAS:  No objection.

18             THE COURT:  Exhibit 210 is received.

19   BY MR. MOORE:

20   Q.   And it appears that Dr. Kavan sent you an e-mail on

21   July 29th indicating that they had looked for equipment but

22   were wondering if you could give the details on what you would

23   need.

24             MR. MOORE:  Then if you would enlarge this portion,

25   Kris, the e-mail -- from here down.

1     BY MR. MOORE:

2     Q.   Now, it indicates there that you were out of the country

3     at that point; is that right?

4     A.   That's correct.

5     Q.   And -- but then you identify the specific FM system that

6     would work with your cochlear implant, correct?

7     A.   Correct.

8     Q.   And you also give the name of your audiologist as well as

9     the contact information for the Phonak representative to get

10    more information to Creighton.

11    A.   Correct.

12    Q.   After Creighton received this, they installed the FM

13    system for you, correct?

14    A.   Yes.

15    Q.   And they purchased the FM system that you identified,

16    right?

17    A.   Yes.

18    Q.   And that was specifically purchased for you as an

19    accommodation, correct?

20    A.   Correct.

21    Q.   Again in this e-mail you're not indicating that you don't

22    believe the accommodation is -- that you don't believe the

23    accommodation is adequate, you're not saying that FM system

24    won't work, correct?

25    A.   Correct.

1    Q.   After you sent this e-mail but before you started class,

2    you contacted a lawyer, correct?

3    A.   Yes.

4    Q.   And after you contacted that lawyer, your lawyer

5    contacted Creighton University, correct?

6    A.   Yes.

7    Q.   And your lawyer asked for a meeting with Creighton to

8    discuss the accommodations you requested, correct?

9    A.   Uh-huh, that's right.

10   Q.   At that point, you believed because you were not getting

11   everything you demanded in your April e-mail you weren't going

12   to get effective communication.

13   A.   I'm sorry, can you restate?

14   Q.   At that point, before classes started when you called a

15   lawyer and the lawyer set up the meeting, you believed at that

16   point if you didn't get everything that you asked for in your

17   April e-mail, you wouldn't be receiving effective

18   communication.

19   A.   I didn't -- I had expressed my concerns and I was still

20   concerned.

21   Q.   So concerned that you believed you needed to call a

22   lawyer, correct?

23   A.   I thought that might be okay.

24   Q.   At that point you believed you were entitled to

25   everything you requested in your April e-mail.

1    A.    I didn't know what entitlement would be.

2    Q.    Do you believe you needed it?

3    A.    I did.

4    Q.    Do you believe the law required it?

5    A.    I did.

6    Q.    So you believed you were entitled to it.

7    A.    If that's what that means.

8    Q.    And that was even before your first class started in

9    medical school, correct?

10   A.    Yes.

11   Q.    Now, the meeting that your lawyer asked for happened two

12   days before class started, right?

13   A.    It was close.

14   Q.    Around two days.

15   A.    Around it.

16   Q.    And you explained to the jury on direct examination that

17   it was Dr. Kavan, Wade Pearson, Amy Bones from Creighton, and

18   Dianne DeLair and you.  Is that what you said?

19   A.    That's what I said.

20   Q.    But there was another person there.

21   A.    I believe there was another person from the Nebraska

22   Advocacy Services.

23   Q.    You also had an advocate there, right?

24   A.    Yes.

25   Q.    So you had Dianne DeLair, your lawyer, and another

1    advocate, not just you and Dianne DeLair.

2    A.   Right.

3    Q.   At that meeting your lawyer said Creighton must provide

4    the accommodations that Mr. Argenyi requested in his April

5    e-mail, didn't they?

6    A.   If I recall, yes.

7    Q.   And you made clear -- you and your lawyer and your

8    advocate made clear that if you didn't get everything that you

9    demanded in that April e-mail, that you wouldn't receive

10   effective communication.

11   A.   It would have not been effective.

12   Q.   So at that point, no matter what would have happened from

13   that point, no matter what would have happened, if you didn't

14   get what you wanted in that April e-mail, you weren't going to

15   receive effective communication.

16   A.   It would not be effective.

17   Q.   From that day until today in court, you haven't changed

18   your opinion, right?

19   A.   Right.

20   Q.   Do you believe -- well, let me withdraw that question.

21        Let me ask you this:  When you get your lawyers and you

22   bring your advocate in and you demand what you originally

23   demanded without even trying the accommodations that Creighton

24   offered, that's not a wholehearted try, is it?

25   A.   It is a wholehearted try.

1    Q.    That's a wholehearted try?

2    A.    Yes, it is.

3    Q.    You had a smile there.  You don't believe that's a

4    wholehearted try, do you?

5    A.    I do believe it is.

6    Q.    All right, sir.  At that meeting Dr. Kavan and Wade

7    Pearson indicated they believed the accommodations offered by

8    the medical school at that time would provide effective

9    communication and at that point that's what they were going to

10   offer, right?

11   A.    Correct.

12   Q.    So you started school with those accommodations.

13   A.    Right.

14   Q.    You had an FM system.

15   A.    Yes.

16   Q.    You used note-takers.

17   A.    Right.

18   Q.    You had the opportunity to get a note-taker that

19   Creighton would -- would pay for as well.

20   A.    Correct.

21   Q.    But you didn't take them up on that opportunity.

22   A.    Correct.

23   Q.    They wanted you to sit in the front row, right, of the

24   lectures?

25   A.    Yes.

1    Q.   And just so I understand, before class started, you were

2    able to look at the PowerPoints and review the PowerPoints and

3    study them before you went to class.

4    A.   That's correct.

5    Q.   Now, at that meeting, two days before you began medical

6    school, around there, you didn't have an interpreter there,

7    did you?

8    A.   That's correct.

9    Q.   You didn't have CART, did you?

10   A.   That's right.

11   Q.   You didn't bring any accommodations, correct?

12   A.   That's right.

13   Q.   So you started your first year with all the

14   accommodations that Creighton was providing to you.  And I

15   think you indicated that you were struggling; is that right?

16   A.   Uh-huh; that's right.

17   Q.   Let's look at Exhibit 9.  That's already in evidence and

18   I think we can bring it up on the screen.  Now, this is the

19   letter -- excuse me, this is the e-mail that you sent to

20   Dr. Kavan on September 1st, correct, after you began law

21   school -- medical school?  I said it again.

22   A.   That's right.

23   Q.   And you'd been in class approximately two weeks.

24   A.   We started -- we had orientation the week before the

25   17th, so probably about three weeks.

1    Q.   But was the -- was it the first week of class or did you

2    have some orientation in there?

3    A.   We had some orientation before the first week of class.

4    Q.   You had some orientation and then started class.

5    A.   Right.

6    Q.   So let's split the difference.  Let's say two and a half

7    weeks; is that fair?

8    A.   Yeah.

9    Q.   I'd like to take a look at this exhibit one paragraph at

10   a time.

11        Let's take a look at the first paragraph starting with

12   "at this time".

13        In the first paragraph you say, "At this time I need to

14   inform you that the accommodations being provided are

15   inadequate and would like to formally request the

16   accommodations as outlined in my April 21st letter and at the

17   August 12th meeting."  You see that?

18   A.   Yes.

19   Q.   So those were the same things that you asked for in the

20   meeting with your lawyers present, correct?

21   A.   Yes.

22   Q.   That you had already determined at that point were the

23   only way you were going to have effective communication.

24   A.   Yes.

25   Q.   So you're just repeating what you said in that meeting on

1    August 12th, right?

2    A.   Uh-huh, that's right.

3    Q.   Now, let's look at the second paragraph.  It starts out

4    by saying:  The accommodations are inadequate as evidenced by

5    the level of stress and fatigue I'm experiencing, as well as

6    the amount of information I am missing.  I am missing on

7    average a decent chunk of lectures.  Even when I'm able to

8    follow the lecture, the intensity of listening to lecturers

9    causes fatigue where I am unable to function properly for the

10   rest of the day, significantly impacting my ability to study.

11   I am also unable to follow conversations effectively any time

12   my [sic] classmates ask questions or there is full class

13   discussion.

14       I think you described your first few weeks or your first

15   year of medical school kind of like I described it in the

16   opening statement.  You said it's like trying to take a drink

17   out of a fire hydrant.  Is that what you said?

18   A.   Yes, it's like that.

19   Q.   So there's a tremendous amount of information coming at

20   all first year medical students, right?

21   A.   Yes.  Everybody said it's like drinking from a fire hose

22   with a straw.  For me it was like drinking from a fire hose

23   with one of those coffee stirrers.

24   Q.   And you believe that the stress and fatigue you were

25   experiencing had to be because you didn't have your

1    accommodations.

2    A.    Absolutely.

3    Q.    Had you been in medical school before?

4    A.    No.

5    Q.    And is it fair for me to say that this was the most

6    challenging academic time of your life regardless of whether

7    you had accommodations or not?

8    A.    Yes.

9    Q.    Looking at that last sentence -- well, let me ask you

10   this:  Did you expect to suffer from stress and fatigue going

11   to medical school?

12   A.    Not like this.

13   Q.    You did, didn't you?  You didn't expect that?

14   A.    No.

15   Q.    You didn't -- you thought you'd just have no stress,

16   fatigue, you'd go right through; is that what you're --

17   A.    No.  That was nothing like I'd experienced.

18   Q.    In the last sentence, you say:  I'm unable to follow the

19   conversations effectively any time classmates ask questions or

20   there is a full class discussion.

21        And is that -- why is that?  What was causing that?

22   A.    Because I would not be able to see the people who were

23   speaking or lip-read them.

24   Q.    You talk a lot about a bouncing ball.  That's the

25   analysis you've been using.  And I think we've all played with

1   our kids with a bouncing ball.  And as you get older, you have

2   trouble keeping up with your kids.  You ask them to stop

3   bouncing the ball for a minute so I can catch up.

4        Did you ever ask your professor to repeat the questions

5   that the students asked?

6   A.   I did.

7   Q.   And they ignored you?

8   A.   Yeah.  They didn't ignore me but it didn't stay

9   consistent.

10  Q.   Did you remind them when they didn't repeat the

11  questions?

12  A.   Yes.

13  Q.   Are you telling the jury they ignored you when you asked

14  this?

15  A.   I'm saying that they teach the way that they do.  It's

16  difficult for them to remember to ask you to do that every

17  time.

18  Q.   Have you ever seen at conferences when speakers are

19  speaking they ask speakers to repeat the questions?  Have you

20  seen that?

21  A.   I've seen that.

22  Q.   So in that large setting, did you have a problem with

23  reminding your professors to repeat the questions the students

24  were asking?

25  A.   It wasn't consistent.

1    Q.   That's not what I asked.  I asked did you believe you

2    should not have had to ask the professors to repeat the

3    questions?

4    A.   That's different from what you asked before.

5    Q.   I'll ask you to --

6    A.   I'm not sure I understand the question.

7    Q.   Okay.  Did you believe you should not have to ask

8    professors to repeat the question?  Did you believe that was

9    not your role?

10   A.   No.

11   Q.   So you believed that that was your role.

12   A.   I believe it's somewhere in between.

13   Q.   So am I to understand that you were unable to follow your

14   classmates because the professors would not repeat the

15   questions after you asked them to do that?

16   A.   No, because some of them I could not speech read.

17   Q.   The professors?

18   A.   Right.

19   Q.   What you're saying is you couldn't understand your

20   professors so they would repeat the questions but you didn't

21   understand them because you couldn't understand the professor.

22   A.   I couldn't -- I couldn't understand everyone in the class

23   100 percent.

24   Q.   100 percent.

25   A.   Right.

1    Q.   Sir, do you believe you could retain 100 percent of the

2    information that was given to you in medical school?

3    A.   Retaining is not the same as understanding it.

4    Q.   I understand that.  But I'm asking you do you think you

5    could retain 100 percent of the information?

6    A.   No.

7    Q.   Let's take a look at the second paragraph if we could.

8    I'm sorry, the third.

9        Do you think you can absorb every single bit of

10   information from a class?

11   A.   No.

12   Q.   You didn't tell me that in your deposition?

13   A.   I'm sorry?

14   Q.   Do you recall that I took your deposition?

15   A.   Yes.

16   Q.   And was your lawyer there?

17   A.   Yes.

18   Q.   And your lawyer was making objections when I was asking

19   questions?

20   A.   Yeah.

21   Q.   Okay.  I'd like to look at page 182, line 16 to 21 of the

22   deposition that I took of you.  I asked you:  You can't

23   possibly absorb every single bit of information from class,

24   can you?

25       You answered:  Some of the students seem to be able to do

ARGENYI - CROSS                                                      425

1    it.

2          Can you?

3          And you said:  If I had access to the information.

4          Do you see that?

5    A.   I see that.

6    Q.   Do you -- you appear to be saying there that if you had

7    access to that information that you could absorb every single

8    bit of information.  Is that what your expectation is?

9    A.   My expectation is not that I would absorb and know every

10   piece of information but I would have access to all of that

11   information and, hence, the potential.

12   Q.   Now, looking back at Exhibit 9 again, the third

13   paragraph, you say:  I'm relying on the Note Service which,

14   while very helpful, has been insufficient and has me at

15   minimum of one day behind my peers in studying as I have to

16   wait for the notes to come out the next day or even after a

17   full weekend which is critical.  This was especially

18   noticeable when at the last MDQI I missed questions -- excuse

19   me, the last MDQ I missed questions because it covered

20   materials *[sic]* that had not yet been covered by the Note

21   Service and possibly *[sic]* left out notes from the earlier

22   lectures.

23         Do you see that?

24   A.   I see that.

25   Q.   So are you saying that the only questions you missed on

1   the MDQ are the ones that weren't in the notes?

2   A.   No.  I also said possibly left out of the notes.

3   Q.   So they could have been left out, they could have been

4   in, you just don't know.

5   A.   We were not allowed to write down what the questions

6   were, so I couldn't confirm.

7   Q.   But you seem -- even though you can't remember that and

8   you weren't allowed to write down the questions, you seem to

9   be saying that you missed questions on the MDQ because of lack

10  of the notes from the note-taker.

11  A.   Yes.

12  Q.   Now, you also say:  I'm also suffering in anatomy lab due

13  to the high noise level.  The FM system only amplifies the

14  general noise level, as well as quiet *[sic]* voices,

15  essentially negating any potential value in amplification,

16  okay?  Did you say that?

17  A.   Yes.

18  Q.   You say, "Finally, the videos (Unnatural Causes) in

19  Ethics and the dissection videos in anatomy are inaccessible

20  because they are not closed-captioned and I have no

21  interpreter to relay the information."  Do you see that?

22  A.   I do.

23  Q.   And I believe you testified on direct examination that

24  Dr. Kavan failed to respond to this e-mail.  Was that your

25  testimony, that he was -- failed to respond to it for three

1    weeks; is that correct?

2              MS. VARGAS:  Objection, your Honor.  That's not what

3    the testimony was.

4              THE COURT:  The witness may clarify what his

5    testimony was.

6    A.   I testified it was sometime -- it was not that week or

7    the week after but 15 days later.

8    BY MR. MOORE:

9    Q.   I guess you were claiming that Dr. Kavan didn't do

10   anything for about two weeks.  Is that what you're saying?

11   A.   I'm saying I didn't get a response for two weeks.

12   Q.   Your professor in anatomy lab was Dr. Quinn, correct?

13   A.   Yes.

14   Q.   After you sent out this e-mail, Dr. Quinn indicated you

15   should move to the closest lab table as close to him as

16   possible, right?

17   A.   I'm sorry, I do not know what you're talking about.

18   Q.   So Dr. Quinn never told you that Creighton was offering

19   you the ability to go to a lab table as close to him as

20   possible?

21   A.   What lab table is he talking about?  I was assigned to a

22   group with a body so, I mean, there's --

23   Q.   In the middle.  There's different rooms, right?

24   A.   Oh, yes, if there was a live demonstration, yes.

25   Q.   Right.  And if there was a live demonstration, Dr. Quinn

1   would be in the middle, correct?

2   A.   Correct.

3   Q.   So the response to that request was to move you to the

4   middle so when there was a live demonstration, you would be

5   close to the professor to be able to use visual cues like

6   reading lips, context, those things, correct?

7   A.   Correct.

8   Q.   So that was responded to, wasn't it?

9   A.   What do you mean "responded to"?

10  Q.   You were offered that in response to this e-mail, weren't

11  you?

12  A.   I'm sorry, what are you looking at?

13  Q.   We were looking at Exhibit 9, the e-mail that you sent on

14  September 1st.  And we're specifically referring to the

15  difficulty you said that you were having in anatomy lab.  And

16  you said that Dr. Kavan didn't respond for almost two weeks.

17       And what I'm saying is Dr. Kavan did respond because

18  Dr. Quinn, in response to that, offered you to move into the

19  middle room closest to him so you could get lip-reading and

20  the other visual cues, correct?

21  A.   They did offer that.  I never understood the reason why.

22  Q.   Well, you sent this e-mail, didn't you?

23  A.   Yes.

24  Q.   You were having difficulty you said, correct?

25  A.   Yes.

1    Q.   And then afterwards they made this offer, correct?

2    A.   I was having trouble in the general room as well.

3    Q.   In the general room?

4    A.   Yes.  The main room --

5    Q.   What I'm saying -- I don't mean to interrupt.  I

6    apologize, sir.  What I'm asking is you said you didn't know

7    why Dr. Quinn offered for you to go in the middle room and

8    what I'm saying is you sent this e-mail, Dr. Quinn made the

9    offer, doesn't it make sense that it was in response to your

10   e-mail?

11   A.   It makes sense.

12   Q.   Okay.  Now, you also mentioned some closed-captioning

13   issues, some of the videos were not closed-captioned.

14   A.   Correct.

15   Q.   There was a response to that as well.

16   A.   Yes, there was.

17   Q.   So there was a response to that, there was a response to

18   the anatomy lab concern.  The only delay as I understand of

19   that two-week period was regarding the note service, right?

20   A.   I'm not sure when I had access to the closed-captioning

21   in the videos used in the ethics course.

22   Q.   Well, they responded to that concern by trying to get

23   those closed-captioned, correct?

24   A.   I talked to Dr. Rentmeester.

25   Q.   And Dr. Rentmeester was working on that.

1    A.    Yes.

2    Q.    Although it didn't come through Dr. Kavan,

3    Dr. Rentmeester was trying to address your concern, right?

4    A.    I'm sorry, I'm not clear on the text.

5          COURT REPORTER:  Could you repeat, please?

6    BY MR. MOORE:

7    Q.    Sure.  So even though the response didn't come from

8    Dr. Kavan, Dr. Rentmeester was addressing your concern.

9    A.    Yes, because I had talked with her.

10   Q.    Okay.  So when we look at -- well, let's -- let me ask

11   you a few other questions.  Those were the only specific three

12   things that you referenced you were having trouble with in

13   this e-mail, correct?

14         MS. VARGAS:  Objection, your Honor.  Could we show

15   the witness the entire exhibit rather than an exhibit --

16         MR. MOORE:  I think he has a copy up there.

17         MS. VARGAS:  If he does, that's fine.

18         THE COURT:  Put the whole thing up on the screen.

19         MR. MOORE:  Sure.  Go ahead.

20      Can you enlarge the e-mail, the entire e-mail from top to

21   bottom?  Thank you.

22   BY MR. MOORE:

23   Q.    So as I understand the e-mail, you talk in the first

24   paragraph about your stress and fatigue generally, and then in

25   the next paragraph, you talk about those three concerns, okay?

1    But you don't -- you don't mention any other specific concerns

2    in that e-mail, do you?

3    A.   Yes, I do.

4    Q.   And what do you mention?

5    A.   Meaningful participation and independence as a student.

6    Q.   That's pretty broad, isn't it?

7    A.   I don't know if that's broad to you.

8    Q.   Meaningful participation and independence as a student?

9    A.   I knew the accommodations that were offered would not

10   allow me to participate.

11   Q.   Okay.  But what I'm talking about is you give three of

12   examples of the problems you were having.  Did you not want to

13   include as much information in this e-mail as possible?  Did

14   you want to hold stuff back?

15   A.   No.

16   Q.   Okay.  So you wanted to make sure Creighton knew why you

17   were struggling, correct?

18   A.   Right.

19   Q.   Now, as I read this e-mail, the only reference to the FM

20   system is that you were suffering in anatomy lab because of

21   the high noise level, right?

22   A.   Correct.

23   Q.   And in the anatomy lab, you have a lot of noise going on,

24   am I right, like sawing and things like that?

25   A.   Right.

1   Q.   Which you wouldn't have in a lecture, right?

2   A.   You still have background noise, just not high.

3   Q.   There's no, like, cadavers in a lecture hall, right, in

4   the -- you're not cutting bones and things like that, right?

5   A.   Right.

6   Q.   Now, I believe on your direct examination you said that

7   it was -- you were so -- well, you were not getting effective

8   communication in small groups and it was so bad that you

9   stopped going to that class.  Was that in a small group or

10   that was in a lecture that you stopped going to class?

11   A.   I testified that one of my small groups was led by a

12   professor whose accent was so strong that I did not -- I could

13   not understand his lecture so I did not attend some of them.

14   Q.   Are small groups mandatory?

15   A.   Yes.

16   Q.   No one said anything when you skipped class even though

17   it was mandatory.

18   A.   Small groups are mandatory.  The lectures are not

19   mandatory.  I'm talking about the lectures.

20   Q.   Okay.  I'm sorry, I'm confused.  I apologize, sir.  So

21   you stopped going to a lecture or you stopped going to a small

22   group?

23   A.   I stopped going to a lecture when it was that specific

24   professor because I could not understand him.

25   Q.   Okay.  So even though you stopped going to class it was

1    so bad, you didn't include that in your September 1st e-mail,

2    right?

3    A.   Let me read the e-mail.  I described that I was missing a

4    decent chunk of the lectures.

5    Q.   I understand that.  But you don't mention anything about

6    a class that you were -- decided not to go to anymore because

7    you weren't receiving effective communication.  There's

8    nothing in that e-mail about that, right?

9    A.   I don't remember when I had that specific professor for

10   that so...

11   Q.   So what?  You don't remember if it was before or after

12   September 1st?

13   A.   Right.

14   Q.   Going back to the lab, you were also -- your team was

15   assigned a specific teaching assistant, correct, Brianna

16   Scott?

17   A.   Correct.

18   Q.   And that again was done by Dr. Quinn after your

19   September 1st e-mail, correct?

20   A.   I believe it was about that time, yes.

21   Q.   And did Brianna Scott indicate she was there to provide

22   you additional assistance?

23   A.   She did.  She was already assigned to our class; she was

24   asked to specifically stay there.

25   Q.   Right.  So she was again assigned specifically to your

1    group to assist you, correct?

2    A.   Right.

3    Q.   So that's another way Dr. Kavan responded to your e-mail,

4    right?

5    A.   Right.

6    Q.   Now, the only place you refer to an FM system is in the

7    lab.  You do not anywhere in this e-mail indicate the FM

8    system has not been working in a lecture, right?

9    A.   Right.

10   Q.   Now, the closed-captioning that you refer to in this

11   e-mail, closed-captioning is the words that appear on the

12   bottom of a video; is that right?

13   A.   Correct.

14   Q.   Closed-captioning is not real-time transcription, right?

15   A.   Right.  Because I was referring to --

16   Q.   I just want to understand.  Closed-captioning is

17   different than CART.

18   A.   In this e-mail, yes.

19   Q.   In some other e-mail it's not?

20   A.   When I wrote this, yes.

21   Q.   But that's your understanding, that closed-captioning is

22   different than CART, right?

23   A.   Yes.

24   Q.   I mean, otherwise you wouldn't have put that in this

25   e-mail, right?

1    A.   Right.

2    Q.   Now, both you and your mother in your direct examination

3    testimony said that in the first few weeks that you were close

4    to failing.  Am I right?  Did you say that?

5              MS. VARGAS:  Objection, your Honor, that's not the

6    witness's testimony.

7              THE COURT:  Then the witness may clarify that that is

8    not his testimony.  You may respond.

9    A.   I did not say that I was failing.  I said that I was

10   struggling.

11   BY MR. MOORE:

12   Q.   But you have said -- in fact, you did say in your

13   deposition that you were close to failing.  Didn't you say

14   that?

15   A.   With the amount of information that I was missing, I

16   would have been.

17   Q.   So are you telling the jury that in the first few weeks

18   you were close to failing without the accommodations that you

19   demanded?

20   A.   No, I'm saying that I did not have access to the

21   information, and since the concepts build on each other

22   through the semester, I would have eventually had so many gaps

23   in my knowledge that I would have not been able to do well.

24   Q.   That's not what you said, is it?  You said you were

25   failing in the first few weeks?

 1          MS. VARGAS:  Objection, that's not what the witness

 2     testified.

 3          MR. MOORE:  Okay.  I'll withdraw the question right

 4     now, your Honor.

 5     BY MR. MOORE:

 6     Q.   I'd like to refer you again to your deposition,

 7     Mr. Argenyi.  Again you were under oath at this deposition,

 8     correct?

 9     A.   Yes.

10     Q.   And your lawyers were there protecting your interests,

11     correct?

12     A.   Correct.

13     Q.   And I'm going to direct your attention to your

14     deposition, page 83-21 through 84-4.  I asked you:

15          Question:  Do you believe that without CART in the

16     lecture that you could have successfully completed your first

17     year of medical school?

18          Answer:  I absolutely believe I would have failed.

19          Question:  Why?

20          Answer:  Because I was close enough in the first few

21     weeks without it.

22          Question:  You were close to failing the first few weeks?

23          Answer: Yes.

24          Question:  And how do you know that?

25          Answer:  Because my test scores were going down each week

 1    and people were talking about concepts and I had no idea what

 2    they were.

 3         Question:  Okay.

 4              MR. MOORE:  Take that off, Kris.

 5    BY MR. MOORE:

 6    Q.   So indeed, you said you were close to failing in the

 7    first few weeks of medical school, right?

 8              MS. VARGAS:  Objection, that is not what his

 9    testimony was.

10              THE COURT:  Well, and the witness may respond and

11    clarify what his testimony in fact is.  You may respond.

12    A.   I said that I was struggling with accessing the

13    information and because of that, I had gaps in my knowledge.

14              MR. MOORE:  Kris, can you put that back up again?

15    Second page.

16    BY MR. MOORE:

17    Q.   Again you say there:

18         Answer:  Because I was close enough in the first few

19    weeks without it.

20         Question:  You were close to failing the first few weeks?

21         Answer:  Yes.

22         Did you say that?

23    A.   I said that there.

24    Q.   You said that there; is that what you just said?

25    A.   Yes.

1    Q.    Are you saying something different now?

2    A.    No.  I'm saying that I was struggling with accessing the

3    information.

4    Q.    Okay.  Now, before -- well, let me ask you this:  On your

5    direct examination I believe you said you were having a

6    particular problem in anatomy without all the accommodations

7    that you requested.  Is that right?

8    A.    I'm sorry, clarify.

9    Q.    Yeah.  Did you testify on your direct examination that

10   you were having particular problems in your anatomy class due

11   to the lack of accommodations?

12   A.    Yes.

13   Q.    Now, am I correct that you took both some quizzes which

14   are called -- I believe it's multidisciplinary quizzes and

15   examinations with the accommodations that Creighton was

16   providing before you secured your own CART and interpreters?

17   A.    Correct.

18   Q.    Just so we clarify it for the jury, as I recall, you

19   started providing your own interpreters and CART on

20   September 28th, right?

21   A.    Yeah.

22   Q.    So before September 28th, I believe you had a written

23   anatomy exam, anatomy practical exam, and just -- you had

24   those two but I also want to clarify, what is an MDQ?

25   A.    An MDQ is a multidisciplinary quiz.  I believe there was

```
 1   one every week or every two weeks that would cover different
 2   topics from different classes.
 3   Q.   So, for example, in anatomy and molecular and cellular
 4   biology, you had two MDQs before September 28th; is that
 5   right?
 6   A.   Yeah.
 7   Q.   And you had one molecular and cell biology written exam,
 8   correct?
 9   A.   Yes.
10   Q.   Now, on your anatomy exam again that you took with the
11   accommodations offered by Creighton where you said you were
12   having a particular problem, you got an 88 percent on your
13   first written exam; is that correct?
14   A.   If that's what the record shows.  I don't remember my
15   grades.
16   Q.   I'm going to go ahead and bring an exhibit up --
17        MS. VARGAS:  Not for the jury, please.  Your Honor, I
18   have an objection.
19        THE COURT:  Are you requesting a sidebar?
20        MS. VARGAS:  Yes, please.
21        THE COURT:  All right.
22   (Bench conference on the record.)
23        MS. VARGAS:  Mr. Moore said he was going to bring up
24   an exhibit and I did not want an exhibit brought up before the
25   jury before proper foundation was established.
```

```
 1              MR. MOORE:  We couldn't deal --

 2              MS. VARGAS:  Should we deal with it?

 3              MR. MOORE:  Right now I'm just going to use it to

 4     refresh his recollection.  I haven't offered it.  I don't know

 5     if I'm going to offer it if you want to object to it.

 6              THE COURT:  I have no idea what exhibit you're

 7     talking about.

 8              MS. VARGAS:  To the extent he's going to offer

 9     Defendant's Exhibit 205, plaintiff has objection to providing

10     this evidence which is obviously altered by unknown persons,

11     which is not maintained in any discernible way, which has

12     portions of this exhibit where some of the information is

13     literally cut off; many of these are entirely undated.  All of

14     the information isn't even there.

15          And on top of that, the relevance of Mr. Argenyi's grades

16     as they're demonstrated here for the time when he was using

17     accommodations that he paid for himself are hardly relevant to

18     the question of whether he understood what was going on in

19     class or not.

20              MR. MOORE:  We're talking about the ones before.

21              MS. VARGAS:  Do you have dates?  There are no dates

22     on here.

23              MR. MOORE:  I'm using it to refresh his recollection.

24              MS. VARGAS:  He testified he didn't know what his

25     grades were.
```

```
 1              MR. MOORE:  That's why I intend to refresh his

 2      recollection, your Honor.

 3              MS. VARGAS:  How is this going to refresh his

 4      recollection when it's undated and altered?

 5              MR. MOORE:  I haven't offered it, yet.

 6              THE COURT:  Obviously, it cannot be shown to the jury

 7      so when you --

 8              MR. MOORE:  Sure.

 9              THE COURT:  -- when you talked about bringing up an

10      exhibit, I thought you meant bringing it up to the witness, to

11      the plaintiff.

12              MR. MOORE:  Uh-huh.

13              THE COURT:  And you can do that either physically or

14      do it by showing it to him alone and we'll block out the jury

15      monitors so that they can't see it.  You can ask him and if it

16      refreshes his memory, fine; if not, it doesn't.

17          I guess while we're here I'll mention on the grades

18      issue, I have not precluded the defendant from introducing

19      evidence of the plaintiff's grades.  And I know that goes to

20      the issue of whether certain accommodations were necessary or

21      not necessary.  I appreciate the point you're raising about

22      certain grades coming about after he provided his own

23      accommodations so the relevance of that will be something we

24      can debate.

25              MS. VARGAS:  Your Honor, I just want to be clear.  I
```

1    also have some serious objection to the state of these records

2    that he is supposedly offering to the extent they are visibly

3    altered with things handwritten on them, with dates removed,

4    it has comments of professors literally cut off in the middle

5    of the comment, in the middle of a word.  When this evidence

6    is obviously unreliable, it should not be presented to a jury,

7    especially when there's questionable relevance.

8              THE COURT:  Right now there is no offer and it will

9    not be shown to the jury at this juncture but counsel may use

10   it in an attempt to refresh the witness's memory.

11        (End of bench conference.)

12             MR. MOORE:  May I have a moment, your Honor?

13             MS. BALUS:  May I approach, your Honor?

14             THE COURT:  Yes, you may.

15             MR. MOORE:  May I continue, your Honor?

16             THE COURT:  You may.

17             MR. MOORE:  Thank you.

18   BY MR. MOORE:

19   Q.   Mr. Argenyi, you've just been handed a document.  And

20   does this document reflect -- let's look at the first page

21   which has Creighton 387 at the bottom.

22        Does this document, the first page reflect your exams --

23             MS. VARGAS:  Objection, your Honor, I understood he

24   was going to see if he could refresh his recollection of his

25   grades.  That doesn't appear to be the direction he's heading.

 1              THE COURT:  Well, first, for identification purposes,

 2      does the document have a number?  Does it have an exhibit

 3      number?

 4              MS. BALUS:  It's part of 205.

 5              MR. MOORE:  Part of 205.  If it would help, I can

 6      tell you what pages it is in 205.

 7              THE COURT:  That might be good to be sure we have a

 8      clear record of what the witness is being asked to look at.

 9              MR. MOORE:  It is the portion of 205 -- it's made up

10      of a document which on the bottom right-hand corner has

11      Creighton 387, the next page is Creighton 388, the next is

12      Creighton 382, and the final page is Creighton 383.

13              THE COURT:  And you are showing plaintiff all four of

14      those pages; is that correct?

15              MR. MOORE:  That's correct, your Honor.

16              THE COURT:  All right.  The objection is overruled.

17      The witness may respond as to whether or not he can identify

18      the document.

19              THE WITNESS:  I haven't seen this document.

20              MR. MOORE:  Okay.

21      BY MR. MOORE:

22      Q.  Do you get copies of your grades, sir?

23      A.  We get copies of the grades but I don't remember the

24      format that it looks like.

25      Q.  And in what format do you get copies of your grades?

1    A.   I'm sorry?

2    Q.   In what format do you get copies of your grades?  Is it

3    by e-mail?  Is it on a computer?  Is it a hard copy?

4    A.   We got e-mails.

5    Q.   Did you save those e-mails?

6    A.   I believe I did for a while, but they're on the Creighton

7    address.

8    Q.   Have they been deleted?

9    A.   I don't have access to that.  I don't have access to it

10   from Creighton.

11   Q.   You don't have access to them?  Did you provide them --

12   did you provide them in this litigation?

13   A.   I was not asked to do that.

14   Q.   Do you have any reason to question that on your 9-21

15   written anatomy exam that you received an 88 percent?

16           MS. VARGAS:  Objection, your Honor.

17           THE COURT:  Sustained.

18           MR. MOORE:  Well --  You can put the document down.

19   BY MR. MOORE:

20   Q.   You recall you took a written anatomy exam on or around

21   9-21 before you secured CART and interpreters.  You recall

22   that, don't you?

23   A.   I don't.

24   Q.   You don't recall?

25           Do you recall how you did in anatomy on that first

1   written examination?

2   A.   I recall it went pretty well because it was a lot of

3   review.

4   Q.   A lot of review, so you weren't learning new material.

5   A.   I wasn't learning any -- I'm sorry, I was learning new

6   material but a lot of the content was also a repeat from

7   previous years.

8   Q.   So you'd had anatomy classes before this?

9   A.   I did.

10  Q.   And where did you take these anatomy classes?

11  A.   I took them at North Seattle Community College.

12  Q.   North Seattle Community College.  You took anatomy.  Was

13  that in medical school?

14  A.   No.

15  Q.   So are you saying that the anatomy class at Seattle

16  Community College is exactly like the anatomy class at

17  Creighton University School of Medicine?

18  A.   No.  I said a lot of the content was review, not all of

19  it.

20  Q.   So in anatomy you weren't close to failing.  Is that what

21  you're saying?

22  A.   I did not fail that exam, no.

23  Q.   You did pretty well on that exam.

24  A.   Yeah.

25  Q.   And isn't it true that on the exam that you took -- the

1    first exam you took which was before September 28th, that was

2    the highest score you got on any of your anatomy written exams

3    that semester; isn't that true?

4    A.   Yes.

5    Q.   And on your anatomy practical, you took an anatomy

6    practical before September 28 before you secured your own

7    interpreters and CART, correct?

8    A.   Yes, if that's what the letter indicated.

9    Q.   You received over an 88 percent on that; is that correct?

10           MS. VARGAS:  Objection, your Honor, I don't know what

11   the relevance of this is.  And to the extent the witness has

12   memory of this, I think he ought to be asked.

13           THE COURT:  Well, as to relevance, overruled.  It is

14   cross-examination.  And the phrasing of the question is not

15   objectionable.  The witness may answer if he recalls.

16   BY MR. MOORE:

17   Q.   Do you recall getting over an 88 percent on your first

18   anatomy practical?

19   A.   I don't recall what score I got.

20   Q.   Somewhere in that range, right?

21   A.   Again there was a lot of review and it was also different

22   parts of the body that -- the examination was on different

23   parts of the body than the other two examinations that

24   semester.

25   Q.   But again in your deposition, even though you're saying

1    that it was a lot of review, that it was easy, in your

2    deposition you told me you were close to failing.

3    A.    I was missing information that was given.

4    Q.    And close to failing.

5    A.    I was struggling with accessing the information.

6    Q.    Do you consider 88 percent failing?

7    A.    I consider that is not the performance I could have with

8    equal access.

9    Q.    So you think if you would have had CART and interpreters,

10   your score would have been higher?

11   A.    I don't know about that but I would have had equal

12   access.

13   Q.    And, in fact, isn't it true that that first anatomy

14   practical that you took was before -- again before you got

15   CART and interpreters was much higher than the anatomy

16   practical you took on December 7th where you got a 69 percent?

17   A.    The material was different.

18   Q.    It's the material that was different.

19   A.    Yes.

20   Q.    All right.  And on your anatomy MDQ, you took two of

21   those prior to getting CART and interpreters, correct?

22   A.    If that's what the record shows.

23   Q.    And did you get failing grades on those?

24   A.    I don't recall.

25   Q.    You don't recall?  You wouldn't recall if you got failing

1    grades?

2    A.    Not --  I had quite a few MDQs.

3    Q.    If I said you got a 77 on your August 8 MDQ, do you think

4    that's about right?

5    A.    Possibly.

6    Q.    Okay.  So high 80s in anatomy, 77 on the MDQs and that's

7    with guessing -- I believe you said you were guessing all the

8    time you were --

9          MS. VARGAS:  Objection, your Honor, the witness

10   didn't testify he was guessing on anatomy labs, on anatomy

11   exams.

12         THE COURT:  Please rephrase.

13   BY MR. MOORE:

14   Q.    Did you testify on direct examination you were doing a

15   lot of guessing before you got CART and interpreters?

16   A.    Yes, when I was speechreading.

17   Q.    When you were speechreading and you didn't have CART, you

18   didn't have interpreters, you were doing a lot of guessing --

19   A.    That's fine.

20   Q.    And you still got high 80s on your exams.

21   A.    Correct, because there was a lot of review and I was

22   asking classmates for notes, I was using the note services and

23   asking my friends to make transcripts of the podcasts.

24   Q.    So the note service helped.

25   A.    It helped prepare the documents because I had no other

1    access, right.

2    Q.   You were just saying you were also getting access to the

3    note-takers and that helped -- that's another reason why you

4    got the high 80s.

5    A.   I'm sorry, I'm not following that.

6    Q.   Well, I asked you, you were doing a lot of guessing you

7    said, but then you said, well, I also had access to the

8    note-takers.  Are you saying -- did you say that because that

9    was helpful and that helped you get in the high 80s?

10   A.   The note service helped me fill in the gaps since I did

11   not have equal access in the classroom.

12   Q.   Molecular and cell biology, was that a lot of review and

13   repeating information?

14   A.   It was for the first part.

15   Q.   You had a molecular and cell biology class in the past?

16   A.   I had biochemistry.

17   Q.   Biochemistry.  But did you have molecular and cell

18   biology before?

19   A.   I took biology.  It was explicitly stated at the

20   beginning of the class it was a review of biology and

21   chemistry principles and later in the semester the material

22   will get much harder.

23   Q.   So the fact that -- do you recall taking an exam on

24   September 14th for molecular and cell biology?

25   A.   I recall I probably had an exam sometime.

1   Q.   Do you recall you got an 81 percent on that?

2   A.   I don't recall what I got.

3   Q.   You think that's about right?

4        MS. VARGAS:  The witness testified he doesn't recall.

5   Objection.

6        THE COURT:  Overruled.  He may respond.

7   A.   That's probably about right.

8   BY MR. MOORE:

9   Q.   What about MDQs, did you take any molecular and cell

10  biology MDQs?

11  A.   I believe I would have.

12  Q.   And that would have been before September 28th when you

13  secured interpreters and CART, correct?

14  A.   Correct.

15  Q.   And do you recall taking one on August 28th and getting a

16  78 percent?

17  A.   If that's what the record shows.

18  Q.   You recall taking one on September 25th and getting 79

19  percent?

20  A.   If that's what the record shows.

21  Q.   Those aren't failing grades, are they?

22  A.   No.

23  Q.   So at least with regard to your examinations and quizzes,

24  those don't reflect that you were failing, correct?

25  A.   Right.

1    Q.   Sir, we talked about the letters from Dr. Backous and

2    Stacey Watson earlier that you had submit on your behalf.  Do

3    you recall those letters?

4    A.   I know about those letters, yes.

5    Q.   And in those letters, Dr. Backous and Stacey Watson said

6    that appropriate auxiliary aids would include FM system, CART

7    and interpreters, correct?

8    A.   Correct.

9    Q.   But Dr. Backous and Stacey Watson don't really know what

10   you need in class, correct?

11   A.   Right.

12   Q.   In fact, the only reason those accommodations were in

13   that letter is because you told them that's what you wanted,

14   right?

15   A.   I told them that's what had been effective for me.

16   Q.   Right.  You said this is what's effective for me and they

17   put it in there, right?

18   A.   I was suspect so.

19   Q.   Okay.  So I think you said that they wouldn't know what

20   my accommodations are because they don't manage my

21   accommodations, right?

22   A.   That's right.

23   Q.   So what you're telling this jury is the stuff that's in

24   those letters that I just mentioned is only in that letter

25   because you told them to, they wouldn't know independently.

1    A.    The letter to the office of disabilities services, no.

2    Q.    Right.  So is that a yes?

3    A.    Yes.

4    Q.    So what you're telling this jury is that you told them to

5    put that in there; it wasn't their independent conclusion, and

6    only you know what provides effective communication.

7    A.    That's correct.  I am that person.

8    Q.    I understand that.  I understand that you think and no

9    one else would know, only you would know what's effective.

10   A.    Correct.

11   Q.    Now, wouldn't you agree with me if you told them to put

12   it in there and they didn't independently put it in there,

13   that that's not very reliable, is it?

14   A.    I don't know if I believe that.

15   Q.    You could have put that in your own letter, correct?

16   A.    I'm sorry?

17   Q.    I said you can put that in your own letter, correct?

18   A.    I put what in my own letter?

19   Q.    That you needed CART, interpreters, and an FM system.

20   A.    Yes.

21   Q.    And you just took that from your letter, and said, This

22   is what I've requested, Dr. Backous, Stacey Watson, this is

23   what I think I need, this is what needs to go in your letter.

24   A.    And I said I let them know that's what had been effective

25   for me.

1          THE COURT:  Mr. Moore, as I had mentioned to counsel

2     earlier today, we need to stop at 4:40.

3          So, we will need to take a break in this testimony.  I

4     want to thank the jury for their time and attention so far

5     this week.

6          Don't come in on Monday.  If you come in on Monday, the

7     courtroom will look very different.  It will be filled with

8     different parties and different lawyers because I have

9     sentencings in criminal matters on Monday.

10         Do come on Tuesday morning before 9:00.  In the meantime,

11    keep an open mind, do not discuss the case among yourselves or

12    with anyone else.

13         Enjoy your weekend with your family and your friends, but

14    talk about something other than the case.  And then join us at

15    nine o'clock on Tuesday, and we will continue to hear the

16    evidence.

17         Thank you.  And we are in recess.

18         (Jury out at 4:40 p.m.)

19          THE COURT:  Is there --

20          MS. VARGAS:  Could I have clarification whether

21    Mr. Moore is finished with his cross or whether he continues

22    on Tuesday?

23          MR. MOORE:  I'll continue.

24          THE COURT:  Thank you all very much.  Have a good

25    weekend.

1          MR. MOORE:  Thank you.

2          MS. BALUS:  Thank you, your Honor.

3          MS. VARGAS:  Thank you.

4

5       (Adjourned at 4:41 p.m.)

6

7

8

        I certify that the foregoing is a correct transcript from
9    the record of proceedings in the above-entitled matter.

10

11      _/s Brenda L. Fauber_              7-21-14
        Brenda L. Fauber, RDR, CRR            Date
12

13

14

15

16

17

18

19

20

21

22

23

24

25