```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF NEBRASKA
2


3       MICHAEL S. ARGENYI,           )
                                      )
4               Plaintiff,            )          8:09CV341
                                      )
5           vs.                       )      Omaha, Nebraska
                                      )      August 27, 2013
6       CREIGHTON UNIVERSITY,         )
                                      )
7               Defendant.            )


8


9


10                              VOLUME IV
                        TRANSCRIPT OF PROCEEDINGS
11              BEFORE THE HONORABLE LAURIE SMITH CAMP
            CHIEF UNITED STATES DISTRICT JUDGE AND A JURY
12


13


14


15


16


17


18


19


20      COURT REPORTER:          Ms. Brenda L. Fauber, RDR, CRR
                                 111 S. 18th Plaza
21                               Suite 3122
                                 Omaha, NE 68102
22                               (402) 661-7322


23


24


        Proceedings recorded by mechanical stenography, transcript
25      produced with computer.
```

```
 1                         A-P-P-E-A-R-A-N-C-E-S

 2

       FOR THE PLAINTIFF:          Ms. Mary C. Vargas
 3                                 Mr. Michael S. Stein
                                   Stein Vargas Law Firm
 4                                 P.O. Box 522
                                   Emmitsburg, MD 21727
 5

 6                                 Ms. Dianne D. DeLair
                                   Nebraska Advocacy Services
 7                                 134 South 13th Street
                                   Suite 600
 8                                 Lincoln, NE 68508

 9
                                   Ms. Caroline E. Jackson
10                                 NAD and Advocacy Center
                                   8630 Fenton Street
11                                 Suite 820
                                   Silver Springs, MD 20910
12

13     FOR THE DEFENDANT:          Mr. Scott P. Moore
                                   Ms. Allison D. Balus
14                                 Baird Holm Law Firm
                                   1700 Farnam Street
15                                 Suite 1500
                                   Omaha, NE 68102
16

17

18

19

20

21

22

23

24

25
```

1          (At 9:00 a.m. on August 27, 2013, with counsel for the

2     parties and the plaintiff present, and the jury NOT present,

3     the following proceedings were had:)

4               THE COURT:  Good morning.

5               MS. VARGAS:  Good morning.

6               MR. MOORE:  Good morning, Judge.

7               THE COURT:  I understand that there are some things

8     we need to talk about before the jury comes in.  Who would

9     like to go first?

10               MR. MOORE:  Well, from the defendant, your Honor,

11     Dr. Kavan unfortunately had emergency surgery last night.  He

12     was under a general anesthetic.  He has -- the trooper he is,

13     he says he's going to try to make it this afternoon.  But I've

14     already spoken with plaintiff's counsel and we've agreed he

15     wouldn't be called until tomorrow because he was under general

16     anesthetic within 24 hours.

17               THE COURT:  Seems to be a wise choice.  And thank you

18     for your cooperation.

19               MR. MOORE:  I don't know if that's something that we

20     just let go, that Dr. Kavan isn't here and we have to tell the

21     jury or -- whatever the Court prefers.

22               THE COURT:  The jury doesn't even know that Dr. Kavan

23     is being called at this point.

24               MR. MOORE:  No, I don't think so.

25               THE COURT:  So I don't think we need to say anything

1    to the jury.

2              MR. MOORE:  Okay.

3              THE COURT:  Of course, when we left off at the end of

4    last week, plaintiff was on the stand.  We were in the process

5    of the cross-examination.

6         I am not sure what other witnesses the plaintiff intends

7    to call today.

8              MS. VARGAS:  Well, your Honor, we had intended to

9    call Dr. Kavan immediately after the plaintiff.  But

10   obviously, under the circumstances, as long as we're permitted

11   to conduct direct of him tomorrow when he's back on his feet

12   and fully in charge of himself, then we have no problem with

13   doing that.

14             THE COURT:  Do you have other witnesses?

15             MS. VARGAS:  Yes, we do.  We have, I believe, three

16   other witnesses.  So I do think that the day will be full.

17             THE COURT:  Very good.

18        Is there anything else that we need to talk about before

19   the jury comes in?

20             MS. VARGAS:  I do actually have two more housekeeping

21   type questions.

22        My first question is obviously I think we'd all like the

23   trial to be done by the end of this week.  In the event that's

24   not possible, would your Honor be able to shed some light on

25   what next week's trial schedule might be like with the holiday

1    on Monday.

2         THE COURT:  We will not be here on Monday.  I believe

3    that a number of hearings were scheduled for me on Tuesday

4    because of the fact that we're not available on Monday.  And

5    that's my usual day for pleas and sentencings and other

6    hearings.

7        But, we do not have a trial next week, do we, Ms. Frahm?

8         COURTROOM DEPUTY:  No, Judge.

9         THE COURT:  Is it possible to move these Tuesday

10   hearings?

11        COURTROOM DEPUTY:  Nothing I can't move.

12        THE COURT:  We will make Tuesday available for this

13   trial.  And we will give this trial priority over everything

14   else.  I shouldn't say everything else because we never know

15   what's going to come in the door, but we will give this trial

16   every priority possible.

17        MS. VARGAS:  And the only other question I have this

18   morning, your Honor, is about at what point in the proceedings

19   we'd be addressing or having a conference about the jury

20   instructions.

21        THE COURT:  At what point in the proceedings?

22        MS. VARGAS:  Yes.

23        THE COURT:  Generally it's after all of the evidence

24   is in.  And then we have an informal conference in chambers

25   with the lawyers.  I have your draft jury instructions and

1      your draft verdict forms.

2           And Ms. Timm and I have been discussing the Court's

3      preliminary draft, trying to keep in mind that not every point

4      of law needs to go in front of the jury.  The jury needs to

5      have instructions that are clear and accurate and

6      understandable and that they can follow without confusion.  So

7      that's our goal.

8           But we generally don't hand out the Court's draft

9      instructions until after the evidence is in because things can

10     change.

11          You'll have an opportunity at the close of evidence to

12     see the Court's draft instructions and draft verdict form.

13     Then we'll meet in chambers off the record.  And the Court's

14     draft almost always changes based upon the objections that are

15     raised at the time of the informal conference.  And sometimes

16     we can hammer things out amicably, and sometimes I just need

17     to rule on your objections.

18          You've obviously filed your objections to each others'

19     instructions and verdict forms, and I will be ruling on those

20     and considering those.

21          After we have the informal conference, then I put

22     together the Court's final draft.  We come back into the

23     courtroom, we go on the record, and you make and preserve your

24     objections at that time so that those are preserved for the

25     record and for appeal.

1           With regard to the closing arguments, lawyers have

2     inevitably wanted me to give the closing instructions before

3     the arguments.  And I'm happy to do that.

4           If for some reason the lawyers were to agree among

5     themselves they wanted me to do the instructions after the

6     closing arguments, I can do that, but that's never been the

7     case.  The lawyers like to be able to refer to the

8     instructions during the closing arguments.  So that's the way

9     that we have proceeded.

10              MS. VARGAS:  Thank you, your Honor.

11              THE COURT:  Anything else?

12        All right.  Please bring in the jury.

13        Let's go ahead and get the plaintiff on the stand first.

14    Mr. Argenyi, you may take the stand.

15          MICHAEL ARGENYI, PREVIOUSLY SWORN, RESUMED THE STAND

16              THE COURT:  You may bring in the jury.

17          (Jury in at 9:08 a.m.)

18              THE COURT:  Please be seated.  Good morning.

19        And welcome back.  As you recall, when we stopped the

20    proceedings at the end of the week last week, the plaintiff,

21    Mr. Argenyi, was on the stand and he was in the process of the

22    cross-examination by defense counsel.  And of course,

23    Mr. Argenyi, you remain under oath.

24        And Mr. Moore, you may continue with your

25    cross-examination.

 1              MR. MOORE:  Thank you, your Honor.  May I approach

 2      the witness with an exhibit, please?

 3              THE COURT:  You may.  What is the number of the

 4      exhibit?

 5              MR. MOORE:  Exhibit 23, your Honor.

 6                      CROSS-EXAMINATION (Cont'd.)

 7      BY MR. MOORE:

 8      Q.   Good morning, Mr. Argenyi.

 9      A.   Good morning.

10      Q.   I'd like to draw your attention to Exhibit 23 which is

11      already in evidence which is an e-mail that you sent to

12      Dr. Hansen.  You recognize that e-mail, correct?

13      A.   Yes, I recognize this.

14      Q.   In the last paragraph, the -- I guess it would be the

15      third sentence, it reads, "This is a very intense year and the

16      longitudinal clinic is well worth my time if I can

17      successfully access it equal to my peers so I can prepare for

18      OSCEs, next year's rotation and my own development as a

19      physician."

20              So, am I correct that you believed OSCEs were an

21      important part of your medical education?

22      A.   Yes, I did.

23      Q.   And an OSCE is an objective structured clinical

24      examination, correct?

25      A.   That's correct.

1  Q.    And that's a simulated patient exam where you as a

2  medical student would go into a room and evaluate a mock

3  patient and you're graded on the physical exam of the patient

4  and your interaction with that patient, correct?

5  A.    Correct.

6  Q.    And I believe you participated in two OSCEs in your first

7  year and two OSCEs in your second year; is that correct?

8  A.    That's correct.

9  Q.    And in one of the OSCEs in your first year, you indeed

10  had an interpreter, correct?

11  A.    Yes, I did.

12  Q.    And in the two OSCEs in your second year, you did not

13  have an interpreter; is that correct?

14  A.    Right.

15  Q.    And those are videotaped; is that correct?

16  A.    Yes.

17          MR. MOORE:  Your Honor, at this time I'd like to turn

18  the monitors of the jury off if we could.

19          THE COURT:  That is done.

20          MR. MOORE:  I would like to bring up Exhibit 209.

21          MS. VARGAS:  Your Honor, may we have a sidebar?

22  Plaintiff objects.

23          THE COURT:  Yes.

24      (Bench conference on the record.)

25          MS. VARGAS:  The defendant is proposing to bring up

1    videos which have no relevance to Mr. Argenyi's understanding

2    of the clinic, the lectures or the classroom.  Defendant has

3    conceded in briefing that an OSCE is not the same as the

4    clinical; it's not the clinical exam even though the word

5    "clinical" is in the title.

6           Furthermore, he's unable to establish authenticity or

7    foundation for the videotapes, he's not listed any witness who

8    can authenticate the videos, who can talk about how they were

9    recorded, if they were altered, how they were maintained, how

10   they came to be here, if they're true and accurate copies.

11   Furthermore, they contain hearsay and again they're not

12   relevant.

13           THE COURT:  Response?

14           MR. MOORE:  Sure.  They are certainly relevant.  They

15   were part of his medical education.  He indeed has just

16   testified it was important to his development as both a

17   medical student and physician, the OSCEs, and in fact his

18   participation in longitudinal clinic will assist him with

19   that.

20           We're also going to hear testimony that the OSCE is very

21   similar to what is given on the standardized examination

22   nationally that all medical students take.  We will lay the

23   foundation and authenticity because Mr. Argenyi will testify

24   it is him in his video and that was him there.  That is enough

25   under the Federal Rules of Evidence to establish authenticity

1    and foundation.  And if he's in there speaking, that would not

2    be hearsay, your Honor.

3         MS. VARGAS:  Your Honor, under *Griffin v. Bell* it is

4    not enough to authenticate the video.  Furthermore, in this

5    case Mr. Argenyi can't hear what's on the video, so he can't

6    authenticate what's being said and whether it was his voice or

7    not and how it was recorded.  He has no access to that on this

8    video.  So there's no way he can authenticate it.  And there's

9    no witness competent to authenticate it.

10        Furthermore, we're not contesting that Mr. Argenyi was

11   unable to take any national boards or any exams.  This isn't

12   to do with exams, it has to do with whether he could get

13   access in classes.  And defendant has conceded it's not a

14   clinical exam in their briefing.

15        THE COURT:  Well, I don't think this case is just

16   about the clinical classes that Mr. Argenyi was taking in his

17   second year or that he anticipated taking in his third and

18   fourth years.  I think Mr. Argenyi's ability to communicate,

19   the way he communicated is relevant.  And I've let in other

20   testimony along those lines; for example, the testimony of his

21   mother about how he communicated.  Mr. Argenyi's own testimony

22   about how he communicates.  So, as far as relevance is

23   concerned, that's overruled.

24        Regarding hearsay, the DVDs may contain certain hearsay

25   if they contain statements made by people other than

 1     Mr. Argenyi.  But, that might be handled through a limiting

 2     instruction to the jury.

 3          I do have one question for defense counsel.  Were these

 4     DVDs something that had been shown to Creighton?  Were these

 5     available to Creighton at some point during Creighton's

 6     decision-making process?

 7               MR. MOORE:  Yes.

 8               THE COURT:  Okay.  Well, the objections are overruled

 9     including the objection -- well, regarding foundation, I

10     understand that defense counsel will be laying foundation

11     through Mr. Argenyi at least identifying himself.  And then I

12     will leave it to the jury to give what weight it believes

13     should be given to the evidence of Mr. Argenyi's ability to

14     communicate.  And I think that's central -- that's central to

15     this case as well as Creighton's understanding of his ability

16     to communicate.  So the objections are overruled.

17               MS. VARGAS:  Your Honor, with respect to testing in

18     higher education and professional degrees, testing falls under

19     a different aspect of the ADA.  It requires a higher standard.

20     They need to actually provide him with the best as opposed to

21     equal access.  And so there's a different standard in testing.

22     That's why we haven't pursued that claim.

23               THE COURT:  I don't think the issue here is really

24     whether Creighton provided him with the appropriate

25     accommodations for the testing.  I think the issue is

1   Mr. Argenyi's ability to communicate, how he communicated in

2   the different settings and Creighton's knowledge or

3   understanding of how he communicated.

4       And I think that these DVDs are relevant to both of those

5   issues.

6       So, the objections -- your objections are preserved for

7   the record; they're overruled.

8           MS. VARGAS:  There remains one issue.  We've not been

9   provided all of the videos.  We've only been provided with

10  some of the videos.  I don't know which videos he's choosing

11  to show.  I've never seen or had access to the rest of them.

12      However, one of the videos that we were given access to

13  is a video showing Mr. Argenyi using interpreters.  At the end

14  of that video, after the exam is completed, there is

15  commentary between the person -- I don't even know who it is,

16  the man who appears to be the proctor and the person, again I

17  don't know who it is, who appears to be the pretend patient

18  discussing -- instigated by this man who appears to be the

19  professor and discussing whether he can be an interpreter --

20  whether he can be a doctor because he's deaf, and discussing

21  the costs of interpreters, all with Mr. Argenyi not in the

22  room.

23      So I would ask that to the extent these videos be shown

24  over the plaintiff's objections, that the videos be stopped at

25  the end of the exam and that the obvious hearsay after the end

1    of the exam not be shown to the jury.

2              THE COURT:  You've raised two issues:  Your request

3    that the videos be stopped when the plaintiff is not shown in

4    the videos is granted.  And defense counsel will stop the

5    videos once the videos stop showing the plaintiff.

6        Regarding making the videos available to plaintiff's

7    counsel, were these videos that you intend to show produced to

8    plaintiff's counsel?

9              MR. MOORE:  Yes.

10             THE COURT:  All right.

11             MS. VARGAS:  And the remainder of the videos that

12   we've never seen that you've just had testimony regarding --

13             MS. BALUS:  There was only --

14             THE COURT:  Only one person gets to talk.

15             MS. BALUS:  I apologize.

16             THE COURT:  If you have something you need to say,

17   you have to say it to Mr. Moore and then he'll talk.

18             MR. MOORE:  Thank you.  First of all, this was a

19   discovery issue.  I guess this wasn't raised until right now.

20       Secondly, there were four OSCEs, the video malfunctioned

21   on one in the first year and there was no video for that one.

22             THE COURT:  You have provided to plaintiff's counsel

23   the videos that you intend to offer; is that correct?

24             MR. MOORE:  Yes, your Honor.  They are listed as

25   exhibits and given to them under the proper disclosure

1    deadlines issued by the Court.  They've had them, yes.

2            THE COURT:  If there's a need to communicate between

3    counsel to properly identify these so that we know exactly

4    what we're talking about, take a moment to do that.

5            MS. VARGAS:  To the extent they're relevant --

6    obviously we should have been given access to all of them, and

7    if it's relevant how he performed in three of them, we should

8    have been able to see the fourth.  And so, that in and of

9    itself shows the lack of reliability of those videos but I

10   understand your Honor has ruled.

11           THE COURT:  We are beyond discovery at this point in

12   time.  So I can't be providing you with additional discovery

13   so we have to go with what discovery has been provided.

14       We've made our record here and we'll continue.

15           MS. VARGAS:  Thank you.

16       (End of bench conference.)

17           THE COURT:  Mr. Moore, you may continue.

18           MR. MOORE:  Thank you, your Honor.

19       Are the videos of the jurors off at this point?

20           COURTROOM DEPUTY:  Uh-huh.

21   BY MR. MOORE:

22   Q.   Sir, I would like to direct your attention to Exhibit

23   209.  And specifically I'm going to direct your attention to

24   the first frame of the OSCE that you took during your first

25   year.

1          Sir, is that you in the video?

2     A.   I believe it is.

3     Q.   Okay.  And do you recall this OSCE that you took during

4     your first year of medical school?

5     A.   Yes.

6     Q.   Okay.  And you understood it was videotaped, correct?

7     A.   Yes.

8     Q.   And this is indeed you performing an objective structured

9     clinical examination?

10    A.   I think so, yes.

11         MR. MOORE:  Your Honor, at this time we'd like to

12    offer -- I guess we should call it 209A because there are two

13    videos so at this time we'd offer 209A, the first of the

14    videos.

15         THE COURT:  The objections that were made at sidebar

16    are preserved for the record.  And counsel may -- well, I will

17    receive 209A.  Counsel has permission to publish 209A with the

18    limitations that were discussed at sidebar.

19         MR. MOORE:  Yes, your Honor.  If we could turn on the

20    video -- if we could start the video from the beginning.  Is

21    this the beginning?

22         MS. KIMBLE:  I'm going to bring it back.

23         MR. MOORE:  Thank you.

24       (Exhibit 209A played.)

25         THE COURT:  Mr. Moore, just to properly identify 209A

1   for future reference, at some point please provide me with the

2   beginning minutes and seconds and ending minutes and seconds

3   and that might be helpful to us.

4            MR. MOORE:  Yes, your Honor.

5            THE COURT:  Thank you.

6   BY MR. MOORE:

7   Q.   Now, Mr. Argenyi, that was, I believe, the OSCE that you

8   participated in in December of 2009; is that correct?

9   A.   I believe it's actually January, but yes.

10  Q.   And did you have an OSCE after that during your first

11  year?

12  A.   Yes.

13  Q.   Okay.  So this was the first you'd have performed,

14  correct?

15  A.   Correct.

16  Q.   And you also participated in two OSCEs during your M2

17  year; is that correct?

18  A.   We had two tests that year, yes.

19  Q.   Okay.

20            MR. MOORE:  At this time, your Honor, I'd like to

21  turn off the jury's monitor so we can bring up the exhibit.

22            THE COURT:  Yes.

23            MR. MOORE:  And for the Court, we'll refer to this as

24  209B.

25  BY MR. MOORE:

1    Q.   Mr. Argenyi, is that you in this video?

2    A.   It looks like me but without being able to understand

3    myself, I'm not -- it looks like me.

4    Q.   Would you like us to play a little bit more to ensure

5    that it's you?

6    A.   I won't be able to understand it.

7    Q.   Okay.  But can you identify yourself by looking at the

8    video?

9    A.   It looks like me, yes.

10   Q.   Okay.  And do you recall performing this OSCE with this

11   mock patient during your M2 year?

12   A.   I do.

13   Q.   Okay.  And do you recall this being your first or your

14   second OSCE of your M2 year?

15   A.   I can't identify which one it is.

16   Q.   Okay.  But it is one of the two, correct?

17   A.   Yes.

18        MR. MOORE:  At this time, your Honor, we'd like to

19   offer Exhibit 209B.

20        THE COURT:  The objections raised at sidebar are

21   preserved for the record.

22        MS. VARGAS:  Thank you, your Honor, and I would

23   maintain the objection that this is not the entirety of the

24   videos that were taken of plaintiff performing OSCEs so

25   they've been selectively displayed.

 1            THE COURT:  All the objections raised at sidebar

 2     including that are preserved for the record.  They are

 3     overruled.  I will receive Exhibit 209B.  And again, I will

 4     ask counsel for the defense to provide the Court at some

 5     juncture with the beginning minutes and ending minutes and

 6     seconds so that we can accurately identify the segment being

 7     shown to the jury.

 8            MR. MOORE:  Yes, your Honor.

 9            THE COURT:  You may publish it.

10        (Exhibit 209B played.)

11     BY MR. MOORE:

12     Q.   Mr. Argenyi --

13            THE COURT:  Let's have a sidebar for a moment.

14        (Bench conference on the record.)

15            THE COURT:  We're here because Ms. Fauber passed me a

16     note indicating that the plaintiff's CART feed stopped.  I'm

17     not sure if he would have been having a CART feed during the

18     time of the playing of the videos.  But let's see if we can

19     get this fixed before we start questioning him again.

20            MS. VARGAS:  Your Honor, the other issue, since we're

21     up here, that I would mention, having seen these videos

22     before, the sound was clearly altered from the original

23     version.  It didn't track -- it was like if you watch a

24     Japanese movie and the mouth movements and the sound didn't go

25     together.  That was the case in the original videos.

1            THE COURT:  I thought the sound was basically

2    unintelligible.  I could hear a few things that were said but

3    I could hear very little of what was actually being said.  The

4    videos showed some communication between the plaintiff and the

5    person playing the role of the patient.  But, the actual

6    language expressed was unintelligible as far as I could see.

7        I don't know.  I can't -- there's nothing more for me to

8    rule on because that's what was introduced.  If there was a

9    better copy and plaintiff has a better copy and wants to

10   introduce that, you're certainly welcome to do that.  I'm

11   going to talk with Ms. Schroder for a moment.  Excuse me.

12       (Off-the-record discussion had.)

13           THE COURT:  We'll go off the record.

14       (Off-the-record discussion had.)

15           THE COURT:  Is it working?

16           COURT REPORTER:  Yes.

17           THE COURT:  Okay.  Let's go back.

18       (End of bench conference.)

19           THE COURT:  You may inquire.

20           MR. MOORE:  Thank you, your Honor.

21   BY MR. MOORE:

22   Q.  Mr. Argenyi, as I understand in that last OSCE that we

23   just watched, you did not have an interpreter; is that

24   correct?

25   A.  Yes, that's correct.

1     Q.   You didn't have CART, correct?

2     A.   Correct.

3     Q.   It was just you, correct?

4     A.   Yes.

5     Q.   Okay.

6           MR. MOORE:  At this time, your Honor, I would like to

7     request that the jury's monitors be turned off so we can

8     introduce the third video.

9           THE COURT:  The jury monitors have been turned off.

10          MR. MOORE:  Your Honor, this is on the same disk,

11    it's a continuation of 209B.

12          THE COURT:  Let me be clear -- let me try to make

13    sure I'm clear on this.  You had 209A, you had 209B, and were

14    209A and B on separate disks?

15          MR. MOORE:  Yes.

16          THE COURT:  This is a continuation of 209B.  Is there

17    an interruption in the minutes and seconds being shown on the

18    DVD?

19          MR. MOORE:  This is an entirely separate video file

20    on the disk that would have been marked 209B.  You have to

21    click on the first file for the first file we saw, click on

22    this file for the second video, 209B, so there's a clear

23    delineation.

24          THE COURT:  All right.  I'm trying to figure the best

25    way to label these and for right now, let's call it 209B2; and

1     let's call the last one 209B1, and perhaps we'll figure out a

2     better way to designate these for the record but we will get

3     that straightened out outside the presence of the jury to make

4     sure it's an accurate record.

5         So, what the jury just saw was 209B1 and now what you are

6     going to be showing to Mr. Argenyi is 209B2.

7              MR. MOORE:  Yes, your Honor.

8              THE COURT:  Go ahead.

9     BY MR. MOORE:

10    Q.   Mr. Argenyi, is that you in the video?

11    A.   Yes, it is.

12    Q.   And this is the other OSCE that you participated in

13    during your M2 school year at Creighton University School of

14    Medicine, correct?

15    A.   That year we had two clinical tests so this would have

16    been the second part of one of them.

17             MR. MOORE:  Very good.

18        Your Honor, we'd like to offer 209B2.

19             THE COURT:  209B2 is received, and you may publish.

20             MR. MOORE:  Thank you, your Honor.  I'm assuming the

21    jury monitors are on.

22             THE COURT:  Now, they are.

23             MR. MOORE:  Thank you.

24        (Exhibit 209B2 played.)

25    A.   Your Honor, I have the same issue.

1              THE COURT:  All right.  It's 10:15.  Let's take the

2      mid-morning break and I'll ask the jury to reconvene at 10:35.

3          Thank you.  We're in recess.

4          (Jury out at 10:17 a.m.)

5          (At 10:39 a.m. on August 27, 2013, with counsel for the

6      parties and the plaintiff present, and the jury NOT present,

7      the following proceedings were had:)

8              MICHAEL ARGENYI, PREVIOUSLY SWORN, RESUMED THE STAND

9              THE COURT:  I understand that we have the CART

10     functioning again.  And our best guess as to what may be

11     happening is issues with wireless.  We recently had wireless

12     installed in the courthouse through the Federal Practice

13     Committee funds as a courtesy to lawyers who use the court

14     facilities so they can get access to wireless, and it may be

15     that that system is interfering with the wireless system being

16     used for CART.

17         If an issue comes up, we will take a little break and

18     address it.

19         Anything else that we need to talk about before the jury

20     comes in?

21         Please bring in the jury.

22         (Jury in at 10:42 a.m.)

23             THE COURT:  Mr. Moore, you may continue with your

24     cross-examination.

25             MR. MOORE:  Thank you, your Honor.

1                        CROSS-EXAMINATION (Cont'd.)

2        BY MR. MOORE:

3        Q.   Mr. Argenyi, I know that we talked about earlier that you

4        used a text pager when you were a CNA at Seattle Children's

5        Hospital; is that correct?

6        A.   Yes, that's correct.

7        Q.   And a text pager, would that -- was that connected to the

8        PA system at Seattle Children's Hospital?

9        A.   No.

10       Q.   Okay, it was not?  Could that have been connected?

11       A.   I don't know.

12       Q.   So you never asked, correct?

13       A.   I don't remember if I did.

14       Q.   But you didn't have any specific accommodations at

15       Seattle Children's Hospital for the PA system, correct?

16       A.   Correct.

17       Q.   Sir, on direct examination, you indicated that -- well,

18       I'll withdraw that question.

19            On direct examination, you indicated that you took out a

20       loan to pay for the CART and interpreters that you were

21       providing yourself during the M1 and M2 year, correct?

22       A.   Yes.

23       Q.   And as I understand you starting taking out those loans

24       after you first provided CART and interpreters for yourself.

25       A.   I'm sorry, I don't understand the question.

1    Q.   Sure.  You didn't take out the loan before September 28th

2    of your first year, before you secured CART and interpreters,

3    right?

4    A.   I don't remember when it started.

5    Q.   You didn't have any bills from any CART providers or

6    interpreters before September 28th, correct?

7    A.   Right.

8    Q.   So your bills would have come after that date, right?

9    A.   Yes, that's right.

10   Q.   You would have had to pay for them after that date,

11   right?

12   A.   Yes.

13   Q.   So is it fair for us to assume that the loan you took out

14   was after September 28th of your first year?

15   A.   I would think so, yes.

16   Q.   And that was after you filed the lawsuit against

17   Creighton, right?

18   A.   I believe so.

19   Q.   And your -- I think your mother testified that she is a

20   radiologist; is that right?

21   A.   Yes.

22            MS. VARGAS:  Objection, relevance.

23            THE COURT:  Overruled.

24   BY MR. MOORE:

25   Q.   And your father is a pathologist, correct?

```
 1              MS. VARGAS:  Objection, relevance.

 2              THE COURT:  Overruled.

 3    A.   Yes.

 4    BY MR. MOORE:

 5    Q.   And the loan that you referred to, that loan you received

 6    from your parents, right?

 7    A.   Yes, that's correct.

 8    Q.   So you didn't borrow from a bank after you filed the

 9    lawsuit, you borrowed that from your mom and dad.

10    A.   Yes, that's right.

11    Q.   And they're the ones charging you interest on the loan?

12    A.   They are.

13    Q.   On direct examination, I believe you testified that the

14    first time you learned your offer to Creighton Medical School

15    was conditional is when you requested accommodations.  Is that

16    what you testified to?

17    A.   I believe so.

18    Q.   But your entry into Creighton Medical School was not only

19    conditional upon meeting the technical standards, right?

20    A.   I don't remember.

21    Q.   You don't remember that your offer was conditional on

22    passing a criminal background check?

23    A.   That's correct.

24    Q.   So that was a condition as well?

25    A.   Right.
```

ARGENYI - CROSS                                                                              481

1    Q.   And that condition applies to every student who is

2    admitted to Creighton Medical School, correct?

3    A.   Yes, that's right.

4    Q.   Also, you had to take a drug test; is that right?

5    A.   Yes, that's right.

6    Q.   So your admission was conditional upon that as well.

7    A.   Right.

8    Q.   And that condition applies to every medical student who

9    enters Creighton Medical School.

10   A.   I would think so, yes.

11   Q.   So do you recall receiving notice of those conditions

12   when you received your acceptance letter?

13   A.   I don't remember when I received notice but at some

14   point, yes.

15   Q.   So it's not just -- it wasn't just conditional upon you

16   meeting the technical standards, correct?

17   A.   That's correct.

18   Q.   And all offers to Creighton are conditioned.

19   A.   I would believe so.

20   Q.   Sir, I'd like to direct your attention to Exhibit 10.

21        MR. MOORE:  Your Honor, may we approach with the

22   exhibit?

23        THE COURT:  You may.

24   BY MR. MOORE:

25   Q.   Sir, do you recall Exhibit 10?

1    A.   Yes, I do.

2    Q.   And Exhibit 10 is an e-mail that you sent to Dr. Kavan

3    with a cc to Dr. Zetterman, Wade Pearson and Father Schlegel

4    attaching the letter from your mother, correct?

5    A.   Yes, that's correct.

6    Q.   That was sent --

7         MR. MOORE:   If we can please zoom in on the e-mail?

8    BY MR. MOORE:

9    Q.   I believe you testified on direct you sent this e-mail

10   because you had not received a response to your September 1st

11   e-mail and your mother had not received a response to the

12   letter she sent on September 7th.  That's what you testified

13   to, correct?

14   A.   Yes.

15   Q.   What time was this e-mail sent on September 15th?

16   A.   It was sent at 6:34 p.m.

17   Q.   Sir, I'd now like to direct your attention to Exhibit 34.

18        MR. MOORE:   Your Honor, may we approach with Exhibit

19   34?

20        THE COURT:   Yes, you may.

21        MR. MOORE:   Is this in?

22        THE COURT:   It is in evidence.

23        MR. MOORE:   Thank you, your Honor.

24   BY MR. MOORE:

25   Q.   Now, sir, we talked about on Friday that there were three

1    specific demands in your note to Dr. Kavan with regard to

2    note-takers, closed-captioning of videos and noise in the lab.

3    And we talked about both the lab accommodations as well as the

4    closed-captioning.

5        This appears to be an e-mail --

6            MR. MOORE:  If we could please zoom in --

7    BY MR. MOORE:

8    Q.   -- an e-mail from Dr. Kavan to you dated September 15th,

9    correct?

10   A.   Yes, that's correct.

11   Q.   And he's responding to the note-taker concern you had,

12   correct?

13   A.   That's correct.

14   Q.   And this was sent on September 15th, the same day that

15   you sent the e-mail attaching your mother's letter to

16   Dr. Kavan; is that right?

17   A.   Yes, that's right.

18   Q.   And what time is Dr. Kavan's e-mail?

19   A.   6:55 a.m.

20   Q.   So would you like to correct your testimony from earlier

21   that, in fact, Dr. Kavan sent you an e-mail before you sent

22   him the e-mail with your mother's letter?

23   A.   It appears that way, yes.

24   Q.   Okay.  So he did respond before you sent that e-mail.

25   A.   He responded that day, yes.

1    Q.    Now, in Exhibit 34, sir, it appears that Dr. Kavan is

2    offering you some enhanced note-taking services; is that

3    correct?

4    A.    He was talking about a designated note-taker.

5    Q.    He offered you the opportunity to take anyone you wanted

6    for notes and Creighton would pay for those notes, correct?

7    A.    Yes, that's correct.

8    Q.    You didn't take him up on that offer, did you?

9    A.    No, I did not.

10   Q.    In fact, you didn't think that would help because you

11   weren't particularly impressed with any of your fellow

12   students.

13         MS. VARGAS:  Objection, your Honor --

14   A.    No, that's not --

15         THE COURT:  It's cross-examination, he may respond.

16   Go ahead.

17   A.    I did not think that would help, no.

18   BY MR. MOORE:

19   Q.    But you weren't particularly impressed with any of your

20   fellow students.

21         MS. VARGAS:  Objection, asked and answered.

22   A.    I have --

23         THE COURT:  Just a moment.  It's argumentative.

24   Sustained.

25         MR. MOORE:  I'd like to bring up, if I could, the

 1    deposition transcript, page 169, lines 2 through 4.

 2    BY MR. MOORE:

 3    Q.   Now again, sir, you recall that I took your deposition?

 4    A.   Yes.

 5    Q.   And again you were under oath, correct?

 6    A.   That's correct.

 7    Q.   And your lawyer was there protecting your interests and

 8    objecting.

 9    A.   Yes.

10    Q.   And I asked you, isn't it true, that you were -- whether

11    you were impressed by any of your fellow students and you

12    said:  Not in particular?

13    A.   That's correct.

14    Q.   Okay.  Thank you.

15         I'd like to direct your attention now to Exhibit 213.

16              MR. MOORE:  Your Honor, may we approach with Exhibit

17    213?

18              THE COURT:  You may.

19              MR. MOORE:  I believe this is already in evidence.

20              THE COURT:  It is.

21    BY MR. MOORE:

22    Q.   Sir, Exhibit 213 is a letter from your lawyer, Dianne

23    DeLair, to me, in which you set forth your requests for

24    accommodations for your second year of medical school,

25    correct?

 1    A.   Yes, that's correct.

 2    Q.   So at this time, you understood that your requests for

 3    accommodations were going through your lawyer to Creighton's

 4    lawyers, right?

 5    A.   Yes.

 6    Q.   You weren't making other accommodations that didn't go

 7    through your lawyer, right?

 8    A.   I'm sorry?  I'm not sure what you're asking.

 9    Q.   In other words, this letter represents what you requested

10    for your M2 year; is that right?

11    A.   Yes.

12    Q.   You weren't independently communicating with Creighton

13    any other demands or requests, were you?

14    A.   Not that I recall.

15    Q.   So at this point, as you recall, you were making your

16    requests through your lawyer to Creighton's lawyer.

17    A.   Yes.

18    Q.   As you sit here today, could Creighton have provided

19    anything less than you were demanding in this letter and still

20    provide you effective communication?

21    A.   I asked for what I needed.

22    Q.   That's not what I asked, sir.  What I asked is could

23    Creighton provide you something less than what you're

24    demanding in Exhibit 213 and still provided you effective

25    communication?

1     A.   No.

2     Q.   You needed everything you asked for in this letter,

3     correct?

4     A.   Yes.

5          MR. MOORE:  At this time, your Honor, we would like

6     to approach with Exhibit 214 which is not in evidence yet so

7     we'd ask that the jurors' screens be turned off.

8          THE COURT:  You may approach with Exhibit 214.

9     BY MR. MOORE:

10    Q.   Now, sir, as you mentioned, at this time you were

11    communicating your demands through your lawyers to Creighton's

12    lawyers.  Did you receive a response back from Creighton to --

13    A.   Yes, I did.

14    Q.   -- to the letter that your lawyer sent?

15    A.   Yes.

16    Q.   And was -- is Exhibit 214 the response that you received?

17    A.   It appears to be, yes.

18    Q.   Your lawyer showed you a copy of this, correct?

19    A.   Yes.

20    Q.   And this is what Creighton was providing or agreeing to

21    provide you for your second year of medical school, correct?

22    A.   Yes, that's correct.

23         MR. MOORE:  At this time, your Honor, we'd like to

24    offer Exhibit 214.

25         MS. VARGAS:  Objection, your Honor.  May we approach?

 1              THE COURT:  Yes.

 2         (Bench conference on the record.)

 3              MS. VARGAS:  This exhibit was the subject of part of

 4    plaintiff's motion in limine insofar as it is a letter that

 5    was drafted by Mr. Moore outlining the legal arguments in his

 6    case.  And it is our position that legal arguments drafted by

 7    counsel should not go to the jury.  The proper time for that

 8    is opening statements, perhaps closing arguments.  But having

 9    Mr. Moore's legal arguments drafted and provided into -- into

10    the jury room could potentially conflict with the Court's jury

11    instructions and is prejudicial to the plaintiff.

12              THE COURT:  Okay.  Well, I won't request a response.

13    I am going to admit Exhibit 214 into evidence.  I will give

14    the jury a limiting instruction regarding the purpose for

15    which they can and cannot consider Exhibit 214.

16              MS. VARGAS:  Thank you, your Honor.

17         (End of bench conference.)

18              THE COURT:  Exhibit 214 is received.

19         And at this time I am going to give the jury a limiting

20    instruction regarding the purposes for which Exhibit 214 can

21    and cannot be considered.

22         You can consider Exhibit 214 as a representation of the

23    offers made by Creighton University to provide certain

24    accommodations to Mr. Argenyi.  To the extent that Exhibit 214

25    includes any statements from counsel regarding the applicable

 1     law of the case, you should disregard that, because I will be

 2     instructing you at the end of the trial about the law of the

 3     case and my instructions on the law will govern.

 4          You may proceed.

 5          MR. MOORE:  Your Honor --

 6          MS. VARGAS:  If I could just note that Exhibit 214

 7     does contain hearsay insofar as Mr. Moore, in addition to his

 8     legal arguments, has included text of communications from

 9     other witnesses who are not on the witness list at trial and

10     who will not be called and, therefore, those -- that text

11     should not be included in this letter.

12          THE COURT:  I will give a limiting instruction

13     regarding any hearsay content contained in Exhibit 214.  And

14     to the extent that Mr. Moore in Exhibit 214 makes statements

15     regarding things that were told to him by other people, you

16     are not to accept those things for the truth of the matter

17     asserted by the other people, but you may accept such

18     statements as indicating what Creighton was relying upon when

19     it made its decision to offer certain accommodations and not

20     others.

21          You may proceed.

22          MR. MOORE:  Your Honor, I apologize.  Just one thing

23     from the defendant?

24          In addition to the accommodations that were offered,

25     there's also an explanation of the reasoning of the MEMT in

1    this particular letter and I would like clarification from the

2    Court if the jury can consider that explanation of why they

3    offered what they offered.

4              THE COURT:  The jury may consider the rationale

5    presented by that committee on which Creighton relied, yes.

6    Your answer is, yes, the jury may consider that.

7              MR. MOORE:  Thank you, your Honor.

8              THE COURT:  You may proceed.

9              MR. MOORE:  I'm sorry, has it been admitted in?

10             THE COURT:  It has indeed been admitted into

11   evidence.  214 is in.

12             MR. MOORE:  May we please publish it to the jury?

13             THE COURT:  You may.

14   BY MR. MOORE:

15   Q.   I would like to begin, Mr. Argenyi, with this was your

16   understanding that this was a response to the requests for

17   accommodations that your lawyer made in her letter for your M2

18   year, correct?

19   A.   Yes, that's correct.

20             MR. MOORE:  If we could please enlarge the Large

21   Group Lecture in Lecture Hall.

22   BY MR. MOORE:

23   Q.   In this letter, the Creighton Medical School offers you

24   interpreters for your large group lectures for your M2 year;

25   is that correct?

1    A.    Yes, that's correct.

2    Q.    And in this letter, the medical school indicates that

3    they have received Dr. Thedinger's letter dated May 6, 2010,

4    correct?

5    A.    Yes, that's correct.

6    Q.    And based upon Dr. Thedinger's letter that the MEMT has

7    revisited the accommodations and agreed to provide you an

8    accommodation for your large group lectures of an interpreter

9    rather than an FM system, right?

10   A.    Yes, that's right.

11   Q.    Okay.

12          MR. MOORE:  Can we go to page 2 of Exhibit 214?  If

13   you can enlarge the first paragraph, please?

14   BY MR. MOORE:

15   Q.    This continues in this letter describing the medical

16   school's rationale in offering you an interpreter rather than

17   CART, correct?

18   A.    Yes, that's right.

19   Q.    And they're indicating that they base their decision to

20   offer you CART on your May 26 letter -- May 26 of 2009 letter

21   where you stated, quote, real-time captioning and interpreting

22   (in my case, Cued Speech or oral) are generally considered

23   interchangeable, based upon client's preference and

24   availability, and the fact that you used an oral interpreter

25   with sign support as an auxiliary aid during your first year?

1           THE COURT:  Mr. Moore, in your question, you said

2    they're indicating that they based their decision to offer you

3    CART --

4           MR. MOORE:  Oh, I apologize.

5           THE COURT:  -- on your May 26 letter.  Do you want to

6    correct your statement?

7           MR. MOORE:  Yes.  Sorry.  I'm stumbling over my words

8    again.

9    BY MR. MOORE:

10   Q.   Let me try that again.

11        They offered you oral interpreters rather than CART in

12   the lecture setting based upon your statement as read there in

13   the May 26, 2009, letter, correct?

14   A.   Yes.

15   Q.   Okay.  And as I understand oral interpreters with sign

16   support, the sign support they provide is similar to ASL,

17   correct?

18   A.   It's not ASL, no.

19   Q.   Is it similar to that?

20   A.   No, it's more English.

21   Q.   More English signing?  Okay.  And you used oral

22   interpreters with sign support during your first year of

23   medical school, correct?

24   A.   I used that, yes.

25   Q.   And based upon that information, again in a large group

1    setting, Creighton would offer you an interpreter and then

2    required you to sit in one of the first two rows of class to

3    receive the maximum benefit of the interpreter, right?

4    A.    Yes.

5    Q.    And in addition to that interpreter, again they offered

6    the note-taking from a student of your choosing and the notes

7    would be photocopied immediately following class and provided

8    to you, right?

9    A.    That's correct.

10   Q.    Okay.

11         MR. MOORE:  If we can go to the next portion of the

12   letter, please.

13   BY MR. MOORE:

14   Q.    The next portion of the letter deals with a second

15   category of requests you made with regard to your labs.  And

16   it says like group lectures Creighton had provided you an FM

17   system in the first year and it revisited that decision based

18   upon Dr. Thedinger's letter, correct?

19   A.    I'm sorry, it's not clear.

20   Q.    Sure.  I'd like you to read the first paragraph.  Take

21   your time.

22   A.    Yes.

23   Q.    Based on Dr. Thedinger's letter, the MEMT revisited the

24   lab classes in which it had offered you an FM system during

25   your M1 year.

1    A.    That's right.

2    Q.    And the MEMT decided to provide you with an oral

3    interpreter with sign support for the didactic portions of the

4    ID and Heme-Onc labs in August and September, right?

5    A.    That's correct.

6    Q.    Then, in addition to that, they talked about the oral

7    interpreter will be present for the didactic portions of these

8    labs and Creighton will also provide an oral interpreter with

9    sign support for computer-based histology and pathology labs

10   which are larger groups which include didactic instruction,

11   right?

12   A.    Yes.

13   Q.    And didactic instruction, as you understand it, is when a

14   lecture is being given where a professor is lecturing and

15   giving you that information.  Is that what you understood?

16   A.    Yes.

17   Q.    Rather than an interactive small group on -- one-on-one

18   setting where you're doing case studies?

19   A.    Yes, that's correct.

20   Q.    And then finally Creighton said it would provide an oral

21   interpreter with sign support in your heart sounds lab, right?

22   A.    Yes.

23   Q.    Then it goes on to say the other labs for M2 which do not

24   involve significant didactic instruction and involve small

25   groups with some individualized instruction for students.  The

ARGENYI - CROSS                                                495

1    physiology lab for cardiovascular and respiratory courses

2    involve one instructor and a small group of five students.  Do

3    you see that?

4    A.   Yes, I do.

5    Q.   And for the cardiology portion of the ECG lab, the

6    instructor will provide instructions for the group while

7    standing close to your work area thus providing you with

8    visual cues.  Then it goes on to say:  Written instructions

9    are also provided to the students in this lab which would

10   assist you.

11        Do you see that?

12   A.   I do.

13   Q.   And then it goes on to talk about renal lab, which I

14   understand renal lab is related to the kidney?  Is that what

15   renal means?

16   A.   Yes, it is.

17   Q.   The students work one-on-one at -- if we can go to the

18   next page -- a computer terminal and all instructions are

19   provided on the screen.  Thus, for those labs they would not

20   provide an oral interpreter with sign support.  Correct?

21   A.   That's correct.

22   Q.   And they provided you this letter in advance of your

23   M1 -- excuse me, your M2 year; is that correct?

24   A.   Yes, they did.

25   Q.   Okay.  And then again it says in every setting where an

1    oral interpreter with sign support is provided, the MEMT would

2    require you to sit in one of the first two rows to maximize

3    the benefit of the interpreter.  Do you see that?

4    A.   Yes, I do.

5    Q.   Okay.  Now, if we can move on to small groups.

6         In small groups, Creighton decided not to provide you an

7    oral interpreter, instead offered you a seat next to the

8    faculty member who was leading the discussion in the small

9    groups to give you the visual cues.  It also indicates in

10   small group settings, students are expected to have read and

11   learned the materials in advance of the small group.  Thus it

12   would be information you already learned in advance of your

13   class and you can take advantage of visual cues from the

14   faculty member.

15        Do you see that?

16   A.   Yes, I do.

17   Q.   And for labs, small groups and lectures, does that

18   accurately reflect the accommodations offered by Creighton

19   Medical School for your second year?

20   A.   Yes, it does.

21   Q.   Now, if we could move on to the next portion of the

22   letter dealing with clinical instruction?

23        Now, clinical instruction, as I understood it, was

24   primarily your longitudinal clinic during the M2 year; is that

25   correct?

1    A.    Yes, that's correct.

2    Q.    And I believe you described that on direct examination as

3    where you would go with a proctor or practicing physician and

4    go into the room, for example, before the physician went in

5    and interacted with the client and shadowed that physician in

6    essence throughout the year, correct?

7    A.    It was more independent than just shadowing but, yes.

8    Q.    Okay.  So it was more independent.  You were doing more

9    than just following, you were actually participating, correct?

10   A.    That's correct.

11   Q.    Including being on your own in the examination room,

12   doing an initial review of the patient and providing --

13   getting as much information as you could from that patient and

14   then reporting back to the preceptor?

15   A.    Yes, that's right.

16   Q.    Now, for this class, Creighton did not offer or allow you

17   to use an interpreter; is that right?

18   A.    That's correct.

19   Q.    And the MEMT said at that point you had not provided

20   evidence sufficient for the need for the interpreter and based

21   on your own statements and documentation, they believed you

22   did not need an interpreter in that setting, correct?

23   A.    That's correct.

24   Q.    In fact, they refer again to your letter dated May 26,

25   2009, in which you talked about the clinical experience you

1    had as a CNA at Children's Hospital, right?

2    A.    Right.

3    Q.    Okay.  They also talk about the fact that you read lips

4    and used other visual cues on one-on-one communication, right?

5    A.    Yes.

6          MR. MOORE:  If we could go to the next page, please?

7    BY MR. MOORE:

8    Q.    And this letter continues to refer to your own May 26,

9    2009, letter in which it said:  Given all these, I've been

10   able to obtain clinical information in a clinical setting,

11   without significant accommodation.

12         And then below, in the last sentence of that, it says, "I

13   would like to emphasize that I am requesting accommodations

14   not for assistance in clinical assessment but for assistance

15   in learning new material."  Do you see that?

16   A.    Yes.

17   Q.    And then if we could go to the next paragraph.  Finally,

18   with regard to your clinical instruction, the MEMT referred to

19   a letter that you provided from Amanda Mogg.  Now, Amanda Mogg

20   was your supervisor while you worked at Seattle Children's

21   Hospital, correct?

22   A.    Yes.

23   Q.    You asked her to provide a letter in support of your

24   accommodations to Creighton Medical School?

25   A.    Yes.

1    Q.   And she provided that letter?

2    A.   Yes.

3    Q.   And the MEMT refers to that letter including in that

4    letter where Ms. Mogg states that the, "Plaintiff was

5    responsible to work and communicate completely verbally with

6    his colleagues on our multidisciplinary team in the Emergency

7    Department."  Do you see that?

8    A.   I see that, yes.

9    Q.   So, in clinical lab, small group, and lectures, this

10   letter set forth the accommodations Creighton was offering,

11   right?

12   A.   Yes, that's correct.

13   Q.   You understood what they were offering.

14   A.   Yes, I did.

15   Q.   And you understood their reasoning for their offers.

16   A.   Yes.

17   Q.   I'm sorry?

18   A.   Yes.

19        MR. MOORE:  Now, if we could go down to highlight the

20   next two paragraphs, please?

21   BY MR. MOORE:

22   Q.   This letter goes on to say that all the videos in your

23   classes would have closed-captioning, correct?

24   A.   Yes.

25   Q.   Creighton remained committed to your success in medical

1    school and asks you to confirm the accommodations offered in

2    this letter were acceptable, right?

3    A.   That's right.

4    Q.   Did you have any question after receiving this letter

5    what Creighton was going to offer as accommodations?

6    A.   No.

7    Q.   Now --

8              MR. MOORE:  Can we take that down, please?

9    BY MR. MOORE:

10   Q.   Now, you indicated in your direct examination that

11   Dr. Thedinger's letter confirmed what you believed and felt

12   about the FM system during M1 year, right?

13   A.   Yes, that's right.

14   Q.   Now, there was nothing stopping you from going to

15   Dr. Thedinger and providing a report before you started your

16   M1 year, was there?

17   A.   I'm sorry, I don't understand the question.

18   Q.   Sure.  There was nothing stopping you from going to see

19   Dr. Thedinger before your M1 year, was there?

20   A.   No.

21   Q.   There was nothing stopping you after you started your M1

22   year and discovered problems with your FM system from going to

23   see Dr. Thedinger, was there?

24   A.   No.

25   Q.   In fact, at that time before you started your M1 class,

1    you were actually requesting an FM system, weren't you?

2    A.   Yes, that's right.

3    Q.   But nonetheless you waited until after your M1 year to

4    provide Dr. Thedinger's letter to Creighton, correct?

5    A.   Yes.

6    Q.   I'd like to direct your attention to Exhibit 202.

7         MR. MOORE:  Your Honor, I don't believe this is in

8    evidence yet.  So if we could turn off the jury's monitors?

9         THE COURT:  It is not in evidence and the monitors

10   are off.

11        MR. MOORE:  May we approach with the exhibit, your

12   Honor?

13        THE COURT:  You may.

14        MR. MOORE:  Thank you.

15   BY MR. MOORE:

16   Q.   Sir, do you recognize Exhibit 202?

17        MS. VARGAS:  Your Honor, the plaintiff objects.  This

18   letter does not have a proper foundation and there is no

19   witness who can lay a proper foundation for this letter.  It

20   is pure hearsay of the purest form.  The person who wrote this

21   letter is not present in court.  The defendant conveniently

22   has not listed this witness on their witness list and so

23   there's no opportunity to communicate with this person about

24   what they meant in this letter and to offer further

25   clarification of the issues discussed in this letter.

1              THE COURT:  Well, if it is being offered for the

2     truth of the matter asserted, it is indeed hearsay.  What's

3     the response?

4              MR. MOORE:  Your Honor, it is not being offered for

5     the truth of the matter asserted.  It's being offered for

6     the -- the -- number one, what Creighton had with regard to

7     notice as regards to what he needed.  It's also offered

8     because it was something that was considered by the MEMT in

9     making its decision with regard to the accommodations.  It

10    goes to the state of mind of Creighton.

11         And again -- and indeed plaintiff is alleging deliberate

12    indifference so state of mind of the -- of the MEMT and

13    Creighton Medical School is at issue and it's offered to

14    understand the state of mind and what that MEMT actually

15    considered in making its decisions to offer accommodations to

16    Mr. Argenyi.

17             THE COURT:  Well, and while I may not disagree with

18    anything that you've said, I don't understand why it's coming

19    in through this witness.

20             MR. MOORE:  Your Honor, we believe that foundation

21    will establish that he reviewed this letter, he had this

22    letter and again he asked for this letter to be sent on his

23    behalf.

24             MS. VARGAS:  Your Honor, he's certainly welcome to

25    ask him if he's seen this letter, but if he's not seen the

1   letter, he's not in a position to offer testimony about it.

2   His mom would have to offer testimony.

3          MR. MOORE:  Or Dr. Kavan.

4          THE COURT:  I will let you attempt to lay foundation

5   for the letter.

6   BY MR. MOORE:

7   Q.   Mr. Argenyi, have you ever seen this letter before?

8   A.   Yes, I have.

9   Q.   And again you asked that this letter be sent on your

10  behalf; is that correct?

11  A.   Yes, I did.

12  Q.   And did this include the information that you asked

13  Amanda Mogg to provide to Creighton University?

14  A.   I asked her to provide a letter.  I don't remember what I

15  asked her to provide in it.

16  Q.   Okay.  But indeed you asked her to provide information to

17  the MEMT with regard to your experience as a CNA at Children's

18  Hospital, correct?

19  A.   Yes, that's correct.

20  Q.   And you believed that would be relevant and helpful to

21  the medical school to determine what accommodations you may

22  need.

23  A.   Yes.

24  Q.   And is there anything in this letter that is untrue?

25         MS. VARGAS:  Objection, your Honor.  Mr. Argenyi

1    didn't write this letter, it wasn't sent to him, and Ms. Mogg

2    is not here to testify about this letter so certainly had he

3    wanted to get this information in and shed full light on the

4    situation, he should have listed Ms. Mogg as a witness.

5           THE COURT:  Overruled.  The witness may respond as to

6    whether he is aware of any information in the letter that is

7    untrue.

8    A.   No, I do not.

9    BY MR. MOORE:

10   Q.   Did you ask her to correct any of the information in this

11   letter?

12   A.   I did not.

13   Q.   Did you expect that Creighton University School of

14   Medicine would rely on this letter in making its decisions?

15   A.   I did not know.

16   Q.   You may not have known but you expected that, didn't you?

17   A.   I really did not know.

18   Q.   Did you offer it to Creighton University as something

19   they should rely on in considering your accommodation

20   requests?

21   A.   I offered it as information.

22   Q.   So Creighton could use that information to decide what

23   accommodations were necessary for you, right?

24   A.   Yes, they could.

25   Q.   And that's why you offered this letter, correct?

 1    A.   Yes.

 2              MR. MOORE:  At this time, your Honor, we'd like to

 3    offer Exhibit 202.

 4              MS. VARGAS:  Plaintiff maintains the objection that

 5    there is no proper foundation for this witness for offering

 6    this letter which is hearsay -- pure hearsay.

 7              THE COURT:  The foundational objection is overruled.

 8    With respect to hearsay, I will instruct the jury that you can

 9    accept Exhibit 202 not for the truth of the statements

10    asserted in the letter but as a representation of something

11    that the plaintiff initiated and requested to be communicated

12    to Creighton so that Creighton could decide what

13    accommodations to provide for the plaintiff.

14         Exhibit 202 is received.

15              MR. MOORE:  May we publish it to the jury, your

16    Honor?

17              THE COURT:  You may.

18    BY MR. MOORE:

19    Q.   I'd like to highlight the third paragraph of the letter,

20    please.  And again for the jury, Mr. Argenyi, this was written

21    by Amanda Mogg who was your supervisor when you were a CNA at

22    Seattle Children's Hospital, correct?

23    A.   Yes, that's correct.

24    Q.   And she was familiar with how you performed your job,

25    correct?

ARGENYI - CROSS                                                    506

1    A.   Yes, she was.

2    Q.   And everything in this letter is accurate, correct?

3    A.   If I -- yes.

4    Q.   "During Michael's employment, he has been actively

5    meeting the [sic] technical standards.  For example, he is our

6    only tech on in the daytime and is responsible to work and

7    communicate completely verbally with his colleagues on our

8    multidisciplinary team in the Emergency Department."

9         Now, again Mr. Argenyi, the multidisciplinary team, that

10   would include physicians?

11   A.   I'm sorry, what's the question?

12   Q.   The multidisciplinary team, would that include

13   physicians?

14   A.   Yes, that would.

15   Q.   Would that include nurses?

16   A.   Yes, that would.

17   Q.   Would that include other medical techs that work in the

18   hospital?

19   A.   Yes.

20   Q.   And then the letter goes on to say that, "He helps to

21   take preliminary patient information during our triage

22   process, negotiates care with families with ease and does that

23   all independently.  Specifically, he takes vital signs, helps

24   to settle incoming ambulances and is a runner during

25   emergencies.  Michael transports and escorts patients

1    throughout the hospital to diagnostics and the floor for

2    admissions.  It is essential that he communicate with patients

3    as they often have questions in *[sic]* route.  Michael has

4    represented the Emergency Department in a week-long process

5    improvement workshop with Radiology looking at safe patient

6    handoffs between units and departments.  He was instrumental

7    in getting all of the techs and volunteers trained for roll

8    out of the new process.  He also is a valued member of our

9    department Operations Committee."

10        Do you see that?

11   A.   Yes, I do.

12   Q.   And you did all of that with no accommodation other than

13   a text pager; is that right?

14   A.   Yes.

15   Q.   No CART, right?

16   A.   That's right.

17   Q.   No interpreter?

18   A.   That's right.

19   Q.   Just you.

20   A.   Yes.

21   Q.   Sir, I would like to talk about your first day of your

22   M2 classes.  Now, when you started the lecture classes during

23   your second year, you understand at that point Creighton was

24   offering you an interpreter in your lecture classes, right?

25   A.   Yes.

ARGENYI - CROSS                                              508

1    Q.   Going back to Exhibit 214, you had that letter before you

2    started your M2 classes, right?

3    A.   Yes, I did.

4    Q.   And you knew an interpreter would show up the first day,

5    didn't you?

6    A.   Yes.

7    Q.   So you weren't surprised when the interpreter showed up,

8    were you?

9    A.   No, I was not.

10   Q.   And as I understand it, the interpreter that showed up,

11   her name was Victoria Deuel?

12   A.   I'm sorry, it didn't come up.

13   Q.   Yes.  The interpreter that showed up was Victoria,

14   V-i-c-t-o-r-i-a; last name Deuel, D-e-w-e-l [*sic*].

15   A.   Yes, that's right.  That's correct.

16   Q.   And you had worked with Victoria in the past at medical

17   school, hadn't you?

18   A.   Yes, I had.

19   Q.   Do you recall how many times it was that you worked with

20   her?

21   A.   I don't remember how many specifically, no.

22   Q.   About ten to 15 times; that fair?

23   A.   I would say that's a little too many but I don't really

24   remember.

25   Q.   Okay.  That's fair.

 1          Now, you indicated on your direct examination that when

 2     the interpreter showed up for that class, that you tried for a

 3     bit to use her and then you would watch your CART screen

 4     again, right?

 5     A.   Yes, that's correct.

 6     Q.   And I think you said she did some finger spelling?

 7     A.   Yes, she did a lot.

 8     Q.   And when Dr. Hansen you asked you to move down to the

 9     first row, you didn't do that, did you?

10          MS. VARGAS:  Objection, your Honor.  The witness

11     testified he couldn't hear Dr. Hansen when he communicated

12     with him.

13          THE COURT:  Overruled.  The witness may answer.

14     A.   When I was told it in the statement, no, I did not.

15     BY MR. MOORE:

16     Q.   Okay.  So you stayed up where you were with your CART

17     provider, right?

18     A.   Yes.

19     Q.   Isn't it true though, Mr. Argenyi, that you didn't even

20     look at Ms. Deuel when she was trying to interpret?

21     A.   No, that's not true.

22     Q.   Didn't you say, "I have CART and I'm not going to watch

23     you.  You can leave."?

24          MS. VARGAS:  Objection, your Honor, hearsay.

25          THE COURT:  Overruled.  He may answer.

1    A.    No, that is not what I said.

2    BY MR. MOORE:

3    Q.    Now, looking at the letter, however, that you sent to

4    Creighton, you did indicate that oral interpreters and CART

5    were interchangeable in your May -- I believe it was May 26th

6    of 2009 letter, right?

7    A.    I made the general statement, yes.

8    Q.    And that was before you had lawyers, right?

9           MS. VARGAS:  Objection, your Honor, relevance.

10          THE COURT:  Overruled.  He may answer.

11   A.    Yes, that is.

12   BY MR. MOORE:

13   Q.    You thought it was inappropriate for Dr. Hansen or anyone

14   else to ask you to move to the front row, didn't you?

15   A.    No, I did not.

16   Q.    But you wanted to stay up by your friends, right?

17   A.    I did.

18   Q.    I'd like to talk about your longitudinal clinic for a

19   while in your M2 year.  You talked to the jury about the

20   struggles that you had in that longitudinal clinic and you

21   also referred to some e-mails that you had sent to Dr. Hansen.

22          Now, your preceptor for the longitudinal clinic was a

23   Dr. Townley; is that right?

24   A.    Yes, that's correct.

25   Q.    And you were evaluated by her, correct?

```
 1    A.   Yes, that's correct.

 2    Q.   And you were given copies of those evaluations; is that

 3    right?

 4    A.   I never saw one.

 5    Q.   You were never given copies of the evaluations?

 6    A.   No.

 7    Q.   Did you get any feedback from Dr. Townley?

 8    A.   I don't recall any specific feedback.

 9    Q.   You don't recall Dr. Townley indicating that you were

10    doing well in your longitudinal clinic?

11    A.   She was a very encouraging figure.

12    Q.   Did you receive any sort of grade in your longitudinal

13    clinic?

14    A.   It was a pass/fail class, yes.

15    Q.   When you say pass/fail, that's the medical school

16    curriculum, isn't it; pass/fail or honors?

17    A.   That was the scale for that course itself.

18    Q.   But that was consistent with the medical school overall

19    curriculum of pass/fail and honors, right?

20    A.   No, because it was only pass/fail.

21    Q.   Oh, there was no honors.

22    A.   That's correct.

23    Q.   Do you recall -- well, let me ask you this:  Did you fail

24    the class?

25    A.   No, I did not.
```

1    Q.   You passed the class, right?

2    A.   Yes, that's right.

3    Q.   Do you have any idea how you did as compared to your

4    fellow students?

5    A.   No, I do not.

6    Q.   Now, sir, you had other clinical experiences outside of

7    medical school; for example, I believe you participated in the

8    Creighton Students United in Relief Assistance.  Did you

9    participate in that program?

10   A.   Yes, I did.

11   Q.   And that was in Peru; is that right?

12            MS. VARGAS:  Objection, your Honor.  We discussed

13   this already on Friday so this has been asked and answered

14   already at length.

15            THE COURT:  Overruled.  He may answer.

16   A.   Yes, it was in Peru.

17   BY MR. MOORE:

18   Q.   And when you went -- before you went to Peru, you were

19   expecting to participate in medical procedures and clinical

20   assessment, right?

21   A.   In procedures, yes.

22   Q.   So that's one of the reasons you wanted to go down there,

23   to be involved in that kind of clinical procedures, right?

24   A.   Yes, that's right.

25   Q.   But you didn't request an interpreter, did you?

1     A.    No, I did not.

2     Q.    And one of the reasons -- well, you didn't ask for an

3     interpreter because you weren't being graded on it; is that

4     right?

5     A.    Yes, that's right.

6     Q.    Okay.  In fact, when I asked you in your deposition why

7     not, why didn't you have an interpreter down there, you said

8     because it's noncredit, right?

9     A.    I gave several reasons and that's one, yes.

10    Q.    You also participated in the Magis Clinic, correct?

11    A.    Yes.

12    Q.    And that is not required but you voluntarily participated

13    in the Magis Clinic to get more clinical experience, right?

14    A.    Yes, that's right.

15    Q.    And you didn't request an interpreter for that, did you?

16    A.    No, I did not.

17    Q.    And when I asked why, you said again, because it's not

18    graded, right?

19    A.    I don't recall.

20          MR. MOORE:  Can we bring up his deposition

21    transcript, please?  Page 288, 3 through 7, please.

22    BY MR. MOORE:

23    Q.    Now, I believe, sir, in your deposition you indicated at

24    the time of your deposition you had participated in two Magis

25    Clinic experiences; is that right?

1    A.   Yes, that's right.

2    Q.   And you said:  I believe only twice.

3         And then I said:  And neither time you requested an

4    interpreter, correct?

5         Your answer:  Neither time I did.

6         And I asked you why.

7         And you said again:  It's not graded.  Right?

8    A.   Yes, that's right.

9    Q.   Okay.  So you did take that.

10   A.   Yes.

11   Q.   Did you have an interpreter by the name of Debra Seiler?

12   A.   I believe I did.

13   Q.   And she provided interpreter services for you at

14   Creighton University; is that right?

15   A.   Yes, she did.

16   Q.   Sir, now I'd like to talk to you a little bit about those

17   e-mails that you sent to Dr. Hansen during your M2 year.  And

18   you recall those e-mails, right?

19   A.   Yes, I do.

20   Q.   Okay.  And did your legal counsel review those before you

21   sent those out?

22   A.   They reviewed it, yes.

23   Q.   Did they help you draft them?

24         MS. VARGAS:  Objection, your Honor, goes to

25   attorney/client privilege.

```
 1              THE COURT:  Sustained.

 2              MR. MOORE:  Okay.

 3    BY MR. MOORE:

 4    Q.   In fact, at that time the litigation had been going on

 5    for over a year, right?

 6    A.   Yes.

 7    Q.   And you had been communicating your accommodations

 8    through your lawyer, right?

 9              MS. VARGAS:  Objection.  Any communications between

10    Mr. Argenyi and his counsel are protected by attorney/client

11    privilege as Mr. Moore clearly knows which is why he's posing

12    these questions that are not appropriate for being answered in

13    federal court.

14              MR. MOORE:  Your Honor?  I just asked him if his

15    accommodations were going through his lawyers.  I didn't ask

16    what they said.  Clearly, they introduced Exhibit 213 which

17    shows the accommodations were coming between lawyers.  And

18    we're trying to establish the fact that at that time he knew

19    the accommodation discussion was between lawyers.

20              THE COURT:  All right.  Overruled.  He may answer the

21    question as phrased.

22    BY MR. MOORE:

23    Q.   You were aware that accommodation discussions were going

24    on between your legal counsel and Creighton's legal counsel,

25    right?
```

 1    A.   Yes, that's correct.

 2    Q.   And in fact, again looking back at Exhibit 213, your

 3    lawyer had conveyed what accommodations you wanted to

 4    Creighton's lawyer because it was in litigation, right?

 5    A.   I'm sorry, can you clarify the question?

 6    Q.   Sure.  Looking at Exhibit 213, which is a letter from

 7    your lawyer to Creighton's lawyer, that's how your

 8    accommodation requests for M2 were given, were asked for in

 9    the first place, right?

10    A.   Yes, that's right.

11    Q.   So even though you were aware of that, you continued to

12    send these e-mails to Dr. Hansen anyway.

13    A.   Yes, that's right.

14    Q.   Now, despite the fact that Dr. Thedinger said an FM

15    system not only didn't help you but actually made

16    communication worse, you still think an FM system might be

17    helpful in your surgical rotations, right?

18    A.   Yes, I do.

19    Q.   Now, sir, you're asking the medical school to pay back

20    all of the money you spent on auxiliary aids and services

21    during your first two years, right?

22    A.   Yes, that's right.

23    Q.   You're not asking for 10 percent back.

24    A.   I'm sorry?  I don't understand.

25    Q.   You're not only -- you're not asking for Creighton just

1    to pay back 10 percent of that amount, are you?

2            MS. VARGAS:  Objection, asked and answered.

3            THE COURT:  Overruled.  He may answer.

4    A.   No, I'm not.

5    BY MR. MOORE:

6    Q.   You're not asking them to only pay back 20 percent of

7    that amount, are you?

8    A.   Correct.

9    Q.   You're not asking them to pay half of that amount, right?

10   A.   Correct.

11           MS. VARGAS:  Objection, your Honor, this is it

12   argumentative and it's been asked and answered repeatedly.

13           THE COURT:  It is cross-examination.  And counsel

14   gets some leeway on cross.

15       You may submit your next question.

16   BY MR. MOORE:

17   Q.   What you're asking for is 100 percent reimbursement for

18   all the demands you made for your M1 year and all the demands

19   you made for your M2 year?

20           MS. VARGAS:  Objection; asked and answered and

21   argumentative.

22           THE COURT:  Overruled.  He may answer.

23   A.   I'm asking for 100 percent reimbursement, yes.

24   BY MR. MOORE:

25   Q.   Plus the interest your parents are charging you.

1    A.    Yes.

2    Q.    Now, you testified in direct examination that the medical

3    school wouldn't allow you to have interpreters in your

4    longitudinal clinic even if you paid for them yourself; is

5    that right?

6    A.    Yes, that's right.

7    Q.    But if you paid for them yourself, you would be asking

8    Creighton to pay you back for those costs in this litigation,

9    right?

10   A.    Yes, that's correct.

11   Q.    So although -- you didn't offer, I'll pay for it myself

12   and I won't ask Creighton to pay me back.  You said, I'll pay

13   for it myself and I'll try to get it back in the litigation,

14   right?

15   A.    I'm sorry, that's not clear.

16   Q.    Sure.  As I understand it, you didn't say:  Creighton,

17   I'll pay for it, don't worry about it; you said:  Creighton,

18   I'll pay for it and then I'll just add it to the tab that I'm

19   asking for in litigation.

20   A.    I said I would be happy to pay for interpreter to access

21   it.

22   Q.    But once you pay for it, you were going to immediately

23   demand that money back from Creighton in this litigation,

24   right?

25   A.    I don't know.

1    Q.   You don't know.  So what you're -- are you telling this

2    jury today -- well, let me ask you this:  Did you in any

3    documentation, in any communication whatsoever tell Creighton:

4    I'll pay for the interpreters and I won't seek reimbursement

5    through the litigation?

6    A.   No, I did not.

7    Q.   Okay.  And in fact, up to that date, every accommodation

8    that you provided for yourself you submitted the bill to

9    Creighton and said you owe me this because you should have

10   provided that to me in the first place.

11        MS. VARGAS:  Objection, your Honor, the plaintiff has

12   not testified he submitted a single bill to Creighton.  He

13   paid for these things himself and that was his testimony.

14   Mr. Moore is mischaracterizing the testimony of this witness.

15        THE COURT:  The witness may answer the question as

16   phrased.

17   A.   Can you repeat the question, please?

18        MR. MOORE:  Sure.

19   BY MR. MOORE:

20   Q.   As I understand it, for every auxiliary aid and service

21   that you provided for yourself during the M1 and M2 year,

22   you're asking for 100 percent reimbursement plus interest,

23   right?

24   A.   Yes, that's correct.

25   Q.   And you believe that Creighton would be required to

ARGENYI - CROSS                                                        520

1    provide you an interpreter both in your longitudinal clinic in

2    your second year and in your M3 and M4 clinical years, right?

3    A.   Yes, that's correct.

4    Q.   And because it's Creighton's responsibility, if you

5    provided that and paid for it yourself, you would ask

6    Creighton to reimburse you for that amount, right?

7    A.   Yes.

8    Q.   Okay.  So, going back, you said you didn't know, but the

9    fact is, is that even though you said I'll pay for it myself,

10   you're "pay for it yourself" would be to pay for it yourself

11   and then turn around in this litigation and ask for

12   reimbursement for interpreters, right?

13   A.   It hasn't come up.  Yes, that's correct.

14   Q.   Okay.

15           MR. MOORE:  May I have one minute, your Honor?

16           THE COURT:  You may.

17      (Off-the-record discussion had.)

18           MR. MOORE:  May I proceed, your Honor?

19           THE COURT:  You may.

20   BY MR. MOORE:

21   Q.   You indicated in your direct examination that you

22   participated in the -- a conference and talked to people from

23   the American MP -- AMPHL which is -- I think it's the American

24   Medical Professionals with Hearing Loss; is that right?

25   A.   Association of Medical Professionals with Hearing Loss,

1    yes.

2    Q.   Indeed you communicated on a listserv Web site with

3    regard to the accommodations you were requesting from

4    Creighton, right?

5    A.   Yes, that's correct.

6    Q.   And you asked for input from folks on what you should ask

7    for when you came to medical school, right?

8               MS. VARGAS:  Objection, your Honor.  May we approach?

9               THE COURT:  Yes, you may.

10   (Bench conference on the record.)

11              MS. VARGAS:  Your Honor, in docket 350, this Court

12   precluded in limine Mr. Moore from offering evidence or

13   argument related to the posting on the Association of Medical

14   Professionals with Hearing Loss Web site.  Therefore, the line

15   of questioning which he is entering has already been precluded

16   and is improper and should be immediately stopped.

17              MR. MOORE:  Can I see that?

18       Your Honor, I would just ask for relief from this order

19   that although the defendant didn't offer any online comments

20   as an exhibit, the comments that were made back to him on this

21   Web site go to his state of mind and they're relevant.  I

22   don't know why offering the written comments to the jury would

23   be necessary.

24       The only thing we want to ask is what he -- that he was

25   requesting information.  They've provided information on

1    direct examination of this particular organization, that he

2    talked to people in this organization, that he got information

3    from them, all those things.

4        There's a statement in there -- in these online forums in

5    which somebody responded that said, "You should ask for more

6    than what you need."  And we believe that's relevant.

7              MS. VARGAS:  We have never --

8              THE COURT:  The objection is sustained.

9              MS. VARGAS:  Thank you, your Honor.

10       (End of bench conference.)

11   BY MR. MOORE:

12   Q.   Mr. Argenyi, just one more question.  After all that

13   you've said on direct examination and all that you've said on

14   cross-examination with regard to your need for an interpreter

15   in the clinical setting, isn't it true that you told me that

16   you don't even know when you start practicing medicine whether

17   you'll need an interpreter or not?

18   A.   This is true.

19   Q.   So as you sit here today, even though you're demanding

20   interpreters from Creighton University, you don't even know

21   whether you'd even actually use one when you were practicing.

22   A.   Correct.  It depends on the field.

23   Q.   In fact, in your deposition when I asked you:  Do you

24   believe when you start practicing medicine that you'll need an

25   interpreter with you, you said:  I really don't know.  I've

1   gone back and forth.  I really don't know.

2       You didn't say anything about which field.  You just said

3   you just don't know if you need one, right?

4   A.   That's right.

5       MR. MOORE:  I have nothing further, your Honor.

6       THE COURT:  Redirect?

7       MS. VARGAS:  Thank you, your Honor.

8                       REDIRECT EXAMINATION

9   BY MS. VARGAS:

10  Q.   Mr. Argenyi, when Creighton University offered you the FM

11  system before your M1 year, how did you respond?

12  A.   When they offered me the FM system M1 year, I went to an

13  appointment with my audiologist and we tested out a system to

14  see whether it would connect into my cochlear implant so --

15  there are different models of cochlear implants, and we wanted

16  to find one that would actually plug in.

17      So, that's what we did.  My audiologist went out into the

18  hallway, out the door and around the corner and asked if I

19  could hear her, and when she came back, I told her I could

20  hear her voice on the FM system.

21      And at that point when I left, I immediately gave the

22  model information and her contact information to Creighton.

23  Q.   Why did you do that?

24  A.   I did that because I thought the FM system would be

25  helpful.  I thought it would give me -- you know, growing up

1    it gave me sound awareness; like if I heard there was a voice

2    next to me, I knew the professor was speaking so I would pay

3    attention.  I knew that it was time to look up.  And I was

4    planning to try what Creighton provided me.

5    Q.   So, after you went to your audiologist, you obtained

6    information about which FM system would connect with your

7    cochlear implant?

8    A.   Yes, that's right.

9    Q.   And when did you provide that to Creighton?

10   A.   Can you reask the question?

11   Q.   Sure.  When did you provide Creighton with the

12   information about the FM system that could connect to your

13   cochlear implant?

14   A.   I provided that information the same day that I met with

15   my audiologist.

16   Q.   And once you arrived at Creighton University, how long

17   did you try that FM system?

18   A.   I tried that FM system every day for all of my classes,

19   all of my lectures, all of my labs, my small groups.  So we

20   had at least four hours of lecture a day plus several hours

21   for lab or group depending on the day.  So, many, many hours.

22   Q.   Did you tell Creighton what your experience was with the

23   FM system --

24   A.   I did.

25   Q.   -- actually in the medical school classroom?

1    A.   Yes, I did.

2    Q.   And I want to show you what's been marked as Plaintiff's

3    Exhibit 34.

4         MS. VARGAS:  I believe this has already been admitted

5    into evidence.

6         THE COURT:  Exhibit 34 is in evidence.

7    BY MS. VARGAS:

8    Q.   So, you testified that you told Creighton you weren't

9    able to -- well, tell me, what was your experience with the FM

10   system in the lectures?

11   A.   The FM system, as I explained, is kind -- it gives me

12   awareness that the professor was speaking so when I heard the

13   professor's voice, it was like he or she was right next to me.

14   However, I still couldn't understand.  And even with

15   speechreading I still couldn't understand a lot of the

16   lectures.  I also got a lot of feedback and static in the

17   system in their classrooms.

18   Q.   And what was your experience in the lab with the FM

19   system?

20   A.   My experience in the lab is that it just picked up all of

21   the noise that was going on so I had one very loud

22   incomprehensible noise that went into my receiver.

23   Q.   And what was your experience with small groups with the

24   FM system once you actually set foot on Creighton University's

25   campus?

1   A.   My experience is I was still missing what my classmates

2   were saying in the discussions.

3   Q.   And you testified earlier that you told all of this to

4   Creighton, correct?

5   A.   Yes.

6   Q.   And looking at Exhibit 34 which is on the screen, can you

7   tell us what this is?

8   A.   This is the response from Dr. Kavan of September 15th to

9   my September 1st e-mail.

10  Q.   And what did Dr. Kavan offer you in this e-mail?

11  A.   He offered me a designated note-taker.

12  Q.   Would a designated note-taker have allowed you access to

13  the classroom content?

14  A.   No.  It's still a summary -- it's still somebody else's

15  summary of notes and I would still be sitting in the lectures

16  not understanding the professors.

17  Q.   And in this e-mail, does Dr. Kavan address any of your

18  concerns about direct access to the lectures or labs or small

19  groups?

20  A.   No, he does not.

21  Q.   Did you receive any other communications from Dr. Kavan

22  other than this e-mail?

23  A.   No, I did not.

24  Q.   How much did you borrow to pay for the auxiliary aids and

25  services you needed in the first year of medical school?

1    A.    I borrowed approximately 51,000.

2    Q.    And would you have borrowed $51,000 for something you

3    didn't need?

4    A.    Absolutely not.

5    Q.    I want to talk for a minute about the classes that you

6    had in that first month of medical school.  What were the

7    lectures that you had?  What courses did you have?

8    A.    That first semester we had four classes all at the same

9    time.  We had an anatomy class with a lab, we had an ethics

10   course, we had an interviewing and physical exam course that

11   went through the year, and we had molecular and cell biology.

12   Q.    And had you taken any of these courses before?

13   A.    I had taken courses that were similar; for example, I

14   took a biomedical ethics course in undergraduate at Seattle

15   University in which we actually used the same textbook we were

16   using again in medical school.  I also took a two-course

17   sequence of anatomy and physiology so some of the content had

18   overlapped.

19        I also had taken -- as prerequisites I had biology,

20   chemistry, and I also took a two-sequence course of

21   biochemistry so many of the same content was covered in those

22   courses.

23   Q.    And when you took those classes in your undergraduate

24   education, what auxiliary aids and services did you have?

25   A.    I had CART and a cued speech interpreter for labs.

ARGENYI - REDIRECT                                                        528

1    Q.   So, did you have full understanding in your undergraduate

2    education of those classes?

3    A.   Yes.

4    Q.   And when you took those classes at Creighton University

5    in your first year, did the medical school lectures cover any

6    material that you hadn't learned in college?

7    A.   Yes, they absolutely did.

8    Q.   And what was your ability to understand that new

9    information that you hadn't covered before using the FM system

10   that Creighton provided?

11   A.   I wasn't able to.

12   Q.   Why not?

13   A.   Because I couldn't understand the professor.  A lot of

14   time the information wasn't even on the PowerPoint for me to

15   try to read along.  Professors would have accents, they might

16   have facial hair.  The room was dark.  I would miss what other

17   students were contributing to the lectures.  There were many

18   reasons but I just could not.

19   Q.   I'd like to show you what's been admitted into evidence

20   as Plaintiff's Exhibit 5.

21        Now, Mr. Moore showed you parts of this letter.  I want

22   you to look at the whole letter.  And could you show us where

23   in this letter you made specific requests for accommodations

24   in medical school?  You can tell me if you want me to turn the

25   page.

1   A.   I believe it's on the next page, but -- I don't think I

2   have the paper copy with me.

3          MS. VARGAS:  May I approach, your Honor --

4          THE COURT:  You may.

5          MS. VARGAS:  -- to give the witness a copy?

6   BY MS. VARGAS:

7   Q.   With this exhibit in front of you, can you show the jury

8   where you made a specific request for accommodations to

9   Creighton University?

10  A.   So, on the second page, under the header regarding the

11  requested accommodations.

12  Q.   And what did you request?

13  A.   I asked for real-time captioning for lectures, an

14  interpreter -- a cued speech interpreter or an oral

15  interpreter for labs, and an FM system for small groups if

16  they were small and quiet.

17  Q.   Now, Mr. Moore asked you about the second sentence of the

18  paragraph that follows your request for accommodation, the

19  paragraph starts with "I believe".

20         Can you explain what you meant by that second sentence?

21  A.   So, in the preceding paragraph, I had made my request for

22  accommodations.  And in this summary paragraph, I was trying

23  to explain that these are widely accepted accommodations for

24  people with hearing loss in the general community, that both

25  CART and interpretation have been used in the educational

1    setting for --

2             MR. MOORE:  I'm going to object on foundation talking

3    about other accommodations and other universities for other

4    people, and relevance.

5             MS. VARGAS:  He's talking about what his letter said

6    which is exactly what Mr. Moore asked about on his cross.

7    We're just seeking to provide Mr. Argenyi with an opportunity

8    to explain what he meant.

9             THE COURT:  The exhibit is in evidence and right now

10   I understand he's reading from the exhibit itself.  He may

11   respond to the question.

12   A.   Could I respond again?

13        So, in the preceding paragraph, I had made my request for

14   accommodations.  And in that paragraph, I was giving a summary

15   of how these accommodations have been widely accepted both --

16   in education and in other students' education, other students

17   with hearing loss, so they were both accepted and used

18   consistently.

19   Q.   Now, when you arrived at Creighton University and

20   actually began providing your own accommodations, your own

21   auxiliary aids, were they interchangeable for you?

22   A.   No, they were not.

23   Q.   Why is that?

24   A.   Because it depends on the kind of setting that it's in.

25   So, CART is -- you know, when the terminology is really

1    technical, then it was -- it was a lot of information being

2    given one direction, then CART is effective because I know

3    what I'm reading in that instant what I see on the transcript.

4    I'm not guessing at the words.

5         When I've used a cued speech interpreter in the past,

6    it's primarily where I can't have CART with me because we're

7    moving around, such as in a laboratory or on a field trip.  So

8    in those situations a cued speech interpreter was effective.

9    Q.   What impact does your ability to seek clarification have

10   on the effectiveness of interpreters?

11   A.   So, in a slower-paced environment, I can ask the

12   interpreter to clarify what was just said.  They have a

13   short-term recall so I can ask them to repeat what was just

14   said and I don't fall behind.  I don't have to do that with

15   CART, I don't have to ask them to go back because it's there

16   appropriately the first time.

17        And if I had an interpreter in that case and I had to ask

18   for clarification, it means that I would miss the next two or

19   three sentences of the lecture.

20   Q.   Do you know any scientific or medical terminology in sign

21   language?

22   A.   Very limited.

23   Q.   So, for the kinds of medical terminology that was being

24   used in your lecture classes, how would an interpreter try to

25   communicate that information to you?

1    A.    A lot of finger spelling would have been used.

2    Q.    And you testified earlier that you had an opportunity to

3    have Ronda Rankin provide oral interpretation with sign

4    support in that lecture setting.  Correct?

5    A.    Yes, I had her provide interpretation for one of my

6    advanced clinical skills lectures.

7    Q.    And was that effective for you?

8    A.    She used a lot of finger spelling.  It was a slower-paced

9    class, so in that situation, I thought it was fine.

10   Q.    Was there ever a circumstance where Ms. Rankin attempted

11   to interpret for you and wasn't able to do so?

12   A.    She did not interpret for any classes where I had CART,

13   no.

14         THE COURT:  We're going to stop at this juncture

15   because it's noon.

16         Please reconvene in the jury room at 1:15.  We'll begin

17   again then.

18         We're in recess.

19         (Jury out and recess taken at 12:01 p.m.)

20         (At 1:20 p.m. on August 27, 2013, with counsel for the

21   parties, the plaintiff, and the defendant's representative

22   present, and the jury NOT present, the following proceedings

23   were had:)

24         MICHAEL ARGENYI, PREVIOUSLY SWORN, RESUMED THE STAND

25         THE COURT:  Please be seated.

1          I'll take a moment to talk about objections.  Some judges

2     don't allow speaking objections.  That means that essentially

3     they allow a lawyer to say one word, foundation, hearsay, and

4     then there's a ruling; and if there's a need, there's a

5     sidebar.

6          I don't do that, but I want to avoid situations where

7     counsel may use objections either to coach a witness on the

8     stand as to what the witness might want to think about saying

9     or to present argument in front of the jury.

10         So I'm just making you aware of that, that I've been

11    concerned about that on a couple of occasions.  And if that

12    happens, if there's a pattern of that, then we're going to

13    need to go to the practice of not having speaking objections.

14    And if counsel want argument, we're going to have to go to

15    sidebar.  Keep that in mind.

16         Anything you would like to discuss before the jury comes

17    in?

18              MS. VARGAS:  No, your Honor.

19              MR. MOORE:  Nothing from the defendant, your Honor.

20              THE COURT:  Please bring in the jury.

21         (Jury in at 1:22 p.m.)

22              THE COURT:  Ms. Vargas, you may continue with your

23    redirect.

24              MS. VARGAS:  Thank you, your Honor.

25                   REDIRECT EXAMINATION (Cont'd.)

1    BY MS. VARGAS:

2    Q.   Mr. Argenyi, Mr. Moore asked you about his August 20th

3    letter laying out the auxiliary aids that Creighton University

4    would offer you for your second year of medical school.

5         Can you explain to us why, having sign-supported oral

6    interpreters in a lecture was not effective for you?

7    A.   So in the lectures, if I was using a sign-supported oral

8    interpreter, I still don't know a lot of the signs that they

9    would have been using.  I can't lip-read a lot of the terms

10   they would have been using.  I'm still guessing some of those

11   words.  And also I don't have the opportunity to ask for

12   clarification.

13        As I explained earlier, when I have real-time or CART,

14   the transcript is right there and I don't have to guess about

15   any part of it.

16        When I have an interpreter in the lecture, I don't have

17   that gap of time where I can ask for clarification on a sign

18   or something that I couldn't lip-read correctly the first

19   time.

20   Q.   Okay.  And in that same letter, Mr. Moore laid out

21   Creighton University's offer for the labs without what he

22   called didactic portions and that offer was to be able to

23   stand next to the professor.

24        Can you explain whether the opportunity to stand next to

25   the professor during labs would have allowed you effective

1    communication in those labs?

2    A.   In the small group, we would be in like a semicircle.   It

3    was a rectangular array of tables so we were seated around the

4    table.

5         And what they had in mind is that I would be seated next

6    to the professor.   But the problem with that is I have to turn

7    to look at the professor which means that nobody else is in my

8    line of sight so I miss what other people are saying.

9    Q.   Let me make sure I understand what you're talking about.

10   In Mr. Moore's letter, he offered the opportunity to stand

11   next to the professor in labs and the opportunity to sit next

12   to the professor in small groups.   Can you explain whether

13   that would have provided effective communication?

14   A.   No, it wouldn't have because I would miss what other

15   people were contributing to the discussion.   Also, some of the

16   professors I could not lip-read in the first place.   Even if I

17   was next to them, I still wouldn't understand them.   For

18   example, one of my instructors in molecular and cell biology

19   in my small group in that class had a very thick Indian accent

20   and I could not understand him regardless of where I was

21   sitting with him.

22   Q.   Okay.   And generally, are you able to lip-read someone

23   when you're seated or standing directly next to him?

24   A.   It's harder than when I'm directly facing them.

25   Q.   Now, I'd like to talk for a minute about your experience

1   in clinical settings at Creighton University.  What was your

2   first experience in any clinical setting at Creighton

3   University?

4   A.   My first experience was when I volunteered at the Magis

5   Clinic.  As a student we were allowed to volunteer one time

6   per semester so I signed up for my one time per semester both

7   fall and spring my first year.

8   Q.   Okay.  And during your first year at Magis Clinic, what

9   was your experience like?

10  A.   The Magis Clinic is a student led clinic that provides

11  medical care to generally the whole population -- the whole

12  valuable population.  It's based at the St. Francis Siena

13  house in North Omaha.  And it's overseen -- there would be a

14  licensed medical physician on-site who oversees prescriptions

15  and verifies the assessment made by a student.

16      The third- and fourth-year students -- there would be

17  several third- and fourth-year students who are there and

18  responsible for a comprehensive and complete physical exam and

19  report.  They are the ones that develop the treatment plan and

20  ask for prescriptions from the licensed medical physician.

21      The first- and second-year students are responsible for

22  collecting the reason why they came to the clinic and doing as

23  much as they can of the patient history.  And the reason why

24  is when they come in, they might say they have an ache so we

25  ask the questions of -- for so-and-so, when did the ache

1    start, what kind of pain do you feel with the ache.

2    Q.   Okay.  And what did you do during your first year

3    experience in the Magis Clinic?

4    A.   So the first time that I signed up was for the STD clinic

5    or sexual health clinic where they provided HIV testing and

6    other STD testing.  When I arrived there, I was matched with a

7    second-year student and because we were very green, I was just

8    observe -- observing.  So I would go in with a second-year

9    student, ask why they were there and try to follow the

10   conversation.

11       I had a difficult time with that but I thought maybe it

12   was because I was new.  So the second time I went in and --

13   into just the regular clinic in the spring.  And at that time

14   they actually had a shortage of first- and second-year

15   students so I was matched with a third-year student and the

16   third-year student had me go in, ask why they were there and

17   collect information about why they were there.  And I had a

18   hard time understanding those patients that came in.

19       A lot of them had accents or did not have clear English.

20   One patient also had neurological deficits so his sentences

21   were not linked to each other.  He would talk about one topic

22   and the next sentence talk about another topic.  And because I

23   could not -- because he did not provide that context, I could

24   not predict what he was likely to say so I had to pull in the

25   third-year student to do the patient history.

1  Q.   So what did you do for your second year experience in the

2  Magis Clinic?

3  A.   I volunteered in the fall semester and I brought an

4  interpreter with me.

5  Q.   And how was the experience with an interpreter in the

6  Magis Clinic different from the experience without an

7  interpreter in the Magis Clinic?

8  A.   My experience with an interpreter is that I didn't have

9  to ask patient to repeat, I didn't have trouble understanding

10  them.  I was able to collect the information and why they were

11  there.  I could communicate effectively.

12  Q.   Okay.  What impact did your experience in the Magis

13  Clinic have on your request for auxiliary aids on the second

14  year of clinical training at Creighton?

15  A.   So because I had trouble in that clinic, I felt it was

16  going to be similar to the outpatient clinic that I would be

17  doing my second-year clinic in.  I knew I was going to be

18  receiving patients and I was going to be asking for details of

19  their medical history and why they were there.  And from my

20  experience, I can't predict whether these are going to be

21  patients I can understand or not.

22       In the Magis Clinic, some of them I could but many of

23  them I couldn't.  And I knew that I would have a similar

24  experience when I would go to the second-year clinic.

25  Q.   And how is your experience in the clinic different from

1    your experience as a CNA at Seattle Children's Hospital?

2    A.   So, at Seattle Children's Hospital as a CNA, I didn't

3    have to ask for so many specific details about this patient.

4    I was there to provide care for them, to take care of their

5    basic needs, to make them feel comfortable.

6         I was talking about needs such as water, blankets, the

7    things that would make their stay comfortable, that would make

8    them feel like they were paid attention to while the doctors

9    and nurses were doing their business.

10        When I was in the clinic or at Magis Clinic or at the

11   clinic as a second-year student, I was responsible for the

12   diagnostic process, I was responsible for pulling out the case

13   details, figuring out which ones were necessary and which ones

14   were not, piecing them together into a history and trying to

15   figure out why they weren't feeling well.  And in that kind of

16   situation, every detail counts.

17   Q.   After you started the second year clinic, you testified

18   that you went to Dr. Hansen and told him that you were having

19   difficulty in the clinic.

20        And I wanted to ask you -- Mr. Moore made the point that

21   we were in litigation.  Why did you go to Dr. Hansen

22   specifically when you experienced difficulty communicating in

23   the clinic?

24   A.   I went to Dr. Hansen because he was the one who was the

25   coordinator of the second-year clinic.  And I wanted him to

1    know what the experience really was like for me.  I wanted him

2    to be aware that this is what clinic looks like to me.  This

3    is how I struggle with it.  And I wanted him to understand

4    what it is like for a deaf person in the clinic.

5    Q.   Had Dr. Hansen ever given you any instructions to

6    approach him if he was having difficulty -- if you were having

7    difficulty?  I'm sorry.

8         MR. MOORE:  Your Honor, I'm going to make an

9    objection and ask for a sidebar.

10        THE COURT:  All right.

11   (Bench conference on the record.)

12        MR. MOORE:  I just wanted to make sure -- I believe

13   what's happening here is there were some discussions I believe

14   in the temporary restraining order hearing with regard to

15   Dr. Hansen, as well as settlement conferences.  I want to make

16   sure we're staying away from there.  You don't think we've

17   opened some sort of door where you can bring that testimony

18   in?

19        MS. VARGAS:  I had no intention to discuss settlement

20   conversations -- and I think I understand the boundaries of

21   the Court's order on not discussing the Court's decision and

22   pretrial matters.

23      Where I was heading was into the sworn testimony of

24   Dr. Hansen advising Mr. Argenyi during the TRO that if he had

25   any difficulty in communication, he should come to him.

1    Mr. Moore made the point on cross that it was inappropriate

2    for Mr. Argenyi to have done that.  And I'm eliciting

3    testimony that that was in fact exactly what he was told to do

4    by Dr. Hansen and by Mr. Moore.

5           THE COURT:  Well, the current question that is posed

6    to the witness is not objectionable.  It calls for a yes or no

7    answer.  And he may answer yes or no.

8           MS. VARGAS:  Okay.  Thank you.

9        (End of bench conference.)

10   BY MS. VARGAS:

11   Q.   Before you entered your second year of medical school,

12   did you ever have -- were you --

13          MS. VARGAS:  I'm sorry, can you please read back the

14   question?  I want to make sure I get it correctly.

15   Q.   (Repeated by Reporter) Had Dr. Hansen ever given you any

16   instructions to approach him if he was having difficulty -- if

17   you were having difficulty?

18          THE COURT:  You may answer.

19          THE WITNESS:  I'm sorry.  I thought you were

20   rephrasing.

21   A.   Yes.  On several occasions he let me know that if I was

22   having trouble in the clinic that we would work together to

23   figure out a solution.

24   BY MS. VARGAS:

25   Q.   And what did he tell you to do if you experienced

1     communication problems in the clinic?

2     A.   He said to let him know.

3     Q.   During the clinic in the second year, approximately how

4     many times did you let Dr. Hansen know that you were having

5     difficulty understanding in the clinic?

6     A.   I know that I sent four e-mails detailing what happened

7     in the clinic.  I also had, I believe, two or three meetings

8     with him.

9     Q.   Okay.  And at what point in the year did those meetings

10    with Dr. Hansen occur?

11    A.   I had a meeting very soon after the clinic had started.

12    Some were in early September.  And I had another meeting for

13    sure sometime in October.

14    Q.   And after the October meeting, how many times did you

15    communicate to Dr. Hansen that you couldn't understand in the

16    clinic?

17    A.   There was an e-mail in October so I believe by that time

18    between two meetings and two e-mails, there had been four.

19    Q.   And did he respond to any of those e-mails?

20    A.   He responded with an alternative option for a different

21    placement.

22    Q.   What was that alternative option?

23    A.   So, at one of the meetings, we started -- I had told him

24    how I was having trouble with Dr. Townley, with understanding

25    the communication with Dr. Townley in the clinics with the

1    patients, and he said that maybe another environment would be

2    a better fit for my communication needs, and so he brought up

3    the pediatrics clinic as a potential option.

4        He asked me if Dr. Townley was still -- still had a

5    pediatrics clinic, and I said that I was very interested in

6    pediatrics.  I really wanted to the work with kids.  I said

7    that would be a great opportunity but I also explained working

8    with pediatrics patients is different.

9        The families may be more articulate, it may be easier to

10   understand the parents but it's also more complicated because

11   you have to understand the kid too.  And if the kid is

12   speaking, age three, four, I can't understand kids that are

13   that young.

14       And also just there are more people in the room.  Now

15   there's not only the parents but there's also the child in the

16   room so I explained there are other communication difficulties

17   that come up in that placement but I would be happy to try it.

18       So, at some time -- sometime a few weeks later he set up

19   the opportunity for me to also do a pediatric placement.  So

20   every two weeks I would go to a different location.  So, in

21   one -- so, in a month, the first two weeks I was in the

22   pediatric location and then the following clinic two weeks

23   later I would be back with Dr. Townley.  So I had two times

24   where I tried that.

25   Q.   And how was your communication in the pediatric clinic?

1    A.   As I had explained to Dr. Hansen before I started, we

2    had -- I had a difficult time.  I couldn't understand the kids

3    very easily.  For example, there was one time where the mother

4    was there with the child who was sick but she also had her

5    other children with her.  So it was very chaotic trying to

6    follow what the mom was trying to say with the kids talking in

7    the background and not knowing whether the kids were also

8    involved in that conversation.

9         There was also a consult on a baby that came in that was

10   really sick.  And so my supervising physician was there,

11   another physician who was actually responsible for that baby

12   was there and the parents were there.  There were several of

13   us in the room.  And I had no idea what was going on.

14   Q.   How many people were in the room during the consult on

15   that sick baby?

16   A.   I don't remember how many exactly but there were at least

17   five.

18   Q.   And was there any auxiliary aid that would have allowed

19   you to have effective communication in that setting?

20   A.   Yes, an interpreter.

21   Q.   Were you permitted to have an interpreter in the

22   pediatric clinic?

23   A.   I was not.

24   Q.   What if you paid for it yourself?  Were you permitted to

25   have an interpreter if you paid for it yourself in the

1    pediatric clinic?

2    A.    No, I was not.

3    Q.    Had you known that you would never receive any of the

4    money back that you spent on auxiliary aids and services,

5    would you still have provided those services for yourself?

6    A.    Yes, I would have.

7    Q.    Why is that?

8    A.    Because I need that information to do my job.

9    Q.    Did there come a point during the second year of medical

10   school that Creighton did agree to provide interpreters in the

11   clinic?

12   A.    Yes, there was a time.

13   Q.    And what was your experience using interpreters during

14   that time in the clinic?

15   A.    My experience was that I didn't have to ask patients to

16   repeat, I could actually understand every single patient that

17   I worked with, I didn't have to worry about whether I would go

18   into the room and this would be somebody I could understand.

19        Before, if I went into a room and it was somebody I could

20   understand, it was a sigh of relief, and I thought, This is

21   somebody I can work with for this one appointment.  But when I

22   left that the room, I wouldn't know about the next one.

23        With the interpreter there, I didn't have to worry about

24   that.  I didn't have to feel like I was embarrassing the

25   patient because I couldn't understand them.  I could get all

 1    of the information I needed to make what I thought would be a

 2    competent diagnosis for my skill level.

 3         I thought I could walk back out and I felt I could

 4    confidently present what happened to Dr. Townley, and then

 5    when the three of us would go back into the room, I would

 6    understand what was going on and I would be able to say yes,

 7    oh, I missed that piece of information, that was a good way to

 8    ask for that kind of information.  I was able to learn from

 9    watching her because I knew what I had done and I knew what I

10    was still missing because I was still learning.

11         It was just amazing.

12    Q.   How many clinics did Creighton University allow you to

13    have an interpreter for?

14    A.   I believe three.

15    Q.   And what happened in that third clinic?

16    A.   At the last clinic, I brought my interpreter with me.

17    And Dr. Townley --

18              MR. MOORE:  I'm going to object at this point and I'm

19    going to ask for a sidebar.

20              THE COURT:  All right.

21         (Bench conference on the record.)

22              MR. MOORE:  Your Honor, we let it go that she said

23    Creighton agreed to provide the interpreter.  That's a

24    violation of the order that you did.  But we didn't object, we

25    let it go.

1        But now I believe asking the circumstances in which the

2   interpreter stopped is not talking about having interpreters,

3   not having interpreters.  I think she's getting into why it

4   was stopped and that it was stopped, how he was treated when

5   it was stopped.  And that goes directly to the issue of

6   settlement that we have been talking about.

7        MS. VARGAS:  I understood the Court's ruling to be

8   that we were free to offer testimony about how he could

9   communicate in the interpreters with -- how he could

10  communicate in the clinic with the interpreters and without;

11  and Ms. Rankin has already offered testimony about what

12  happened on that last day from her perspective.

13       I understand we're not allowed to ask about settlement.

14  And I registered my objection with that pursuant to 408(b).

15  And I understand the boundaries of that, and I'm not seeking

16  to cross over those boundaries.

17       THE COURT:  Okay.  We'll just have to see where it

18  goes.

19       MR. MOORE:  Okay.

20       (End of bench conference.)

21  BY MS. VARGAS:

22  Q.   What happened that last day of clinic?

23  A.   So, on that last day of clinic, I brought my interpreter

24  with me.  And shortly after we arrived, Dr. Townley, my

25  supervisor, pulled me into a patient room, just me and my

1    interpreter.  And she explained that my interpreter needed to

2    leave.  It was upsetting, but I -- I asked her a couple of

3    minutes, I excused myself from the clinic for a few minutes

4    and went outside, and I talked to my interpreter and then she

5    left at that point.

6        I came back in and Dr. Hansen was there and he said that

7    I should have not brought my interpreter with me.  He said he

8    was sorry that it happened this way but I should have known

9    not to bring my interpreter with me at that point.

10   Q.   And what did you do for the rest of clinic that day?

11   A.   For the rest of that clinic, I went back to my duties.  I

12   would go back to patient rooms, try to figure out what the --

13   why they were there, do a examination if I could, but I was

14   back to missing information.

15       MS. VARGAS:  Your Honor, if I may, I'd like to

16   approach and show the witness what's been marked as

17   Plaintiff's Exhibit 26.

18       THE COURT:  You may.

19       MS. VARGAS:  Thank you.

20   (Off-the-record discussion had.)

21   BY MS. VARGAS:

22   Q.   Mr. Argenyi, showing you what's been marked as

23   Plaintiff's Exhibit 26, do you recognize this document?

24   A.   Yes, I recognize this document.

25   Q.   What is it?

 1    A.   This is the last e-mail that I sent to Dr. Hansen in

 2    April 2011.

 3              MS. VARGAS:  Your Honor, at this time I move to have

 4    Plaintiff's Exhibit 26 admitted into evidence.

 5              THE COURT:  Any objection to 26?

 6              MR. MOORE:  Yes, there's an objection, your Honor, an

 7    objection that we've already dealt with.  We can have a

 8    sidebar if you'd like.

 9              THE COURT:  Let me read the exhibit first.

10        All right.  Unless there is redaction to this exhibit,

11    the objection is sustained.

12              MS. VARGAS:  Your Honor, may I have a sidebar to

13    clarify?

14              THE COURT:  You may.

15        (Bench conference on the record.)

16              THE COURT:  There's one question I had for you.  What

17    is the reference to a shooting?

18              MS. VARGAS:  There was a shooting in the clinic and

19    Mr. Argenyi didn't have access to PA overhead announcements.

20    He wasn't there at the time, but he was, as I understand it,

21    trying to point out the importance of having access to all of

22    the information.  We're happy to redact that in whatever way

23    you think is appropriate.

24              THE COURT:  The parts that would alleviate my

25    concerns if you were to redact them would be to redact the

1    last paragraph in its entirety and then the first paragraph

2    with the exception of the first sentence.

3              MS. VARGAS:  I'm happy to do that.  Do you have a

4    Sharpie or --

5              MR. MOORE:  We also ask to redact that portion with

6    regard to the shooting.

7              THE COURT:  That's in the last paragraph.  I'm taking

8    that out.

9              MR. MOORE:  We have no objection unless the

10   redactions are not made.

11             THE COURT:  Okay.  We'll get you a marker.

12        (End of bench conference.)

13             THE COURT:  26 has been offered.  There's been an

14   objection.  We had a sidebar and I will now receive Exhibit 26

15   redacted pursuant to the sidebar.

16   BY MS. VARGAS:

17   Q.   Mr. Argenyi, I'm showing you what's been --

18             MR. MOORE:  I believe you can see the redaction

19   portion on the screen -- at least we can on our screen.

20             THE COURT:  Let's take it down until --

21        (Off-the-record discussion had.)

22   BY MS. VARGAS:

23   Q.   With the exception of the redactions, is this a true and

24   accurate copy of the e-mail that you sent to Dr. Hansen?

25   A.   Yes, it is.

1    Q.   And could you please read the second, third and fourth

2    paragraphs -- what's showing on the screen?

3    A.   "After the interpreters were ordered out of the clinic, I

4    no longer had effective communication.  For the remainder of

5    that clinic, I saw one patient with the resident also present

6    as this patient had a complicated case presentation.  It was a

7    difficult conversation, where I would estimate that I could

8    access about 65 percent of what was said, especially after the

9    resident stepped in to direct the patient interview because of

10   mismatches in the patient history.  This also *[sic]* involved

11   *[sic]* having a private conversation with a *[sic]* neurologist

12   and the medical student with her.  With multiple persons

13   present, I estimate that I only got about 50 percent of the

14   communication.

15       "During clinic on March 17th, I saw two patients.

16   Luckily, the first of those patients was relatively easy for

17   me to lipread.  She was articulate and I picked up her lip

18   movements quickly, understanding nearly 90 percent.  With the

19   second patient, I understood only about 80 percent of

20   communication.  When I met with her alone, she mumbled her

21   words and covered her mouth often, breaking sentences into

22   chunks.  When the infectious disease specialist was present,

23   my understanding dropped sharply, as adding a third

24   participant to communication reduces my ability to communicate

25   without an interpreter.

1          "In the following clinic on March 31st, I saw three

2     patients.  Notably, one had a previously broken jaw and

3     mumbled, and despite asking numerous times to repeat himself,

4     I still struggled, getting only about 45 percent

5     independently, and even less when Dr. Townley performed her

6     exam."

7     Q.    Did you receive a response to that e-mail?

8     A.    No, I did not.

9     Q.    Did you receive any instructions from Mr. Moore about

10    further requests for auxiliary aids?

11               MR. MOORE:  Objection, your Honor.

12               THE COURT:  From Mr. Moore?  Sustained.

13    BY MS. VARGAS:

14    Q.    At any point, were you instructed not to make any further

15    requests for auxiliary aids?

16    A.    Yes, I was told not to ask for anything.

17    Q.    I'd like to turn to the videos we saw this morning of

18    what's called the OSCE.  And I wanted to ask whether you could

19    understand the videos when they were shown this morning in

20    court?

21    A.    No, I did not.

22    Q.    During the first video with the interpreter, you reached

23    behind your ear at one point during the patient's exam.  What

24    were you doing?

25    A.    The cochlear implant has programs on it.  They're

1    basically like computer programs that tell how to receive

2    sound and what to do from that point.  So, I have a special

3    program for using the stethoscope that amplifies low

4    frequencies where breath sounds tend to be and amplify them --

5    make them even louder so I was switching to the stethoscope

6    program.

7    Q.   And what kind of stethoscope were you using?

8    A.   I was using an amplified stethoscope that has a higher

9    volume output.  It's electronic and it plugs into my cochlear

10   implant.

11   Q.   In the videotapes of the OSCEs that we saw, how close

12   were you to the patients that were speaking?

13   A.   At times I was one foot away.  When I was sitting with

14   the psychiatric mock patient, I was probably four feet away.

15   Q.   And in the first session with the interpreter, where was

16   the interpreter standing -- in comparison to the patient?

17   A.   The interpreter was in my line of sight.

18   Q.   Can you explain what you mean by that?

19   A.   So that means wherever I was standing, I could use my

20   field of vision to see the interpreter.  Even if I was looking

21   at the patient, the interpreter was in the periphery of my

22   vision.

23   Q.   And how would you compare the communication you had in

24   the first video with the interpreter to the second two videos

25   without the interpreter, if you remember?

1    A.   So I was more confident, I knew I wasn't missing

2    anything, I knew I would catch medicine names if they were

3    mentioned.  Although sometimes the patient -- the mock patient

4    that I had, I know the one where I had the long psychiatric

5    history, when I walked in and talked to that one, I was

6    relieved because it was one of those patients that I could

7    understand more easily.

8    Q.   What about that patient could you understand more easily?

9    A.   He didn't have facial hair, there was no accent, he spoke

10   clear English, he was very relaxed, very calm.  He was also --

11   he gave me a lot of information that I could fill in the

12   context so even if I missed one word, it was pretty easy to

13   predict what would have been there.

14   Q.   Now, in that video with the pretend psychiatric patient,

15   by my count you said sorry three or four times.  Why were you

16   saying you were sorry to the patient?

17   A.   I say I'm sorry when I don't catch something that was

18   said.

19   Q.   And so, in the second video with the young man with

20   breathing problems, again by my count, I counted four times

21   you said sorry that I could hear.  And what did you mean when

22   you said sorry to him?

23   A.   I was apologizing that I didn't catch what he said and

24   having him repeat again.

25   Q.   Were you aware that the young man with the breathing

1    problems -- if you remember, were you aware if he said he was

2    taking Singulair?

3    A.    I don't remember.

4    Q.    How many OSCEs did you say you had during medical school?

5    A.    From my memory, the first year we had one per semester

6    and then the second year we had one per semester that was two

7    parts each.

8    Q.    Okay.  And did your professors or anybody at Creighton

9    University ever show you those videos to help you learn from

10   your mistakes?

11   A.    No, they did not.

12   Q.    After the classes ended, have you ever been provided with

13   copies of all of the videos of the OSCEs?

14            MR. MOORE:  I'm going to object to the extent this is

15   a discovery issue, Your Honor, that's been closed and

16   determined and by the court.

17            MS. VARGAS:  I can rephrase, your Honor.

18            THE COURT:  All right.

19   BY MS. VARGAS:

20   Q.    Did we see all of the videotapes this morning that were

21   taken of you during OSCE examinations at Creighton University

22   or did we only see selected videos?

23   A.    You only saw some.

24   Q.    And how did your experience in the OSCE compare to your

25   experience in the clinic at Creighton University?

1    A.   With the OSCE, we actually could prepare a lot.  Students

2    would talk about what patients were in the clinics.  They

3    would talk about where there might be an asthma patient, there

4    might be a patient with bowel issues.  But we also were given

5    a lot of cues on what to study before we went in.  We were

6    given the criteria that we would be graded on.  So when we

7    walked into the room, there was a level of expectation from

8    previous years of this is what we might anticipate; this is

9    what we're looking for.

10       The patients also were healthy.  None of the ones that I

11   had for my OSCE had accents or facial hair or spoke a

12   different language or had broken jaws or mumbled.  They were

13   clear, they were concise.

14       In the second year, we actually -- if you asked

15   appropriate questions, they actually gave you a note card with

16   the symptom so they were written down when you left the room.

17   So it was much more predictable and much more formal.

18       When I went to the clinic, I couldn't predict any of

19   that.

20   Q.   Did any patients in the clinic ever give you a note card

21   with all of your symptoms written down?

22   A.   No, they did not.

23   Q.   Did Creighton University offer you even one dollar to

24   help pay for auxiliary aids in the first semester of your

25   first year?

1    A.    No.

2    Q.    After Dr. Thedinger told them the FM system actually made

3    your hearing worse, did Creighton University offer you even

4    one dollar to pay for the auxiliary aids and services you used

5    in the first year?

6    A.    No, they did not.

7    Q.    And after you told Creighton University that you were

8    taking a leave of absence, did they offer you even a single

9    dollar to help you cover the cost of the auxiliary aids and

10   services you had provided for two years at Creighton

11   University?

12   A.    No.

13          MS. VARGAS:  No further questions, your Honor.

14          THE COURT:  All right.  Thank you, Mr. Argenyi.  You

15   may stand down.

16      And the plaintiff may call its next witness.

17          MS. VARGAS:  Thank you, your Honor.

18          MS. DeLAIR:  Your Honor, at this time we would call

19   Dr. Floyd Knoop to the stand.

20          THE COURT:  Dr. Knoop, if you'll please come forward

21   and come up to the bench where the courtroom deputy is, she

22   will swear you in.

23          COURTROOM DEPUTY:  State your full name for the

24   record, and spell your last name.

25          THE WITNESS:  Floyd Knoop, K-n-o-o-p.

1            FLOYD KNOOP, PLAINTIFF'S WITNESS, SWORN

2            THE COURT:  You may inquire.

3                       DIRECT EXAMINATION

4       BY MS. DeLAIR:

5       Q.    Please state your name.

6       A.    My name is Floyd Knoop, K-n-o-o-p.

7       Q.    Do you teach at Creighton University Medical School?

8       A.    I do.

9       Q.    Do you have a medical degree?

10      A.    No, I don't.  I have a PhD.

11      Q.    Were you -- when Mr. Argenyi was in his first year of

12      medical school, you were responsible for overseeing the first

13      year curriculum; is that correct?

14      A.    Yes.

15      Q.    That must have been a very busy schedule, right?

16      A.    Correct, yes.

17      Q.    But you found the time to go to Mr. Argenyi's classes

18      during his first year of medical school to take his attendance

19      and to find out what auxiliary aids and services he was using;

20      isn't that right?

21      A.    Would you repeat that, please?

22      Q.    During the first year, did you go around to Mr. Argenyi's

23      classes and take attendance, if he was there or not?

24      A.    Yes.

25      Q.    And did you record what type of auxiliary aid and service

1    he had?

2    A.   I did.

3    Q.   And you did that because Creighton's lawyers asked you

4    to?

5              MR. MOORE:   Objection --

6    A.   Yes, I was asked for --

7              MR. MOORE:   -- calls for attorney-client --

8              COURT REPORTER:   Wait...

9              THE COURT:   We have to stop when there's an

10   objection.

11             MR. MOORE:   Calls for attorney-client privilege.

12             THE COURT:   Just a moment.   Sustained.

13   BY MS. DeLAIR:

14   Q.   Now, you went to his classes in October to take

15   attendance, correct?

16   A.   Yes.

17   Q.   In 2009?

18   A.   Yes.

19   Q.   And in November of 2009?

20   A.   Yes.

21   Q.   And in December of 2009?

22   A.   Yes.

23   Q.   In fact, you kept records on Mr. Argenyi for the entire

24   school year, right?

25   A.   That's correct, except for August and September.

1          MS. DeLAIR:  Your Honor, I'd like to approach the

2     witness with an exhibit, please.

3          THE COURT:  You may.

4     BY MS. DeLAIR:

5     Q.   Dr. Knoop, I'm showing you what's been marked as

6     Plaintiff's Exhibit No. 27.  Can you take a look at that

7     document, please?

8     A.   Yes.

9     Q.   Do you recognize the contents of that document?

10    A.   Yes.

11    Q.   Does it appear to be an accurate copy of the attendance

12    records you took on Mr. Argenyi?

13    A.   Yes.

14         MS. DeLAIR:  Your Honor, at this time I would move to

15    admit and offer Plaintiff's Exhibit No. 27.

16         MR. MOORE:  No objection, your Honor.

17         THE COURT:  Exhibit 27 is received.

18    BY MS. DeLAIR:

19    Q.   Now, these are all the calendars where you kept the

20    attendance for Mr. Argenyi and what he had in class for

21    auxiliary aids and services, correct?

22    A.   Yes.

23    Q.   And it's about 21 pages long; is that about right?

24    A.   I'm not sure how long this is.

25    Q.   It's quite a few documents here, wouldn't you say?

```
 1    A.    There's one for each month, yes.

 2    Q.    Some of the calendars have only two weeks on them; is

 3    that correct?

 4    A.    That's correct.

 5    Q.    Now, Dr. Knoop, you didn't take attendance on anybody

 6    else in Mr. Argenyi's first year class except him, did you?

 7    A.    That's correct.

 8              MS. DeLAIR:  I have no further questions, your Honor.

 9              THE COURT:  Cross-examination?

10              MR. MOORE:  Your Honor, at this time, as I understand

11    that we can't do our direct examination, we'll reserve and

12    call Mr. Knoop during our case in chief.

13              THE COURT:  Very good.  Thank you, Mr. Knoop.  You

14    may step down.  You will be subject to recall during the

15    defendant's case in chief.

16              THE WITNESS:  Thank you.

17              THE COURT:  You may call your next witness.

18              MS. VARGAS:  Thank you, your Honor.  The plaintiff

19    calls Dr. Thomas Hansen.

20              THE COURT:  Dr. Hansen, if you'd please come forward

21    to the courtroom deputy, who is here in front of me on my

22    right, she will swear you in.

23              COURTROOM DEPUTY:  State your full name for the

24    record, please, and spell your last name.

25              THE WITNESS:  Thomas J. Hansen, H-a-n-s-e-n.
```

```
 1              THOMAS HANSEN, PLAINTIFF'S WITNESS, SWORN

 2              THE COURT:  You may inquire.

 3              MS. VARGAS:  Thank you, your Honor.

 4                          DIRECT EXAMINATION

 5   BY MS. VARGAS:

 6   Q.   Good afternoon.  Will you please state your full name for

 7   the record?

 8   A.   Thomas J. Hansen, H-a-n-s-e-n.

 9   Q.   And you went to -- you attended Creighton Medical School,

10   right?

11   A.   Yes, I did.

12   Q.   And after graduating from Creighton's Medical School, you

13   did a fellowship at Creighton?

14   A.   I did a residency at Creighton.

15   Q.   You did a residency?  Did you also do a fellowship at

16   Creighton?

17   A.   I did not.

18   Q.   Did you work at Creighton as a faculty member?

19   A.   Yes, I did.

20              MS. VARGAS:  Your Honor, at this point I would move

21   for permission from the Court to treat Dr. Hansen as a hostile

22   witness.

23              THE COURT:  Any objection?

24              MR. MOORE:  No.  He's an adverse witness, your Honor.

25              THE COURT:  Very good.  You may.
```

1          MS. VARGAS:  Thank you, your Honor.

2     BY MS. VARGAS:

3     Q.   Now, in January of 2010 you interviewed at Creighton

4     University for a promotion to the position of the Associate

5     Dean of Medical Education; is that correct?

6     A.   I started as Associate Dean on January 1, so the

7     interview actually took place in October or November.

8     Q.   So you interviewed in October or November of 2009 --

9     A.   That's correct.

10    Q.   -- for the position.

11         And during that interview, one of the topics that the

12    hiring committee discussed with you was Mr. Argenyi's lawsuit

13    against Creighton University; isn't that correct?

14    A.   The Dean at the time --

15    Q.   That's a yes or no, sir.

16         MR. MOORE:  Your Honor, I'd ask that he be given the

17    opportunity to answer the question.

18         THE COURT:  Because he is being treated as an adverse

19    witness, if you can answer the question yes or no, answer it

20    yes or no.  If you can't, let us know that you cannot answer

21    the question yes or no.  And then counsel may require -- or

22    may request some additional explanation from you.

23         But I'll ask that you don't volunteer beyond yes or no

24    questions -- I mean beyond yes or no answers.

25         Go ahead.

1    A.   Yes.

2    BY MS. VARGAS:

3    Q.   Just to be clear, during the interview, one of the topics

4    the hiring committee discussed with you was Mr. Argenyi's

5    lawsuit, correct?

6    A.   Yes.

7    Q.   And after the interview, you were hired.

8    A.   That is correct.

9    Q.   As Associate Dean -- the new Associate Dean of Medical

10   Education, you were the point person for Mr. Argenyi's

11   requests for captioning and interpreters for his second year

12   of medical school, right?

13   A.   That is not correct.

14   Q.   Do you recall being deposed in this case?

15   A.   Yes, I do.

16   Q.   And do you recall offering testimony that as the

17   Associate Dean of Medical Education, you had a role in the

18   decisions with respect to Mr. Argenyi?

19   A.   Yes, I do.

20   Q.   And in fact, in a hearing in this court, didn't you

21   testify that if there were any problems Mr. Argenyi

22   experienced communicating in the clinic, that he should come

23   directly to you?

24   A.   Yes, I do.

25   Q.   So Creighton University decided before the start of the

1    second year of medical school that it would not allow

2    Mr. Argenyi to use interpreters in the clinic.

3    A.   That is correct.

4    Q.   Right?  And specifically, that he would not be allowed to

5    use interpreters in the clinic, even if he paid for them

6    himself, correct?

7    A.   That is correct.

8    Q.   And in making that decision, you didn't consult any deaf

9    doctors, did you?

10   A.   No, I did not.

11   Q.   And you didn't consult any people who trained deaf

12   doctors using interpreters, did you?

13   A.   No, I did not.

14   Q.   And in fact, before you met Mr. Argenyi a week before

15   school started, you had never even met another deaf doctor or

16   deaf medical school student, correct?

17   A.   That is correct.

18   Q.   On that very first day of clinic, Mr. Argenyi's clinic in

19   the second year of school, you were present with him and with

20   Dr. Townley at the start of clinic.

21   A.   That is correct.

22   Q.   And you were present when Dr. Townley, who is the

23   clinical instructor, asked Mr. Argenyi if an interpreter was

24   coming to translate for him, correct?

25   A.   That is correct.

1    Q.   And you responded by telling Dr. Townley that Creighton

2    had decided there would be no interpreter in the clinic,

3    right?

4    A.   That is correct.

5          MS. VARGAS:  If I may approach the witness to show

6    Exhibit 22?

7          THE COURT:  You may.

8    BY MS. VARGAS:

9    Q.   Do you recognize this document, Dr. Hansen?

10   A.   Yes, I do.

11   Q.   You received this document in September, September 21st

12   of 2010?

13   A.   Yes.

14   Q.   And could you please read aloud the fifth paragraph

15   beginning with "the fact"?

16   A.   "The fact is some people are easier to lip-read than

17   others.  For example, there's a distinct difference, facial

18   attributes notwithstanding, between a composed patient who is

19   very easy to lip-read and one who fidgets and becomes

20   emotional.  In those situations, my understanding can drop

21   dramatically.  Situations where there is an additional person

22   involved in the communication, such as where a family member

23   participates, are also usually more difficult.  I average, by

24   my own estimates, under 60, 70 percent confident understanding

25   of patients with a very wide range, given some of these

 1    factors I have managed to describe.  Also with the constant

 2    background noise in the hall, I do not always catch

 3    conversations about patients or other clinical concerns.

 4    Again, I understand that Creighton has said it will not fail

 5    me if I show up.  My primary concern is not in my grade, but

 6    in providing a positive experience for my patients and

 7    learning what clinic is supposed to teach me.  I've also been

 8    unable to understand two overhead pages, PA announcements, or

 9    the telephone."

10    Q.   Is understanding 60 to 70 percent of patient

11    communication what you would call effective communication,

12    Dr. Hansen?

13    A.   That is not ideal communication.

14    Q.   Is it effective communication to understand 60 to 70

15    percent of what a patient tells you?

16    A.   No, that's not.

17    Q.   And do you see in this e-mail where Mr. Argenyi says that

18    there are deaf doctors all over the United States who have

19    used interpreters in medical schools and clinics?

20    A.   Yes, I do.

21    Q.   But you never contacted any of those deaf doctors, did

22    you?

23    A.   No, I did not.

24    Q.   And you never contacted anyone who has trained those deaf

25    doctors.

1    A.   No, I did not.

2    Q.   At the end of the first page, do you see where

3    Mr. Argenyi asked for permission to pay for his own

4    interpreter?

5    A.   Yes, I do.

6    Q.   But Creighton wouldn't let him have the interpreter even

7    if he paid for it himself, would they?

8    A.   That is correct.

9    Q.   I'd like to show you what's been marked as -- what's been

10   accepted into evidence as Plaintiff's Exhibit 23.

11          MS. VARGAS:  May I approach?

12          THE COURT:  You may.

13          MS. VARGAS:  Thank you.

14   BY MS. VARGAS:

15   Q.   Do you recognize this document?

16   A.   Yes, I do.

17   Q.   So, in this e-mail dated October 8, 2010, Mr. Argenyi

18   told you about his difficulties again communicating in the

19   clinic without interpreters.  And you received this e-mail.

20   A.   That is correct.

21   Q.   Can you please read aloud the paragraph about

22   Mr. Argenyi's communication in the clinic with the first

23   patient he calls Patient One without an interpreter?

24   A.   "Patient One:  When it was one-on-one, I understood about

25   70 percent, despite constant repeating and summary.  When

1    Dr. Townley performed her attending evaluation, it dropped to

2    40 percent.  And during the procedure, Pap smear, it was

3    virtually zero percent."

4    Q.   Is understanding 70 percent of communication in a

5    clinical setting, is that effective communication?

6    A.   It is not ideal.

7    Q.   I didn't ask if it was ideal, I asked if it was

8    effective.  We're talking about patients here.  Is it

9    effective communication to only be able to --

10   A.   It is not effective.

11   Q.   And I assume you would agree that understanding zero

12   percent of a patient who is having a Pap smear in a clinical

13   setting, that's not effective communication either, is it?

14   A.   No.

15   Q.   Could you please read aloud the paragraph about Patient

16   Number Two?

17   A.   "Patient Two:  I understood 85 percent, which dropped to

18   about 60 percent when Dr. Townley came in and I had to follow

19   both individuals."

20   Q.   Was understanding 85 percent in a clinical setting of

21   what a patient has to tell you, is that effective

22   communication?

23   A.   No, it is not.

24   Q.   And 60 percent in a clinical setting, is that effective

25   communication?

1    A.    No, it is not.

2    Q.    Could you please read aloud the paragraph about the third

3    patient, Patient Number Three?

4    A.    "Patient Three:  I talked with the parents of a medically

5    complex child also present and a very frustrated father

6    proceeded to give me a ten-minute lecture on the role of a

7    physician and their lack of availability.  I understood

8    probably 70 percent, before I was interrupted by medical

9    staff.  I then came back in later with Dr. Townley and

10   followed about 50 percent between three people."

11   Q.    So, was understanding 70 percent, like Mr. Argenyi

12   reports to you, of patient communication, was that effective

13   communication?

14   A.    No, it was not.

15   Q.    And was understanding 50 percent effective communication?

16   A.    No, it is not.

17   Q.    Do you see in this e-mail where Mr. Argenyi again asks if

18   he could pay for his own interpreters so he could understand

19   what his patients were saying?

20         Second paragraph from the bottom, first sentence.

21   A.    Yes, I do.

22   Q.    But Creighton still wouldn't let this young man pay for

23   his own interpreters to understand patients in your clinic; is

24   that correct?

25   A.    That is correct.

1    Q.   Now, isn't it true that you've said, under oath, that

2    there's no amount of documentation that Mr. Argenyi can

3    provide that will convince you to allow him to have

4    interpreters in the clinic setting?  Did you say that under

5    oath?

6    A.   I'd like to see that document, please.

7    Q.   I would be happy to show you.

8         MS. VARGAS:  Your Honor, may I put it on the ELMO?

9         THE COURT:  Yes, you may.

10   BY MS. VARGAS:

11   Q.   Dr. Hansen, could you please read the highlighted portion

12   beginning on line 11 with Q, meaning question?

13   A.   "What I'm asking is, is there any documentation that

14   Michael can provide to the committee that would change its

15   mind about allowing interpreters in the clinical setting?"

16   Q.   And then continuing on line 17.

17   A.   "I do not believe that there is.  I would have to bring

18   this back to the MEMT, but the decision was fairly clear that

19   we felt that it was important to uphold the technical

20   standards."

21   Q.   The decision was fairly clear or very clear?

22   A.   Very clear.

23        MS. VARGAS:  May I approach the witness and show him

24   Exhibit 26, your Honor?

25        THE COURT:  Yes, you may.

1              MS. VARGAS:  Thank you.

2          (Off-the-record discussion had.)

3      BY MS. VARGAS:

4      Q.   Now Dr. Hansen, if you could please be careful not to

5      read the portions of the e-mail that are crossed out.

6      A.   Okay.

7      Q.   Do you recognize this e-mail?

8      A.   Yes, I do.

9      Q.   And this is an e-mail which you received December 6,

10     2010, from Mr. Argenyi, correct?

11     A.   It's dated April 7, 2011.

12     Q.   I'm sorry, I skipped one.  Let's talk about this one.

13          In this e-mail -- could you please read the first

14     paragraph?

15     A.   Beginning with "I'm writing," or the first paragraph

16     that's legible?

17     Q.   The first paragraph that's not crossed out.

18     A.   Sure.  "After the interpreters were ordered out of the

19     clinic, I no longer had effective communication.  For the

20     remainder of that clinic, I saw one patient with a resident

21     also present, as this patient had a complicated case

22     presentation.  It was a difficult conversation, where I would

23     estimate that I could access about 65 percent of what was

24     said, especially after the resident stepped in to direct the

25     patient interview because of mismatches in the patient's

1    history.  This also -- this involved also having a private

2    conversation with a neurologist and the medical school student

3    with her.  With multiple persons present, I estimate that I

4    got only about 50 percent of the communication."

5    Q.   And 50 percent of the communication wasn't effective

6    communication in the clinic, was it?

7    A.   No, it's not.

8              MS. VARGAS:  And if I may approach and show Exhibit

9    25, which I inadvertently skipped over?

10             THE COURT:  You may.

11             MS. VARGAS:  Thank you.

12   BY MS. VARGAS:

13   Q.   You recognize this document also, right?

14   A.   Yes, I do.

15   Q.   Is this yet another e-mail from Mr. Argenyi begging you

16   to let him have effective communication in the clinic?

17             MR. MOORE:  Objection, your Honor, form of the

18   question, "begging".

19             MS. VARGAS:  I'll rephrase.

20             THE COURT:  Sustained.

21   BY MS. VARGAS:

22   Q.   Is this the fourth or fifth e-mail that Mr. Argenyi had

23   sent you detailing his inability to communicate in the clinic

24   and asking for permission to pay for his own interpreters so

25   he could understand the patients in your clinic?  Is that

1    correct?

2    A.   Yes, that is correct.

3    Q.   Now, returning back to Exhibit 26, which we spoke about a

4    moment ago, that would be the April 2010 e-mail from

5    Mr. Argenyi to you.  Did you respond to the April e-mail?

6    A.   No, I did not -- not to Michael.

7    Q.   Not to Michael?

8    A.   That is correct.

9    Q.   Did you respond to the December e-mail from Michael?

10   A.   Not directly to Michael.

11   Q.   Did you respond to the October e-mail to Michael?

12   A.   Not directly to Michael.

13   Q.   For the April e-mail, Exhibit 26, can you please read the

14   last paragraph before the redaction?

15   A.   "In the following clinic on March 31st, I saw three

16   patients.  Notably one had a previously broken jaw and

17   mumbled.  And despite asking numerous times to repeat himself,

18   I still struggled, getting only 45 percent independently, and

19   even less when Dr. Townley performed her exam."

20   Q.   And after you received this e-mail -- you've testified

21   that you didn't respond to Mr. Argenyi about this e-mail.

22   A.   Not directly.

23   Q.   Not to him at all.

24   A.   Not directly to Michael, that is correct.

25   Q.   At all.

1    A.   Correct.

2    Q.   And are you aware that after this e-mail, Mr. Argenyi was

3    instructed not to make any more requests for accommodation in

4    the clinic?

5    A.   I believe that is correct.

6    Q.   Thank you.

7            MS. VARGAS:  No further questions at this time, your

8    Honor.

9            THE COURT:  Cross-examination?

10           MR. MOORE:  Thank you, your Honor.

11                      CROSS-EXAMINATION

12   BY MR. MOORE:

13   Q.   Good afternoon, Dr. Hansen.

14   A.   Good afternoon.

15   Q.   I just have a few questions for you with regard to

16   Ms. Vargas's cross [*sic*] examination.

17       She mentioned that in your interview for the Associate

18   Dean for Medical Education that the lawsuit that Mr. Argenyi

19   had filed was discussed.  Do you recall that?

20   A.   Yes, I do.

21   Q.   And what happened?  What was discussed during your

22   interview?

23   A.   I was simply informed by our dean at the time,

24   Dr. Zetterman, that we had a case that was in litigation with

25   a student who was hearing impaired.  There was no other

1    discussion with regard to the case.

2    Q.   Did that have any impact on how you viewed the job or

3    whether you would take the job or not?

4    A.   No, it did not.

5    Q.   Now, in the cross-examination, Ms. Vargas referred to

6    you, I think, as the point person, and you said you were not.

7         Could you explain a little bit to the jury what you meant

8    by that?

9    A.   Sure.  Our usual process is if a student is requesting

10   accommodations, that they actually submit a request to

11   Dr. Kavan, who is the Associate Dean for Student Affairs.

12   Then Dr. Kavan would bring it to the Medical Education

13   Management Team -- we call it MEMT for short.  I chair the

14   MEMT.  So it eventually comes to the committee that I chair.

15        Once an accommodation is requested, then Dr. Kavan will

16   make sure that we have a diagnosis of what the condition is,

17   and then what is requested -- what kind of accommodation is

18   requested.

19        So it usually goes through Dr. Kavan's office, and then

20   it comes to the MEMT committee of which I chair to discuss if

21   we're going to provide accommodations.

22   Q.   And you yourself don't make any decisions independent of

23   the Medical Education Management Team, correct?

24   A.   No, I do not.

25   Q.   Now, there were some references to the e-mails that

1      Mr. Argenyi had sent you throughout his M2 year.  I want to

2      first direct your attention -- well, let me ask you this --

3      give you the opportunity --

4               THE WITNESS:  I'm sorry, I'm just getting some water

5      here.

6      BY MR. MOORE:

7      Q.   I first want to give you the opportunity to explain --

8      she asked you did you ever respond to Mr. Argenyi, and you

9      said not directly.

10          Could you explain what happened with these e-mails?

11     A.   The decision had already been made that we were not going

12     to provide an oral interpreter in the clinical setting for

13     Mr. Argenyi.

14          And so when these e-mails came in repeatedly asking for

15     an oral interpreter, I did not feel it was appropriate for me

16     to respond directly to Mr. Argenyi since this was in

17     litigation.

18          And so I did send all these e-mails to our legal counsel

19     so they were aware that these requests were being made.

20     Q.   Was it your understanding at that time that the requests

21     for accommodations were coming through legal counsel for

22     Mr. Argenyi and through legal counsel for Creighton?

23     A.   Yes.

24     Q.   I'd like to direct your attention to Exhibit 24, which is

25     one of the e-mails Mr. Argenyi sent to you.

1    A.   I have 22, 23, 25, and 26.

2              MR. MOORE:  Your Honor, may we approach with Exhibit

3    24?

4              THE COURT:  You may.

5              MR. MOORE:  Thank you.

6    BY MR. MOORE:

7    Q.   And that is one in a series of e-mails that Mr. Argenyi

8    sent to you, correct?

9    A.   That is correct.

10   Q.   What's the date on that e-mail?

11   A.   That is October 20th of 2010.

12   Q.   And am I correct in saying that he sent that on October

13   20th of 2012?

14   A.   2010.

15   Q.   Excuse me, 2010.

16         And that just six days later the plaintiff's counsel took

17   your deposition in this case.

18   A.   That is correct.

19   Q.   Okay.  Were you aware Mr. Argenyi's legal counsel were

20   reviewing these e-mails before they were sent to you?

21   A.   Yes.

22   Q.   Now, during the time that you were receiving these

23   e-mails from Mr. Argenyi with regard to the longitudinal

24   clinic, were you in contact with his preceptor for that class?

25   A.   Yes, I was.

1    Q.    Who is that preceptor?

2    A.    It was Dr. Townley for most of the longitudinal clinic.

3    Q.    And why were you consulting with her?

4    A.    I wanted to see how Michael was doing in the longitudinal

5    clinic.

6    Q.    And what response did you get from Dr. Townley?

7    A.    The response was that he was doing as well as other

8    students were doing in the longitudinal clinic.

9          MR. MOORE:  At this time I have nothing, your Honor,

10   until we recall him on our case in chief.

11         THE COURT:  Very good.

12    Redirect?

13         MS. VARGAS:  Thank you, your Honor.

14                        REDIRECT EXAMINATION

15   BY MS. VARGAS:

16   Q.   I want to clarify what your involvement was with respect

17   to Mr. Argenyi's accommodations for his second year.

18         You were chair of the committee that decided what

19   auxiliary aids and services Mr. Argenyi would be provided in

20   his second year of medical school, correct?

21   A.    That is correct.

22   Q.    And that committee decided, for example, that in small

23   groups, he would be offered the opportunity to sit next to his

24   professor, correct?

25   A.    That is correct.

1    Q.   And in labs, that committee that you were chair of

2    decided that Mr. Argenyi would be offered the added benefit of

3    standing next to his professor in laboratories; is that

4    correct?

5            MR. MOORE:  Your Honor, I believe this is beyond the

6    scope of cross-examination.

7            THE COURT:  Sustained.

8    BY MS. VARGAS:

9    Q.   You spoke a moment ago to Mr. Moore and said something to

10   the effect of the decision had already been made with respect

11   to Mr. Argenyi's requests for interpreters in the clinic.

12       So you were surprised that Mr. Argenyi would be

13   contacting you asking for help when he couldn't understand in

14   clinic?

15   A.   Yes, I was.

16   Q.   That was surprising to you?

17   A.   Yes.

18   Q.   And you didn't think it was at all appropriate he should

19   be contacting you for help when there was litigation going on.

20   A.   Correct.

21   Q.   Do you think it's possible that the reason he did that

22   was because you explicitly instructed him to do so under oath

23   in this very courtroom?

24   A.   That may be.

25   Q.   If I showed you your testimony, do you think it might

1    help you recall?

2    A.    Yes.

3          MS. JACKSON:  May I have the Court's assistance with

4    the technology?

5          (Off-the-record discussion had.)

6    BY MS. VARGAS:

7    Q.    Do you recognize this as your testimony under oath in

8    this case?

9    A.    Yes, I do.

10   Q.    And could you please read the highlighted paragraph?

11   A.    "If there is a problem with a preceptor, if there's a

12   problem with the preceptor either not being positioned so that

13   Mr. Argenyi is able to understand what the preceptor is saying

14   to him, if there's a problem with the clinical staff, I would

15   ask that Mr. Argenyi come to me.  And then I will personally

16   go to the preceptor, go to the clinic so we can resolve this

17   problem, because I want him to be successful in the clinical

18   setting."

19   Q.    You wanted him to be so successful that you didn't even

20   respond when he did what you told him to do.

21   A.    I did not respond directly to Michael.

22   Q.    You didn't respond directly to him.

23   A.    That is correct.

24         MS. VARGAS:  No further questions at this time.

25         THE COURT:  Thank you, Doctor.  You may stand down.

 1    You are still subject to recall in the presentation of the

 2    defendant's case in chief.

 3              THE WITNESS:  Thank you.

 4              THE COURT:  Thank you.

 5         Plaintiff may call its next witness.

 6              MS. VARGAS:  Thank you, your Honor.  The plaintiff

 7    calls Jan Madsen.

 8              THE COURT:  Ms. Madsen, if you'll please approach the

 9    courtroom deputy here my right, she will swear you in.

10              COURTROOM DEPUTY:  State your full name for the

11    record, please, and spell your last name.

12              THE WITNESS:  Sure.  Jan, J-a-n; Madsen, M-a-d-s-e-n.

13                 JAN MADSEN, PLAINTIFF'S WITNESS, SWORN

14              THE COURT:  You may inquire.

15                            DIRECT EXAMINATION

16    BY MS. VARGAS:

17    Q.   Good afternoon, Ms. Madsen.  Can you please state your

18    full name for the record.

19    A.   Jan Madsen.

20    Q.   And what is your job at Creighton University?

21    A.   I'm the vice president for finance.

22    Q.   So as a vice president of finance, you have

23    responsibility, some degree of responsibility for the

24    university's financial reports?

25    A.   That is correct.

1   Q.   And you're familiar with the university's financial

2   reports for the fiscal year ending June 30, 2010?

3   A.   I joined Creighton University in September of 2010, so I

4   have looked at those statements but did not prepare them.

5   Q.   Okay.  Thank you.  But --

6   A.   I'm familiar with them.

7        MS. VARGAS:  May I approach and show the witness

8   what's been marked as Plaintiff's Exhibit 56.

9        THE COURT:  You may.

10  BY MS. VARGAS:

11  Q.   Do you recognize this document?

12  A.   I do.

13  Q.   And what is it?

14  A.   It's Creighton's financial report for June 30th, 2010.

15  Q.   And if you could take a careful look at it and see if

16  it's a true and accurate copy of the financial reports that

17  you have seen before for the fiscal year ending June 1st,

18  2010?

19  A.   I believe it is.

20  Q.   And is it the regular practice of Creighton University

21  and your office in particular to prepare these reports?

22  A.   It is.

23  Q.   And was this financial report made in the normal course

24  of the business of your office?

25  A.   To my knowledge, it was.

1    Q.   Okay.

2         MS. VARGAS:  Your Honor, at this time I move to

3    introduce Plaintiff's Exhibit 56 into evidence.

4         MS. BALUS:  No objection.

5         THE COURT:  Exhibit 56 is received.

6    BY MS. VARGAS:

7    Q.   If you could, would you please turn to page 1 of this

8    report, numbered page 1 at the bottom?

9    A.   Okay.

10   Q.   Now, do you see where it says that Creighton University's

11   return on investment exceeded 15 percent and the endowment

12   increased from 225 million to 253 million in 2010?  I believe

13   it's the sentence at the end of the first paragraph.

14   A.   I do.

15   Q.   Could you read that last sentence of the first paragraph

16   for me, please?

17   A.   "Our investment return exceeded 15 percent, and the

18   endowment increased from $225 million to $253 million."

19   Q.   And then turning to page 4, do you see where it says that

20   Creighton University in 2010 had $884,303,000 in total assets?

21   A.   I do.

22   Q.   Turning to page 5, do you see where it says that

23   Creighton University had 405,935,000 in total net operating

24   revenue for that fiscal year 2010?

25   A.   It does.

1               MS. VARGAS:  If I may approach and show the witness

2       Exhibit 57?

3               THE COURT:  You may.

4       BY MS. VARGAS:

5       Q.   Do you recognize this document?

6       A.   I do.

7       Q.   What is it?

8       A.   It's Creighton's financial report for June of 2011.

9       Q.   And was this document something that was created in the

10      ordinary course of business of your office?

11      A.   It was.

12      Q.   And did you have responsibility in overseeing and

13      formulating this report?

14      A.   I did.

15              MS. VARGAS:  Your Honor, at this point if I may move

16      for the admission of Plaintiff's Exhibit 56 into evidence --

17      I'm sorry, 57.

18              MS. BALUS:  No objection.

19              THE COURT:  57 is received.

20              MS. VARGAS:  Thank you.

21      BY MS. VARGAS:

22      Q.   If you could please turn to page 16, with respect to --

23      do you see on page 16 where it says that Creighton

24      University's endowment during the fiscal year ending in 2011

25      actually rose to $300 million?

MADSEN - DIRECT                                            586

1    A.    I do.

2    Q.    Turning to page 2, do you see where it says that in 2011

3    Creighton University's total assets were $918,364,000?

4    A.    I do.

5    Q.    And then on page 3, in the fiscal year ending in 2011,

6    Creighton University's total net operating revenues were

7    $414 million?

8    A.    That's correct.

9    Q.    That's accurate?

10   A.    Uh-huh.

11   Q.    Now, as vice president of finance, are you aware that

12   Creighton University receives in excess of about $20 million

13   in federal financial assistance every year -- every fiscal

14   year?

15   A.    I don't know the exact amount that we receive for

16   federal -- from the federal government.

17   Q.    If I told you that Creighton University accepted

18   $28,487,604 in federal financial assistance in 2010, do you

19   think that might be accurate?

20   A.    Are you talking about federal grants?

21   Q.    I'm talking about any form of federal money, grants,

22   anything you receive.

23   A.    So the only federal money that Creighton receives would

24   be for grants or money that would be directly tied to a

25   specific student.

1    Q.   Really?

2         And so...

3              MS. VARGAS:  If I may approach, your Honor?

4              THE COURT:  You may.

5    BY MS. VARGAS:

6    Q.   Does this help you remember how much federal money

7    Creighton University accepted in 2010?

8    A.   I'm not familiar with this particular, I guess, Web site.

9              MS. VARGAS:  If I could move for the admission of

10   Exhibits 53, actually, and 54.  These are admissible pursuant

11   to the Federal Rule of Evidence 902 (5) as official

12   publications maintained by the United States government.

13   They're from www.USAspending.gov, which is a Web site

14   maintained by the United States government for the express

15   purpose of providing clarity in how much federal financial

16   assistance universities and other businesses accept from the

17   federal government.

18             THE COURT:  Any objection?

19             MS. BALUS:  Yes, your Honor.  We do object to these

20   exhibits.  We don't object to authenticity, it is from a

21   government Web site.

22        We object both on hearsay because it doesn't meet the

23   requirements of Rule 902 -- if you'll give me just a second to

24   pull it up.  In order to be a government Web site -- or a

25   public record, there has to be some sort of foundation laid

1   that this is a record that the government keeps on a regular

2   basis, that it collects this information as part of it, you

3   know, as part of the government's responsibility.

4        This witness can't lay that foundation, so we do object

5   that it's -- both on foundation and on hearsay grounds.

6             MS. VARGAS:  Your Honor, may I respond?

7             THE COURT:  You may.

8             MS. VARGAS:  Thank you.  Pursuant to Federal Rule of

9   Evidence 902 section 5, documents of this nature that are

10  officially maintained by the United States government are

11  self-authenticating on their own.  They don't need a witness

12  to testify to their -- the authenticity of them.

13       These records say at the top "an official Web site of the

14  United States government".  It doesn't get any more official

15  than that.

16       And these are the records that are maintained by the

17  government for purposes of providing transparency so that

18  recipients of federal financial -- it can see the amount of

19  federal financial assistance, and the nature and type of

20  federal financial assistance that a recipient actually

21  receives.

22             THE COURT:  Well, while I'm looking at the rule --

23  which is very short -- 902(5) says a book, pamphlet, or other

24  publication purporting to be issued by a public authority.

25  And referring back to the beginning of the rule, it indicates

 1      it's self-authenticating and requires no extrinsic evidence of

 2      authenticity to be admitted.

 3          So the objection is not based on authenticity.  And

 4      again, Ms. Balus, what is the defendant's objection?

 5              MS. BALUS:  Our objection is on hearsay and on

 6      foundation.  This witness can't provide the foundation.  In

 7      the advisory committee notes on paragraph 5, it says, "it will

 8      be noted this rule does not confer admissibility upon all

 9      official publications, it merely provides a means whereby the

10      authenticity may be taken as established for purposes of

11      admissibility."

12          We're not making an objection on authenticity, just on

13      foundation and hearsay.

14              THE COURT:  Well, while I may question the relevance

15      in light of the fact that the parties have stipulated that

16      Creighton receives federal funds, the objections presented are

17      overruled.  And I will receive Exhibits 52 and 53 -- excuse

18      me, those are the numbers, right, 52 and 53?

19              MS. VARGAS:  53 and 54, your Honor.

20              THE COURT:  53 and 54.  All right.  53 and 54 are

21      received.

22      BY MS. VARGAS:

23      Q.  Now, Ms. Madsen, if you look at page 1 of Exhibit 53, it

24      appears to document that in the year 2010 Creighton University

25      received $28,487,604 U.S. tax dollars in federal financial

1    assistance.

2    A.   It does say that Creighton received $28,487,604.

3         As I look at the list of items, it appears that they are

4    either related to medical research grants where we had to

5    spend the money basically to do the research specifically or

6    related to some other specific program or services that we

7    provided --

8    Q.   So --

9    A.   -- like to the VA.

10   Q.   -- Creighton University -- it says here in 2010 there

11   were 408 different grants of federal financial assistance that

12   Creighton University received in that year alone, direct

13   grants.

14   A.   That's correct.  It says --

15   Q.   And they weren't all tied specifically to a student, were

16   they?

17   A.   They were not all specifically tied to a student.

18   Q.   And --

19        MS. BALUS:  Objection, your Honor, she didn't let the

20   witness finish her answer.

21        THE COURT:  We have to make sure we don't have two

22   people talking at the same time.  So the witness may finish

23   her answer if she was not yet finished.

24   A.   So it does say there are 408 specific transactions.

25        And looking through them -- and I haven't gone through

1     every page, but the pages I have gone through, they are all

2     tied to something specific, to a specific student, a specific

3     service that -- the first item, pathology services provided to

4     the VA; so we do provide services to the VA Hospital, for

5     example, which would be a reimbursement from the federal

6     government.

7     BY MS. VARGAS:

8     Q.   But you don't dispute that Creighton University received

9     $28,487,604 in federal financial assistance --

10    A.   Yes.

11    Q.   -- in 2010?

12    A.   I dispute that it's assistance.  I don't dispute the

13    dollar amount.

14    Q.   Okay.  And with each of these 408 transactions in a

15    single year, you're aware that your university was required to

16    sign a notice of compliance saying that in exchange for

17    accepting the money, you wouldn't discriminate on the basis of

18    disability.  You're aware of that, right?

19    A.   I am not specifically aware of what we sign.  There's a

20    compliance office that handles those items.

21    Q.   So would you be surprised that in the course of discovery

22    of this matter, Creighton University wasn't able to produce a

23    single signed notice of compliance despite having accepted 408

24    separate federal financial assistance grants in which the

25    signature of that document would have been required?

 1              MS. BALUS:  Objection, your Honor, this is a

 2      discovery issue.

 3              THE COURT:  The objection is sustained.

 4      BY MS. VARGAS:

 5      Q.   Turning to Exhibit 53, Ms. Madsen -- I'm sorry, 54.

 6           Now, this document is with respect to the other money

 7      Creighton took in 2011.  And it appears, doesn't it, that

 8      Creighton University accepted more than $20 million in federal

 9      financial assistance?

10      A.   I'm sorry, did you give me that exhibit?

11      Q.   I may not have.  Let me make sure I give it to you.

12      A.   I'm looking...

13      Q.   Now, looking in the middle on the first page, do you see

14      where it says that Creighton University accepted $20,057,623

15      in federal financial assistance?

16      A.   I see where we received 20 million plus dollars, yes.

17      Q.   And that was in 242 separate grants of federal financial

18      assistance that went to Creighton University, correct?

19      A.   There were 242 transactions, correct.

20      Q.   Those were all made on the promise that you wouldn't

21      discriminate on the basis of disability when the time came to

22      provide access to a student to the facility, correct?

23      A.   Again, I'm not aware -- that's not my responsibility.

24              MS. VARGAS:  No further questions at this time, your

25      Honor.

1              THE COURT:  Cross-examination?

2              MS. BALUS:  Thank you, your Honor.

3                         CROSS-EXAMINATION

4    BY MS. BALUS:

5    Q.   Good afternoon, Ms. Madsen.

6    A.   Hello.

7    Q.   There was a lot of talk about federal funds that

8    Creighton receives.  Can you just generally describe what

9    those federal funds are?

10   A.   Right.  So Creighton has a research group.  And so they

11   apply for grants from the National Institute of Health, which

12   is the federal agency.  And it's a competitive process to

13   receive those grants.

14        So, that arm of the government evaluates those

15   applications and chooses ones that they believe would be

16   worthwhile for society to pursue some kind of medical

17   research.  So we receive grants like that.

18        In addition, we have grants that come with students.  So

19   there are students that meet certain qualifications based on

20   their income level -- primarily it would be income level.  And

21   if they choose to come to Creighton, that federal money then

22   comes with the student.

23   Q.   Are there restrictions on what you can spend those

24   federal funds on?

25   A.   So the money that comes with a student obviously goes to

1    cover the student's tuition, so that's a stipulation.

2        For a grant, obviously we have to spend the money

3    specifically for the project that we're researching, so if

4    it's for researching a cure for something.

5        And we have an outside firm come and audit our

6    expenditures and our processes to make sure that we are

7    spending those funds in compliance with the terms of those

8    agreements.

9    Q.   Is there any leftover money that you could spend on other

10   things from these grants?

11   A.   No.

12   Q.   What would happen if Creighton spent the federal funds on

13   something other than the purpose for which they were

14   designated?

15   A.   So we would be in violation of our agreements.  That

16   information gets reported to the government agencies.  And

17   then ultimately, you know, they decide if they're going to

18   pull future funding or perhaps fine us, those types of things.

19   Q.   Do any of the federal funds go directly to the medical

20   school?

21   A.   Directly to the medical school?  Well, the medical school

22   obviously does a lot of the research, but again it would go to

23   those research projects.

24   Q.   Does the federal government give Creighton any federal

25   funds that are to be used for the specific purpose for

1    providing accommodations to students with disabilities?

2    A.    Not that I'm aware of.

3    Q.    So if Creighton provides a student with disabilities

4    accommodations, it does so with its own revenue?

5    A.    Correct.

6    Q.    Now, Ms. Vargas also talked about endowments.  Can you

7    explain what endowments are?

8    A.    Sure.  So Creighton has been blessed to have many

9    generous donors give money to the university.  Those donors,

10   primarily when they give money, they define what we can spend

11   the money on.

12       So sometimes it's for a building; sometimes it's for

13   scholarships for students, or for some specific program in a

14   school or college.

15   Q.    And is there -- are endowments labeled as restricted or

16   unrestricted?

17   A.    That's correct.  They're restricted and unrestricted

18   endowments.  By law we have to basically comply with the

19   donor's wishes with how they spend -- how we spend their

20   money.

21       And so when you look at Creighton's endowment, about 70

22   percent of it is considered restricted.

23   Q.    So the rest of the endowments that are unrestricted, does

24   that mean that Creighton could spend that money however it

25   wanted tomorrow?

1   A.   So there's a few issues with the unrestricted endowment,

2   the first being our debt.  So Creighton has borrowed money.

3   And so we have to comply with the bank's requirements in terms

4   of how much we hold in available assets compared to our debt

5   balance.

6        So we look at the unrestricted endowment as part of those

7   assets that help us comply with our debt agreements.

8        In addition, as that amount has accumulated over time, it

9   has been designated for something historically.  So this has

10  happened over a hundred years or more.

11       Those amounts have been designated for scholarships, or

12  for our Native American program or, you know, different

13  things.  And so if we were to tap into any of that, we would

14  have to discontinue something else.

15       And then the third thing is we do have a requirement with

16  our board of directors that we would never -- that we have a

17  cap of 5 percent, you know, distribution from the endowment on

18  an annual basis.

19  Q.   And why is that?

20  A.   Basically it's prudent financial management so that we

21  can sustain the programs that we have, the scholarships we

22  have for students over a long period of time.

23  Q.   You mentioned having to have a certain ratio of assets to

24  your debt.  What is Creighton's debt currently?

25  A.   Today it's over $160 million.

1    Q.   I'm going to have you turn to Exhibit 55.  Do you still

2    have a copy up there?

3         MS. VARGAS:  Exhibit 55 has not been introduced into

4    evidence.

5         MS. BALUS:  Oh, I apologize.  56.

6    BY MS. BALUS:

7    Q.   And if you will turn to page 4, where it talks about

8    Creighton's total assets, and Ms. Vargas pointed out that it

9    lists 884 million plus for Creighton's total assets.  What

10   does that include?

11        MS. VARGAS:  I'm sorry to interrupt, your Honor.  Are

12   we looking at Exhibit 55?

13        THE COURT:  I thought we were looking at 56.

14        MS. VARGAS:  I'm sorry.

15   A.   So included in total assets are student loan receivables,

16   the endowment, and then our land, buildings and equipment

17   would be the biggest components.

18   BY MS. BALUS:

19   Q.   So the land, buildings and equipment, that's not cash

20   that Creighton has on hand, correct?

21   A.   That's correct.

22   Q.   And the investments, which is another large portion of

23   that, it's tied up in those investments, correct?

24   A.   That's correct.

25   Q.   You have to keep a certain portion of those investments

1    in order to comply with your loans.

2    A.    Right.

3    Q.    Now, turning to page 5, Ms. Vargas asked you about -- on

4    direct and also mentioned in opening that Creighton has a

5    total net operating revenue of more than 400 million.

6          What is -- for those of us that did not take many

7    accounting classes, what is net revenue?

8    A.    So net revenue would be net of revenue deductions which

9    sounds...

10         So in our health care business, we have contracts with

11   insurance providers.  And so we report that revenue net to the

12   negotiated price.

13         So we have a list price and then a negotiated price with

14   Blue Cross Blue Shield and Medicare.  It's also reported in

15   net in scholarships that we give out or tuition discounts that

16   we provide for students.

17   Q.    So is it the same thing as profit?

18   A.    No, it is not the same thing as profit.

19         So in addition, we have operating expenses that we deduct

20   from that revenue.  So in the fiscal year ending June 30,

21   2010, we had almost 400 million of operating expenses that

22   went against the 405 million of operating -- net operating

23   revenue.

24   Q.    And on Exhibit 57, was that the same situation, looking

25   at page 4?

1    A.   Right.  That's correct.

2              MS. BALUS:  Your Honor, we reserve the right to

3    recall Ms. Madsen during our case in chief.  But for now, we

4    pass the witness.

5              THE COURT:  Redirect?

6              MS. VARGAS:  Thank you, your Honor.

7         If I may approach the witness and show the witness what's

8    been marked as Plaintiff's Exhibit 50?

9              THE COURT:  You may.

10             MS. BALUS:  Your Honor, this goes beyond the scope of

11   cross-examination.

12             MS. VARGAS:  Your Honor, turning to page -- well, it

13   says 15 at the top, it's the third page of this exhibit, it

14   explains where the revenues that Ms. Madsen talked about

15   actually come from.  So it's squarely within the cross.

16             MS. BALUS:  I think it goes beyond the scope to

17   introduce a new exhibit.  We also have issues with the

18   exhibit, but I can wait.

19             MS. VARGAS:  It's your own strategic plan.

20             THE COURT:  Well, it's almost 3:15.  This may be a

21   good time for a break.

22        But let me inquire first, is this the last witness for

23   the afternoon?

24             MS. VARGAS:  We do have one more witness.  We

25   actually could probably finish this witness in two or three

1    minutes with your Honor's permission, and start the next after

2    the break.

3              THE COURT:  All right.  Let's hear all of the

4    objections to Exhibit 50.

5              MS. BALUS:  Well, we object that this is not a

6    complete document, so on the rule of completeness.

7         We also object to foundation although we haven't heard

8    any testimony on that yet, so...

9         But other than that, no objection.

10             THE COURT:  You may proceed to question the witness

11   to lay foundation for the exhibit.

12             MS. VARGAS:  Thank you, your Honor.

13                          REDIRECT EXAMINATION

14   BY MS. VARGAS:

15   Q.   Do you recognize this document?

16   A.   I'm not familiar with this document.

17   Q.   You've never seen Creighton University's strategic plan?

18             MS. BALUS:  Objection, your Honor, that

19   mischaracterizes the document.  It's the School of Medicine's.

20             MS. VARGAS:  I'm happy to rephrase, your Honor.

21             THE COURT:  You may rephrase.

22   A.   Well, the date on this document is 2008 to 2018.  And so

23   it was prepared, I'm sure, well before I got to Creighton by

24   the School of Medicine.

25   BY MS. VARGAS:

1    Q.   So you have no familiarity -- as the vice president of

2    finance for Creighton University, you've never before seen the

3    strategic plan and overview of Creighton University School of

4    Medicine, Patient Care, Teaching and Research for the years

5    2008 to 2018?

6    A.   I think the plan was under revision by the time I arrived

7    at Creighton.

8    Q.   So you have no familiarity with it as the vice president

9    of finance?

10   A.   This particular document?  No.

11   Q.   Well, if I told you that when Creighton University

12   divides up its finances into the different sources of

13   revenue -- and I'll confess right up, I'm not really good with

14   finance.  So if I get it wrong, you tell me.

15        But as I understand how Creighton University, the third

16   page of this exhibit, page 15, how it divides up where all its

17   money comes from, the biggest chunk comes from what you charge

18   patients, correct?

19        MS. BALUS:  Objection, your Honor, still object on

20   foundation.

21        THE COURT:  Sustained.

22        MS. VARGAS:  May I ask questions about the exhibit

23   without actually introducing it into evidence?

24        THE COURT:  Well, you can ask a question.  We'll see

25   how far we go.

1              MS. VARGAS:  Okay.

2    BY MS. VARGAS:

3    Q.   Is it correct, based on everything you know as the vice

4    president of finance, that the majority of Creighton

5    University School of Medicine's revenue comes from patient

6    care; is that correct?

7    A.   It did in 2010.

8    Q.   Okay.  Well, 2010 were pretty tough financial years for a

9    lot of people, weren't they?  2010, was that a pretty tough

10   financial year for most people?

11   A.   I can't speak to most people, I guess.

12   Q.   Okay.  But at Creighton University, you were doing pretty

13   well in 2010.

14   A.   I don't believe we were.

15   Q.   You don't believe that having an endowment exceeding $300

16   million was doing pretty well?

17   A.   No, I don't.

18   Q.   And you don't believe that receiving more than

19   $20 million a year in U.S. tax collars was doing pretty well?

20   A.   Again, those monies were designated for specific

21   expenses.

22   Q.   So let's talk about that.

23        So money that comes in for tuition, whether it comes from

24   the federal government or whether it comes from a student or

25   whether it comes from a student's parent, that money goes to

1    Creighton University.  The tuition money goes to Creighton

2    University, doesn't it?  It's not like it goes to somebody

3    else.

4    A.   Tuition money goes to Creighton University.

5    Q.   Okay.  And when you receive grants, the grant money goes

6    to Creighton University and a portion of that is used for

7    overhead, isn't it?

8    A.   There is a portion.

9    Q.   And what portion is that?

10   A.   It's about 40 percent.

11   Q.   So about 40 percent of money that Creighton University

12   receives in grants for, say, research on cancer, 40 percent of

13   that actually goes to Creighton University; is that correct?

14   A.   It does.

15   Q.   And Creighton University decides what to do with its

16   money, right?

17   A.   Each school decides what to do with its revenue.

18   Q.   Creighton University decides how to spend the funds that

19   it has, correct?

20   A.   Creighton University obviously manages its finances

21   overall.

22   Q.   And so in 2010 when Creighton University had almost $900

23   million in assets and a federal financial assistance stream of

24   more than $20 million a year, and tuition from students, and

25   charges from what you charge your patients for their care,

1    there wasn't a single dollar of that money that could have

2    gone to provide one deaf student, the only deaf student in the

3    medical school, with full and equal access to the education

4    that he took out loans to pay for; is that correct?

5    A.    The funds are allocated by the schools based on their

6    best judgment.

7    Q.    So based on their best judgment, there wasn't one dollar

8    that could have been allocated to allow a student with a

9    disability to have access to the education that is provided to

10   do all other students and for which that student was paying;

11   is that correct?

12   A.    That's correct.

13            MS. VARGAS:   No further questions, your Honor.

14            THE COURT:   Thank you.   You may stand down.

15       And you remain subject to recall in the defendant's case

16   in chief.   Thank you.

17       Let's take our mid-afternoon break now.   Please reconvene

18   in the jury room at 3:35.

19       We're in recess.

20       (Jury out and recess taken at 3:20 p.m.)

21       (At 3:41 p.m. on August 27, 2013, with counsel for the

22   parties, the plaintiff, and the defendant's representative

23   present, and the jury NOT present, the following proceedings

24   were had:)

25            THE COURT:   I understand we have one more witness for

1    the afternoon; is that correct?

2              MS. VARGAS:  That's correct, your Honor.

3              THE COURT:  Very good.

4         Anything else we need to talk about?

5              MS. VARGAS:  There's one issue that I hope should be

6    simple that perhaps we could clear up before the jury comes

7    in.

8         Defendant has listed an Exhibit No. 218, which contains

9    medical and audiological records from Mr. Argenyi's treating

10   physician, emergency physicians, from his treating

11   audiologist.

12        And what I would like to propose is that only the first

13   page through what's marked as page -- in the bottom right

14   corner -- Argenyi 104, be admitted because we'll be

15   separating -- obviously we need to offer it for the jury.  But

16   all of the records from page Argenyi 105 and beyond are not

17   records that are authored by the next witness.  And the

18   authors from those records are not testifying in this case.

19        So my suggestion is just that the first group up to 104

20   be separated out as Exhibit 218, or as some other new number.

21             MR. MOORE:  May I look at it just a second.  So I'm

22   sorry, 70 -- 218 starts out with, I believe, page 73; is that

23   right?

24             MS. VARGAS:  The exhibit sticker is over the page,

25   but it says on the top right, Argenyi Michael S., 6047199.

1   And then the next page is Argenyi 74 and it continues through

2   Argenyi 104.  And the records after that are not records

3   authored by this next witness.

4         THE COURT:  So in connection with your examination of

5   the next witness, you wish to use those pages that you just

6   designated from Exhibit 218, and you'd like to refer to this

7   as 218A?

8         MS. VARGAS:  Yes, that was a far more elegant way to

9   say what I said.

10        THE COURT:  Any objection?

11        MR. MOORE:  Yes, your Honor.  If you look at the end

12   of the documents, if you look at -- in the bottom right-hand

13   corner, Argenyi 135, 136, 137, those were all authored and

14   signed by Stacey Watson.  And those we would like to include

15   as well.

16        THE COURT:  Any objection to including 135, 136, and

17   137 --

18        MS. VARGAS:  No objection --

19        THE COURT:  -- the next three pages as a part of

20   Exhibit 218A?

21        MS. VARGAS:  I'm sorry.  No objection, your Honor.

22        THE COURT:  All right.  Then is there, in fact, an

23   offer at this time?  If so, perhaps I can just go ahead and

24   receive this into evidence without having to go through this

25   dialogue again.

1        Mr. Moore?

2            MR. MOORE:  As it just -- I want to clarify for the

3    record.  Exhibit 218 now consists of the documents marked from

4    the first page through Argenyi 104, and then Argenyi 135, 136

5    and 137.  I understand that to be now Exhibit 218 to which the

6    defendant has no objection.

7            THE COURT:  I referred to it as 218A in the event

8    that somebody at some point might try to offer the rest of the

9    pages.  I don't care though.  If you want to take out the

10   other pages and throw them away, we can just call it 218.

11       Ms. Vargas?

12           MS. VARGAS:  Your Honor, I obviously have no

13   objection to that.  However, I noticed that pages Argenyi 135,

14   136 and 137 do need to be redacted.

15           THE COURT:  I see a serial number.

16           MR. MOORE:  Oh, a date of birth.

17           THE COURT:  A date of birth?  Is that what you're

18   referring to.

19           MS. VARGAS:  Yeah.

20           THE COURT:  Any objection to the redaction?

21           MR. MOORE:  No, your Honor.

22           THE COURT:  All right.  If counsel will please handle

23   the redaction of pages 135, 136 and 137, that will be

24   appreciated.  I will assume that that is done.

25        And then Ms. Vargas, the question is whether you are

 1    willing to simply eliminate pages 105 through 134 from the

 2    exhibit.

 3              MS. VARGAS:  Certainly I am, your Honor.  However,

 4    this is a defendant's exhibit, so...

 5              THE COURT:  Is defendant willing to do that?

 6              MR. MOORE:  Reserving the opportunity to introduce

 7    the remaining document as a subsequent exhibit, if necessary.

 8              THE COURT:  If necessary, then it will be renumbered.

 9        So, we will simply refer to this as Exhibit 218.  And 218

10    is received.

11              MS. VARGAS:  Thank you, your Honor.

12              THE COURT:  Anything else?

13        Please bring in the jury.

14        (Jury in at 3:48 p.m.)

15              THE COURT:  Please be seated.

16        Ms. Vargas, you may call the next witness on behalf of

17    plaintiff.

18              MS. VARGAS:  Thank you, your Honor.  Plaintiff calls

19    Stacey Watson to the stand.

20              THE COURT:  Ms. Watson, if you'll please come forward

21    to the courtroom deputy here on my right, she will swear you

22    in.

23              COURTROOM DEPUTY:  State your full name for the

24    record, please, and spell your last name.

25              THE WITNESS:  Stacey Watson, S-t-a-c-e-y W-a-t-s-o-n.

```
 1              STACEY WATSON, PLAINTIFF'S WITNESS, SWORN

 2              THE COURT:  You may inquire.

 3              MS. VARGAS:  Thank you, your Honor.

 4                          DIRECT EXAMINATION

 5      BY MS. VARGAS:

 6      Q.   Good afternoon, Ms. Watson.  Will you please state your

 7      full name for the record.

 8      A.   Stacey Watson.

 9      Q.   Where do you live?

10      A.   I live in Seattle, Washington.

11      Q.   Where do you work?

12      A.   I work at the Swedish Neuroscience Institute.

13      Q.   And what is your job at the Swedish Neuroscience

14      Institute?

15      A.   I'm a clinical audiologist.

16      Q.   What training did you receive to be a clinical

17      audiologist?

18      A.   I have an undergraduate bachelor of science degree in

19      speech and hearing sciences, a master's degree in audiology,

20      and I'm currently pursuing a doctorate in audiology as well.

21      Q.   How long have you worked as an audiologist?

22      A.   I've been an audiologist for about 13 years.

23      Q.   As part of your professional work, have you ever attended

24      any conferences?

25      A.   Yes, I have.  I attend conferences on a fairly regular
```

1    basis.  There are cochlear implant conferences annually.  I do

2    attempt to attend those on a regular basis.

3    Q.   Okay.  And have you presented at any conferences?

4    A.   I have.  I have presented some of my own clinical

5    research at those conferences based on clinic efficiency,

6    pediatric performance with a cochlear implant.

7         I've presented on performance of cochlear implants within

8    the elderly population, as well as research based on

9    performance of cochlear implants in adults that were born with

10   a hearing loss that were implanted in their teenage years or

11   adulthood.

12   Q.   Thank you.

13        And can you tell us a little bit more about your work in

14   Seattle as an audiologist?  What kind of environment do you

15   work in?

16   A.   I work in a large tertiary hospital, so we get a lot of

17   referrals from outside community hospitals.  We are a stand-

18   alone clinic within a hospital environment.

19   Q.   And what kind of patients do you see in your clinic?

20   A.   We see anywhere from people that are just coming in to

21   check their hearing for a hearing test.  We see people with

22   hearing losses.  We have a variety of different types of

23   patients we see at the Neuroscience Institute.  We have a lot

24   of multiple sclerosis patients, as well as pediatrics with

25   brain tumors.

WATSON - DIRECT                                                    611

1    Q.   And how much of your practice involves people with

2    cochlear implants?

3    A.   About 80 percent of my practice is cochlear implant

4    recipients.

5    Q.   Do any of your patients themselves -- are any of your

6    patients themselves medical professionals?

7    A.   Yes.

8    Q.   Now, how do you know Michael Argenyi?

9    A.   Michael came to our clinic in 2004 looking to investigate

10   advanced technology for his hearing loss.

11   Q.   What does that mean?  What kind of technology was he

12   investigating?

13   A.   He was investigating getting a cochlear implant.

14   Q.   And do you remember the first time that Mr. Argenyi came

15   to your office?

16   A.   I do actually.  When I called him from the waiting area,

17   I knew I was dealing with somebody that was pretty

18   intelligent.  He was carrying an astrophysics textbook, so I

19   knew that he was a pretty smart guy.

20   Q.   How old was he at that time?

21   A.   Oh gosh, in 2004 he would have been early college at that

22   point.

23   Q.   What kind of hearing loss did Mr. Argenyi have when you

24   first met him?

25   A.   Michael has a severe-to-profound hearing loss meaning the

 1    hearing loss is based in the inner ear.  He was able to hear

 2    maybe a jackhammer or a loud jet engine if he was standing

 3    next to it.

 4    Q.   Tell me a little bit more about what it means to have a

 5    severe-to-profound hearing loss.  Can you hear and understand

 6    speech with a severe-to-profound hearing loss?

 7    A.   Most often not.  There are very rare cases that can, but

 8    the majority of people with a severe-to-profound hearing loss

 9    are not able to understand speech.  It takes somebody yelling

10    at the top of their lungs in order for them to be heard with a

11    profound loss.

12    Q.   Do you know why Mr. Argenyi wanted to get a cochlear

13    implant?

14    A.   He reported that he was feeling like his hearing aids

15    were not providing him as much benefit as they had in the

16    past.  It's not uncommon in college-level where your materials

17    that you're studying get more challenging and the difficulties

18    of your hearing aids come out.

19    Q.   So who would be eligible to receive a cochlear implant?

20    A.   The Food and Drug Administration, or the FDA, governs who

21    can get a cochlear implant.  They state that you must have a

22    severe-to-profound hearing loss and not be performing well

23    with traditional hearing aids.

24    Q.   And did Mr. Argenyi fall into that category?

25    A.   Yes, he did.

1   Q.   So he was eligible to receive a cochlear implant when he

2   came to your office?

3   A.   Correct.

4   Q.   And when did he receive his first cochlear implant?

5   A.   He received his first cochlear implant in September of

6   2004.

7            MS. VARGAS:  Your Honor, may I approach?

8            THE COURT:  Yes, you may.

9            MS. VARGAS:  Thank you.  I'm going to be showing the

10   witness what has been now marked as Defendant's Exhibit 218A.

11            THE COURT:  We actually received it as 218.

12            MS. VARGAS:  218.

13            THE COURT:  And it is, in fact, received in evidence

14   so the jury can consider it.

15            MS. VARGAS:  Thank you.

16   BY MS. VARGAS:

17   Q.   Do you recognize these documents?

18   A.   I do.

19   Q.   What are they?

20   A.   They are reports that I have written when I have seen

21   Michael for testing in the clinic.

22   Q.   And could you please turn to the page that says Argenyi

23   90 on the bottom right corner.

24   A.   Sure.  Okay.

25   Q.   Just wait a moment until we get it up on the screen.

1          So could you please tell me about this March 24th, 2009,

2     visit to your office.

3     A.    Sure.  This visit was an initial consultation for a

4     second side cochlear implant.

5     Q.    And why did Mr. Argenyi want a second cochlear implant?

6     A.    The hearing aid on the other -- on his nonimplanted side

7     was not providing him much benefit.  So the next proper

8     medical intervention would be to put a cochlear implant in

9     that side to help him with sound awareness.

10    Q.    Did you perform tests on him that day to determine if he

11    was eligible?

12    A.    I did.

13    Q.    What tests did you perform?

14    A.    It appears that I performed some speech testing using

15    what's called the HINT test.

16    Q.    You're going to have to explain that to me.

17    A.    The HINT test is sentences presented to Michael at a

18    speaker about two meters away.  He is to listen to those

19    sentences just using his auditory abilities and be able to

20    repeat back as much as he can of what he's heard.

21          Those sentences are very basic and redundant, they are

22    predictable.  They are essentially kindergarten level, similar

23    to, "The sky is blue."

24    Q.    To make sure I understand, you said the HINT is auditory

25    only.  That means that he's not able to speech read during

 1    that test.

 2    A.   Correct.

 3    Q.   This is listening only.

 4    A.   Correct, listening only.

 5    Q.   And what were the results of the testing you performed on

 6    Mr. Argenyi on March 24th, 2009?

 7    A.   In the ear that we were looking to implant, he was

 8    scoring about 11 percent correct, meaning out of essentially a

 9    sentence with ten words in it, he was getting about one of

10    those.

11    Q.   So using -- you said it was kindergarten level speech?

12    A.   Correct.

13          MS. VARGAS:  Could we put up page Argenyi number 1 so

14    the jury can see these results?

15    BY MS. VARGAS:

16    Q.   So are these the test scores that you obtained from

17    Mr. Argenyi's testing in March 2009 --

18    A.   Yes.

19    Q.   -- on page 91?

20    A.   Yes.

21    Q.   Can you walk us through what those numbers mean?

22    A.   Sure.  Which condition would you like?

23    Q.   Well, why don't we talk about the best he can hear, so

24    with the cochlear implant and the hearing aid.

25    A.   At that time, in March of 2009, he was understanding

1    about 42 percent of what was given to him, so less than half

2    of the words in the sentences he was picking out.

3    Q.   And again that was using the HINT, which is the

4    kindergarten level speech.

5    A.   Correct.

6    Q.   Okay.  Based on these test results, was he eligible to

7    receive a second cochlear implant?

8    A.   Yes, he was.

9    Q.   And what did you advise him to expect from that second

10   cochlear implant?

11   A.   We advised Michael to expect to be able to detect more

12   sound in that ear than what his hearing aid could provide to

13   him.  We know that a bilateral, somebody wearing two cochlear

14   implants, has better ability to localize where a sound is

15   coming from, whether the door slammed over here versus over

16   there on the right side.

17        Sometimes speech perception -- your ability to understand

18   spoken language and noise gets better, but each individual

19   person is different.  And we can't guarantee that a second

20   implant will improve that.

21   Q.   Did he tell you any other reasons why he wanted to get

22   that second cochlear implant at that time?

23   A.   Yes.  Michael had mentioned to us that he was going to

24   start medical school that next fall, and he wanted to be able

25   to maximize his auditory abilities the best he could before

1    entering medical school.

2    Q.   You tested him in March 2009.  And when did Mr. Argenyi

3    next visit your office?

4    A.   I believe that was in May of 2009.

5    Q.   And is the record that begins Argenyi 88 on the bottom...

6    A.   Yes, it would have been June.

7    Q.   Is that the record?

8    A.   Yes.  That is the second half of the consultation process

9    when you're undergoing the second implant.  So this would have

10   been the next visit for him.

11   Q.   And I see that you checked off under counseling,

12   "expectations of cochlear implant".

13   A.   Uh-huh.

14   Q.   So what were those expectations at that point?

15   A.   Expectations of getting more sound in that side, so we

16   didn't have expectations for him for understanding more speech

17   without visual cues at that time.  We worked on localizing

18   sound as well.

19   Q.   Then turning to page 89, could you please read the

20   comments second of your report.

21   A.   Sure.  "The extensive amount of time was spent on

22   discussion of the need for a letter specifically addressing

23   Michael's accommodation needs and current implant performance

24   as it relates to his upcoming medical school education at

25   Creighton University.  Michael brings with him a copy of the

1    letter and specific information that he will need to send to

2    the associate dean for student affairs at Creighton.  After

3    the letter is written, the info the patient brought in today

4    will be sent to the medical records, along with a copy of the

5    letter generated."

6    Q.   I would like to show you -- just a moment, please.

7              MS. VARGAS:  May I approach, your Honor?

8              THE COURT:  You may.

9    BY MS. VARGAS:

10   Q.   I'm showing you what's been admitted into evidence as

11   Plaintiff's Exhibit 4.  Is this a letter that Mr. Argenyi

12   brought with him that day?

13   A.   Yes.

14   Q.   And --

15             MS. VARGAS:  If I may approach again, your Honor?

16             THE COURT:  You may.

17             MS. VARGAS:  Thank you.

18   BY MS. VARGAS:

19   Q.   Ms. Watson, I'm showing you what's been admitted into

20   evidence as Plaintiff's Exhibit 17.  Do you recognize this

21   letter?

22   A.   I do.

23   Q.   What is it?

24   A.   This is a letter I wrote in response to Creighton's

25   request for further information on May 18th.

1    Q.   Now, turning to the second page of this letter, I see

2    that it's signed both by you and by Dr. Backous.  Who is

3    Dr. Backous?

4    A.   Dr. Backous is our neurotologist.  He's our ears, nose

5    and throat surgeon that has performed the cochlear implant

6    surgery.  He's the medical director of our facility.

7    Q.   And how did he come to be involved with Mr. Argenyi?

8         MR. MOORE:  Objection to the extent that she provides

9    testimony of what Dr. Backous said consistent with the

10   stipulations of the parties with regard to calling

11   Dr. Backous.

12        THE COURT:  The current question is not

13   objectionable.  The witness may answer regarding how she --

14   her knowledge -- her personal knowledge of how Dr. Backous

15   became involved with Mr. Argenyi.

16   A.   Dr. Backous is the implanting physician.  He's our

17   director that would have performed the surgeries for the

18   cochlear implants on Michael.

19   BY MS. VARGAS:

20   Q.   So he was Mr. Argenyi's treating ear specialist?

21   A.   Correct.

22   Q.   Now, when you have a letter like this that's signed by

23   you and by Dr. Backous, how does it come to be written?

24   A.   The request for further information, the letter from

25   Creighton of May 18, 2009, was brought to the cochlear implant

1    team.

2         As a team, we discussed what requirements Creighton was

3    asking for.  We also reviewed Michael's medical record.  And

4    based on that information and how we know Michael uses his

5    cochlear implants, we generated the letter.

6         I, as a managing audiologist for Michael, typed up the

7    letter.  It's then reviewed again by Dr. Backous and myself to

8    make any final edits.  We sign the final copy and submit that.

9    Q.  And what input does the patient have into a letter like

10   this?  Do they dictate the content?

11   A.  No.  No, they don't.

12   Q.  Have you written letters to universities for other

13   patients in your practice?

14        MR. MOORE:  Objection, beyond the scope, asking for

15   expert testimony.

16        THE COURT:  Well, she may answer yes or no.  The

17   objection's overruled.  The witness may answer yes or no.

18   A.  Yes.

19   BY MS. VARGAS:

20   Q.  So looking back at page 1 of this May 27th letter, what

21   specific recommendations did you and Dr. Backous make for

22   Mr. Argenyi in lectures, the lecture setting in medical

23   school?

24   A.  We found it necessary for Michael to have real-time

25   captioning or CART available to him in lectures.

1    Q.   Why did you make that recommendation?

2         MR. MOORE:  Your Honor, I'm going to object to the

3    extent that she's testifying for information outside of this

4    letter rather than what is in the letter.  The only thing that

5    was provided to Creighton University was this letter.  She did

6    not call Creighton University, she didn't provide any of these

7    records.

8         MS. VARGAS:  Your Honor, this witness is being

9    offered to testify to her personal knowledge.  This is the

10   letter she's just testified that she drafted.  And so she

11   should be permitted to testify why she drafted what she did

12   and why she said what she said.

13        THE COURT:  Let's have a sidebar.  And I'd like the

14   lawyers to bring to the sidebar reference to my earlier

15   orders.  I have them here in front of me, but you may have

16   your hands on them, so please bring them to the sidebar.

17        (Bench conference on the record.)

18        (Off-the-record discussion had.)

19        THE COURT:  Let's go on the record at this point in

20   time.

21        We've been having an off-the-record discussion while we

22   were looking through the numerous and voluminous orders in

23   limine in this case.

24        And neither of the lawyers is able to point me directly

25   to my order on Ms. Watson, but I don't think that matters a

 1    great deal because Ms. Watson -- Dr. Watson was not -- is a

 2    doctor?

 3              MS. VARGAS:  No.

 4              THE COURT:  Ms. Watson was not named as an expert

 5    witness.  The opinions that she offered directly to Creighton

 6    in connection with this case have been received into evidence

 7    because those were communications that Creighton received and

 8    they are relevant to Creighton's decision-making process and

 9    its potential or alleged deliberate indifference.

10        Her examination of the plaintiff and her findings and

11    what she did regarding the plaintiff is all evidence that has

12    come into the record and may come into the record.

13        What I will not allow in is expert opinions by this

14    witness specifically regarding what this witness thinks

15    Mr. Argenyi needs or needed at the relevant time period in

16    connection with accommodations because that is expert

17    testimony.

18        That's my ruling.

19              MS. VARGAS:  If I could clarify?  The exhibits we

20    intend to offer through this witness have already been

21    admitted into evidence by agreement of the parties.  And they

22    are the letters that she wrote.  In these letters she states

23    those opinions.  So may she testify about the letters that she

24    wrote?

25              THE COURT:  She can say she wrote those letters and

1    those letters expressed her opinions.

2            MR. MOORE:  Your Honor, can we object on cumulative?

3    I've let this go.  Over and over they're reading the same

4    evidence in.  I would object this is cumulative.  This is

5    already in, those letters are already in.  This has been

6    discussed ad nauseam.

7            MS. VARGAS:  This is the heart of the case, whether

8    he needs it.  This is our burden to prove it.  Evidence that

9    she's reporting was just now admitted into the record.

10           THE COURT:  Your objection on cumulative at this

11   juncture is overruled.

12           MR. MOORE:  Thank you, your Honor.

13       (End of bench conference.)

14           THE COURT:  You may continue your examination,

15   Ms. Vargas.

16           MS. VARGAS:  Thank you.

17   BY MS. VARGAS:

18   Q.   Ms. Watson, if you could please look at the exhibit that

19   appears on the screen, and could you please read for the jury

20   item number 2 in your letter?

21   A.   Sure.  "Real-time captioning:  Real-time captioning is

22   provided by a skilled steno captioner using a laptop computer

23   with stenographic input.  Special software translates and

24   transmits the simultaneous text to the display screen.  This

25   will allow Michael to be an active part of the classroom

```
 1    education and be able to verify what is being said when

 2    needed."

 3    Q.   And could you also read recommendation number 3?

 4    A.   Sure.  "Cued speech interpretation:  Some speech

 5    sounds -- excuse me.  Some sounds in speech are not visible

 6    when using speech reading cues.  Given the nature of any

 7    classroom situation with new vocabulary and necessity for

 8    mobility, a cued speech or oral interpreter is the most

 9    appropriate accommodation in lab environments."

10    Q.   And then recommendation number 1, can you please read

11    that one?

12    A.   Sure.  "An FM system will allow Michael an improved

13    signal-to-noise ratio in group working environment and the

14    advantage of a clear sound signal from the presenter/talker/

15    group members.  This will aid in tracking fast moving

16    conversation.  It is recommended that a wireless system be

17    used to allow for unimpeded and unrestricted movements around

18    the work space and patients."

19    Q.   What does improved signal-to-noise ratio mean?

20    A.   That refers to the signal being the talker and any

21    background noise, like the static that was playing just a

22    minute ago.  If we were attempting to talk in that

23    environment, an FM system would pick up the talker's voice,

24    just the sound of their voice, and make it louder over the top

25    of that background noise.
```

1    Q.   How many people did you -- were you referencing when you

2    talk about a group working environment?

3         MR. MOORE:  Objection, your Honor, again it's beyond

4    the scope of the letter, it's giving opinion testimony and

5    explaining things that are not in it.

6         THE COURT:  Sustained.

7         MS. VARGAS:  If we could slide the exhibit down so

8    that we can see -- page 1, please, the first page of the

9    letter.

10   BY MS. VARGAS:

11   Q.   Could you please read the second paragraph of this

12   letter?

13   A.   "Michael was last evaluated with his cochlear implant

14   system on 24 March, 2009.  At that time, Michael was able to

15   detect sounds in the mild hearing loss category (30 decibels

16   or better across all frequencies).  His ability to understand

17   speech in the auditory only condition is quite good at 81

18   percent, (sentence level materials without contextual cues).

19   When he is able to take advantage of visual cues and context,

20   his performance improves to nearly 100 percent."

21   Q.   What are sentence level materials?

22        MR. MOORE:  Again objection, your Honor, she's going

23   beyond the scope of the letter, what was said in the letter

24   and what was provided to Creighton.

25        THE COURT:  Sustained.

1    BY MS. VARGAS:

2    Q.   Does Mr. Argenyi have a mild hearing loss?

3    A.   No.

4    Q.   What is his hearing loss?

5    A.   He has a severe-to-profound hearing loss.

6    Q.   Turning to the second page of this letter, can you please

7    read the very last sentence?

8    A.   "Please feel free to contact our Center should you have

9    any further questions or concerns related to the topics

10   discussed in this letter."

11   Q.   Did anyone from Creighton University ever contact you?

12   A.   No.

13   Q.   When you wrote this letter in May 2009, had you seen

14   Dr. Backous's April 10th, 2009, letter?

15   A.   We did review that in the medical records during the

16   cochlear implant team review before we generated this letter.

17   Q.   And was your May letter consistent with his

18   recommendations in his April 10th letter?

19   A.   I believe so, yes.

20   Q.   And how did you reach that conclusion?

21   A.   The cochlear implant --

22        MR. MOORE:  Again objection, your Honor --

23        MS. VARGAS:  Your Honor, I'm seeking to elicit

24   testimony about the group process, her personal knowledge and

25   the discussions about Mr. Argenyi that preceded the letters

 1    that went to Creighton University.

 2         THE COURT:  The objection is sustained.

 3    BY MS. VARGAS:

 4    Q.   What happened in June of 2009?

 5    A.   Michael received his second cochlear implant.

 6    Q.   And turning to page 81 of Defense Exhibit 218, what is

 7    this document, page 81?

 8    A.   This a report that I wrote on June 23, 2009.  It was his

 9    two-week check of his second cochlear implant.  We were

10    checking the programs.

11    Q.   So when you checked the cochlear implant, what did you

12    find with respect to his thresholds, the threshold check?

13    Page 81.

14    A.   Thresholds were borderline normal to the mild hearing

15    loss category.

16    Q.   Does he have a normal or mild hearing loss?

17    A.   No, he does not.

18    Q.   What is a threshold?

19    A.   The threshold is how soft of a sound someone can detect

20    with the cochlear implant in place.

21    Q.   Why is that different from a mild hearing loss?

22         MR. MOORE:  Objection, your Honor, again asking for

23    expert opinion.

24         THE COURT:  I'll let her answer; overruled.

25    A.   A mild hearing loss -- mild -- detecting sounds in the

1    mild category indicates that he can hear soft sounds; doesn't

2    imply understanding, much like if you're using a cell phone

3    with a bad signal.  You can hear the sound on the cell phone

4    but you can't understand it all the time.

5    BY MS. VARGAS:

6    Q.   So with two cochlear implants, is Mr. Argenyi deaf?

7    A.   Yes.

8    Q.   And how would you categorize his hearing loss after

9    receiving cochlear implants?

10   A.   He has a severe-to-profound hearing loss.

11   Q.   And could you please turn to page 80?

12        Are these the tests that you -- results of the tests you

13   performed on Mr. Argenyi after he received the second cochlear

14   implant in the summer of 2009?

15   A.   Yes, July of 2009.  So this would have been his one-month

16   check.

17   Q.   Okay.  And what do these numbers mean?

18   A.   In the bilateral condition, meaning with both cochlear

19   implants in place, Michael was able to understand about 75

20   percent of the simple basic kindergarten level sentences, in

21   just the auditory only, meaning with just hearing.

22   Q.   Then the line below that, what does that mean?

23   A.   So when we put noise into the room where Michael was

24   listening to these sentences, his performance significantly

25   decreased.  With a moderate amount of noise, it decreased down

1    to about 25 percent of understanding.

2    Q.   When did you next see Mr. Argenyi after that?

3    A.   It would have been, I believe, August of 2009 or

4    September.  I'm not entirely sure.  We can look at the

5    records.

6    Q.   I think if you turn to page 75 and 76 --

7    A.   That would have been August 2009.

8    Q.   Okay.  And what happened at this appointment?

9    A.   This was again a programming check two months after his

10   second implant was activated.

11   Q.   And turning to page 76, can you explain what this

12   counseling comment means?

13   A.   Yeah.  That day we had talked a lot about use of an FM

14   system with Michael's cochlear implants.  We had time enough

15   in clinic to connect an FM system to his cochlear implants and

16   see how he was able to just detect sounds.  And he was able to

17   do that.

18   Q.   Did he ask you about the FM system?

19   A.   Yes, he did.

20   Q.   And what specific questions was he asking about the FM

21   system?

22   A.   I believe what an FM system can do for him.

23   Q.   And can you explain about the 3G?

24   A.   The 3G is actually the type of sound processor he was

25   using at the time.  The sound processor is the piece on the

1    outside that picks up the sound around the room and the

2    environment around you.  So we were discussing what type of FM

3    system would work with his implant type.

4    Q.   And did you test that FM system?

5    A.   No, we did not.

6    Q.   Did you connect the FM system to his cochlear implant?

7    A.   We did do some playing around with the device.  We did

8    put an FM system on his processor.  We didn't do any formal

9    testing to see if it works.

10   Q.   What did you do?

11   A.   We put the FM system on.  He went out into a noisier

12   environment.  I wore the microphone and spoke to him.  He was

13   able to detect my voice.

14   Q.   Okay.  And then --

15            MS. VARGAS:  If I may approach the witness, your

16   Honor, and show what's already been admitted into evidence as

17   Exhibit 18?

18            THE COURT:  You may.

19   BY MS. VARGAS:

20   Q.   Do you recognize this document?

21   A.   Yes.

22   Q.   What is it?

23   A.   This is a letter that I generated in the same manner that

24   the previous letter had been generated in request for further

25   information.

1          It was in response to a letter that was sent to us from

2     Dianne DeLair of the Department of -- I'm sorry, Disability

3     Rights of Nebraska.  It was a letter requesting further

4     information from Creighton.

5     Q.   You testified that you wrote this document.

6     A.   Correct.

7     Q.   And Dr. Backous signed off on the letter?

8     A.   Yes.  I wrote the letter.  It was reviewed again during

9     the cochlear implant team meeting and we both signed the final

10    copy.

11    Q.   Can you please read the paragraph that's highlighted at

12    the bottom of this letter?

13    A.   Sure.  "Michael remains to be deaf regardless if he is or

14    is not using his cochlear implant systems.  He is able to

15    detect sounds in the mild hearing loss category, but this does

16    not mean Michael has a mild hearing loss.  He does not

17    understand or use sound like someone with a mild hearing loss.

18    Michael has a bilateral profound sensorineural hearing loss.

19    His hearing loss requires Michael to concentrate at a much

20    higher level than someone with a mild hearing loss.  This can

21    be stressful in a difficult listening environment."

22    Q.   And if we could please turn to the second page?  Could

23    you please read that page.

24    A.   "Making use of the electrical stimulation through the

25    cochlear implant systems is not an easy task.  Factors that

 1     affect the quality of sound Michael receives include, but are

 2     not limited to neural survival, placement of the electrode

 3     array, auditory processing of the sounds received, duration of

 4     the implant use, cause of hearing loss and duration of

 5     auditory deprivation.  The longer Michael uses his cochlear

 6     implant systems, the better he will become at using the sound

 7     to his advantage.

 8          "It is imperative that Michael have access to visual cues

 9     for everyday communication and education.  Visual cues

10     include, but are not limited to closed captioning on videos

11     and films; real-time captioning for lectures and discussions;

12     and speech reading cues for one-on-one interactions.

13          "Without visual cues, cochlear implant users experience

14     more difficulty understanding speech in demanding listening

15     environments.  Michael is no exception.  With these

16     accommodations in place, Michael has proven himself to do

17     quite well.  For specific requests, please see our letter

18     dated 27 May, 2009.

19          "Michael is adept at identification of what he needs in

20     order to be successful in spite of his hearing loss.  He is

21     motivated to do well.  Please feel free to contact our center

22     should you have further questions or concerns related to the

23     topics discussed in this letter."

24     Q.   And did anyone from Creighton University ever contact

25     you?

1    A.   No.

2    Q.   In all of the letters that you wrote to Creighton

3    University, did you ever write something just because

4    Mr. Argenyi wanted you to?

5    A.   No.

6    Q.   Would you do that?

7    A.   No.

8    Q.   Under any circumstances?

9    A.   In any circumstance.

10   Q.   What did you think when you were asked to write a fourth

11   letter to Creighton University?

12          MR. MOORE:  Objection, your Honor, beyond the scope.

13          THE COURT:  Overruled.  She may answer.

14   A.   It was very frustrating.  We'd never had requests this

15   many times from any educational setting or employer before.

16          MR. MOORE:  Again, your Honor, that was --

17          THE COURT:  The jury will disregard the response.

18          MS. VARGAS:  No further questions, your Honor.

19          THE COURT:  You may cross-examine.

20          MR. MOORE:  Thank you, your Honor.

21                          CROSS-EXAMINATION

22   BY MR. MOORE:

23   Q.   Good afternoon, Ms. Watson.

24   A.   Hello.

25   Q.   Your goal is to give Michael Argenyi the best possible

1    communication, correct?

2    A.   Correct.

3    Q.   And you want to do the most for your patient that you

4    possibly can; is that correct?

5    A.   In terms of his implant?  Yes.

6    Q.   Oh, you don't want to in other settings?

7    A.   It's not my job description.

8    Q.   Not your job description to do the best for your patient.

9    A.   It is -- my job description is to do the best for my

10   patient in regards to their auditory implant.

11   Q.   Right.  With regard to the auditory implant, you're

12   trying to get the best possible communication you can for

13   Michael, correct?

14   A.   Correct.

15   Q.   I'd like to direct your attention again to Exhibit 218,

16   and specifically to page Argenyi 76 in the bottom right-hand

17   corner.

18        Now, as I understand these were your notes from the visit

19   in August -- on August 3rd, 2009; is that correct?

20   A.   Yes.

21            MR. MOORE:  If I could put this on the ELMO...

22   BY MR. MOORE:

23   Q.   Now, if you would, for the jury -- under counseling,

24   that's the counseling you provided Mr. Argenyi, correct?

25   A.   Yes.

1   Q.   Okay.  And I think on direct examination you indicated

2   that you tried an FM system with his cochlear implant that

3   day, correct?

4   A.   According to the records, yes.

5   Q.   Did you?

6   A.   And I must have.

7   Q.   Not just according to the records, you did that; is that

8   correct?

9   A.   Yes.

10  Q.   I think you said he was able to detect sound; is that

11  what you said, on your direct examination?

12  A.   Yes.

13  Q.   Will you please read that paragraph out loud for the

14  jury?

15  A.   "Michael was asking specific questions about what FM

16  system he would need for use at school.  He was given a Web

17  site, the product names and contact information for this

18  Center's Phonak rep for the school.  The FM system was

19  illustrated in clinic today and found to work great with his

20  3G.  And he was encouraged by the advantages the system could

21  offer him."

22  Q.   So your conclusion was that it worked great and he was

23  encouraged by the advantages the system could offer him,

24  correct?

25  A.   Yes.

1    Q.   So not just detecting sounds, it worked great.

2    A.   Our goal at that time for Michael was that he would have

3    access to sound in the presence of a larger background noise

4    environment.  So yes, that did work great.

5    Q.   In fact, so great that you recommended an FM system would

6    be helpful for his medical school experience, correct?

7    A.   I did, for --

8    Q.   Let's go back and look at your letter that you sent to

9    Creighton, which is Exhibit 17.  And this was a letter sent

10   again in response to Creighton's request for information,

11   correct?

12   A.   Yes.

13   Q.   Do you use the word "lecture" anywhere in that exhibit --

14   in that letter?

15   A.   No.

16   Q.   Now, I believe on direct testimony you testified not once

17   but twice that no one from Creighton ever contacted you.  Is

18   that your testimony today?

19   A.   That is.

20   Q.   Have you ever heard of a man named Chuck Lenosky?

21   A.   I don't remember the name.

22   Q.   You don't remember Chuck Lenosky calling you with regard

23   to the FM system that was being incorporated at Creighton

24   University?

25   A.   I don't, but I'm not very good remembering names, so it

1    doesn't surprise me.

2    Q.   It doesn't surprise you that you may have talked to

3    Mr. Lenosky from Creighton?

4    A.   I don't recall talking to him.

5    Q.   Now, you're not saying you didn't, you're saying you

6    don't recall.

7    A.   Correct.

8    Q.   So if Mr. Lenosky came in here and testified that he

9    talked to you, you're not saying he would be lying, you're

10   just saying you don't recall talking to him.

11   A.   I don't recall.

12   Q.   You don't recall saying anything with regard to the

13   specific FM system that Mr. Argenyi was asking for for his

14   cochlear implant?

15   A.   I don't recall that, no.

16   Q.   You don't remember questions about making sure they set

17   it up right at the medical school?

18   A.   I don't recall that, no.

19   Q.   So you're not saying it didn't happen, you're saying you

20   just don't remember as you sit up there today.

21   A.   Correct.

22   Q.   Now -- but you seem to remember everything else really

23   well regarding Mr. Argenyi from the direct examination, right?

24   A.   I remember what my notes have told me.

25   Q.   Okay.  But -- well, let me back up for a minute here.

```
 1          Now, just so I understand, other than the letters that
 2   you sent to Creighton University, you didn't send any other
 3   information, did you?
 4   A.   Not to my knowledge.
 5   Q.   You didn't send any medical records to them, correct?
 6   A.   Not without express requests from the patient.
 7   Q.   You didn't --
 8   A.   I do not recall that.
 9   Q.   You didn't call Creighton University, did you?
10   A.   I do not know -- no, not that I recall.
11   Q.   Okay.  And you would have had Mr. Argenyi asked you to,
12   correct?
13   A.   I would have, yes.
14   Q.   And you said in the testing you do that you test at
15   kindergarten level with predictable sentences.
16   A.   At the time, that was the industry standard.
17   Q.   Has it changed?
18   A.   It has changed.
19   Q.   It has changed?  I don't want to get into that, but, with
20   Mr. Argenyi, you used predictable words that he would know
21   were coming?
22   A.   That was the industry standard of what we were to test
23   adults with.
24   Q.   That's what you did, it was predictable.
25   A.   Correct.
```

1    Q.   He knew what was coming.

2    A.   Anybody could predict, given -- understanding the first

3    couple of words, if you hear "the sky is," you know it's

4    probably going to be "blue".

5    Q.   Okay.  I'd like to direct your attention to Exhibit 218

6    again, Argenyi 137 in the corner, which I believe is an

7    audiogram.

8    A.   I do not have 137.

9    Q.   You don't have --

10   A.   I don't have it here.

11        MR. MOORE:  Page 137?  That was part of the exhibit,

12   I believe.

13        MS. BALUS:  May I approach, your Honor?

14        THE COURT:  Yes.

15   BY MR. MOORE:

16   Q.   Again, I'd like to direct your attention to Argenyi 137.

17   Do you see that?

18   A.   Yes, I do.

19   Q.   Is that an audiogram?

20   A.   It is an audiogram of Michael's ability to detect sound

21   with his implants, yes.

22   Q.   So this is his ability to detect sound with his cochlear

23   implant.  And I'm going to go ahead and again put this up on

24   the ELMO.

25        MR. MOORE:  This is publishing to the jury?

1           COURTROOM DEPUTY:  Correct.

2           MR. MOORE:  Thank you.

3   BY MR. MOORE:

4   Q.   This is the audiogram that you did in -- I believe it was

5   August of 2009, correct?

6   A.   Yes.

7   Q.   And again, it talks about -- I think it says in -- under

8   "assessment", it says, "CI assisted thresholds are in the mild

9   to borderline normal hearing loss category."  Do you see that?

10  A.   Yes, I do.

11  Q.   Do you know why Mr. Argenyi -- Argenyi did not provide

12  this to Creighton University?

13  A.   I don't know.

14  Q.   Now, I think you said on direct examination

15  severe-to-profound hearing loss is Mr. Argenyi's diagnosis;

16  correct?

17  A.   Correct.

18  Q.   And what that means is he can hear a jet engine if it's

19  right by his ear.  Is that what you were saying?

20  A.   If he was standing next to it, yes.

21  Q.   With his cochlear implants, is that still the case?

22  A.   He can still hear that.  He can hear sounds that are

23  softer.

24  Q.   But he couldn't hear a jet engine with his cochlear

25  implants unless it was right next to him.

1   A.   He could hear a jet engine from a little farther away.  I

2   don't know what that distance would be.

3   Q.   Just a little farther.  A couple feet?

4   A.   Probably more than that.

5   Q.   You talked about wanting to limit Mr. Argenyi's

6   expectations with regard to the second cochlear implant, that

7   it -- you do that, correct, because you don't want to get

8   their expectations too high.  You don't want them to think

9   they're going to hear normally, correct?

10  A.   Correct.

11  Q.   And that's why you did that with Mr. Argenyi, correct?

12  A.   Yes.  I did do that with all my bilateral patients.

13  Q.   Let's look at Exhibit 18, if we could again.

14       Now, this was the third letter that you sent to Creighton

15  University, but it had been since -- well, I'm sorry, I want

16  to look at Exhibit 18 first.  I apologize.  Oh, I did say 18?

17  A.   Uh-huh.

18  Q.   It's -- it's been a long day.

19       The September 10th letter.  That was the third letter you

20  sent to Creighton; is that correct?

21  A.   That would have been the second letter that I sent.

22  Q.   Oh, from you.  Okay.

23       And the last one that you sent was May 27th, correct?

24  A.   I believe so, yes.

25  Q.   Okay.

1    A.   Yes.

2    Q.   Now, Creighton didn't ask you to write the letter that's

3    Exhibit 18, did it?

4    A.   That was --

5    Q.   In fact, it was Dianne DeLair that asked you to write

6    that letter, correct?

7    A.   It was in response to a letter from Creighton that Dianne

8    had forwarded to us.

9    Q.   And what letter is that?

10   A.   Well, I don't have it in front of me, so I'm not sure.

11   Q.   Okay.  And I notice that in the cc on your letter, dated

12   September 10th, that it actually cc's to Nebraska Advocacy

13   Services, correct?

14   A.   Yes.

15   Q.   That sent a copy to Dianne DeLair.

16   A.   Correct.

17   Q.   So you talk about a letter from Creighton, but Dianne

18   DeLair asked you to write that letter, didn't she?

19   A.   The letter came directly from Dianne.  The letter

20   requested further information from the cochlear implant team,

21   particularly Dr. Backous.

22   Q.   Right.  But that request came from Dianne DeLair.

23   A.   Yes.  That letter came in, yes.

24   Q.   And looking back on your letter dated May 27th, Exhibit

25   17, there's no cc to Dianne DeLair, is there?  It's just

1    Michael Argenyi, correct?

2    A.   Correct.

3    Q.   And then let's look at Exhibit 19.

4    A.   I don't have 19.

5         MS. BALUS:   May I approach, your Honor?

6         THE COURT:   You may.

7    BY MR. MOORE:

8    Q.   Now, this was another letter that you wrote, correct?

9    A.   Correct.

10   Q.   And again, you wrote that at the request of Dianne

11   DeLair; is that correct?

12   A.   I do not recall who requested this letter.

13   Q.   Okay.  And the cc on there, again that's Nebraska

14   Advocacy Services, correct?

15   A.   Correct.

16   Q.   So you don't remember who asked you to write that letter.

17   A.   Exactly; correct.

18        MR. MOORE:   May I have one moment, your Honor?

19        THE COURT:   You may.

20   (Off-the-record discussion had.)

21   BY MR. MOORE:

22   Q.   Ms. Watson, in the letters that you sent to Creighton

23   University, was there anything inaccurate?

24   A.   Not to my knowledge, no.

25   Q.   Did anyone ask you to change anything in those letters?

1    A.   Other than after it was generated and the cochlear

2    implant team reviewed it, no.

3    Q.   But the letters that you actually sent to Creighton,

4    those were completely accurate, correct?

5    A.   To my knowledge, yes.

6    Q.   And no one ever asked you to make any changes to those

7    letters, correct?

8    A.   Other than members of the cochlear implant team -- nobody

9    outside the cochlear implant team asked me.

10   Q.   But once you sent them to Creighton, nobody from the

11   cochlear implant team made any changes, right?

12   A.   Right.

13   Q.   So in the letters, after you sent them to Creighton, no

14   one ever asked you to make any changes, correct?

15   A.   Correct.

16          MR. MOORE:  I have nothing further.

17          THE COURT:  Redirect?

18          MS. VARGAS:  Thank you, your Honor.

19                    REDIRECT EXAMINATION

20   BY MS. VARGAS:

21   Q.   Ms. Watson, looking at Exhibit 19 which defense counsel,

22   Mr. Moore, has just referenced --

23   A.   Uh-huh.

24   Q.   -- can you please read to us the paragraph beginning "in

25   the real world"?

1  A.  "In the real world, there is much more noise present even

2  in a controlled classroom environment.  There may be noises

3  from people moving around the room, turning pages in a

4  notebook, or typing on a computer keyboard during note-taking,

5  not to mention room ventilation system noise.  All of these

6  sounds make it more difficult for Michael to understand what

7  is being said.  During his last evaluation session in a

8  signal-to-noise ratio of plus 10, Michael's speech

9  understanding dropped to 57 percent, and in a signal-to-noise

10  ratio of plus 5, his speech perception further decreased to 25

11  percent."

12  Q.  What is signal-to-noise ratio of plus 5?

13  A.  A signal-to-noise ratio of plus 5 implies the speaker,

14  the talker, is five what we call decibels units louder than

15  the background noise.

16  Q.  And where might you find a plus 5 ratio?

17       MR. MOORE:  Objection, your Honor, again beyond the

18  scope, asking for expert testimony more than was included in

19  the letter.

20       THE COURT:  Sustained.

21  BY MS. VARGAS:

22  Q.  When you said -- when you concluded each of your three

23  letters offering to make yourself available to Creighton

24  University to answer any questions about Mr. Argenyi's

25  hearing, were you willing to talk to them?

 1   A.   Absolutely.

 2   Q.   Would you have answered questions if they raised them?

 3   A.   Yes.

 4   Q.   At any time did anyone other than you and the cochlear

 5   implant team in any way influence the test results that are in

 6   Defense Exhibit 218 that we looked at earlier?

 7   A.   No.

 8   Q.   And in any way, at any time, did anyone influence, cause

 9   you to change what was said in these letters you wrote to

10   Creighton University?

11   A.   No.

12   Q.   Did anyone ask you to make changes in your professional

13   opinions based on your evaluations of Mr. Argenyi?

14   A.   After they were sent, no.

15   Q.   At any time?

16   A.   The cochlear implant did; but outside of that, no.

17   Q.   But that's it?

18   A.   Correct.

19        MS. VARGAS:  No further questions, your Honor.

20        THE COURT:  Thank you, Ms. Watson.  You may stand

21   down, and you are excused.

22        THE WITNESS:  Thank you.

23        THE COURT:  I believe that this brings the day to an

24   end.  I understand that there will be another witness for the

25   plaintiff tomorrow morning.

1          So please enjoy your evening with your family and

2     friends.  Talk about something other than this case.  Keep an

3     open mind until all the evidence is in.

4          Please reconvene in the jury room before nine o'clock.

5          I do have a plea hearing set at 8:30 in the morning, so I

6     will need counsel tables cleared off for that purpose.  Those

7     generally take less than half an hour.  If we run just a few

8     minutes late, you'll know that's the reason.

9          Thank you.  We'll see you in the morning.

10

11          (Adjourned at 4:51 p.m.)

12

13

14          I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.

15

16          _/s Brenda L. Fauber_          _____7-21-14_____
          Brenda L. Fauber, RDR, CRR              Date

17

18

19

20

21

22

23

24

25