```
 1                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF NEBRASKA
 2

 3      MICHAEL S. ARGENYI,         )
                                    )
 4              Plaintiff,          )          8:09CV341
                                    )
 5          vs.                     )      Omaha, Nebraska
                                    )      August 28, 2013
 6      CREIGHTON UNIVERSITY,       )
                                    )
 7              Defendant.          )

 8

 9

10                             VOLUME V
                       TRANSCRIPT OF PROCEEDINGS
11           BEFORE THE HONORABLE LAURIE SMITH CAMP
        CHIEF UNITED STATES DISTRICT JUDGE AND A JURY
12

13

14

15

16

17

18

19

20      COURT REPORTER:           Ms. Brenda L. Fauber, RDR, CRR
                                  111 S. 18th Plaza
21                                Suite 3122
                                  Omaha, NE 68102
22                                (402) 661-7322

23

24
        Proceedings recorded by mechanical stenography, transcript
25      produced with computer.
```

```
1                         A-P-P-E-A-R-A-N-C-E-S

2

      FOR THE PLAINTIFF:           Ms. Mary C. Vargas
3                                  Mr. Michael S. Stein
                                   Stein Vargas Law Firm
4                                  P.O. Box 522
                                   Emmitsburg, MD 21727
5

6                                  Ms. Dianne D. DeLair
                                   Nebraska Advocacy Services
7                                  134 South 13th Street
                                   Suite 600
8                                  Lincoln, NE 68508

9
                                   Ms. Caroline E. Jackson
10                                 NAD and Advocacy Center
                                   8630 Fenton Street
11                                 Suite 820
                                   Silver Springs, MD 20910
12

13     FOR THE DEFENDANT:          Mr. Scott P. Moore
                                   Ms. Allison D. Balus
14                                 Baird Holm Law Firm
                                   1700 Farnam Street
15                                 Suite 1500
                                   Omaha, NE 68102
16

17

18

19

20

21

22

23

24

25
```

1                (At 9:17 a.m. on August 28, 2013, with counsel for the

2        parties, the plaintiff and the defendant's representative

3        present, and the jury NOT present, the following proceedings

4        were had:)

5                      THE COURT:  Good morning.

6                      MS. VARGAS:  Good morning.

7                      MR. MOORE:  Good morning.

8                      MS. BALUS:  Good morning.

9                      THE COURT:  Sorry about the delay.  Counsel for the

10       8:30 showed up 15 minutes late.  And when that happens,

11       everything gets delayed.

12            Is there anything that we need to talk about before the

13       jury comes in?

14                      MS. VARGAS:  Yes, your Honor, if we might, there are

15       four issues.  I don't think any of them are probably too long.

16            My first request of the Court is that any motions that

17       either party might make at the conclusion of that party's

18       evidence be made outside the presence of counsel.

19                      MR. MOORE:  You mean to the jury?

20                      MS. VARGAS:  I would also like them to be made

21       outside the presence of counsel.

22                      MR. MOORE:  I'm sure you would.

23                      MS. VARGAS:  Thank you.

24                      MR. MOORE:  Obviously no objection to that.

25                      THE COURT:  All right.

```
 1            MS. VARGAS:  That was easy.  Hopefully the second
 2       issue is easy as well.
 3          And I wanted to raise this outside of the presence of the
 4       jury.  We're glad that Dr. Kavan is back and is presumably
 5       well.  But given he wasn't able to testify yesterday because
 6       of medical reasons, we wanted to just make sure there weren't
 7       any concerns about his ability to testify today.
 8            DR. KAVAN:  I'm fine.  My wife would not agree, but
 9       I'm -- my throat -- I didn't want to say this to them.  They
10       had a tube down it and stuff, so it might be a little
11       gruffly --
12            MS. VARGAS:  My only concern -- I don't want to pry
13       into your personal business.
14            THE WITNESS:  I'm on no narcotics, just an
15       antibiotic.  Thank you.
16            MS. VARGAS:  Two easy things.
17          The second two are a little more substantive.
18          Defendant has listed as a witness for today an individual
19       named Victoria Deuel.  And Ms. Deuel was not listed on either
20       party's July 2nd witness list or in the pretrial order that
21       was submitted through Magistrate Gossett.
22          Whether they're actually intending to try and call this
23       person, I don't know.  But we obviously would have an
24       objection.  We don't see that it's a proper witness, given
25       they weren't listed.  And furthermore they don't have any
```

```
1    testimony presumably that would go to the questions in this

2    case which are whether Mr. Argenyi needs auxiliary aids and

3    services for effective communication and whether the defendant

4    was deliberately indifferent.  We don't see the relevance of

5    any testimony this witness might offer.

6         To the extent the witness might be offered to impeach,

7    it's not proper under Nebraska Civil Rule 16.2.  16.2 says

8    that impeachment -- you can only offer evidence to attack or

9    support a witness's credibility but -- and this is a quote, it

10   does not include evidence that merely contradicts other

11   evidence.

12        So to the extent this witness may be asked to come in and

13   testify to hearsay that contradicts Mr. Argenyi -- one of

14   Mr. Argenyi's statements out of court wouldn't be admissible

15   for a variety of reasons.  In addition to those mentioned, the

16   fact that it is hearsay, the fact it would only be this kind

17   of evidence that doesn't fall under 16.2 for impeachment.

18        Furthermore, this witness is an interpreter who operates

19   under a code of ethics.  And therefore, to the extent she

20   might be called to testify about communications that are

21   privileged and protected as an interpreter, it's confidential

22   communications through an interpreter, they would be even

23   further compromised.

24             THE COURT:  Response?

25             MR. MOORE:  Yes, your Honor.  The defendants intend
```

1    to call Victoria Deuel for purposes of -- solely for

2    impeachment under Rule 16.2.  Ms. Deuel will provide testimony

3    that specifically impeaches statements made by the plaintiff

4    in this case, and solely for that reason only, material to the

5    case because it goes to whether he was using her the day that

6    he said he was using her, saying that he was looking at her

7    and looking at CART; saying that he did not ask her to leave,

8    that she -- that she interpreted the entire day.

9        There are many things that would directly impeach that

10   testimony which is material to the issue of whether

11   Mr. Argenyi was even willing to try the accommodations offered

12   by Creighton.  Solely for impeachment purposes, it would not

13   be hearsay.  She would be, number one, offering for

14   impeachment; number two, offering the statements of the

15   defendant -- excuse me, the plaintiff himself which is an

16   admission against interest.

17       And with regard to the confidentiality, she was under a

18   confidentiality agreement signed between Creighton and her.

19   The plaintiff was not a party to that confidential agreement.

20   Moreover, there's no protection for the interpreter

21   individual -- there's no privilege recognized in this court

22   under the Federal Rules of Evidence since there is not an

23   attorney-client privilege, it's not a spousal privilege, it's

24   not one of the privileges that fall under those protected by

25   the Federal Rules of Evidence and the Federal Rules of Civil

1      Procedure.

2              THE COURT:  I'm not aware of any privilege that would

3      govern this particular communication.  If the testimony is

4      offered solely for the purpose of impeachment, then I will

5      just need to rule on objections as they come up during the

6      witness's testimony.  And I'll need to do my best to recall

7      what the plaintiff had testified to and determine whether or

8      not it is, indeed, testimony that would impeach a statement

9      made by the plaintiff on the stand.

10             MS. VARGAS:  Your Honor, the plaintiff would request

11     that because of the sensitive nature and the ethical

12     implications, the fact this wasn't a witness listed and

13     doesn't fall within 16.2, definition of impeachment, we would

14     ask that the Court provide -- have voir dire of this witness,

15     were she called to testify, outside the presence of the jury.

16             THE COURT:  So you're asking that the defense call

17     the witness outside the presence of the jury, hear her

18     testimony, determine whether it is, in fact, impeachment

19     testimony and then proceed in the presence of the jury with

20     what is admissible?

21         You know, if the testimony that the defense is

22     anticipating eliciting from Ms. Deuel is fairly short, I will

23     do that.

24             MR. MOORE:  May I be heard?

25             THE COURT:  You may.

1          MR. MOORE:  We would ask that that not happen, that

2     they get a chance to cross before we do the direct.  They'll

3     have an opportunity to cross her after we do the direct.

4     Giving them an opportunity to cross her in advance would

5     unduly prejudice the defendant in this case.  There's no

6     reason for a voir dire.

7          We're not talking about anything that was protected by an

8     order of this Court.  We're not talking about expert

9     testimony.  She will be called to impeach the plaintiff.  If

10    it's an improper question, she may object.  If it is something

11    that needs to be clarified, she'll have a chance to do a

12    cross-examination of the witness.

13         THE COURT:  Well, since there is not an agreement on

14    this matter, when the witness is called, I will rule on

15    objections as they come up, we will do it in the presence of

16    the jury.  I will instruct the witness to pause after each

17    question by counsel so that counsel for the plaintiff will

18    have an opportunity to object and I'll have an opportunity to

19    rule on the objections before any statement is offered and

20    heard by a jury.

21         That's all I can do.

22         All right.  What was the fourth issue?

23         MS. VARGAS:  The fourth issue goes to exhibits that

24    the defendant has indicated an intention to offer today.  And

25    I raise this now because of prejudicial impact of attempting

1    to introduce this in front of the jury.

2         We've received proposed demonstratives from defendant

3    today, and we can deal with the grades one later.  But the one

4    I would like to ask the Court's indulgence on right now is

5    that M3 core clinical clerkship, M4 clinical clerkships.

6         And these documents, I don't know where the evidence

7    comes from that creates these.  And typically demonstratives

8    under Rule 1006 need to come from evidence in the record.

9         That issue aside, which is a major issue.  The question

10   of the cost of auxiliary aids and services for the M3 and M4

11   year is an issue not within the purview of the jury.  M3 and

12   M4 is what happens going forward.  So that is within your

13   Honor's discretion to address after the jury's decision.

14        And so there is no possible relevance of speculative

15   costs of M3 and M4 accommodations at this point in time.

16   After the jury issues its decision, I would presume and we

17   certainly would be seeking an opportunity to have a hearing on

18   injunctive relief.  We haven't put forward and neither -- I

19   don't know what they will put forward to offer evidence that

20   the Court would consider in crafting any potential injunctive

21   relief.

22             THE COURT:  This is an interesting issue that I had

23   not fully hashed out.  And it's certainly something we're

24   going to need to talk about, I guess, both now in connection

25   with these demonstratives and also in connection with the jury

1      instructions.

2          Certainly the issue of injunctive relief will be in my

3      hands, and I recognize that.  And certainly the question of

4      damages, if any, will relate just to the years M1 and M2 and

5      that's in the hands of the jury.

6          But, we're going to be asking the jury to determine

7      whether the defendant [*sic*] needs certain auxiliary aids and

8      accommodations.  And that determination would go to M3 and M4

9      because I think the jury, as the finder of fact, gets to

10     decide whether the plaintiff needs the accommodations.  And

11     then once the jury decides, yes, the plaintiff needs those

12     accommodations, then my duty to determine injunctive relief

13     kicks in.

14         And so we may need to divide out the jury's verdict into

15     more sections than I now have it divided into on the verdict

16     form to have the jury determine whether the plaintiff needed

17     the accommodations and aids that he requested for M1 and M2

18     and whether he needs certain accommodations that he's still

19     requesting for M3 and M4.

20         MS. VARGAS:  Your Honor, that's the very essence of

21     prospective relief.  Mr. Argenyi's third year of medical

22     school would begin in August of 2014.  And so the jury is not

23     able to make a determination of what he needs in August of

24     2014.

25         What the jury is asked to decide is the facts of this

1    case, what's happened and where we stand today, not what's

2    going to happen eight months from now.  That's injunctive

3    relief.  And plaintiff would maintain that's strongly and

4    firmly within the Court's discretion.

5         THE COURT:  Okay.  I may be getting ahead of myself

6    here, but this is something that I have not hashed out yet,

7    something that I have not specifically researched.  And it may

8    be that Ms. Timm, who has been doing research in preparation

9    for helping me with the jury instructions, has already looked

10   at case law that would be controlling.

11       While the responsibility for ordering any injunctive

12   relief and for crafting the injunctive relief would be in my

13   hands, I am wanting to know any information that counsel can

14   give to me, citations to court decisions with respect to

15   injunctive relief, as to whether the judge in those cases

16   always made the determination that certain accommodations were

17   needed and then proceeded with the injunctive relief; or

18   whether the decision of whether -- I'm using two whethers.

19       Whether the decision of whether accommodations were

20   needed went first to the jury; and then if the jury decided

21   the accommodations were necessary, then it went to the judge

22   to decide how those accommodations were going to be effected.

23       And I'm just thinking out loud here, and I have not

24   researched it and dissected it.  So I don't know the answer to

25   that question.

```
1              MS. VARGAS:  Your Honor, I could give an example of a

2      trial that was held in federal court just two weeks ago on an

3      ADA matter.  And it involved, as we have here, the decisions

4      for the jury, whether there was discrimination, or -- in that

5      case it wasn't auxiliary aids, but whether there was

6      discrimination and violation law of federal law, federal

7      disability law, and whether there should be damages awarded.

8      And what the jury determined was, yes, there was

9      discrimination and, yes, damages would be awarded and they set

10     the amount.

11          After that, the Court set a separate hearing on

12     injunctive relief and held a hearing at which evidence was

13     taken and the Court is now in the process of crafting, going

14     forward, how does the jury's decision on this, how does that

15     decision get implemented going forward.

16          The trial I'm referring to is Slaby vs. FBI, which was

17     just held in the District of Virginia two weeks ago.  And

18     that's certainly how I've seen it happen in every case we've

19     been involved in, where the injunctive relief is both -- you

20     know, how it's implemented and what's necessary going forward,

21     we would obviously see the decision of the jury, but the Court

22     would craft going forward starting in 2014, August of 2014,

23     how that would be implemented.  And presumably both parties

24     would have an opportunity to offer evidence about that issue

25     going forward.
```

1          What would happen in August 2014 is not something that's

2     appropriate, I would submit, for both parties to be discussing

3     to the jury.

4               THE COURT:  Let me turn to defense counsel for a

5     moment.  Do these demonstrative exhibits concern the M3 and M4

6     years?

7               MR. MOORE:  Yes, they do, your Honor.

8               THE COURT:  Why is that relevant for the jury?

9               MR. MOORE:  First of all, throughout the plaintiff's

10    evidence, they've indicated, "I wanted interpreters for the M3

11    and M4 year.  I didn't get those, so I took a leave of

12    absence."

13         So number one, it goes to he's already made the request.

14    The question for the jury is he made that request, it was

15    denied, is that discrimination under the ADA and Rehab Act.

16    There's no question that's within the purview of the jury.

17         More importantly within the purview of the jury is to

18    decide whether -- if Creighton provided those auxiliary aids

19    that he demands, whether it is an undue burden.  That is

20    squarely within the jury -- that's a jury question.  And that

21    goes to whether indeed the defendant discriminated against

22    him.  If it was an undue burden, then it's not discrimination

23    because Creighton University School of Medicine only needs to

24    provide the accommodations, auxiliary aids and services, that

25    are necessary if it is not an undue burden.  So that goes

1    squarely to the question of discrimination.

2         The jury needs to know how much that costs.  And we're

3    going to present evidence on that cost so they can determine

4    whether it's an undue burden.

5         I fully agree with the opposing counsel that the Court

6    would decide if there is liability, if there's discrimination,

7    what the prospective injunctive relief would be.  But that's

8    an entirely separate question from did Creighton deny him his

9    request for accommodations for M3 and M4, which would include

10   the undue burden.  And that -- and the numbers that are in

11   these -- in these demonstrative exhibits are nothing new.

12   They were presented to the Court in the summary judgment

13   motion.

14        THE COURT:  Okay.  Let me turn again to plaintiff's

15   counsel.

16        Would the plaintiff agree that the jury should be

17   instructed not to give any consideration to the M3 and M4

18   years, including when it is exercising its function of

19   determining damages, that the fact that the plaintiff dropped

20   out of medical school and is now doing something different

21   should not be in any way considered or weighed by the jury

22   when determining the plaintiff's damages?

23        MS. VARGAS:  So, your Honor, the jury, as I

24   understand it, is charged with deciding where we stand right

25   now; so, what's happened up until this point.

1         And so, the fact that Mr. Argenyi took a leave of absence

2    is something that's already happened.  And at the time that

3    decision was made, it was made because Creighton University

4    had maintained that interpreters would not be provided under

5    any circumstances in the clinical setting.

6         THE COURT:  But then this -- I don't think you can

7    have it both ways.  I think if you want to say that the Court

8    can instruct the jury to look just at M1 and M2 when deciding

9    the issue of undue burden and the accommodations that the

10   plaintiff needed and the plaintiff's damages, I can instruct

11   them that way.

12        But, if you're saying that the jury should also consider

13   the defendant's denial of certain accommodations that the

14   plaintiff requested for his M3 and M4 years and that that was

15   the reason why he quit and that the jury should consider that

16   as part of his damages, the fact that he went to medical

17   school for two years, he quit, it was humiliating, he now sees

18   people who are practicing medicine who have their residencies,

19   he would have been there but for the defendant's refusal, then

20   I think the M3 and M4 stuff comes in.

21        So, you can have it one way or the other, but I don't

22   think you can have it both ways.

23        MS. VARGAS:  I don't think we need to have it both

24   ways.  I think what's -- factually what's been offered here is

25   that there was yet no request for M3 and M4.  M3 and M4 is

1    prospective relief going forward.

2         In the years before, Mr. Argenyi made the request in July

3    for what services he would need for the next year.  In this --

4    with respect to M3 and M4, there's no evidence in this case

5    about what Mr. Argenyi was asking for specifically in M3 and

6    M4.  And we don't know what his residency -- what his

7    placements would be and how many weeks.  They offered some

8    evidence -- or they intend to offer some evidence about the

9    weeks, but there are question marks on this because they don't

10   know how many hours it would be for the simple reason it's

11   going forward.  They don't know where he would be placed.

12        COURT REPORTER:  Ma'am...

13        MS. VARGAS:  Sorry.

14        So any kind of forward relief, forward-acting relief is

15   squarely the province of the Court.  What happened up to the

16   day Mr. Argenyi left Creighton University in May 2010, that's

17   for the jury.  But there's a hard line there.

18        After Mr. Argenyi left, what happens next, that's

19   injunctive relief.  And that's within the province of the

20   Court.

21        And this connects to -- this is all interrelated with

22   some of the briefing that the parties have done on undue

23   burden.  And so, I would also raise at this point the fact

24   that defendant has fully, irrevocably waived the defense of

25   undue burden with respect to the provision of interpreters,

1    not only in M1 or M2, but in M3 and M4.

2         And they say -- I'm quoting from their response to

3    requests for production of documents, which is treated as a

4    judicial admission under the law of this circuit, it says:

5    Defendant does not contend that providing plaintiff qualified

6    interpreters constitutes an undue burden.  So there are no

7    responsive documents.

8         So, in a sense, none of this has any relevance.  The only

9    question is whether the provision of CART would have been an

10   undue burden, because I don't know how else a defendant could

11   more effectively waive a defense than putting it here and then

12   they say it in their briefing.  Now in the briefing, they

13   attempt to limit what they had said before.

14        MR. MOORE:  Your Honor, this has been decided by the

15   Court.

16        THE COURT:  We need to move on.  The jury has been

17   waiting for 40 minutes.  And that's not all your fault, but I

18   need to make a decision, and that's my job.  You've got a

19   dispute, and so I need to decide how we're going to resolve

20   it.

21        And as I've noted, the M3 and M4 information regarding

22   the undue burden on Creighton would be irrelevant if the jury

23   is instructed only to consider years M1 and M2 and that the

24   plaintiff is not claiming any damages related to anything that

25   happened after he ended his M2 year.  And I'm willing to

1    instruct the jury that way.

2         So, Ms. Vargas, I will ask you, do you want me to

3    instruct the jury that way or not?

4              MS. VARGAS:  Your Honor, might I have a moment?

5              THE COURT:  Yeah.

6              MR. MOORE:  Your Honor, may I respond?

7              THE COURT:  Briefly.

8              MR. MOORE:  Briefly, yes.

9         The cat's already out of the bag.  They've already asked.

10   They have asked for it and talked about it.  I think it's very

11   difficult to put the cat back in the bag.

12        Moreover, if it isn't in front of the jury now, we're

13   going to close these doors and be trying this case in front of

14   you again in six months.  And we can't put it back.

15        She's already said it in opening.  They've presented

16   evidence.  I think trying to put the cat back in the bag is

17   something that would be extremely prejudicial to Creighton.

18        The case has been prepared this way, they've argued it

19   this way, and I think that the jury -- it's in the province of

20   the jury to decide liability.  Mr. Argenyi has said on the

21   stand that he didn't attend his third and fourth year because

22   Creighton wouldn't provide him interpreters.  He requested

23   them, he didn't get them, and that's why he left.  We can't

24   put it back there.  We can't put it back.

25        So, I would say even if the plaintiff is amenable to

1    that, then again we'd object to that.  We believe that issue

2    is already before the Court.  And we would ask that the

3    Court -- that issue remain in front of the jury.

4              THE COURT:  I understand your position.  Your

5    objection is preserved for the record.  It may be moot,

6    depending upon what the plaintiff's position is.

7         And from time to time it's my job to put the cat back in

8    the bag and unring the bell with curative jury instructions.

9    And if I need to do that, I will do my best.

10        So, what is the plaintiff's position?

11             MS. VARGAS:  Your Honor, I would just maintain my

12   objection that we shouldn't be forced into making this choice

13   because compensatory damages versus injunctive forward-seeking

14   relief are different issues, but I understand the Court has

15   ruled.

16        Given that ruling, we maintain our entitlement to seek

17   damages up through M2, but we will accept the Court's

18   instruction that the jury's consideration ends with M2, and M3

19   and M4 are not relevant for the jury's consideration.

20             THE COURT:  Very good.  And I will be instructing the

21   jury accordingly.

22        And that may include an instruction that they are not to

23   consider the fact that he left medical school as part of his

24   damages.

25        I don't know yet how that's going to be crafted.  But, we

1    will limit the damages to the M1, M2 years, and we will not be

2    getting into M3 and M4.  So the demonstratives that

3    demonstrate the undue burden for M3 and M4 are not going to be

4    relevant.  And they're not going to be shown to the jury.

5         Anything else we need to talk about?

6              MS. VARGAS:  Your Honor, I'm sorry, I'm unclear on

7    whether the defendant will now be allowed to reassert undue

8    burden when they've already waived it with respect to

9    interpreters.

10             THE COURT:  Well, I read in the newspaper your

11   position that they waived that.  It may be up to you to offer

12   an admission that was made by defense.  And I will leave it to

13   you to do so in what way you wish to do so.

14        I don't remember ruling on this in connection with one of

15   the many, many motions in limine.  If I did, please point it

16   out to me.

17             MS. VARGAS:  Well, your Honor, the reason you didn't

18   rule on it is because they waived it.  Looking at page 15 of

19   docket 296, they said the same sentence over and over again in

20   multiple documents.  But in 296, on page 15, footnote 8, the

21   defendant says:  Creighton has never asserted an undue burden

22   defense with respect to interpreters during M1 and M2.  It is

23   only with respect to providing interpreters in clinical

24   courses in M3 and M4 that Creighton asserts an undue burden

25   defense.

1           So therefore -- I can't show this to the jury.  This is

2     briefing, which my understanding of the Court's ruling is I

3     can't show to the jury.  They waived it.  They waived it over

4     and over again.

5           THE COURT:  All right.

6     Your response?

7           MR. MOORE:  Sure.  And she can say "waived" as much

8     as she wants.  There was no waiver of what we can present for

9     an undue burden argument.  We've never waived the undue burden

10    argument.

11         Creighton offered interpreters for the M2 year in

12    response to Dr. Thedinger's letter.  With regard to what they

13    offered, that would not be an undue burden.  They offered it.

14         However, Mr. Argenyi, as we will show, refused to even

15    try that and instead insisted on having what he wanted, which

16    is CART, which there is a significant difference in the cost

17    of interpreters and CART.  And despite the argument that

18    Creighton didn't spend one dollar, that was meant to

19    compromise, to look at it and change their position.

20         So, the question is, as Mr. Argenyi said over and over

21    again, it was all or nothing.  Whether everything he wanted,

22    which he says he demands he needs, whether the cost of that is

23    an undue burden.  He wants all or nothing; we've got to look

24    at all or nothing, your Honor.

25         THE COURT:  I'm not going to make any ruling on that

1    issue.  We're going to proceed with the introduction of

2    evidence.  And we'll bring in the jury now.

3         Thank you.

4         (Jury in at 9:48 a.m.)

5         THE COURT:  Please be seated.  Good morning.

6         Thanks very much for your patience.  We all really were

7    here on time.  We were working in here for the last 45 minutes

8    dealing with matters that we hope will end up saving you time

9    in the long run.  So, we weren't unmindful of the fact that

10   you were back there waiting for us.  And we do appreciate your

11   patience.

12        When we ended at the end of the afternoon yesterday, the

13   plaintiff was still in the process of the presentation of his

14   case in chief.

15        And at this point in time, the plaintiff may call his

16   next witness.

17        MS. JACKSON:  The plaintiff calls Dr. Michael Kavan.

18        THE COURT:  Dr. Kavan, if you'll please come forward

19   to the courtroom deputy, she'll swear you in.

20        COURTROOM DEPUTY:  State your full name for the

21   record and spell your last.

22        THE WITNESS:  Michael G. Kavan, K-a-v-a-n.

23         MICHAEL KAVAN, PLAINTIFF'S WITNESS, SWORN

24        THE COURT:  You may inquire.

25        MS. JACKSON:  Thank you, your Honor.

```
 1                         DIRECT EXAMINATION

 2   BY MS. JACKSON:

 3   Q.   Please state your name.

 4   A.   Michael G. Kavan.

 5   Q.   And are you a medical doctor?

 6   A.   No, I'm not.

 7   Q.   Are you an audiologist?

 8   A.   No, I'm not.

 9   Q.   Are you an ear, nose and throat doctor?

10   A.   No, I'm not.

11   Q.   You were Creighton University's School of Medicine Dean

12   of Student Affairs in December 2009, correct?

13   A.   Actually it's the Associate Dean for Student Affairs.

14   Q.   And on September 1, 2009, the auxiliary aids you were

15   providing to Mr. Argenyi were an FM system and another

16   student's notes; is that correct?

17              MR. MOORE:  Objection, form of the question,

18   mischaracterization of testimony.

19              THE COURT:  Overruled.  He may answer.

20   A.   Could you repeat the date, please?

21   BY MS. JACKSON:

22   Q.   September 1, 2009.

23   A.   Okay.  An FM system was supplied to Michael.  In addition

24   to that, there was a note-taking service.  We had also offered

25   him special placement in front of classes and in small groups.
```

 1          In addition to that, we offered a personalized note

 2     service, that somebody would be able to take notes for him and

 3     then immediately copy those notes so he'd have access to those

 4     as well.

 5     Q.   And that somebody is another student, correct?

 6     A.   Another student, either a --

 7     Q.   Yes or no, please.

 8     A.   Yes, that's the case.

 9     Q.   So it's another student's notes; isn't that correct?

10     A.   Yes.

11     Q.   And no further accommodations, correct?

12     A.   Not at that time.

13              MS. JACKSON:  May I approach, your Honor?

14              THE COURT:  Yes, you may.

15     BY MS. JACKSON:

16     Q.   I'm going to show you Exhibit 9.

17          Do you recognize this document?

18     A.   Yes, I do.

19     Q.   This is the e-mail that Mr. Argenyi wrote to you on

20     September 1st, 2009, correct?

21     A.   Yes, it is.

22     Q.   Do you see where it says, "I need to inform you that the

23     accommodations being provided are inadequate"?

24     A.   Yes, I do.

25     Q.   The accommodations refers to the FM system and the other

1    student's notes, correct?

2    A.   It's hard for me to infer what he's meaning by that.

3    Q.   Yes or no.

4         MR. MOORE:  Your Honor, I'd ask that he answer the

5    question.

6         THE COURT:  If the witness cannot answer yes or no,

7    then please indicate that you can't and then it will be up to

8    counsel to inquire further.

9    A.   I can't specifically answer that.

10   BY MS. JACKSON:

11   Q.   The accommodations you had offered up until that point

12   were the FM system and another student's notes; is that

13   correct?

14   A.   No.

15   Q.   And preferential seating?

16   A.   Yes, we did offer that as well.

17   Q.   So those were the accommodations you were offering,

18   correct?

19   A.   No.  In addition to that, we offered, as indicated

20   earlier, the note service.  And in addition to that, we also

21   offered him podcasting availability as well.

22   Q.   And were the podcasts audio only?

23   A.   Yes.

24   Q.   Did they have any visual cues or aids included?

25   A.   Not that I'm aware of.

1    Q.   So would it be fair to say that when he's referring to

2    the accommodations being provided, he's referring to an FM

3    system, notes provided after class, a special seat, and an

4    audio recording?

5    A.   I would believe that would be true.

6    Q.   Do you see that with these accommodations in place

7    Mr. Argenyi says that he is missing a decent chunk of

8    lectures?

9    A.   Yes, I do see that.

10   Q.   Do you see that with these accommodations in place,

11   Mr. Argenyi is telling you that I am also unable to follow

12   conversations effectively anytime classmates ask questions or

13   there is a full class discussion?

14   A.   Yes, I do.

15   Q.   That doesn't sound like effective communication to you,

16   does it?

17   A.   I think effective communication is subjective.

18   Q.   Do you remember the judge's instructions?

19   A.   Okay.  To him, no.

20   Q.   So to him, missing a decent chunk of lectures and anytime

21   classmates ask questions or there's a full class discussion

22   would not be effective communication?

23   A.   That would be correct.

24            MS. JACKSON:  May I approach, your Honor?

25            THE COURT:  Yes, you may.

```
 1              MS. JACKSON:  I'm going to show you Exhibit 19.

 2    BY MS. JACKSON:

 3    Q.   Do you recognize this document?

 4    A.   Yes, I do.

 5    Q.   You received this document during Mr. Argenyi's first

 6    semester of medical school; is that correct?

 7    A.   That's correct.

 8    Q.   In the second paragraph, it describes the kind of

 9    background noise in those classrooms.  Do you see where it

10    says:  There may be noise from people moving around the room,

11    turning pages in a notebook, or typing on a computer keyboard

12    during note-taking, not to mention room ventilation system

13    noise?

14    A.   Yes, I do.

15    Q.   You had both Mr. Argenyi's e-mail to you and this letter

16    during Mr. Argenyi's first semester of medical school; is that

17    correct?

18    A.   That is correct.

19    Q.   I'm going to show you Exhibit 20.

20              MS. JACKSON:  May I approach, your Honor?

21              THE COURT:  You may.

22    BY MS. JACKSON:

23    Q.   Do you recognize this document?

24    A.   Yes, I do.

25    Q.   You received this letter after the first year ended,
```

1    correct?

2    A.   Yes, I did.

3    Q.   Do you see where it says that with the FM system in

4    place, Mr. Argenyi could understand only 38 percent of what

5    was being said?

6    A.   That's not how that sentence reads.

7    Q.   With the FM system in place, he had HINT scores of 62

8    percent in quiet and 38 percent with background noise,

9    correct?

10   A.   Yes, that's correct.

11   Q.   And a previous letter from a different audiologist

12   explained there is background noise in all classrooms,

13   correct, in the real world?

14   A.   That previous letter says there may be noises.  Doesn't

15   say that's in all.

16   Q.   Fair enough.

17        Do you see where it says it does appear that the --

18             MS. JACKSON:  I will withdraw that.

19   BY MS. JACKSON:

20   Q.   You don't consider understanding 38 percent of what is

21   said in class to be effective communication during class, do

22   you?

23   A.   No, I wouldn't.

24   Q.   So what Dr. Thedinger told you in this e-mail is exactly

25   what Mr. Argenyi had told you all along, that the FM system

1    was not providing effective communication during class; isn't

2    that correct?

3    A.   Yes.  This provided professional documentation for that.

4    Q.   And would you consider a letter from another audiologist

5    to also be professional documentation?

6    A.   Yes.

7    Q.   Finally --

8              MS. JACKSON:  May I approach, your Honor?

9              THE COURT:  You may.

10   BY MS. JACKSON:

11   Q.   I'm going to show you Exhibit 40.  Do you recognize this

12   document?

13   A.   Yes, I do.

14             MR. MOORE:  Is this in evidence, your Honor?

15             MS. JACKSON:  No, it's not.

16             MR. MOORE:  Okay.

17   BY MS. JACKSON:

18   Q.   This is an e-mail from Alice Smith, Senior Instructional

19   Designer of the Office of Medical Education; is that correct?

20   A.   Yes, it is.

21   Q.   And it's addressed to you; is that correct?

22   A.   I'm one of the addressees, yes, that's correct.

23   Q.   And you received it prior to the start of Mr. Argenyi's

24   first year of medical school, correct?

25   A.   Yes, that's correct.

 1              MS. JACKSON:  I move to admit Exhibit 40 into

 2    evidence.

 3              MR. MOORE:  No objection, your Honor.

 4              THE COURT:  Exhibit 40 is received.

 5    BY MS. JACKSON:

 6    Q.   Is it correct to say that this is an estimate that you

 7    received regarding the cost of CART services?

 8    A.   Yes.

 9    Q.   In paragraph numbered 1, please read for me the estimated

10    charge per hour.

11    A.   It says, quote, his charge would be about $75 an hour.

12    Q.   Thank you.

13              MS. JACKSON:  No further questions, your Honor.

14              THE COURT:  Cross-examination?

15              MR. MOORE:  Your Honor, we'll just wait to deal with

16    these issues when we call him on our direct examination.

17              THE COURT:  Very good.

18         Dr. Kavan, you may stand down.  And you may be subject to

19    recall later.  You can leave those right there.  Thank you.

20         And the plaintiff may call his next witness.

21              MS. VARGAS:  Your Honor, the plaintiff rests.

22              THE COURT:  Very good.

23         Let's have a sidebar for any motions we need to discuss

24    at this time.

25              (Bench conference on the record.)

```
 1              MR. MOORE:  At this time, your Honor, we would like

 2     to make a motion pursuant to Federal Rule of Civil Procedure

 3     50(a) seeking judgment as a matter of law on all the

 4     plaintiff's claims.

 5          Under the Americans with Disabilities Act and Rehab Act,

 6     plaintiff has failed to establish that Creighton discriminated

 7     against him on the basis of disability.  In order to establish

 8     his claim, plaintiff has the burden to prove the defendant

 9     failed to provide him with the necessary and reasonable

10     accommodations and auxiliary aids and services to afford him

11     effective communication.

12          In this case, the Eighth Circuit defined that as

13     meaningful access to gain a like educational benefit as

14     compared to his fellow medical students.

15          Plaintiff has failed to present evidence upon which a

16     reasonable jury could conclude that Creighton failed to

17     provide him meaningful access or effective communication.

18          Importantly, your Honor, Mr. Argenyi admitted that before

19     he even began his M2 year, that either Creighton grant him all

20     those accommodation requests or it wouldn't be effective.  He

21     did not even attempt to use the accommodations offered by

22     Creighton.  Because he failed to even try to use those,

23     they've not presented evidence those would not provide

24     effective communication.

25          Again under the regulations, Creighton may choose between
```

1     two accommodations.  Ultimately, it's their choice; it's not

2     the preference of the plaintiff.  And the fact that there's no

3     evidence that he even tried shows that they have failed to

4     prove that the accommodations offered by Creighton provide

5     effective communication.

6          Again, plaintiff rejected those.

7          For that reason, and because there's not evidence that a

8     reasonable jury could conclude there was any discrimination

9     based upon disability, we ask for a judgment as a matter of

10    law.

11         As to --

12             THE COURT:  Go ahead.

13             MR. MOORE:  As to compensatory damages, as the Court

14    is aware, Title III of the ADA does not allow compensatory

15    damages under the Rehab Act.  Under *Meagley vs. City of Little*

16    *Rock*, 639 F.3d 389, Eighth Circuit 2011, under the Rehab Act

17    the plaintiff would only be entitled to compensatory damages

18    if he proved that Creighton was deliberately indifferent to

19    his request for accommodations.

20         In *A.P. vs. Anoka Hennepin Independent School District*

21    *No. 11*, 538 F.Supp.2d 1125, District of Minnesota 2008, the

22    court held that that standard is -- it was plainly obvious

23    that the specific accommodations requested by the plaintiff

24    were reasonable and necessary, and it was plainly obvious that

25    they wouldn't impose an undue burden.

1          Plaintiff has failed to present evidence that it was

2     plainly obvious to Creighton that either the accommodations

3     that he requested, all or nothing, were necessary and

4     reasonable; and that they wouldn't impose an undue burden.

5          There is no evidence that Creighton acted with deliberate

6     indifference.  There is evidence that Creighton denied the

7     specific accommodations that he requested.  But there's

8     evidence that it offered alternative accommodations.  It was

9     willing to consider evidence that plaintiff presented

10    throughout his education, consider that, make changes to the

11    accommodation plan, and even offer more, which were solely

12    rejected at every instance.

13         And again, because he didn't even try those

14    accommodations, he can't establish not only there was

15    discrimination, but he certainly can't establish that

16    defendants were deliberately indifferent.

17         So at this point we would ask for judgment as a matter of

18    law pursuant to Federal Rule of Civil Procedure 50(a) on both

19    plaintiff's claims for violations of the ADA Act, Title III,

20    and the Rehabilitation Act as well as that Creighton did not

21    act with deliberate indifference.  And compensatory damages

22    should not go to the jury.

23              THE COURT:  And your motion is preserved for the

24    record.  It's denied.

25         We'll proceed with the presentation of defendant's case.

```
 1              MR. MOORE:  Very good.

 2              MS. VARGAS:  Thank you, your Honor.

 3         (End of bench conference.)

 4              THE COURT:  The plaintiff has now rested.  And so it

 5    is the defendant's opportunity to present its evidence at this

 6    point.

 7         And the defendant may call its first witness.

 8              MR. MOORE:  Thank you, your Honor.  We would call to

 9    the stand Dr. Michael Kavan.

10              THE COURT:  Dr. Kavan, you remain under oath, and you

11    may take the stand.

12              THE WITNESS:  Thank you, your Honor.

13         MICHAEL KAVAN, PREVIOUSLY SWORN, RESUMED THE STAND

14                          DIRECT EXAMINATION

15    BY MR. MOORE:

16    Q.   Well, unfortunately, Dr. Kavan, you were down just for a

17    second and now you're back up.

18         Could you please introduce yourself to the jury?

19    A.   I'm Michael Kavan, Associate Dean for Student Affairs at

20    Creighton University School of Medicine.

21    Q.   Dr. Kavan, where do you live -- what city?

22    A.   Omaha, Nebraska.

23    Q.   And how old are you, sir?

24    A.   I am 53.

25    Q.   Do you have any family?
```

```
 1    A.    Yes, a spouse and four daughters.

 2    Q.    How old are they?

 3    A.    Elizabeth is 23, works at Union Pacific; Kathryn is 21,

 4    she is a senior at Creighton University; I have a third

 5    daughter, Sara, who is a sophomore at St. Louis University;

 6    and a 15-year-old daughter, Hannah, who is a sophomore in high

 7    school in Omaha.

 8    Q.    A lot of girls.

 9    A.    Yes.  A lot of estrogen, yes.

10    Q.    Now, sir, you are currently employed by Creighton Medical

11    School, correct?

12    A.    Yes, I am.

13    Q.    How long have you worked for the medical school?

14    A.    This October it will be 25 years.

15    Q.    And what is your current position?

16    A.    Current position, I'm a full professor in the Department

17    of Family Medicine.  In addition to that, I'm the Associate

18    Dean for Student Affairs in the School of Medicine.

19    Q.    And if you could give the jury a little bit of

20    information regarding your educational background after high

21    school.

22    A.    Okay.  I went to Creighton University undergrad, and then

23    I went to the University of Nebraska Lincoln for my master's

24    degree in counseling psychology.  Then I went to the

25    University of Nebraska Lincoln for my PhD in counseling-
```

1    psychology.

2         And then after that -- or as part of that process, I was

3    up in the Minneapolis VA Hospital for one year for my

4    internship.  And then I came back to Creighton to work there.

5    Q.   And when you started with Creighton, what position did

6    you hold?

7    A.   I worked in the Department of Family Medicine as the

8    Director of Behavioral Sciences for them.

9    Q.   And when did you become the Associate Dean for Student

10   Affairs?

11   A.   In 1996.

12   Q.   And you've held that position since that time, correct?

13   A.   Yes, I have.

14   Q.   Now, outside of Creighton, do you belong to any

15   professional organizations?

16   A.   Yes, I do.

17   Q.   And what are those?

18   A.   Well, I'm a member of the American Psychological

19   Association, I'm a member of the Society of Behavioral

20   Medicine, a member of the Nebraska Psychological Association,

21   and also a member of the Health Service Providers in

22   Psychology which is a national organization as well.

23   Q.   And what about anything in connection to your position

24   with student affairs?

25   A.   Yeah.  Schools belong to -- as part of that, I'm a member

 1    of the Association of American Medical Colleges and its group

 2    on student affairs.

 3    Q.   What does that group do?  Why does that exist?

 4    A.   It is a group of student affairs officers, oversees

 5    things such as admissions and diversity programs in medical

 6    schools throughout the country.  It's kind of a governing body

 7    of that whole group of 135-plus medical schools.

 8    Q.   Now, in addition to being a member, did you serve on the

 9    board of that organization?

10    A.   Yeah.  Actually I went through the leadership of the

11    central region on student affairs.  And then I became in the

12    national leadership, just ended that this past November, a

13    five-year stint from vice chair, chair elect, chair, past

14    chair and previous past chair.  So I just ended that as well.

15    Q.   You indicated all medical schools in the country are part

16    of this organization?

17    A.   Yeah.  And there's just select individuals on the

18    national steering committee that are elected.

19    Q.   Have you received any awards in connection with your

20    student affairs?

21    A.   Actually in November I received the AAMC, the Association

22    of American Medical College's group on student affairs

23    exemplary service award.

24    Q.   Now, for a period of time in 2009, did you hold an

25    interim position in addition to your position as Associate

1    Dean for Student Affairs?

2    A.   Yes, I did.

3    Q.   What position did you hold?

4    A.   During that six-month time period, I also served as the

5    interim Associate Dean for Medical Education.

6    Q.   Okay.  Now, I'd like to direct your attention to Exhibit

7    211.

8              MR. MOORE:  And this exhibit is not in, so if we

9    could keep it off the jurors' screens, please?

10        May we approach, your Honor, with the exhibit?

11             THE COURT:  You may.

12             MR. MOORE:  Thank you.

13   BY MR. MOORE:

14   Q.   Sir, do you recognize that document?

15   A.   Yes, I do.

16   Q.   What is that document?

17   A.   It's the Creighton University School of Medicine Student

18   Handbook for 2008.

19   Q.   And what is the purpose of the student handbook?

20   A.   Well, it provides kind of the rules, regulations,

21   policies for the School of Medicine that the students must

22   adhere to.

23   Q.   And this says July of 2008.  Was this in effect in the

24   start of 2009?

25   A.   Yeah.  This was in effect until August 14th of 2009 when

1    the 2009 handbook was then approved.

2            MR. MOORE:  Your Honor, at this time we'd like to

3    offer Exhibit 211 into evidence.

4            MS. JACKSON:  No objection, your Honor.

5            THE COURT:  Exhibit 211 is received.

6    BY MR. MOORE:

7    Q.   Sir, if you would please turn in Exhibit 211 to page 6

8    and 7 of the handbook?

9            COURTROOM DEPUTY:  Do you want me to put it on?

10           MR. MOORE:  Yeah, you can publish it to the jury.  I

11   apologize.

12   BY MR. MOORE:

13   Q.   Now, pages 6 and 7 include a section -- I'm sorry, 6, 7,

14   8, into 9, include the technical standards for the medical

15   school, correct?

16   A.   Yes.

17   Q.   Can you explain to the jury what the technical standards

18   are?

19   A.   Well, these are kind of standards that were developed by

20   faculty within the School of Medicine who are experts in

21   teaching students about what is necessary --

22           MS. JACKSON:  Objection, your Honor, narrative.

23           THE COURT:  Overruled.  He may answer.

24   A.   -- which are necessary to be admitted as a medical

25   student, to function as a medical student, and then to

1   graduate as a medical student from the School of Medicine.

2           MS. JACKSON:  Objection, your Honor, this witness is

3   not an expert.  He's not able to offer expert testimony.

4           THE COURT:  Overruled.  The answer will remain.

5   BY MR. MOORE:

6   Q.   Now, Dr. Kavan, in your role on the committee on student

7   affairs with the national group, are you familiar with other

8   technical standards from other medical schools?

9   A.   Yes, I am.

10  Q.   And how do Creighton's technical standards compare to

11  other medical schools?

12  A.   They're very similar.  I think most schools have almost

13  identical technical standards because of --

14          MS. JACKSON:  Objection, your Honor, he's not an

15  expert witness.

16          THE COURT:  Overruled.  He may answer this question.

17  A.   Okay.  Thank you.

18      Because all of our technical standards are pretty similar

19  due to the fact we all get accredited from the same

20  accrediting institute, and they demand certain standards be in

21  place, so they're very similar.

22  BY MR. MOORE:

23  Q.   Now, you said --

24          MS. JACKSON:  May we have a sidebar, your Honor?

25          THE COURT:  Yes, you may.

1            (Bench conference on the record.)

2            MS. JACKSON:  Your Honor, in briefing -- leading up

3       to this case, you ruled that the plaintiff was not allowed to

4       offer testimony as to the technical standards of other medical

5       schools.  And now the defendant is offering testimony

6       regarding the technical standards of other medical schools.

7            THE COURT:  Okay.  I need to go back and look at that

8       order, if you can point out to me where I said that.

9            MS. JACKSON:  Yes, your Honor.  We can find that.  It

10      was in an order regarding expert witnesses, specifically

11      Dr. Gail Peoples of the University of California at Davis.

12      She was going to testify about technical standards and how

13      they were handled there.  She was excluded as an expert

14      witness, saying it wasn't relevant.

15           MR. MOORE:  I don't think that's what the order said,

16      but I'd like to see it.

17           THE COURT:  Well, I've got it.

18      I am looking at pages 3 and 4 of filing number 257 in

19      which I ruled on the defendant's motion in limine regarding

20      plaintiff's offer of Gail Peoples.  And I do not see something

21      that specifically mirrors what counsel for the plaintiff is

22      raising as a concern.

23      I did indicate that Creighton contends that Peoples'

24      experience and testimony relate to the UCD curriculum and she

25      has no knowledge of Creighton Medical School's curriculum or

1    universal medical school curricula.

2         And all that this current witness, Dr. Kavan, has said is

3    that the technical standards for Creighton Medical School are

4    similar to the standards of other medical schools.  I don't

5    get it.  I don't understand the objection or the importance of

6    the objection.

7         MS. JACKSON:  So, your Honor, in this order we were

8    excluded from offering testimony about the medical -- the

9    technical standards of other medical schools and how they were

10   handled.  And that's precisely what the defense witness is

11   prepared to testify about.

12        THE COURT:  So, what you're saying is it's not fair.

13        MS. JACKSON:  And he has not testified as to

14   universal knowledge of these medical school's curricula

15   either.  And he's not an expert.  He's not listed as an expert

16   to have this kind of knowledge.

17        THE COURT:  Well, I have not yet heard him be asked

18   his opinion as to anything based upon his expert knowledge --

19   alleged expert knowledge.

20        The questions I've heard so far have asked him about

21   Creighton's handbook, Creighton's technical standards, and

22   then there was a question as to whether or not those are

23   similar to the standards used by other universities.  I

24   understand that to be within his knowledge.

25        But I understand that to be factual knowledge, not an

1    opinion, an expert opinion.  And I don't think that the answer

2    is that important anyway.

3        So, we're spending a lot of time on something that I

4    don't think really is hurting your case.  I don't know why

5    we're here.

6            MS. VARGAS:  May I respond, your Honor?

7            THE COURT:  Yes, you may.

8            MS. VARGAS:  Throughout plaintiff's case, we were

9    restricted from offering evidence of how other deaf medical

10   students communicate, what happens in other medical schools.

11   We were restricted from offering our experts that can talk

12   about that same information on the basis it wasn't relevant.

13       So the objection is Mr. Moore is now setting Dr. Kavan up

14   as an expert, which he isn't.  And he's seeking to go through

15   information that was not relevant in our case.

16       So if it wasn't relevant in our case, it hardly can be

17   relevant in his case.

18           THE COURT:  Oh, it was relevant in your case.  It was

19   very relevant.  But you didn't designate an expert witness to

20   testify about it.

21           MS. VARGAS:  We weren't allowed to have our fact

22   witnesses to testify.  Dr. Christopher Moreland, who was a

23   fact witness, he wasn't allowed to testify what happened at

24   his medical school, even though he's on the faculty.

25           THE COURT:  Okay.  So far -- and I can't anticipate

1    what questions are going to be asked.  So far this witness was

2    simply asked if the technical standards for Creighton were

3    similar to the technical standards of other medical schools.

4    I understand that to be within his knowledge.

5         And he's a representative of Creighton Medical School.

6    He can testify about why Creighton does what Creighton did.

7    And if you'll remember in my rulings on the various motions in

8    limine, when I was asked by plaintiff's counsel to exclude

9    what might be viewed as expert opinions and expert testimony

10   by witnesses for Creighton, I said people who were involved in

11   the decision-making process at Creighton can testify about why

12   they did what they did, why they made the decisions they made,

13   and that may include information such as what they know about

14   other medical schools.

15        So, that can come in.  And if counsel goes there with

16   this witness, it's going to come in.

17             MS. VARGAS:  And will we be permitted to offer

18   rebuttal on that testimony?

19             THE COURT:  I don't know.  We'll see.

20        But you can't offer expert testimony when you didn't

21   designate experts.  The testimony of a representative of

22   Creighton, who was a decision-maker, can come in because a

23   decision-maker can testify about why they made the decision

24   they made, including their own background and expertise.

25        They can't testify about things they discovered since

1     then that would be the basis for their expert opinion.  But

2     they can testify about why they did what they did, including

3     research they may have done, people they may have talked to,

4     their own experience, their expertise, including what they

5     know about what other universities have done.  And that may

6     have formed the basis for their opinion as to why they did

7     what they did.  So that can come in.

8          But, no, you can't bring in experts to offer expert

9     opinions when you didn't designate experts relevant as that

10    may have been.

11          MS. VARGAS:  Gail Peoples was designated as an expert

12    and the Court struck Gail Peoples.

13          I understand the Court's ruling.

14          THE COURT:  Well, yeah, it's there at page 3 of 8 on

15    filing number 257.  And we won't revisit that now.  Okay.

16          (End of bench conference.)

17          THE COURT:  You may continue.

18          MR. MOORE:  Thank you, your Honor.

19    BY MR. MOORE:

20    Q.   Now when we left off, Dr. Kavan, you were indicating that

21    you had knowledge of the technical standards of other medical

22    schools because you participated in the student affairs group

23    and were in leadership positions.

24    A.   That's correct.

25    Q.   And you indicated that the Creighton University Medical

1    School technical standards were substantially similar.

2         And the next question I had is you mentioned an

3    accreditation body.

4    A.   Yes.

5    Q.   What is that?

6    A.   Okay.  All schools of medicine in the United States have

7    to be accredited by what's called the LCME or the Liaison

8    Committee on Medical Education.  And that's a group that comes

9    in, representatives from national organizations and medical

10   schools, comes into a medical school.  It's about a two-year

11   process.

12        And that medical school has a site visit, takes about

13   three to four days, which they go over everything and decide

14   whether to accredit that medical school for the next eight

15   years, or whether to put sanctions on them or make them do

16   certain things and give updates and such.

17   Q.   And do they look at your technical standards?

18   A.   Yes, they do.

19   Q.   And what happens if you would lose accreditation from the

20   LCME?

21   A.   I think you'd probably no longer operate as a medical

22   school, wouldn't be -- yeah, you'd probably close down.

23   Q.   Okay.  Now, if we could take a look at the technical

24   standards.  It appears that there are technical standards

25   related to -- if we turn to page 7 -- observation, right?

1    A.    Yes.

2    Q.    Communication.

3    A.    That's correct.

4    Q.    Then there's -- it looks like C, which is motor.  Is that

5    motor skills?

6    A.    Yes.

7    Q.    Going to the next page, intellectual, conceptual,

8    integrative, and quantitative abilities.

9    A.    That's correct.

10   Q.    And then finally, attitudinal, behavioral, interpersonal,

11   and emotional attributes, correct?

12   A.    Yes.

13   Q.    As I understand, these technical standards apply to every

14   student that is conditionally admitted to Creighton

15   University, correct?

16   A.    Yes, that is correct.

17   Q.    And do all those students have to show that they're

18   capable of meeting these technical standards?

19   A.    Yes, they do.

20   Q.    So there was some testimony from Mr. Argenyi with regard

21   to you raising the issue of technical standards with regard to

22   his reasonable accommodation.  Did you only raise the issue of

23   technical standards only with Mr. Argenyi?

24   A.    No.  That's something we make sure all students who are

25   admitted understand they must adhere to the technical

1      standards.

2      Q.   Do you give exceptions to the technical standards?

3      A.   The exceptions would be if somebody is able to

4      demonstrate a disability.  And then we would offer appropriate

5      accommodations, but they would still follow the technical

6      standards.

7      Q.   So as long as they meet the technical standards with or

8      without reasonable accommodations?

9      A.   That's correct.

10     Q.   Other than that narrow category, do you allow any other

11     exceptions for any other students?

12     A.   No.

13     Q.   What if a student doesn't have a disability but says "I

14     just can't do that"?

15     A.   Then that would not be allowed because they have to

16     adhere to the technical standards.

17     Q.   If they didn't have a disability and couldn't meet the

18     technical standards, would they be qualified?

19     A.   No, they would not.

20     Q.   I'd like to turn to the bottom of page 8 in the technical

21     standards.  And there at the bottom of page 8, if we could

22     focus in on the last paragraph, in that particular paragraph,

23     Dr. Kavan, it says the school of medicine will obviously

24     consider reasonable accommodations under the ADA for students.

25     Why is that in there?

1   A.   Well, because if they do have requests for -- or they

2   have a disability and they have a request for an

3   accommodation, we would consider that, again as long as they

4   continue to meet the technical standards with that

5   accommodation or without it.

6   Q.   And do you want to encourage students with disabilities

7   to request accommodations?

8   A.   Absolutely.

9   Q.   Then if we could turn to page 9 of Exhibit 211?  And if

10  we could focus in on Section 4, Americans with Disabilities

11  Act?

12       Now, in this portion of the handbook, it talks about

13  Creighton's commitment to the Rehabilitation Act and the ADA

14  and also talks about the process for people to seek

15  accommodations.  Why is this provision in the handbook?

16  A.   Well, this provides the student with just some method

17  to -- that they can follow in order to get an accommodation.

18  So it provides them with the instructions to do that and how

19  to go about that process.

20  Q.   Okay.  And again, do you encourage students with

21  disabilities to request accommodations?

22  A.   Yes, we do.

23  Q.   I'd like to focus the attention now on the MEMT or the

24  Medical Education Management Team.  The jury's heard some

25  testimony on this.  What is the Medical Education Management

1    Team?

2    A.   Okay.  This is a team of faculty in the School of

3    Medicine.  And the Medical Education Management Team is

4    composed of the component directors or the person

5    responsible -- faculty member responsible for each year of the

6    curriculum.

7        So there's a component director for the first year and

8    the second year.  So that's two people.  They both have PhDs

9    in biomedical sciences.  We also have the component director

10   from the third year of medical school who is a physician.  And

11   we have a component director for the fourth year of medical

12   school who is also a physician.

13       In addition to that, the Associate Dean for Medical

14   Education sits on that Medical Education Management Team.  The

15   association -- Associate Dean for Student Affairs sits on that

16   Medical Education Management Team.  And in addition to that,

17   we also have the Associate Dean for Medical Education on there

18   as well.

19       And we kind of watch out for the day-to-day activities of

20   the curriculum.  They set the agenda for the larger

21   educational policy committee which kind of runs the

22   curriculum, per se.  And then the MEMT also considers requests

23   for accommodations that a student might have.

24   Q.   Now, why do you have such a broad array of individuals on

25   this team?

1   A.   Well, I mean, these are the folks who really are kind of

2   on the front lines in regards to the development of curriculum

3   and making sure it functions well.  And we want to make sure

4   that we have representation of people who are teaching this

5   stuff, the basic science faculty, physicians who are well

6   aware of what it takes to become a physician.

7   Q.   Now, in 2009 and 2010, were you a member of the MEMT?

8   A.   Yes, I was.

9   Q.   And while you were a member of the MEMT, did the MEMT

10  have a process that it implemented with regard to reasonable

11  accommodation requests?

12  A.   Yes, we did.

13  Q.   Could you explain what that process was?

14  A.   Well, anyone -- a student who might be admitted to the

15  School of Medicine or it could be a student who is in the

16  School of Medicine and has a request, at any point in time,

17  they can submit documentation of -- what we want is a request

18  in terms of what are the accommodations that the student is

19  requesting.  And then we ask for supporting documentation

20  which would support that specific request.

21      At that point in time, what happens is I forward that

22  information on to the Medical Education Management Team, who

23  considers the documentation, looks at the technical standards

24  and other factors and determines whether those are appropriate

25  or not.  And then we provide feedback to that student

```
 1   regarding the accommodation request.
 2   Q.   And is this committee set up to comply with the ADA and
 3   the Rehabilitation Act?
 4   A.   Yes, absolutely.
 5   Q.   In addition to the members of the MEMT, do you ever bring
 6   anyone else to consult with the MEMT?
 7   A.   Yes, we do.
 8   Q.   And who is that?
 9   A.   Well, we are allowed to bring in our Director of
10   Disability Accommodations for consultation or advice.  And
11   that can be by phone or e-mail.  But oftentimes we actually
12   have him come in and talk with us, to work through the issue,
13   just to make sure that we're following the law and providing
14   what appropriate accommodations we should be providing to the
15   student.
16        THE COURT:  Let me stop you there, because it's
17   10:30, and it's time for our mid-morning break.
18        Please reconvene in the jury room at 10:45, and we'll
19   start again then.
20        Thank you.  We are in recess.
21        (Jury out and recess taken at 10:31 a.m.)
22        (At 10:50 a.m. on August 28, 2013, with counsel for the
23   parties, the plaintiff, and the defendant's representative
24   present, and the jury NOT present, the following proceedings
25   were had:)
```

```
 1        MICHAEL KAVAN, PREVIOUSLY SWORN, RESUMED THE STAND
 2             THE COURT:  I hesitate to ask whether there's
 3    anything to discuss before the jury comes in, but I will.
 4             MS. VARGAS:  Nothing from the plaintiff, your Honor.
 5             MR. MOORE:  Nothing from the defendant.
 6             THE COURT:  Thank you so much.
 7        Please bring in the jury.
 8        (Jury in at 10:51 a.m.)
 9             THE COURT:  Mr. Moore, you may continue with your
10    direct examination.
11                    DIRECT EXAMINATION (Cont'd.)
12    BY MR. MOORE:
13    Q.   Now, Dr. Kavan, when we left off, you were talking about
14    on certain occasions you will bring in the Director of the
15    Office of Disability Accommodations for Creighton to consult
16    with the MEMT, correct?
17    A.   Yes, that's correct.
18    Q.   And when you were on the MEMT, who was in that role?
19    A.   That would be Wade Pearson.
20    Q.   Okay.  Now, was this -- with regard to Mr. Argenyi, was
21    this the first reasonable accommodation request the MEMT ever
22    had?
23    A.   No.  We get dozens and dozens over the years.
24    Q.   And certainly there have been a lot of requests since
25    then, correct?
```

1    A.    Yes, that's correct.

2    Q.    Okay.  Why is it important for a student to submit

3    documentation supporting their request for accommodations and

4    auxiliary aids and services?

5    A.    Well, we want to make sure that, again, the technical

6    standards are followed and that a student just doesn't make a

7    request that's not necessary, and, you know, at one level it

8    could give him or her an advantage over another student.

9    Q.    And that documentation requirement, does that apply to

10   all students that request reasonable accommodation?

11   A.    Yes, anyone who requests an accommodation has to have

12   documentation to support that request.

13   Q.    Now, you know Mr. Argenyi, correct?

14   A.    Yes.

15   Q.    And how did you come to first learn about Mr. Argenyi?

16   A.    Actually in my role as Associate Dean for Student

17   Affairs, I also oversee admissions for the School of Medicine.

18   And I'm on what's called the Executive Committee which

19   determines which students are admitted into medical school.

20        And so I remember his application coming through at that

21   time.

22   Q.    And he was admitted to Creighton Medical School, correct?

23   A.    Yes, we admitted him, yes.

24   Q.    And what was the thought of the committee with regard to

25   Mr. Argenyi?

1    A.   That he was a well-qualified student, had good

2    experiences; academically, he had really wonderful clinical

3    experiences.  We thought this would be a good student to have

4    in our school.

5    Q.   Did his hearing impairment discourage you from admitting

6    him to medical school?

7    A.   Not at all.  Like I think we've talked about, we like

8    diversity.  Diversity enhances the environment for our

9    students, creates a better educational environment.  And so we

10   seek that out in all forms.

11   Q.   I'd like to direct your attention to Exhibit 1.

12        MR. MOORE:  And if we could bring Dr. Kavan a copy of

13   that, I think that would be easier than just looking at it on

14   the screen.  May we approach, your Honor?

15        THE COURT:  You may.

16        MR. MOORE:  Thank you.

17   BY MR. MOORE:

18   Q.   Dr. Kavan, do you recognize this document?

19   A.   Yes, I do.

20   Q.   How do you recognize this document?

21   A.   This was the documentation that Michael sent in to the

22   School of Medicine requesting his accommodation.

23   Q.   And if we can turn to page 2 of that document --

24   A.   Yes.

25   Q.   -- now there's a form there, Technical Standards -

1    Requests for Accommodation.  Is that a form that Creighton

2    University sends out?

3                MS. JACKSON:  Excuse me, your Honor, the exhibit

4    needs to be redacted.  This is an unredacted version.

5                THE COURT:  Let's take it down.

6                MR. MOORE:  Sorry about that.  May I approach, your

7    Honor?

8                THE COURT:  You may.  And it is at the bottom of the

9    page you were referring to, the second page, that you need to

10   strike a number.

11               MR. MOORE:  Yes, your Honor.  Sorry about that.  I

12   think we have it taken care of now.

13   BY MR. MOORE:

14   Q.   Now, this is the form that's sent to -- who is it?

15   A.   This is a form that's sent to all students who have been

16   accepted into the medical school.

17   Q.   So it wasn't just sent to Michael, correct?

18   A.   No.

19   Q.   And this is the form that starts the process if someone

20   needs a reasonable accommodation, correct?

21   A.   Yes, that's correct.

22   Q.   And Mr. Argenyi, indeed, requested a reasonable

23   accommodation.

24   A.   Yes.

25   Q.   And that was related to his hearing impairment, correct?

1    A.   Yes, that's correct.

2    Q.   Now, looking at the third page of Exhibit 1, was this

3    also submitted with Mr. Argenyi's request for accommodation?

4    A.   Yes, it was.

5    Q.   And I guess he professed this to be an audiogram of his

6    ability to hear; is that correct?

7    A.   Yes, I think that's what he indicated on the first page

8    of the letter that he wrote.

9    Q.   Okay.  And did you have the ability to read this

10   audiogram?

11   A.   No.

12   Q.   Okay.  So what did you do next after you received this

13   request?

14   A.   Well, I first consulted with our director of the Office

15   of Disability Accommodations because this was the first

16   request that we had regarding somebody who had a hearing

17   impairment.

18        And plus, I thought the documentation was lacking.  And I

19   wanted to get his input as to what else did we need in order

20   to verify that the accommodation would be appropriate.

21   Q.   Okay.  And did you, indeed, speak with Mr. Pearson?

22   A.   Yes, I did.

23   Q.   Okay.  And I'd like to direct your attention to Exhibit

24   2.

25             MR. MOORE:  Is this in?

```
 1              MS. VARGAS:  Yes.

 2              MR. MOORE:  Okay.

 3   BY MR. MOORE:

 4   Q.   Do you recognize Exhibit 2?

 5   A.   Yes, I do.

 6              MR. MOORE:  Can you make it bigger, please, Kris?

 7   Go to the second page of Exhibit 2, which is the first e-mail.

 8   BY MR. MOORE:

 9   Q.   Now this appears to be an e-mail that you sent to

10   Mr. Argenyi; is that correct?

11   A.   Yes, it is.

12   Q.   And why did you send him this e-mail?

13   A.   Well, based on my consultation with Mr. Pearson and the

14   fact that there was not a specific request, as well as

15   documentation to support that, we felt like we needed more

16   information from Michael.

17   Q.   And I notice you cc'ed Wade Pearson.

18   A.   Yes, that's correct.

19   Q.   Why did you do that?

20   A.   Because I want him in the loop on it to make sure we're

21   following the appropriate procedures and such.

22   Q.   Why did you point to the technical standards with regard

23   to communication in this letter -- or in that e-mail?

24   A.   Well, Michael had indicated that he had a hearing

25   impairment.  And as a result of that, we would oftentimes
```

1    provide that information to the student for two purposes:

2    One, especially in this case, Michael wasn't real clear on the

3    accommodations he was requesting.  And the second one, I think

4    by providing those technical standards, that's also very

5    helpful in terms of having him get the appropriate

6    documentation so he can feed that forward to his letter

7    writers or people who are going to be writing the letters for

8    documentation purposes.

9    Q.   So you were aware that he was requesting an accommodation

10   with regard to his hearing impairment, and you believed the

11   most relevant provision of the effective standards were

12   communication.

13   A.   Yes.

14   Q.   Was this consistent with what you've done in the past

15   with regard to reasonable accommodations?

16   A.   Yes, it is.

17             MR. MOORE:  If we could go to the first page of

18   Exhibit 2?  I think if you blow up the whole page there

19   starting -- there, and then going down.  Hopefully the jury

20   can see.

21   BY MR. MOORE:

22   Q.   Now, it appears that then, you know --

23             MR. MOORE:  Let's just do -- let's just highlight the

24   bottom down.  That's a little small, at least for me.

25             MS. KIMBLE:  Here?

```
 1              MR. MOORE:  Yeah.

 2     BY MR. MOORE:

 3     Q.   Now, this appears to be an e-mail from Mr. Argenyi to

 4     you, Dr. Kavan, dated April 7.  Did you receive this e-mail?

 5     A.   Yes, I did.

 6     Q.   And what did you take from this particular e-mail?

 7     A.   Well, Michael was asking several things.  First, do I

 8     return the documentation, the information we requested,

 9     specifically to the Office of Disability Accommodation.  And

10     how we like that information was another question.  And then

11     what specific information would we like about the implant.

12     Q.   Okay.  Now, he also makes some suggestions down there

13     to -- of different universities where he knows deaf/hearing

14     impaired physicians.  What did you do with that information?

15     A.   Nothing.

16     Q.   At that point did you believe you should be calling other

17     medical schools regarding other students?

18     A.   No, I didn't think it was appropriate.  Specifically I

19     think these folks were physicians practicing or residents, and

20     that's a different realm of medicine.

21          This is medical school.  And each medical school is a

22     little bit different in terms of how they handle things and

23     such.  I was focusing on getting the appropriate documentation

24     we needed for Creighton University Medical School.

25     Q.   Specifically regarding Mr. Argenyi?
```

KAVAN - DIRECT                                                    708

1   A.    Yes, specifically him.

2   Q.    And throughout this whole process, did any other deaf

3   physicians or deaf medical students or medical schools contact

4   you?

5   A.    No, they did not.

6   Q.    Okay.  Let's go to the top e-mail, if we could, in

7   Exhibit 2.  And do you recognize this e-mail?

8   A.    Yes.

9   Q.    And what is this e-mail?

10  A.    This is an e-mail to Michael from me.

11  Q.    And was this in response to Michael's previous e-mail?

12  A.    Yes.

13  Q.    And what was your purpose in sending this e-mail?

14  A.    To provide him with the information that he had asked for

15  in that previous e-mail.

16  Q.    Just responding to his questions?

17  A.    Yes.

18  Q.    Okay.  And it appears that he sent his e-mail on

19  April 7th of 2009 at 6:47, and you responded to him the next

20  day at -- I believe it was 6:49 a.m.; is that correct?

21  A.    Yes.

22  Q.    So you responded to it when you got it, correct?

23  A.    Oh, yeah, I tried to.

24  Q.    Okay.  Now again, you mentioned the technical standards.

25  Did you believe that was unusual to mention that?

1    A.   No.  It just gets the student to zero in on what we need

2    as opposed to going back and forth, back and forth all the

3    time in terms of documentation.

4    Q.   And again, was this the process you always follow with

5    regard to reasonable --

6    A.   Especially if there is a question -- if it's not clear

7    what the student is providing us.

8    Q.   Now, if I could direct your attention to Exhibit 16.  Do

9    you recognize this document?

10   A.   Yes, I do.

11   Q.   And what is this document?

12   A.   This was a letter from Dr. Backous, sent to me regarding

13   documentation for Michael's request.

14   Q.   Okay.  And you understood that this particular e-mail --

15   or this particular letter was sent on behalf of Mr. Argenyi.

16   A.   That's what I had assumed.

17   Q.   In support of his reasonable accommodation request.

18   A.   Yes.

19   Q.   Now, as I understand, you received this but you weren't

20   the decision-maker alone with regard to accommodations,

21   correct?

22   A.   No.  I think I indicated previously, the Medical

23   Education Management Team, with representation from all four

24   years of the curriculum, they make that decision.

25   Q.   Okay.  So what was -- at this point in the accommodation

1    interactive process, what was your role?

2    A.   My role at this point in time is gathering information.

3    And then at some point, once I feel that we have adequate

4    documentation, then I forward that on to the Medical Education

5    Management Team.  And that's where the decision is made.

6    Q.   Okay.  Then if I could direct your attention to Exhibit

7    4 --

8             MR. MOORE:  If we could zoom in, not all the way,

9    down to the signature, just down --

10   BY MR. MOORE:

11   Q.   Do you recognize this document?

12   A.   Yes, I do.

13   Q.   What is this document?

14   A.   That's communication back to Michael.

15   Q.   Okay.  And if we can look at -- I apologize for that --

16   actually Exhibit 3, you recognize that document, don't you,

17   sir?

18   A.   Yes, I do.

19   Q.   What is this document?

20   A.   That's an April 24th, 2009, e-mail from Michael

21   indicating the specific accommodations he's requesting from

22   the School of Medicine.

23   Q.   Okay.  So the original letter from Dr. Backous was dated

24   April 10th, and this e-mail came in after that; is that

25   correct, on April 24th?

1    A.   Yes, that's correct.

2    Q.   And did you understand that this -- in this e-mail these

3    were the accommodations and auxiliary aids and services that

4    Mr. Argenyi was requesting?

5    A.   Yes, I did.

6    Q.   Okay.  Now, let's go back to Exhibit 4, if we could, the

7    letter that you sent out.

8         Now, this letter is dated May 18.  So this is after the

9    Backous letter came in and after Mr. Argenyi's request came

10   in.

11   A.   That's correct.

12   Q.   Why did you send this letter?

13   A.   Well, there were several reasons for it.  The first one

14   is that initially we did request an audiogram -- an

15   interpretation of the audiogram because we didn't know how to

16   read it.  And we hadn't received that yet.

17        Also he said -- Dr. Backous said that Michael was

18   undergoing a second cochlear implant and that that could or

19   may improve his hearing, I think he said significantly.  And

20   so we were hoping to get an update on that because

21   accommodations should change with that -- or one would think.

22        And then, let's see, there were some confusion just in

23   regards to the nature of the request.  There were some

24   inconsistency between what Michael was requesting and what was

25   being requested in the Dr. Backous letter.

1   Q.   Okay.  Let's go back to the Dr. Backous letter, which is

2   Exhibit 16.

3          MR. MOORE:  And again, if we can magnify just the

4   letter, not the heading.

5   BY MR. MOORE:

6   Q.   You said there were inconsistencies between what Michael

7   was requesting and what's stated in the letter.  Explain to

8   the jury what you mean.

9   A.   Well, in the Dr. Backous letter, Dr. Backous had

10  specifically indicated in terms of that I believe in -- quote,

11  in medical school he would benefit from closed-captioning and

12  he has not tried an FM system but that could also improve his

13  communication strategy significantly.

14         And so that's what we read as the supporting

15  documentation for the accommodations.

16  Q.   And how was that inconsistent with his request?

17  A.   Well, if you go back to that April 24th letter, Michael

18  had laid out several other requests in addition to these.

19  Q.   And going back and taking a look at that e-mail that was

20  sent to you with the requested accommodation, which is Exhibit

21  3, so some of the things that weren't mentioned in that letter

22  was -- there was no breakdown from lectures or labs or small

23  groups, correct?

24  A.   In the letter from Dr. Backous, no, there was not.

25  Q.   There was no mention of an interpreter or CART, correct?

1    A.    No, there was not.

2    Q.    Okay.  So, going back to Exhibit 4, the letter you sent

3    out, that was to clarify that as well.

4    A.    Yes.

5    Q.    Now, looking at Exhibit 4, the last paragraph, you

6    indicate, "Since all acceptances to our medical school are

7    conditioned on several factors, one being the ability to meet

8    the technical standards of the school, we are still in the

9    process of determining whether your accommodations are

10   reasonable and whether you are able to meet these with the

11   accommodations."

12         Do you see that?

13   A.    Yes, I do.

14   Q.    Why did you include that in there?

15   A.    Because that's the case with any student.  I mean, all

16   acceptances are conditional; one, whether they can meet the

17   technical standards; two, they have to do things like a drug

18   test, they have to have a background check, they have to get

19   in their transcripts to show they actually completed the

20   degrees that they said they would.

21         So there's a lot of factors that go into that.  So every

22   student who is accepted into medical school is conditionally

23   accepted.

24   Q.    And all those students accepted in medical school are

25   informed of that, correct?

 1    A.    Yes, that is true.

 2    Q.    So anyone who requests a reasonable accommodation would

 3    still have to be able to meet the technical standards with the

 4    reasonable accommodation.

 5    A.    That's correct.

 6    Q.    Okay.  If I could direct your attention to Exhibit 5, do

 7    you recognize this document?

 8    A.    Yes, I do.

 9    Q.    And what is this document?

10    A.    It's a letter from Michael Argenyi.

11    Q.    And did you receive this letter?

12    A.    Yes, I did.

13    Q.    Okay.  Let's take a look at Exhibit 17, if we could.  Do

14    you recognize this document?

15    A.    Yes, I do.

16    Q.    What is this document?

17    A.    This is a May 27, 2009, letter from Dr. Backous.  And I

18    think Stacey Watson, I think, might have signed on it as well.

19    Q.    Okay.  And then finally let's look at Exhibit 202.  Do

20    you recognize that document?

21    A.    Yes.

22    Q.    What is that document?

23    A.    That is a June 2, 2009, letter from Amanda Mogg from the

24    Seattle Children's Hospital.

25    Q.    You received that?

KAVAN - DIRECT                                                    715

1    A.    Yes, I did.

2    Q.    Okay.  So after receiving this letter and all the other

3    information -- all the letters that you received that

4    Mr. Argenyi submitted, what did you do with them?

5    A.    Well, at that point in time, what we do is I felt like we

6    had enough information in terms of the request, as well as the

7    documentation.  Then I take that to the Medical Education

8    Management Team for a decision.

9    Q.    And do you recall when that medical -- when the medical

10   examination -- excuse me.  Withdraw the question.

11        Do you recall when the Medical Education Management Team

12   met to make a decision with regard to Mr. Argenyi's requests?

13   A.    Yeah.  That was June 9th of 2009.

14   Q.    Okay.  And who was present at that meeting?

15   A.    Well, that would have been Dr. Tom Hansen -- let me see

16   now -- let me take that back.  I have to get my people

17   straight here.

18        June of 2009, that would have been me as associate dean;

19   it would have been Dr. Terry Zach, who is the M4 component

20   director; it would have been Dr. Eugene Barone as the

21   component 3 director; it would have been Tom Pisarri --

22   Dr. Pisarri, who is the component 2 director; it would have

23   been Dr. Knoop, who is the component 1 director; it would have

24   been Dr. Katy Huggett and she is the associate dean for Med

25   Ed.  And then it would have been Wade Pearson from the Office

1    of Disability Accommodations was there as well.  And then at

2    that point in time, I think Dr. Jeffries was there as

3    Associate Dean for Medical Education.

4    Q.   And why did you invite Wade Pearson at that meeting?

5    A.   Just to make sure we had everything straight and we were

6    providing the appropriate accommodations.

7    Q.   And do you recall if legal counsel was present at that

8    meeting?

9    A.   I do not believe they were.

10   Q.   Okay.  And did you provide the committee all of the

11   documentation that you received with regard to Mr. Argenyi?

12   A.   Right.  Anytime we do this, we make sure that the

13   documentation that we have from the student is submitted to

14   the committee.

15   Q.   Okay.  And did the committee follow the process it

16   normally follows in evaluating reasonable accommodations?

17   A.   Yes, it did.

18   Q.   Now, let's take a look at the documentation that indeed

19   was presented to the MEMT.  And let's start with Exhibit 16.

20   Did the MEMT consider this letter?

21   A.   Yes, it did.

22   Q.   Okay.  And do you recall what the MEMT considered with

23   regard to this letter?

24   A.   Well, we looked at the letter from Dr. Backous, and it

25   said that Michael would benefit from closed-captioning, as

1    well as an FM system.

2    Q.   Okay.  And what was your understanding of what closed-

3    captioning was?

4    A.   Kind of what is typically done, you know, you have a TV

5    and a person can decide whether to put the words across the

6    bottom of the screen or the captioning across the bottom of

7    the screen.  That can be for a movie or TV show or whatever.

8    Q.   So for any videos that would be shown during his medical

9    education, he was requesting closed-captioning.

10   A.   That's right, correct.

11   Q.   Okay.  And did the MEMT consider that Dr. Backous

12   indicated that Mr. Argenyi had worked in a nursing home

13   environment over the last three years and is communicating

14   well with patients?

15   A.   Yes, we did.

16   Q.   Why was that important?

17   A.   Well, I mean, he had indicated -- and it was supported by

18   what Michael had said in his letter and what Amanda Mogg said

19   in her letter, that he performed very well in a clinical

20   setting and was able to communicate effectively without

21   accommodation.

22   Q.   Okay.  Let's go ahead and look at Exhibit 3,

23   Mr. Argenyi's e-mail.  That was sent on April 24th.  Did you

24   share this with the Medical Education Management Team?

25   A.   Yes, we did.

1    Q.   And did the Medical Education Management Team understand

2    what Mr. Argenyi was requesting for accommodations and

3    auxiliary aids and services?

4    A.   Yes.

5    Q.   And they took this e-mail into consideration, correct?

6    A.   They did.

7    Q.   Now, if we could take a look at Exhibit 5, now again this

8    is the letter from Mr. Argenyi that you indicated that you

9    received.  Did you share this with the Medical Education

10   Management Team?

11   A.   Yes, we did.

12   Q.   And did the Medical Education Management Team consider

13   this letter?

14   A.   Yes, they did.

15   Q.   Did it consider everything in the letter?

16   A.   Yes.

17   Q.   Okay.

18           MR. MOORE:  I'd like to focus on the second section,

19   please.

20   BY MR. MOORE:

21   Q.   Now, you understand this was Mr. Argenyi's own words,

22   correct?

23   A.   Yes.  We knew this was his letter to us.

24   Q.   And in this letter, he talks about obtaining -- first of

25   all, being a CNA at Children's Hospital for two and a half

1    years and performing all of these duties without any exception

2    but a text pager.  Was this important to the MEMT?

3    A.   Yes.  I think we all understood that he was able to

4    function in a clinical setting without accommodation and do

5    some pretty impressive things.

6    Q.   You agree a CNA is different than a medical student.

7    A.   Yes.

8    Q.   How could it be important he was working as a CNA when

9    it's different than being a medical student?

10   A.   Well, I think there's still patient interactions

11   entailed.  And if you look at some of the duties he describes

12   within the letter in terms of things such as medication and

13   allergy history, he's taking vital signs, he's communicating

14   with patients and family members, he's doing a lot of things

15   that kind of go above and beyond, I think, in our opinion.

16   Q.   Okay.

17           MR. MOORE:  If we can zoom out of that letter real

18   quick?  And then highlight the bottom portion of that, if you

19   would.

20   BY MR. MOORE:

21   Q.   Now, in this particular section, Mr. Argenyi talks about

22   being -- having residual hearing, using visual cues and lip-

23   reading body language.  He said, "I've been able to obtain

24   clinical information in the clinical setting without

25   significant accommodations."

1          Then he goes on to say, "I would like to emphasize I'm

2     requesting accommodations not for the assistance of clinical

3     assessment, but for the assistance in learning new materials."

4          Did you -- did the MEMT consider that in their decision?

5     A.   I think we considered everything that he wrote.

6     Q.   Well, let's just focus on this point.  Why was this

7     important to the MEMT?

8     A.   Well again, I mean, he's saying that -- from what we

9     could understand, that he wasn't requesting an accommodation

10    in a clinical environment, but he was requesting accommodation

11    when he was actually learning new information.

12          MR. MOORE:  Okay.  And then going to the second page

13    of Exhibit 5 looking -- let's highlight the bottom three

14    paragraphs starting -- up -- bottom three.  Go down -- right

15    before -- one more paragraph down.  Right there.  Thank you.

16    Sorry.

17    BY MR. MOORE:

18    Q.   Now, he also indicates that he believed his

19    accommodations were in accordance with Dr. Backous's

20    recommendations.  Real-time captioning and interpreting, in my

21    case cued speech, are generally considered interchangeable

22    based on the client's preference.  And then at the bottom he

23    does say, "I do believe that an FM system would be useful for

24    my medical studies."

25          Did the MEMT take those into consideration?

1    A.   Yes, they did.

2    Q.   Let's go to Exhibit 17.  You said this letter is dated

3    May 27th from Dr. Backous.  You indicated you did receive

4    this, correct?

5    A.   Yes.

6    Q.   You shared this with the MEMT, correct?

7    A.   Yes.

8    Q.   And did the MEMT consider this letter?

9    A.   Yes, they did.

10   Q.   Now, was -- was -- I take it you considered the entirety

11   of the letter, correct?

12   A.   Yes, we did.

13   Q.   Okay.

14        MR. MOORE:  If we could highlight the second

15   paragraph in this letter?

16   BY MR. MOORE:

17   Q.   Now, in this particular sentence, they say, "Based on

18   Mr. Argenyi's testing in March of 2009, that when he's able to

19   take advantage of visual cues and context, his performance

20   improves to nearly 100 percent."

21        Was this important to the MEMT?

22   A.   Yes, it was.

23   Q.   Why was it important?

24   A.   It seemed like if he were provided with visual cues and

25   context, that he would do quite well with his cochlear

 1    implants in terms of getting effective communication.

 2            MR. MOORE:  Now, if we could look to the bottom of

 3    the first page, again highlight that, starting with that

 4    paragraph.  Yes.

 5    BY MR. MOORE:

 6    Q.   Let me ask you one question before we move on.  In this

 7    exhibit where Dr. Backous talks about testing, where they

 8    actually used visual cues and context, did Mr. Argenyi ever

 9    submit any other documentation where he had been tested with

10    visual cues and context?

11    A.   Not to my office -- or our office.

12    Q.   So, this was the only time he presented any testing with

13    regard to testing being able to use those visual cues he said

14    he uses and the context of what's going on.

15    A.   Yes, that's true.

16    Q.   And this says his communication improves to nearly 100

17    percent.

18    A.   That's what the document reads, yes.

19    Q.   And all the other documentation you received included

20    testing but without those visual cues and contexts.

21    A.   That is correct.

22    Q.   Now, focusing on the bottom of this letter, it says,

23    "Based on this center's knowledge and history of working with

24    Michael, the following accommodations are considered

25    appropriate."  It says an FM system, it says real-time

1    captioning -- you understood real-time captioning to be CART.

2    A.   At that time, yes.

3    Q.   How did you learn what CART was?

4    A.   Well, when it was mentioned, since I did not know what it

5    was, we relied on our Office of Disability Accommodations and

6    Wade Pearson to explain that to us and everything to get a

7    good feel for it.

8              MR. MOORE:  And then if we can go to the second page?

9    Why don't we highlight all the way to the bottom of the

10   letter, if we could -- not -- that's okay.

11   BY MR. MOORE:

12   Q.   The third thing that he says is appropriate is a cued

13   speech interpreter.  Did you check into the availability of a

14   cued speech interpreter?

15   A.   I did not personally, but somebody did do that.  And I

16   think it might have been Wade Pearson's office, if I'm not

17   mistaken.

18   Q.   What did you learn about cued speech interpreters?

19   A.   Very rare, very difficult to find somebody who does that.

20   Q.   Anybody around here you were able to --

21   A.   It's my understanding there's nobody in the Omaha area

22   that did that.

23   Q.   And when you looked at these three categories, did you

24   believe you needed to provide all -- did the MEMT believe they

25   needed to provide all three of these accommodations for

1     Mr. Argenyi?

2     A.   No.

3     Q.   Why not?

4     A.   Well, I think there was a variety of factors that took

5     place.  First of all, Dr. Backous was recommending an FM

6     system from his April 10th letter, so we relied on that

7     heavily and felt that would be a reasonable accommodation.

8          In addition to that, we were concerned with the CART

9     system just because of the visual nature of the curriculum,

10    highly visual -- looking at slides of anatomy, of cells, of --

11    you name it.  And it's very detailed.  And we honestly thought

12    that that would be a distraction and could inhibit his

13    learning.

14    Q.   How would that be a distraction?

15    A.   Again, as it was explained to us in terms of CART, that

16    he would be looking at the screen and taking his eyes away

17    from what would be pointed to up in the lecture on the slides

18    and such.

19         And like I said, there's a lot of stuff they're having,

20    like anatomy of the brain or the spinal cord or a cell and

21    pathology of a cell and that kind of stuff.  It gets very

22    intense.  And I really felt like that would be a distraction

23    and he wouldn't catch stuff and catch information, new

24    information like he was supposed to, and felt that would not

25    be good under these circumstances.

1    Q.   I'd like to turn your attention to Exhibit 202.   And

2    again this is the letter from Amanda Mogg.   Who did you

3    understand Amanda Mogg to be?

4    A.   It was our understanding that she was Michael's

5    supervisor at Seattle Children's Hospital.

6    Q.   Okay.  And did you share this letter with the MEMT?

7    A.   Yes, we did.

8    Q.   And did the MEMT consider this letter?

9    A.   Yes, they did.

10        MR. MOORE:  Okay.  And let's highlight just the

11   entire letter from Dr. Kavan down to before the signatures so

12   the jury can see it.

13   BY MR. MOORE:

14   Q.   And what did the MEMT consider with regard to this

15   letter?

16   A.   Well, I think we tuned into it, first of all, she

17   commented on him meeting the technical standards, but then

18   there was a lot of information in terms of his duties as a CNA

19   at Seattle Children's.

20   Q.   And why was that important?

21   A.   Because of the intensity of his involvement.  She says

22   some very interesting things, such as he's taking vitals

23   signs, helps to settle incoming ambulances, and is a runner

24   during emergencies, transports and escorts patients throughout

25   the hospital, to diagnostics and the floor for admissions.

 1            And she continues on to say that it is essential that he

 2      communicate with patients as they have questions en route.

 3      And then above and beyond that, we thought it was very

 4      impressive he had represented the emergency department in a

 5      week-long process improvement workshop with radiology, looking

 6      at safe patient handoffs between units and departments, he was

 7      instrumental in getting all of the techs and volunteers

 8      trained to roll out the new process.  He also is a valued

 9      member of our department and such.

10      Q.    Okay.  And you understood that he did all this without

11      any accommodation other than a text pager, correct?

12      A.    That is correct.

13      Q.    And he made clear he didn't use CART, correct?

14      A.    Yes.

15      Q.    He made clear he didn't use his interpreter, correct?

16      A.    That is correct.

17      Q.    Were you encouraged by these letters?

18      A.    Yeah.

19      Q.    And why were you encouraged?

20      A.    I mean, I, again -- it kind of goes back to what I had

21      mentioned earlier about the admissions process.  I thought we

22      had a very well-qualified student coming into medical school.

23      And these additional letters proved that not only was he

24      strong academically, but he had significant clinical

25      experiences as well.

1    Q.   Okay.  And as the MEMT was considering these

2    accommodations, in addition to determining whether it was

3    necessary, did the issue of cost come up?

4    A.   You know, initially I was more concerned with getting the

5    appropriate accommodations and such.  But during that process,

6    we did look at cost, and in terms of what it would be to

7    provide these accommodations to the student, to Michael.

8    Q.   Okay.  And did Wade Pearson share with you -- well, going

9    back to --

10             MR. MOORE:  May I have a minute, your Honor?

11             THE COURT:  You may.

12        (Off-the-record discussion had.)

13             MR. MOORE:  If we could take a look at Exhibit 40?

14   If we could zoom in on that.

15   BY MR. MOORE:

16   Q.   Now, this is the e-mail from Alice Smith discussing

17   costs.  Was this shared with the MEMT?

18   A.   Yes, it was.

19   Q.   Okay.  So this -- the cost of interpreters and CART and

20   those things were considered, correct?

21   A.   Yes.

22   Q.   And was it your understanding that Michael would need one

23   interpreter for most interactions and perhaps he may need two

24   every once in a while?

25   A.   That's what was my understanding.

1          MS. JACKSON:  Objection, leading, your Honor.

2          THE COURT:  The objection comes too late.  The answer

3     is in.  It will not be stricken.

4          You may inquire.

5     BY MR. MOORE:

6     Q.   Now, at that particular time -- well, let me ask you

7     this:  You talked about the LCME accreditation process.  How

8     often does that occur?

9     A.   It's every eight years they come in, unless there's a big

10    issue with the medical school.  But we've been fortunate, it's

11    been every eight years.

12    Q.   So that's a routine thing.  If something big happens,

13    they come in.

14    A.   That's correct.

15    Q.   And when was the last LCME accreditation?

16    A.   Well, we had our most recent one in October of 2011.  And

17    prior to that, it was in 2003.

18    Q.   Okay.  And is [*sic*] that accreditation look at tuition

19    and finances of the medical school?

20    A.   Yes, absolutely.

21    Q.   And did they raise any issues with regard to those --

22    those two issues in the last accreditation?

23    A.   Yes, they did.

24    Q.   And what did they raise?

25    A.   Actually the past couple LCME site visits, accreditation

1    visits, they've raised the issue that Creighton's tuition is

2    high and that the student debt is very high as well; and that

3    the past two times they've asked us to do something about that

4    in terms of helping to offset some of those problems.

5    Q.   And has that been difficult?

6    A.   Yeah, it is.

7    Q.   Why?

8    A.   Well, Creighton relies heavily on tuition dollars and --

9    in order to educate our students.  The problem is we can't

10   raise tuition; otherwise, students go farther in debt.  So

11   it's kind of a vicious cycle that gets going.

12        That's why the university really works hard at getting

13   donations and such, scholarship dollars, to help support

14   students and everything else because there's limited dollars

15   to go around.

16   Q.   And you said you rely heavily on tuition.  How does that

17   compare to, for example, the University of Nebraska?

18   A.   Well, we get no state funding, so it's all, you know --

19   we rely on tuition a lot.  And if you look at the averages

20   compared to other schools, we're way above the average in

21   terms of reliance on tuition.

22   Q.   So if you had to raise tuition, does that impact the LCME

23   accreditation?

24   A.   Yeah.  If we raise tuition significantly, that would

25   certainly impact our accreditation because they've noted it a

1   couple times.  And they want to make sure that we correct

2   problems as opposed to allowing them to continue.

3   Q.   And at that particular time -- when I say at that

4   particular time, in 2009 when he was requesting

5   accommodations, what was going on with the medical school

6   budget?

7   A.   Well, we had been asked to cut back our department

8   specifically in the Office of Medical Education, as well as

9   other departments, because of the budget issues we were

10  having; and so anywhere from 5 to 15 percent a year for at

11  least two, maybe three years of cutbacks in terms of our own

12  budgets or operating budgets.

13  Q.   And if Creighton were to grant what Mr. Argenyi's

14  requesting, all of the accommodations, where would that money

15  come from?

16  A.   Well, that's a good question.

17  Q.   Would it -- I'm sorry.

18  A.   I mean, it would have to come out of somewhere.  You

19  either cut staff or you cut services to students or you cut

20  something, but it's not like we can go and ask for more money.

21  We're given a set amount of money each year in our budgets.

22  And so if we have something unanticipated that comes up, it's

23  a big expense, no matter what it was, whether it's an

24  accommodation or whether it's a huge computer malfunction or

25  whatever, we've got to find money for that somewhere, which

1      means we take it away from somewhere else.

2      Q.   In the alternative of cutting expenses or staff, what's

3      the other alternative?

4      A.   Well, you raise tuition to get the extra dollars, you

5      raise fees and that type of thing.  But again, we can't do

6      that because we're got our hands tied with the LCME or

7      accrediting body.

8      Q.   Do you get any specific federal funds, federal money from

9      the federal government, to pay for accommodations?

10     A.   No, we don't.

11     Q.   Do you get any state tax dollars or local tax dollars to

12     pay for accommodations?

13     A.   No, we don't.

14          MR. MOORE:  I'd like to direct your attention to

15     Exhibit 6.  If we can --

16     BY MR. MOORE:

17     Q.   Well, do you recognize this document?

18     A.   Yes, I do.

19          MR. MOORE:  Is this --

20     BY MR. MOORE:

21     Q.   How do you recognize this document?

22     A.   This was the letter that was sent back to Michael Argenyi

23     regarding what accommodations we would be granting him for the

24     first school year.

25     Q.   And these are the accommodations that the MEMT approved

1    for Mr. Argenyi based on the documentation provided to them.

2    A.   Yes, that's correct.

3    Q.   And I don't want you to read this ad nauseam, we've read

4    enough in this trial.  But if you could explain to the jury

5    what the MEMT offered Mr. Argenyi?

6    A.   Okay.  The MEMT, Medical Education Management Team,

7    offered Michael an FM system, which was specifically geared to

8    his cochlear implant so that the transmission would be

9    appropriate and everything else.

10        Also offered him a note service.  We have a note service

11   and that we would pay for.  Also offered him a note-taker that

12   either he could pick or we would select, and then that person

13   would, immediately following the class, come in and photocopy

14   notes for him so he'd have easy and quick access to them.

15        We also had our podcasting system which he could take

16   part in as well, as well as having preferential seating so

17   he'd be close to an instructor in order to take advantage of

18   the visual cues and the contexts and those types of things

19   that were felt to be very important based on the documentation

20   he submitted.

21   Q.   Now, that's in a lecture setting, right?

22   A.   That's correct.

23        MR. MOORE:  Your Honor, at this time I'd like the

24   witness to demonstrate the distance between the professor and

25   the front row of the auditorium that was raised certainly by

1    some other witnesses, and Dr. Kavan -- well, let me ask.

2    BY MR. MOORE:

3    Q.   Dr. Kavan, do you teach classes in that auditorium?

4    A.   Yes, I do.

5    Q.   Do you teach M1 students?

6    A.   Yes.

7    Q.   Do you know where the professor sits or stands and the

8    distance between the professor and the front row?

9    A.   Yes, I do.

10          MR. MOORE:  We'd like him to demonstrate that to the

11   jury, your Honor.

12          THE COURT:  And Doctor, you may go down from the

13   witness stand and stand in front of the jury to make this

14   demonstration.  If you speak in response to a question when

15   you're away from the witness stand, please be sure you're by a

16   microphone.

17          THE WITNESS:  Okay.  Thank you, your Honor.

18   BY MR. MOORE:

19   Q.   If you could just stand the approximate -- come right

20   here in front of the jury and stand the approximate distance

21   between you and where the student would be sitting in the --

22   A.   So ideally the podium would be over here (indicating),

23   and the first seat -- or the first row would be -- so I'm

24   going to go over there.

25   Q.   That would be -- the distance between you and the first

1     juror, that's the distance between where a professor stands

2     and Mr. Argenyi would be sitting in the front row.

3     A.   Yes, that's correct.

4     Q.   Okay.  Thank you.  You can sit back down.

5          And Dr. Kavan, I believe that Mr. Argenyi also had access

6     to the PowerPoints in advance of the lecture.

7     A.   Yes, that's correct.

8     Q.   Those are the exact PowerPoints that would be shown

9     during the lecture; is that correct?

10    A.   That's correct.

11    Q.   And I assume -- I've never been in medical school -- from

12    the testimony, that students are required to read the material

13    in advance of attending the class.

14    A.   That would include the PowerPoints, but also all the

15    readings they would have and whether that's for the lectures

16    or small groups or whatever.

17    Q.   So in the PowerPoints and in the books, are they seeing

18    the terminology and the medical terms that will be used at the

19    lectures?

20    A.   Yes, they are.

21    Q.   Now, let's talk about small groups.  And you can refer to

22    the letter if you need to.  What was offered in the -- well,

23    first of all, explain to the jury what a small group is.

24    A.   A small group is a group of about 13 to 14 students who

25    are in a pretty small room.  I mean, it's a -- about the size,

 1    I guess, of the -- a little bit bigger than the jury box and

 2    such, probably out to the end of the chairs here.  And there's

 3    a table inside with a whiteboard as well as with a screen and

 4    a lot of technology, computers and such.

 5         And a small group is where the students will bring in

 6    information that they learn previously from lecture or from

 7    their own readings and such, and then discuss that with the

 8    faculty member.  And sometimes, depending on the class, like

 9    molecular and cell biology lectures have two faculty, a

10    physician faculty as well as a basic science faculty member,

11    and they discuss cases and such.

12    Q.   Is everybody talking at the same time in that small

13    group?

14    A.   That's pretty rare.

15    Q.   Is it normal one-on-one interaction?

16    A.   Typically.

17    Q.   Okay.  Those could be, I think you said, 13 or 14, but

18    they could be up to 15, correct?

19    A.   If there's two faculty in there, it would be 15 people

20    and 13 students.

21    Q.   Can you give the approximate dimensions of a small group

22    room?

23    A.   Like I said, it's just probably a little bit bigger than

24    the jury box out past the chairs, so I don't know, is that 15

25    feet by 20 -- 22, something like that.

1    Q.   So that's not a big lecture hall.

2    A.   No, no.

3    Q.   Pretty close quarters.

4    A.   Yes.

5    Q.   And what was offered to Mr. Argenyi in that small group?

6    A.   Well, that he would be able to sit next to the faculty

7    members so that he would be able to hear better, as well as to

8    read lips, taking advantage of visual cues and context.

9         But in addition to that, that we would use that FM system

10   and purchase a special microphone that would pick up on the

11   discussion taking place in that small group setting.

12        MS. JACKSON:  Objection, your Honor.  I don't see any

13   reference -- ask for a sidebar so I don't make an argument in

14   front of the jury.

15        THE COURT:  All right.

16   (Bench conference on the record.)

17        MS. JACKSON:  So he's talking about the preferential

18   seating in the small groups.  That's not indicated in the

19   letter, so he's testifying to something that's not offered.

20        THE COURT:  I don't understand the objection.  The

21   witness was asked about various exhibits but just because the

22   witness was asked about a particular exhibit doesn't mean that

23   the witness can't be asked questions about other things

24   outside the exhibit.

25        Now, if you have something on cross-examination that you

1    wanted to cover, such as the fact that this small group

2    setting and the accommodations in a small group setting were

3    not matters that were addressed in this particular letter, you

4    could certainly point that out on cross-examination.

5         But, the question and the answer were not objectionable

6    just because those matters weren't something discussed in an

7    exhibit that the counsel has pointed to.

8         (Off-the-record discussion had.)

9         MS. JACKSON:  I'd like to express a concern, your

10   Honor, that Mr. Moore is continuing to lead the witness.  I

11   don't want to interrupt too often.

12        THE COURT:  Okay.  We'll ask that the questions be

13   phrased as questions and not be leading so that plaintiff's

14   counsel doesn't have to interrupt with objections regarding

15   leading questions.

16        Thank you.

17        (End of bench conference.)

18        THE COURT:  You may inquire.

19   BY MR. MOORE:

20   Q.   So there's no confusion with regard to small groups, is

21   what you offered in this letter for small groups what you

22   offered to Mr. Argenyi?

23   A.   Yes, it is.

24   Q.   And what was that?

25   A.   In terms of the small groups, it was the FM system with a

1    microphone that would pick up on what was being said in that

2    small group room.

3    Q.   And then the third category is laboratories.  If you

4    could explain to the jury what the lab classes are?

5    A.   Well, there's different types of lab classes.  One is the

6    anatomy lab where the students are working on cadavers and so

7    they're dissecting cadavers.

8         Another type of lab is in the computer center where they

9    look at slides on a computer.  And there's a faculty member at

10   the front of the room instructing them what to do and what to

11   look at on the slides and actually pointing them out on the

12   slides, each individual computer.  Everybody has their own

13   computer monitor.

14        Then there's some other pathology labs, real small labs

15   as well, that instructors will be giving information to

16   students.

17   Q.   And do students have their own laptops that they have in

18   medical school?

19   A.   Many do.

20   Q.   Okay.  And do they use those in their classes?

21   A.   Some will.

22   Q.   Were the accommodations offered in this letter consistent

23   with the MEMT's conclusions?

24   A.   Yes, they were.

25   Q.   And did you consult with legal counsel before you sent

1     this out?

2     A.   Before sending it out?  Yes.

3     Q.   And why did you do that?

4     A.   Well, just to make sure that we're adhering with the law

5     and that we're following our obligations in that extent.

6           MR. MOORE:  I'd like to turn your attention to

7     Exhibit 7.  And if we could focus in on that?  Go from the top

8     so the jury doesn't...

9     BY MR. MOORE:

10    Q.   Do you recognize this document?

11    A.   Yes, I do.

12    Q.   What is that document?

13    A.   This is an e-mail from Michael dated July 15, 2009.

14    Q.   And was this in response to your Exhibit 7 -- excuse me,

15    was this in response to Exhibit 6 where you offered the

16    accommodations?

17    A.   Yeah.  This was in response to that June 23rd letter that

18    we had sent to him.

19    Q.   Okay.  It appears in this particular e-mail that he says,

20    "I have to note they are different from what I'm used to, but

21    I will give them a wholehearted try," correct?

22    A.   Yes.

23    Q.   "And should they be inadequate, I'll let you know

24    immediately and work with your office -- with you and your

25    office to devise an adequate solution," correct?

1    A.    That's correct.

2    Q.    And then he goes on to ask whether the FM system would be

3    purchased by Creighton and that he would know the specific FM

4    receivers to buy.

5    A.    Yes.

6    Q.    Did Creighton eventually buy that FM system?

7    A.    Yes, Creighton did purchase that system.

8    Q.    And that was exclusively for Mr. Argenyi.

9    A.    That was for his use only.

10   Q.    Now, after he sent this, did you have any concerns?

11   A.    No.  I mean, I felt like things were going forward, no

12   other issues, and the school year would start.

13   Q.    I'd like to direct your attention to Exhibit 210.  And

14   then this is a string of e-mails, so I'd like to start with

15   the second page.  And the e-mail at the bottom.

16           MR. MOORE:  A little bit higher.  Right from -- who

17   it's from, Dr. Kavan.  No, down, down, down...

18           MS. KIMBLE:  Can you show me on the screen?

19           MR. MOORE:  Sure, if I wasn't so short and had short

20   arms -- from right there down.  That works pretty good.

21   BY MR. MOORE:

22   Q.    Do you recognize this e-mail?

23   A.    Yes, I do.

24   Q.    What is this e-mail?

25   A.    It's an e-mail that I sent to Michael on July 29, 2009.

1     Q.    Why did you send this e-mail?

2     A.    Just letting him know that when I'd been out of town and

3     that we had looked at equipment but was wondering if he could

4     give us the details of what he needed in regards to his FM

5     system.

6               MR. MOORE:  Can we turn to the first page of this

7     document, 210 -- Exhibit 210?  And let's start right there

8     (indicating) and go down from there.

9     BY MR. MOORE:

10    Q.    Was this Mr. Argenyi's response to your inquiry?

11    A.    Yes, it was.

12    Q.    And what did he provide in this e-mail?

13    A.    Well, he was providing information on the specific

14    transmitter and the receiver that he recommended, and also

15    gave information about who his audiologist was, which was

16    Stacey Watson, and that she's available for questions for

17    guidance in ordering the FM system for him.

18    Q.    And did you order the specific FM system that Mr. Argenyi

19    identified?

20    A.    Creighton did; I did not.

21    Q.    Okay.  And did anyone reach out to Stacey Watson?

22    A.    It was my understanding that Chuck Lenosky talked to her.

23    We had discussions and Chuck, who is our kind of technical guy

24    at the School of Medicine, contacted her and was working with

25    her, making sure the appropriate system was in place and

1    getting advice on setting it up appropriately as well.

2    Q.   After this e-mail, what happened with regard to the FM

3    system?

4    A.   We received it and they worked with Michael to get

5    everything in place.

6    Q.   So what was your thought after this e-mail and buying the

7    FM system?

8    A.   I again thought everything was a go and the semester

9    would start.

10   Q.   And did that change at some point?

11   A.   Yes.

12   Q.   What happened?

13   A.   Well, the next thing that happened -- excuse me, is, I

14   believe, that Michael's lawyer contacted Creighton to set up a

15   meeting before school started to get everybody together.

16   Q.   And was that before Michael had even started classes?

17   A.   Right, that was before he started taking courses at

18   Creighton.

19   Q.   Was that before he tried any accommodations offered by

20   the medical school?

21   A.   Right, that was before he tried any of the

22   accommodations.

23   Q.   And did that meeting occur before he started class?

24   A.   Yes, it did.  It occurred actually the first day of

25   orientation.  We have a three-day orientation that takes place

1    Wednesday, Thursday, Friday.  I think this took place on a

2    Wednesday afternoon or sometime that day, and then Monday was

3    the start of the school year.

4    Q.   Okay.  And then the meeting actually took place before he

5    tried any accommodations?

6    A.   Yes, that is correct.

7    Q.   What happened at that meeting?

8             MR. MOORE:  Well, I withdraw the question.

9    BY MR. MOORE:

10   Q.   Who was at that meeting from the medical school or from

11   Creighton?

12   A.   From the medical school, it was me, Wade Pearson was

13   there, the director of the Office of Disability

14   Accommodations, and then Amy Bones, who was our legal counsel,

15   was there from Creighton.

16   Q.   That's your -- that was your --

17   A.   Inhouse legal person, correct.

18   Q.   Who came for Mr. Argenyi?

19   A.   Michael was there; Dianne DeLair, his lawyer, was there;

20   and then there was an advocate.  And I honestly don't remember

21   what the advocate's name was, but there was also an advocate.

22   Q.   When you say "advocate", do you know exactly what that

23   is?

24   A.   Well, somebody, I thought, from one of the disability

25   offices.  I thought it was Lincoln, maybe, but I'm sketchy on

```
1    that.  I'm not quite sure who he is.

2    Q.   And what happened at that meeting?

3    A.   Well, I mean, I went into it thinking that this was going

4    to be kind of, okay, just make sure everything's in place,

5    everything's ready to go to assure success and all, and was

6    surprised that it was a demanding tone that Michael be given

7    the accommodations that he had requested in the April 24,

8    2009, letter.

9    Q.   Did they ask you about what the MEMT did and what they

10   considered to arrive at their conclusions?

11   A.   I don't think there was much discussion.  It was this was

12   what we want.

13   Q.   And when they said "this is what we want," were they

14   referring back to -- for the record, Exhibit 3, which was the

15   April 24th e-mail from Mr. Argenyi to you specifically

16   requesting all of those accommodations?

17   A.   Yeah, that's what they were asking for.

18   Q.   Okay.  Was there any particular statement that stood out

19   to you that was important?

20   A.   Yeah.  And I typically don't remember specifics, but it

21   was so bold.  At one point, I think Michael's lawyer said,

22   Michael --

23             MS. JACKSON:  Objection, hearsay.

24             THE COURT:  Well, this was a statement that was made

25   during the conversation and something that this witness relied
```

```
1   upon.  So, it is not a statement being offered for the truth

2   of the matter asserted, and the jury does not need to accept

3   it or should not accept it for the truth of the matter

4   asserted, but as something that this witness relied upon.

5        The objection's overruled.

6             MR. MOORE:  Your Honor, we believe that -- well, I'll

7   do a sidebar.  I don't want to do a speaking objection.

8             THE COURT:  All right.  Let's do a sidebar.

9        (Bench conference on the record.)

10            THE COURT:  Just to review, I understand that the

11  witness was asked about a statement that Michael's lawyer

12  made, and that this witness heard in conversation.

13       And again, I don't know the purpose for the question and

14  the answer.  But, it appeared to me that it's not something

15  offered for the truth of the statement made by the declarant,

16  but instead as part of the process of information that this

17  witness heard and gathered in making his decision.

18       So now you can enlighten me.  And we'll start with

19  defense counsel because it's your question.

20            MR. MOORE:  Yes.

21            THE COURT:  And you can tell me the purpose of the

22  question and what you expect to elicit in the answer.

23            MR. MOORE:  Well, your Honor, first of all, you're

24  absolutely correct, it's not hearsay because it was considered

25  in the process.
```

1          However, it is both an admission against interest as well

2      as an admission by a party-opponent because obviously his

3      lawyer is his agent and speaks for Mr. Argenyi.

4          So, my point is, is that the jury can consider it for any

5      purpose, not just the limited purpose you instructed the jury,

6      because it was an admission against interest and stated by a

7      party-opponent that was adverse.

8              THE COURT:  Well, I understand you are arguing

9      additional reasons why I was right.

10             MR. MOORE:  I just want to limit the instruction.

11             THE COURT:  But do you really want me to tell the

12     jury that they can consider this for the truth of the matter

13     asserted by the lawyer?  Why would you want me to tell the

14     jury that?

15             MR. MOORE:  Well, I just didn't think any instruction

16     was needed to limit the admissibility of it.  I'll accept your

17     ruling, and I'll withdraw my objection.

18             THE COURT:  The ruling was, like, totally in your

19     favor and --

20             MR. MOORE:  Well, kind of.

21             THE COURT:  So to come over and argue about how I

22     should have gone farther and there were other reasons why my

23     ruling was good...

24             MR. MOORE:  Any chance I get to do that, Judge, I

25     like to do that.

1              THE COURT:  Okay.  It's almost noon.  Let's get

2      going.

3           (End of bench conference.)

4              THE COURT:  You may inquire.

5      BY MR. MOORE:

6      Q.   I'll ask you again, Dr. Kavan, was there any statement

7      that stood out to you at that meeting?

8      A.   Yes.  As I started to say, Michael's lawyer made the

9      statement, "Michael wants what Michael wants."  And -- and at

10     that time I thought, whoa, that's what they want.  There's not

11     going to be any easy task to work that out.

12     Q.   Did you believe they were willing to engage in an

13     interactive process to determine appropriate accommodations?

14     A.   Not at all, not at that point in time.  Before that I

15     thought there was a fairly good, collegial process of working

16     through the issues of making sure that appropriate

17     accommodations were provided.

18          At this point in time, I really felt, like, whoa, they've

19     drawn the line in the sand, they want those accommodations

20     requested at the April 24th meeting or nothing at all.

21             MR. MOORE:  Good time to break for lunch?

22             THE COURT:  This is a good time to break.  We will

23     take an hour and 15-minute break.  Please reconvene in the

24     jury room at 1:15.

25          We're in recess.

1          (Jury out and recess taken at 11:59 a.m.)

2          (At 1:20 p.m. on August 28, 2013, with counsel for the

3     parties, the plaintiff, and the defendant's representative

4     present, and the jury NOT present, the following proceedings

5     were had:)

6          THE COURT:  Is there anything we need to talk about

7     before the jury comes in?

8          MS. VARGAS:  No, your Honor.

9          MR. MOORE:  Nothing from the defendant, your Honor.

10          THE COURT:  Please bring in the jury.

11     MICHAEL KAVAN, PREVIOUSLY SWORN, RESUMED THE STAND

12          (Jury in at 1:21 p.m.)

13          THE COURT:  Please be seated.

14     Mr. Moore, you may continue with your direct examination.

15          MR. MOORE:  Thank you, your Honor.

16                    DIRECT EXAMINATION (Cont'd.)

17     BY MR. MOORE:

18     Q.   When we left off, Dr. Kavan, we were talking about the

19     meeting that occurred -- that Mr. Argenyi's lawyers called two

20     days before class started.

21          At that meeting was Mr. Argenyi using any sort of

22     auxiliary aids and services or accommodations?

23     A.   No, he was not.

24     Q.   No CART?

25     A.   No, there's no CART there.

1    Q.    No interpreter?

2    A.    No interpreter was there.

3    Q.    Just him.

4    A.    Him and his attorney and advocate.

5    Q.    Okay.  Now, after that meeting, did Creighton inform

6    Mr. Argenyi or his attorneys if there was any change in their

7    position --

8              MS. JACKSON:  Objection.

9    BY MR. MOORE:

10   Q.    -- with regard to accommodations?

11             THE COURT:  Overruled.  He may answer.

12   A.    There was no change in accommodations as a result of that

13   meeting.

14   BY MR. MOORE:

15   Q.    After that meeting, did Mr. Argenyi start his first year

16   of medical school?

17   A.    Yes, he did.

18   Q.    And did you have any interaction with Mr. Argenyi during

19   his first couple weeks of medical school?

20   A.    Yes, I did.

21   Q.    If you could please explain to the jury what interactions

22   you had.

23   A.    Well, I know on the first day that we had the FM system

24   in place, I went in there, I think Dr. Knoop was in there, I

25   think our technology person was in there, if I'm not mistaken,

1    just to make sure everything was running okay and such.

2         And then I was in there on another occasion just to check

3    on him as well, not checking anything other than to make sure

4    the FM system was working appropriately.

5    Q.   And did you have any interaction or communication with

6    Mr. Argenyi himself?

7    A.   Yes, I did.

8    Q.   And what was that?

9    A.   Well, I had asked him if it was running okay and he

10   smiled, gave me a thumbs up, that things were working.

11   Q.   And with regard to students who are just beginning their

12   M1 year, does the medical school monitor their grades?

13   A.   Yes, we do.

14   Q.   And what -- well, if you could explain to the jury what

15   you do.

16   A.   Okay.  We have a system in place where we monitor every

17   student's grades.  So, the Office of Medical Education, which

18   at that time was run by Dr. Hansen, his staff, as well as my

19   staff -- and I have two -- we call them academic success

20   consultants; they're master's level people -- one is now a

21   doctorate level person -- who provide academic support,

22   tutoring, that kind of stuff to help people who might be

23   struggling for test-taking, learning, that type of stuff.

24        So the team of us, with the help of Dr. Knoop, who is the

25   component 1 director, what we do is we get the results from

1    the multidisciplinary quizzes, as well as the exams, and we

2    look at them to see if anybody is struggling at all.

3        If they are, then we intervene.  We have an e-mail that's

4    sent to them.  They have them come in and meet with Linda

5    Pappas or with Michele Millard to work up a study plan to see

6    if there is any tutoring they may need and that type of stuff.

7    Q.   And that's done for all students, correct?

8    A.   Yeah, we monitor all students.

9    Q.   I would like to direct your attention to Exhibit 9.

10           MS. BALUS:  May I approach, your Honor?

11           THE COURT:  Yes, you may.

12   BY MR. MOORE:

13   Q.   Now, I believe there was some cross-examination [*sic*]

14   done earlier on this particular exhibit.  You're familiar with

15   this exhibit?

16   A.   Yes, I am.

17   Q.   Just for the jury, what is it?

18   A.   This is a letter that Michael Argenyi had sent to me.  He

19   had copied Wade Pearson from our Office of Disability

20   Accommodations, as well as copied his lawyer, Dianne DeLair.

21   Q.   And you received this e-mail, I assume?

22   A.   Yes, I did.

23   Q.   I'd like to -- first of all, did you -- did you consider

24   this e-mail with regard to Mr. Argenyi's request for

25   accommodation?

1    A.   I'm not sure what you're asking.

2    Q.   Sure.  I'll rephrase that.

3         Mr. Argenyi in this e-mail is referring to the

4    accommodations that he desires, correct?

5    A.   That is correct.

6    Q.   And you read this e-mail, I assume?

7    A.   Yes, I did.

8    Q.   And did you take into consideration what he was writing

9    in this e-mail?

10   A.   Yes.

11              MS. JACKSON:  Objection, leading.

12              THE COURT:  Overruled.  The answer will remain.

13   BY MR. MOORE:

14   Q.   Going through this e-mail, I think it's very important

15   for you to explain to the jury how you responded to it.

16        The first paragraph says, "At this time I need to inform

17   you the accommodations are inadequate and would like to

18   formally request the accommodations contained in my April 21st

19   letter and August 12th meeting."

20        What was your understanding of that particular paragraph?

21   A.   Well again, Michael was going back to his original

22   request from April 24th actually.  That date is wrong in here,

23   but the April 24th letter that he had requested that set out

24   the accommodations we had discussed previously.

25   Q.   And was there anything different in that first paragraph

1    than what you heard from him in the August 12th meeting?

2    A.    No.

3    Q.    Now, let's take a look at the second paragraph.  In the

4    second paragraph, Mr. Argenyi speaks about his accommodations

5    are inadequate as evidenced by the level of stress and fatigue

6    he's experiencing.  He said he was missing information, that

7    he was unable to follow the lectures and effectively -- with

8    his classmates significantly impacting his ability to study.

9          What was your reaction to that paragraph?

10   A.    Well, I mean, there's certainly a concern anytime a

11   student is experiencing stress or fatigue or missing

12   information.

13         I think my attitude in response at that time was that's

14   nothing new for a medical student.  The amount of information

15   -- I think everybody's heard -- is like drinking -- taking a

16   drink from a fire hydrant.  There's a lot of information.

17   People miss a lot of information in that sense.

18         And stress and fatigue is not uncommon.  And actually

19   when I was the national chair of the group on student affairs,

20   we surveyed medical schools, and the number one mental health

21   complaint of students was anxiety and stress.

22         And again, not to be unsympathetic in any way, we want to

23   the deal with these issues, but that was not unusual by any

24   means.

25   Q.    Was there any way for you to distinguish what Mr. Argenyi

 1    was saying in this paragraph with the other students that

 2    expressed the same concern?

 3    A.    No.

 4    Q.    Now, let's go on to the next paragraph.  And I'd like to

 5    take this one at a time.  In the next paragraph he says, "I'm

 6    relying on the Note Service which, while very helpful, has

 7    been insufficient and has me at a minimum of one day behind my

 8    peers in my studying as I have to wait for the notes to come

 9    out the next day or even after a full weekend, which is

10    critical.  This was especially noticeable when at the last

11    MDQ, I missed questions because it covered material that had

12    not yet been covered by the Note Service and potentially left

13    out the notes from earlier lectures."

14         Were you concerned about that?

15    A.    Yes.

16    Q.    And how did you respond?

17    A.    Well, I was concerned as well as surprised because in our

18    June 23rd letter in terms of the accommodations that we were

19    offering him, we offered him a note-taker that he could choose

20    or that we would choose for him who could take the notes from

21    the class, we would copy those immediately thereafter so he'd

22    have immediate access to them.  I looked at this that he was

23    not taking advantage of those accommodations presented to him.

24    Q.    So that individualized note service, the note-taker, is

25    that different than the note service he's referring to?

1    A.    Yes, that is.

2    Q.    What is the note service?

3    A.    The note service is something that a lot of students sign

4    up for.  Each student is assigned a particular lecture and

5    then that student is responsible for taking very good notes.

6    You have to take very good notes during that lecture.  And

7    then those are distributed to the whole class, and so they

8    kind of rotate who takes the notes.

9    Q.    Okay.  So it would be a different person maybe each time

10   taking notes?

11   A.    Correct.

12   Q.    Rather than somebody specifically designated.

13   A.    That is correct.

14   Q.    Now, this goes on to say, "I am also suffering in anatomy

15   lab due to the high noise level.  The FM system only amplifies

16   the general noise level as well as voices, essentially

17   negating any potential value in amplification."

18        Did you have a concern about this particular issue that

19   was raised?

20   A.    Yes.

21   Q.    What was your concern?

22   A.    Well, again, we wanted to make sure he's getting the

23   information.  We were told that the FM system would work, and

24   so I was a little surprised that it didn't.  And so that would

25   cause a concern for us.

1    Q.   And what did you do in response to this issue?

2    A.   Well, I had been in contact with Dr. Quinn, who is the

3    anatomy professor.  And actually Dr. Quinn was starting to

4    work on this on his own.  So I'm assuming Michael might have

5    even talked to him about it.

6         But we talked about the importance of getting Michael out

7    of the two big rooms where the cadavers are and actually going

8    where Dr. Quinn does his dissection in the small group room

9    where there's less noise, less interference, and everything

10   else, and Michael could take advantage of that.  He'd be right

11   there being able to take advantage of being right with

12   Dr. Quinn, reading his lips, taking advantage of visual cues,

13   and being right there with his FM system on and with Dr. Quinn

14   miked up for that.

15        In addition to that, Dr. Quinn made the suggestion that

16   Michael be given what he said "our best TA".  And that was

17   Brianna Scott, who was a master's level anatomy student.  And

18   she works specifically with his table and specifically with

19   Michael to help him out with any other questions that he would

20   have.

21   Q.   When you say TA, what is a TA?

22   A.   A teaching assistant.

23   Q.   Okay.  So if you can kind of describe -- because I've

24   never been in anatomy lab -- if you could explain to the jury

25   what they're doing in the lab, what's going on there.

1    A.   Okay.  Well, Dr. Quinn, who is the anatomy professor, is

2    in the middle room.  And he's demonstrating dissection

3    techniques on monitors that are throughout the anatomy lab.

4    And the anatomy lab has various cadaver tables where there's

5    small groups of students, about four or five at a table.  And

6    then they kind of have their books with them, they're

7    following along with the instructions, and doing the

8    dissection as well -- or starting to do the dissection at that

9    point in time.

10   Q.   And did you believe that responded to Mr. Argenyi's

11   concern in this e-mail?

12   A.   Yeah, I thought that would do -- yes.

13   Q.   Okay.  The final issue raised is, "Finally the video --

14   videos Unnatural Causes in Ethics and the dissection videos in

15   anatomy are inaccessible because they are not closed-captioned

16   and I have no interpreter to relay the information."

17        Were you concerned about that?

18   A.   Yes, I was.

19   Q.   And what did you do in response to this?

20   A.   Well, I was probably a little more concerned.  I was

21   actually a little miffed by it because we told people we

22   needed to have closed-captions, etc., on any videos and

23   movies, that type of thing.

24        So I started talking to Dr. Knoop, who is a component 1

25   director.  And he pulled in Dr. Rentmeester, who is the

1   faculty member showing that particular video, and making sure

2   that across the curriculum, that if a video was going to be

3   shown, that that video would have closed-captioning to it like

4   we had indicated previously.

5   Q.   There's nothing -- was there anything in this e-mail

6   regarding Michael's inability to use the FM system in his

7   lecture classes?

8   A.   No.

9   Q.   Was there anything in this e-mail with regard to Michael

10  being unable to use the FM system in small groups?

11  A.   No.

12  Q.   Now, I'd like to point your attention to the last

13  paragraph.  And he mentioned that he was gathering more

14  information at the request of Amy Bones.  Who was Amy Bones?

15  A.   Amy Bones was our general counsel or legal counsel for

16  the university.

17  Q.   Okay.  And do you know, was she working with anybody on

18  Michael's team with regard to these requests for

19  accommodations?

20  A.   I don't know for sure.  I would imagine that her -- that

21  Amy Bones and Michael's lawyers were --

22              MS. JACKSON:  Object, speculation.

23              THE COURT:  Sustained.

24  BY MR. MOORE:

25  Q.   In the last line of that paragraph, it says, "Please

1    contact Dianne if you have any questions."  Who is Dianne?

2    A.   I would think that that would be who was copied on this

3    e-mail, which would be Dianne DeLair, which is his lawyer.

4    Q.   Okay.  So, if there were any responses needed back to

5    Mr. Argenyi, who did you believe the medical school needed to

6    contact?

7    A.   Well, it looks like Dianne DeLair.

8    Q.   Okay.  I'd like to turn your attention to Exhibit 18.

9         MS. BALUS:  May I approach, your Honor?

10        THE COURT:  Yes, you may.

11   BY MR. MOORE:

12   Q.   Dr. Kavan, do you recognize this document?

13   A.   Yes, I do.

14   Q.   And what is this document?

15   A.   This is a September 10th letter from Stacey Watson and

16   Dr. Backous.

17   Q.   Okay.  And again, I don't want -- this letter has been

18   read ad nauseam.  I don't want to read everything.

19        MR. MOORE:  If you could go to the second page, Kris?

20   And then if you would focus in on the second paragraph.

21   BY MR. MOORE:

22   Q.   The first thing I want to ask you, Doctor, is did you

23   bring this letter to the attention of the MEMT?

24   A.   Yes.

25   Q.   Okay.  And did this change the MEMT's belief with regard

 1    to whether the accommodations the medical school was providing

 2    provided effective communication?

 3              MS. JACKSON:  Objection, leading.

 4    A.   It --

 5              THE COURT:  Overruled.  He may answer.

 6    A.   It did not.

 7    BY MR. MOORE:

 8    Q.   And what -- did you believe there was anything new in

 9    this letter?

10    A.   Nothing from our perspective.

11    Q.   Okay.  And I highlighted that paragraph.  It appears that

12    Dr. Backous and Stacey Watson say:  For specific requests

13    please see our letter 27 May 2009.  Correct?

14    A.   Yes.

15    Q.   Okay.  If we could look back at Exhibit 17 --

16              MR. MOORE:  We'll bring it up to you if it's not

17    there.

18              MS. BALUS:  May I approach, your Honor?

19              THE COURT:  Yes, you may.

20    BY MR. MOORE:

21    Q.   So the September 10th letter refers back to this May 27,

22    2009, letter, correct?

23    A.   Yes, it does.

24    Q.   And again, this was -- looking at that letter, it appears

25    this is the letter that says when Michael's able to take

```
 1    advantage of visual cues and context, his performance improves

 2    to nearly 100 percent.

 3    A.   Yes, that is correct.

 4    Q.   Now, if I can direct your attention, sir, to Exhibit

 5    34 --

 6              MS. BALUS:  May I approach, your Honor?

 7              THE COURT:  Yes, you may.

 8    BY MR. MOORE:

 9    Q.   -- do you recognize that document?

10    A.   Yes, I do.

11    Q.   What is that document?

12    A.   That is an e-mail that was sent from me to Michael

13    Argenyi --

14    Q.   Okay.

15    A.   -- on September 15, 2009.

16    Q.   And we talked earlier -- you talked with Dr. Quinn to

17    deal with the anatomy lab issue and Dr. Knoop to deal with the

18    closed-captioning issue.  Is this addressing the note-taking

19    issue?

20    A.   Yes.

21    Q.   This is September 15th.  This is two weeks from when

22    Mr. Argenyi sent the September 1st e-mail.  What took you so

23    long to respond?

24    A.   Well, I mean, I -- I remember having discussions with our

25    legal counsel on this issue just because that last e-mail that
```

1   was sent was sent to his lawyer as well.

2        But, in addition to that, we were trying to make sure --

3   to find out how appropriately to address this.

4        We went back to our June 23rd letter, and I was surprised

5   by the fact that he wasn't taking advantage of these things.

6   And again wanted to remind him that just as we offered in the

7   June 23rd letter, once again we would offer you an individual

8   note-taker that you can select or we would select for you that

9   would take notes immediately and then have those copied and

10  given to you following a class.

11  Q.   Now, I'd like to direct your attention to Exhibit 206.

12       MR. MOORE:  If we could shut down the jurors'

13  monitors, this is not in evidence yet.

14       MS. BALUS:  May I approach, your Honor?

15       THE COURT:  Yes, you may.

16       MS. JACKSON:  Your Honor, we object to this evidence.

17       THE COURT:  Well, it hasn't been offered.

18       MS. JACKSON:  May we have a sidebar to discuss it?

19       THE COURT:  All right.

20     (Bench conference on the record.)

21       THE COURT:  I have in front of me Exhibit 206, a

22  letter from Amy Bones to Dianne DeLair dated September 21,

23  2009.

24       MS. JACKSON:  We have first foundational concerns

25  with this document.  Neither -- Amy Bones is not listed as a

1    witness, so she cannot attest to its contents.  And when we

2    asked to depose Ms. Bones, we -- the defense was not willing

3    to waive attorney-client privilege so we could ask her about

4    this document.

5         THE COURT:  Well, as I noted, the document hasn't

6    been offered yet.  And I can only assume that counsel for the

7    defense will attempt to lay foundation for the document.  I

8    don't know at this point in time what foundation will be laid.

9    I don't know at this point in time what the purpose of the

10   offer, if there is one, will be.

11        But I can anticipate that there would be some

12   circumstances under which the document would come in.  For

13   example, if this witness had -- well, perhaps I shouldn't say

14   anything more because it may look as if I'm coaching defense

15   counsel, and I don't want to do that.  So I'll just stop

16   there.

17        So, I appreciate your objection, but I would say it's

18   premature.  We need to wait until counsel for the defense

19   attempts to lay foundation and then attempts to offer the

20   exhibit.  And then if there's an objection, I may address

21   matters such as the purpose for which the document is being

22   offered.  And if necessary, I may give the jury a limiting

23   instruction.

24        But all of that is premature.

25        MS. JACKSON:  Okay.

1              (End of bench conference.)

2        BY MR. MOORE:

3        Q.   Dr. Kavan, again I'd like to direct your attention to

4        Exhibit 206.  Have you seen a copy of this document before?

5        A.   Yes, I have.

6        Q.   And was this provided to you at or about September 21st,

7        2009?

8        A.   Yes.

9        Q.   And this is a letter from Creighton's --

10             MS. JACKSON:  Objection, your Honor, he's -- he's

11       leading.

12             THE COURT:  All right.  Ask the witnesses what it is.

13       BY MR. MOORE:

14       Q.   What is this letter?

15       A.   It is a letter from our general counsel to Michael's

16       lawyer dated September 21st, 2009.

17       Q.   And referring back to the e-mail that you received from

18       Mr. Argenyi on September 1st, again what was your

19       understanding, if there were any questions regarding the

20       accommodation, who would the medical school need to contact?

21       A.   His lawyer.

22       Q.   And his lawyer...

23       A.   Dianne DeLair.

24       Q.   Okay.  And were you -- was it your understanding that

25       this document was provided in response to that e-mail?

1    A.   I think it was a response to a combination of things,

2    including that e-mail, and I think my understanding was that

3    our legal counsel had had a phone call with Michael's lawyer

4    as well.

5    Q.   And did this particular document impact whether you

6    believed you needed to contact Dr. Backous?

7    A.   I mean, I did not feel I needed to contact Dr. Backous.

8    Q.   And why not?

9    A.   Well, I mean, I think our general counsel had asked

10   specifically in the letter saying that if a conversation

11   rather than a letter will facilitate answers to these

12   questions, the staff from Disability Support Services and I

13   will be happy to call Dr. Backous with your permission.  That

14   was from our general counsel to Michael's lawyer.

15   Q.   And were you ever advised that Mr. Argenyi or his lawyer

16   ever responded to this letter?

17   A.   I had no information that they had responded to it.

18          MR. MOORE:  At this time, your Honor, we'd like to

19   offer Exhibit 206.

20          MS. JACKSON:  We object, your Honor.

21          THE COURT:  The objection is overruled.  Exhibit 206

22   is received.

23          MR. MOORE:  If we could publish this to the jury,

24   your Honor?

25          THE COURT:  You may.

```
 1              MR. MOORE:  Now, if we could go to the second page of
 2      the letter, the second to the last paragraph?  If you could --
 3      one more down.  There we go.
 4      BY MR. MOORE:
 5      Q.   Now, just to confirm, this was a portion of the letter
 6      from Creighton's general counsel to Dianne DeLair that you
 7      were referring to with regard to contact with Dr. Backous,
 8      correct?
 9      A.   Yeah, that is correct.
10      Q.   Okay.  And it's your understanding that they didn't
11      respond to this, correct?
12      A.   That was my understanding.
13      Q.   Okay.  Did you understand that somebody, in fact, did
14      contact Dr. Backous or attempted to?
15      A.   I do not know.
16      Q.   Okay.  I'd like to direct your attention to Exhibit 12.
17              MS. BALUS:  May I approach, your Honor?
18              THE COURT:  You may.
19      BY MR. MOORE:
20      Q.   Do you recognize that document?
21      A.   Yes, I do.
22      Q.   And what is that document?
23      A.   It is an e-mail from Michael Argenyi dated September 24th
24      to me and then copied to Wade Pearson, as well as to his
25      lawyer, Dianne DeLair, I'm assuming.
```

 1    Q.   Okay.  And what does he inform you in this letter --

 2    A.   It says --

 3    Q.   -- or this e-mail?

 4    A.    It says, "Dear Dr. Kavan, this is to notify you that I

 5    have arranged for the use of real-time captioning (CART) and

 6    interpreting to assist my full participation in the

 7    educational process.  These accommodations will start on

 8    Monday, September 28, '09."

 9         And he continues by saying that CART providers and

10    interpreters are professionals, trained in their field, and

11    adhere to a strict conduct -- code of conduct.  Should you

12    need any more information about the nature of their work, I am

13    sure the disability office can help you.

14    Q.   And this e-mail was sent on September 24th; is that

15    correct?

16    A.   That is correct.

17    Q.   And that's the same day that Mr. Argenyi filed this

18    lawsuit, correct?

19    A.   Yes.

20    Q.   I'd like to direct your attention to Exhibit 19.

21              MS. BALUS:  May I approach?

22              THE COURT:  Yes, you may.

23    BY MR. MOORE:

24    Q.   Do you recognize that document, sir?

25    A.   Yes, I do.

1    Q.   And what is that document?

2    A.   It's a September 28, 2009, letter, to whom it may

3    concern, and it is from Stacey Watson and Dr. Backous.

4    Q.   And you received this letter four days after Mr. Argenyi

5    filed this lawsuit against Creighton Medical School, correct?

6    A.   That is correct.

7    Q.   Okay.  And do you know what happened with this letter?

8    Did this go to the MEMT or your lawyers or who did it go to?

9    A.   It was my understanding that -- and my memory says it

10   went to the MEMT for their review.  And I think -- might have

11   even gotten it through our general counsel's office.  I think

12   it was sent to them first and then put forward to us.

13   Q.   Was there anything -- any information in this letter that

14   changed the MEMT's belief they were providing effective

15   communication through the accommodations they offered?

16   A.   No, there was not.

17   Q.   Why not?

18   A.   Well, I think it was basically providing us with mostly

19   the same information we had received in previous letters.

20   Q.   And again was -- there is -- they do refer to some

21   testing that was done in this second paragraph.

22   A.   Yes.

23   Q.   How did the MEMT address that?

24   A.   Well again, I think we looked at it, and this was

25   information that did not involve contextual cues or visual

 1    cues or anything like that.  So it was under testing

 2    circumstances, from what we could tell, so it was not

 3    consistent with that May 27th letter that we had from

 4    Dr. Backous.

 5    Q.   Now, Dr. Kavan, you taught classes that Michael Argenyi

 6    attended.

 7    A.   Yes, I did.

 8    Q.   Those were lectures.

 9    A.   Yes.

10    Q.   They were in the lecture hall.

11    A.   Yes, they were.

12    Q.   What did you observe with regard to his use of

13    accommodations?

14    A.   Well, I remember actually lecturing twice to him.  And

15    under those circumstances, we did -- or he had an interpreter

16    in the room.  He was seated up on the right-hand side of the

17    large lecture hall, probably, I don't know, 10, 12 rows up,

18    something like that.

19         And I was a little perturbed because he wasn't listening

20    to my lecture.  He was talking to a classmate next to him and

21    kind of joking, laughing.  And in my observations, I did not

22    feel he was paying any attention to the interpreter in the

23    front of the room.

24    Q.   Now, Dr. Kavan --

25              MR. MOORE:  Take that exhibit down.

1    BY MR. MOORE:

2    Q.   -- you indicated that you were part of the team that

3    monitored grades during that F1 -- excuse me, M1 year.

4    A.   Correct.

5    Q.   How were the grades kept?  In other words, how did they

6    get from a student taking a test to you?

7    A.   Well, what happens is a student takes the exam on a

8    computer.  All the exams are computerized.  And those are fed

9    into the grading system we have.

10         And then for the first year anyway, the curriculum

11   coordinator tabulates that, puts them into a spreadsheet,

12   prints them out.  And Dr. Knoop is typically the one that

13   brings it over to us for discussion.  He was the M1 component

14   director.

15         We sit down and look at it with Dr. Knoop, as well as

16   with an academic success consultant, just to look and see are

17   there any students struggling academically that we need to

18   intervene with.

19   Q.   Did you access Mr. Argenyi's grades for the M1 year?

20   A.   We accessed everybody's grades.

21   Q.   Did you personally access Mr. Argenyi's grades?

22   A.   Yes, to look at them, yes.

23   Q.   How did you look at them?

24   A.   Just by going through the list of each of the exams and

25   looking for his name and what grade he got for each

1    multidisciplinary quiz, as well as each exam.

2    Q.   And those grades are kept -- the grades that you accessed

3    are how they're normally kept in the regular course of the

4    school's operations.

5    A.   Yes, sir.

6    Q.   Were they altered by anyone?

7    A.   No.

8         MR. MOORE:   At this time, your Honor, we would like

9    to use the demonstrative exhibits that we've disclosed.

10        MS. JACKSON:   Objection, your Honor.

11        THE COURT:   All right.   Is this the demonstrative

12   that we had discussed earlier today outside the presence of

13   the jury?

14        MR. MOORE:   These go to Mr. Argenyi's grades.

15        THE COURT:   Okay.   The nature of the objection?

16        MS. JACKSON:   A violation of the rules of evidence.

17   They summarize content not in evidence.   There are significant

18   authenticity and foundation concerns with the evidence that

19   the demonstrative is based on.

20        THE COURT:   Overruled.   You may show the

21   demonstrative.

22        MS. JACKSON:   Your Honor, may I -- I renew my

23   objection.   There's information included on the demonstrative

24   that's not in the grades and not in evidence.

25        THE COURT:   Response, Mr. Moore?

1              MR. MOORE:  These are his grades.  And I could -- he

2      can testify to it, if you'd like to, before we put the

3      demonstratives up.

4              THE COURT:  Let's hear the further foundation then.

5              MR. MOORE:  Sure.

6      BY MR. MOORE:

7      Q.   Now, Dr. Kavan, as I understand, you accessed

8      Mr. Argenyi's anatomy MDQs.  What are MDQs?

9      A.   MDQs are multidisciplinary quizzes.  Every week or two a

10     student -- all of our students are asked to take a quiz which

11     in that multidisciplinary perspective they could include a

12     quiz that includes anatomy items, molecular and cell biology

13     items, ethic items.  So it's kind of multiple courses that are

14     included on this quiz.

15     Q.   Okay.  And in addition to MDQs in the M1 year, students

16     take written examinations; is that correct?

17     A.   They take examinations on that particular content.  Again

18     they're all computerized though.

19     Q.   I guess written these days means computerized.

20     A.   Yeah.

21     Q.   In anatomy, do they also take a practical exam?

22     A.   Yes.  They actually go down to the lab, a cadaver lab,

23     and different parts of the body are tagged and they go through

24     and they actually have to identify the different parts of the

25     body.

1    Q.   And did Mr. Argenyi take quizzes and examinations before

2    September 28th of 2009, the date on which he secured

3    interpreters and CART?

4    A.   Yes, he did.

5    Q.   And those would have been examinations he took during the

6    period of time he was using the accommodations offered by

7    Creighton, correct?

8    A.   That is correct.

9    Q.   Did he take examinations and quizzes after he started

10   using CART and interpreters during his M1 year?

11   A.   Yes, he did.

12   Q.   Okay.  And did you review -- in the manner that we talked

13   about, did you review the grades that Mr. Argenyi received on

14   those examinations and MDQs and practical exams?

15   A.   Yes, we did.

16   Q.   Do you remember the exact number he received on those or

17   would something help fresh your recollection?

18   A.   I can give you general information, but it would be nice

19   to have something to refer to in order to be accurate with it.

20   Q.   Okay.

21        MS. BALUS:  Your Honor, may I approach?

22        THE COURT:  Yes, you may.

23        MS. JACKSON:  Your Honor, there's information on

24   there that is different from the information in the actual

25   grades reports in evidence.

1          THE COURT:  We'll hear what counsel is showing to the

2     witness and we'll hear if it refreshes the witness's memory.

3     Counsel has not offered it into evidence so I have to see

4     where the questioning goes.

5          MR. MOORE:  Your Honor, may I have just a moment?

6          THE COURT:  You may.

7          MR. MOORE:  The grade reports they objected to and

8     they're not in evidence, so...

9          MS. BALUS:  Sorry, your Honor.  May I approach one

10    more time?

11         THE COURT:  You may.

12    BY MR. MOORE:

13    Q.   Now Dr. Kavan, I'd first like to ask you about the

14    portion of the MDQs that were anatomy for Mr. Argenyi during

15    his first semester -- for his M1 year.  Did he take an

16    examination -- an MDQ on August 28, 2009?

17    A.   Yes, he did take a multidisciplinary quiz on that day.

18    Q.   What score did he get?

19    A.   77.78, if it's rounded.

20    Q.   And when was the next time he took an MDQ that had an

21    anatomy component?

22    A.   That would be September 11th of 2009.

23    Q.   What was his score?

24    A.   69.56.

25    Q.   And did he take MDQs that had anatomy portions after

1    September 28th when he secured CART and interpreters?

2    A.   Yes, he did.

3    Q.   When was the first one that he took after that date?

4    A.   That would be October 9th, 2009.

5    Q.   What was his score there?

6         THE COURT:  Mr. Moore, I'm going to stop you at this

7    juncture for a couple of reasons.  First, is this document

8    that the witness is referring to marked for purposes of

9    identification?

10        MR. MOORE:  It is not, your Honor.  The purpose of it

11   was just to be a demonstrative exhibit and help refresh

12   recollection.

13        THE COURT:  At this junction he appears to be

14   testifying from the exhibit that is not in evidence and is not

15   marked for purposes of identification.

16      So I would ask first that it be marked for purposes of

17   identification.  And then if it refreshes the witness's

18   recollection, he may testify; but I don't want him testifying

19   from a document that is not in evidence.

20        MR. MOORE:  Okay.  We'll go ahead and mark this at

21   this point as Exhibit 220, which would be the next consecutive

22   number.

23        MS. BALUS:  May I approach?

24        THE COURT:  You may.

25   BY MR. MOORE:

1    Q.   Now, the document has just been marked Exhibit 220.

2    There's two pages to that.  Does that document help refresh

3    your recollection as to the examinations that Mr. Argenyi took

4    and the grades he received?

5    A.   Yes, it does.

6    Q.   Would that help your recollection to provide information

7    to the jury on that subject?

8    A.   Yes, it would.

9    Q.   Now, as we said, he did take some examinations after

10   September 28th of 2009, correct?

11   A.   That is correct.

12   Q.   And did he have an anatomy MDQ after that date?

13   A.   Yes, he did.

14   Q.   And on what date?

15   A.   On October 9, 2009.

16   Q.   And what was his score?

17   A.   62.069.

18   Q.   Okay.  And then did he have any others that first

19   semester of anatomy?

20   A.   Yes.  He had an MDQ on November 6, 2009, and he had a

21   score of 66.667.

22   Q.   Okay.  And did he also have written exams in anatomy?

23   A.   Yes.  There were three written exams that fall semester.

24   Q.   And when was the first exam?

25   A.   September 21st, 2009.

1    Q.   And what was his score on that anatomy exam?

2    A.   He had an 88.

3    Q.   And did he have any written exams after September 28th

4    when he brought in his own CART and interpreters?

5    A.   Yes, he did.  He had two exams listed.

6    Q.   And when was the first exam?

7    A.   October 16th, 2009.

8    Q.   And what did he score on that?

9    A.   78.46.

10   Q.   And you said he had one more?

11   A.   Yeah.  On December 7th, 2009, and he had an 85.07.

12   Q.   Okay.  And did Mr. Argenyi have anatomy practical exams

13   during that semester?

14   A.   Yes, he did.

15   Q.   When was the first?

16   A.   That would be September 21st.

17   Q.   And what was his score?

18   A.   88.73.

19        MS. JACKSON:  Your Honor, he's testifying from the

20   document.

21        THE COURT:  It would appear that way.

22   Mr. Moore, it would not appear this document has actually

23   refreshed his memory.  It would appear he is testifying from

24   the document itself.

25        MR. MOORE:  Well, your Honor, it is refreshing his

1    recollection.  We're talking about scores that are very -- and

2    dates that are very difficult to remember.  He's testified

3    that he accessed the grades, that he was involved in getting

4    the grades, how he got the grades, it was established that

5    way.  These are very difficult numbers to remember.  No one

6    can be expected to remember all the minute numbers or points.

7    This is refreshing his recollection, your Honor.

8              THE COURT:  I would agree nobody could be expected to

9    remember those figures and those dates, and so the document

10   isn't really refreshing his memory, he's testifying from the

11   document.

12        Creighton obviously has these records and some record

13   keeper may be able to produce them, but this witness isn't the

14   one --

15             MR. MOORE:  May I have a moment, your Honor?

16             THE COURT:  You may.

17        (Off-the-record discussion had.)

18             MR. MOORE:  We had Exhibit 205 marked, and we

19   attempted to offer that.  I'm not sure where that is at this

20   point.  Do we have -- no, the exhibit --

21             THE COURT:  Well, as I recall, you questioned the

22   plaintiff about Exhibit 205, and he declined to identify that

23   or could not identify that as the grade reports that he

24   received from Creighton.

25             MR. MOORE:  Okay.

```
 1                  THE COURT:  So it didn't come in.

 2                  MR. MOORE:  What I'm asking for is if this original

 3       exhibit is somewhere around here.

 4                  COURTROOM DEPUTY:  I don't have anything that's not

 5       received.

 6                  MR. MOORE:  We'll go ahead and re-mark, that's fine.

 7                  MS. BALUS:  May I approach, your Honor?

 8                  THE COURT:  You may.

 9       BY MR. MOORE:

10       Q.   Dr. Kavan, do you recognize Exhibit 205?

11       A.   Yes, I do.

12       Q.   And what is it?

13       A.   These are the grades for Michael Argenyi in the first

14       year of medical school.

15       Q.   Okay.  And are these grades -- let me back up.

16            How was this document generated?  Where did it come from?

17       A.   It would have come from our database which collects

18       grades for the students.

19       Q.   Okay.  And how is that -- who has access to that

20       database?

21       A.   Usually personnel within the Office of Medical Education;

22       Dr. Knoop as the M1 component director as well as the M1

23       curriculum coordinator, they would share those with us as

24       appropriate.

25       Q.   And in accessing those grades, do you go to the computer?
```

1    A.   Yes, we do.

2    Q.   And what do you do?

3    A.   Just download the grades.

4    Q.   Okay.  And does it come out in a report as evidenced by

5    Exhibit 205?

6    A.   Yeah, it can.  That's one version, yes.

7    Q.   And this is a version that you accessed, correct?

8    A.   Yes.

9    Q.   And that -- this is an accurate representation of

10   Mr. Argenyi's grades during his M1 year.

11   A.   Yes, it is.

12        MR. MOORE:  At this time, your Honor, I'd like to

13   offer Exhibit 205.

14        MS. JACKSON:  Objection.  Sidebar?

15        THE COURT:  All right.

16   (Bench conference on the record.)

17        MS. JACKSON:  Your Honor, for starters, some of the

18   pages are visibly altered.

19        MR. MOORE:  That's not -- may I interrupt?  That

20   first page you pointed to is not in the exhibit.

21        MS. JACKSON:  There's also testimony that there are

22   multiple and different versions of grades which suggests

23   perhaps there are different grades out there, so we can't be

24   sure that these are the grades.

25        MS. VARGAS:  May I, your Honor?

1                THE COURT:  You may.

2                MS. VARGAS:  May we show you the three reports that

3       are in question?

4                THE COURT:  Yes.

5                MS. VARGAS:  Dr. Kavan has testified that they just

6       generate the grades -- the version of grades -- whatever

7       alternate version of the grades, so there's no routine method

8       of keeping the grades.  This is one, it's just computer-

9       generated and now that's a different form.

10           And then this one has comments which have been cut out.

11      So just choosing some from among these when we know there are

12      multiple versions of these grades and now being offered into

13      evidence raises serious concerns.

14               THE COURT:  What I'm actually interested in hearing

15      at this sidebar is how this document overcomes a hearsay

16      objection.  And I am wondering how it comes in under a

17      business record exception to the hearsay rule.  And I want to

18      hear about how the elements of the business record exception

19      have been met.

20           So that's what I'm interested in.  If you don't want to

21      talk about that, it's up to you.  But you can talk to me about

22      that issue if you want to.

23               MR. MOORE:  Do they have to make an objection first,

24      your Honor?

25               MS. JACKSON:  Objection, hearsay.

1            THE COURT:  Business record exception?  Tell me.

2            MR. MOORE:  They're kept in the ordinary course of

3    business.  I've established that.  The grades are entered into

4    a computer system that is only accessed by the staff and

5    personnel.  This is how they keep the grades.  This is how

6    they access the grades.

7        And he accessed those from the same computer system in

8    which these grades are regularly kept.  He printed those off.

9    He said these are reliable, these are the grades, and that is

10   the system he follows.

11           THE COURT:  Now I want to hear from plaintiff's

12   counsel what elements of that business record exception have

13   not been met here, and then I'll rule on your objection.

14           MS. VARGAS:  First of all, we're not hearing from the

15   person responsible for maintaining these documents.

16           THE COURT:  Bingo.  Sustained.

17           MR. MOORE:  One more issue.  I notice Stacey Watson

18   is in the courtroom.  If you intend to call her again, she

19   must be sequestered.

20           MS. JACKSON:  We don't.

21           MR. MOORE:  Okay.  Thank you.

22        (End of bench conference.)

23           THE COURT:  You may proceed.

24   BY MR. MOORE:

25   Q.   Now, Dr. Kavan, you are familiar with Mr. Argenyi's

1    grades for his molecular and cell biology classes and other

2    classes.

3    A.   Yes, that's correct.

4    Q.   Did you identify anything in those grades that affect

5    your conclusion, or the MEMT's conclusion, that you were not

6    provided effective conclusion?

7    A.   No.  I think we --

8    Q.   Why?

9    A.   Like, he was doing well throughout the curriculum, and

10   that was equally -- for the most part equally well before he

11   put his own accommodations in place versus ours.

12        So, he did a little better in the one, a little worse in

13   the others.  For the most part, he was doing very well with

14   the accommodations we gave him as based upon the grades, and

15   he was never at risk, in our mind, for intervention or for

16   failure.

17   Q.   Based upon your review of the grades before he got

18   interpreters and CART, was he on the verge of failing?

19   A.   Never.

20   Q.   And an 88 percent, how does that measure up?  I mean, I'm

21   not sure -- if you could explain to the jury what an 88

22   percent means, a hundred percent, 65, what does that mean?

23   A.   Well, in medical school we have a pass/honors system is

24   what we call it.  You can get honors grade, you can get

25   satisfactory grades or failure grades.

1          And, you know, we try to keep it at about 10 percent of

2     our students, 12 percent of our students getting honors out of

3     each class.  So 88 would be what we would call either near

4     honors or honors, depending on how that class kind of -- their

5     grades ranked out.  So 88 is doing very well.

6     Q.   So, as we sit here today, are you still confident that

7     the accommodations and auxiliary aids offered by the MEMT for

8     Mr. Argenyi's first year of medical school provided him

9     effective communication?

10    A.   Yes, I am.

11    Q.   Now, let's take into consideration Dr. Thedinger's

12    letter.

13    A.   Okay.

14    Q.   When did the medical school receive Dr. Thedinger's

15    letter?

16    A.   I believe that was in June of 2010.

17    Q.   Okay.  And was he still -- was Mr. Argenyi still in his

18    first year of medical school?

19    A.   No, he was done with his first year.

20    Q.   Okay.  And I know the -- did the MEMT consider that

21    letter for his second year of medical school?

22    A.   Absolutely.

23    Q.   Would the MEMT have considered Dr. Thedinger's letter had

24    it come in during his M1 year?

25    A.   Yes, we would have.

1   Q.   Would that may have changed your conclusion with regard

2   to whether what you were providing at that time was effective

3   communication?

4   A.   Well, my belief is since it did change the accommodations

5   we offered him in the second year, if that letter would have

6   come to us earlier in the year in the first year, whenever, we

7   would have taken it into the committee or the MEMT --

8            MS. JACKSON:   Objection.  He's speculating, your

9   Honor.

10            THE COURT:   Sustained.

11            MR. MOORE:   Okay.

12   BY MR. MOORE:

13   Q.   You were on the MEMT before his M2 year, right?

14   A.   Yes.

15   Q.   Did the MEMT take into consideration Dr. Thedinger's

16   letter?

17   A.   Yes, we did.

18   Q.   Did you make any accommodation changes based on that?

19   A.   Yes.

20   Q.   What accommodation changes did you make?

21   A.   We provided Michael with an interpreter.

22   Q.   Okay.  And in all settings or in what settings?

23   A.   We provided it in the classroom setting.

24   Q.   Okay.  And are you aware -- did you ever receive -- or

25   did the MEMT ever receive any communication from any third

 1    party that an oral interpreter was ineffective in the lecture

 2    setting?

 3    A.    No.

 4    Q.    Based on the information you had at the time you made the

 5    decision with regard to M1, at that point were you confident

 6    that you were providing effective communication?

 7    A.    Yes, we were.

 8              MR. MOORE:  I have nothing further, your Honor.

 9              THE COURT:  Cross-examination?

10              MS. JACKSON:  Yes, your Honor.

11                          CROSS-EXAMINATION

12    BY MS. JACKSON:

13    Q.    So, without hashing through all the exhibits again --

14    good afternoon, Dr. Kavan.

15    A.    Good afternoon.

16    Q.    Thank you.  Nice to see you again.

17    A.    Ditto -- kind of.

18    Q.    Without rehashing every detail of every letter, I want to

19    review.  You testified that the MEMT committee, prior to the

20    start of Mr. Argenyi's first year of law [*sic*] school,

21    reviewed in entirety the May letter he sent.  I believe it's

22    marked as Exhibit 5.

23    A.    The May 27th letter.

24    Q.    The May 26 -- I'm speaking specifically the May 26th

25    letter from Mr. Argenyi.  Perhaps that's Exhibit 4.

KAVAN - CROSS                                                    787

1    A.   Yes, we did.

2    Q.   And in that letter, were you aware that it mentioned that

3    he did not -- that he did use CART and interpreters in every

4    other college and university that he had attended?

5    A.   Yes, I do remember that.

6    Q.   And do you recall the May 27th letter from his medical

7    professional telling -- listing among the accommodations CART

8    and interpreters?

9    A.   Yes, I do.

10   Q.   You testified earlier that in making the determination

11   about CART, you looked at the cost in deciding what

12   accommodations to offer; is that correct?

13   A.   Eventually we did, yes.

14   Q.   Eventually.  So did you consider it at that meeting?

15   A.   Which meeting?

16   Q.   At the June meeting, before you made the offer.

17   A.   You know, I'm sure it came up.  I don't specifically

18   remember though.

19   Q.   But didn't you testify earlier today that you did look at

20   cost during that meeting prior to writing the June 23rd

21   letter?

22   A.   I mean, I think I -- well, we had the letter from Alice

23   Smith indicating what the cost was.  So, like I said, I think

24   that was used as part of the determining factor.  So I think

25   that we reviewed it in terms of providing the accommodations,

 1    right.

 2    Q.   So you were aware -- so is it your testimony you were

 3    aware of the costs?

 4    A.   Yes.

 5    Q.   Do you recall having your deposition taken?

 6    A.   Yes.

 7    Q.   And you took an oath to tell the truth.

 8    A.   Yes, I did.

 9    Q.   And you were represented by counsel.

10    A.   Yes.

11    Q.   Please read the highlighted portion.

12         MR. MOORE:  Can I have a page and line, please?

13         MS. JACKSON:  I'm sorry.  We're showing the witness

14    page 54 of his deposition, his 30(b)(6) deposition, line 6

15    through 13.

16    A.   And just read that?

17    BY MS. JACKSON:

18    Q.   Yes.

19    A.   Question:  Was there a discussion of the cost of CART

20    prior to the June 23rd decision?

21         Answer:  I don't know if there was specifically a

22    conversation about it.  I'm sure it might have been brought

23    up.  We were unaware of what the cost would be associated with

24    CART.  But I'm not sure if a specific, you know, discussion

25    centered on what the cost of CART would be under these

1    circumstances.

2    BY MS. JACKSON:

3    Q.   So at the time the deposition was taken, you were

4    unaware; today, after sitting through three days of testimony,

5    you were aware.  Is that your testimony?

6    A.   Since the time of the deposition, I was made aware of

7    that May 6th letter -- or that e-mail from Alice Smith that

8    indicated that there -- that she had looked up the cost of

9    CART.

10   Q.   So you did not know of the cost of CART during the

11   June 23rd meeting.

12   A.   No.  I'm saying at the deposition I was unaware of all

13   the circumstances because it was four years ago.

14   Q.   Moving ahead to the August 12th meeting prior to the

15   start of school, at that meeting were you aware that

16   Mr. Argenyi was about to pay $45,000 in tuition alone to

17   attend your institution?

18   A.   I would be aware of that, yes.

19   Q.   And you do remember that your legal counsel, Ms. Bones,

20   stated to Mr. Argenyi, "We are not sure that you're qualified

21   to be a medical student here."  You do remember that

22   statement, don't you?

23   A.   I don't remember specifically that statement, I'm sorry.

24   Q.   Do you remember her saying anything to that effect?

25   A.   I don't.

 1    Q.   So you -- okay.

 2         And after that meeting -- several weeks after that

 3    meeting, you received an e-mail from Mr. Argenyi, correct?

 4    A.   Could you be more specific, please?

 5    Q.   Yes.  I'm referring to Exhibit 9, the September 1st

 6    e-mail from Mr. Argenyi.

 7    A.   Okay.  Yes.

 8    Q.   So this was given to you -- sorry.  So do you see where

 9    Mr. Argenyi is saying that with the FM system in place, as we

10    discussed in your earlier testimony, the FM system was among

11    the accommodations you were offering, correct?

12    A.   Are you referring to he's saying that in this?

13    Q.   He said "the accommodations --

14    A.   Yeah, he was saying --

15    Q.   -- provided."

16    A.   -- "At this time I need to inform you that the

17    accommodations being provided are inadequate."  Yes, I do see

18    that.

19    Q.   Okay.  So the accommodations -- we went over this morning

20    the accommodations are the FM system, among others.

21    A.   That is correct.

22    Q.   And he's saying -- so he's sitting in a special seat and

23    he's saying that he's still missing a decent chunk of

24    information and entire class discussions, correct?

25    A.   He is saying, "I'm missing on average a decent chunk of

1    the lectures."

2    Q.   And...

3    A.   He goes on to say, "Even when I'm able to follow the

4    lectures, the intensity of listening to the lecture causes

5    fatigue."

6         He continues to say, "where I'm unable to function

7    properly for the rest of the day."

8    Q.   And we discussed this morning that you do not consider

9    missing decent chunks of lectures and entire class discussions

10   to be effective communication during a lecture, correct?

11   A.   Yeah.  And I -- I apologize, but I'm not sure where he

12   says, "I'm missing complete class discussions."  Is that in

13   the letter or -- I apologize.

14   Q.   He said in the last sentence of the second paragraph, "I

15   am also unable to follow conversations effectively any time

16   classmates ask questions or there is a full class discussion."

17   A.   Yeah, I do see that.  Yes.

18   Q.   So he's unable to follow those conversations, correct?

19   A.   Yeah, that is what he is saying.

20   Q.   Okay.  And this was how many weeks into the school year?

21   A.   Well, this would have been -- I mean, the school year

22   started August 17, so probably two weeks into the school year.

23   Q.   At least two weeks he'd been sitting there missing chunks

24   of information, not following conversations; is that correct?

25              MR. MOORE:  Objection, form of the question,

1    misrepresents testimony and evidence.

2            THE COURT:  It's cross-examination.  He may answer,

3    if he can.

4    A.   Would you repeat the question, please?

5    BY MS. JACKSON:

6    Q.   So several weeks into the school year, he informed you

7    that he was missing decent chunks of the lectures and he's not

8    following class discussions.

9    A.   Yes, that's what his e-mail says.

10   Q.   And you also testified that the MEMT considered this

11   e-mail and it did not change their minds.

12   A.   Not about the accommodations, but we did address the

13   concerns within the e-mail.

14   Q.   Okay.  So did you address the considerations within the

15   e-mail by giving him a visual cue that he could use during the

16   lectures?

17   A.   During the classroom lectures?

18   Q.   Yes.  Other than having a special seat, did you give him

19   access to a visual cue during the lectures?

20   A.   Well, it was the MEMT's thought that the visual cues

21   would come from the professor giving the lecture in the terms

22   of lip-reading as well as context, facial expressions, those

23   types of things.

24   Q.   And this is his testimony -- this is his statement to you

25   that even with those visual cues, he was not understanding;

1    isn't that correct?

2    A.   He's saying he's missing an average of a decent chunk of

3    the lectures.

4             MS. JACKSON:  May I approach, your Honor?

5             THE COURT:  You may.

6    BY MS. JACKSON:

7    Q.   This is a document that's already been received into

8    evidence.  Can you tell me what this looks like?

9             THE COURT:  Identify the exhibit, please.

10            MS. JACKSON:  My apologies, your Honor.  It's Exhibit

11   29.

12            THE COURT:  Thank you.

13            MS. JACKSON:  It's a section of Exhibit 29.

14   BY MS. JACKSON:

15   Q.   The first page of the exhibit has been redacted.

16   A.   Yeah.

17            THE COURT:  Just a moment.  You said Exhibit 29?

18            MS. JACKSON:  Yes.  This is towards the end of the

19   exhibit.

20            THE COURT:  My notes don't indicate that it's in

21   evidence.  Ms. Frahm, is Exhibit 29 in evidence?

22            COURTROOM DEPUTY:  I have 29A in evidence, not 29.

23   And 29A says it's a redacted...

24            THE COURT:  All right.  Thank you.

25   BY MS. JACKSON:

1  Q.  Do these appear to you to be slides used during medical

2  school lecture?

3  A.  Yes, but I can't confirm that one way or the other.

4  Q.  Okay.  Can you please read the highlighted portion on the

5  first slide?

6          MR. MOORE:  Objection, foundation.

7          MS. JACKSON:  The exhibits are in evidence.

8          THE COURT:  It's an exhibit already in evidence.

9          MR. MOORE:  He doesn't have foundation to testify to

10  a document he's never seen.

11          THE COURT:  I don't think he's testifying from it.

12  She's asking him to read a passage from a document that's

13  already in evidence.

14          MR. MOORE:  I still believe that's a foundational

15  objection, and I'll maintain my objection.

16          THE COURT:  Overruled.  I'll allow him to read.

17  A.  You said the highlighted section on slide 1?

18  BY MS. JACKSON:

19  Q.  Correct.

20  A.  On mine, I apologize, but there is nothing highlighted.

21  Q.  The second slide.

22  A.  The second slide?  Okay.  So the yellow highlight then?

23  Q.  Yes.

24  A.  "Converted by hepatic alcohol dehydrogenase into glycolic

25  acid and oxalic acid producing severe acidosis."

1    Q.   In your opinion, is that the kind of information that's

2    shared in a medical school lecture?

3    A.   I would think -- I have no reason not to think so.

4    Q.   So, when Mr. Argenyi testified to missing decent chunks

5    of lectures, he's missing things like this, correct?

6              MR. MOORE:   Objection, foundation.

7              THE COURT:   Overruled.  He may answer.

8    A.   I have no idea what he's missing based upon this.

9    BY MS. JACKSON:

10   Q.   And would you consider the passage you just read to be an

11   everyday phrase?

12   A.   Everyday to whom?

13   Q.   That's a very good question.

14   A.   I apologize.  I'm not understanding your question.

15   Q.   Okay.  To give you some context, we have -- in Exhibit

16   18, you received a letter from -- which we've discussed.

17   There was a letter you received from Dr. Backous and Stacey

18   Watson.

19   A.   I did find it up here.

20   Q.   And if you go to the top of the second page, and the

21   second paragraph, do you see where the first sentence says,

22   "It is imperative that Michael have access to visual cues for

23   everyday communication and education."

24   A.   Yes, I do.

25   Q.   So for fun, let's go to the second page of the slides

1    that you have.  Would you please read the highlighted portion

2    on this second page?

3    A.   "Korsakoff's psychosis, bilateral neuronal loss and

4    gliosis of dorsomedial thalamus and mammillary bodies."

5    Q.   And would you consider that to be everyday communication?

6    A.   Not for someone who is not a medical student.

7    Q.   Okay.  So you understand the letter we just spoke of to

8    reflect test results that were before Mr. Argenyi was a

9    medical student, correct?

10   A.   That is correct.

11   Q.   And so that was before this kind of a phrase was an

12   everyday communication for him, correct?

13   A.   I don't know because I don't know his background in

14   regards to whether he's taken courses in neurology or not.

15   Q.   Fair enough.

16        Speaking of not knowing whether he's taken courses, are

17   there prerequisites to medical school?

18   A.   Yes, there are.

19   Q.   What are they?

20   A.   I'm kind of going a little off the cuff here, but we have

21   eight hours of English, eight hours of physics, eight hours of

22   chemistry, eight hours of biology, and -- ba, ba, ba, ba, I

23   think that's the major ones.

24   Q.   When you say eight hours, what do you mean by eight

25   hours?

1    A.    Eight credit hours.

2    Q.    What is usually the credit hours, how many courses would

3    a student have to take?

4    A.    Typically it's about two, along with lab.  Some of them

5    will have labs with them as well.

6    Q.    So two courses plus lab in chemistry and two courses plus

7    lab in biology?

8    A.    Yes, I think so.

9    Q.    Is it common for students to have taken additional

10   science courses before medical school?

11   A.    Yes, it is.

12   Q.    So, when students arrive at medical school, and they're

13   taking things like biochemistry, multicellular biology, would

14   they be learning all of the information for the first time?

15   A.    There's -- obviously the prerequisites that they need to

16   do, some of the information they've known before, but it's a

17   foundation for learning new information.

18   Q.    So when Mr. Argenyi was listening to information that he

19   likely had known before and was forming a foundation for new

20   information, he was still telling you he was missing decent

21   chunks of lectures; isn't that correct?

22   A.    I mean, he's telling us that he is missing decent chunks

23   in lectures, yes, that is correct.

24   Q.    And not following class discussions, correct?

25   A.    That's what he said in his e-mail.

1    Q.    And if you'd read from the third page?

2    A.    Of...

3    Q.    Of the lecture slides.

4    A.    The slides?  The highlighted section on that slide?

5    Q.    Yes, please.

6    A.    "Alcoholic cerebellar degeneration, truncal and gait

7    ataxia, shrinkage of superior rostral vermis and adjacent

8    anterior lobe."

9    Q.    And when you said you believed with visual cues he could

10   understand it better, visual cues like seeing the professor's

11   mouth?

12   A.    Visual cues and looking at the slides beforehand and

13   reviewing the material and reading the material before so he

14   knows what the words would be coming up.

15   Q.    You were expecting that simply by reading the notes

16   beforehand, he could lip-read that from a professor?

17   A.    No, but that, in combination with the slides that are up

18   on the projector.

19   Q.    So he could look at the professor's mouth and up at the

20   slide at the same time and lip-read a statement like that.

21   A.    We had him situated in a seat as demonstrated earlier

22   where he would be in line of sight of the professor and the

23   slide.

24   Q.    So he could look at the professor's mouth and lip-read

25   that and look at the PowerPoint and lip-read that at the same

1    time?

2    A.   Yes.

3    Q.   And you didn't -- so earlier you testified regarding

4    CART, that one of the reasons you didn't offer it is because

5    you were concerned about his learning being inhibited if he

6    had to look at a screen and PowerPoint at the same time.  Does

7    that accurately reflect your testimony?

8    A.   Yes, it does.

9    Q.   So if it would inhibit his learning to look at a screen

10   that's writing out this information, is it your testimony that

11   it would not inhibit his learning to have to catch these words

12   as they flew from a professor's mouth?

13   A.   I think the Medical Education Management Team thought if

14   Michael was seated in the proper location, looking at the

15   professor and then looking up at the screen line of sight,

16   that that would be better than him trying to look at the

17   screen in the auditorium, plus look off to the side or this

18   side at the CART system.

19   Q.   And you were aware that he had been using CART since at

20   least college, if not before, correct?

21   A.   Yes.

22   Q.   And you were aware that he had been, according to his

23   statement, using CART and that he had taken science classes

24   before, correct?

25   A.   Yes.

1    Q.    So you -- did it occur to you that perhaps he knew how to

2    arrange that himself?

3    A.    It was hard to assume in that sense but as --

4    Q.    But at 22 years old, he wouldn't know where to place

5    himself in a classroom?

6              MR. MOORE:  I'd ask he be able to finish the answer.

7              THE COURT:  Yes, finish the answer.

8    A.    It's hard to assume what he would know or not.  But I

9    think that what we were thinking is that under these

10   circumstances, that that would actually inhibit his learning

11   because he would, one, not know exactly what the medical

12   school curriculum would entail.  He's not used to it.  He's

13   asking for that accommodation ahead of time without knowing

14   what he really needs under those circumstances.

15       And the Medical Education Management Team, with faculty

16   who have been through the curriculum over and over again, had

17   a better feel for what would be important for Michael to look

18   at during the lectures and such, because it's very visual.

19   BY MS. JACKSON:

20   Q.    So your testimony is that prior to starting medical

21   school, you didn't think he would know what he would need in

22   medical school.

23   A.    No, I'm not saying that.  I'm saying Michael would not

24   necessarily know what he needed in medical school.

25   Q.    So prior to Michael starting medical school, Michael

1    wouldn't know what he needed during medical school.

2    A.    Yes.

3    Q.    And you were surprised when he said that the FM system

4    wasn't working.

5    A.    Yes.

6    Q.    So prior -- and you were surprised because prior to

7    medical school he had agreed to do try it when he didn't --

8    according to your testimony, he did not know what medical

9    school would be like, he did not know what he would need.

10   A.    But we had a recommendation from his physician indicating

11   that the FM system would be an effective way for him to

12   communicate and receive communication in medical school.

13   Q.    And did that letter include any other ways that he would

14   receive effective communication?

15   A.    Yeah.  That letter specifically talked about closed-

16   captioning.

17   Q.    And what else?

18   A.    That was it on the April 10th letter.

19   Q.    Closed-captioning.  And on the May 27th letter?

20   A.    It also mentioned real-time captioning, as well as

21   possible oral interpreter.

22   Q.    So, his doctors had told you prior to medical school that

23   captioning and interpreters would be appropriate, correct?

24   A.    Could you repeat the question?  Sorry.

25   Q.    His doctors had written a letter to you prior to starting

1    medical school that captioning and interpreters would be

2    appropriate, correct?

3    A.    That was their opinion, yes.

4    Q.    But you believed they would not because they would

5    inhibit his learning, correct?

6    A.    It was our belief that the FM system would be an

7    effective way for him to gain communication in the medical

8    school setting.

9    Q.    Now, looking at Exhibit 19 -- actually, let's not dig out

10   a new exhibit, let's stick with Exhibit 18.

11        You see the second page of Exhibit 18, the second

12   paragraph we talked about already.  It says, "It is imperative

13   that Michael have access to visual cues for everyday

14   communication and education.  Visual cues include, but are not

15   limited to, closed-captioning on videos and films, real-time

16   captioning for lectures and discussions, and speechreading

17   cues for one-on-one interactions."  Correct?

18   A.    Yes, I see that.

19   Q.    And when you got this letter from Michael's physician,

20   you didn't conclude that an FM system would be ineffective?

21   A.    No.  It doesn't say anything in here about FM system

22   being ineffective.

23   Q.    It just says that visual cues are imperative, correct?

24   A.    That's part of that sentence, yes.

25   Q.    And is an FM system a visual cue?

1    A.   An FM system in and of itself is not a visual cue, but --

2    Q.   Does it create any visual information?

3         MR. MOORE:  May he answer the question?

4         THE COURT:  We have to make sure we never have two

5    people talking at once, or the court reporter can't make a

6    record.  And we need to let the witness fully answer the

7    question.

8         If a witness starts to get narrative, then you can object

9    and bring that to my attention.

10        So, you may finish your answer.

11   A.   Thank you.

12        But we also offered him that front seat next to the

13   person who was lecturing so he could take advantage of visual

14   cues.

15   BY MS. JACKSON:

16   Q.   So he could look at the professor's lips.

17        Can we go back to lecture 66?

18        MR. MOORE:  I object, she was testifying there, that

19   wasn't a question.

20        THE COURT:  The jury will disregard the comment by

21   counsel.  We'll proceed to the next question.

22   BY MS. JACKSON:

23   Q.   So, for lecture 66, do you see the page that at the

24   bottom is marked page 8?

25        MR. MOORE:  I'm sorry, to what exhibit are we

1    referring?

2              MS. JACKSON:  29A.

3    BY MS. JACKSON:

4    Q.   Can you read the highlighted portion of that page?

5    A.   Yes.  "Metachromatic leukodystrophy, cavitated white

6    matter, sparing of U fibers, loss of oligodendrocytes and

7    Schwann cells and myelin, granular masses of accumulated

8    sulfatide in macrophages."

9    Q.   It's your testimony that he could sit close enough to the

10   professor to lip-read that.

11   A.   In combination with the PowerPoints that are on the

12   screen, as well as him having the PowerPoints ahead of him.

13   Q.   Even though real-time captioning is imperative to his

14   understanding?

15             MR. MOORE:  Objection, form of the question, assumes

16   evidence not in the record and testimony.

17             THE COURT:  The form of the question is

18   objectionable.  Sustained.  Please rephrase.

19   BY MS. JACKSON:

20   Q.   So, referring back to Exhibit 18, the second paragraph on

21   the second page, where it says that it is imperative that

22   Michael see visual cues for everyday communication and that

23   visual cues include real time -- closed-captioning on videos

24   and films, real-time captioning for lectures and discussions

25   and speechreading cues for one-on-one.

```
 1            And one-on-one is not a lecture, correct?

 2       A.   That is correct.

 3       Q.   And this -- for lectures, it specifically references this

 4       real-time captioning, correct?

 5       A.   Yes.

 6       Q.   And does it say that an interpreter is a visual cue?

 7       A.   Where are you referring to?

 8       Q.   I'm referring to the sentence starting "visual cues

 9       include"?

10       A.   Yes.

11       Q.   So does it say that?

12       A.   And it says, "speech reading cues for one-on-one

13       interactions".

14       Q.   So it's a one-on-one, an interpreter is a visual cue.

15       A.   You know, it doesn't say interpreter.

16       Q.   Okay.  So --

17            MS. JACKSON:  May I have a moment, your Honor?

18            THE COURT:  You may.

19       BY MS. JACKSON:

20       Q.   You testified earlier that you did not believe that this

21       lettered shed new information, correct?

22       A.   Which letter?

23       Q.   The letter -- Exhibit 18.

24       A.   Yeah.  For the most part, that was the same information

25       we had previously.
```

1    Q.    So when it said it was imperative that Michael had visual

2    cues, that was the same information you had previously.

3    A.    I think there are references in other letters that it is

4    important for him to have some type of visual cues, such as

5    lip-reading or context, that type of things.

6    Q.    But this letter says captioning -- it says captioning for

7    lectures and discussions, and your testimony is that was not

8    new information.

9    A.    No.  The April 10th letter from Dr. Backous said he would

10   need closed-captioning.

11   Q.    And the May 27 said real-time captioning is appropriate.

12   A.    That was one of the recommendations.

13   Q.    So you already had real-time captioning recommended,

14   correct?

15   A.    By Dr. Backous in the May 27th letter.

16   Q.    And then here it's saying that real-time captioning is

17   imperative, correct?  Is that a fair way to characterize the

18   two sentences?

19   A.    That is one of the things Dr. Backous mentions.

20   Q.    You did not consider that new information, correct?

21   A.    We considered it, but we did not feel we should take

22   action on it at that time.

23   Q.    So your testimony is that you decided not to take action

24   on a letter saying that it is imperative for Michael to have

25   visual cues, like real-time captioning for lectures and

1    discussions; is that your testimony?

2    A.   To clarify, my testimony is that he had visual cues in

3    the lecture hall.  We did not provide real-time captioning in

4    the lecture hall or the classroom.

5    Q.   Okay.  So the visual cues were -- we're beating a dead

6    horse.  I will withdraw that question.

7         Let's look at -- returning to Exhibit 18, looking at the

8    bottom of the page, you see the last paragraph?  Can you read

9    the first sentence of the last paragraph, please?

10   A.   Yes.  "Michael remains to be deaf, regardless if he is or

11   is not using his cochlear implants."

12   Q.   My apologies, I meant the second page.

13   A.   Did you say the last paragraph of that?

14   Q.   Yes, sir.

15   A.   Okay.  "Michael is adept at identification of what he

16   needs in order to be successful in spite of his hearing loss."

17   Q.   Would you consider that to be new information?

18   A.   I guess that would be something that had not been stated

19   before.

20   Q.   So now the letter -- so a new piece of information you

21   got was that you should listen to Mr. Argenyi; is that

22   correct?

23   A.   It says that he is adept at identifying what his needs

24   are.

25   Q.   So the new information is Mr. Argenyi is adept at

 1    identifying his needs, correct?

 2    A.   Yes.

 3    Q.   And at this time, had Mr. Argenyi asked you for real-time

 4    captioning for lectures?

 5    A.   Yes, he has.

 6    Q.   How many times?

 7    A.   I don't know the exact time.  I'd have to look at the

 8    documentation.

 9    Q.   So to help you remember, do you recall an April 24th

10    letter in which he requested real-time captioning?

11    A.   Yes, I do.

12    Q.   Do you remember a May 26th letter when he asked for

13    real-time captioning?

14    A.   Yes, I do.

15    Q.   And do you remember an August 12th meeting when he asked

16    for real-time captioning?

17    A.   Yes, I do.

18    Q.   And then here you have a letter saying that it is

19    imperative for him to have real-time captioning and that

20    Michael is adept at identification of what he needs, correct?

21    A.   Well, here again, it's imperative --

22            MR. MOORE:  Your Honor, I'm going to object as

23    cumulative.  I think she even said beating a dead horse.

24    She's read this phrase 20 times.

25            THE COURT:  I'll let the witness answer.

1    A.   He says -- Backous says that it's imperative that Michael

2    have excess to visual cues and those include -- one of the

3    things those include is real-time captioning.

4    BY MS. JACKSON:

5    Q.   Okay.  You thought he could lip-read all the things we

6    read off the slides.

7    A.   That's not what I said.

8    Q.   Let's move to Exhibit 19.  I'll withdraw that.

9         Let's move to Exhibit 34.  And so in Exhibit 4 [*sic*] you

10   offer Mr. Argenyi enhanced note-taking services -- sorry, you

11   offer him the additional benefit of having a peer take notes

12   for you; is that correct?

13   A.   Yes.  This is what we had offered in the June 23rd letter

14   as well.

15   Q.   Somebody's notes, that doesn't appear on his -- he

16   wouldn't see that during the lectures, would he?

17   A.   No, he would not.

18   Q.   And so when Mr. Argenyi was talking about real-time

19   captioning, he was talking about something he would see during

20   the lecture; is that correct?

21   A.   That would be correct.

22   Q.   And so Mr. Argenyi was actually asking to access the

23   lectures himself; is that correct?

24   A.   I'm confused by the question.  Can you rephrase or

25   repeat?

1    Q.   So by asking for real-time captioning --

2    A.   Okay.

3    Q.   -- he was asking for a service that would let him read

4    the lectures as they unfolded, correct?

5    A.   That would be one way to do that, yes.

6    Q.   And when you're offering that he get a copy of a peer's

7    notes after the lecture, that means he's not getting anything

8    during the lecture; is that correct?

9    A.   That's not correct.

10   Q.   Can you clarify, please?

11   A.   No, he'd be -- he would have the opportunity to take his

12   own notes, etc., during the lectures, so he'd be getting that

13   content.  And then what our students do, they may miss bits

14   and pieces of the lecture, which is very common.  And then

15   they would have the opportunity to clarify that with the other

16   note service or in this case an individualized note-taker.

17   Q.   So he could look down at his own paper and take his notes

18   while looking up at the professor and lip-reading statements

19   like the ones you've been making all testimony, correct?

20   A.   That would be up to him, if he was willing to do that.

21   Q.   And you consider that effective communication?

22   A.   Yes.

23   Q.   You also testified earlier that you were very concerned

24   about Mr. Argenyi not getting closed-captions on the videos,

25   correct?

1   A.   Yeah, I said -- I forgot what term -- I think I used

2   perturbed or miffed or something like that.

3   Q.   Would it be fair to characterize your testimony to say

4   that you had reached out to people after learning that he was

5   missing closed-captioning?

6   A.   As I remember, what happened was that I got -- I believe

7   I got in contact with Dr. Knoop or Dr. Rentmeester.  I was

8   made aware of that, and that ball got rolling to fix that

9   problem or issue.

10  Q.   So you were made aware of that?

11  A.   I don't remember exactly, I just know it was an issue we

12  addressed immediately.

13         MS. JACKSON:  May I approach, your Honor?

14         THE COURT:  You may.

15         MS. JACKSON:  I am showing you what is marked Defense

16  Exhibit 215.

17     (Off-the-record discussion had.)

18         MS. JACKSON:  I'm sorry, I can't find the page.

19     I have shown him the page marked Creighton 479.

20  BY MS. JACKSON:

21  Q.   Do you recognize the e-mail on that page?

22  A.   Yeah, on this presentation I do.

23  Q.   And can you tell me who it is sent from and to?

24  A.   Sent from Dr. Christy Rentmeester, and it is sent to me,

25  Dr. Knoop, M1 component director, as well as Wade Pearson,

```
 1    director of disability or accommodations office.

 2    Q.   And what is the date, please?

 3    A.   September 8th, of 2009.

 4    Q.   And can you turn to the document marked Creighton 469 on

 5    the bottom?

 6    A.   (The witness complies.)  Got it.

 7    Q.   And can you tell me who this e-mail is from and who it is

 8    to?

 9    A.   Yeah.  Dr. Christy Rentmeester, and it is to me and

10    copied to another individual.

11    Q.   And give me the date, please?

12    A.   Yeah, that was September 1st, 2009.

13    Q.   And can you please read the first sentence?

14    A.   Yeah.  It says, "After my IDC 135 session today --

15         MR. MOORE:  Objection, your Honor, this is not in

16    evidence.

17         THE COURT:  It is not in evidence.

18         MS. JACKSON:  May I move to have --

19    BY MS. JACKSON:

20    Q.   Do you recognize this document?

21    A.   Upon this presentation, yes.

22         MS. JACKSON:  I move to admit it into evidence.

23         MR. MOORE:  May I ask what -- all of 215 or just this

24    e-mail?

25         MS. JACKSON:  For now, we can just do this e-mail or
```

1     we can do all of it, if it's easier.

2              MR. MOORE:  No objection.

3              THE COURT:  So the entire Exhibit 215 is coming in.

4     Very good.  Exhibit 215 is received.

5     BY MS. JACKSON:

6     Q.   Can you read the first sentence, please?

7     A.   It says, "After my IDC 135 session today, M1 student

8     Michael Argenyi politely informed me that he was unable to

9     take in a video clip I used in class today."

10    Q.   So you were learning from the professor, not Michael,

11    that the closed-captioning was not working.

12    A.   That could very well be.

13    Q.   So when you testified earlier that you were miffed and

14    you tried to fix the problem, that wasn't accurate, was it?

15    A.   No, I think it was.  I found out about that this was

16    going on, and it disturbed me.  And I wanted to make sure that

17    people were doing things to get this rectified.

18    Q.   But it's Dr. Rentmeester trying fix the problem, not you,

19    correct?

20    A.   It was our team.  I mean, we all work together in the

21    medical school, so there's various people involved in the

22    process.

23    Q.   And when you talked about reaching out to the director of

24    the humanities lab, Dr. Quinn, do you remember when you

25    reached out to him?

1    A.   I don't specifically recall the date.

2    Q.   If I showed you a segment of your deposition, would that

3    help you recall?

4    A.   It might.

5              MS. JACKSON:  I am showing --

6              MR. MOORE:  Your Honor, before she puts this on the

7    board, this is hearsay unless she's using it to impeach him.

8              THE COURT:  Tell me exactly what you are planning to

9    show to the witness.

10             MS. JACKSON:  The precise date of when he reached out

11   to Professor Quinn.

12             THE COURT:  All right.  And this is part of his

13   deposition -- a segment of the deposition you're referring to.

14   So you're intending to show it to the witness in order to at

15   this point refresh his memory?

16             MS. JACKSON:  I can do that, your Honor.

17             THE COURT:  All right.  Let's show it to the witness

18   and see if it refreshes his memory.

19             MR. MOORE:  Again, we don't believe it should be

20   shown to the jury.

21             THE COURT:  She's not going to.  She's going to come

22   up and show it to the witness.

23             MS. BALUS:  What page and line?

24             MS. JACKSON:  Pages 69 and 70.

25         (Off-the-record discussion had.)

1    BY MS. JACKSON:

2    Q.   Does this document refresh your recollection of when you

3    spoke with Dr. Quinn?

4    A.   This would have been one of the conversations that I had

5    with him, yes.

6    Q.   And what is the date?

7    A.   This is 9-22-09.

8    Q.   So a September 22nd e-mail, three weeks after Mr. Argenyi

9    told you he was having trouble in anatomy lab, you had a

10   conversation with the professor, correct?

11   A.   This probably would not have been the only conversation

12   that I had with Dr. Quinn.  This is actually saying -- kind of

13   checking on -- he said that the TA was -- the teaching

14   assistant was actually in place and working at Michael's

15   table.

16   Q.   Finally let's turn to Exhibit 19.

17          MS. JACKSON:  May I approach, your Honor, to take the

18   pages back?

19          THE COURT:  You may.

20          MS. JACKSON:  May I approach to see his copy, your

21   Honor?

22          THE COURT:  You may.

23   BY MS. JACKSON:

24   Q.   Starting the second paragraph of this letter that starts

25   "in the real world", do you see that paragraph?

1    A.   Yes, I do.

2    Q.   And do you -- would it be fair to characterize it as

3    describing the kind of background noise that is found in

4    lectures?

5    A.   It's Dr. Backous's impression of what's found in a

6    classroom setting.

7    Q.   And does his impression include ventilation systems,

8    computer typing, shuffling papers, and the like?

9    A.   Yes, it does.

10   Q.   Is that consistent with your understanding of the

11   background noise that occurs in lectures?

12   A.   I think our lecture room is pretty quiet, but that's his

13   perception, like I said.

14   Q.   Do you see where it talks about circumstances where

15   Mr. Argenyi's speech understanding drops to 25 percent?

16   A.   I see the sentence that mentions that, yes.

17   Q.   And it says something about a signal-to-noise ratio.  Do

18   you understand what it's referring to?

19   A.   No, I don't.

20   Q.   And why not?

21   A.   Because I'm not an expert in audiology.

22   Q.   And was anybody on the MEMT an expert in audiology?

23   A.   No, they weren't.

24   Q.   I understand you have two professors of biomedical

25   science on the MEMT, correct?

1    A.    That is correct.

2    Q.    Did you -- to your knowledge, did anyone on the MEMT

3    consult with somebody who is an expert in the ear and how it

4    works?

5    A.    Not that I'm aware of.

6    Q.    Were you aware at the time there were two professors of

7    biomedical science that that year had received federal grants

8    to study the inner ear?

9    A.    At Creighton?

10   Q.    At Creighton.

11   A.    Not on the MEMT.

12   Q.    Not on the MEMT.

13   A.    That could be.

14   Q.    But you didn't ask these professors who received federal

15   grants to study the ear to help you understand this letter?

16   A.    I didn't feel that was our responsibility.  Michael was

17   always free to produce any documents he would be able to

18   produce.  We would have considered every one of them, like we

19   did.

20          THE COURT:  It is now three o'clock.  We're going to

21   take our afternoon break.

22       Please reconvene at about 17 after 3.  That way you'll

23   get your full 15 minutes.

24       Thank you.

25       (Jury out and recess taken at 3:02 p.m.)

1          (At 3:21 p.m. on August 28, 2013, with counsel for the

2     parties, the plaintiff, and the defendant's representative

3     present, and the jury NOT present, the following proceedings

4     were had:)

5          THE COURT:  Ms. Frahm was asking me about an exhibit

6     and whether it had been received or not when we had discussed

7     at sidebar.  Exhibit 205.  My notes on 205 indicate that we

8     discussed four pages, but I don't think that the exhibit was

9     received.  Both lawyers are shaking their heads and my notes

10    do not indicate anything was received.

11         MR. MOORE:  You ruled it was inadmissible hearsay.

12         THE COURT:  That answers that question.

13         MR. MOORE:  I do need to bring something up because

14    it's relevant both to the -- to the testimony that we intend

15    to offer this afternoon.

16         Earlier today we talked about what evidence would come in

17    with regard to the M3 and M4 year.  I want to raise a couple

18    issues because we need to get this resolved before our

19    witnesses come up.

20         Number one, we believe that if Mr. Argenyi does not

21    continue to assert, as he has, that Creighton denied M3 and M4

22    accommodations despite the fact that he's already testified

23    that he asked for those, that any attempt to raise that after

24    this trial would be barred by res judicata which bars claims

25    that could have been litigated in earlier proceedings.

1          They have to exist at the time of the suit.  Those do.

2     The request was there.  The denial was made.  I will cite the

3     Court to *Lundquist vs. Rice Memorial Hospital*, 238 F.3d 975,

4     Eighth Circuit, 2001; and *Wedow vs. City of Kansas City*, 442

5     F.3d 661, Eighth Circuit.

6          And also with regard to Creighton's undue burden defense,

7     because Creighton understood certainly from counsel, if not

8     from Mr. Argenyi himself after he requested his leave of

9     absence, that he was not attending Creighton and was going to

10    another school because they wouldn't grant him interpreters,

11    at that point certainly the issue of the cost of those

12    interpreters comes into play with regard to whether they would

13    allow that or not.  We believe those should be judged at the

14    time the request was made certainly, as well as what Creighton

15    was thinking in denying that.

16         And the fact that that was considered at the time, the

17    totality of the costs were contemplated and should be before

18    the Court.

19         Also, the district court is acting within its discretion

20    when it allows rebuttal evidence to cure a false impression

21    created by the other party.  In opening statements it was

22    mentioned that he didn't attend because he didn't receive

23    these M3s (verbatim).

24         Based upon that, Creighton maintained a position that the

25    cost of those accommodations, several hundred thousand

1    dollars, would come into play.  Creighton relied on those

2    arguments in taking that position which now prejudices

3    Creighton from moving forward.  And we don't believe a simple

4    jury instruction would cure that.

5         Finally, your Honor, we don't believe that if Mr. Argenyi

6    takes that position, that this Court would be entitled -- or

7    would have the authority to grant any affirmative relief for

8    the M3 or M4 injunctive relief because that issue wasn't

9    decided by the jury.  There was no decision with regard to

10   whether Creighton was -- denied the request.  There would be

11   no consideration of whether Creighton's denial violated the

12   ADA or the Rehab Act.

13        So if that's not before the Court to decide -- before the

14   jury to decide liability, this Court would have no authority

15   to grant affirmative relief for something that hasn't even

16   occurred yet.

17        We believe all those factors need to be considered before

18   the position is taken by the plaintiff that they're not

19   raising that issue now.

20             THE COURT:  And all of these are excellent questions

21   and ones that I had not anticipated until coming in today and

22   hearing the objection that plaintiff raised regarding the

23   defense evidence related to the M3, M4 accommodations.

24        I appreciate Mr. Moore's point that the Creighton

25   decision-makers may have considered the M3, M4 expenditures

1     when deciding what accommodations were reasonable and what

2     might be an undue burden looking at the totality of

3     Mr. Argenyi's medical school experience.

4          And I'm not sure I really understand or appreciate the

5     plaintiff's objection to information coming in regarding what

6     the costs would likely be to Creighton for the M3, M4 years.

7     The plaintiff appeared to be so adamant about the objection to

8     that information and appeared to be willing to waive relief

9     regarding the M3, M4 years that I thought if the plaintiff

10    feels so strongly and is willing to waive claims regarding the

11    M3, M4 years, we'll just focus on M1, M2.

12         Mr. Moore raises some very legitimate concerns.  And I

13    want to make sure that the plaintiff's waiver is knowing and

14    voluntary and was not something just made on the spur of the

15    moment under the pressure of the Court's ruling.

16         So, Ms. Vargas, do you wish to discuss this further,

17    recognizing that the plaintiff may be waiving more than you

18    had anticipated?

19         MS. VARGAS:  Well, your Honor, to be clear, we were

20    put in a position where we were forced to make a choice this

21    morning.  But that doesn't change the fact that black letter

22    law is that the issue of damages goes to the jury; the issue

23    of whether there's been a violation of law up until where we

24    stand today goes to the jury.  And the issue of injunctive

25    relief going forward goes to the Court.

1          And so what I understand clearly is that we were willing

2     to waive the damage claim for the denial of opportunity for M3

3     and M4 so that we were seeking damages from the jury for M1

4     and M2 and were turning to the Court for injunctive relief

5     going forward.

6          And I understood that as is routinely done in these kinds

7     of cases, as Mr. Moore himself argued in his motion in limine,

8     evidence that is purely going to injunctive relief is evidence

9     that shouldn't go to the jury.  That's evidence that goes to

10    the Court.  It's simply not relevant to the jury's

11    determination.  There's no way it can be.  It wasn't

12    considered.  It wasn't considered by his clients.

13         It's not only not relevant, but it would be prejudicial

14    insofar as the speculative numbers that they've invented

15    without any opportunity for both sides to offer some fact-

16    finding evidence about what would happen going forward and

17    what would be needed going forward under the specific

18    circumstances of where Mr. Argenyi would be placed because

19    context matters.

20         And so where he might actually be doing each of the

21    eight-week segments matters a lot going forward.  And that

22    kind of evidence should have an opportunity to go to the

23    Court.  And then it's within the Court's discretion to make

24    those determinations going forward about the injunctive

25    relief.

1          Obviously Mr. Argenyi wants to go back to medical school.

2     And so the ability to go back rests in the Court's hands.  And

3     assuming we get the verdict that we expect from the jury, we

4     would be turning to the Court and seeking the opportunity to

5     put on evidence, as Mr. Moore would also have the opportunity

6     to put on evidence, to the Court of what kind of injunctive

7     relief we would be seeking.

8          THE COURT:  As I noted this morning, this is not

9     something that I have researched.  I have not read the case

10    law on this particular issue.  I will stand by my earlier

11    ruling and the legal consequences of that ruling may be

12    briefed later by the parties.

13       All right.  Let's bring in the jury.

14        MICHAEL KAVAN, PREVIOUSLY SWORN, RESUMED THE STAND

15        (Jury in at 3:32 p.m.)

16          THE COURT:  Please be seated.

17       Ms. Jackson, you may continue with your

18    cross-examination.

19          MS. JACKSON:  Thank you, your Honor.

20                    CROSS-EXAMINATION (Cont'd.)

21    BY MS. JACKSON:

22    Q.   Dr. Kavan, did you or the MEMT team consider giving CART

23    a wholehearted try?

24    A.   We discussed it intensely, yes.

25    Q.   Would you agree that after one year at medical school in

1    which Mr. Argenyi presented to you four expert reports from

2    treating physicians and his numerous e-mails, that Mr. Argenyi

3    was right and that the FM system did not work and that

4    Creighton was wrong?

5              MR. MOORE:  Objection, form of the question, calls

6    for a legal conclusion as testified.

7              THE COURT:  Overruled.  He may answer.

8    A.   The letter that we received from Dr. Thedinger indicated

9    the FM system wasn't effective.  And at that point in time, we

10   made the accommodations that we thought were appropriate.

11   BY MS. JACKSON:

12   Q.   And to clarify, this morning you testified that 38

13   percent, the number in Dr. Thedinger's letter, is not

14   effective communication; is that correct?

15   A.   I'm not sure what you're referring to, 38 percent with

16   what?

17   Q.   Dr. Thedinger told you that the FM system let him

18   understand 38 percent in background noise.

19   A.   That's why we made the recommendation to use an

20   interpreter once we had that official documentation, yes.

21   Q.   And in September, there was a letter drafted by

22   Mr. Argenyi's treating physician that you received that

23   semester saying that he understood 25 percent in background

24   noise; isn't that right?

25   A.   You -- is that Exhibit 19 that you're referring to?

1    Q.    It is.

2    A.    Yeah, but that's without an FM system.  From what I

3    understand anyway, that's just -- that's testing not related

4    to an FM system, correct.

5          MS. JACKSON:  No further questions, your Honor.

6          THE COURT:  Redirect?

7          MR. MOORE:  Thank you, your Honor.

8                      REDIRECT EXAMINATION

9    BY MR. MOORE:

10   Q.    Dr. Kavan, I would like to direct your attention to

11   Exhibit 18.

12         MR. MOORE:  And if we can pull that up on the screen,

13   the second page of Exhibit 18?  And magnify the second

14   paragraph.

15   BY MR. MOORE:

16   Q.    I think opposing counsel mentioned numerous times that

17   what a medical student learns in medical school is not

18   everyday communication, correct?

19   A.    Yes, that's correct.

20   Q.    But could -- this also says education right there, right?

21   A.    You're going to have to -- I have to apologize.

22   Q.    It says, "It is imperative that Michael has access to

23   visual cues for everyday --

24   A.    And education.

25   Q.    And education.

1    A.   Yes, that is correct.

2    Q.   And the next sentence says, "Visual cues include but are

3    not limited to closed-captioning."

4    A.   Yes.

5    Q.   And so on.

6         Did you believe that this letter -- well, what did you

7    believe this letter said with regard to the FM system?

8    A.   Absolutely nothing.

9    Q.   Okay.  And it does refer you back to the May 27th, 2009,

10   letter, correct?

11   A.   Yes, where Dr. Backous recommended an FM system.

12   Q.   Okay.  I'd like to take a look at 29A again, if we could,

13   the PowerPoints.  I believe they've created it so we have to

14   put it on the ELMO.  I'll just put the first page up here.

15        MR. MOORE:  Kris, can you hit the button?  I'm not

16   going to spend too much time...

17   BY MR. MOORE:

18   Q.   Now, Dr. Kavan, these are slides that presumably were

19   used in medical school, correct?

20   A.   I don't know, to be honest with you.

21   Q.   Do they look --

22   A.   They look like they could be slides used in medical

23   school, yes.

24   Q.   Do you have any idea who made those notes to these

25   slides?

1           MS. VARGAS:  Objection, your Honor.

2           THE COURT:  Overruled.  He may answer.

3   A.   No, I do not.

4   BY MR. MOORE:

5   Q.   Now, these are the slides that are given to Michael in

6   advance of class, correct?

7   A.   Again, if these are the medical school slides, it's not

8   uncommon, and actually it's a common practice for medical

9   school students to get the slides prior to the actual

10  presentation of the lecture.

11  Q.   And that's what you considered a visual cue to assist

12  Michael.

13  A.   That's one visual cue.

14  Q.   And he's also reading about these big words in the

15  textbooks as he's preparing, correct?

16  A.   They're required to be reading the textbook as well or

17  any other reading they're supposed to be doing, yes.

18  Q.   Now, in the e-mail that Mr. Argenyi sent you where he

19  said he's missing a decent chunk of lectures, did that

20  correlate with your understanding of how well he was doing in

21  class?

22  A.   No, because he was doing excellent in his class.

23  Q.   As you sit there, in your experience at Creighton

24  University, could someone who is missing a decent chunk of

25  lectures score an 88 percent, close to honors, on their

1    examination?

2    A.   No.  In fact, they would be probably failing.

3    Q.   Again looking at Exhibit 18, the second page of 18 --

4          MS. KIMBLE:  You don't want this --

5          MR. MOORE:  No, I want Exhibit 18.  We'll just put it

6    on the ELMO.  Don't worry about it.

7          MS. KIMBLE:  Second page?

8          MR. MOORE:  Yes.

9    BY MR. MOORE:

10   Q.   You were questioned on cross-examination regarding the

11   first sentence of the last paragraph where it says, "Michael

12   is adept at identification of what he needs in order to be

13   successful in spite of his hearing loss," correct?

14   A.   That's correct.

15   Q.   And didn't you, in fact, consider Michael's letter that

16   he sent to you, which is Exhibit 5?

17   A.   I'm just making sure I'm referring to the right exhibit;

18   I apologize.

19          MR. MOORE:  Do you want to put 5 up there?

20   A.   Could you please restate the question?

21   BY MR. MOORE:

22   Q.   Sure.  March 26, 2009, was a letter that Mr. Argenyi sent

23   to you and you shared with the MEMT and the MEMT considered

24   it, correct?

25   A.   Yes.

1    Q.   So when Dr. Backous and Stacey Watson say, "he's adept at

2    identifying his accommodations," you indeed did consider what

3    he said, correct?

4    A.   Absolutely.

5    Q.   You considered everything he said in this letter, didn't

6    you?

7    A.   Right.

8    Q.   Were you aware of attempts to contact Dr. Backous?

9    A.   You know, I'm not sure I was.  I don't know if somebody

10   contacted him or not.

11   Q.   Okay.  Do you know if anybody tried to contact him?

12   A.   I thought that our --

13             MS. JACKSON:  Asked and answered, your Honor.

14             THE COURT:  He may answer that question yes or no.

15   Do you know if anybody tried to contact him?  Yes or no.

16   A.   I thought maybe our general counsel, but I wasn't sure.

17   I know in a previous letter she offered to do that if given

18   permission from Michael Argenyi's lawyer.

19   BY MR. MOORE:

20   Q.   In order to speak with the physician, do you need --

21   well, let me ask you this:  In your work with the MEMT, when

22   you need to speak with a treating physician or physician, can

23   you just call them up?

24   A.   No.  FERPA is what we have to adhere to, which is the

25   Family Educational Rights and Privacy Act.  So a student would

1    have to grant us written permission to speak to somebody.

2    Q.   Is that a form they have to fill out to make sure they're

3    covering everything required in the law?

4    A.   Yes.  They would have to complete the form and sign it

5    and date it.

6    Q.   Did Mr. Argenyi ever provide this form to you?

7    A.   No, he did not.

8    Q.   I'd like to talk about Dr. Quinn quickly.  In the

9    deposition transcript, they referred to a conversation you had

10   with Dr. Quinn at the end of September.  Was that the only

11   conversation you had with Dr. Quinn?

12   A.   No, it was not.

13   Q.   Do you remember how many conversations you had with

14   Dr. Quinn?

15   A.   Probably two on this topic.

16   Q.   Okay.  And as I understood the deposition testimony, what

17   were you referring to in that late September conversation you

18   had with Dr. Quinn?

19   A.   That was specifically referring to the accommodation of

20   getting a teaching assistant assigned directly to Michael at

21   his anatomy table.

22   Q.   Were you following up?

23   A.   Yes, I was.

24          MR. MOORE:  May I have a moment, your Honor?

25          THE COURT:  You may.

1          (Off-the-record discussion had.)

2              MR. MOORE:  I have nothing further.

3              THE COURT:  Very good.  Thank you, Doctor.  You may

4     stand down.

5          Defense may call its next witness.

6              MR. MOORE:  Plaintiff calls Dr. Thomas Hansen --

7     defendant calls Dr. Thomas Hansen.

8              THE COURT:  Dr. Hansen, you remain under oath, and

9     you may take the stand.

10             THE WITNESS:  Thank you.

11          THOMAS HANSEN, PREVIOUSLY SWORN, RESUMED THE STAND

12             THE COURT:  You may inquire.

13                         DIRECT EXAMINATION

14    BY MR. MOORE:

15    Q.   Hello again, Dr. Hansen.  I'm going to give you an

16    opportunity to introduce yourself to the jury.

17    A.   Sure.  My name is Dr. Thomas Hansen.

18    Q.   Doctor, where do you live?

19    A.   Chicago, Illinois.

20    Q.   And are you currently employed?

21    A.   Yes, I am.

22    Q.   And with whom are you employed?

23    A.   I'm employed by Advocate Health Care System.  It's a

24    health care system of 12 hospitals in the Chicago area

25    primarily and then outpatient clinics.

1   Q.   And what is your position with Advent Health Care [*sic*]?

2   A.   I'm the chief academic officer, so I oversee all of the

3   12,000 students coming through the health care system.  I'm in

4   charge of the 800 residents in our program and then all

5   continuing medical education for physicians, like library

6   services and research.

7   Q.   And what are your responsibilities?

8   A.   Basically I oversee everything that takes place within

9   our health care system to ensure that we are meeting the

10  accreditation needs for the medical schools who send their

11  students to us, also meeting the accreditation needs for the

12  residents in our training programs, and following research

13  protocols.

14  Q.   How long have you held that position?

15  A.   I started on July 8th of this summer.

16  Q.   And where did you work before that?

17  A.   I worked for Creighton University.

18  Q.   Okay.  And if you could just share your educational

19  background with the jury after high school?

20  A.   Sure.  My educational background, I was actually in a

21  Jesuit order for a few years, so my background includes a

22  degree in philosophy from St. Louis University.  And then I

23  received a master of divinity from the Jesuit Weston School of

24  Theology in Boston.  Then I did my medical training at

25  Creighton University.  So I went to medical school, graduated

```
 1    medical school in the year 2000, and then stayed on and ended

 2    my residency in family medicine at Creighton University.

 3    Q.   Okay.  And how long did you work for Creighton University

 4    between the time you got out of medical school and your

 5    residency until you left?

 6    A.   Ten years.

 7    Q.   And if you could just briefly go through your positions

 8    you had with the medical school.

 9    A.   Sure.  Once I completed residency, which is a three-year

10    program, basically preparing me to be a family physician to go

11    out and practice independently, I joined the faculty.  So I

12    was in the Old Market for a year in the Old Market Clinic

13    practicing just medicine.

14        And then I became the program director, so I actually was

15    in charge of the residency program for the family medicine

16    residents for about six years.  And then following that, then

17    I took the job as Associate Dean for Medical Education

18    overseeing the curriculum for the medical students.

19    Q.   When did you take the position of Associate Dean for

20    Medical Education?

21    A.   It would have been January of 2010.

22    Q.   And is it fair for me to say you took over the position

23    that Dr. Kavan was holding in the interim in 2009?

24    A.   That is correct.

25    Q.   And what were your responsibilities as Associate Dean for
```

1    Medical Education?

2    A.    So the Associate Dean of Medical Education basically

3    oversees the curriculum of all four years of medical school.

4    So I would be -- and as I mentioned yesterday, I was the chair

5    of the Medical Education Management Team, a smaller working

6    group which would make decisions if we wanted to make a change

7    in the policy or the curriculum.

8         The actual authority to make changes actually rests with

9    the Educational Policy Committee, something that I also

10   chaired, which would be composed of faculty and students.

11        In addition -- and then underneath me, I would have had a

12   component director, so someone who is in charge of each year

13   of the four years of the curriculum.  You met Dr. Knoop who

14   was the component 1 director for the curriculum.  And then

15   underneath the component director, we have the course

16   directors who would be in charge of each individual course.

17   For example, anatomy would have a course director, and then

18   there would be faculty that are lined up to teach the various

19   topics within the curriculum.

20        So I basically oversaw the management of the curriculum

21   for the campus here, as well as the campus we opened in

22   Phoenix, Arizona.

23   Q.    Beginning in January 2010, what was your role on the

24   MEMT?

25   A.    I was the chair of the MEMT.

1    Q.   Okay.  And the jury knows what the MEMT is so we don't

2    need to get into that.

3         As chair of the MEMT, did you deal with reasonable

4    accommodation requests?

5    A.   Yes, we did.

6    Q.   Were there requests other than the request for Michael

7    Argenyi that the MEMT has dealt with?

8    A.   Yes.

9    Q.   And in dealing with Mr. Argenyi's request, did you use

10   any different procedure or process than any other reasonable

11   accommodation request?

12   A.   No, we did not.

13   Q.   Now, by the time that you took over in January of 2010,

14   Mr. Argenyi was halfway through his M1 year.  Were you

15   involved with determining what accommodations he needed for

16   the M1 year?

17   A.   No, I was not.

18   Q.   What about M2 year?

19   A.   Yes.

20   Q.   If you could briefly discuss the courses for the M2 year

21   and what each student goes through?

22   A.   If you don't mind, I'll give a bit of a process for the

23   first two years.  Basically the first year is focusing on the

24   foundation such as anatomy, biochemical, body defense, so how

25   does the body fight off infection, for instance.

1          And at the end of the first year, we start a systems

2     approach.  That's taking a look at the various organ systems

3     of the body.  In the first year, we focus on neurology.  And

4     so we review the neuroanatomy of the body.  Then we start

5     looking at what are some of the things that could go wrong in

6     the nervous system?  How do you identify those symptoms?  And

7     then what is the treatment plan for the different diseases

8     that might show up?

9          So that continues then in the second year of the

10    curriculum.  Then we'd be looking at the cardiovascular system

11    or the heart, looking at the pulmonary system or the lungs,

12    the GI system or the abdomen; again reviewing basic anatomy,

13    basic physiology, how should it work normally.  And then when

14    it doesn't work normally, then what are the diseases that that

15    might reflect, and what are the symptoms and how do you treat

16    it.

17    Q.   Now, in addition to lecture courses, are there -- is

18    there a clinical component to the M2 year?

19    A.   Yes, there is.  During the first year we don't have a

20    clinical component to our curriculum.  The third and fourth

21    year is dedicated exclusively to the clinical.

22         So during the second year, we actually have a course that

23    helps prepare students for the third and fourth year.  And

24    it's basically spending half a day in a primary care clinic

25    every other week.

1        So instead of the 40 to 80 hours they would get in their

2   third year, it focuses just on half a day every other week.

3   And basically the goal of that is initially -- because we know

4   the students haven't gone through the systems yet in the

5   second year to be able to -- to be able to make a diagnosis.

6        Initially it really is focusing how to start to develop a

7   rapport with a patient when they come in, how to learn from

8   the attending, the physician; observing how they interact with

9   the patient, because the patient is there to see their doctor.

10  So the student is there to observe how did the interaction

11  take place, to start learning how to develop a rapport.  And

12  as time goes on, they start the process of interviewing

13  patients, doing a focused physical exam.

14       And then we, as time goes on, start asking them, "So what

15  do you think is going on here?" to see, are they starting to

16  piece together what they're learning in lectures with what

17  they're seeing in a clinic.

18  Q.   Do you expect students -- M2 students in that process to

19  retain 100 percent of the information from the patients?

20  A.   No, we do not.

21  Q.   Is that part of the process, as they -- if you could

22  explain for the jury as they go towards their M4 year and

23  completing medical school?

24  A.   Sure.  So we know in the M2 year that students are just

25  learning -- they're practicing, if you will, how to gather

1    information from the patient.

2        And so then the third year is when they're actually in

3    their clerkships.  There's six two-month blocks, periods of

4    time when they're focusing just two months on, say,

5    obstetrics, two months on pediatrics, and two months on

6    surgery.

7        They're developing those skills and obtaining the --

8        MS. VARGAS:  Objection, your Honor.  I understood we

9    were discussing M1 and M2, so I'm not sure of the relevance at

10   this point.

11       THE COURT:  Response?

12       MR. MOORE:  I think he was just giving context for

13   what M2 is.  I can ask a different question.

14       THE COURT:  Let's stop with M2 and not get into M3.

15       MR. MOORE:  Okay.

16   BY MR. MOORE:

17   Q.  So, in the longitudinal -- well, let's move on.

18       I'd like to direct your attention to Exhibit 213, sir.  I

19   think we'll bring it up on the ELMO because we have some

20   computer malfunctions here.

21       (Off-the-record discussion had.)

22   BY MR. MOORE:

23   Q.  Sir, do you recognize that document?

24   A.  Yes, I do.

25   Q.  What is this document?

1    A.   This is a document that we received from Mr. Argenyi's

2    lawyers the summer prior to his second year informing us of

3    auxiliary aids and services that Michael would like.  And it

4    was broken out with the different courses that he would be

5    taking in his second year.

6    Q.   So this, as you understood, was his request for

7    accommodations on auxiliary services for his M2 year?

8    A.   That is correct.

9    Q.   And in advance of this, did Creighton University provide

10   Mr. Argenyi with the syllabi for each class so he could

11   prepare this?

12   A.   Yes.

13   Q.   As I understand, the MEMT met to discuss Mr. Argenyi's

14   requests for the M2 year; is that correct?

15   A.   Yes.

16   Q.   Do you recall exactly when the MEMT met?

17   A.   I'm sorry, I'm trying to remember.

18   Q.   Let me give you some context.

19   A.   Yes.

20   Q.   Let's take a look at Exhibit 214.  I believe we may have

21   already talked about this document when you were up.  Do you

22   recognize this document?

23   A.   Yes, I do.

24   Q.   What is that document?

25   A.   This is a response from our attorneys -- from you

1    informing Mr. Argenyi's lawyers what we will provide for him

2    during his M2 year.

3    Q.   And this letter was sent on August 13th of 2010.  Does

4    that help refresh your recollection when the meeting was?

5    A.   The MEMT meets twice a month, the first Tuesday and the

6    third Tuesday of the month.  So it would have been -- we met

7    either the last -- the third Tuesday of July or the first

8    Tuesday of August to be able to respond by August 13th.

9    Q.   And again this letter accurately reflects the MEMT's

10   conclusions and what was offered for M2, correct?

11   A.   That is correct.

12   Q.   I want to talk a little bit about what the MEMT

13   considered.

14   A.   Sure.

15   Q.   And I first want to direct your attention to Exhibit 20

16   from -- that is the letter from Dr. Thedinger.

17        Now, this letter is dated May 6 of 2010.  Do you recall

18   exactly when Creighton University Medical School received this

19   letter?

20   A.   I believe we received this in June.

21   Q.   And was this shared with the MEMT with regard to making

22   decisions with regard to the M2 year?

23   A.   Yes.

24   Q.   What impact did it have on the MEMT?

25   A.   This is the letter in which it was stated that it does

1    not appear that the FM system provides any significant benefit

2    and today's results show it actually reduces the

3    discrimination ability.

4         So, this is the first time that we found out that the FM

5    system was not working as well as we had hoped.

6    Q.   And going back to Exhibit 214, which is the letter

7    indicating what the MEMT has offered, I'd like to take a look

8    at the large group lectures and lecture hall portion on the

9    first page.

10        And again I'm not going to read this verbatim -- the jury

11   will have it -- but does this accurately reflect the impact of

12   the FM system letter from Dr. Thedinger on the MEMT's

13   consideration of his request?

14   A.   Yes, it does.

15   Q.   And going on to page 2, again there's a continuation.

16        In this letter, the MEMT considered Dr. Thedinger's

17   letter, but it also considered Michael Argenyi's May 26, 2009,

18   letter.

19             MS. VARGAS:  Objection, your Honor, leading.

20             MR. MOORE:  I'm just reading from the document here.

21             THE COURT:  Let's hear a question.

22   BY MR. MOORE:

23   Q.   Looking at the document, did you also consider

24   Mr. Argenyi's May 26, 2009, letter?

25   A.   Yes, we did.

1    Q.   And when determining whether to offer real-time

2    captioning or CART versus an oral interpreter, what did you

3    consider?

4    A.   The fact that Mr. Argenyi said that they are

5    interchangeable.

6    Q.   Did you ever have any documentation from Mr. Argenyi that

7    an oral interpreter was not sufficient in the lecture setting?

8    A.   No, we did not.

9    Q.   And did the MEMT members discuss the fact that

10   Mr. Argenyi had actually used an oral interpreter during his

11   M1 year?

12   A.   Yes, we did.

13   Q.   Did it go to the decision of the MEMT?

14   A.   Yes, it did.

15   Q.   Looking down in the laboratory classes, if we can go down

16   in that letter a little bit, does this letter accurately

17   reflect the reasoning of the MEMT in offering the specific

18   accommodations for laboratory classes?

19   A.   Yes, it does.

20   Q.   Okay.  And was this again influenced at all by

21   Dr. Thedinger's letter?

22   A.   Dr. Thedinger's letter as far as...

23   Q.   The FM system being ineffective.

24   A.   Yes.

25   Q.   Okay.  And again, did the MEMT consider Mr. Argenyi's

1    statement that an oral interpreter and CART were

2    interchangeable?

3    A.   Yes.

4    Q.   Now, in fact, Creighton University offered interpreters

5    or -- well, did Mr. Argenyi take advantage of the

6    accommodations offered under laboratory classes?

7    A.   Under laboratory classes?

8    Q.   Yes, under laboratory classes.

9    A.   I don't believe he did.

10   Q.   Okay.  Do you recall him using an interpreter and

11   submitting some invoices to you?

12   A.   Yes.

13   Q.   Does that help refresh your recollection?

14   A.   Yes.

15   Q.   Did he use interpreters in the laboratory classes?

16   A.   He did.

17   Q.   Did he submit those invoices to you?

18   A.   He did.

19   Q.   Who paid for those?

20   A.   Creighton University.

21   Q.   And that came out of what budget?

22   A.   The medical education budget.

23        MS. VARGAS:  Objection, your Honor.  May we have a

24   sidebar?

25        THE COURT:  Yes.

```
 1            (Bench conference on the record.)

 2            MS. VARGAS:  Mr. Moore is eliciting testimony about

 3    documents I don't believe we've ever seen before.  I'm

 4    concerned they're not in the record.  I may be wrong, but can

 5    you clarify what documents you're referring to?

 6            MR. MOORE:  I'm not offering any documents, first of

 7    all.

 8            MS. VARGAS:  You're asking about invoices that

 9    haven't been produced.

10            MR. MOORE:  The invoices were produced in discovery,

11    your Honor.  They're invoices submitted by Beth, I think,

12    something -- I can't remember who it was -- on behalf of

13    Mr. Argenyi that he asked her to submit to Creighton

14    University for reimbursement.

15            MS. VARGAS:  Are they on the exhibit list?

16            MR. MOORE:  I don't think they are.

17            MS. VARGAS:  That would be --

18            MR. MOORE:  Excuse me.

19            THE COURT:  Well, right now, what is being done is

20    not objectionable.  He hasn't offered anything into evidence

21    at the moment.  The witness -- he's simply asking if this

22    witness had received invoices; and if so, how those invoices

23    were paid.

24        He's not asking the witness to testify from some document

25    that's not in evidence.  So the objection is overruled.
```

```
 1              (End of bench conference.)

 2                   THE COURT:  You may proceed.

 3     BY MR. MOORE:

 4     Q.   And when these invoices were submitted, out of what

 5     budget were they paid?

 6     A.   Medical education.

 7     Q.   And did you understand that Mr. Argenyi was submitting

 8     those pursuant to this accommodation you were offering in this

 9     letter?

10     A.   Yes.

11     Q.   Now, let's look, if we could, at the portion of this

12     letter that talks about clinical instruction.  And that's the

13     first part.

14                   MR. MOORE:  Then if you can put up the next page as

15     well so he sees everything?

16     BY MR. MOORE:

17     Q.   Does that accurately reflect the MEMT's response to

18     Mr. Argenyi's request for interpreters in his longitudinal

19     clinic?

20     A.   Yes.

21     Q.   And what did the MEMT consider with regard to

22     Mr. Argenyi's request in the longitudinal clinic?

23     A.   We took many things into consideration.  First, the

24     technical standards of Creighton University, which states that

25     we believe that in a clinic setting with patients, that a
```

1    medical student needs to be able to see, to hear, and to feel

2    a patient, with or without accommodation.

3        We then looked at the fact that we had documentation from

4    both Mr. Argenyi, as well as a nurse practitioner who

5    supervised him for three years in a emergency room setting in

6    which Mr. Argenyi was doing clinical work, he was working with

7    patients, he was working with family members, he was leading

8    interdisciplinary teams.  And for those three years, he did

9    not require any kind of accommodation.

10       And the fact that we did not have documentation from a

11   physician indicating that Mr. Argenyi needed to have

12   accommodations in the clinical setting.

13   Q.   And, sir, at that meeting of the MEMT, in addition to the

14   MEMT members, was anyone else there?

15   A.   Yes.

16   Q.   Who else was there?

17   A.   So our legal counsel was there, as well as Mr. Wade

18   Pearson.

19   Q.   And why were they invited?

20   A.   Wade Pearson at that time was in charge of disabilities

21   at Creighton University, and then legal counsel because this

22   was in litigation.

23   Q.   And did the MEMT believe that the accommodations covered

24   in this August 13th letter would provide effective

25   communication?

1   A.   Yes.

2   Q.   Now, there's a lot of questions with regard to whether

3   you contacted other deaf physicians.  Did you ever contact any

4   other deaf physicians?

5   A.   No, I did not.

6   Q.   Did anyone else call you who is a deaf physician?

7   A.   No.

8   Q.   Is there any reason you know why -- well, did you prevent

9   Mr. Argenyi from offering that information?

10  A.   No.

11  Q.   Could he have provided that?

12  A.   Yes.

13  Q.   Now, with regard to educating Mr. Argenyi in the

14  longitudinal clinic for the educational portion, did the

15  impact of the preferred method of communication come into play

16  at all?

17  A.   As far as in the longitudinal clinic?

18  Q.   Yes.

19  A.   At that point, we did not have any documentation that he

20  even needed to have accommodations in the longitudinal clinic.

21  So, we did not discuss --

22  Q.   Well -- I'm sorry.

23  A.   So we did not discuss the type of accommodation that we

24  would provide in the longitudinal clinic.

25  Q.   In other words, he was asking for interpreters, but he

```
 1      didn't get --

 2      A.   That's correct.

 3           MS. VARGAS:  Objection, your Honor, leading.

 4           THE COURT:  Sustained.

 5      BY MR. MOORE:

 6      Q.   So despite the fact that he didn't have documentation

 7      supporting it, why not just let him have it?  Why not just let

 8      an interpreter come?

 9      A.   The longitudinal clinic is an actual clinic where a

10      patient is coming to see their physician.  To allow

11      Mr. Argenyi to just have someone come into a room, an

12      interpreter or anyone else, it would be -- for us to say that

13      a medical student can bring anyone they wish who is

14      unauthorized into a clinical setting in which the primary

15      relationship and trust is between the patient and physician,

16      if we were to allow Mr. Argenyi to bring in an interpreter, we

17      basically, for consistency, would have to allow any medical

18      student to bring anyone they want into a clinic room, and we

19      don't feel that is appropriate.

20      Q.   Now, did you ever receive a response to the August 13th,

21      2010 letter?

22      A.   A response from...

23      Q.   From Mr. Argenyi or from anyone that you're aware of in

24      writing?

25      A.   Not that I recall.
```

1    Q.   At least -- well, let me ask you this:  Before the first

2    day of his M2 year, did you ever receive any response?

3    A.   No.

4    Q.   Okay.  And did you have any interaction with Mr. Argenyi

5    his first day of M2?

6    A.   Yes, I did.

7    Q.   And what happened?

8    A.   We had provided an oral interpreter to come for his

9    classes.  And so I received a call that -- she lives in rural

10   Iowa.  I received a call, she was going to possibly be a few

11   minutes late because there was an accident in Council Bluffs.

12   So I told her I would meet her outside of the lecture hall so

13   I could escort her in, which I did during the break --

14   students get a 10-minute break every hour between classes.

15        So I escorted her into the lecture hall.  And then I went

16   up to Mr. Argenyi, and I asked her -- I said that our oral

17   interpreter is here, pointed her out, and asked him to move to

18   the front of the classroom so he could see her.

19   Q.   Why did you ask him to move?

20   A.   Our agreement was we would provide oral interpreters and

21   we'd provide front row seats.  He'd be able to utilize the

22   service.  If there were students in those seats, I would ask

23   those students to leave.

24   Q.   What did you learn happened after that class?

25            MS. VARGAS:  Objection, calls for hearsay.

1              THE COURT:  Overruled.  He may answer.

2      A.    I was told that the interpreter was informed by --

3              THE COURT:  Well, I'm going to stop you because it is

4      hearsay that's being offered.  So I will sustain it and the

5      jury will disregard the response.

6              MR. MOORE:  May I be heard, your Honor?

7              THE COURT:  You may.

8              MR. MOORE:  This goes --

9              MS. VARGAS:  May we have this conversation at

10     sidebar, your Honor?

11             THE COURT:  Sure.

12        (Bench conference on the record.)

13             THE COURT:  Okay.  So I'm assuming it does not go to

14     the truth of the matter asserted, but to a different issue?

15             MR. MOORE:  It does not go to the truth of the matter

16     asserted, it goes to notice of Mr. Argenyi not using the

17     accommodations that were offered, what Creighton did after

18     that with regard to his reaction to that.  And it's not

19     offered for the truth of the matter asserted.

20             MS. VARGAS:  Your Honor, it's double hearsay.  It's

21     not what he heard Mr. Argenyi say, it's what he heard somebody

22     else say Mr. Argenyi said, so it's two levels of hearsay.

23     It's what the interpreter said, not what Mr. Argenyi said.

24        There are -- it's not an admission from a party-opponent

25     currently offered to the Court.  It's based upon hearsay,

1    inherently unreliable, extremely prejudicial.

2           THE COURT:  I understand it's being offered for the

3    purpose of showing why this witness did what this witness did.

4    I will instruct the jury not to accept it -- not for the truth

5    of the matter asserted but as information as to why this

6    witness took the actions he took.

7           (End of bench conference.)

8           THE COURT:  I am going to let the witness respond to

9    this question.

10          In responding to the question, he is going to be telling

11   you information that he heard from another party -- another

12   individual.  In receiving of this information, you are not to

13   accept the information that was said by the other party for

14   the truth of the matter asserted, but as an indication or

15   evidence of why this witness took the actions that he took.

16          Now, would you like the question read back?

17   A.   Please.

18          THE COURT:  Ms. Fauber, please?

19   Q.   (Repeated by Reporter) What did you learn happened after

20   that class?

21   A.   What I learned was that Michael had indicated to the oral

22   interpreter that we provided that she was not needed.  And so

23   she left the classroom.

24   BY MR. MOORE:

25   Q.   And with regard to providing interpreters in the future

1    for Mr. Argenyi, did that affect your decision?

2    A.    Yes.

3    Q.    And what did you do after that?

4    A.    If Michael was going to refuse to use our interpreters, I

5    wasn't going to continue to have an interpreter come to the

6    classroom.

7    Q.    Okay.  Now, I also understand that you had interaction

8    with Mr. Argenyi on his first day of longitudinal clinic,

9    correct?

10   A.    That is correct.

11   Q.    Can you tell the jury what happened?

12   A.    Sure.  So the first day of clinic, students meet their

13   preceptors in the clinical setting.  So I actually went to --

14   Dr. Townley was his preceptor.  I went to her office, which is

15   at Creighton Medical Center in the internal medicine clinic

16   side.  And I met with Michael and Dr. Townley.  And I asked

17   Michael if he could explain to Dr. Townley the best way for

18   him to communicate with her and the patient to try and

19   maximize communication.

20   Q.    Okay.  And did you follow up with Dr. Townley throughout

21   the year with regard to how Mr. Argenyi was doing in

22   longitudinal clinic?

23   A.    I would periodically check to go see how he was doing.

24   Q.    What did you learn?

25   A.    He was doing just as well as any other medical student.

1    Q.   And for a short period of time, Mr. Argenyi had used

2    interpreters in the longitudinal clinic.  Did you follow up

3    with Dr. Townley after that?

4    A.   Yes, I did.

5    Q.   And what did you learn?

6    A.   That he was still doing just as well as any other medical

7    student.

8    Q.   Now, I'd like you to take a look at Exhibits -- well, I

9    don't want to take -- you've looked at them.  We've talked

10   about them, all right?

11       The e-mails that Mr. Argenyi sent to you, we talked a

12   little bit about these when they called you up.  What did you

13   do with these e-mails when you received them?

14   A.   I forwarded them to our legal counsel.

15   Q.   Why did you do that?

16   A.   For the e-mails that focused on the accommodation of

17   having an oral interpreter in the clinic setting, this had

18   already been discussed among our legal counsel.  I did not

19   feel it was appropriate for me to respond directly to Michael.

20       I forwarded them to the legal counsel with the

21   understanding they would be discussed among legal counsel on

22   both sides.

23   Q.   Did the e-mails -- did the statements in the e-mails that

24   he was struggling in longitudinal clinic and missing a lot of

25   information, did those correlate with the reports you were

1    getting with Dr. Townley?

2    A.    They did not.

3    Q.    Why not?

4    A.    According to Dr. Townley he was doing fine in the

5    longitudinal clinic.

6    Q.    Now, there was a lot of testimony with regard to

7    Mr. Argenyi's ability to hear someone with a thick accent,

8    with a broken jaw.  Does that happen with students in

9    longitudinal clinic?

10   A.    It happens with physicians in a clinic, as well as

11   students, sometimes for various reasons.  It can be difficult

12   to understand a patient, especially if there's a broken jaw or

13   surgical procedures affecting the face.

14   Q.    And do students and practicing physicians have to repeat

15   questions often?

16   A.    Yes, yes, just for clarity, to understand what the

17   patient is saying.

18   Q.    Okay.  Now, there were questions about whether 50 percent

19   of communication, 70 percent of the communication, 20 percent,

20   zero percent, as far as what Mr. Argenyi perceived he was

21   getting with regard to communications.

22         Do students sometimes perceive that they're unable to get

23   the kind of communication they're desiring when they're in the

24   longitudinal clinic?

25   A.    Sometimes students will be a bit frustrated they aren't

1    able to get the communication from the patient that they want.

2    Sometimes the patient won't answer.  Sometimes they'll feel

3    that a patient told them one thing, and I'll come into the

4    room as the physician and they'd tell me the complete

5    opposite.  So it's not uncommon for students to feel

6    frustrated.

7    Q.   As we sit here today, Dr. Hansen, are you confident that

8    the MEMT's offer to Mr. Argenyi for a second year of medical

9    school provided effective communication?

10   A.   Yes.

11            MR. MOORE:  I have nothing further.

12            THE COURT:  Cross-examination?

13                        CROSS-EXAMINATION

14   BY MS. VARGAS:

15   Q.   Dr. Hansen, quite frankly I'm a little confused.

16   Yesterday when you testified before the court you were under

17   oath.

18   A.   Yes.

19   Q.   And you were represented by counsel.

20   A.   Yes.

21   Q.   And yesterday, you testified that having 60 percent

22   communication in the clinic wouldn't be effective.

23   A.   Yes.

24   Q.   And having 85 percent communication in the clinic

25   wouldn't be effective, right?

1    A.   Yes.

2    Q.   And then you also testified a moment ago today that the

3    reason you didn't provide interpreters in the clinic was

4    because Mr. Argenyi hadn't provided the sufficient

5    documentation.

6         MR. MOORE:  I'm going to --

7    Q.   Did I understand that correctly?

8         MR. MOORE:  I'm going to object to the question.  She

9    referred to "you".  The MEMT makes the decision with regard to

10   the accommodations.

11        THE COURT:  Well, the witness may respond, if he can.

12   If he needs clarification, he can request it.

13   A.   Please clarify.

14   BY MS. VARGAS:

15   Q.   Okay.  I want to make sure I understand what you

16   testified this afternoon because there seems to be some

17   confusion.  You testified this afternoon that the reason you

18   or the MEMT -- you tell me who -- the reason you didn't

19   provide interpreters for Mr. Argenyi in the clinic at

20   Creighton University is because he didn't provide you with

21   documentation and you needed it.  Did I understand what you

22   need?

23   A.   Yes.  That's correct.

24   Q.   That was it.

25   A.   And to clarify --

1    Q.   Well, let me ask you something.  I'm sorry, I'm asking

2    the questions.  You had an opportunity with your counsel.

3         MR. MOORE:  Your Honor, can he answer the question?

4    This is --

5         THE COURT:  Defense counsel can follow up on

6    redirect.

7         Go ahead, Ms. Vargas.

8         MS. VARGAS:  Thank you, your Honor.

9    BY MS. VARGAS:

10   Q.   Without going into the circumstances of when this

11   happened or why this happened, can we agree that you had an

12   opportunity to testify in this courtroom under oath about that

13   exact same issue and you gave a different answer?

14   A.   I don't understand your question.

15   Q.   Well, let me show you your testimony.

16        THE COURT:  Let's take this down from the jury.

17        MR. MOORE:  May we have a sidebar, your Honor?

18        THE COURT:  All right.

19        MR. MOORE:  This is...

20        (Bench conference on the record.)

21        MR. MOORE:  She's pulling up the testimony from the

22   TRO hearing and the testimony that was on the screen referred

23   to the technical standards and providing things may violate

24   the technical standards.

25        My understanding is we cannot argue -- the basis of that

1    argument was it mediated judgment and that's why it violated

2    the technical standards.  I don't think that's appropriate to

3    be in front of the jury, and I don't think it's appropriate to

4    be asked about.

5            MS. VARGAS:  Your Honor, we don't intend to offer

6    testimony that interpreters mediate judgment.  Defense has

7    offered the technical standards into evidence.  So the fact

8    that it may or may not mention the technical standards is no

9    different than what defendant has already discussed and asked

10   this witness.

11           What I'm intending to ask this witness about, without

12   referencing the circumstances, are his sworn testimony under

13   oath that directly contradicts what he just told the jury

14   about a pivotal issue in this case, which is why he didn't

15   provide -- or why the MEMT didn't provide interpreters in the

16   clinic.  He testified a moment ago that he didn't have

17   documentation.  And he was there and under oath, he gave a

18   very different reason.  I'd like to have an opportunity to

19   explain why he gave two different answers under oath.

20           MR. MOORE:  If she says the TRO, it opens the door

21   and I'll have the opportunity to --

22           THE COURT:  I don't have a reason to believe at this

23   point in time that the questioning is going to violate any

24   prior court orders regarding getting information about

25   mediating judgment.

1              MR. MOORE:  Okay.

2              THE COURT:  So, with the information I have available

3    at this point in time, the objection is overruled.

4              MS. VARGAS:  Thank you, your Honor.

5         (End of bench conference.)

6    BY MS. VARGAS:

7    Q.   Dr. Hansen, you testified under oath in this courtroom

8    not 30 minutes ago that the reason you didn't provide -- the

9    MEMT didn't provide interpreters to Mr. Argenyi in the clinic

10   at Creighton University Medical School was because he didn't

11   provide any documentation that he needed it.  Did I understand

12   you correctly?

13   A.   That is correct.

14   Q.   Okay.  And so if you could please look at this testimony

15   that you gave under oath, and the answer that you gave this

16   time you swore to tell the truth, and if you could please

17   reference and begin reading at line 11 through line 21.

18             MR. MOORE:  What page is this?

19             MS. VARGAS:  On page 69.

20   A.   "So I just want to make sure I am clear on this point,

21   there's no documentation, there's no person that Mr. Argenyi

22   could bring forward, including his physician, that would

23   change Creighton's mind about having an interpreter in the

24   clinical exam room for this year."

25   BY MS. VARGAS:

1    Q.   And if you could begin reading -- let's just stop right

2    there.

3         So it wasn't because he didn't provide the documentation,

4    was it?

5    A.   Yes, it was.

6    Q.   So you testified that it was because -- I'm confused.

7    A.   I'm sorry for your confusion.  The student handbook

8    outlines our process for accommodations.  Accommodations are

9    supposed to be submitted to the Medical Education Management

10   Team five weeks, I believe, prior to the beginning of a

11   semester.  Mr. Argenyi actually had a full year to provide us

12   with that documentation.

13        This document took place after the beginning of the

14   academic year.  And so at this point, this would be making an

15   exception to the student handbook which Mr. Argenyi signed

16   that he understood what was in the handbook.

17   Q.   So let me make sure that I understand the story.  So now

18   the story is that you didn't know that Mr. Argenyi was

19   requesting accommodations for the second year of his medical

20   school?

21   A.   I did not say that.  He provided us --

22   Q.   Was Mr. Argenyi trying to bring a girlfriend into the

23   clinic with him?

24   A.   No, he was not.

25   Q.   Was he trying to bring a dog into the clinic with him?

1            MR. MOORE:  Objection, your Honor, relevance,

2      argumentative.

3            MS. VARGAS:  Your Honor, the witness has testified

4      that if they allowed Mr. Argenyi to bring in an interpreter to

5      the clinic, that would open up the floodgates and they'd have

6      to allow everybody to bring a friend.

7         So I'm asking Mr. Argenyi -- Dr. Hansen about his

8      testimony.

9            MR. MOORE:  Your Honor, what the testimony was is

10     because he didn't show a need, they didn't allow him to have

11     an interpreter.  And if he doesn't have to show a need, nobody

12     does and then everybody can bring somebody in.  That was the

13     testimony.

14           THE COURT:  I don't want to repeat testimony in front

15     of the jury in connection with the objections because I think

16     those matters shouldn't be brought up again before the jury.

17        Ms. Vargas, I think you've made your point with your last

18     two questions, so move on.

19           MS. VARGAS:  Thank you, your Honor.

20     BY MS. VARGAS:

21     Q.   You testified that you went to Dr. Townley's office on

22     the first day that Mr. Argenyi was going to clinic; is that

23     correct?

24     A.   That's correct.

25     Q.   Is that something you do for all students?

1    A.   No, it is not.

2    Q.   So that was a special benefit for Mr. Argenyi, your going

3    with him to meet with his -- with Dr. Townley was a special

4    benefit?

5    A.   Yes.

6    Q.   Was that a special benefit he asked for?

7    A.   No, it was not.

8    Q.   In that meeting, that was the meeting, wasn't it, when

9    Dr. Townley asked if he would be bringing an interpreter with

10   him into the clinic?

11   A.   Yes.

12   Q.   Because she didn't have a problem with that, did she?

13           MR. MOORE:   Objection, foundation, argumentative.

14           THE COURT:   Overruled.  He may answer if he knows.

15   A.   I cannot speculate what Dr. Townley meant by that

16   question or her intention.

17   BY MS. VARGAS:

18   Q.   You were there, and so when she asked if he was bringing

19   an interpreter with him, did it seem like she was upset about

20   it?

21   A.   I'm not going to speculate how she felt.

22   Q.   What did you see on her face?  Did she seem upset?

23   A.   I'm not going to speculate on how she felt.

24   Q.   So, Mr. Argenyi is the only student who gets the benefit

25   of having you go with him to his first day of clinic; is that

1    correct?

2    A.    That is correct.

3    Q.    And he's also the only student -- maybe he's not.  You

4    testified earlier that you gave him the special benefit of

5    giving him a special seat in the lecture hall.

6    A.    Not a special seat, but a seat in the first two rows of

7    the auditorium.

8    Q.    So that first day, was there a specific area you wanted

9    him to sit in --

10   A.    Yes.

11   Q.    -- to see the interpreter?  And that was down front?

12   A.    Yes.

13   Q.    Which side of the room was that on?

14   A.    That was going to be -- if you're facing the screen, it

15   would have been on the left-hand side of the auditorium.

16   Q.    But the interpreter was standing on the right side of the

17   auditorium, wasn't she?

18   A.    It was my understanding she was on the left-hand side.

19   Q.    And you testified that if there were any other students

20   sitting in that area, they would have to leave.

21   A.    If there was not a vacant seat, I would ask someone to

22   vacate a seat so that Michael could sit there.

23   Q.    Was it crowded down front?

24   A.    It was during the break so I don't know who was sitting

25   where.  People were up on bathroom breaks.

1    Q.   We've heard testimony that there were about 125 people in

2    the room at the time.  Was there anyone at the time sitting

3    down in the front?

4    A.   They were on a break.  The room holds approximately 155

5    seats.

6    Q.   Have you ever had an opportunity to give a medical school

7    lecture in that room?

8    A.   Yes, I have.

9    Q.   In your experience, do students typically sit in the

10   front row?

11   A.   No, they don't.

12   Q.   They don't.  Typically the front row is empty, isn't it?

13   A.   Yes, it is.

14   Q.   I'd like to refer back to your testimony about the letter

15   that Mr. Moore drafted August 13th, Exhibit 214.  Do you have

16   that in front of you?

17   A.   I do not.

18        MS. VARGAS:  I'm sorry, your Honor.  May I approach?

19        THE COURT:  You may.

20   BY MS. VARGAS:

21   Q.   So this was the first opportunity that you participated

22   in the MEMT decisions affecting Mr. Argenyi, correct?

23   A.   That is correct.

24   Q.   This August 13th decision was the first time?

25   A.   That is correct.

1    Q.   Okay.  And before this -- before you made this, you

2    helped participate and make this decision, did you have an

3    opportunity to review the kinds of auxiliary aids and services

4    Mr. Argenyi had used in the past?

5    A.   With the documentation I had available, yes.

6    Q.   Okay.

7              MS. VARGAS:  If I may approach again, your Honor?

8              THE COURT:  You may.

9              MS. VARGAS:  I'm going to be showing Dr. Hansen

10   what's been marked as Plaintiff's Exhibit 15.

11   BY MS. VARGAS:

12   Q.   So did you have an opportunity to review that document?

13   A.   I don't recall seeing this document prior to right now.

14   Q.   Did you have a chance to review any documentation of the

15   auxiliary aids and services Mr. Argenyi had used prior to

16   coming to Creighton University?

17   A.   No, I don't recall those documents.

18   Q.   You didn't review that?

19   A.   I don't recall.

20   Q.   A moment ago I understood that you had testified that you

21   had reviewed the accommodations -- the auxiliary aids and

22   services he had used in the past.

23   A.   For the first year of medical school but not prior to

24   that.

25   Q.   You weren't interested in what he had used at every other

1    university he'd attended?

2    A.   It was not my decision, it was the decision of MEMT.  And

3    the other members of MEMT had already made decisions with

4    regard to the first year, so I relied on their historical

5    memory of how they made the decision for the first year.  I

6    was only focusing on the second year.

7    Q.   Do you recall what kind of interpreters they said were

8    provided during the -- Mr. Argenyi provided for himself during

9    the first year in labs?

10   A.   I believe during the first year he was providing himself

11   CART.

12   Q.   And did you have any knowledge of what kind of

13   interpreters he was using during the first year for the

14   smaller group settings?

15   A.   Again I was focusing on the second year of the curriculum

16   based on the documentation that we had received.

17   Q.   I thought you just said that you had reviewed what he

18   used during his first year.

19   A.   With MEMT.

20   Q.   Right.

21   A.   I'm chair of that committee so it was the committee that

22   would look at the accommodations that were used.  I believe

23   that it was accommodation of CART and oral interpreter, but

24   again I don't have that documentation in front of me.

25   Q.   You don't remember that?

```
 1    A.    No.

 2    Q.    So looking back at what I've provided to you, Exhibit 214

 3    from Baird Holm -- I'm sorry, from Mr. Moore, this letter was

 4    the result of the careful consideration of the whole MEMT

 5    committee?

 6    A.    That is correct.

 7    Q.    And you were the chair of the committee?

 8    A.    That's correct.

 9    Q.    And it was very carefully considered?

10    A.    With the documentation available.

11    Q.    And it was --

12    A.    With the documentation I had available.

13    Q.    And it was a decision -- it was a decision you made, it

14    wasn't an accident that these auxiliary aids and services were

15    offered in this letter?

16    A.    That is correct.

17    Q.    So if I used the word "deliberate", it was a deliberate

18    choice what to provide him.  Would that be accurate?

19    A.    That is correct.

20    Q.    Okay.  And so, knowing that Mr. Argenyi had requested

21    CART for his large lectures, and knowing that his doctors had

22    submitted documentation for his need for CART in large

23    lectures, it was the deliberate decision of the MEMT committee

24    to provide him something else.

25          MR. MOORE:  Objection, form of the question.
```

 1            THE COURT:  Overruled.  He may answer if he can.

 2   A.   May I respond with a statement?

 3   BY MS. VARGAS:

 4   Q.   If it's the truth.

 5   A.   We looked at the documentation that we received from -- I

 6   believe it was Dr. Backous, who listed the FM system, CART and

 7   oral interpreters.

 8        We then looked at Michael Argenyi's letter stating that

 9   for him CART and oral interpreters were interchangeable.  So

10   we made the decision to provide him with an oral interpreter.

11            MS. VARGAS:  One moment, your Honor.

12        Your Honor, this has already been admitted into evidence,

13   Plaintiff's Exhibit 5.  Might I just put this on the ELMO?

14            THE COURT:  You may.

15   BY MS. VARGAS:

16   Q.   Can you see that okay?

17   A.   Yes, I can.

18   Q.   You testified a moment ago that the reason you decided to

19   provide interpreters when Mr. Argenyi had said that he needed

20   captioning in large lectures was because he said they were

21   interchangeable?

22        And I do see in the second sentence, what does it say

23   in -- sorry, the paragraph begins with "I believe", the second

24   sentence of that paragraph.

25   A.   "Real-time captioning and interpreting, and in my case

1    cued speech or oral, are generally considered interchangeable

2    based on client's preference and availability."

3    Q.   Do you see the word "generally" there?

4    A.   Yes.

5    Q.   And if you look above to the section heading, it's

6    underlined.  And it says, "regarding the requested

7    accommodations."  Doesn't he make specific requests for each

8    setting in this same letter?

9    A.   Yes, he does.

10   Q.   So you paid attention to that one sentence, but the rest

11   of the letter that included specific information, that wasn't

12   important to you?

13   A.   What was important to us was the documentation that we

14   had received from a physician stating that the FM system,

15   CART, and oral interpreters are basically the same.

16   Q.   Could you let me know what letter that is?  What date was

17   that?

18   A.   I believe it was in June from Dr. Backous.

19   Q.   Do you mean the May 27th letter from Dr. Backous?

20   A.   That may be it.

21        MS. VARGAS:  Could we get that on the ELMO?

22   BY MS. VARGAS:

23   Q.   Can you see that okay?

24   A.   Yes, I can.

25   Q.   Can you tell me where in that letter it says that

1    captioning and cued speech interpreters and an FM system are

2    all the same thing?

3    A.   It says, "With Michael, the following combinations are

4    considered to be appropriate."

5    Q.   Okay.  Go ahead.  Keep reading.

6    A.   Then it lists FM system, real-time captioning, and then

7    number 3 is, I believe, the oral cued interpreter.

8    Q.   Right.  And where does it say that an FM system, which it

9    says, "gives an improved signal-to-noise ratio in a group

10   working environment to aid in tracking fast-moving

11   conversation," where does it say that the FM system is the

12   same thing as real-time captioning?

13   A.   It does not say "the same".

14        The MEMT looked at this, and the fact that it says, "the

15   following accommodations are considered to be appropriately --

16   appropriate specifically for Michael," we took this to

17   indicate that all three would work for Michael.

18   Q.   Like a restaurant menu?

19   A.   I did not say that.

20   Q.   Looking back at the letter from Mr. Moore, which

21   documented the deliberate decision of the MEMT committee going

22   into the second year of medical school, you have testified

23   that you offered interpreters in the large lecture halls --

24   that was the MEMT's decision to do that.

25   A.   That is correct.

1    Q.   And why would you offer interpreters rather than

2    captioning when Mr. Argenyi had requested captioning, had used

3    it at every institution he ever attended and had paid for it

4    himself to provide access in the first year of medical school?

5         MR. MOORE:  Objection, asked and answered.

6         THE COURT:  Overruled.  He may answer.

7    A.   We looked at the fact that Michael was requesting both

8    CART and the oral interpreters.  We looked at the

9    documentation that we received from Mr. Argenyi indicating

10   that both were interchangeable.  And then we had to consider

11   the cost factor and the fact that cued speech is over twice

12   the cost of an oral interpreter.

13   BY MS. VARGAS:

14   Q.   Let's talk about cost then, since you brought it up.

15   Isn't it true that there aren't any cued speech interpreters

16   in the Omaha area?

17   A.   We had an oral interpreter.

18   Q.   Well, let's talk about the cued speech interpreter.

19   A.   That, I don't know the answer to.

20   Q.   Okay.  So the -- I understand -- I see that you're

21   looking at Mr. Moore.

22   A.   Where would you like me to look?

23   Q.   Look at the jury, look at me, look anywhere you want.

24   You don't need to look at Mr. Moore to give you advice.

25        MR. MOORE:  I was looking down.

1           THE COURT:  I don't have any reason to believe that

2     anyone is doing anything improper in giving or receiving cues.

3           MS. VARGAS:  I was not suggesting that Mr. Moore was.

4     I was commenting on the fact that the witness keeps looking

5     over to Mr. Moore.

6           THE COURT:  I don't even know that that's improper.

7     We'll just proceed.

8           MS. VARGAS:  All right.

9     BY MS. VARGAS:

10    Q.   So, there was testimony earlier today that Creighton

11    University was able to obtain CART for $75 an hour.

12    A.   The number that I was provided was, I believe, $95 per

13    hour for CART, $40 per hour upon an oral interpreter.

14          MS. VARGAS:  Could we approach with the exhibit --

15    with Exhibit 40, please?

16          THE COURT:  You may.

17    BY MS. VARGAS:

18    Q.   So was Dr. Kavan a part of the MEMT?

19    A.   Yes, he was.

20    Q.   And so you see that this exhibit, which has been admitted

21    into evidence and which Dr. Kavan testified about, this says

22    he was able to get CART for $75 an hour, correct?

23    A.   That's correct.

24          MR. MOORE:  Objection, mischaracterization of the

25    exhibit.

```
 1              THE COURT:  Overruled.  He may answer.

 2    A.    That is correct.

 3    BY MS. VARGAS:

 4    Q.    Okay.  And how many interpreters are necessary for --

 5    just assuming they would be effective, how many interpreters

 6    are necessary for a four-hour lecture?  You can't use just

 7    one, can you?

 8    A.    I don't know the answer to that.  You're indicating two.

 9    Q.    So I am indicating two.  There's been testimony that you

10    need two interpreters for a four-hour lecture.

11              MR. MOORE:  There has been no testimony on that

12    issue, your Honor.

13              THE COURT:  I don't recall hearing testimony of that.

14              MS. VARGAS:  I'm happy to rephrase.  It's been a long

15    week.

16              THE COURT:  Okay.

17         The jury will disregard counsel's comment about the

18    number of interpreters that may or may not be required for any

19    length of time.

20         Go ahead.

21    BY MS. VARGAS:

22    Q.    So, if it's true that two interpreters are necessary in a

23    lecture setting, and they cost $40 an hour, wouldn't it mean

24    $80 an hour for interpreters?

25    A.    That's speculation.  I don't know if it's true that two
```

 1     are required.

 2     Q.   You don't know that?

 3     A.   I do not.

 4     Q.   But you wouldn't have chosen the more expensive option on

 5     purpose, would you?

 6     A.   No, we would not.

 7     Q.   Okay.  And so then turning from lectures to

 8     laboratories -- laboratory classes, as I understand Exhibit

 9     214 -- and you have it in front of you, right, sir?

10     A.   Yes, I do.

11     Q.   On page 2 of Exhibit 14 [*sic*] where it discusses

12     laboratory classes, in some of the labs, an interpreter's

13     offered and in some of the labs, Mr. Argenyi is offered the

14     special benefit of standing close to his teacher.  Do I

15     understand that correctly?

16     A.   Which paragraph are you reading?

17     Q.   Well, the standing close is in the paragraph at the

18     bottom of the page.

19     A.   Yes.

20     Q.   And so Mr. Argenyi had requested for lectures with

21     didactic elements -- I'm sorry, with labs with didactic

22     elements -- the lecture labs, the labs that had more than just

23     doing an experiment or cutting something open, he had

24     requested CART in those didactic labs, correct?

25     A.   That is correct.

1    Q.   And in the labs that involved moving around and doing

2    blood draws and those kinds of things, he had requested

3    interpreters.

4    A.   That is correct.

5    Q.   And do you find it deliberate that what was offered was

6    exactly not what he asked for?

7    A.   We offered him the oral interpreter.

8    Q.   Right.  So where he'd asked for CART in certain labs, you

9    offered interpreters.

10   A.   That is correct.

11   Q.   And where he asked for interpreters in certain labs, you

12   offered standing close to the teacher.

13   A.   (No response.)

14   Q.   That seems a little bit fishy to you, doesn't it?

15   A.   My interpretation of this is that for the cardiology

16   portion of the EKG lab, the instructor will provide

17   instructions for the group while standing close to

18   Mr. Argenyi's work area.  So it's the instructor who is

19   standing...

20   Q.   How will -- okay.  Having the instructor stand close to

21   Mr. Argenyi, how will that help him understand speech?

22   A.   I'd like to explain the nature of small groups, if I may,

23   to the jury.

24           THE COURT:  If counsel does not object, you may.

25   A.   In general, with the small groups, what happens,

 1   oftentimes students are given a case prior to the small group,

 2   and so they are to read through the case.  There are specific

 3   questions for the case that the students are to come to the

 4   small group already have answered.

 5        So, in those situations, we felt with the groups being

 6   15, 12, or smaller, that it was not unreasonable given that

 7   Mr. Argenyi had said that in small groups that he would not

 8   need an interpreter, that we do not need to provide an

 9   interpreter.  For those situations in which there was teaching

10   that was going on in the small groups, a lecture-style format,

11   then we would provide an oral interpreter for Mr. Argenyi.

12        In the case with the EKG lab where they're doing an EKG

13   on students and then practice looking at the EKG to learn how

14   to read it, we felt that it was reasonable for Mr. Argenyi to

15   stand close to the instructor in case he had difficulty

16   hearing the instructor.

17   BY MS. VARGAS:

18   Q.   Are you an audiologist, sir?

19   A.   I am not.

20   Q.   Did anyone on the MEMT committee have any audiology

21   training?

22   A.   No, they did not.

23   Q.   Did anyone on the MEMT committee actually read

24   Mr. Argenyi's audiogram?

25   A.   No, they did not.

1    Q.   Did anyone on the MEMT committee consider going to one of

2    the professors at Creighton University School of Medicine who

3    have received federal funding to cure deafness to ask them how

4    to read an audiogram?

5    A.   We did not.

6    Q.   Why is that?

7    A.   We did not have the documentation that we felt was needed

8    to provide the accommodations for Mr. Argenyi.

9    Q.   What documentation would that have been?

10   A.   The documentation that we ask of all students, that we

11   have a diagnosis from a physician indicating what the needs

12   are, and we based it on that.  We based it on Mr. Argenyi's

13   letter to us and then the feedback that we were getting from

14   our faculty.

15   Q.   You remember being deposed in this case?

16   A.   Yes, I do.

17   Q.   And you were under oath.

18   A.   Yes, I am.

19   Q.   And you were represented by counsel.

20   A.   Yes, I was.

21   Q.   And at your deposition, you testified --

22             MR. MOORE:  What page, please?

23             MS. VARGAS:  I'm sorry, page 59 and 60, the bottom of

24   page 59.

25   BY MS. VARGAS:

1    Q.    The question was:

2          Question:  So what does Michael need to do in order to

3    present that information to you?

4          And sir, you answered:  Quite simply, Michael would have

5    to demonstrate how he would be able to hear the patient and

6    maintain the technical standards.

7          So the documentation you were waiting for was proof that

8    Mr. Argenyi could hear; is that correct?

9    A.    The proof was that he was able to meet the technical

10   standards; and if not, specifically what -- and this is -- the

11   technical standards are applied to the patient care.  So we

12   need to have a note from a physician that he could not meet

13   the technical standards, but then what accommodations would be

14   required for him to meet the technical standards.

15   Q.    But the technical standards say that the Americans with

16   Disabilities Act in Section 504 apply.

17   A.    That's correct.

18   Q.    And that you can make accommodations.  So I'm a little

19   confused about how it is that you testified that you were

20   waiting for proof that Mr. Argenyi could hear in order to

21   provide him accommodations he needed because he couldn't hear.

22   Does that make sense to you?

23   A.    I don't know how to answer that question.

24   Q.    Me either.

25          MS. VARGAS:  No further questions.

```
 1                    THE COURT:  Redirect?

 2                    MR. MOORE:  Yeah, just a couple of questions.

 3                              REDIRECT EXAMINATION

 4    BY MR. MOORE:

 5    Q.   Dr. Hansen, Mr. Argenyi had submitted one audiogram to

 6    the MEMT in M1.  He didn't submit any other audiograms for M2,

 7    did he?

 8    A.   No, he did not.

 9    Q.   Mr. Argenyi never provided an explanation of the

10    audiogram, did he?

11    A.   No, he did not.

12    Q.   Would you expect that from him if he wanted the

13    audiogram -- wanted to provide the audiogram as support?

14    A.   Yes.

15    Q.   Would you expect that from any other student?

16    A.   Yes.

17    Q.   Now, did Wade Pearson provide the MEMT with the numbers

18    with respect to the cost of CART?

19    A.   Yes.

20    Q.   Is that one of the reasons he was there?

21    A.   Yes.

22    Q.   And you said you took cost into consideration, right?

23    A.   Yes.

24    Q.   And that's why you chose to offer the oral interpreters

25    over CART.
```

```
 1    A.   Yes.

 2             MS. VARGAS:  Objection, your Honor, he's leading the

 3    witness.  And I'd like to hear what Mr. -- Dr. Hansen has to

 4    say.

 5             THE COURT:  It has become leading.  Go ahead.

 6    BY MR. MOORE:

 7    Q.   Why did you ask Mr. Pearson to come to the meeting?

 8    A.   We needed to know what the cost of the accommodations

 9    would be, especially when we were considering CART versus an

10    oral interpreter.

11             MR. MOORE:  May I have a minute, your Honor?

12             THE COURT:  You may.

13    BY MR. MOORE:

14    Q.   Dr. Hansen, just so -- there was a lot of back and forth.

15    Did the MEMT consider all the documentation that Mr. Argenyi

16    submitted from Dr. Backous and Stacey Watson?

17    A.   Yes.

18    Q.   Did they consider the letter that was sent from the

19    supervisor, Amanda Mogg?

20    A.   Yes.

21    Q.   Did they consider the letter he sent in support of his

22    own requests?

23    A.   Yes.

24    Q.   Just one last question.  Did Mr. Argenyi even try the

25    accommodations that the MEMT offered him for his M2 year?
```

1    A.   No, he did not.

2            MR. MOORE:  Nothing further.

3            THE COURT:  Thank you, Dr. Hansen.  You may stand

4    down, and you are excused.

5            THE WITNESS:  Thank you.

6            THE COURT:  It's now close to five o'clock.  We're

7    not going to start with another witness at this time.

8        We will start again tomorrow at nine o'clock in the

9    morning.

10       Enjoy your evening with your family and friends, talk

11   about something other than the case.  Keep an open mind until

12   all the evidence and the arguments are in and you've been

13   instructed on the law.

14       We'll see you tomorrow at 9.

15       We are in recess.

16       (Jury out at 4:55 p.m.)

17           THE COURT:  Please be seated.  And I actually have a

18   question for you this time.

19       We'd like to talk a little bit about schedule and

20   anticipated schedule simply because now and then Ms. Frahm

21   sticks hearings in for me at 8:30 in the morning or one

22   o'clock in the afternoon.  And as you know, we have those

23   hearings -- numerous hearings set for Tuesday that will

24   proceed if we're not in trial on Tuesday.

25       So, I guess I'll direct my question to Mr. Moore about

1    what you anticipate in the way of additional evidence.

2           MR. MOORE:  We'll have Wade Pearson, Jan Madsen,

3    Chuck Lenosky, Dr. Townley and Victoria Deuel.  I have no

4    doubt we'll finish tomorrow.

5      I can tell you that Wade Pearson would be the longest

6    witness that we have.  Most of the other ones are relatively

7    short.  I would think that we would rest certainly tomorrow,

8    if not in the early afternoon.

9           THE COURT:  All right.  And I won't hold the

10   plaintiff to it because you don't know what all the evidence

11   is going to show and how much rebuttal you want, but at this

12   point in time, do you anticipate calling any rebuttal

13   witnesses?

14          MS. VARGAS:  Well, your Honor, I guess the confusion

15   in my mind is really with respect to the boundaries that the

16   Court decides with respect to defendant's assertion of undue

17   burden as we've discussed earlier.  And I recognize it's the

18   end of the day.

19     Our position obviously is it's been waived over and over

20   and over again.  And it's not so much an issue of impeachment,

21   it's in briefs where counsel has deliberately waived it.  So

22   we can't show that to the jury to impeach.  It's an admission

23   of a legal fact.  They've waived undue burden with respect to

24   the provision of interpreters for M1 and M2.

25     So, what we will need to offer on rebuttal would be

1    directly correlated to what defenses they're allowed to

2    resurrect.

3              THE COURT:  Okay.

4              MR. MOORE:  I don't know what that means, but...

5              THE COURT:  We will see how things proceed tomorrow,

6    and we'll just take it one step at a time.

7         At this point, Ms. Frahm, I have one hearing on Friday.

8    What time is that set for?

9              COURTROOM DEPUTY:  8:30.

10             THE COURT:  What is that, a sentencing?

11             COURTROOM DEPUTY:  Supervised release violation.

12             THE COURT:  Okay.  We will leave things as they are

13   for the moment, anticipating that we may get the case to the

14   jury on Friday.  And of course, if they're deliberating on

15   Tuesday, that's fine, that doesn't matter.

16        All right.  Thank you.

17        Good night.

18

19        (Adjourned at 4:59 p.m.)

20

21

22        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

23

24        /s Brenda L. Fauber                    7-21-14
          Brenda L. Fauber, RDR, CRR               Date

25