1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEBRASKA
2

3    MICHAEL S. ARGENYI,          )
                                  )
4              Plaintiff,         )        8:09CV341
                                  )
5         vs.                     )     Omaha, Nebraska
                                  )     August 29, 2013
6    CREIGHTON UNIVERSITY,        )
                                  )
7              Defendant.         )

8

9

10                            VOLUME VI
                      TRANSCRIPT OF PROCEEDINGS
11          BEFORE THE HONORABLE LAURIE SMITH CAMP
           CHIEF UNITED STATES DISTRICT JUDGE AND A JURY
12

13

14

15

16

17

18

19

20   COURT REPORTER:          Ms. Brenda L. Fauber, RDR, CRR
                              111 S. 18th Plaza
21                            Suite 3122
                              Omaha, NE 68102
22                            (402) 661-7322

23

24

     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.

```
 1                           A-P-P-E-A-R-A-N-C-E-S

 2

 3      FOR THE PLAINTIFF:            Ms. Mary C. Vargas
                                      Mr. Michael S. Stein
                                      Stein Vargas Law Firm
 4                                    P.O. Box 522
                                      Emmitsburg, MD 21727
 5

 6                                    Ms. Dianne D. DeLair
                                      Nebraska Advocacy Services
 7                                    134 South 13th Street
                                      Suite 600
 8                                    Lincoln, NE 68508

 9
                                      Ms. Caroline E. Jackson
10                                    NAD and Advocacy Center
                                      8630 Fenton Street
11                                    Suite 820
                                      Silver Springs, MD 20910
12

13      FOR THE DEFENDANT:            Mr. Scott P. Moore
                                      Ms. Allison D. Balus
14                                    Baird Holm Law Firm
                                      1700 Farnam Street
15                                    Suite 1500
                                      Omaha, NE 68102
16

17

18

19

20

21

22

23

24

25
```

1          (At 9:02 a.m. on August 29, 2013, with counsel for the

2     parties and the plaintiff present, and the jury NOT present,

3     the following proceedings were had:)

4          THE COURT:  Good morning.

5          MS. VARGAS:  Good morning.

6          THE COURT:  I understand there are some things that

7     counsel would like to address before the jury comes in.  No?

8          MS. VARGAS:  I'm sorry, your Honor, I understood

9     Mr. Moore had issues he wanted to address.

10         MR. MOORE:  Yes.  As this trial has progressed, your

11    Honor, I know you had slated us for 30 minutes for closing

12    argument.  We can talk about this in the instruction

13    conference or afterwards, but we'd like some additional time

14    to kind of bring the story together.  We'd ask for an hour.

15         THE COURT:  An hour?  This trial has been a long time

16    in coming, and I'm not going to cut you short on the

17    opportunity to make your closing arguments to the jury.

18      So, both sides will have an hour.

19         MR. MOORE:  Thank you, your Honor.

20         THE COURT:  Is that sufficient for the plaintiff?

21         MS. VARGAS:  Your Honor, the jury has sat for almost

22    two weeks, and I think half an hour is sufficient.  But if

23    Mr. Moore needs an hour, I'm certainly not going to object.

24         THE COURT:  Thank you.

25         MR. MOORE:  Thank you, your Honor.

DEUEL - DIRECT                                                         887

1           THE COURT:  Please bring in the jury.

2           (Jury in at 9:08 a.m.)

3           THE COURT:  Please be seated.  Good morning.

4       As you know, the defense is in the process of the

5   presentation of its evidence.

6       And at this time, Mr. Moore, you may call your next

7   witness.

8           MR. MOORE:  We would call Victoria Deuel.

9           THE COURT:  Ms. Deuel, if you'll come forward to the

10  courtroom deputy here on my right, she will swear you in.

11          COURTROOM DEPUTY:  State your full name for the

12  record, please, and spell your last name.

13          THE WITNESS:  Victoria May Deuel, D-e-u-e-l.

14           VICTORIA DEUEL, DEFENDANT'S WITNESS, SWORN

15          THE COURT:  You may inquire.

16          MR. MOORE:  Thank you, your Honor.

17                         DIRECT EXAMINATION

18  BY MR. MOORE:

19  Q.   Ms. Deuel, can you introduce yourself?

20  A.   Hi.

21  Q.   And Ms. Deuel, are you employed?

22  A.   Yes.

23  Q.   And by whom are you employed?

24  A.   I'm a freelance sign language interpreter.

25  Q.   Okay.  And do you know Michael Argenyi?

1    A.    Yes.

2    Q.    How do you know Mr. Argenyi?

3    A.    I provided services for him.

4    Q.    And when you provided sign language services, was that at

5    Creighton University School of Medicine?

6    A.    Correct.

7    Q.    Did Creighton University hire you to provide interpreting

8    services for Mr. Argenyi for his second year of medical

9    school?

10   A.    Yes.

11   Q.    And did you attend a lecture on the first day of

12   Mr. Argenyi's class -- classes in the M2 year to provide

13   interpreter services?

14   A.    Yes.

15   Q.    What happened that day?

16   A.    When I arrived, he was already seated in the auditorium

17   next to CART.  And he was -- asked why I was there and I said

18   to provide interpreting services, that Creighton had hired me.

19         And after a short -- after the class started, a short

20   time later, he wasn't watching me.  And he basically said he

21   wasn't going to watch me and I could go ahead and leave.

22         I asked, "Do you want me to leave?  Do you want me to

23   stay?"  And we kind of associated [*sic*] back and forth, and at

24   that time I went ahead and left.

25   Q.    Now, Mr. Argenyi has testified that in that lecture he

1    did look at you and -- tried to look at you and then turned

2    back to CART and wasn't able to, and then at the end of the

3    class came down and you asked if you should leave; is that

4    correct?

5    A.   No.

6    Q.   Did he indicate -- did he say anything to you with regard

7    to whether he would look at you or not?

8    A.   He said he wasn't going to watch me.

9    Q.   Were you subpoenaed to come here today?

10   A.   Yes.

11   Q.   And did you have any concern testifying today?

12   A.   I do.  Interpreters follow a strict code of

13   confidentiality and it's against our confidentiality to talk

14   about assignments.  But once you're subpoenaed, then that code

15   of confidentiality is no longer...

16   Q.   Applicable?

17   A.   Yeah.

18   Q.   And any other concerns that you have?

19   A.   No, not really.

20            MR. MOORE:  I have nothing further, your Honor.

21            THE COURT:  Cross-examination?

22                          CROSS-EXAMINATION

23   BY MS. JACKSON:

24   Q.   Good morning, Ms. Deuel.

25   A.   Good morning.

1    Q.   Are you certified as a sign language interpreter?

2    A.   I am not nationally certified, no.

3    Q.   Are you certified by Nebraska?

4    A.   We're licensed in Nebraska.

5    Q.   Is that certified?  Did you have to take a test?

6    A.   Correct, yes, but it's not a certification, it's a

7    license -- it's a assessment.

8    Q.   So you're not certified to provide sign language services

9    but you decided to interpret in a medical school for a

10   lecture?

11        MR. MOORE:  Objection, beyond the scope.  She was

12   called specifically just to rebut -- excuse me, to impeach

13   Mr. Argenyi.

14        THE COURT:  Sustained.

15   BY MS. JACKSON:

16   Q.   When we discussed that day -- how clear did you say your

17   recollection was?

18   A.   Fairly.

19   Q.   Fairly?

20   A.   Fairly clear.

21   Q.   Did you review any notes to refresh it?

22   A.   I do not keep notes about assignments.

23   Q.   Did Creighton give you any notes?

24   A.   No.

25   Q.   Do you remember telling me that you don't have a clear

```
 1    recollection of what happened?

 2    A.    I remember stating that I do not exactly remember word

 3    for word what was said.

 4    Q.    So you don't know for certain what was said there.

 5    A.    Not word for word.

 6    Q.    You just have a general recollection of maybe what

 7    happened.

 8    A.    I have a -- I have a fairly clear general recollection of

 9    the exchange that happened, yes, of, "I'm not going to watch

10    you," and "do you want me to stay or go," "you can go ahead

11    and leave."

12          Is that the exact words that was said?  Probably not.

13    Q.    And you were hired by Creighton that day?

14    A.    Correct.

15    Q.    So you worked for Creighton.

16    A.    Correct.

17               MS. JACKSON:  No further questions, your Honor.

18               THE COURT:  Redirect?

19               MR. MOORE:  I have nothing further.  Thank you.

20               THE COURT:  Ms. Deuel, you may stand down and you are

21    excused.

22               THE WITNESS:  Thanks.

23               THE COURT:  Defense may call its next witness.

24               MS. BALUS:  Thank you, your Honor.  Defense calls

25    Chuck Lenosky.
```

1          THE COURT:  Mr. Lenosky, if you will please come

2    forward to the courtroom deputy here on my right, she will

3    swear you in.

4          COURTROOM DEPUTY:  State your full name for the

5    record, please, and spell your last name.

6          THE WITNESS:  Charles Alexander Lenosky,

7    L-e-n-o-s-k-y.

8          CHARLES LENOSKY, DEFENDANT'S WITNESS, SWORN

9          THE COURT:  You may inquire.

10          MS. BALUS:  Thank you, your Honor.

11                        DIRECT EXAMINATION

12    BY MS. BALUS:

13    Q.   Good morning, Mr. Lenosky.  Could you please introduce

14    yourself to the jury.

15    A.   My name is Chuck Lenosky.

16    Q.   And where do you currently live, what city?

17    A.   Omaha, Nebraska.

18    Q.   Where are you currently employed?

19    A.   I work at Creighton University in the division of

20    information technology.

21    Q.   What's your position?

22    A.   I'm director of learning environments.

23    Q.   And how long have you worked for Creighton University?

24    A.   I started in March of 1982, so over 31 years.

25    Q.   And how long have you been in your current position?

1    A.    Approximately ten years.

2    Q.    What are your job responsibilities in your position?

3    A.    I have the responsibility for managing the team that

4    supports the university's 170 or so classrooms.  So that's the

5    technology that's in the classrooms and things like

6    videoconferencing and other technology-related learning

7    environments.

8    Q.    So can you give the jury some examples of things you do

9    in your job for Creighton?

10   A.    Sure.  We build new classrooms, we're doing a lot of

11   renovation right now.  When there are problems, the engineers

12   that work for me answer faculty questions.  If the faculty

13   member is having a problem, we go right away to try to help

14   them.  But we also look to design new learning environments.

15   Q.    Were you involved at all in Creighton Medical School's

16   response to Mr. Argenyi's request for accommodations?

17   A.    Yes.

18   Q.    What was your involvement?

19   A.    I was asked to buy and install the hearing assist device

20   that we eventually did.

21   Q.    Do you remember what that device is called?

22   A.    Phonak, I believe.

23   Q.    Is it sometimes referred to as an FM system?

24   A.    Yes.

25   Q.    Do you recall when someone first approached you about

1    this?

2    A.   It was July of '09.  And from my recollection, it was a

3    conversation either with Dr. Kavan or Wade Pearson.  And then

4    it was followed up by e-mail.

5    Q.   And what did they direct you to do?

6    A.   They directed me to buy a specific system that was

7    recommended by Mr. -- by Michael's people.

8    Q.   Okay.

9         MS. BALUS:  Kris, can we pull up Exhibit 210, please?

10   I believe this is already in evidence.

11        And could we pull up from the very top down to the -- to

12   "Sincerely, Michael Argenyi".

13        THE COURT:  Just a note 210 is indeed in evidence.

14        MS. BALUS:  Thank you, your Honor.

15   BY MS. BALUS:

16   Q.   Now, Mr. Lenosky, what is this document?

17   A.   It's an e-mail that I was copied on.

18   Q.   Okay.  And who forwarded you this e-mail?

19   A.   Looks like Dr. Kavan.

20   Q.   Okay.  And whose e-mail is he forwarding to you?

21   A.   It's down below, but it was Michael's e-mail.

22   Q.   What did Mr. Argenyi convey to Creighton in this e-mail?

23   A.   He laid out the specific products that the transmitter

24   which was the Phonak Inspiro, the specific kind of receiver.

25   And then he named his audiologist and the representative for

1    the FM system so that we could contact them.

2    Q.   Did you contact Ms. Watson?

3    A.   Yes.

4    Q.   And did you have any trouble getting ahold of her?

5    A.   I did because in this e-mail there's no contact

6    information for her other than where she worked.  And I did

7    try to contact her through -- find her address or phone number

8    through Google, but I eventually got it through Michael.

9         Because she's a clinician, they're particularly hard to

10   get ahold of during the day, but we did speak.

11   Q.   Did you get ahold of her on the first time you called

12   her?

13   A.   No.

14   Q.   So what did Ms. Watson say to you?

15           MS. DeLAIR:  Objection, hearsay.

16           MS. BALUS:  It goes to the information Creighton

17   relied on in purchasing this FM system.

18           THE COURT:  All right.  The jury may accept the

19   statement made by Ms. Watson to Mr. Lenosky not for the truth

20   of what the matter Ms. Watson -- the truth of the statements

21   Ms. Watson made, but as the basis for why this witness took

22   the actions that he took.

23        You may respond.

24   A.   Okay.  I wanted to make sure that this was the system --

25   this was the system that she was recommended to work with

1    Michael's cochlear implant.  I wanted to know if there were

2    any special configuration or things that we needed to do that

3    I needed to be aware of to make sure that it would work

4    properly for him once we got it installed.

5         And she just reassured me that this was the best system

6    and that there were no really special configurations or

7    anything like that for this.

8    Q.   Did she say anything about any limitations on the system?

9    A.   Not that I recall, no.

10   Q.   And were you able to confirm with her that you had all

11   the information you needed to purchase the FM system?

12   A.   Yes.  I mean, I believe even before I spoke to her that

13   we had a place to buy it at and that we were ready to order

14   the system.

15   Q.   And she confirmed that that was indeed the appropriate

16   system?

17   A.   Yes.

18   Q.   And so then what did you do next based on your

19   conversation with Ms. Watson?

20   A.   Well, I believe I would have told Mr. Pearson to go ahead

21   and place the order because we were going to buy that system.

22   He had a way to order it quickly just with a credit card

23   through the University system.

24        And then I was hiring an outside AV company to do the

25   install work in several of the classrooms where it would be

1    needed.

2    Q.   Is it common for you to hire an outside vendor to do the

3    installation work --

4    A.   Yes.

5    Q.   -- for IT stuff?

6              THE COURT:  Just a moment.  I need to ask the witness

7    to be sure that you wait until the question is complete before

8    you answer.  Otherwise, we can't make a clear record.

9        Go ahead, Ms. Balus.

10             MS. BALUS:  Thank you, your Honor.

11   BY MS. BALUS:

12   Q.   From the research you did, was the FM system purchased

13   for Mr. Argenyi a good piece of technology?

14   A.   I believe so, yes.

15   Q.   Where were the FM systems installed in the medical

16   school?

17   A.   It was installed in the major teaching lecture hall where

18   freshmen medical students have their lectures.  It was also

19   installed in a small group room, again where his cohort of

20   students would be taking their small group lectures.  And it

21   was also installed in an anatomy lab.

22   Q.   Was there some urgency in getting the system installed?

23   A.   Yes.

24   Q.   Why was that?

25   A.   Because this -- we were already -- by the time I got

1    ahold of Dr. Watson, it was somewhere early in August.  And

2    classes were beginning -- I believe the date was August 17th

3    or somewhere in that range.

4    Q.   Did you get it installed by the first day of class?

5    A.   I believe so.  I mean, we had something ready to go on

6    day one.  From my recollection, I think we still needed to

7    have a session where Michael could tell us if we needed to

8    turn the system up or down or not after the first lecture.

9    But the first lecture was just orientation so there was no

10   material for -- that he would be graded on or anything like

11   that.

12   Q.   Did you --

13   A.   But that's just -- oh, I apologize.  That's just my

14   recollection.

15   Q.   Okay.  Did you do anything to make sure the FM system was

16   working then?

17   A.   We did everything that we could, of course.  And then we

18   did have Michael come and we made sure that -- I believe we

19   turned the system up a little bit for him in the lecture hall.

20   And then we did the same thing a few days later in the small

21   group room.  In fact, we exchanged e-mails because I needed

22   him to come and be there for us and we eventually worked that

23   out.

24   Q.   How many times do you recall meeting with Mr. Argenyi

25   about the FM system?

1    A.   I would say twice, probably once in the lecture hall and

2    once in the small group room.

3    Q.   Did Mr. Argenyi ever tell you that the FM system wasn't

4    working?

5    A.   No.

6    Q.   If he had, what would you have done?

7    A.   We would have done everything that we can to make it

8    work.

9    Q.   Was this the first hearing assistive device that

10   Creighton has installed?

11   A.   No.

12   Q.   What other type of device was there?

13   A.   In building a new building in 2008, we installed some

14   general hearing assist devices in the auditorium in the Harper

15   Center.

16   Q.   Was this the first hearing assistive device that was

17   specific to one student that you installed?

18   A.   As far as I know, yes.

19   Q.   Have you been involved in installing any other assistive

20   technology for students with disabilities?

21   A.   Yes.  The Harper Center issue, we've installed touch

22   panels where students make appointments to have

23   technology-related problems fixed for them.  And we had to

24   follow ADA standards to make sure that it was accessible by

25   all students.  It's placed in a public hallway.

1          And then in a lot of classrooms, when we're designing

2     classrooms, we need to make sure that there are proper tables

3     and chairs if we do have someone that's rolling in with a

4     wheelchair and other things like that.

5     Q.   Do you recall putting in any other assistive technology

6     for one specific student other than this FM system for

7     Mr. Argenyi?

8     A.   No.

9     Q.   Are you familiar with the video equipment that's used to

10    record the OSCE exams that the medical students take?

11    A.   Yes.

12    Q.   And is that technology being replaced right now?

13    A.   Yes.

14    Q.   Why?

15    A.   Because the other system was failing.

16    Q.   In what ways?

17    A.   There were times when it just simply would fail to

18    record.  We've had system failures where hard drives fail.

19    And quite frankly, from the very beginning of the system,

20    we've had problems with what's called the sync between video

21    and audio.  So the lip sync isn't proper when you're looking

22    at somebody speaking, and that can be very difficult to watch

23    when you're trying to -- this is used as an evaluation tool.

24    Q.   And why was it important for Creighton Medical School to

25    replace this system?

1    A.   Having that type of equipment is necessary to meet

2    accreditation.

3            MS. BALUS:  I have no further questions, your Honor.

4            THE COURT:  Cross-examination?

5            MS. DeLAIR:  Thank you, your Honor.

6                        CROSS-EXAMINATION

7    BY MS. DeLAIR:

8    Q.   Mr. Lenosky, you're not an audiologist, are you?

9    A.   No, I'm not.

10   Q.   You're not an ear doctor?

11   A.   I'm not.

12   Q.   Okay.  And you said that part of your responsibilities is

13   ensuring accessibility in the lecture halls; isn't that right?

14   A.   I would have to work with people to provide whatever is

15   necessary, so if that's a piece of furniture or if it's a

16   piece of technology, yes.

17   Q.   And if technology breaks, you fix it.

18   A.   I have someone that fixes it, yes.

19   Q.   If it's not working, you're right on it.

20   A.   To the best of our ability, yes.

21   Q.   Mr. Lenosky, are you part of any of the facility surveys

22   regarding classroom access at Creighton University?

23           MS. BALUS:  Objection, your Honor, beyond the scope.

24           THE COURT:  It does appear to be beyond the scope.

25           MS. DeLAIR:  He did testify that he was the director

 1    of learning environment of the entire university.

 2              THE COURT:  Fine.  I'll let him answer the question

 3    and we'll find out if it relates to what was discussed on

 4    direct.

 5         You may answer.

 6    A.   Can you answer the question again?

 7    BY MS. DeLAIR:

 8    Q.   Are you familiar with the classroom accessibility surveys

 9    done at Creighton University?

10    A.   I'm aware, yes.

11    Q.   You are?  And are -- would you be responsible for

12    assisting in accessibility based on the results of those

13    surveys?

14    A.   Yes, if I'm asked to by facilities management, yes --

15    Q.   Even --

16    A.   -- or -- I'm sorry, or other people at the university.

17    Q.   So you wouldn't be surprised that Creighton's own faculty

18    says its classrooms aren't accessible to students with

19    disabilities?

20              MS. BALUS:  Objection, your Honor, beyond the scope.

21    It's asking him to speculate about testimony that's not in the

22    record.

23              THE COURT:  Sustained as to speculation and to the

24    form of the question.

25    BY MS. DeLAIR:

1    Q.   You mentioned that you're familiar with the facility

2    surveys that employees are filling out for Creighton

3    University, correct?

4    A.   I'm aware that they are, yes.

5    Q.   And that some of those surveys have stated that students

6    in wheelchairs can't even get into some of the buildings on

7    campus?

8             MS. BALUS:  Objection, your Honor.  Same objection.

9             THE COURT:  Sustained.  And at this point this line

10   of questioning is outside the scope of the direct examination.

11   BY MS. DeLAIR:

12   Q.   Sir, you've testified that you're the IT specialist for

13   classroom accessibility so you know that the microphone for

14   the FM system, it does need to be within 7 inches of the

15   speaker's mouth to be effective.  Are you aware of that?

16   A.   The particular system that we installed was using -- was

17   not -- was using our own amplification system feeding into the

18   FM transmitter.  So, yes, microphones have to be worn

19   properly, yes.

20   Q.   Okay.  So you testified that you installed the microphone

21   in the gross anatomy lab; is that correct?

22   A.   Yes.

23   Q.   And so, was that installed properly?

24   A.   I was not aware if it's not.

25   Q.   Was it installed 7 inches from the speaker's mouth?

LENOSKY - CROSS                                                    904

1    A.   I couldn't tell you.  I mean, I don't know the exact

2    distance from where that microphone is hanging over the table.

3    The microphone is hanging over the table so that it could pick

4    up all the people that would be working around a body as

5    they're doing their dissections.

6    Q.   Okay.  That sounds like that's further than 7 inches from

7    the speaker's mouth, wouldn't you say?

8    A.   I haven't been in the room lately, so I couldn't tell you

9    the exact distance.

10   Q.   Okay.  But you recall --

11   A.   My guess is it may be further than 7, but I'm not a

12   hundred percent sure.

13   Q.   So you mentioned that the recording systems for the OSCEs

14   failed; is that correct?

15   A.   They failed several times, yes.

16   Q.   And you're testifying to that today.  And it's just a

17   coincidence that some of the OSCEs for Mr. Argenyi were erased

18   during these exams?

19   A.   I'm not aware of that, ma'am.

20   Q.   And sir, you've worked for Creighton University for 31

21   years; is that correct?

22   A.   Correct.

23   Q.   You still work for Creighton University?

24   A.   I do.

25        MS. DeLAIR:  No further questions.

```
1              THE COURT:  Redirect?

2              MS. BALUS:  Thank you, your Honor.  May I have just a

3   moment?

4              MR. MOORE:  Sorry.

5         (Off-the-record discussion had.)

6                      REDIRECT EXAMINATION

7   BY MS. BALUS:

8   Q.   Mr. Lenosky, were you aware that some of the videos that

9   were recorded of Mr. Argenyi doing his OSCE failed?

10  A.   Not -- just pre -- just a moment ago I learned that.

11  Q.   Now, you testified about the hanging mike in -- I'm

12  sorry, was it the small group room?

13  A.   Anatomy.

14  Q.   Did Mr. Argenyi ever come to you and ask that the mike be

15  readjusted so it was closer to one of the speakers?

16  A.   No.

17             MS. BALUS:  No further questions, your Honor.

18             THE COURT:  All right.  Thank you, Mr. Lenosky.  You

19  may stand down and you are excused.

20        The defense may call its next witness.

21             MR. MOORE:  The defense calls Dr. Theresa Townley.

22             THE COURT:  Dr. Townley, if you'll please come

23  forward to the courtroom deputy here on my right, she will

24  swear you in.

25             COURTROOM DEPUTY:  State your full name for the
```

1    record, please, and spell your last name.

2              THE WITNESS:  Theresa Ann Townley, T-o-w-n-l-e-y.

3              THERESA TOWNLEY, DEFENDANT'S WITNESS, SWORN

4              THE COURT:  You may inquire.

5                          DIRECT EXAMINATION

6    BY MR. MOORE:

7    Q.   Good morning, Dr. Townley.

8    A.   Good morning.

9    Q.   Please introduce yourself to the jury.

10   A.   My name is Theresa Townley.

11   Q.   And Ms. Townley, where do you live?

12   A.   I live in Omaha.

13   Q.   And are you currently employed?

14   A.   Yes, I'm employed by -- well, Creighton University and

15   Alegent -- Alegent Creighton Health now.

16   Q.   Okay.  Are you a practicing physician?

17   A.   Yes, I am.

18   Q.   And what area do you practice?

19   A.   I practice internal medicine at Creighton University

20   Medical Center and Clinic.

21   Q.   Okay.  And how much of your time is spent practicing

22   medicine?

23   A.   About 80 percent of my time is spent...

24   Q.   And you also have a role as a preceptor/educator for

25   Creighton University School of Medicine?

1    A.    Yes, I do.

2    Q.    What do you do in that role?

3    A.    I work with students in the clinics, and also when I

4    round in the hospital as a -- when I'm an attending physician.

5    Q.    And when you -- when you say work with, let's talk about

6    the longitudinal clinic.  Do you have some responsibilities

7    for the longitudinal clinic for the second year of medical

8    school?

9    A.    Yes.  We -- I have second year medicine -- second year

10   medical students work with me in clinic.  We -- kind of work

11   with us to see patients and to get some experience in the

12   clinical setting.

13   Q.    And in that role, are you referred to as a preceptor?

14   A.    Yes, that would be a way to say that.

15   Q.    And how long have you been a preceptor for Creighton

16   University School of Medicine?

17   A.    For 11 years.

18   Q.    And do you know Michael Argenyi?

19   A.    Yes, I do.

20   Q.    And how do you know Michael?

21   A.    Michael was in my clinic.  I think that was two years

22   ago.

23   Q.    Okay.  So you were his preceptor; is that correct?

24   A.    Uh-huh.

25   Q.    And as a preceptor, could you explain to the jury how

1    students are evaluated for that portion of their education?

2    A.   Well, the goals of this -- of the longitudinal experience

3    are to give students an exposure to clinical medicine.  The

4    first two years are primarily spent in the classroom.  And as

5    you know, most doctors don't spend their time in the classroom

6    when they're practicing.

7         So the goal of this is to give a patient -- give students

8    exposure to patients, to get them comfortable obtaining what

9    we call a history or the story of their illness, to get some

10   of these key points such as, you know, what medicines do they

11   take, what has been their experience in the hospital or what

12   kind of surgeries, what past medical history do they have; and

13   then to try to get the key elements of what they're coming

14   into clinic with and what their needs are that day.

15        In addition, we give them the opportunity to learn

16   physical examination skills, how you listen to a heart, how

17   you listen to lungs, so they can become adept at these skills

18   as well.

19   Q.   And do you evaluate students with any sort of evaluation

20   system or grading system?

21   A.   We evaluate them based on their certain competencies.

22   It's kind of a standard type form we use.  We've used that for

23   a number of years to get a sense how students are doing in the

24   clinic.

25   Q.   Are there different categories of evaluations?  Is it

1   pass/fail or is there a range?

2   A.   I think it's just pass/fail for that course.  I don't --

3   most of the classes are either pass/fail or honors, and I

4   think this class is just pass or fail.

5   Q.   Okay.  Do you complete written evaluations on the

6   students?

7   A.   Yes, we do.

8   Q.   And you provide copies of those evaluations to the

9   students?

10  A.   The students are provided with a copy, as well as

11  obviously the people in charge of the course.

12  Q.   And did you evaluate Mr. Argenyi when he was

13  participating in the longitudinal clinic?

14  A.   Yes.  I evaluated him in the fall for the fall block of

15  that course and then as well in the spring for the spring

16  block of that course.

17  Q.   And for a short period of time Mr. Argenyi had an

18  interpreter; is that correct, for a few weeks?

19  A.   There were some times in clinic when he did have an

20  interpreter.

21  Q.   And other times where he didn't have an interpreter?

22  A.   Yes.

23  Q.   Okay.  Do you recall the exact evaluations that you

24  provided to Mr. Argenyi?

25  A.   I have seen them.

1    Q.    Okay.  Would anything help refresh your recollection as

2    to your evaluations of Mr. Argenyi?

3    A.    I can certainly look at them again or...

4    Q.    When you say "them", the evaluations?

5    A.    Yes.

6            MR. MOORE:  At this time, your Honor, we'd like to

7    approach.

8            THE COURT:  You may.

9            MR. MOORE:  These are documents that --

10           MS. VARGAS:  May we have a sidebar, your Honor, to

11   discuss this?

12           THE COURT:  Yes.

13       (Bench conference on the record.)

14           MS. VARGAS:  Your Honor, I have no objection to

15   Mr. Moore offering these to the witness to refresh her

16   recollection, but I want to be very clear that I do have a big

17   objection to him attempting to offer these into evidence for a

18   few reasons:  First of all, they were never turned over in

19   discovery so we never had an opportunity, despite having asked

20   for them, to conduct a deposition of this witness.

21       Second of all, they were never listed as an exhibit for

22   the simple reason because they were never in existence, we

23   believe, prior to this.  However, they are now suddenly

24   produced a week or two weeks ago in an e-mail to us.  It's a

25   little -- it wasn't listed on the exhibit list.  We had no

1    opportunity to discuss these.  Furthermore, the documents that

2    were turned over I believe there was more than this, so these

3    aren't even complete.  So...

4              THE COURT:  Mr. Moore?

5              MR. MOORE:  A couple things, your Honor.  These are

6    complete because as Dr. Townley said, she did one in the fall

7    and one in the spring.  These are the two evaluations.

8         She's correct, we got these late and turned them over.

9    However, these were provided to Mr. Argenyi so they had an

10   equal duty to provide these to us in discovery.

11        Moreover Mr. Argenyi has testified under oath that he did

12   not receive evaluations, nobody ever gave them to him.  This

13   is directly impeaching that testimony.

14        At this time I'm only asking her to refresh her

15   recollection, but we may indeed offer them for impeachment

16   purposes as well as -- for impeachment purposes, yes.

17             THE COURT:  All right.  Well, right now you're asking

18   me to rule on matters that have not yet come up.

19        Defense counsel may use these documents to refresh the

20   witness's memory.  And if at some point they are offered into

21   evidence, then I will rule, taking into consideration the fact

22   that these were not on the exhibit list.  And I will determine

23   whether or not there is sufficient reason to believe that the

24   documents are, in fact, impeachment evidence.

25             MS. VARGAS:  May I have a copy of that document?

1              MR. MOORE:  Sure.  We gave you one before, but I'll

2       give you one now.  There you go.

3          One more question, your Honor.  Should I mark these?

4              THE COURT:  It's a good idea when you're showing

5       something to a witness to mark it for identification so the

6       record is clear what was shown to the witness if it becomes an

7       issue in the future.

8          So, I would say please do.

9              MR. MOORE:  Very good.  Thank you, your Honor.

10         (End of bench conference.)

11             MR. MOORE:  I would like to mark these.  I believe

12      that consecutively we've marked another one as 220, so I would

13      like to mark these as 221 and 222.  Is that consistent with

14      the Court's understanding?

15             THE COURT:  Let me look.  That is.  The last marked

16      document was 220, a demonstrative.  It was not used.  And then

17      this would be 221 and 222.  These are separately marked; is

18      that correct?

19             MR. MOORE:  That's correct.  The fall is marked 221

20      and the spring is marked 222.

21         May we approach, your Honor?

22             THE COURT:  You may.

23         You may proceed.

24      BY MR. MOORE:

25      Q.   Dr. Townley, you indicated that the evaluations that you

1    completed would help refresh your recollection.  Do these

2    documents help refresh your recollection with regard to how

3    you evaluated Mr. Argenyi in the longitudinal clinic?

4    A.   Yes, they do.

5    Q.   And for the fall, what was your evaluation of

6    Mr. Argenyi?

7    A.   We were asked to evaluate them on knowledge, critical

8    thinking, problem-solving skills --

9              MR. MOORE:  That's our fault.  Go ahead, I'm sorry.

10   A.   And interpersonal skills, in summary.  There's a number

11   of different marks on there, but he did very well both on his

12   ability to talk with patients and to report that to me.  His

13   presentations were good.

14   BY MR. MOORE:

15   Q.   And how did he do as compared to the other medical

16   students?

17   A.   He did well.

18   Q.   And then I'd like to ask you again we have the evaluation

19   from the spring, if that refreshes your recollection with

20   regard to the spring evaluation?

21   A.   Uh-huh.

22   Q.   And could you please for the jury describe how you

23   evaluated him for the spring longitudinal clinic?

24   A.   Again, he did well.  I don't know if you need more detail

25   on that.

1    Q.   Well, I'll ask you this:  At this point had he had some

2    clinics with an interpreter and some without?

3    A.   Yes, he had.

4    Q.   And did you make a note of that?

5    A.   Yeah.  I wrote on here that "Michael is quickly able to

6    establish rapport with patients.  He was able to do this with

7    and without an interpreter.  He was not as confident with his

8    physical exam skills but these should improve with time."

9    Q.   Okay.  And are these true and accurate copies of the

10   evaluations that you did of Mr. Argenyi in his longitudinal

11   clinic?

12   A.   Yes.

13   Q.   And you completed these at the time you were evaluating

14   him?

15   A.   Yes.

16   Q.   And you gave him a copy of these, correct?

17   A.   I don't know if I provided him with a copy, but all

18   students are provided a copy of their evaluations.

19   Q.   And Mr. Argenyi -- there was no reason to except him from

20   that, correct?

21   A.   No.

22            MR. MOORE:  At this time we'd like to offer Exhibit

23   221 and 222 into evidence.

24            MS. VARGAS:  No objection, your Honor.

25            THE COURT:  Exhibits 221 and 222 are received.

1                    MR. MOORE:  I have nothing further, your Honor.

2                    THE COURT:  Cross-examination?

3                    MS. VARGAS:  Thank you, your Honor.

4                                CROSS-EXAMINATION

5      BY MS. VARGAS:

6      Q.   Dr. Townley, I heard you testify just a moment ago that

7      Mr. Argenyi did well compared to the other students in clinic.

8      A.   He does -- he did a -- yes, he did well.

9      Q.   He always acted professionally?

10     A.   Yes.

11     Q.   He always acted professionally with you?

12     A.   Yes.

13     Q.   He always acted professionally with patients?

14     A.   Yes.

15     Q.   Even when he was upset?

16     A.   He did not express that he was upset in front of

17     patients, no.

18     Q.   You had a lot of residents over the past -- I'm sorry, a

19     lot of medical students over the last 11 years, I would

20     imagine?

21     A.   Yes.

22     Q.   So you probably don't remember all of them.

23     A.   I remember most of my students.  Could I tell you how I

24     evaluated all of them?  No.

25     Q.   And you probably, for the most part -- you might have

1    general impressions, you probably don't remember specific days

2    in the clinic with each of those students.

3    A.    I might remember specific incidents; but no, I don't

4    remember every specific day that occurred.

5    Q.    So you might remember specific days or incidents if they

6    were unique or unusual, I would imagine?

7    A.    Yes.

8    Q.    And so I would imagine that you remember the day that

9    Mr. Argenyi's interpreter was ordered out of the clinic in the

10   building, correct?

11          MR. MOORE:   Objection, form of the question,

12   mischaracterizes evidence, beyond the scope.

13          THE COURT:   Overruled.   She may answer.

14   A.    No, I don't remember that.

15   BY MS. VARGAS:

16   Q.    You don't remember the day that you were told to go in

17   and remove Mr. Argenyi's interpreter from the clinic in the

18   middle of clinic session?

19          MR. MOORE:   Same objection, your Honor.

20          THE COURT:   She may respond.   Overruled.

21   A.    I think I may have told the interpreter -- I mean, I --

22   I'm trying to recall that incident.   I may have told an

23   interpreter that she could no longer be in clinic, but I don't

24   recall that being a difficult incident.

25   BY MS. VARGAS:

1    Q.   Maybe not for you.

2         Do you recall how Mr. Argenyi responded when you told him

3    that?

4    A.   No.

5    Q.   You don't recall him asking if he could have a few

6    minutes to compose himself?

7    A.   He may have asked that.

8    Q.   You don't recall seeing he was visibly shaken when you

9    told him that?

10   A.   We have lots of incidents that occur in a clinic where

11   sometimes it takes a few minutes to compose yourself.

12   Q.   Fair enough.  I believe that's true.

13        But I'm asking about removing the interpreter from the

14   clinic, how many times in 11 years have you been told to

15   remove an interpreter from the clinic?

16   A.   Once.

17   Q.   And when was that?

18   A.   The incident you referred to.

19   Q.   You testified again a few moments ago that Mr. Argenyi

20   did well in comparison to the other students, correct?

21   A.   He did well, yes.

22   Q.   And you testified that that was with or without an

23   interpreter he did well.

24   A.   Yes.

25   Q.   And he only had an interpreter for about three, three and

1    a half classes -- or clinic sessions; is that correct?

2    A.   I think so.

3    Q.   So --

4    A.   I didn't record those.

5    Q.   So most of the time during the M2 year, during the time

6    you were supervising Mr. Argenyi in the clinic, he didn't have

7    an interpreter.

8    A.   I do want to remind you that these take place every other

9    week, so it's not as if we see students on a daily basis as in

10   some of their other rotations.

11   Q.   Fair enough.  This was every other week.  And how many

12   hours every other week did this happen?

13   A.   They're in clinic for about three to four hours.

14   Q.   And --

15   A.   And --

16   Q.   -- once the medical students are sort of set up and get

17   started in clinic -- I'm not talking about September, maybe

18   October, November, December, how much time do you actually

19   spend with each student during one clinic session that's three

20   hours?

21   A.   Well, they're beside me most of that clinic.  I mean, I'm

22   not physically present in the room every time they're with a

23   patient because we are also at the same time completing a

24   clinic and have a number of patients to see.

25   Q.   Understood.

1    A.    So I was not by Michael's side constantly during that

2    time he was in longitudinal clinic.

3    Q.    And so --

4    A.    And that would be standard for all the students we work

5    with.  How much time exactly, it's hard to really put a number

6    on.  We probably spend -- a student might see four to five

7    patients in the course of the afternoon.  And probably we

8    spend five to ten minutes maybe talking about that patient or

9    depending on how complicated they are, going back in the room

10   with the student and, you know, getting out the key points of

11   the history or the physical.

12   Q.    So when you go back in the room --

13   A.    Uh-huh.

14   Q.    -- as I understand it, the medical student conducts the

15   initial patient interview by themselves --

16   A.    Yes.

17   Q.    -- correct?

18         And then after that, you go back into the room -- you go

19   into the room with them and then you conduct the exam.  And

20   that would be with you in the room and the medical student and

21   the patient.  Might anybody else be in the room?

22   A.    At times we have perhaps a medical assistant in the room

23   with us.  If the patient -- if an interpreter is needed for

24   the patient, that would be in the room as well.

25   Q.    So if an interpreter is needed for the patient, that

1  would be in the room?

2  A.   Uh-huh.

3  Q.   And that's because communication with a patient is

4  important.

5  A.   Uh-huh.

6  Q.   And you want to know for sure if a patient says, "I'm

7  allergic to penicillin," correct?

8  A.   Yes.

9  Q.   And so you obviously didn't have any concern about

10 Mr. Argenyi having an interpreter in the clinic, correct?

11         MR. MOORE:  I -- I withdraw the objection.

12 A.   As a second year student, I don't really rely on my

13 second year students to tell me what exactly is going on with

14 the patient, nor with the physical exam.

15 BY MS. VARGAS:

16 Q.   Okay.  So --

17 A.   I feel that it's my job to go back and confirm all that.

18 That would obviously be different with perhaps a licensed

19 physician who is still in training.

20     But with a second year student, it's my job to really

21 make sure what's going on with the patient.

22 Q.   I understand and appreciate that you are ultimately

23 responsible for the patient, but I'm asking a different

24 question.

25     What I'm asking, given that Mr. Argenyi has paid

1    substantial tuition for a medical education, and part of that

2    education is going in and watching how you interact with that

3    patient, isn't he in that room to learn?

4    A.   Yes, he's clearly in that room to learn.

5    Q.   And if he's not getting full communication in that room,

6    he couldn't possibly learn everything that all of the other

7    students have an opportunity to learn, could he?

8    A.   I suppose -- I don't quite know how to answer your

9    question.

10   Q.   You're hesitating, and I want to make sure that you

11   answer honestly and the way that you really believe.

12   A.   Uh-huh.

13   Q.   Mr. Argenyi paid tuition in order to have a medical

14   education.  And part of that medical education is clinic,

15   correct?

16   A.   Yes.

17   Q.   And part of clinic is his opportunity to interview the

18   patient.  I understand that.  And part of clinic is learning

19   from you, learning how you interact with a patient, correct?

20   A.   Uh-huh.

21   Q.   And how a patient reacts to you.

22            THE COURT:  If you could answer yes or no out loud,

23   can you --

24   A.   Can you repeat the question?

25   BY MS. VARGAS:

1    Q.   Part of what Mr. Argenyi was supposed to be learning as a

2    medical student in the clinic was what to do if a patient is

3    having difficulty answering questions or if they're emotional,

4    correct?

5    A.   I'm sorry, I'm still confused as to what the question is.

6    Q.   Fair enough.  Let me ask it a different way.

7         Do you recall that one of the patients you saw with

8    Mr. Argenyi was a woman who was having a Pap smear?  Do you

9    recall that?

10   A.   That would be a common patient.  I don't recall the

11   specific person, but that would be a common scenario in

12   clinic, yes.

13   Q.   Fair enough.  So generally speaking, when a woman comes

14   in to have a Pap smear, might she be a little bit

15   uncomfortable?

16   A.   Yes.

17   Q.   Do physicians have special ways that they interact with

18   patients to put them at ease?

19   A.   Certainly, yes.

20   Q.   And part of what the medical students are doing in clinic

21   is learning that from you.

22   A.   Yes.

23   Q.   And so if a medical student wasn't able to understand

24   everything that was being said in that clinic interaction,

25   that medical student wouldn't have an opportunity to learn

 1    that was equal to the other students who could access it,

 2    would they?

 3            MR. MOORE:  Objection, calls for speculation and a

 4    legal conclusion.

 5            THE COURT:  Sustained.

 6    BY MS. VARGAS:

 7    Q.   Is it unusual for -- in clinic when you have a patient

 8    with a complicated medical situation to have a specialist come

 9    into the room?

10    A.   In -- I would usually refer them to another clinic.  At

11    times I do have access to some of my colleagues and may call

12    them into the room.  But that doesn't happen on a very regular

13    basis.

14    Q.   So Mr. Argenyi testified about an experience in the

15    clinic when there was -- well, a few experiences in the clinic

16    when there were multiple people in the room, so you and other

17    medical personnel and specialists and a patient, who might be

18    an infant who was ill and their family, so there could be

19    multiple people in the room, correct?

20    A.   There could be.  I did not supervise Michael in the care

21    of pediatric patients.  That was with a different attending.

22    Q.   Okay.  Fair enough.

23         You said that you evaluated Mr. Argenyi in the clinic.

24    But I noticed you were careful to say that you didn't give him

25    the evaluation yourself.

1    A.   It's often the case that we're evaluating students at the

2    time they're either taking tests or preparing for boards or

3    perhaps they're on vacation.

4    Q.   I'm not faulting you for not giving it to him, I'm

5    just -- did you hand him the evaluation yourself?

6    A.   No, I didn't.

7    Q.   So you don't actually know whether it was ever given to

8    him or not, do you?

9    A.   I know that students have the ability to access their

10   evaluations online.

11   Q.   Were you aware that Mr. Argenyi's access to his Creighton

12   University account was cut off by Creighton University?

13           MR. MOORE:   Objection, testimony not in evidence,

14   speculation.

15           MS. VARGAS:   Your Honor, Mr. Argenyi testified that

16   he was unable to excess the information himself during his

17   direct and redirect.

18           THE COURT:   I believe the -- the question as worded

19   is objectionable.  And the objection is sustained.

20   BY MS. VARGAS:

21   Q.   Do you know whether Mr. Argenyi ever received his

22   evaluation?

23   A.   No.

24   Q.   And in this evaluation, you made a point about his

25   struggle in evaluating -- in the physical exam of the patient,

1    right?

2    A.   Yes.

3    Q.   And the physical exam of a patient is based on the

4    information they give you during your -- during your spoken

5    interview, right, to some degree?

6    A.   What you would choose to examine would be based on what

7    you're concerned about, so, yes.

8    Q.   So if you didn't understand everything that was being

9    said during that spoken interview, it makes sense, doesn't it,

10   that you wouldn't know how to begin the examination?

11   A.   It -- it's not -- well, there are certain exams that in

12   my clinic that I do -- I mean, if somebody came in and said

13   their hand was hurting and you didn't examine the hand, that

14   would obviously be of concern.

15        However, if somebody had nonspecific symptoms, they just

16   don't feel good, it would be crucial to do clearly heart and

17   lung exam and abdominal exam.

18   Q.   Right.  So there are basic general things you did with

19   most patients when examining?

20   A.   Yes.

21   Q.   When someone comes in and says, for example, they have a

22   sore throat, you would probably get an exam by looking at

23   their throat, correct?

24   A.   Yes.

25   Q.   Unless you didn't know what they said.

1   A.   Yes.

2   Q.   And so when you said that Mr. Argenyi did fairly well

3   compared to other students, do you know how he was ranked

4   compared to the other 125 students in the clinic?

5   A.   No.

6   Q.   Is there a document that might refresh your recollection

7   of how he did compared to those other students?

8   A.   Not that I'm aware of.

9   Q.   If the university maintained student rankings as part of

10  their ordinary operation of business and maintaining records

11  and they had ranked how their students performed in the

12  clinic, would that document refresh your recollection of how

13  Mr. Argenyi performed?

14  A.   It would, but I have no access to those documents, nor do

15  I ever look at them.

16       MS. VARGAS:  Your Honor, may I approach and show the

17  witness the document?

18       MR. MOORE:  I'm going to object to even showing the

19  document to the witness.  She said she has never accessed them

20  or looked at them.

21       MS. VARGAS:  She said it might refresh her

22  recollection of how he performed compared to the other

23  students which is exactly the testimony she offered on direct.

24       MR. MOORE:  It can't refresh her recollection if

25  she's never seen it.

1              THE COURT:  It's not something that can be used to

2     refresh the witness's recollection.  So, that objection is

3     sustained.

4     BY MS. VARGAS:

5     Q.   Would you be surprised to learn that Mr. Argenyi

6     testified --

7              MR. MOORE:  I'm going to object to any questions

8     along this line to try to sneak in the testimony.

9              THE COURT:  I will sustain objections to any

10    questions that begin with the phrase "would you be surprised".

11         So, if you start off with "would you be surprised," the

12    objection will be sustained.

13         Go ahead.

14              MS. VARGAS:  Thank you, your Honor.  I will choose my

15    words carefully.

16              MR. MOORE:  I take it that can't be "would you be

17    shocked".

18              THE COURT:  Don't try that one either.

19    BY MS. VARGAS:

20    Q.   Dr. Townley, did you know that Mr. Argenyi was told that

21    he would pass just for showing up?

22    A.   No.

23    Q.   Did you know that Mr. Argenyi -- I'll withdraw that

24    question.

25         Do you have any training as an oral interpreter?

1    A.    No.

2    Q.    Do you have any training as an oral sign-supported

3    interpreter?

4    A.    No.

5            MS. VARGAS:  If I could just have a moment, your

6    Honor?  I think I'm almost done.

7            THE COURT:  You may.

8    BY MS. VARGAS:

9    Q.    Dr. Townley, when you are caring for your patients and a

10   medical student is observing, do you focus on the patient?

11   A.    Yes.

12   Q.    So when you're communicating with a patient, you're not

13   necessarily watching the medical student?

14   A.    No.

15   Q.    And even if you were watching the medical student, you're

16   focused on patient care so you would have no way of knowing

17   whether the medical student was understanding the

18   communication or not, would you?

19   A.    No.

20           MS. VARGAS:  No further questions.

21           THE COURT:  Redirect?

22           MR. MOORE:  Thank you, your Honor.

23                          REDIRECT EXAMINATION

24   BY MR. MOORE:

25   Q.    Dr. Townley, on cross-examination there was some mention

1    that you had to ask an interpreter or tell an interpreter that

2    that interpreter couldn't participate in the longitudinal

3    clinic, correct?

4    A.    Yes.

5    Q.    And that was one interpreter, correct?

6    A.    Yes.

7    Q.    So Michael Argenyi had one interpreter for that clinic,

8    correct?

9              MS. VARGAS:  Asked and answered, your Honor.

10             MR. MOORE:  That's fine.  I'll withdraw it.

11   BY MR. MOORE:

12   Q.    Dr. Townley, I'd like to direct your attention again to

13   Exhibit 227 [*sic*].  Now there were some questions about his

14   physical exam skills.  And this is the evaluation you did in

15   the spring in which you indicated Michael was able to do this

16   -- quickly establish rapport with patients, he was able to do

17   this with and without an interpreter.

18        And then it says he was not as competent with his

19   physical exam skills.  What are physical exam skills?

20             THE COURT:  Let me interrupt because the exhibit was

21   misidentified.  Would you give me the number again, please?

22             MR. MOORE:  122.  Did I say 7?

23             THE COURT:  Yes.

24             MR. MOORE:  I can't read my own handwriting.

25             THE COURT:  That's okay.  And the witness may answer

1    the question which was --

2    BY MR. MOORE:

3    Q.   What do you mean by physical examination skills?

4    A.   Listening to the patient's heart sounds, listening to the

5    lung sounds, palpating the abdomen, observing like rashes,

6    looking in a throat, those kind of things.

7    Q.   So actually performing physically what you're supposed to

8    do, that's what you're referring to, correct?

9    A.   Uh-huh.

10   Q.   And just so I understand, all second year students, you

11   follow up with the patients to make sure that you're getting

12   the --

13             MS. VARGAS:  Objection, leading.

14             THE COURT:  All right.  Please rephrase.

15   BY MR. MOORE:

16   Q.   With all second year students, do you follow up with a

17   patient to make sure you have the information?

18   A.   Yes.

19   Q.   And do you expect a second year student to have -- fully

20   be able to diagnose and communicate effectively with a

21   patient?

22   A.   No.

23   Q.   Could Mr. Argenyi pass longitudinal clinic just by

24   showing up?

25   A.   Not in my clinic.

```
 1              MR. MOORE:  I have nothing further, your Honor.

 2              THE COURT:  Thank you, Doctor.  You may stand down.

 3       And you are excused.

 4           The defense may call its next witness.

 5              MS. BALUS:  Defense calls Jan Madsen, your Honor.

 6              COURTROOM DEPUTY:  State your full name for the

 7       record, please, and spell your last name.

 8              THE WITNESS:  Jan Madsen, M-a-d-s-e-n.

 9                JAN MADSEN, DEFENDANT'S WITNESS, SWORN

10              MS. VARGAS:  Your Honor, I'm sorry to interrupt.  I

11       see it's close to 10:15.  There's actually a folder I'm

12       missing.  Might we take our morning break and then continue

13       with this witness?

14              MR. MOORE:  That's fine.

15              THE COURT:  Let's take a 15-minute break.  Please

16       reconvene at 10:25.

17           Thank you.

18           (Jury out and recess taken at 10:12 a.m.)

19           (At 10:32 a.m. on August 29, 2013, with counsel for the

20       parties, the plaintiff, and the defendant's representative

21       present, and the jury NOT present, the following proceedings

22       were had:)

23                JAN MADSEN, PREVIOUSLY SWORN, RESUMED THE STAND

24              THE COURT:  Anything we need to talk about before the

25       jury enters?
```

1          MS. VARGAS:  Not from the plaintiff, your Honor.

2          MR. MOORE:  Nothing from the defendant, your Honor.

3          THE COURT:  Please bring in the jury.

4      (Jury in at 10:30 a.m.)

5          THE COURT:  You may inquire.

6          MS. BALUS:  Thank you, your Honor.

7                     DIRECT EXAMINATION

8   BY MS. BALUS:

9   Q.   Good morning Ms. Madsen.

10  A.   Good morning.

11  Q.   I know you've already been on the stand, but can you

12  please reintroduce yourself to the jury.

13  A.   Sure.  My name is Jan Madsen, and I'm the vice president

14  for finance at Creighton.

15  Q.   And where do you currently live?

16  A.   Here in Omaha.

17  Q.   Do you have a family?

18  A.   I do.

19          MS. VARGAS:  Objection, your Honor, relevance of her

20  family.

21          THE COURT:  Overruled.  We've heard that from other

22  witnesses, but we won't get into details.

23      Go ahead.

24          MS. BALUS:  Thank you.

25  BY MS. BALUS:

1    Q.   Now you said you're the current vice president of

2    finance.  How long have you been in that position?

3    A.   Almost three years.

4    Q.   And what are your responsibilities in that position?

5    A.   So I'm responsible for cash management, all the accounts

6    payable, the budget process for the university, our business

7    service center.

8    Q.   So I'd like to talk about some things that you were asked

9    about the last time you were on the stand by plaintiff's

10   counsel.

11       She was asking questions and you indicated that Creighton

12   was not doing well in 2010.  Can you explain what you meant by

13   that?

14   A.   Sure.  So there's a few things.  Probably first, after

15   the stock market collapsed in 2009, Creighton was monitoring

16   its compliance with the -- our debt covenants pretty closely.

17       So the bank puts rules on the university in exchange for

18   loaning the money.  And if the university's not in compliance

19   with those rules, then the bank could call the balance of the

20   loan, which at the time Creighton owed almost $200 million.

21   So that was one thing.

22       The other thing is when you look at Creighton -- some of

23   our key financial ratios, we don't compare well to our peer

24   institutions.  So when you look at other private universities,

25   Creighton's ratios are well below the averages.

MADSEN - DIRECT                                                  934

1          Probably the simplest way -- or the simplest ratio maybe

2     to explain would be something that many of us would use on a

3     personal basis to manage our finances, which is kind of that

4     common rule of thumb you should have three to six months of

5     your expenses set aside in cash in case of an emergency.

6          Well, the same is true for a university, that you should

7     have some money set aside in case of an emergency.  And when I

8     arrived at Creighton, we had three months basically set aside.

9     And the industry standard is that you should never have less

10    than five months.  And most of our peers have about one year

11    set aside.  So that's one of the big issues we're monitoring.

12    Q.   Is the school currently where you would like it to be

13    financially?

14    A.   We've made progress over the past couple of years, but

15    we're not where we want to be.

16    Q.   Okay.  Creighton's counsel also talked about 40 percent

17    of Creighton's federal grants going to overhead.  Is that a

18    large percentage compared to other research institutions?

19    A.   No.  So there's a process basically where we have to

20    submit all of our expense data into an agency of the

21    government.  And they determine what our overhead -- what

22    overhead percent they will pay us based on our costs and how

23    much space and activity we allocate to research, to support

24    research.

25         So through that process -- it's kind of a complicated

1    process.  But in the end, what always happens is the rate that

2    the government agrees to pay you is less than what your

3    documented expenses are.

4        So we documented maybe 3 percentage more than what they

5    ultimately agreed to reimburse us.

6    Q.   Is the Creighton a for-profit institution?

7    A.   No.

8    Q.   So where does all of its revenue go?

9    A.   The revenue obviously goes to cover expenses.  And the

10   rest of our cash would go to cover the debt payments, maintain

11   facilities, make repairs, those types of things.

12   Q.   Does it all go back into the schools?

13   A.   It all stays within the university, yes.

14   Q.   If you would, could you describe Creighton University's

15   budgeting process?

16   A.   Sure.  So it's basically an incremental budgeting

17   process.  So we kind of start with last year, the prior year.

18   And we look at our overhead areas.  So we kind of divide it up

19   into the revenue-generating units, which are the schools and

20   the colleges.  And then we have the overhead units, which

21   would be areas like information technology, financial, our

22   facilities area, those types of areas.

23       So we look at the overhead areas and what's going to

24   happen to the costs over the next year.  So are utilities

25   going to go up, what's happening with our health care costs,

1    are we going to give raises to our employees, those types of

2    things.

3         And so then we look at how much -- if there is an

4    increase overall, which there has been definitely as of late,

5    then we look at how much each school would have to increase

6    their net contribution to overhead to cover that increased

7    cost.

8    Q.   So you talked about revenue-generating units and overhead

9    units.  Can you describe what you meant by those terms?

10   A.   The overhead units don't make any money.  There's no

11   source of income for the finance department or the human

12   resources department.  They support the rest of the university

13   and use our services, if you will.

14        So I pay -- the finance department that I'm responsible

15   for, we pay the bills for the whole university, whether it's a

16   school or the facilities group.

17        The revenue-generating units again are the units -- are

18   the schools and the colleges.  They charge tuition and fees.

19   And then they allocate those to support their programs and

20   their students.

21   Q.   So can you give us some examples of some of those

22   revenue-generating units?

23   A.   The School of Medicine would be one, School of Dentistry,

24   School of Law, College of Business, Pharmacy School.

25   Q.   And is there a separate budget for each of those units?

1    A.    There is.

2    Q.    Is there a separate budget for each of the overhead units

3    as well?

4    A.    There is.

5    Q.    And the revenue-generating units, do they have their own

6    sources of revenue?

7    A.    That's correct.  So the schools set their tuition, and

8    then they establish their expenses based on what they need to

9    run their programs.

10   Q.    Do any of the schools get any revenue from Creighton

11   University?

12   A.    No.

13   Q.    And then the revenue for the operating units comes from

14   all of those different revenue-generating units.

15   A.    So the revenue for the overhead units -- effectively

16   there's no revenue for the overhead units.  Basically we have

17   a pool of expenses that needs to be covered by all of the

18   schools and colleges and their faculty and staff that use the

19   services being provided.

20         So included in those services are the people that clean

21   the office space and the classrooms and do the snow removal in

22   the winter and those types of things.

23   Q.    So talking specifically about the school of medicine, are

24   you, as a VP of finance, involved in coming up with a budget

25   for --

 1              MS. VARGAS:  Objection, your Honor, relevance.  May

 2      we have a sidebar?

 3              THE COURT:  All right.

 4          (Bench conference on the record.)

 5              MS. VARGAS:  Your Honor, the defendant in this case

 6      is Creighton University.  And Section 504, definition section,

 7      is very clear that the proper defendant in a case against a

 8      university is the university in and of itself.  So all of this

 9      testimony about medical school is something different, and

10      it's separate, has no relevance in this case.  It's simply

11      wasting time and prejudicing the jury.  And I have a copy of

12      the statute with the definition section, which I'd be happy to

13      provide.  And I believe the Department of Justice -- they may

14      have commented on this in their statement of interest, but we

15      certainly have briefed it that the proper defendant is

16      Creighton University and that Creighton University is

17      responsible for compliance with the law, not just the medical

18      school.

19              THE COURT:  Defense response?

20              MS. BALUS:  Sure.  I have three responses to that.

21      One, the regulations actually talk about that the operating

22      expenses and the revenue for the operating unit asking for

23      this, the requesting is relevant and something you look at in

24      determining undue burden.  It's one of the factors.

25              Number two, under the *KinderCare* case, that case said

1   that where that's -- that's a preschool, it was KinderCare as

2   an institution that was sued.  But they looked at that

3   operating unit, the individual preschool.  And they said it

4   was an undue burden because of the expenses because they

5   operated as its own unit.

6        And number three, Ms. Madsen will testify that Creighton

7   Medical School will be responsible for paying for the

8   accommodations.  And so it's relevant for the jury to hear

9   where it will come from.

10        THE COURT:  I won't need more argument on that at

11   this time.  We'll certainly be talking about that more at the

12   jury instruction conference.

13        But based on my research, including the *KinderCare* case,

14   it appears to me that both the assets of Creighton University

15   as a whole and the assets of the medical school are relevant

16   to the jury's determination of undue burden.

17        So, you may continue.

18        MS. VARGAS:  Your Honor, if I could just note my

19   objection on the record to the defendant being allowed to

20   pursue the affirmative defense of undue burden when that -- as

21   a judicial admission, that no evidence can be offered to

22   counteract that in this case.  I believe it's Exhibit 32 is

23   the response to request for production of documents where they

24   stated clearly there was no undue burden in providing

25   interpreters.  We have case law which I could provide which

1    shows that functions as a judicial admission and no evidence

2    can be offered to counteract that judicial admission.

3            THE COURT:  And your objection is preserved.

4            MS. VARGAS:  Thank you.

5            MS. BALUS:  And just to be clear, we also have an

6    undue burden defense.  Even assuming what she says is correct,

7    we still have an undue burden defense with respect to CART.

8            THE COURT:  I understand.

9         (End of bench conference.)

10           THE COURT:  You may continue.

11           MS. BALUS:  I'm sorry, can you refresh my

12   recollection as to where I was?

13   Q.   (Repeated by Reporter) So talking specifically about the

14   school of medicine, are you, as a VP of finance, involved in

15   coming up with a budget for --

16   BY MS. BALUS:

17   Q.   Are you, as the VP of finance, involved in setting the

18   budget for the school of medicine?

19   A.   No.  Again the university requires each of the schools to

20   contribute to all the overhead expenses of the university.

21   And that's really where my part of the process is.

22        Then the school of medicine determines their tuition rate

23   and any other fees they can generate.  And then they determine

24   how they should spend that money to support the students and

25   meet their accreditation requirements, etc.

1    Q.   How is a revenue-generating unit, such as Creighton

2    University medical school, how is their contribution to the

3    general expenses pool for the nongenerating -- revenue-

4    generating unit, how do you come up with that contribution?

5    A.   It's an incremental process that we basically -- you

6    know, when I got there, there was an established amount and

7    then we just looked at how much the costs were going to go up

8    in the overhead areas for the next year.  And then we kind of

9    pro rata that increase across all the schools as a percentage

10   of expenses.

11   Q.   And when is that set?

12   A.   Well, it gets finalized probably -- our fiscal -- we have

13   a fiscal year, so it's July 1st to June 30th, which kind of

14   matches the school year versus the calendar year.

15        And so the process starts probably in the fall, October,

16   November.  So we're almost getting ready to start the cycle

17   for our budget year that will begin next July.

18   Q.   Can a school request to have its contribution decreased?

19   A.   You know, historically I've never been involved in any

20   conversations with a school along those lines.  But recently,

21   in the last few months, we did have one school come forward

22   with a request to decrease their contribution.  It was the law

23   school.

24        And the applications to law schools across the country

25   has been declining significantly.  They were concerned about

1    their ability to fill their class and wanted some adjustment

2    to their contribution rate so they could give more

3    scholarships and do some things like that.

4         Ultimately, the budget advisory committee looked at the

5    school's expenses and suggested that they had an opportunity

6    to reallocate their current budget to meet whatever needs they

7    thought were necessary.  And so they went off -- I ultimately

8    don't know exactly what they did, but they did contribute the

9    amount that was requested initially.

10   Q.   So the university denied their request to decrease their

11   contribution?

12   A.   That's right.

13   Q.   Did the medical education management team, the MEMT, ever

14   contact you or your office for information about Mr. Argenyi?

15   A.   No.

16   Q.   Did you or your office participate in discussions about

17   the cost of auxiliary aids or services that Mr. Argenyi was

18   discussing?

19   A.   No.

20   Q.   If the decision was made that Creighton University had to

21   provide Mr. Argenyi the accommodations that he has requested,

22   where would that come from?  Who would pay for that?

23        MS. VARGAS:  Objection, calls for speculation.

24        THE COURT:  Overruled.  She may answer, if she knows.

25   A.   Well, our current process would be the school of medicine

 1   would determine whether they could increase tuition or reduce

 2   some other programs to cover the cost.

 3   BY MS. BALUS:

 4   Q.   Is there any other option for the med school other than

 5   increasing tuition or reducing services to pay for those

 6   costs?

 7   A.   No.

 8            MS. BALUS:   No further questions.

 9            THE COURT:   Cross-examination?

10                         CROSS-EXAMINATION

11   BY MS. VARGAS:

12   Q.   Ms. Madsen, you just testified there's no other option

13   for the medical school other than just reducing services and

14   cutting costs; is that correct?

15   A.   That's correct.

16   Q.   You can't think of a single other option for the medical

17   school.

18   A.   The only other way I'm aware of schools getting funding

19   is to go out and raise money from donors.

20   Q.   Go out and get it from the public?

21   A.   From the public, a donor.

22   Q.   Uh-huh.

23   A.   And most donors specify what they want to contribute for,

24   so they would have to ask specifically to cover this expense.

25   Q.   I would assume as the vice president of finance that

1     you're very familiar with the university's policies and

2     practices for allocation of funds.  Are you?  Is that correct?

3     A.   Yes.

4     Q.   You're very familiar with those.

5     A.   I'm familiar with them.

6     Q.   And we discussed them in your deposition.

7     A.   Right.

8     Q.   Didn't we?  Where you were represented by counsel.

9     A.   Correct.

10    Q.   You were under oath.

11    A.   Correct.

12    Q.   Just as you're under oath today.

13    A.   Correct.

14    Q.   So why don't you tell me now about policy number 10.

15    A.   Policy number 10?

16    Q.   You're not familiar with policy number 10?

17    A.   I don't have policy numbers memorized, no.

18    Q.   I'm not asking for numbers.  I'm asking for policy 10,

19    budget adjustments for Creighton University.  And I have a

20    printout from Creighton University's financial Web site which

21    I'd be happy to provide you if it might refresh your

22    recollection.

23    A.   Okay.

24         MS. VARGAS:  May I approach, your Honor?

25         THE COURT:  You may.

1          MS. BALUS:  May I see a copy of that?  Do you have a

2     copy for me?

3          (Off-the-record discussion had.)

4     BY MS. VARGAS:

5     Q.   Why don't you tell us about policy 10, Ms. Madsen.

6          MS. BALUS:  Objection, your Honor, we'd like some

7     foundation on whether she's seen this document or is familiar

8     with it.

9          THE COURT:  All right.  That objection is sustained.

10         MS. VARGAS:  Thank you, your Honor.

11    BY MS. VARGAS:

12    Q.   Ms. Madsen, as the vice president of finance, have you

13    seen the policy 10 which is part of the budget policies for

14    the finances at Creighton University?  Have you seen that

15    before?

16    A.   No, I haven't seen this.  I am familiar with budget

17    adjustments, however.

18    Q.   Oh.

19    A.   We can talk about that.

20    Q.   And so Budget Adjustments is the title for policy 10,

21    correct?

22    A.   Right, it is.

23    Q.   Okay.  Now that you recall policy 10, budget

24    adjustments --

25         MS. BALUS:  Objection --

1    Q.   -- can you please tell us what it is?

2              MS. BALUS:  Objection, your Honor, she didn't say she

3    knew policy 10, she said she's familiar with budget

4    adjustments.  She still hasn't established foundation for this

5    document.

6              THE COURT:  She's not offering the document.  The

7    question to the witness is -- give me a moment.  The question

8    was not objectionable.  If Ms. Fauber would read back the

9    question?

10   Q.   (Repeated by Reporter) Now that you recall policy 10,

11   budget adjustments, can you please tell us what it is?

12             THE COURT:  The witness may answer if she can.

13   A.   Sure.  So there's activity around the university.  So one

14   of the schools may decide they want to purchase more services

15   from IT.  So if they have a project that wasn't part of the

16   original budget that they would like to fund, they would go to

17   the IT department and say, We need you to do this project for

18   us.  IT says, It's not in the budget, wasn't in our estimated

19   expenses, and it will cost a certain amount.

20        And so the school then decides if they are going to

21   allocate some of their budget to IT so they can complete the

22   project for them.

23        Sometimes it's a temporary thing, it's a one-time

24   project, and so we temporarily allocate the money to IT, they

25   complete the project, and then the money goes back to the

1   School of Medicine.

2       Sometimes it's permanent.  So when the School of Medicine

3   implemented the electronic health records system, they had to

4   have IT resources manage that system because the faculty and

5   staff in the School of Medicine didn't have the skills to do

6   that.  And so that required a few additional IT personnel to

7   run that system.

8       So that was a permanent budget adjustment from the School

9   of Medicine to the IT department to cover the costs for that

10  service that they were acquiring incremental to the general IT

11  overhead costs.

12  Q.  All right.  That's a lot of financial words, so let me

13  make sure I understand.

14  A.  Sure.

15  Q.  If any part of the university, for example, the School of

16  Medicine, has unexpected expenses that aren't in their budget,

17  policy 10 where you call it budget adjustment policy, that

18  policy would allow the School of Medicine to come to Creighton

19  University, which it's part of, and ask for additional funds,

20  correct?

21  A.  No, that's not what the policy is used for.

22      So the policy is used --

23  Q.  Well --

24  A.  -- to move money between departments.

25  Q.  I'm sorry to interrupt but I asked you a yes or no

1    question.  And you may certainly on redirect offer an

2    explanation.

3         If I may, I'd like to show you your deposition.  You

4    remember being deposed?

5    A.   I do.

6    Q.   And you were under oath?

7    A.   Uh-huh.

8    Q.   And you were represented by counsel?

9    A.   Correct.

10   Q.   And you were answering on behalf of Creighton University

11   that day; isn't that correct?

12   A.   I was.

13            MS. BALUS:  Could I have a page and line, please.

14            MS. VARGAS:  16 to 18.  Page 16, beginning on line

15   14.

16            MS. BALUS:  Thank you.

17   BY MS. VARGAS:

18   Q.   Ms. Madsen, can you see that okay?

19   A.   I can.

20   Q.   Looking on page 16, line 14:  Could you please read the

21   question.

22   A.   "Now if a particular school is in need of requesting

23   additional funds, is there a process or procedure in place to

24   do that?"

25   Q.   And what was your answer?

1   A.   "Currently any request for funds would come to the budget

2   committee of the university."

3   Q.   And you're a member of the budget committee.

4   A.   I am.

5   Q.   Now, I'd like to show you two pages later in your

6   deposition, page 18, beginning on line 14, could you please

7   read that question.

8   A.   It says:  "And to your knowledge, no write-ups were

9   submitted to the budget committee from the medical school on

10  behalf of a student with a disability?"

11  Q.   And your answer?

12  A.   "Again I joined in September 2010, so since I've been

13  employed, no."

14  Q.   So the medical school didn't ask for additional funds to

15  pay for services for students with disabilities.

16  A.   Not since I've been at Creighton.

17  Q.   Okay.  And when you came to Creighton in 2010, I would

18  assume that you were responsible for reviewing the finances,

19  at least of the previous year.

20  A.   But I didn't review requests.  I looked at the audited

21  financials.

22  Q.   You looked at audited financials for the School of

23  Medicine?

24  A.   No, for the university.

25  Q.   So when you looked at the audited financials for the

1   university, you would have been able to see if additional

2   funds had been allocated to the School of Medicine, correct?

3   A.   No.

4   Q.   You wouldn't have been able to see that?

5   A.   No.

6   Q.   Ms. Madsen, are you familiar with Section 504?

7   A.   Section 504 of...

8   Q.   Of the Rehabilitation Act.

9   A.   No.

10  Q.   You're not familiar with that law?

11  A.   No.

12  Q.   But you're aware that the university receives more than

13  $20 million in federal tax money every year?

14  A.   I am.

15  Q.   And you understand that when you receive that money as a

16  university, you sign what's called an Assurance of Compliance

17  form promising to comply with Section 504, correct?

18          MS. BALUS:  Objection, your Honor.  This was asked

19  and answered the last time she was on the stand.  And it's

20  beyond the scope.

21          THE COURT:  I'll let her answer once more.

22  Overruled.  She may answer.

23  A.   So I'm not responsible for compliance of the university.

24  There's another group responsible for that.  But I believe

25  that the university is in compliance.

 1   BY MS. VARGAS:

 2   Q.   Have you provided a copy to your counsel of signed

 3   Assurance of Compliance forms for any of the federal funds you

 4   received, ever?

 5   A.   Again the finance office doesn't do the compliance work

 6   for the university.

 7   Q.   Now, when the university receives federal funds, you

 8   understand that binds the university to comply with Section

 9   504, don't you?

10   A.   I assume so, if you say so.  Again, I'm not legal counsel

11   or -- I'm just responsible for the finances.

12   Q.   I understand.  I don't want a legal answer.  I'm asking

13   for your answer as the financial person.

14   A.   And the question was...

15           MS. VARGAS:  Ms. Fauber, would you mind repeating the

16   question?

17        (Question repeated.)

18           MS. BALUS:  Objection, your Honor, calls for a legal

19   conclusion, speculation.

20           THE COURT:  And it really does.  The objection is

21   sustained.

22   BY MS. VARGAS:

23   Q.   So when you testified two days ago, you said -- and

24   correct me if I get this wrong, I understood you to say that

25   you weren't aware that there were tough financial times during

1    2010.  Is that how you testified?

2              MS. BALUS:  Objection.

3    A.   No, I did not.

4    BY MS. VARGAS:

5    Q.   You didn't?  But Creighton University wasn't in tough

6    financial times in 2010, was it?

7    A.   I believe that it was.

8    Q.   You believe that it was.  So you didn't have $5 million

9    in excess funds?

10   A.   Well again, when you compare Creighton's financial

11   stability to our peers --

12             MS. VARGAS:  Your Honor, I'm not asking the witness

13   to compare to other universities, I'm asking about their

14   finances.

15   A.   We did not have excess funds.

16   BY MS. VARGAS:

17   Q.   You didn't have more than $5 million net after all your

18   expenses were paid in 2010?

19   A.   Our net operating contribution was probably around 5

20   million, but we used that money to pay our debt payments.

21   Q.   You used this money -- let me go back.  Creighton

22   University sets the tuition.

23   A.   Each school sets their tuition.

24   Q.   Okay.  And that tuition comes to Creighton University.

25   A.   It is allocated to each school.

1     Q.   And do you provide a service in exchange for the receipt

2     of those funds?

3     A.   Each school provides a program for the students that

4     enroll.

5     Q.   They provide those students access to an education,

6     correct?

7     A.   Yes.

8     Q.   Now, you referred to the School of Medicine as revenue-

9     generating.

10    A.   I did.

11    Q.   Does revenue-generating mean that it makes money for the

12    university?

13    A.   It means that they charge money to their students, and

14    then they contribute to the overhead of the university for the

15    services that they use.

16    Q.   So does revenue-generating mean that the School of

17    Medicine makes money for Creighton University?

18    A.   No, that's not what it means.  They collect money.

19    Q.   And they give it to --

20    A.   They allocate it for staff salaries and supplies and

21    other things.  And then they contribute to the other expenses

22    of Creighton.

23    Q.   You just testified that they allocate their revenue to

24    staff salaries, like their professors?

25    A.   Correct.

1    Q.   Are you familiar with policy 4?  And it's called Fund

2    Budgeting of Creighton University?

3    A.   No.

4    Q.   You're the vice president of finance and you've never

5    heard of that before?

6    A.   So Creighton is not very good at updating our Web site,

7    I'll be the first to admit.  We haven't had funds to go and

8    get IT resources to do that.  So there are some old policies

9    out there.

10   Q.   So the policy maintained on your financial Web site for

11   financial transparency that says salaries at the school of

12   medicine are paid by Creighton University, not the medical

13   school, you're saying that's inaccurate?

14            MS. BALUS:  Object to the form of the question, your

15   Honor.

16            THE COURT:  Sustained.

17   BY MS. VARGAS:

18   Q.   Where do the salaries for your medical school faculty

19   come from?  The general fund; isn't that correct?

20   A.   So there is a general fund --

21   Q.   And the general fund is Creighton University general

22   fund, correct?

23   A.   Each school has a general fund --

24   Q.   Could you please answer the question?

25   A.   Each school has a --

1    Q.   Could you please --

2    A.   Each --

3             COURT REPORTER:  You may not --

4             THE COURT:  We're going to stop.  Everybody take a

5    deep breath.  We have three people talking at once, four if we

6    include Ms. Fauber.

7         The witness is indeed answering the question.  And she

8    will be allowed to answer the question.

9    A.   Each school has their own general current fund.

10   BY MS. VARGAS:

11   Q.   Does the university have its own general current fund?

12   A.   It does.

13   Q.   And aren't the medical school faculty paid out of

14   Creighton University's general current fund called the GCF?

15   A.   The faculty salaries are paid for out of the School of

16   Medicine's general current fund which, from an accounting

17   perspective, at the end of the day when we do our audited

18   financials, all gets added up to one university financial

19   statement.

20   Q.   So one university financial statement.

21   A.   That's audited, correct.

22   Q.   And that's Creighton University.

23   A.   It is.

24            MS. VARGAS:  No further questions.

25            THE COURT:  Redirect?

```
 1              MS. BALUS:  Thank you, your Honor.

 2                        REDIRECT EXAMINATION

 3     BY MS. BALUS:

 4     Q.   Can Creighton School of Medicine borrow from other

 5     schools' general fund to pay the salaries of their teachers,

 6     their faculty?

 7     A.   No.

 8     Q.   And just to be clear, the tuition amount that Creighton

 9     medical school charges its students, does that go to the

10     medical school or to the university?

11     A.   It's allocated to the medical school.

12     Q.   And then what does the medical school do with that

13     tuition?

14     A.   They allocate it to their faculty and staff and expenses

15     to run their programs for their students.

16     Q.   Do they pay for expenses for the law school out of those

17     funds?

18     A.   No.

19     Q.   Any other schools?

20     A.   No.

21              MS. BALUS:  I have nothing further, your Honor.

22              THE COURT:  Thank you.  You may stand down.

23          And Ms. Madsen, you are excused.

24              THE WITNESS:  Thank you.

25              THE COURT:  Defense may call its next witness.
```

```
 1              MR. MOORE:  Defense calls Wade Pearson.

 2              THE COURT:  Mr. Pearson, if you'll please come

 3     forward to the courtroom deputy here on my right, she'll swear

 4     you in.

 5              COURTROOM DEPUTY:  State your full name for the

 6     record, please, and spell your last.

 7              THE WITNESS:  Wade Lawrence Pearson, P-e-a-r-s-o-n.

 8              WADE PEARSON, DEFENDANT'S WITNESS, SWORN

 9              THE COURT:  You may inquire.

10              MR. MOORE:  Thank you, your Honor.

11                          DIRECT EXAMINATION

12     BY MR. MOORE:

13     Q.   Good morning, Mr. Pearson.

14     A.   Good morning.

15     Q.   Please introduce yourself.

16     A.   My name is Wade Pearson.

17     Q.   And Mr. Pearson, where do you live?

18     A.   I live in -- off Dodge, a hundred and --

19     Q.   No, don't give your exact address.

20     A.   In Omaha.

21     Q.   There you go.  Can't do that.  There are people watching.

22          Do you have any family, sir?

23     A.   Yes, I have two children.

24     Q.   And you're married, sir?

25     A.   Yes, married for 28 years.
```

1    Q.    How old are your children?

2    A.    28 and 30.

3    Q.    What do they do?

4    A.    One is working for a computer company here in Omaha,

5    another works for a telemarketing firm, so...

6    Q.    Are you currently employed?

7    A.    No, I am retired.

8    Q.    Okay.  And are you recently retired?

9    A.    Recently retired as of June 14th, yes.

10    Q.    I imagine you thought you were done.

11         Were you employed by Creighton before your retirement?

12    A.    Just for approximately 26 years.

13    Q.    What position did you hold at Creighton University?

14    A.    The most recent position was I was the director of

15    educational opportunity programs.  And that involved the

16    oversight of five federally funded programs that worked with

17    approximately 2,000 first generation low income students.

18         And underneath that rubric of educational opportunity

19    programs, I was also responsible for services for students

20    with disabilities on campus, primarily at the undergraduate

21    level.

22    Q.    How long were you responsible for the -- excuse me, I'll

23    withdraw the question.

24         How long did you have responsibilities in the area of

25    students with disabilities?

1    A.   Approximately 20 years.

2    Q.   Okay.

3    A.   In the prior position, that dealt with Creighton

4    students, I also -- part of the responsibility was oversight

5    of services for those students with disabilities, so

6    approximately 20 years.

7    Q.   Okay.  And if you could share with the jury a little bit

8    of your educational background after high school?

9    A.   I went to college in Minnesota, small public university,

10   Southwest State College.  And then I went to Nebraska, even

11   though I'm from Iowa and a Hawkeye fan, now a Nebraska alum.

12   And I did the undergraduate prior to graduate work and

13   received a master's degree from UNL.

14   Q.   What was that master's degree in?

15   A.   It was in European history.

16   Q.   And did you have any specific training or educational

17   opportunities in the area of students with disabilities?

18   A.   Pretty extensively because when I was employed by the

19   university, there were numerous trainings from the Department

20   of Education, a national organization called Association for

21   Higher Education and Disability provided extensive training to

22   college personnel regarding disability-related issues and

23   working with students that have a disability.

24   Q.   And you said --

25   A.   So there was available a lot of training.  And usually

1    there was something done every year, if not by myself, at

2    least another staff member too.

3    Q.   Could you explain some of the duties or the

4    responsibilities of the office with regard to students with

5    disabilities?

6    A.   Primarily what we did was oversight at a graduate level

7    of any student that the requests came in, disclosed a

8    disability, and requested accommodations for their work at the

9    university.

10        So we met with parents, we met with students.  We

11   collected the documentation.  We talked about what would be

12   the accommodations for the classroom activities that they'd be

13   involved in.  And then we served as a liaison with the

14   faculty.

15        So we let the -- the student let the faculty member know

16   that they had a particular disability and that these are the

17   accommodations that would be needed in their classroom.  And

18   if there are any issues that came from that, we attempted to

19   mediate that.

20   Q.   Now, for that, was that specifically with the

21   undergraduate population?

22   A.   That's -- that's correct.

23   Q.   Do you require documentation to support what they're

24   requesting?

25   A.   Absolutely.  The fundamental -- the first two things we

1    looked at was a disclosure of a disability and then the

2    documentation that supported the disclosure of that

3    disability.

4         It needed to talk about what the disability entailed and

5    how it limited their ability to be successful at the

6    postsecondary level without particular accommodations.

7    Q.   And you indicated the organization.  And I'll say AHEAD

8    because I don't remember --

9    A.   Okay.

10   Q.   -- it and --

11   A.   I know --

12        THE COURT:  Mr. Pearson, we're making a record of the

13   case.  And we can't make a record if two people talk at the

14   same time.  So when there's a question, make very sure the

15   question is finished before you start your answer.

16        Go ahead.

17        MR. MOORE:  Thank you, your Honor.

18   BY MR. MOORE:

19   Q.   And what is AHEAD again?

20   A.   Association for Higher Education and Disability.

21   Q.   And are you involved in that -- or were you involved in

22   that organization?

23   A.   I was a member.

24   Q.   And being involved in that organization, were you

25   familiar with what other universities did with regard to

1     accommodations?

2     A.   Yeah.   Part of being a member was to be able to share

3     that kind of information, what was being done at other

4     universities, what are the best practices used for -- at their

5     schools, what might be appropriate for particular use or

6     disability, might be what issues, what problems came up with

7     disabilities.   So it became a forum for that kind of exchange

8     of information.

9     Q.   And was your requirement that a student provide

10    documentation of their disability and need for accommodations,

11    is that consistent with other universities across the country?

12    A.   Yes.

13         MS. DeLAIR:   Objection, your Honor.   This witness is

14    a fact witness.   And it appears he is testifying in the

15    capacity of an expert witness.

16         THE COURT:   Was this witness involved in some way in

17    the decision-making process?

18         MR. MOORE:   This witness consulted with the MEMT

19    throughout this process because he was the director of the

20    office of disability accommodations.

21         THE COURT:   Overruled.   The answer will remain.

22    BY MR. MOORE:

23    Q.   So again was that consistent with other universities?

24    A.   Yes.

25    Q.   Was it identified as a best practice?

1    A.   Yes.

2    Q.   Now, in addition to the undergraduate accommodations, did

3    your office do other things with regard to students with

4    disabilities and awareness?

5    A.   A number of things.  We tried to provide information to

6    the university personnel in terms of what our office was

7    doing, what were the needs of particular students on campus.

8         We also -- all the -- Creighton is kind of unique in that

9    it has a number of professional schools, the School of

10   Dentistry, School of Medicine, Law School, Pharmacy and Allied

11   Health.  And they identify particular individuals at those

12   schools to be kind of the point person to talk with anybody

13   that might disclose a disability.

14        So we were the liaison to consult with those, if the need

15   arose.

16   Q.   And did your office have symposiums?  Did you bring

17   speakers on campus, those kind of things?

18   A.   Yes.  We --

19   Q.   Describe that for the jury.

20             MS. DeLAIR:  Objection, relevance.

21             THE COURT:  What is the relevance?

22             MR. MOORE:  This goes to the fact that -- shows

23   Creighton's commitment to providing accommodations with

24   disabilities -- its students with disabilities and goes to the

25   deliberate indifference allegations I think at the very least,

 1    your Honor.

 2              THE COURT:  I'm going to sustain the objection.

 3    BY MR. MOORE:

 4    Q.   Let's go back to professional schools.  Again you

 5    indicated earlier that you handled the accommodations for the

 6    undergraduates.  Who handles the accommodations for the

 7    various professional schools?

 8    A.   A particular associate dean or vice president that's been

 9    designated by that particular school to be responsible for

10    those -- for those issues.

11    Q.   And why didn't you just decide the accommodations for

12    those schools?

13    A.   Part of the -- a couple reasons.  I think part of the

14    concern is that at a professional school level, the curriculum

15    is much different than at the undergraduate level.  It's

16    intense.  They know the curriculum much better than I ever

17    would.

18         Two, I think that part of the thing was that -- and why

19    we served in the role that we did was that professional

20    schools didn't always get a request for accommodation on a

21    annual basis.  I mean, I was doing that as a full-time job.

22    The School of Dentistry, I remember went a couple years

23    without a school -- an individual disclosing a disability or

24    needing an accommodation.

25         So it was kind of like, okay, now we do have an

1     individual.  Let's sort of refresh our memory, let's talk

2     about what we need to do.  That's why that kind of consulting

3     and liaison kind of came in, especially because they weren't

4     doing it frequently.  It wasn't their job to be doing it all

5     the time.

6              MS. DeLAIR:  I -- excuse me.

7     BY MR. MOORE:

8     Q.   Now, are you familiar with the process that the medical

9     school followed in addressing reasonable accommodations?  Why

10    don't you go get -- if you need to get a drink first...

11    A.   Can you repeat the question?

12    Q.   Sure.  Were you familiar with how the medical school

13    addressed requests for reasonable accommodations from medical

14    school students?

15    A.   Yes.

16    Q.   How were you familiar with that?

17    A.   I worked with Dr. Kavan, who was the designee at the

18    medical school.

19    Q.   Did you work with Dr. Kavan on accommodations other than

20    Mr. Argenyi's?

21    A.   Yes.

22    Q.   And are you familiar with the Medical Education

23    Management Team?

24    A.   Yes.

25    Q.   And how were you familiar with that?

1    A.   I attended meetings.  I mean, I knew that they were

2    the -- the group that looked at particular requests and

3    evaluated that information.

4    Q.   And why did you attend those meetings?

5    A.   I was asked to, as -- in this case a normal course of our

6    conversation.

7    Q.   Okay.  And -- but for what reason?  Were you consulting?

8    A.   Yes.

9    Q.   That's okay.  That's okay.  It's not fun being up there.

10   I realize that.

11        Now, are you familiar that Mr. Argenyi requested

12   accommodations from the medical school?

13           MS. DeLAIR:  Objection, leading.  I'd like to hear

14   from the witness how these facts transpired.

15           THE COURT:  The question as presented is not

16   objectionable.  The witness may answer.

17   A.   Can you repeat that?

18        (Question repeated.)

19   A.   Yes.

20   BY MR. MOORE:

21   Q.   And were you involved with consulting with the medical

22   school with regard to Mr. Argenyi's requests?

23   A.   Yes.

24   Q.   And when did you first become involved?

25   A.   Dr. Kavan, after an initial inquiry from Michael, sent me

1    an e-mail saying that they had a potential student with a

2    disability, that had a hearing impairment.  And as I normally

3    do, I reminded him to make sure that he contacts the student,

4    gets a disclosure of disability and supporting documentation.

5    And those are my general initial comments right away.

6    Q.   And did Dr. Kavan stay in touch with you throughout that

7    process?

8    A.   Yes.

9    Q.   What happened?

10   A.   As the -- I received essentially e-mails as they -- as

11   they came in to Dr. Kavan and stayed in the loop.

12   Q.   Okay.  And was there anything that you identified as

13   unusual in the process that Dr. Kavan did to collect the

14   information?

15   A.   No.

16   Q.   And did Dr. Kavan share with you the information that

17   Mr. Argenyi was providing to the medical school?

18   A.   Yes.

19   Q.   And did his approach to gathering that information, was

20   that unusual in your opinion?

21   A.   No.

22   Q.   Now, did you make any decisions with regard to what

23   accommodations would be offered to Mr. Argenyi?

24   A.   No.

25   Q.   Who made that decision?

1    A.   The educational management team.

2    Q.   Okay.  Now, during the process when you were working with

3    Dr. Kavan, did you do some of your own investigation with

4    regard to Mr. Argenyi's requests?

5    A.   Yes.

6    Q.   And was that related to the cued speech interpreter?

7    A.   Yes.

8    Q.   And what did you do?

9    A.   When that came up, I wasn't familiar exactly with what

10   cued speech was.  And so I called interpreters that I knew to

11   find out explanations of that so I could relay that to

12   Dr. Kavan and the committee.  So it was a fact-finding and

13   educational inquiry.

14   Q.   And did you consult with Dr. Kavan and the team with

15   regard to what CART was?

16   A.   Yes.

17   Q.   What did you do with that?

18   A.   I basically told them what I was familiar with in terms

19   of CART as a procedure and how it displayed -- recorded

20   information and displayed it on a computer screen real time.

21       So I basically explained that and explained what I had

22   found out about the cued speech.

23   Q.   Okay.  And did you then attend the meeting where the MEMT

24   discussed and made its determinations with regard to

25   Mr. Argenyi's requests?

1    A.    Yes.

2    Q.    And what was your role at that meeting?

3    A.    As a member, attendee.  I mean, I don't remember the

4    discussion per se.  Generally I don't think I offered anything

5    more in terms of comments.

6    Q.    Okay.  But you didn't vote on any --

7    A.    No.

8    Q.    -- accommodations, you were there in a consulting --

9    A.    Correct.

10   Q.    Did the Medical Education Management Team in evaluating

11   Mr. Argenyi's request for his M1 year follow the normal and

12   regular procedure that is followed in granting accommodations.

13   A.    Yes.

14   Q.    Did they do anything unusual?

15   A.    I don't believe so.

16   Q.    Now, after Mr. Argenyi learned of what the MEMT was

17   offering but before school, did you participate in a meeting

18   with Mr. Argenyi and his legal counsel?

19   A.    Yes.

20   Q.    And do you recall when that was?

21   A.    August, two days before classes were to begin.

22   Q.    Okay.  And do you recall who was in attendance at that

23   meeting?

24   A.    Myself; Dr. Kavan; Creighton's general counsel, Amy

25   Bones; Michael; Dianne DeLair; and an individual that I'm not

 1    sure what -- a man, and I don't recall what his position was.

 2    Q.   Okay.  Do you recall what that third person's purpose

 3    was?

 4    A.   I assume advocacy.

 5    Q.   Okay.  And what happened at that meeting?

 6    A.   It was --

 7         MS. DeLAIR:  Your Honor, I'm going to object to this

 8    line of testimony as cumulative.  We've heard several

 9    different versions from Creighton's employees about what the

10    transpired during that meeting.

11         THE COURT:  Overruled.  The witness may answer.

12    BY MR. MOORE:

13    Q.   And just generally, we don't need to spend a lot of time

14    on it, but just generally what was your impression of that

15    meeting?

16    A.   I was surprised.  I was a little uncomfortable with

17    attorneys.  I didn't know what to expect.

18         And when we got there -- at my recollection, it did not

19    last very long.  We talked a little bit about -- Dr. Kavan

20    talked a little bit about how we arrived at our procedures --

21    I mean, our -- the accommodations, what was determined

22    appropriate.  And we were told that that wasn't what they

23    wanted -- what Michael wanted.  And he basically wanted

24    everything that he had stated in earlier correspondence to

25    Dr. Kavan.

1    Q.   You said you were a little bit uncomfortable and

2    surprised in that kind of meeting.  Does that generally happen

3    when a student is requesting an accommodation?

4    A.   It didn't happen at my tenure at Creighton.

5    Q.   I'd like to direct your attention to Exhibit 206.  And

6    we'll go to the -- let's go to the second page of this letter.

7    And this is a letter from Amy Bones to Dianne DeLair that was

8    sent on September 21st, 2009.

9    A.   Yes.

10   Q.   And I'd like to -- you've seen this letter before,

11   correct, sir?

12   A.   Yes.

13   Q.   I'd like to highlight the second to the last paragraph in

14   the letter, starting with "if a conversation"?

15            MS. DeLAIR:  Objection, foundation.

16            THE COURT:  Well, the exhibit is already in evidence.

17            MS. DeLAIR:  I'm objecting to the line of

18   questioning, your Honor, and the relevance of whether or not

19   Mr. Pearson has reviewed the letter.

20            THE COURT:  Right now he's just been asked if he's

21   seen the letter before.  I don't know what the line of

22   questioning is going to be, and the exhibit is in evidence.

23       So, overruled.  You may answer.

24            MS. BALUS:  May I approach and hand the witness the

25   exhibit, your Honor?

 1              THE COURT:  You may.

 2    BY MR. MOORE:

 3    Q.   And focusing on the second page in the second to the last

 4    paragraph where it says, "If a conversation, rather than a

 5    letter, will facilitate getting answers to these questions,

 6    the staff from Disability Support Services and I will be happy

 7    to call Dr. Backous with your permission."  Do you see that?

 8    A.   Yes.

 9    Q.   And does that accurately reflect your willingness -- let

10    me ask you this:  Do you know -- when the letter refers to

11    Disability Support Services, that staff, do you know who that

12    refers to?

13    A.   That refers to me or --

14    Q.   Okay.

15    A.   Yeah.

16    Q.   Did you have a discussion with Ms. Bones that you'd be

17    happy to talk to Dr. Backous?

18    A.   Yes.

19    Q.   Do you know if Dianne DeLair or anyone from Michael's

20    team ever responded to this?

21    A.   I don't know.

22    Q.   Did you understand that someone from Creighton actually

23    tried to contact Dr. Backous?

24              MS. DeLAIR:  Objection, hearsay.

25              THE COURT:  Sustained.

```
 1              MR. MOORE:  Your Honor, we wouldn't be offering it

 2      for the truth -- proof of the truth of the matter, asserted

 3      excuse me, but for notice and the steps that Mr. Pearson

 4      believed he needed to take with regard to Dr. Backous.

 5      They've alleged that no one ever tried to contact him.  That

 6      goes right to that issue.

 7              THE COURT:  All right.  I will overrule the objection

 8      and allow the witness to respond on that basis.

 9      BY MR. MOORE:

10      Q.   Did you understand that someone from Creighton actually

11      tried to contact Dr. Backous?

12      A.   Yes.

13      Q.   Who was that?

14      A.   Amy Bones, general counsel.

15      Q.   And what happened in response to her phone calls to

16      Dr. --

17              MS. DeLAIR:  Objection, hearsay.  He wasn't a

18      decision-maker in this process at this point.  He testified to

19      that, your Honor.

20              THE COURT:  He can only testify as to his actual

21      knowledge.  I'll just instruct the witness that he must limit

22      his response to his knowledge of the facts.

23          So you may answer the question, if you know.

24      BY MR. MOORE:

25      Q.   Do you know what happened in response to Amy Bones trying
```

1    to contact Dr. Backous?

2    A.   She was not able to contact him -- or did not get a

3    response back.

4    Q.   Now, Mr. Pearson, did you continue to consult with the

5    MEMT with regard to Mr. Argenyi's requests for his second year

6    of medical school?

7    A.   Minimally.

8    Q.   And why is that?

9    A.   Primarily because after the lawsuit was filed, a lot of

10   the communication was handled through attorneys.  And I was

11   kept in the loop, but less and less as the process progressed.

12   Q.   Being involved in the MEMT's decision, consulting, in

13   that -- in that M2 year, was there anything that the MEMT did

14   that was unusual or out of the ordinary in the process of

15   evaluating those accommodations?

16         MS. DeLAIR:  Objection, foundation, asked and

17   answered.

18         THE COURT:  Overruled.  He may answer.

19   A.   No.

20         MR. MOORE:  Nothing further, your Honor.

21         THE COURT:  Cross-examination?

22         MS. DeLAIR:  Thank you, your Honor.

23                       CROSS-EXAMINATION

24   BY MS. DeLAIR:

25   Q.   Mr. Pearson, I want to back up to some of your earlier

1      testimony this morning.

2           You testified that you acted as a consultant to the MEMT;

3      is that correct?

4      A.   Yes.

5      Q.   And you were doing this because your position at

6      Creighton University is the head of disability accommodations

7      for students.

8      A.   Yes.

9      Q.   And you have 20 years of experience in that role,

10     correct?

11     A.   Yes.

12     Q.   And so the MEMT asked you to consult with them based on

13     the request of a potential medical student.

14     A.   Yes.

15     Q.   Now you said that you attended those meetings, correct?

16     A.   Yes.

17     Q.   And you provided -- I want to make sure I get your

18     testimony correct -- some type of procedure for CART to the

19     team?

20     A.   No, I gave an explanation of what CART consisted of for

21     those that didn't know.

22     Q.   And did you explain how this worked in the classroom?

23     A.   Yes.

24     Q.   And did you explain how it worked for other students?

25     A.   Yes.

1    Q.   Now, in your role as the undergraduate officer for the

2    disability accommodations office, you talked about best

3    practices for requests that came in for accommodations for

4    students with disabilities, correct?

5    A.   Yes.

6    Q.   And one of those factors that you take a look at is the

7    disclosure of the disability, correct?

8    A.   Yes.

9    Q.   And the other factor is documentation.

10   A.   Yes.

11   Q.   And do you also look at the experiences of a student, you

12   know, maybe what they used in high school?

13   A.   Yes.

14   Q.   And that's relevant in the determination?

15   A.   It could be, yes.

16   Q.   It could be?

17   A.   Uh-huh.

18   Q.   Is it something that is a best practice?

19   A.   It's always helpful to know as much information as you

20   can.  But not all the accommodations offered at the high

21   school level are applicable or offered at the college level.

22   Q.   That's not what I asked.  I asked in making the

23   determination, is it relevant to look at what the student had

24   at the former institution?

25   A.   Yes.

 1    Q.   And that would also be relevant to what the student had

 2    at another university?

 3    A.   Yes.

 4    Q.   So the information that Mr. Argenyi provided to the MEMT

 5    about what he used in the past, that was relevant too, wasn't

 6    it?

 7    A.   Yes.

 8    Q.   And the fact that these other institutions provided CART

 9    for Mr. Argenyi, was that relevant?

10    A.   Yes.

11    Q.   Now, your office once provided CART for a student in the

12    undergraduate level after an FM system didn't help that

13    student, that's correct, isn't it?

14    A.   We provided CART service for a student.  I don't remember

15    if the FM system was the issue, but we did provide part of a

16    semester -- for about half of a semester we provided CART to a

17    student.

18    Q.   Mr. Pearson, do you recall when I took your deposition?

19    A.   Yes.

20    Q.   And you were represented by counsel?

21    A.   Yes.

22    Q.   And you were testifying under oath?

23    A.   Yes.

24         (Off-the-record discussion had.)

25    BY MS. DeLAIR:

1    Q.   Mr. Pearson, can you go ahead and read line 11 that's

2    highlighted all the way through line 14?

3         MR. MOORE:  Your Honor, I'll object.  It's improper

4    impeachment, so it's hearsay.

5         THE COURT:  Overruled.  He may read the deposition

6    answer, response.

7    A.   "Probably felt that he didn't get it from whatever was in

8    place, the note-taking, the FM, and then halfway through the

9    class you approved CART for this student."

10   BY MS. DeLAIR:

11   Q.   So you did approve CART after an FM system didn't work

12   for this student.

13   A.   Yes.

14   Q.   So note-taking wouldn't have been sufficient because they

15   wouldn't have access to the whole class, correct?

16        MR. MOORE:  Objection, relevance.

17        THE COURT:  Overruled.  He may answer.

18   A.   Can you repeat that, please?

19        MS. DeLAIR:  Ms. Fauber, can you please read back the

20   question.

21        (Question repeated.)

22   A.   Yes.

23   BY MS. DeLAIR:

24   Q.   In your role as director of disability accommodations,

25   you provided interpreters, sign language interpreters on

1    campus to other students, correct?

2    A.   Yes.

3    Q.   And providing those interpreters, that doesn't give a

4    student an extra advantage, does it?

5    A.   No.

6    Q.   Is that a special benefit to that student?

7    A.   No.

8    Q.   Is it a competitive advantage for that student?

9    A.   No.

10   Q.   The student who is -- has a disability verified by the

11   university, for instance, such as Mr. Argenyi, he's requesting

12   CART, they're not -- he's not asking for a competitive

13   advantage over other students, is he?

14        MR. MOORE:  Objection, foundation, calls for

15   speculation.

16        THE COURT:  Sustained.

17   BY MS. DeLAIR:

18   Q.   The students who request accommodations from your office,

19   they're just asking for equal access to their education; isn't

20   that correct?

21   A.   Yes.

22   Q.   And there was a lot of discussion about the meeting with

23   me on August 12th.  Are you aware of what the protection and

24   advocacy system is in the state of Nebraska?

25        MR. MOORE:  Objection, foundation, relevance.

1              THE COURT:  Overruled.  He may answer, if he knows.

2    A.   No specifics.

3    BY MS. DeLAIR:

4    Q.   Do you know that's the agency that's charged with

5    protecting and advocating --

6              MR. MOORE:  Objection.

7    Q.   -- for the rights of individuals with disabilities?

8              MS. DeLAIR:  Can I finish my question?

9              THE COURT:  Objection sustained.

10             MR. MOORE:  Thank you.

11   BY MS. DeLAIR:

12   Q.   Mr. Pearson, you testified that when the FM system was

13   not working for that student, you changed it.  When something

14   works, why would you change it?

15             MR. MOORE:  Objection, form of the question.

16             MS. DeLAIR:  I can rephrase, your Honor.

17             THE COURT:  All right.

18   BY MS. DeLAIR:

19   Q.   Mr. Pearson, if an accommodation is working for a

20   student, why would you change that accommodation?

21   A.   If an accommodation was working, I don't think I would.

22   Q.   And I just want to be clear.  A student who requested

23   accommodations for their disability, that's not a special

24   favor and it's not a special benefit, is it?

25   A.   No.

1          MS. DeLAIR:  No further questions, your Honor.

2          THE COURT:  Redirect?

3          MR. MOORE:  Thank you.

4                      REDIRECT EXAMINATION

5    BY MR. MOORE:

6    Q.   Mr. Pearson, let's talk about first the student in

7    undergraduate that received CART.

8    A.   Uh-huh.

9    Q.   If you could describe to the jury what class did he

10   receive it for and for how long?

11   A.   He was taking a basic history class.  It was part of the

12   core curriculum, one of the classes that every other graduate

13   student needs to take to satisfy the core curriculum.  He was

14   about halfway through the class and came to me, we had a

15   conversation about his progress in the class.  And he wanted

16   to know if I would be willing to -- be willing to go ahead and

17   provide CART for that class.

18   Q.   And did he have the proper documentation supporting the

19   need for these things?

20   A.   I don't recall the specific documentation.

21   Q.   Sure.

22   A.   But he had support for his hearing impairment, yes.

23   Q.   And the need for CART, correct?

24   A.   Yes.

25   Q.   And as I recall, it was only that class for a half

 1    semester, correct?

 2    A.   Correct.

 3         MS. DeLAIR:  Objection, that's out of the scope of

 4    what the witness testified to.

 5         THE COURT:  Overruled.  The witness's response will

 6    remain.  The response was that that was correct.

 7    BY MR. MOORE:

 8    Q.   Now you're responsible -- again the accommodations that

 9    you were responsible for granting that Ms. DeLair questioned,

10    but that's for the undergraduate population, correct?

11    A.   Yes.

12    Q.   I think she testified [*sic*] that what they received --

13    you testified that what they received in high school may be

14    relevant to the consideration of what you may grant in

15    college, correct?

16    A.   Yes.

17    Q.   But do you grant -- if they received something in high

18    school, do you automatically grant that for college?

19    A.   No.

20    Q.   And are there -- are high schools under a greater duty to

21    provide accommodations than colleges?

22         MS. DeLAIR:  Objection, outside of the scope,

23    irrelevant.

24         THE COURT:  Sustained.

25         MR. MOORE:  May I be heard, your Honor?

1          THE COURT:  You want to be heard at sidebar?  I think

2     you're asking for a question that requires a response as to

3     what the law requires.  And it's not for the witnesses to tell

4     the jury what the law does or does not require.  That's why I

5     sustained the objection.

6          MR. MOORE:  I don't want to discuss it here.

7          THE COURT:  You can have a sidebar.

8          MR. MOORE:  Yeah.

9     (Bench conference on the record.)

10         MR. MOORE:  Okay.  They asked on cross-examination

11    if what's relevant in high school is relevant in his opinion

12    in college.  And Mr. Pearson will testify that oftentimes it's

13    not relevant because students request what they received in

14    high school.

15         And the reason he doesn't rely on that many times is

16    because there's a student expectation of receiving more.  And

17    the law in high school, the IDEA and other laws apply that

18    give them the broader rights.  And that goes into the

19    determination of how he determines what accommodations.  And

20    they opened that door.

21         MS. DeLAIR:  Your Honor --

22         THE COURT:  You don't need to respond.  No, I'm not

23    going there.

24         MR. MOORE:  Okay.

25         THE COURT:  The objection's sustained.

 1                    MR. MOORE:  Okay.

 2             (End of bench conference.)

 3                    THE COURT:  You may continue.

 4                    MR. MOORE:  Thank you.

 5    BY MR. MOORE:

 6    Q.    Now, Mr. Pearson, you testified on cross-examination that

 7    an accommodation isn't a special benefit, doesn't give someone

 8    an advantage.

 9    A.    Correct.

10    Q.    But is it true that that's if it is documented that it's

11    needed because of the disability?

12    A.    That's correct.

13    Q.    If it's not documented that it's needed for a disability,

14    would that be something that you would provide?

15    A.    No.

16    Q.    Now, there was some testimony on your consultation with

17    regard to CART services.  And we had some testimony that

18    Margaret Tyska Heaney was providing the CART services that

19    Mr. Argenyi was provided --

20                    MS. DeLAIR:  Objection, your Honor, that was not the

21    witness's testimony.

22                    MR. MOORE:  I'll rephrase.

23    BY MR. MOORE:

24    Q.    Did you understand who was providing CART services for

25    Mr. Argenyi that he was providing himself?

1              MS. DeLAIR:  Objection, leading the witness.

2              THE COURT:  Overruled.  He may answer.

3    A.   Who was providing CART services for --

4    BY MR. MOORE:

5    Q.   For Mr. Argenyi that he was providing for himself.

6    A.   A name of an individual?

7    Q.   Did you know who was doing that?

8    A.   I know Margaret Heaney was doing it.

9    Q.   Okay.  And if -- and if -- and Ms. Tyska Heaney also

10   provided the CART services for the student in the history

11   class, correct?

12   A.   Yes.

13   Q.   So if Creighton were to provide those CART services to

14   Mr. Argenyi, it would be her that would provide those CART

15   services, correct?

16             MS. DeLAIR:  Objection, speculation.

17             THE COURT:  Overruled.  He may answer if he knows.

18   A.   Could you ask the question?

19   BY MR. MOORE:

20   Q.   Sure.  Creighton used Ms. Tyska Heaney in the past.

21   Mr. Argenyi was using Ms. Tyska Heaney for his own

22   accommodations that he was providing.  If Creighton would

23   provide those services, they'd use the same CART reporter,

24   correct?

25   A.   Yes.

1           MS. DeLAIR:  Objection, leading, that was not the

2    testimony elicited on direct.  Mr. Moore is testifying.

3           THE COURT:  It was a leading question but I'm going

4    to allow the answer to remain.  The witness answered yes and

5    we'll move on.

6           MR. MOORE:  I have nothing further, thank you.

7           THE COURT:  All right.  Thank you, Mr. Pearson.  You

8    may stand down and you are excused.

9           THE WITNESS:  Thank you.

10        It's a quarter till noon.  Do you wish to start with

11   another witness at this time, Mr. Moore?

12          MR. MOORE:  Just one second.

13        (Off-the-record discussion had.)

14          MR. MOORE:  Your Honor, the defense rests.

15          THE COURT:  Well, the jury is going to get a

16   longer -- well, not necessarily.  I guess I need to ask the

17   lawyers a question at sidebar before I tell the jury that they

18   have a longer noon break.

19        (Off-the-record bench conference had.)

20          THE COURT:  The defense has rested.  And the

21   plaintiff may present any rebuttal evidence that plaintiff

22   wishes to present.

23          MS. VARGAS:  Thank you, your Honor.

24        Very briefly, the plaintiff calls Dr. Kavan back to the

25   stand.

```
 1                THE COURT:  All right.  Doctor, you remain under
 2        oath.
 3            MICHAEL KAVAN, PREVIOUSLY SWORN, RESUMED THE STAND
 4                THE COURT:  You may inquire.
 5                MS. VARGAS:  Thank you, your Honor.
 6                           DIRECT EXAMINATION
 7        BY MS. VARGAS:
 8        Q.   Dr. Kavan, you've been present in these proceedings as
 9        the representative of Creighton University the past two weeks.
10        A.   Yes, that's correct.
11        Q.   And you were represented by counsel, correct?
12        A.   That's correct.
13        Q.   And your counsel is Mr. Moore.
14        A.   That's correct.
15        Q.   And Ms. Balus?
16        A.   That's correct.
17        Q.   And Mr. Moore in these proceedings has been acting as
18        your agent, correct?
19                MR. MOORE:  Objection, relevance, improper rebuttal
20        testimony.
21                THE COURT:  I don't know where we're going with this.
22        Do we need to have a sidebar?
23                MS. VARGAS:  I don't believe so, your Honor.  I think
24        we can get to the point pretty quickly.
25                THE COURT:  All right.  The jury is already aware
```

1    that Creighton University is represented by counsel, including

2    Mr. Moore and Ms. Balus.  We won't get into issues of agency.

3         MS. VARGAS:  I phrased that inartfully.

4    BY MS. VARGAS:

5    Q.   Dr. Kavan, the -- during the course of this litigation,

6    Creighton University was required to respond to what's called

7    Requests for production of documents and interrogatories,

8    correct?

9         MR. MOORE:  I'm going to object, improper rebuttal,

10   violation of the Court's orders with regard to previous orders

11   and previous proceedings in this action.

12        MS. VARGAS:  We do need a sidebar.

13        THE COURT:  Yeah, we do need a sidebar.

14     (Bench conference on the record.)

15        MS. VARGAS:  Your Honor, my understanding of the

16   Court's order more than once was that the plaintiffs would be

17   permitted to offer the defendant's responses to requests for

18   production of documents stating that it was not an undue

19   burden to provide interpreters.  And that's what we'd like to

20   do now through Dr. Kavan.  The reason I asked about Mr. Moore

21   is that this is signed by Mr. Moore on behalf of Creighton

22   University.

23     With that said, we don't even need a witness really.

24   Under Rule 801 this is admissible.  It's not hearsay.

25        MR. MOORE:  Sure.  The Eighth Circuit law is very

1    clear that rebuttal is for something that they couldn't have

2    provided during their case in chief and couldn't have expected

3    to come up in their case in chief.  This -- as we've been

4    talking about from the beginning, these are requests for

5    production of documents, not interrogatories.  They're not

6    verified.

7         There's no such thing as a corporate rep that gets up

8    here and provides foundation for a document like this.

9    Dr. Kavan has never seen this document.  Dr. Kavan never

10   participated in putting this document together.

11             MS. VARGAS:  Your Honor --

12             THE COURT:  What I will allow you to do is ask this

13   witness if Creighton contends that providing the plaintiff

14   with qualified interpreters would have constituted an undue

15   burden on Creighton.  You may ask that question.

16        And if he says --

17             MS. VARGAS:  No, may I impeach him?

18             THE COURT:  You may.

19             MS. VARGAS:  Thank you.

20        (End of bench conference.)

21   BY MS. VARGAS:

22   Q.   Dr. Kavan, does Creighton University contend that

23   providing interpreters for Mr. Argenyi would have constituted

24   an undue burden?

25             MR. MOORE:  Your Honor, we will assert an objection

1      that --

2              MS. VARGAS:  Your Honor, no speaking objections at

3      that point.

4              MR. MOORE:  It's not a speaking objection.

5              THE COURT:  You may make an objection for the record.

6              MR. MOORE:  I want to preserve -- I want to preserve

7      the objection that this is -- that it was not -- this was not

8      offered solely to rebut any new information disclosed by the

9      defendant during its case in chief.

10             THE COURT:  Your objection is preserved, and the

11     witness may answer the question.

12     A.   Could you repeat the question, please?

13             MS. VARGAS:  Ms. Fauber, can you please repeat that

14     question?

15     Q.   (Repeated by Reporter) Dr. Kavan, does Creighton

16     University contend that providing interpreters for Mr. Argenyi

17     would have constituted an undue burden?

18     A.   Not in the circumstances provided.

19     BY MS. VARGAS:

20     Q.   Let me make sure I understand your answer, sir.

21          You're saying that it is not an undue burden for

22     Creighton University to have provided qualified interpreters

23     to Mr. Argenyi during his education.

24             MR. MOORE:  Again that mischaracterizes his

25     testimony.

1    A.   Right.

2              MS. VARGAS:  I'm asking a question.

3              THE COURT:  The witness may clarify his earlier

4    statement regarding the circumstances provided.

5    A.   Yeah, which was in the classroom setting for learning new

6    didactic information.

7    BY MS. VARGAS:

8    Q.   But I'm asking for all of his education.  Let's say M1

9    and M2.  Would it have been an undue burden to provide

10   interpreters for all of his education during M1 and M2?

11   A.   I'm not -- I'm still not certain as to the question.  I

12   have to apologize.  You're saying what now?

13   Q.   Does Creighton University contend that it would have been

14   an undue burden to provide interpreters during all of the

15   classroom content in M1 and M2?

16             MR. MOORE:  Objection, asked and answered,

17   mischaracterized what was requested as an accommodation.

18             THE COURT:  Overruled.  He may answer.

19   A.   So in the classroom setting, you're saying, that's what

20   you're limiting it to from what I'm hearing?

21   BY MS. VARGAS:

22   Q.   No.  I'm saying all of M1 and M2, the education offered

23   to medical school students, the entirety of M1 and M2, would

24   that have been an undue burden?

25   A.   I think that Creighton would have to look at the costs

 1    associated with that.  I'm not in a position to say.

 2    Q.   Well, the defense presented a case where I understood it

 3    offered as an affirmative defense that it was an undue burden

 4    to provide the accommodations requested.

 5        Was it an undue burden for Creighton University to

 6    provide qualified interpreters during all of that education in

 7    M1 and M2?

 8               MR. MOORE:  Objection, form of the question.

 9               THE COURT:  Sustained as to form of the question.

10    BY MS. VARGAS:

11    Q.   Was it an undue burden for Creighton University to

12    provide qualified interpreters during M1?

13               MR. MOORE:  Objection, form of the question.

14               THE COURT:  The witness may answer.

15    A.   An undue burden is defined as what?

16    BY MS. VARGAS:

17    Q.   Well, undue burden.  If that was -- I'm asking you if

18    that was your defense that -- was it too expensive?  Was it

19    too much of a burden on the university to ask the university

20    to do that?

21               MR. MOORE:  Objection, calls for a legal conclusion.

22               THE COURT:  No, he may answer.

23    A.   I'm not sure if I'm in a position to say.  I'm the

24    associate dean for student affairs.  I'm the person who is the

25    target person for providing documentation and accommodations

1    for students.  I'm not sure if I'm truly in a position to say

2    that.

3    BY MS. VARGAS:

4    Q.   You were designated as the 30(b)(6) representative.  That

5    means you were designated as the representative to speak for

6    the university in discovery.  And you've sat at counsel table

7    all week as the face of the defendant.

8         So I'm asking you, sir, do you believe it's an undue

9    burden, too much to ask, for Creighton University to provide

10   qualified interpreters throughout M1 and M2?

11             MR. MOORE:  Objection, form of the question,

12   referring to Rule 30(b)(6) which has nothing to do with the

13   trial and -- form of the question, calls for speculation.

14             THE COURT:  Sustained.

15             MS. VARGAS:  Your Honor, may I have a sidebar?

16             THE COURT:  Yes.

17        (Bench conference on the record.)

18             MS. VARGAS:  As I understand the purpose of rebuttal,

19   it is to address the affirmative defenses that have been

20   raised.

21        And so I'm trying to address the affirmative defenses

22   that have been raised.  We've asked your Honor repeatedly for

23   the opportunity to address this concern, and we were told we

24   would be able to address it.

25        Now I'm somewhat at a loss when we don't even need to

1    witness to admit this under Rule 801.  I'm happy to put it on

2    the ELMO and publish it to the jury and read it myself.

3         MR. MOORE:  He said under the circumstances provided

4    it wasn't an undue burden.

5         MS. VARGAS:  I don't even know what that means

6    because they didn't provide any in the first place.

7         THE COURT:  To me, it means Creighton is not

8    asserting the undue burden defense with respect to providing

9    the plaintiff with qualified interpreters in connection with

10   M1 and M2.

11        And while I'm not going to allow you to put this on the

12   ELMO, and it doesn't appear that you're able to get as much as

13   you want to get out of this witness, although he did say under

14   the circumstances presented it was not an undue burden, what I

15   think we can do that may alleviate some of your concerns is

16   include some language in the jury instructions that mirrors

17   this response that Creighton gave to the requests for

18   production so that you don't feel that you're prejudiced by

19   relying on this statement that Creighton made.

20        That much I can do for you.

21        MS. VARGAS:  Your Honor, I'm concerned on multiple

22   levels.  I'm concerned that this is the witness who has been

23   the face of the defendant, who has functioned for the

24   defendant, who was -- and this is the deposition where he

25   admits he was one of the 30(b)(6) designees, he participated

1    as the chair of the committee that made the decisions.

2         So the fact that he says he doesn't know anything about

3    this and didn't see it and --

4              THE COURT:  I'll stop you --

5              MS. VARGAS:  I can call Mr. Moore to the stand.

6              THE COURT:  I will stop you.  This witness said in

7    response to your question that under the circumstances

8    presented, Creighton did not contend that it would be an undue

9    burden on Creighton to provide the plaintiff with

10   interpreters.  He said that.  That's as much as that response

11   to the request for admission says.

12        So you're not going to get anything more out of this

13   witness, and that's as much as I can offer you.

14             MS. VARGAS:  Then I would ask, your Honor, that we

15   let Dr. Kavan go from the stand and that we be allowed to

16   present this as a judicial admission that under the law of

17   this circuit and the U.S. Supreme Court we're allowed to do.

18             THE COURT:  You can make an offer of proof right now,

19   right here.  And as I mentioned, I will do my best to craft

20   something in the draft jury instructions that incorporates the

21   essential language of that admission so you're not prejudiced.

22        Let's go ahead and put an exhibit number on it for

23   purposes of an offer of proof, and you'll have your record.

24             MS. VARGAS:  This has been marked as Plaintiff's

25   Exhibit 32.  Should I read it for clarification?

 1              THE COURT:  If you wish to.  This begins the offer of

 2       proof.

 3              MS. VARGAS:  Request number 13 sought all documents

 4       that support or contradict your defense that providing

 5       qualified interpreters to Michael Argenyi constitutes an undue

 6       burden.

 7          Creighton University responded:  "Defendant objects to

 8       request number 12 because it seeks documents protected by the

 9       attorney-client privilege and the attorney work-product

10       doctrine.  Defendant also objects to request number 12 because

11       it seeks a legal conclusion.  Subject to and without waiving

12       said objections, defendant does not contend that providing

13       qualified interpreters constitutes an undue burden so there

14       are no responsive documents."

15          I would point out at this point that there is no

16       qualifying language in the way that this was written.  The

17       defendant has an ongoing obligation pursuant to the Federal

18       Rules of Civil Procedure to supplement all of its responses to

19       discovery, including specifically this document.

20          The answer that the witness gave was qualified.  He

21       narrowed the circumstances and he said "as offered" or "as

22       requested" or whatever narrow language he used.  I don't want

23       to get it wrong, but he qualified it.

24          This statement is unqualified.  And to the extent we are

25       not allowed to put this in front of the jury, we are

1    substantially prejudiced.  The Supreme Court and every court

2    that we've looked at has said that when this happens, it

3    functions as a judicial admission and no evidence can be

4    offered -- no factual evidence can be offered to contradict

5    this statement.

6        We relied on this statement.  And therefore we seek the

7    opportunity to put this statement in front of the jury as we

8    believe it is our right under the Federal Rules, under the law

9    of this circuit, under the law of the Supreme Court of the

10   United States.

11       THE COURT:  This ends the offer of proof which has

12   also included argument on the subject.

13       MR. MOORE:  Can I --

14       THE COURT:  You wish to make -- you can assert your

15   objections.

16       MR. MOORE:  I want to assert my objections.  First of

17   all, the request for production of documents itself was

18   objectionable as noted.  And those answers were given without

19   waiving those objections, so it wasn't unqualified, there were

20   objections.

21       Number two, that this is a request for production of

22   documents, it's not a request for admission, nor is it

23   verified by the client so it can't be an admission of such.

24   It's hearsay.  It is -- and it would be improper impeachment

25   because indeed the witness did testify that under the

1   circumstances provided, Creighton did not -- does not claim

2   it's an undue burden.

3        MS. VARGAS:  Your Honor, if I could just add,

4   defendant provided similar response in response to its

5   interrogatories.  And again, as with requests for production

6   of documents and interrogatories, defendant has an ongoing

7   obligation to supplement those documents.  And to the extent

8   the Court would now allow the defendant to assert a defense

9   that it itself has not asserted, we're going to appeal and

10  we're going to end up trying this case again.

11       (Off-the-record discussion had.)

12       MS. VARGAS:  And Mr. Moore signed both the requests

13  for production of documents and the interrogatories on behalf

14  of Creighton University.  And he filed the certificate of

15  service of having done that with this court.  And I'm showing

16  page 9 of the relevant -- of the requests for production of

17  documents, showing Mr. Moore's signature on behalf of

18  Creighton University, defendant; and page 10 showing a

19  certificate of service, that these requests for production of

20  documents were filed with PACER -- with CM/ECF.  And these

21  documents have never been supplemented.  And therefore, the

22  defendant cannot assert this defense, qualified, unqualified

23  at all.

24       THE COURT:  Let's go off the record for a moment.

25       (Off-the-record discussion had.)

1          MS. VARGAS:  The plaintiff's counsel was referring to

2     -- specifically to request number 13 and response number 13 to

3     plaintiff's first request for production of documents.

4          And again similar language was also provided signed by

5     Mr. Moore as counsel for the defendant in response to

6     interrogatories inquiring about the scope of the affirmative

7     defenses asserted by the defendant.

8          THE COURT:  Okay.

9          (End of bench conference.)

10         THE COURT:  All right.  Does that complete the direct

11    line of questioning?

12         MS. VARGAS:  Yes, your Honor.

13         THE COURT:  Any cross?

14         (Off-the-record discussion had.)

15                         CROSS-EXAMINATION

16    BY MR. MOORE:

17    Q.   Dr. Kavan, with regard to the questions of interpreters

18    imposing an undue burden --

19         MS. VARGAS:  Your Honor, this is outside the scope.

20    We were not allowed to get into that, so it's outside of the

21    scope of what direct actually covered.

22         THE COURT:  No, it's not.  Overruled.

23    BY MR. MOORE:

24    Q.   Did Mr. Argenyi request interpreters in every one of his

25    classes throughout M1 and M2?

1    A.   No, he did not.

2    Q.   What did he request instead of interpreters in those

3    classes?

4    A.   Well, he was wanting the CART system.

5         MR. MOORE:  I have nothing further, your Honor.

6         THE COURT:  Redirect?

7                        REDIRECT EXAMINATION

8    BY MS. VARGAS:

9    Q.   During M1, was it an undue burden for -- let me try that

10   again.

11        During M1, do you believe it was an undue burden for

12   Creighton University to provide qualified interpreters in the

13   settings where Mr. Argenyi requested them?

14        MR. MOORE:  Objection, your Honor, beyond the scope

15   of cross-examination, and asked and answered.

16        THE COURT:  No.  The objection's overruled.  He may

17   answer.

18   A.   Please repeat the question.

19        MS. VARGAS:  Ms. Fauber, would you please read back

20   the question?

21      (Question repeated.)

22   A.   He requested them in limited settings, so I'd say no.

23        MS. VARGAS:  No further questions, your Honor.

24        THE COURT:  Thank you, Dr. Kavan.  You may stand

25   down.

1        Any further rebuttal?

2             MS. VARGAS:  No, your Honor, the plaintiff rests.

3             THE COURT:  Very good.  Both sides have now rested.

4        And what this means is you get to rest a little bit, too.

5        You are going to get the afternoon off today because the

6        lawyers and I have work to do in crafting the jury

7        instructions for you for tomorrow morning.

8        So we need you back tomorrow morning before nine o'clock.

9        At that time I will be instructing you on the law, and then

10       you will be hearing the closing arguments of counsel, and then

11       you will deliberate and reach your verdict in this case.

12       So, enjoy your afternoon, enjoy your time with family and

13       friends.  Don't talk with anybody else about the case.  And

14       don't talk among yourselves about the case until you've been

15       sent into the jury room to deliberate.

16       And still keep an open mind.  Although you've heard all

17       the evidence, you have not heard the closing arguments of

18       counsel.

19       So we will see you tomorrow at nine o'clock in the

20       morning.

21            (Jury out at 12:10 p.m.)

22             THE COURT:  Please be seated.

23       I'll just mention a couple more things to follow up on

24       our sidebar conversation.

25       Obviously because it's now 10 minutes after noon I don't

1    expect to have the draft instructions ready for you at 12:30.

2    But optimistically I might have them ready at one o'clock or

3    shortly thereafter.

4        Also, in light of the follow-through testimony and

5    clarification by Dr. Kavan, I do not intend to include

6    anything in the jury instructions regarding the response to

7    the requests for discovery that we discussed at sidebar.

8        And I will see you this afternoon when both sides are

9    ready for an in-chambers jury instruction conference.

10        MS. VARGAS:  Your Honor, I would respectfully note my

11   strong objection to plaintiff not being allowed to offer the

12   defendant's own assertion of its defenses with unlimited

13   boundaries in response to requests for production of documents

14   and interrogatories.

15        In this situation I firmly believe the Court is allowing

16   the defendant to assert defenses it has not asserted in this

17   litigation.  And I believe that that's error.  And so with

18   respect, I maintain a firm objection.

19        THE COURT:  And your objection was preserved at

20   sidebar.  And I recognize it.  I have considered it, I have

21   weighed it.

22        There's been much discussion and evidence, testimony in

23   this case, using the term "interpreters" and using the term

24   "CART".  While some people might think that a CART service is

25   an interpreter service, I don't think that that is the way the

1      terminology has been used throughout the trial.  I think

2      people have talked about interpreters, both American sign

3      language interpreters and cued speech interpreters, and then

4      they've talked about CART service but not as an interpreter

5      service.

6          So I don't see the waiver of the undue burden defense

7      that you've pointed out in this response to the request for

8      production of documents as indicating that it was an

9      across-the-board waiver of the undue burden defense.

10          MS. VARGAS:  Your Honor, let me clarify.  I was not

11      suggesting that the defendant had waived the defense of undue

12      burden with respect to CART.  That issue was not a part of the

13      discussion at sidebar, as I understood it.

14          THE COURT:  Okay.

15          MS. VARGAS:  What I was maintaining is the defendant

16      does not contend that providing qualified interpreters

17      constitutes an undue burden.

18          As it's written by Mr. Moore and signed by Mr. Moore on

19      behalf of his client, there is no qualification in that

20      statement "as requested" or "as we provided" or "in certain

21      classes".  It was an unqualified statement that under no

22      circumstances were qualified interpreters an undue burden.

23          And so to the extent that the defendant is now being

24      permitted to assert a defense -- and the jury is being

25      potentially asked to decide a defense that the defense has not

1  asserted -- I think that's serious error.  And I would again

2  stress my firm objection.

3       THE COURT:  And that is preserved.

4       And I'll just make one more comment just because I'm

5  somebody here who has been listening to the testimony, and

6  I'll just offer my impression is based on Dr. Kavan's

7  testimony and other testimony I've heard.  It did not appear

8  that Creighton was contending that it was an undue burden on

9  Creighton to provide interpreters in those classes where the

10  plaintiff was requesting interpreters.

11       But we'll discuss this at length later when we get into

12  the jury instructions.

13       MR. MOORE:  Your Honor?  I wouldn't mind if we set a

14  time when -- to meet with you.

15       THE COURT:  Okay.

16       MR. MOORE:  I think that would just be helpful for

17  both parties.

18       THE COURT:  And in doing that though, I'm likely to

19  set that time later than the time when both of you might be

20  ready for me.  So, that's the downside of --

21       MR. MOORE:  Can we come to you earlier, if we --

22       THE COURT:  If I set a time certain, it's going to be

23  a time that's convenient for me when I know I can get the

24  instructions ready for you because I don't know when I go back

25  into chambers who is going to be there and who is going to be

 1    out taking a noon day run and who's going to be getting a bite

 2    to eat.  So there might not be anybody back there to help me

 3    until afternoon.

 4         If you want me to set it, I'm going to say three o'clock.

 5    But if you want to set it, you can come in when both of you

 6    are ready.

 7         I'll tell you what, I'll make this easy.  I will say we

 8    will meet for our informal jury instruction off-the-record

 9    conference in chambers at three o'clock or such earlier time

10    as both lawyers are ready and I will make myself available.

11         Agreeable?

12         MR. MOORE:  Absolutely.  Thank you.

13         THE COURT:  All right.  Thank you.

14    We're in recess.

15    (Adjourned at 12:18 p.m.)

16

17

18

         I certify that the foregoing is a correct transcript from
19    the record of proceedings in the above-entitled matter.

20

21        /s *Brenda L. Fauber*              7-21-14
          Brenda L. Fauber, RDR, CRR             Date
22

23

24

25