1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEBRASKA

2

3    MICHAEL S. ARGENYI,          )
                                  )
4              Plaintiff,         )          8:09CV341
                                  )
5         vs.                     )      Omaha, Nebraska
                                  )      August 30, 2013
6    CREIGHTON UNIVERSITY,        )
                                  )
7              Defendant.         )

8

9

10                      VOLUME VII
                 TRANSCRIPT OF PROCEEDINGS
11        BEFORE THE HONORABLE LAURIE SMITH CAMP
        CHIEF UNITED STATES DISTRICT JUDGE AND A JURY
12

13

14

15

16

17

18

19

20   COURT REPORTER:          Ms. Brenda L. Fauber, RDR, CRR
                              111 S. 18th Plaza
21                            Suite 3122
                              Omaha, NE 68102
22                            (402) 661-7322

23

24

     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.

```
 1                        A-P-P-E-A-R-A-N-C-E-S

 2

 3      FOR THE PLAINTIFF:          Ms. Mary C. Vargas
                                    Mr. Michael S. Stein
                                    Stein Vargas Law Firm
 4                                  P.O. Box 522
                                    Emmitsburg, MD 21727
 5

 6                                  Ms. Dianne D. DeLair
                                    Nebraska Advocacy Services
 7                                  134 South 13th Street
                                    Suite 600
 8                                  Lincoln, NE 68508

 9
                                    Ms. Caroline E. Jackson
10                                  NAD and Advocacy Center
                                    8630 Fenton Street
11                                  Suite 820
                                    Silver Springs, MD 20910
12

13      FOR THE DEFENDANT:          Mr. Scott P. Moore
                                    Ms. Allison D. Balus
14                                  Baird Holm Law Firm
                                    1700 Farnam Street
15                                  Suite 1500
                                    Omaha, NE 68102
16

17

18

19

20

21

22

23

24

25
```

1       (At 9:12 a.m. on August 30, 2013, with counsel for the

2   parties, the plaintiff, and the defendant's representative

3   present, and the jury NOT present, the following proceedings

4   were had:)

5       THE COURT:  Good morning.  Ms. Frahm -- Ms. Frahm?

6       I had asked her to let the jury know it's going to be at

7   least ten minutes before we're ready for them so they can be

8   at ease for that period of time.

9       For the record, yesterday we had met in chambers for a

10  couple of hours -- at least it seemed that way -- at the end

11  of the afternoon.  I had provided the lawyers with a draft of

12  jury instructions and a draft of a verdict form that we had

13  prepared after reviewing the proposed jury instructions and

14  verdict forms submitted by both sides, as well as the

15  objections submitted by both sides.

16      And after a pretty thorough discussion in chambers, a

17  number of changes were made to the Court's draft of the jury

18  instructions and of the verdict form.  And then a new copy of

19  each was provided to both lawyers this morning shortly after

20  eight o'clock.  So you've had about an hour to review the most

21  recent draft by the Court of the jury instructions and the

22  verdict form.

23      And at this time, we will go on the record with the

24  objections of counsel to the jury instructions and verdict

25  form.  And I will start with counsel for the plaintiff,

1   Ms. Vargas.

2           MS. VARGAS:  Thank you, your Honor.

3       I would ask the Court's direction on the appropriate

4   moment to address plaintiff's motion for directed verdict.

5           THE COURT:  And thank you for reminding me on that.

6       I think it would be appropriate to do it right now

7   actually before I take the objections to the instructions and

8   the verdict form.  So you may proceed with your motion.

9           MS. VARGAS:  Thank you, your Honor.

10      The plaintiff moves for a motion for a directed verdict

11  at the rest of the defendant's case.

12      Plaintiff is required to establish it's more likely true

13  than not that Creighton University failed to provide the

14  auxiliary aids and services that were necessary to ensure

15  effective communication.

16      And Creighton has utterly failed to offer any evidence to

17  respond to what amounts to a mountain of evidence from

18  plaintiff that he did, in fact, need auxiliary aids and

19  services in his medical education and the services he needed

20  were exactly the ones he requested.

21      Specifically with reference to the M1 year, the first

22  year of medical school, Creighton's own witnesses conceded

23  that the FM system was not effective.  The only other

24  auxiliary aids and services, if you can call it that, that was

25  offered was access to podcasts, which were audio only with no

1    captioning.  So obviously Mr. Argenyi was unable to understand

2    those.

3        And of course, he was offered to access classes through

4    another student.  So another student would get to attend

5    classes and take notes and he would get access to their notes

6    but not to the actual medical education.

7        And so while we move for a directed verdict with respect

8    to the entire range of the plaintiff's claims, we in

9    particular draw the Court's attention to that M1 year where

10   there really is no dispute that there was not effective

11   communication in the medical education that Mr. Argenyi was

12   entitled to receive.

13       Also with respect to the second year, we believe we're

14   entitled to a directed verdict for many of the same reasons.

15   The offer of an oral sign-supported interpreter only in large

16   lectures and limited number of didactic labs was a very

17   deliberate effort to provide exactly what Creighton knew

18   Mr. Argenyi didn't need and exactly what wouldn't be effective

19   for him.  And no decision could be more deliberate than the

20   decision to not -- to deny him interpreters in the clinic even

21   if he paid for those interpreters himself.

22       And so the defendant has certainly not met its burden

23   with respect to undue burden.  And the plaintiff has, I think,

24   repeatedly objected to the fact that the defendant has been

25   allowed to assert the defense of undue burden after it had

1   stated unequivocally in an admission of a party-opponent

2   signed by counsel for Creighton University that it was not

3   asserting entitlement to undue burden with respect to the

4   provision of interpreter services without qualification.

5        And so we believe that's not hearsay, it falls within the

6   exception to the hearsay rules.  We believe it's an admission

7   of a party-opponent.

8        And based on that, not only has undue burden not been

9   proved, but it shouldn't even have been asserted with respect

10  to the claims in the first place.

11       And so on that basis, we ask for a directed verdict at

12  this time.

13            THE COURT:  And your motion obviously is preserved

14  for the record.  I won't request response from defense

15  counsel.  I think that there are sufficient issues to have the

16  matter go to the jury in this case.  And so it will proceed to

17  go to the jury.

18       And the motion is denied.

19       We'll now turn to the jury instructions.  And I will hear

20  the plaintiff's objections to the jury instructions.

21            MS. VARGAS:  Would your Honor like to proceed going

22  instruction by instruction or only those broad issues where we

23  have objection?

24            THE COURT:  Only those instructions to which you have

25  an objection.

1     MS. VARGAS:  Thank you, your Honor.

2         And really, they are relatively small.  They fall into

3     two categories only, one of which is incredibly important --

4     really both of which are important.

5         One, again is the issue I just referenced a moment ago

6     with respect to undue burden, that we don't believe that

7     defendant should be entitled to assert that defense without

8     limitation when it's failed to supplement its discovery

9     responses which are viewed as judicial admissions that no

10    evidence can be offered to contradict.

11        In addition, the specific instruction on undue burden

12    does not include the language -- it includes only part of the

13    language of the regulation.  It doesn't include the language

14    contained in 28 CFR 36.303(g) where it says not only must

15    defendant prove entitlement to assert undue burden --

16        THE COURT:  I suspect someone may be wearing a

17    hearing aid and -- very good.  We got it.

18        Thank you.

19        MS. VARGAS:  I'm sorry, your Honor.

20        I was discussing undue burden and the fact that the undue

21    burden instruction -- I believe that's found on page 16,

22    yes -- that in addition to the fact that, as I've stated

23    multiple times, we don't believe it is properly asserted in

24    this case.  As currently written, it excludes the critical

25    language in the regulation that even if the defendant were to

1    be correct that providing the auxiliary aids and services

2    requested would amount to an undue burden, it still has an

3    obligation to provide auxiliary aids and services that are

4    necessary to ensure effective communication pursuant to the

5    ADA to the extent -- to the maximum extent possible without

6    incurring an undue burden.  And that is the exact language of

7    the ADA regulation.

8         Of course, this case is also filed pursuant to 504.  504

9    regulation, Rehabilitation Act regulations, don't contain any

10   undue burden language at all.  And so certainly with respect

11   to the Section 504 claim, we would object that this

12   instruction includes a claim that's not included in the

13   regulations at all.

14        THE COURT:  All right.  And specifically, the

15   objection is to instruction number 13; is that correct?

16        MS. VARGAS:  Yes, your Honor.

17        THE COURT:  All right.  And just to recap some of the

18   discussion that we had on this issue yesterday, part of which

19   was at sidebar, there was evidence adduced that Creighton had

20   waived its defense of undue burden with respect to providing

21   interpreters.

22        And I had noted that that evidence is before the jury and

23   plaintiff's counsel can certainly argue that in the closing

24   argument.  But I did not find that Creighton had completely

25   waived its defense of undue burden.

1          So the objection to instruction 13 is denied.

2              MS. VARGAS:  Your Honor, the only other issue is more

3     of a global concern, and I can point out each place where it

4     appears.

5          But, this case is filed pursuant to two federal laws.

6     It's filed pursuant to the ADA, of course, and also the

7     Rehabilitation Act.  These two laws have different language of

8     what the standard is that defendant is obligated to provide to

9     students with disabilities.

10         And with respect to Section 504 of the Rehabilitation

11    Act, that standard is meaningful access, which is included in

12    these instructions.  However, what's not included in these

13    instructions is the ADA language, which is important.

14         And that language provides Mr. Argenyi with an

15    opportunity for full and equal enjoyment.  And so the

16    plaintiff would specifically object in instruction 7,

17    instruction 9, instruction 10 and instruction 11 where the ADA

18    standard of full and equal enjoyment is not mentioned at all

19    in the instructions.

20             THE COURT:  And that issue was discussed at length

21    yesterday in chambers and was given careful consideration by

22    the Court.

23         I had concluded that to use the specific language -- and

24    I want to quote it exactly -- but referring to enjoyment, full

25    enjoyment, could be misleading in the context of a medical

1    school education.  I think that the term full enjoyment is

2    more applicable to situations involving entertainment.  I

3    think it's more applicable to going to the theater, going to a

4    restaurant, going to a swimming pool where a member of the

5    public is seeking enjoyment.

6         I think in a medical school context, what Mr. Argenyi was

7    seeking was equal access to an education, to the benefit of

8    the education that Creighton was offering.  And so that's why

9    I chose that language in these instructions, referring to the

10   benefit of the educational opportunity.  That's what he was

11   seeking.  He wasn't going there for fun.

12        And I think the term enjoyment, in the context of this

13   case, would be misleading.  So I just want to assure you I

14   gave your proposal careful consideration and deliberation.  I

15   recognize that it is the language that exists in that statute.

16   But I found it to be misleading in the context of the facts of

17   this case.  And that's why I selected the specific language I

18   selected.

19             MS. VARGAS:  Your Honor, I recognize the Court's

20   careful consideration of this issue.  And I would suggest, as

21   an alternative, to track and respect the language of the law

22   that's at issue in this case, as an alternative to use full

23   and equal access.

24             THE COURT:  And let me mark down exactly which

25   instructions you're referring to so that it's clear for the

1    record which instructions are affected by your specific

2    objection.

3            MS. VARGAS:  Your Honor, I believe it's

4    instruction 7.

5            THE COURT:  All right.  And I'll just note in

6    instruction 7, I really thought I was going with the language

7    that the plaintiff requested there because the defendants

8    wanted to include "reasonable accommodation" in that

9    instruction, and the plaintiff's focus in the discussion in

10   chambers was to keep instruction 7 limited to necessary

11   auxiliary aids and services.

12       And so I specifically focused in instruction number 7 on

13   the defendant's proposed language on necessary auxiliary aids

14   and services which you said was all that the plaintiff needed

15   to prove at that particular juncture.  And I took out the

16   language that the defendants so adamantly wanted, and I'm sure

17   we'll hear about that in a moment, about reasonable

18   accommodations.

19           MS. VARGAS:  Your Honor, you're correct, I misspoke.

20           THE COURT:  Okay.

21           MS. VARGAS:  I withdraw my objection to number 7, the

22   language isn't in there.  I do see it on page 12, which is

23   instruction number 9, where it says, "individuals with

24   disabilities to provide such individuals with meaningful

25   access to the educational benefits offered by Creighton."  So

1    the plaintiff would ask that it read instead, individuals with

2    disabilities to provide such individuals with meaningful

3    access or -- meaningful and full and equal access to the

4    educational benefits offered by Creighton University.

5              THE COURT:  Okay.

6              MS. VARGAS:  And then again in instruction 10 and 11.

7              THE COURT:  Your objection is noted and it is denied.

8    I will stay with the language indicating that Creighton had an

9    obligation to provide the plaintiff with meaningful access to

10   the educational benefits offered by Creighton.

11        And I believe that there is other language in there also

12   describing what "meaningful access" means.  Yes.  In

13   instruction 10, it describes what meaningful access means,

14   that Creighton was required to give the plaintiff an equal

15   opportunity to gain the same benefit.

16        So while we can always debate and disagree about how many

17   more adjectives should be added, as I discussed in chambers,

18   my objective is to keep the instructions clear, concise, and

19   readable for the jury.  And I think that this does that.  And

20   therefore, your objection is denied.

21             MS. VARGAS:  Thank you, your Honor.

22        We have no further objections to the jury instructions as

23   drafted by the Court.

24             THE COURT:  Any objection to the verdict form?

25             MS. VARGAS:  No, your Honor.

1    THE COURT:  Very good.  Thank you.

2        And we will hear now from defense counsel with the

3    defendant's objections to the instructions and the verdict

4    form.

5        MS. BALUS:  Thank you, your Honor.

6        Starting with instruction number 7, as you surmised, we

7    would like the language in there on the third element to say

8    -- where it starts with provide, to say "provide reasonable

9    and necessary accommodation and/or auxiliary aids and

10   services".

11       Number one, I think it's clear and it has been clear from

12   the evidence in this case that what Mr. Argenyi was asking for

13   was a reasonable accommodation.  In Plaintiff's Exhibit No. 1,

14   which started this whole process, he asked for an

15   accommodation from the medical school's technical standards in

16   receiving these auxiliary aids and services.  So he checked a

17   box that said, "Yes, I do require accommodation."

18       Number two, I believe the Court's opening instructions

19   referred to accommodations.  I think that word has been used

20   throughout this case.  And I think it could be confusing to

21   the jury now to not have those referenced anywhere in the

22   closing instruction.

23       And number three and most importantly, I think that

24   language is consistent with the Eighth Circuit's opinion in

25   this case.  The court said in directing this case to be

1    remanded, and what it found to be the issue, it said, "We

2    conclude that the evidence produced in this case created a

3    genuine issue of material fact as to whether Creighton denied

4    Argenyi an equal opportunity to gain the same benefit from

5    medical school as his nondisabled peers by refusing to provide

6    his requested accommodations."  That was the conclusion to

7    their opinion.

8            THE COURT:  And I'll just note at this juncture, you

9    can make whatever objections you want to make for the order,

10   I'm not going to stop you.  But I did hear all of the

11   arguments in chambers.

12       And you're going to be making your arguments to the jury

13   here pretty soon.  Right now we're just really preserving your

14   objections for the record.  So you don't need to try to

15   persuade me again of your positions because I heard the

16   argument, I absorbed the arguments, I considered your

17   arguments.  And you lost on these points.

18       So right now, you're just really preserving them for the

19   record.  But if you feel the need to say more, that's fine.

20       Go ahead.

21           MS. BALUS:  I appreciate it, your Honor.  Just to

22   give you a little bit of background, I've been involved in a

23   case before where -- and thankfully it was the other side was

24   found by the Eighth Circuit to not have preserved their

25   argument because they didn't make their argument with

1    specificity.

2              THE COURT:  Okay.

3              MS. BALUS:  So if the Court would indulge me a little

4    bit, I want to make sure I preserve my record.

5              THE COURT:  I will.

6              MS. BALUS:  Okay.  In addition, the Eighth Circuit

7    also referred to "reasonable auxiliary aids and services"

8    twice in their opinion at least, once at page 449 and once at

9    page 450.  So we think adding both "accommodation" and

10   "reasonable" to that instruction is appropriate.

11             THE COURT:  And I'll just note because I want you to

12   understand part of the process I went through in concluding

13   that I was not going to add that language in this particular

14   instruction, I did find the plaintiff's argument persuasive

15   that including the term "reasonable" in instruction number 7

16   would tend to blur the burdens of proof; and that the

17   reasonableness of the accommodations requested by Mr. Argenyi

18   went more to the issue of undue burden; and that in

19   instruction number 7, we should focus on whether or not

20   Mr. Argenyi proved that the auxiliary aids and services

21   provided by Creighton did not provide him with access to the

22   information.  So that's why the term "reasonable" was taken

23   out of this particular instruction.

24        Regarding "accommodations", I accepted the plaintiff's

25   argument that the plaintiff in his complaint was seeking

 1     auxiliary aids and services, and he was focused on that

 2     narrower issue, not focused on broader accommodations.  So

 3     that's why I did what I did on 7.

 4          Go ahead.

 5          MS. BALUS:  We have the same issues with the second

 6     to the last sentence on page 9 of instruction 7 where it

 7     starts, "Therefore," it had "necessary auxiliary aids and

 8     services," we'd ask that the same phrase, "reasonable and

 9     necessary accommodation and/or service -- auxiliary aids and

10     services" be inserted for the same reasons.

11          On instruction 8, same issue with the first sentence

12     where it says "necessary auxiliary aids and services" for the

13     same reasons.

14          On instruction 9, at the very last sentence on page 11,

15     again it says "provide necessary auxiliary aids and services,"

16     we'd want the same language added for the same reasons.

17          On instruction 10, in the first sentence, same language

18     for the same reasons.

19          On the second sentence, same language for the same

20     reasons.

21          At the beginning of the third paragraph, same language

22     for the same reasons.

23          And then we would like to add from defendant's proposed

24     instruction 18, which is page 25 of filing number 324, the

25     language that said, unlike Title II of the ADA that applies to

1    state and local governments, Title III of the ADA which

2    applies to public accommodations like Creighton University

3    does not require defendant to give "primary consideration" to

4    the specific request of the person with a hearing impairment.

5        I assume you want me to continue or did you want to --

6        THE COURT:  You can keep going.

7        MS. BALUS:  Okay.

8        On instruction number 13, which is on page 16, we have

9    the same objection to the first sentence where it says

10   "provide necessary auxiliary aids and services".  We would

11   like to add the same language for the same reasons.

12       And then we would also like to add the language from --

13   this was our proposed instruction on undue burden -- to say

14   one way defendant can prove an undue burden is if the

15   accommodations and auxiliary aids and services requested by

16   plaintiff are excessive in relation either to the benefits of

17   the accommodation or to defendant's financial survival or

18   health.  This language is taken from the *Vande Zande vs.*

19   *Wisconsin Department Administration*, 44 F.3d 538, Seventh

20   Circuit 1995.

21       I recognize that this is an employment case, but Title I

22   and Title III regulations use the exact same factors in

23   determining whether there was an undue burden, so we think

24   that's appropriate to Title III cases as well.

25       And then one of the things I noted that changed from the

1    Court's previous instruction -- and I know plaintiffs had a

2    problem with, in two different places in the instructions, it

3    saying you must find for Creighton University.  And I

4    understand why they wanted to take that language out.

5        So now the instruction doesn't tell the jury what they

6    should do if they find Creighton meets its burden.  So I would

7    prefer either that language be put back in, or as an

8    alternative, somewhere in here it says:  If Mr. Argenyi has

9    met his burden of proving what it says in the first sentence,

10   and Creighton has met -- has not met its burden in proving

11   undue burden, then you must find for Mr. Argenyi.

12       Instruction number 14, we would ask that the word

13   "reasonable" be added back in, in addition to the word

14   "necessary" for the same reasons I've already mentioned with

15   respect to the Eighth Circuit's opinion.

16       Number 15, we would ask that the definition of deliberate

17   indifference from defendant's proposed instruction number 23

18   which was page 31 of filing 324 that included the plainly

19   obvious language from *AP versus Anoka-Hennepin Independent*

20   *School District No. 11*, 538 F.Supp.2d 1125 District of

21   Minnesota 2008.

22       We'd also like to add back in the language that was in

23   the Court's original proposed instruction that talked about

24   negligence or inadvertence not constituting deliberate

25   indifference from model civil jury instruction from the Eighth

1    Circuit 4.23, or some language from defendant's proposed

2    instructions that talks about intermediate level of

3    culpability, which comes from the *Folkerts vs. City of Waverly*

4    case, 707 F.3d 975, which is an Eighth Circuit 2013 case; or,

5    deliberate indifference is akin to criminal recklessness or

6    requires something more than mere negligent conduct, which is

7    from *Drake v. Koss*, 445 F.3d 1038, Eighth Circuit 2006.

8         On instruction 16, we would ask that the word

9    "accommodations" be added where it says "as a direct result of

10   Creighton's failure to grant," so it would be "grant the

11   accommodations and/or auxiliary aids and services he

12   requested" for the same reasons I've already explained.

13        And then finally, we would ask -- there were some of

14   defendant's proposed instructions that weren't included, so

15   we'd like to preserve our record on those as well.

16        We would ask that our proposed instruction number 19 on

17   reasonable -- the definition of reasonable be added which was

18   page 26 of filing 324.  We'd ask that proposed instruction

19   number 22 on academic deference be added, which was page 30 of

20   filing 324.  We'd ask that defendant 's proposed instruction

21   number 25 on the treatment of students with disabilities, page

22   33 of filing 324; and defendant's proposed instruction number

23   26 on educational institutions/nonprofit corporate party, page

24   34 of filing 324, those all be added.

25             THE COURT:  All right.

1    MS. BALUS:  Thank you, your Honor.

2    THE COURT:  Your objections are preserved for the

3    record.  They are denied.

4    And I believe that some of the concerns raised are

5    adequately handled by the verdict form.  Do you have any

6    objection to the verdict form?

7    MS. BALUS:  No objection to the verdict form.

8    THE COURT:  All right.  And also just for the record,

9    the parties' objections to each others' proposed jury

10   instructions and proposed verdict forms are denied as moot.

11   Now, is there anything else we need to talk about before

12   the jury comes in to hear closing arguments?

13   One thing I will ask if plaintiff's counsel is aware of

14   our local rule regarding the fact that counsel can't use more

15   than one half the time that was used in the initial closing

16   argument for rebuttal.  In other words, if you have an hour,

17   you can devote 40 minutes to the initial part of your argument

18   and then save 20 for rebuttal.  But if you only use 10 minutes

19   for your initial part of the argument, you're only going to

20   have three and a third minutes for your rebuttal.  Does that

21   make sense?

22   MS. VARGAS:  There was some discussion of this, your

23   Honor.  Thank you for bringing it to my attention, I

24   appreciate that.

25   There was some discussion of this before we went on the

1    record with some of the court staff.  And I just want to

2    clarify, Mr. Moore had requested that the parties have an hour

3    for closing.  And I understood something different from the

4    court staff with respect to time, and perhaps if I didn't use

5    all 40 minutes in closing, that I wouldn't be entitled to any.

6              THE COURT:  No, not at all.

7              MS. VARGAS:  So I wanted to clarify that it is as you

8    just explained, and that I would have one-third; is that

9    correct, of whatever time used for rebuttal?

10             THE COURT:  Right.  You don't waive your rebuttal.

11   The local rule is set up just so that most of what you have to

12   say comes in at the beginning so that defense counsel has an

13   opportunity to address that, rather than saving most of your

14   time for the rebuttal.

15        So, generally what a lawyer would do in your

16   circumstances, given an hour, is you might reserve 20 minutes

17   for your rebuttal.  You don't have to, you could use your full

18   hour at the beginning if you wanted to.  But you can't reserve

19   more than 20 minutes for your rebuttal.

20             MS. VARGAS:  Thank you, your Honor.  I appreciate the

21   Court's attention to this matter.  And at this time, we would

22   like to plan for 40 minutes for closing and 20 minutes for

23   rebuttal time.

24             THE COURT:  Very good.

25             MS. VARGAS:  Thank you.

1    THE COURT:  And if you wanted to let Ms. Frahm know

2    when you want your yellow light to go on, how much of a

3    warning you want, that's also something you can communicate to

4    her.

5        Okay.  You're probably way ahead of me on that.

6        MR. MOORE:  I'm just going to use a timer up there.

7    I won't be able to see back there.

8        THE COURT:  Very good.  Anything else before we bring

9    in the jury?

10        MS. VARGAS:  No, your Honor.

11        MR. MOORE:  A couple things from the defendant, your

12    Honor.

13        First of all, because this came up again with the

14    objection to the requests for production, the documents and

15    the admission, the allegation of waiver and that request for

16    production did not come in, obviously Dr. Kavan testified with

17    regard to what the undue burden was for interpreters and what

18    Creighton was and was not claiming.

19        We just want to make sure that discovery disputes and

20    those discovery issues may not be raised in closing arguments.

21    That's the first issue.

22        And then the second issue is very quickly, we just want

23    to know do you call us back before the jury reads its verdict?

24        THE COURT:  And those are all good questions.

25        Regarding closing argument, I would expect the lawyers to

1    base their closing argument on the law as is set out in the

2    jury instructions and on the evidence that came in during the

3    trial.

4         So it's true that reference to pretrial matters, whether

5    it's pretrial motions or discovery or other things that didn't

6    come in during the presentation of the evidence, would be

7    inappropriate to bring up at the time of the closing

8    arguments.

9         In civil cases, the lawyers aren't required to be here.

10   The parties aren't required to be here when the jury brings in

11   its verdict.  But if you wish to be here, you're very welcome

12   to be.  And we will be happy to notify you.

13        One thing we do require though is if you want to be here

14   when the jury brings in its verdict, we need you to stay

15   within a 15-minute radius of the courthouse because I just

16   don't want to keep the jury waiting when somebody has gone off

17   to, you know, west Omaha.

18             MR. MOORE:  That's still ten minutes away.

19             MS. VARGAS:  I obviously don't want to speak for the

20   defendant, as for the plaintiff we most certainly want to be

21   present when the verdict is read.  And we will stay within

22   that radius.

23             MR. MOORE:  Same for the defendant.

24             THE COURT:  Very good.  Then you'll just want to make

25   sure you leave Ms. Frahm with a telephone number where you can

```
 1    be reached.

 2              MR. MOORE:  Very good.

 3              THE COURT:  I will also, of course, let you know if

 4    we have any jury questions, which is often the case.  And then

 5    we'll get you on the line to talk about the proposed response

 6    to the jury questions.

 7         One other matter I'll bring up is obviously we'll be

 8    having a mid-morning break at some point in time.  And the

 9    logical time would appear to be after the plaintiff's closing

10    argument.

11              MS. VARGAS:  Your Honor, I would request that -- the

12    jury has been cooling its heels for some time.  And in order

13    for things to proceed expeditiously and also in fairness to

14    both parties, that both closing arguments proceed

15    uninterrupted without any break.

16              THE COURT:  If that's your request, I'll honor that

17    request.  But then what I'm going to do is -- the jury has

18    been sitting in there waiting for us.  And as a courtesy to

19    them, I'm going to let them know that they will be listening

20    to two hours of argument and they need to be prepared to sit

21    here for two hours.

22         And so we're going to start at ten o'clock with the

23    closing arguments, and we're going to keep running until noon.

24    And that way they'll have an opportunity to take a bathroom

25    break before they come in here.  Otherwise, somebody is going
```

1   to have an issue.

2        Okay.  We'll start at 10.  Thank you.

3        (Recess taken at 9:50 a.m.)

4        (At 10:10 a.m. on August 30, 2013, with counsel for the

5   parties, the plaintiff, and the defendant's representative

6   present, and the jury NOT present, the following proceedings

7   were had:)

8        THE COURT:  Ms. Frahm, please bring in the jury.

9        (Jury in at 10:11 a.m.)

10       THE COURT:  Please be seated.  Good morning.

11       Once again thank you very much for your patience.  We

12  have been in here working on the jury instructions, and they

13  are now in final form.

14       You will have copies of these -- in fact, let's just go

15  ahead and hand them out at this point in time and that way you

16  can read along with me silently on your part as I go through

17  these instructions.  And then we'll be hearing the closing

18  arguments of counsel.

19       (Instructions 1 through 17 read.)

20       THE COURT:  Now, I'm going to wait to read

21  instruction number 18 until after the closing arguments

22  because it gives you more specific information about what

23  you're supposed to do when you actually go into the jury room

24  to begin your deliberations.

25       But if you'll take a moment and turn back to instruction

1    number 5, that's where I was missing the section number.  And

2    does everyone there have a pencil or close access to a pencil?

3    Looks like you do.

4         Where it starts with paragraph number 1 that says

5    "Creighton is a place of public accommodation for purposes of

6    Title III of the Americans with Disabilities Act, 42 USC --

7    please insert section mark 12181 through -- and then you can

8    put a dash -- 12189.  And that's simply a reference to the

9    law.  So it should be included there for that purpose, not

10   that we expect you to look up the law; in fact, we don't.

11        Now, at this point in time, we are going to hear closing

12   argument, beginning with counsel for the plaintiff.

13        And Ms. Vargas, will you be presenting the closing?

14             MS. VARGAS:  Yes, your Honor, I will.

15             THE COURT:  Very good.  You may proceed?

16             MS. VARGAS:  Thank you, your Honor.

17        Good morning.

18        So the white coat ceremony marks the beginning of medical

19   education in almost every medical school in the United States.

20   It's a symbolic beginning of medical education.  It represents

21   the student having worked really hard and achieved the

22   opportunity to be admitted to medical school.

23        It's also, more importantly, the first time when a

24   student steps up on the stage and puts on their white coat,

25   and they do that in front of their family and their friends.

 1    And it's a really big deal.

 2         This is how it began for Michael Argenyi at Creighton

 3    University.  And if I may --

 4              MR. MOORE:  This is not in evidence, your Honor.

 5              THE COURT:  I understand it's not in evidence.  I

 6    expect it's a picture of Michael; is that correct?  I will not

 7    require you to take it down.  If you want it up there, I'll

 8    let you leave it up there.

 9              MS. VARGAS:  Thank you, your Honor.

10         And so, in August of 2009, Michael put on the white coat

11    in front of his family and his friends.  And he stood with his

12    classmates, eager to learn and ready to work hard and prove

13    himself worthy.

14         That day when Michael first put on his white coat was a

15    day of hope for him.  He was proud to be accepted at Creighton

16    University.  He believed that he was entering a university

17    where every person would be treated with dignity; where every

18    person would be valued.

19         But even that first day, there were signs; signs that

20    Creighton might not be what it promised.

21         Five months before that day when Michael put on his white

22    coat for the first time, he did what he'd done at every other

23    community college and university he had ever attended.  He

24    requested the auxiliary aids and services that he needed to

25    access his education.  He requested captioning, which is

1   sometimes called CART; and he requested oral sign support

2   interpreters.

3        He provided an audiogram, a document that he was really

4   deaf, the nature of his disability.  And when Creighton asked

5   for more documentation, he complied.  He complied willingly.

6   He provided letter after letter after letter from his treating

7   specialist, Dr. Backous, and from his treating audiologist of

8   many years, Stacey Watson.

9        He provided a reference from his former supervisor.  And

10  when Creighton denied his request for the captioning and the

11  interpreters, and instead offered an FM system, Michael agreed

12  to give it a wholehearted try, and he did.

13       Was he worried?  You bet he was.  Because when he first

14  asked for auxiliary aids and services, Dr. Kavan told him that

15  his admission to Creighton University School of Medicine was

16  now conditional.  That was the exact word, "conditional".

17       He was afraid he was about to be kicked out of medical

18  school at any moment.  And perhaps, looking back now, that

19  would have been the kinder course of action for Creighton

20  University to take.  Instead, Creighton took his tuition and

21  advised him to think carefully whether he was qualified to be

22  a medical student.

23       He was worried because he and his treating specialists,

24  Dr. Backous and Stacey Watson, had told Creighton that he'd

25  never used an FM system before to understand speech.  He had

1    only tried the FM system to locate sound, where sound was

2    coming from.

3        And while he hoped that an FM system could -- and that

4    word is important -- could be helpful in knowing where sound

5    was coming from in a small group, if it was maybe less than

6    eight people, in a quiet place, and people weren't moving

7    around, he was concerned -- rightfully so -- that he wouldn't

8    be able to understand the words.  And isn't education all

9    about the words?

10       Nevertheless, he met with his audiologist.  He found out

11   what FM system could plug into the cochlear implant that he

12   had had surgically implanted in his head.  He provided that

13   information to Creighton respectfully, professionally.  He was

14   in contact with Mr. Chuck Lenosky, who you heard from

15   yesterday, making sure that he had the information that was

16   necessary for the FM system to have its best chance of

17   working.

18       In other words, he did everything that was asked of him

19   willingly.  But that day when he arrived for his white coat

20   ceremony, you heard yesterday from Mr. Lenosky that the FM

21   system wasn't even installed yet; no captioning, no

22   interpreters, no FM system; just Michael.

23       Having paid nearly $50,000 in tuition for his first year

24   of medical school alone, knowing that in medical school there

25   are no do-overs, you can't take the class over again, Michael

1    asked to meet with the folks at Creighton.  They brought their

2    general counsel, Amy Bones, who has not testified in this

3    matter.

4        And you heard testimony that she, the lawyer for

5    Creighton University at the time, told Michael -- and Dianne

6    DeLair -- that Michael might not be qualified to be a medical

7    student at Creighton University, at this moment, when he had

8    picked up his entire life and moved to Omaha to start medical

9    school.

10       You've heard testimony that his advocate said Michael

11   wanted Creighton University to provide the auxiliary aids and

12   services he'd requested.  And you know what?  That's the

13   truth.  He did want them to provide the auxiliary aids and

14   services he had requested; not because it was some extra

15   benefit, not because he was trying to gain some competitive

16   advantage over anybody else; but because he knew that he

17   needed them to understand the education that is the service

18   Creighton University offers to its students, the service for

19   which he paid dearly.

20       That meeting didn't go well.  I think the parties can

21   agree on that.

22       Nevertheless, Mr. Argenyi went with professionalism, with

23   willingness, to school.  He didn't complain.  You didn't hear

24   any testimony that he complained, that he went to his

25   professors and complained about what had happened and what was

PLAINTIFF'S CLOSING ARGUMENT                                    1036

1    going on.

2         What you heard was he went to class and he tried to hear,

3    every day for almost three weeks.  He went to class and he

4    tried to hear for hours a day, for days a week, for almost

5    three weeks.

6         And I ask you, how long does it take you to know when you

7    can't hear something?  Does it take three weeks?  Does it take

8    even five minutes?  Or do you really know that you can't hear

9    something when you can't hear it?  And how do you really

10   explain that to somebody else?

11        I think a good example of a tiny little bit of what

12   Mr. Argenyi was experiencing was actually the OSCE videos, the

13   selected ones that weren't accidentally destroyed that you got

14   to see.  Remember how they were loud and you could hear the

15   words, but it was really hard to understand them.  It was

16   really hard to listen and know what all those words were.

17   There was distortion.  It wasn't a simple thing.  You had to

18   concentrate.

19        That's a little bit, just a little taste of what it was

20   like for him every day, all day long, in the most complex of

21   settings, medical school terminology.

22        So, he tried to do the impossible, right?  He tried to

23   hear.  He tried to understand.  He tried to lip-read; lip-read

24   words like gangliosidosis hexosaminidase, lipofuscinosis,

25   metachromatic leukodystrophy.  Not one at a time, but in a

1     blur, all together, in a two-story lecture hall with 126

2     people typing on their computers and taking notes.  And he

3     couldn't hear.  He couldn't hear.

4         Creighton doesn't want to talk about what happened next.

5     On September 1st, Michael Argenyi, as you know, sent an e-mail

6     describing the fact that he was missing decent chunks of

7     lectures that he couldn't hear, that he was unable to

8     concentrate for so long to try and find the words that were

9     hidden in all that static.

10        And Creighton offered the testimony of its own employees;

11    nobody else, its own employees; who said, well, there's this

12    one word or this one phrase in this letter that was sent a few

13    months ago.  And if we only just put that little word on the

14    screen and we black out everything else and take it out of

15    context, then maybe we don't have to actually comply with the

16    law; maybe we don't actually have to admit that Michael was

17    right all along, that he couldn't understand.

18        And what we ask you to do is to look at all the evidence

19    and to find the truth that is there.  Look at all of the

20    letters, the ones beginning from his very first request in

21    March when he was asking for the obvious.  He didn't know it

22    would be complicated because he's deaf; because it's obvious

23    that he can't hear.  And so that's what he asked for.

24        He asked what he'd used at every other school that he

25    attended.  He didn't know that their lawyers were going to be

1   looking for a word here and a word there to try and catch him

2   to try and prove that somehow he wasn't deaf enough.

3       Look at all the evidence from his first request, right

4   through the spring of 2009, through his wholehearted try.  But

5   don't stop there, where Creighton draws a line and tries to

6   put its head in the sand and hope that you won't pay attention

7   to what is obvious to you, to them, and to everyone in this

8   courtroom, that he couldn't understand.  And he didn't tell

9   them once or twice; he didn't just say it out of court to

10  somebody.  He told them every way he could over and over and

11  over again, in e-mail after e-mail after e-mail.  You sat for

12  two weeks looking at these e-mails and letters.

13      How often do doctors write even one letter for a patient?

14  And yet this young man's doctors wrote not once or twice or

15  three times, they wrote four times.  And they said, "Michael

16  remains to be deaf regardless whether he is or is not using

17  his cochlear implants."  Michael's need for captioning and

18  interpreters in the appropriate settings that were described

19  over and over and over again, in lectures, small groups,

20  clinics, they said the need was imperative.

21      And I only know that one word, it only has one meaning;

22  imperative means he needed it a lot.  There's no other meaning

23  for that one word.

24      But don't even look at just that one word; look at

25  everything.  Look what happened after he set foot on campus

1    after he told them again and again and again, please, I can't

2    understand, I'm missing lectures, I'm missing labs.  I can't

3    understand.

4        I'd like to show you -- or perhaps you can just pull out

5    your verdict form that Judge Smith Camp has given to you

6    because it's really important that you follow through the

7    instructions that the Court has laid out exactly as they're

8    written.

9            THE COURT:  Ms. Vargas, I don't think I've provided

10   the verdict form as yet because we only send one verdict form

11   back with the jury at the time they go in for their

12   deliberations.  They don't have that in front of them.  But

13   there is no problem with you showing that to them.  If you

14   wish to put it on the overhead, that would be fine.

15           MS. VARGAS:  May I?

16           THE COURT:  Go ahead.

17           MS. VARGAS:  Thank you.

18       So, if you look at question one, that's where you start.

19   And this form is essentially your roadmap to work through all

20   of the instructions.  The first question is whether Michael

21   proved it was more likely than not that Creighton University

22   violated the ADA and Section 504.

23       And if you look at the instructions that the Court has

24   given you, what you're being asked to decide is whether

25   Creighton University failed to provide auxiliary aids and

PLAINTIFF'S CLOSING ARGUMENT                          1040

1    services that were necessary to ensure effective

2    communication.

3         And I hope -- boy, we haven't done our job over the past

4    two weeks if that's not an easy question for you.

5         In the first year of medical school, Creighton offered an

6    FM system.  Creighton offered that Michael could not have

7    direct access to the lectures, but could have the notes of

8    another student, a hearing student who had the opportunity to

9    go into the classroom and get the information firsthand.

10        And Michael tried the FM system, he tried it for a long

11   time.  He tried it until he was certain that he couldn't do it

12   anymore.

13        And Creighton, despite all of his e-mails explaining,

14   begging, asking for access to the education that Creighton had

15   promised to provide him, Creighton responded by assigning

16   Dr. Knoop to follow him.  To follow him.  That's not something

17   they do for any other student.  That doesn't help him.  That

18   doesn't allow him to hear what happens in class.

19        They assigned Dr. Knoop to follow him every single day,

20   to every single lecture.  And you can look at those records

21   which have been admitted into evidence and see that Creighton

22   knew exactly where Michael was, exactly what he needed to

23   communicate.  And they did nothing.

24        And for the rest of that year, they say, oh, we had no

25   idea, he didn't provide enough documentation.

1            But you heard testimony from Dr. Thedinger.

2      Dr. Thedinger, whose first job was working at Creighton

3      University; Dr. Thedinger here in Omaha, who defense counsel,

4      along with other folks from Creighton University, went to; not

5      at the end of the first year of medical school, but in

6      February, a little more than halfway through the year.  And

7      they told him, "There's this student at Creighton with

8      cochlear implants and he's having trouble, he's struggling, he

9      can't understand in the classroom."

10         There was only one student with cochlear implants at

11     Creighton University School of Medicine who was struggling in

12     the classroom.  And Dr. Thedinger, remember what he said.  He

13     said, "There's testing you can do.  Is he deaf?  You can test

14     his hearing, you can test the FM system."

15         And what's interesting is that Creighton and its lawyers,

16     they never went back to Dr. Thedinger.  It was Michael who had

17     already paid to access health care with his own doctors, who

18     didn't need to go get another opinion, who didn't need to pay

19     for another appointment, he already knew he was deaf.  It was

20     Michael who went to Dr. Thedinger and said, "Please, test my

21     hearing."

22         And he did.  And you know what he proved?  Dr. Thedinger,

23     who had no interest in supporting one side or the other, who

24     was just looking for the truth, he's an expert.  I think he

25     testified that he was listed as one of the best doctors in

1    America.  He testified that he wrote a letter which you've

2    seen; and that when he tested that FM system that Michael said

3    wasn't working, when he tested it, that that FM system, it

4    actually made his hearing worse.

5        Imagine that.  He could understand 38 percent of basic

6    speech in a sound booth with the FM system.  No wonder he

7    couldn't understand the medical school lectures.  And

8    Creighton admitted it.  You heard Dr. Kavan on the stand admit

9    that that was not effective communication.

10       They knew Michael couldn't hear.  They knew he couldn't

11   understand.  They knew day to day to day that he was

12   fulfilling the promise that they made to the federal

13   government when they chose to accept our tax dollars, federal

14   funds.  Michael was paying for his own auxiliary aids and

15   services.  And they knew it, and they sat back and watched.

16       When you look at the evidence with respect to this first

17   question of whether Creighton failed to provide auxiliary aids

18   and services that were necessary for Michael to access a

19   medical education, consider who testified.

20       Michael offered all of the letters he ever sent Creighton

21   University.  He testified himself.  He offered full and

22   complete access to his doctor, to his audiologist.  He

23   provided the information for other deaf doctors, for other

24   medical schools that educated deaf medical students.  He

25   wasn't in this to be a pioneer.  He wanted to be a doctor.

PLAINTIFF'S CLOSING ARGUMENT                                    1043

1     And there are lots of other deaf doctors.  You met one of

2     them.

3          Look at Michael's past use of auxiliary aids and services

4     at other universities.  Look at his actual experience once he

5     got to Creighton, once he tried the FM system.  Has defendant

6     offered any evidence at all that he could hear and understand

7     these lectures, its labs, its clinics?  Did you hear any

8     evidence?  Did they have an expert?

9          It's a school full of doctors.  It's a school that has

10    accepted federal funding to cure deafness.  There are experts

11    in that school.  And Dr. Kavan sat back and said, "Well, we

12    need more documentation.  I don't know how to read an

13    audiogram."

14         He couldn't have walked down the hall and asked one of

15    those experts?  He couldn't have found a single doctor

16    anywhere in the entire medical school who could read an

17    audiogram?

18         Instead, the evidence that Creighton offered was about

19    something that we don't dispute:  Michael can sometimes

20    communicate by himself.  Sometimes when the lighting is good,

21    and the context is quiet, when the speaker is familiar, or

22    when the conversation is conversational and he can seek

23    clarification, when it's not complex terminology, when it's

24    not really, really important like whether somebody has an

25    allergy to a medicine, whether somebody is having a symptom

PLAINTIFF'S CLOSING ARGUMENT                                    1044

1      that's in her head or in their elbow or in their leg.

2           And so the fact that Michael could sometimes understand,

3      he doesn't dispute that.  He's talking about the times he

4      couldn't understand.  And I'd ask you to look very carefully

5      whether Creighton has offered any evidence about those times.

6           And I would suggest that both Dr. Kavan with respect to

7      the first year of medical school and Dr. Hansen with respect

8      to the second year of medical school, they admitted on the

9      stand that the communication he had was not effective.  That's

10     the first question.

11          I would also just point out Creighton offered people who

12     are on its payroll.  That's it.  While some of that testimony

13     is certainly relevant -- I'm not suggesting it isn't -- I do

14     think it's important to look and see if there's anyone who has

15     not received a paycheck from Creighton University who has

16     gotten up on that stand to support them.

17          Let me say something else.  Does it really make sense

18     that a medical student who wants to be a doctor, who wants to

19     be able to go to his professors, to the faculty at the school

20     of medicine, to get a letter of recommendation so that some

21     day he can get a good residency, does it make sense that he

22     would borrow $111,000 for something he doesn't need and then

23     file suit against his medical school?  Does that make sense?

24          In opening statement Mr. Moore said that Creighton

25     University believes in Michael, that they believed he'd make a

1    good doctor, that they wanted what was best for him.

2         And I'd ask you to review in your mind what you saw when

3    Michael was on the stand trying to explain that in some

4    situations he can communicate okay, and in other situations he

5    can't.  And I want you to ask yourselves if Creighton and its

6    counsel treated Michael in the way that you think the

7    university would treat a student they believed in, a student

8    they were proud of, a student they wanted the best for.

9         Is that what you saw?

10        Turning to the second question, the question is -- well,

11   let me go back.  It's our burden to prove it's more likely

12   than not that Creighton failed to provide necessary auxiliary

13   aids and services.  That's our burden.

14        When it comes to number 2, the Court has instructed you

15   that that is Creighton's burden; that Creighton must prove

16   it's more likely than not that providing the auxiliary aids

17   and services that were necessary would have resulted in an

18   undue burden.

19        You heard testimony that Creighton University generates

20   $400 million in revenue each year.  You heard testimony and

21   it's been stipulated to the parties how much Michael Argenyi

22   paid for auxiliary aids and services.

23        And I'm just going to -- with permission of the Court --

24   walk over to the notepad, and I won't have a microphone over

25   there so I'm just going to put some numbers up there on that

PLAINTIFF'S CLOSING ARGUMENT                                    1046

```
 1    notepad for you.

 2              THE COURT:  You may.

 3              MR. MOORE:  Your Honor, may we have permission to

 4    move over so we can see it?

 5              THE COURT:  You may.

 6              MR. MOORE:  Thank you.

 7              MS. VARGAS:  When you consider undue burden, you need

 8    to look at the overall financial resources of the defendant,

 9    Creighton University, as well as the resources of the medical

10    school.

11        We know from testimony of the vice president of finance

12    and from the evidence you'll have in a binder you will receive

13    from the Court that Creighton University had more than $400

14    million in revenue.  And it's hard to wrap your mind around

15    what that means to a real human being.

16        And so what I've done on that notepad is I've crossed

17    out, I think, four zeros.  So, Creighton University, $400

18    million in revenues.  Let's compare -- and Michael Argenyi

19    paid $51,000 for one year of his auxiliary aids and services.

20        If we compare $400 million to a person with an annual

21    salary of $40,000, just by dropping the zeros, and you drop

22    the same number of placeholders from the $51,000 cost of the

23    auxiliary aids and services, what you get is that the person

24    who makes the salary of $40,000 a year, that would be like

25    asking them to pay $5.10.  That's a sandwich and maybe, maybe
```

1    a cup of coffee.

2         And for that, four years and two weeks in this courtroom.

3         And remember, you heard Dr. Kavan testify yesterday that

4    providing interpreters was not an undue burden.

5         You have evidence in the binder you'll receive from the

6    Court that the captioning that worked for Michael, that

7    allowed him access to all of the important words that the

8    other students could hear, that that cost $75 an hour.

9         What do interpreters cost in a lecture setting?  You saw

10   Dr. Moreland testify.  How many interpreters did he have?

11   Interpreters cost $40 an hour.  Two interpreters are required

12   for a lecture setting.  It's complex terminology.  That means

13   $80 an hour.

14        So why would Creighton pay more for something Mr. Argenyi

15   was saying didn't work when he had already successfully used

16   something that did, that actually cost less?

17        The third question on the verdict form will simply ask --

18   so there are no mistakes -- who would you vote for; who won?

19   Is it Michael or is it Creighton?  Hopefully that will be an

20   easy one.

21        The fourth question, plaintiff bears the burden of

22   proving it's more likely than not that Creighton intentionally

23   discriminated.  And there's a jury instruction which the Court

24   has provided and you should follow exactly what the Court said

25   to do.  It doesn't require ill will.  It requires that they

1   acted with deliberate indifference to Michael's federally

2   protected civil rights.

3       They knew.  They knew he couldn't hear.  They knew he

4   couldn't understand.  They talked to their lawyers.  And boy,

5   they changed what they offered after that first year.  Oh,

6   it's Dr. Thedinger's letter.  That was four months before,

7   that didn't change their minds because they didn't have him do

8   any testing.  But now that they had the letter, that changed

9   their minds.  That's what they said.

10      And, they very carefully and very deliberately offered

11  exactly the auxiliary aids and services that they knew

12  wouldn't work.  They chose deliberately.

13      Dr. Hansen, I asked him a few different ways to make sure

14  it was clear, to make sure I understood.  And I hope you

15  remember he said it was deliberate, it was a choice that they

16  made.

17      And what they chose was even though captioning was what

18  he'd always used, what he used successfully in his first year

19  paying for it himself, even though it cost less, they chose to

20  provide something that Michael said was not effective.  And he

21  provided reasons why.  And they deliberately chose to offer

22  what he didn't ask for.

23      And when it came to the labs, and he said in that

24  setting, the labs where there's a lot of lecture, I still need

25  captioning.  But if the labs are moving around and we're

1    learning how to do certain kinds of procedures, then I can

2    seek clarification and the terminology isn't quite so

3    complicated in that setting, an oral interpreter will work.

4         And of course, did they provide the oral interpreter in

5    that setting?  They did not.  Instead, what they did was they

6    looked at exactly what wouldn't work.

7         They offered him the privilege of having his professor

8    stand next to him.  They offered him the privilege of having a

9    seat next to the professor.  If he's sitting next to someone,

10   do you think he could read their lips?  If the professor is

11   writing on the board, do you think he could read their lips?

12   Even if the words weren't so complicated, even if every sound

13   could be seen on the lips -- which we've heard testimony isn't

14   the case -- that was a deliberate choice.

15        And the worst part of what they did, the very worst part

16   was then they said for the clinic, for the clinic you can't

17   have interpreters, even if you pay for them yourself.

18        It wasn't about cost.  That was about very carefully

19   choosing to offer not what Michael needed.  And they have the

20   nerve to say that they were offering him help, special

21   benefits; sitting next to the professor; being ordered to sit

22   in the front row in front of 126 of his peers, being told to

23   sit in the front row with his girl.  That was the special

24   privilege they were offering him.

25        And so, it's important when you think about whether they

PLAINTIFF'S CLOSING ARGUMENT                                    1050

1    acted deliberately to think about what they knew.  And they

2    knew a lot.

3         Let me show you the letters -- and you will have all of

4    these in your binder of evidence.  And again, we want you to

5    look at all of them, not just a highlighted line here and

6    there on the screen.

7              THE COURT:  Ms. Vargas, you're welcome to continue

8    with your closing at this point, we just need to reset the

9    clock.

10             MS. VARGAS:  Thank you.

11        They've told you that he didn't provide enough

12   documentation.  What else could he have provided?  What else?

13        And wasn't it an important moment when Dr. Hansen

14   admitted on the stand that he had testified in deposition that

15   there was no amount of documentation Michael could provide

16   that would change their minds.  That was the truth.  There's

17   no amount of information he could provide.

18        It was like a game of Open Sesame except the trick to

19   their game was that there was no magic word.  There's nothing

20   he could say.  They weren't going to provide it.  They didn't

21   provide it.  They did it on purpose.

22        The last question, and it's an important one, but I need

23   to move kind of quickly.  The last question you'll be asked is

24   what amount you would award Michael in damages.  And you'll be

25   asked about direct damages and other damages.  And the jury

1    instructions will explain this to you, and you should follow

2    exactly what they say.

3         Today Michael carries approximately $130,000 in loans

4    from the first two years of his medical education from tuition

5    with the increasing interest every day.  Michael carries loans

6    which, as a social work student, he is trying to pay back on a

7    monthly basis, in the amount of roughly $111,000.

8         That's roughly $241,000 in debt for his two years at

9    Creighton University.  You may decide that $241,000 is the

10   appropriate measure of direct damages.

11        When it comes to the other category of damages, the

12   damages that are for humiliation, embarrassment, emotional

13   pain and suffering; for that you need to rely on your own

14   judgment and decide what a fair and just measure of damages

15   would be.  That's up to you.

16        We would suggest that given what this young man went

17   through every single day for two years, every single day, we

18   would suggest that an appropriate measure might be taking that

19   $241,000 and multiplying it by 3.  And that would bring you to

20   $723,000.

21        But it's up to you to choose whether you think that is

22   just.  It could be that you think more is just, it could be

23   that you think less is just.  You will rely on your own

24   judgment.  And of course, follow strictly the instructions of

25   the Court.

 1        My husband and I have three boys at home.  So that means

 2    in our house, there's a lot of discussion of being brave and

 3    having courage, all those kinds of things.  And my husband, of

 4    course, being a guy, says -- I don't know if this is from

 5    Superman or what, but he says in order to be brave, in order

 6    to have courage, you have to first be afraid.

 7        He was.

 8        And I say, because I'm the mom and moms see it

 9    differently, it's a quote that I've always told them:  Courage

10    doesn't always roar.  Sometimes courage is the quiet voice at

11    the end of the day that says, "I will try again tomorrow."

12        And he did that every day.  Every day.

13            THE COURT:  Thank you, Ms. Vargas.

14        And as you take your seat, if you would please take down

15    the photo and then turn the flip chart to a clean page, I'd

16    appreciate that.  Thank you.

17        And we will now here the closing argument from defense.

18    And Mr. Moore, you may proceed.

19            MR. MOORE:  Thank you, your Honor.  I can't see the

20    timer, so I was going to put a timer right in front of me

21    here, if I may.

22            THE COURT:  You may.

23            MR. MOORE:  Your Honor, counsel, ladies and gentlemen

24    of the jury, Michael wants what Michael wants.  Two days

25    before he even stepped into a medical school classroom, that's

1    what his lawyer said.  Michael wants what Michael wants.

2          Now folks, you also heard Mr. Argenyi say that on

3    August 12th, 2009, before he even stepped into medical school,

4    that he knew at that time what Creighton offered was not

5    enough.  And if Creighton didn't provide him everything he

6    demanded, it wasn't enough.

7          Now, as we said in opening, I think as you saw,

8    Mr. Argenyi's a smart guy.  Creighton believes that, we

9    believe that.  It's no question he's a smart guy.  And he

10   wants to maximize his educational results.

11         And he's used to, as he's clearly said, going to a

12   college and saying, "Here's what I want," and the college

13   gives it to him.  He believed he was entitled to it.  And he

14   believed Creighton should do the same thing, that he shouldn't

15   have to provide any documentation.

16         I have a disability.  You've got to give me whatever I

17   want.

18         But that's simply not the standard the law requires.  But

19   he went farther than that, folks.  He sat on this stand and he

20   told you that he's the only one who knows what effective

21   communication is for him.

22         When I asked him, as you recall, about the Dr. Backous

23   and Stacey Watson letters, I asked him, "How did those

24   recommendations for CART and FM system get into those

25   letters?"  He said, "because I told them."  And I said, "Do

DEFENDANT'S CLOSING ARGUMENT                                    1054

1    you think you're the only one that knows?"  And he said, "Yes,

2    I'm the one with the hearing impairment, I'm the only one that

3    knows."

4         Even assuming that's a standard -- which it can't be and

5    which the law tells you in your jury instructions that it's

6    not -- he doesn't even know what's effective communication.

7         Why do I say that?  Because he wasn't even willing to try

8    what Creighton offered.  How do we know he wasn't willing to

9    try?  Because when I asked him, "Do you really believe that

10   you gave it a wholehearted try," he couldn't even keep a

11   straight face.  You saw him.  He smiled.  And I said, "Sir,

12   you're smiling.  Are you sure you really believe that's a

13   wholehearted try?"  And he continued to smile and said,

14   "Yeah."

15        He even knows it wasn't a wholehearted try.  In fact, he

16   testified before he even stepped into a medical school

17   classroom, he knew what Creighton was offering was not enough

18   and he wasn't willing to try.

19        For M2, what did we hear?  For M2, first day of class,

20   Creighton provided an oral interpreter which he himself said

21   was interchangeable with CART, oral interpreter that he'd

22   actually used in the past, Victoria Deuel on multiple

23   occasions.  Creighton offered that.

24        Mr. Argenyi sat on that stand and said, "Yeah, I really

25   tried, I was looking at her but I really didn't understand so

1   I had to look at CART.  And after the class ended, I went down

2   and I told her, you know, it's not working and she asked if

3   she should leave."

4        Folks, that's not true.  Victoria Deuel, who is not

5   employed by Creighton University, does not receive a paycheck

6   from Creighton University, like Ms. Vargas said, doesn't have

7   a stake in this case, we subpoenaed her to come in for one

8   purpose, to come in and tell you what happened that day.  And

9   what did she say?  "I tried to sign and he wouldn't look at

10  me.  Not only would he not look at me, he said, 'I'm not going

11  to look at you.  You might as well leave.'"

12       He wasn't even willing to try.  I've always got CART.

13  I'm used to getting CART.  I'm entitled to CART.  I'm not

14  going to try what you're offering.  Despite the fact that he

15  admitted that no one ever asked him in his whole life is it

16  necessary?  Is it appropriate?  No one, ever.  He was offended

17  when Creighton did.

18       How can he sit on that stand and tell you that Creighton

19  has to pay $110,000 for these auxiliary aids and services when

20  he won't even try what Creighton offered?  Won't even try.

21  That's his standard.  That's the problem with his standard.

22  And it's certainly not what the law requires, as you know,

23  from your jury instructions.

24       So, what is the law?

25       Well, this is not a case where the medical school didn't

1    admit Mr. Argenyi.  They clearly thought he was a bright

2    student.  They admitted him.  They were excited to have him.

3    You heard Dr. Kavan.  This helped the diversity of the medical

4    school.  They were excited because he was an accomplished

5    person.  They wanted him there.  It's not about that.

6         This isn't about a case where Creighton kicked him out

7    because of his disability.  Again, the opposite.  He

8    successfully completed his first two years of medical school;

9    well on his way to becoming a doctor.

10         This case is about whether Creighton provided additional

11    services that it doesn't provide to other students; additional

12    auxiliary aids and services that are necessary because of his

13    disability to ensure meaningful access.

14         Now, I've been doing this for a while.  And a long time

15    ago somebody was talking to me about providing accommodations

16    and providing auxiliary aids for persons with disabilities.

17    And they said, I look at it this way:  A track -- track and

18    field, the 400-meter race.  Now, in the 400-meter race, not

19    everybody starts on the same line, right?  It's a staggered

20    start.  Lane 8 looks like it's way up there, looks like they

21    get a head start but they don't because lane 8 is longer.  So

22    you've got to get a staggered start.

23         And that's what this law is about.  If a person with a

24    disability needs an equal opportunity to get to the finish

25    line, they need to start at the same distance.

1    It doesn't require that they get to go run ten yards

2    before the gun goes off.  It doesn't give them roller skates

3    or a jet pack.  It gives them an equal opportunity to get

4    around.

5        What Mr. Argenyi is telling you is:  I have a disability,

6    so you have to give me everything I demand.  You can only rely

7    on me.

8        But, Mr. Argenyi wants to maximize his educational

9    results.  I get that.  He's a smart, competitive overachiever,

10   we know that.  And he wants to maximize the results of his

11   education.  He wants to get everything he can to maximize

12   those results.

13       But that's not what the law requires.  It's a balancing.

14   It is, number one, first you have to show you need it for the

15   disability.  And secondly, is it reasonable, is it an undue

16   burden?

17       It's not, I have a disability.  I get everything.  It

18   would be great if we could do that.  It would be great if we

19   could do that, but we can't.

20       Congress recognized that when it passed the law.  We

21   can't provide unlimited resources because somebody wants this.

22   We all know that.  We know that in our own households.

23       Now, you're going to get instructed by the jury -- you

24   were instructed, excuse me, and you have those jury

25   instructions you can read when you go back.  And it talks

1    about what Mr. Argenyi's burden is.  And his burden is to show

2    that Creighton failed to provide the necessary auxiliary aids

3    and services, those that are necessary because he has a

4    hearing impairment, to provide meaningful access.

5         Now, what meaningful access is, it doesn't require an

6    identical result or identical level of achievement.  It

7    doesn't require maximum achievement.

8         What it requires is an equal opportunity to gain the same

9    benefit.  It doesn't require Creighton to provide something if

10   it will just help improve his grade a few percentage points.

11   It doesn't require Creighton to provide everything so

12   Mr. Argenyi doesn't miss one word.  It doesn't require

13   Creighton to provide something so he's honors rather than the

14   88 percent he got on the anatomy test.  It requires an equal

15   opportunity to gain the information; not to get every word,

16   not to make sure he doesn't miss everything; it's an equal

17   opportunity, not an equal result.

18        We wanted you to see everything.  We tried to get all the

19   documents in that Creighton saw, okay?  The plaintiffs have

20   introduced documents that came up afterwards or from Web sites

21   or other things.  We wanted you to see everything that the

22   medical school saw.  I told you that in opening.

23        We wanted you to hear Mr. Argenyi's story so we let him

24   testify.  We let him testify for a long time.  Maybe we let

25   him go on for too long because I appreciate the fact that you

1    guys are sitting here away from your family, friends, jobs.  I

2    know that's not easy.  I get that.

3        But I appreciate you sitting there, I appreciate you

4    deliberating.  And I'm sorry if we went -- if it went on too

5    long, but I wanted you to have all the information they had

6    because we're not afraid of anything.  We want you to see that

7    information.  We didn't want to keep anything out.  We're

8    confident if you see that information, you'll come to the same

9    conclusion the medical school did.

10       So let's take this one at a time.  Let's talk about M1

11   first.  A couple of jury instructions that I think are very

12   important -- well, they probably all are, but we'll talk about

13   these first.

14       Number one is you're to judge Creighton on the

15   information that it knew or should have known at the time it

16   made the decision.  What was in front of the medical school at

17   the time it made its decision?  Not something that just came

18   up in trial four years later; not something that Mr. Argenyi

19   could have provided to Creighton but didn't; but what they

20   actually had, right?  Makes sense.  It's fair.  You don't get

21   the gotcha later on, it's what Creighton saw at the time.

22       Number two is, as the law instructs you, Creighton has

23   the right to require information and documentation from a

24   third-party qualified professional.  In other words, Creighton

25   doesn't have to just take his word for it, it can require him

DEFENDANT'S CLOSING ARGUMENT                                      1060

1    to provide that information for them to make the decision.

2    Two very important things to focus on.

3        So let's talk about what they need, okay?  What did they

4    know?

5        Well, what they knew at the time -- and I want to be -- I

6    want to point something out that Ms. Vargas said.  She said

7    for the first time Dr. Kavan told Mr. Argenyi his admission

8    was conditional when he asked for an accommodation.  It's not

9    true.  Mr. Argenyi, on the stand, said he understood that his

10   admittance and every other student's admittance was

11   conditional; conditional on everybody being able to be meet

12   the technical standards, everybody being able to pass the

13   criminal background check, everybody passing the drug test.

14   It wasn't just him.  You heard that it was conditional for

15   everyone.

16       But let's talk about Dr. Kavan.  Dr. Kavan got on that

17   stand, answered every question.  He was not afraid to answer

18   questions, not afraid to talk about all the documentation.

19       So what documentation did they have?  Well, they

20   certainly at that time -- before he started his M1 year, they

21   had his demands.  No question about that, right?  The April

22   e-mail sets out exactly what he wants.  And as he said on the

23   stand, from August 12th, before he started his first year

24   until now, the demands were the same and they never changed.

25   Never changed.

 1          Dr. Kavan collected the information and tried to get the

 2     information the MEMT needed to make the decision about the

 3     accommodation.  When there was some confusing, conflicting

 4     evidence, when Michael Argenyi asked for all these things but

 5     Dr. Backous only said closed-captioning on videos and a FM

 6     system and it was conflicting, did Dr. Kavan say, "Oh, we're

 7     just going to follow Dr. Backous"?  No.  He went out and got

 8     more information to clear up that conflict, gave Michael

 9     another opportunity to provide the information so they

10     understood what may be required.

11          They were very deliberate.  No question they were very

12     deliberate, very deliberate in collecting all the

13     documentation they needed, very deliberate in reviewing the

14     information, very deliberate in making the decisions.  And you

15     have the evidence and documents in front of you that explain

16     that.  That's not deliberate indifference, that's being very

17     deliberate to what they're required to do under the law.

18          So, in addition to his demands, Dr. Backous submitted a

19     letter on April 10th.  This was the first letter.  And in that

20     letter, as you know -- and I'm not going to pull it up again,

21     but you can read it in the jury room -- he said he was doing

22     quite well, had been communicating well in a nursing home

23     environment and would benefit from closed-captioning and -- I

24     heard in her closing, she started talking about closed-

25     captioning, real time, and maybe trying to confuse those

1   things.  We all know what closed-captioning is.  Michael said

2   what closed-captioning is, Dr. Kavan said what closed-

3   captioning is.  Closed-captioning is on videos.  You can turn

4   it -- it's open if it's turned on.  What closed means is you

5   can turn it on and off.  Closed-captioning and an FM system.

6        And in the letter, this is even before he had the second

7   cochlear implant and his communication may improve

8   notwithstanding or regardless of any accommodations.  That was

9   it.  That was it in the April 10th letter.

10       So Dr. Kavan says we need some clarification, we need

11  more information because that conflicts with what you're

12  asking for.

13       So the second letter comes in.  This letter comes in from

14  Stacey Watson and Dr. Backous.  And it says, "Michael Argenyi

15  went through some testing in auditory only and with visual

16  cues and context."

17       So in addition to being in the booth not having any

18  visual and hearing sentences, they also did the testing with

19  visual cues and context.  And what did that letter say?  With

20  visual cues and context, his performance improves to nearly

21  100 percent.  That's what Creighton knew.

22       That letter also said appropriate accommodations include

23  an FM sister -- system, an interpreter, and real-time

24  captioning.  Nowhere does it say, "You better provide all

25  three" or, "You have to have provide all three."  Nowhere in

1   that letter does it say, "You need to do provide this in a

2   lecture, FM system doesn't work in a lecture."  In fact, look

3   in that letter.  The word "lecture" doesn't appear in that

4   letter.

5        Now, in that letter was the first and only time

6   Mr. Argenyi was tested with visual cues and context.  Look at

7   all the other letters.  All the other letters are auditory

8   only; auditory only.  Why?  Why was he never tested again for

9   visual cues and context?

10       Well, number one, that was before he got his second

11  cochlear implant.  So based upon what the expert doctors say,

12  his communication could only improve with the second one.  And

13  you can't get better than 100 percent.  You can't get better

14  than 100 percent.

15       The reason he didn't do that testing is because the

16  testing would have said the same thing.  Instead of him

17  hearing 100 percent, Michael just had 100 percent [*sic*].

18       But that's very important.  Look at all those letters and

19  you'll notice that the only time he was tested with visual

20  cues and context was in that letter, and it was nearly 100

21  percent.  And that's what Creighton knew.  That's what

22  Creighton knew.

23       Now, Creighton also took into consideration what

24  Mr. Argenyi said.  Mr. Argenyi submitted a letter, a long

25  letter -- and I know we've talked about it, you've seen it.

1   It will be back in the jury room.

2       And when I was talking to Dr. Kavan, we didn't go through

3   part of that letter, we went through all of that letter.  When

4   Dr. Kavan was talking about the Dr. Backous letters, we didn't

5   go through part of the letters, we went through each letter.

6   And he gave the reasoning and his thoughts, what the MEMT did

7   with it.

8       But I'm not going to read that whole letter.  But clearly

9   in that letter Michael, in his own words, says:  I have been

10  working as a CNA in the medical emergency department at

11  Seattle Children's Hospital, I've doing procedures and helping

12  with them and communicating with doctors and nurses and

13  communicating with patients.  And I've done all of this

14  without any significant accommodation, with nothing but a text

15  pager.

16      Yeah.  Is a CNA different than a doctor?  Of course.  But

17  it's the communication we're focusing on.  We're focusing on

18  how does Michael communicate?  Can he communicate, and how

19  does he communicate in that setting?

20      Yes, doctors are different than CNAs.  But we're talking

21  about how he communicated and how he was able to do that

22  without any accommodation in an emergency department,

23  communicating with patients, doctors, nurses, techs.

24      Now, also in that letter it says, "I have been able to

25  obtain clinical information in a clinical setting without

1    significant accommodation."  No CART, no interpreter; just

2    him.

3         He also says -- and he uses the word, I want to

4    emphasize -- not just "say", I want to emphasize that I'm not

5    requesting accommodations for clinical -- for assistance in

6    clinical assessment.  That's his words.  His words.

7         He also says -- and this is very important -- that CART

8    and oral interpreters are interchangeable.  He says that; not

9    a doctor, not Creighton; he says that.  And he ends that

10   letter that he believes an FM system would be useful in his

11   medical studies.

12        Now, I asked him, "Isn't it true that you said it would

13   be useful?"  "Yeah, it would be useful but not effective.  I

14   never said it would be effective."

15        That's again telling, folks.  He wants to maximize the

16   results.  He doesn't want reasonable auxiliary aids and

17   services.  He doesn't want just those that are necessary.  He

18   wants everything he can get, the most technologically

19   advanced, the most expensive.  He wants that because he wants

20   to do -- maximize the results of his education.  Maximize the

21   results.  And that's a great example.

22        But that's not what's required.  That's not what's

23   required under the law.

24        The MEMT also had the letter from Amanda Mogg.  You've

25   seen it.  You can see it in the jury room again.  What did his

1    supervisor at Children's Hospital say?  She went on and on how

2    much he did in the ER, communicating with patients, requiring

3    that he must work and communicate completely verbally,

4    completely verbally with nothing but a text pager; no CART, no

5    interpreters; just him.

6        What else did the MEMT know before they made their

7    decision?  Well, they knew that Mr. Argenyi had come to his

8    interview and come to workshops with no CART, no interpreter,

9    just him.  Didn't request any accommodations, didn't have any

10   accommodations.

11       So when I asked him on the stand, "Why didn't you request

12   an interpreter for that?"  "Well, I didn't want an interpreter

13   because I wanted to build rapport with whoever was

14   interviewing me."

15       Kind of taken aback, I said, "Don't you want to build

16   rapport with your patients?"  "Oh, that's different.  That's

17   different."  Did he explain what was different?  No.  He just

18   said, "That's different.  That's different."  Again, we're

19   talking about his ability to communicate.  And Creighton knew

20   that at that time.

21       Now, the MEMT took all of this information.  It consulted

22   with Wade Pearson, who had been the director of the Office of

23   Disability Accommodations for 20 years at Creighton.  It sat

24   down and it looked at all of the information.  It talked about

25   all of the information.  It looked at what Mr. Argenyi said,

1    it looked at the documents he submitted, and it made a

2    reasoned judgment.

3         And they made the reasoned judgment as medical educators

4    and practicing physicians, knowing what medical school was.

5    And they decided, based on those statements and the

6    documentation that he provided, that they were going to offer

7    him an FM system.  They were going to offer him note-takers.

8    He had access to PowerPoints.  He had access to all the

9    information in advance.  And because he himself said, "With

10   visual cues and context, I am able to get information on my

11   own," they said, "We'll make sure there's always a seat in the

12   front row so you can communicate that way."  If the front

13   row's full or the second row's full, if that makes you feel

14   more comfortable, we'll make sure we save a seat for you so

15   you don't have to sit in the back where it wouldn't be

16   effective.

17        Now, I want you to look at instruction number 9 because

18   instruction number 9 lists what are auxiliary aids and

19   services.  And what you're going to see in there is assistive

20   listening devices.  That's an auxiliary aid the law

21   recognizes.  That's an FM system, note-takers.  That's what

22   the law recognizes as an auxiliary aid, and they provided it.

23   Other means that would provide him access to the information.

24        You know, they make light of the fact that we said we

25   wanted to make sure he was close to the professor, we wanted

1   to make sure he was in the front row because that is another

2   way to deliver that information, to make sure he has visual

3   cues, to make sure he has context based upon what he said.

4       All of the things that Creighton Medical School offered

5   are recognized as auxiliary aids and services by the law.  Now

6   they ran this by legal counsel, and they sent this out to

7   Mr. Argenyi.

8       Mr. Argenyi responded by saying, "I'm going to give it a

9   wholehearted try."  His words, "wholehearted try".  He worked

10  with the medical school to pick out a specific auxiliary --

11  excuse me, the specific FM system that would work with his

12  cochlear implant.  And Chuck Lenosky told you he worked with

13  Stacey Watson to make sure everything worked.

14      Let's talk about Stacey Watson for a minute.  Look, I get

15  it.  Stacey Watson has been working with Michael Argenyi for a

16  long time.  She is a medical professional.  Her job is to get

17  everything she can for her patient.  That should be what

18  doctors do.

19      We see that sometimes people go in, they want a

20  handicapped parking permit or they want something else, they

21  go in to their doctor and the doctor signs it -- maybe they

22  don't even need it -- because doctors and medical

23  professionals should do the most -- should do everything they

24  can to help their patients.  The Hippocratic oath, right?  Do

25  no harm.  So I get it, I get she wants to be an advocate.  And

1     she was an advocate on the stand.

2          On the stand, during direct examination, she said, "You

3     know, no one from Creighton ever contacted me."  Then on

4     cross-examination when I asked about Chuck Lenosky, what did

5     she say?  She didn't say, "I never talked to him."  "Well, you

6     know, maybe I did, I just don't remember.  I can't say I

7     didn't, I just don't remember."  Maybe she doesn't remember.

8     That's okay.  But she talked with Chuck Lenosky.

9          Now, I also want you to pay attention to what she said

10    with regard to the FM system.  On direct examination she said,

11    "Yeah, the FM system, yeah, it kind of helped him pick up a

12    few more sounds."  She downplayed it.  Again, it's okay, she's

13    advocating.

14         Then we looked at her medical records, her medical

15    records she wrote at the time they did the testing.  She said,

16    quote, the FM system was illustrated in clinic today and found

17    to work great with his 3G and he was encouraged by the

18    advantages the system could offer.

19         It worked great.  He was encouraged.  Does that sound

20    like picking up a few sounds?

21         She also said, "He's severely and profoundly deaf, that a

22    jet engine would have to be a few feet from him to hear that."

23    Folks, that's without his cochlear implants.  And then when I

24    said, "What about that jet engine when he has the cochlear

25    implants?"  "Well, maybe a few more feet away."  Come on.  I

1   give you more credit than that, guys.

2       What did their own expert say, Dr. Thedinger, their own

3   expert they brought in?  He said without the cochlear implant,

4   sure, he's severely and profoundly deaf.  But with the

5   cochlear implants, he's hearing impaired.  That's why he gets

6   stuff.  That's why he wore the hearing aids before he got the

7   cochlear implant.

8       You look at the jury instructions.  You can judge the

9   credibility of the witnesses.  Do they say something different

10  on the stand?  Is it believable?  Is it credible?  That's for

11  you to decide.  But, I think Stacey Watson was an advocate,

12  not a fact witness.

13      Now, what happens next?  After the medical school and

14  Mr. Argenyi worked together to get the FM system, Dr. Kavan

15  was excited.  Here we go, we're going to get this started.

16  But what happens?

17      Two days.  Two days before medical school starts, Dianne

18  DeLair calls up Creighton University and demands a meeting.

19  And it's Dianne DeLair, Mr. Argenyi, and a deaf advocate.  And

20  they say, "Michael wants what Michael wants."  Not "Michael

21  wants what Michael needs"; not "Michael needs what Michael

22  needs"; "Michael wants what Michael wants."  If that's not a

23  threat, I don't know what is.

24      At that time he had his lawyers.  He had made up his mind

25  in that meeting that it's all or nothing, folks.  You either

DEFENDANT'S CLOSING ARGUMENT                                    1071

1     give me, Dr. Kavan, everything I want or it's not going to be

2     enough.  This is the wholehearted try, right?  At that

3     meeting, however, no CART, no interpreter, just him.

4         I want you to do one thing.  I want you to look at the

5     statements that Michael made and the statements his team made

6     before he got lawyers and after he got lawyers.

7         The two letters from Dr. Backous and Stacey Watson were

8     enough documentation for the MEMT to make the decision.  They

9     had enough information at that point.  They didn't ask for two

10    more letters from Dr. Backous.  Mr. Argenyi's lawyer asked

11    Dr. Backous and Stacey Watson to write two more letters.  They

12    didn't need any more.  They had enough information at that

13    point.  So compare what was said before lawyers and what was

14    said after lawyers.

15        Now they said Creighton University doesn't want to talk

16    about the e-mail that Michael sent on September 1st.  Because

17    what we know is Michael started class, and two weeks later he

18    sent an e-mail -- that, by the way, was cc'ed to his lawyer.

19    Sent it to Dr. Kavan.  We don't want to talk about it.  We

20    talked about it.  We want to talk about it.

21        Let's talk about that e-mail.  First of all, let's talk

22    about the credibility of that e-mail when Michael himself

23    said, "Before I started class, I knew nothing less than

24    everything I wanted was going to be enough.  I knew at that

25    point."

1           So let's look at the credibility of that e-mail after he

2    says that on the stand in front of you.  Let's look at the

3    credibility when his lawyer is cc'ed on it.  You have to make

4    that decision.  Let's look at the fact that he smiled and he

5    couldn't even take it seriously with regard to his

6    wholehearted try.

7           But beyond that, the medical school took that e-mail

8    seriously, very seriously.  And Mr. Argenyi pointed out three

9    specific problems he was having.  Number one, the FM system in

10   the anatomy lab because of the background noise.  There is

11   background noise in anatomy lab.  There's sawing and other

12   stuff that kind of grosses me out a little bit on cadavers,

13   but there is a lot of background noise in the anatomy lab.

14          Number two, closed-captioning on videos.  One of the

15   videos was not closed-captioned.

16          And number three, the note-takers in the note-taking

17   service pool were not getting him the notes fast enough.

18          It's important to point out that before that, the medical

19   school had offered him individualized note-takers of his

20   choice.  But as you heard, he wasn't particularly impressed

21   with any of his fellow students.  He didn't think that would

22   be good.  That wasn't enough.

23          And what did Dr. Kavan do?  He addressed every single one

24   of those issues.  The anatomy lab:  Talked to Dr. Quinn.

25   Dr. Quinn, who is the anatomy professor who teaches the

1    professor [*sic*], moved him into the center room right by him

2    so he could have that individual one-on-one communication

3    right at the cadaver table.

4        Number two, assigned their best teaching assistant to

5    assist Michael in communicating.  They said in opening

6    statement Creighton didn't even respond.  That's not true.

7    It's not true.  And then at trial, they said, "Well, Dr. Kavan

8    didn't respond because it was Dr. Quinn."  Come on.

9        With regard to the closed-captioning, not only did

10   Dr. Kavan say they addressed it, he was miffed because this

11   had been discussed before class starts, it should have been

12   done already.  He took it very seriously to work to get those

13   closed-captioned.  And with the note-takers, again he had been

14   offered the individualized note-taker he admitted he didn't

15   take advantage of, and Dr. Kavan reminded him that he could do

16   that and help with the note-taking service.

17       Now, folks, what else did they know at that time?

18   Because in addition to that e-mail, there were a couple

19   letters from Dr. Backous and Stacey Watson.

20       Again, look at those letters.  One of them refers back to

21   the May letter where he had 100 percent communication; and the

22   next letter was auditory only testing.  Didn't do it with

23   visual cues and context.  There was nothing new in those

24   Backous and Stacey Watson letters that the lawyers asked them

25   to write.

DEFENDANT'S CLOSING ARGUMENT                                    1074

1          What else did they know at that time?  Well, first of

2     all, he included a broad statement, "I'm fatigued and stressed

3     and missing a big chunk of information."

4          Now, Mr. Argenyi assumed that's because he wasn't getting

5     everything he wanted.  The statement he made in that e-mail,

6     Dr. Kavan told you, he hears from medical students all the

7     time.  Even Mr. Argenyi said it's like trying to take a drink

8     of water out of a fire hydrant.  These kids are overachievers.

9     Well, they're used to it being easy.  And they get in the

10    environment that's really hard, yes, they'll be stressed and

11    fatigued.  On the LCME accreditation what they're concerned

12    about is too much stress for all medical students.  There is

13    no way to differentiate that from what any other student was

14    suffering from.

15         But what else did they know?  They knew his grades.  They

16    knew his grades.  And you heard Dr. Kavan talk about what his

17    grades were before he got interpreters and CART.  88 percent

18    on anatomy exams; doing well in anatomy; doing well in MCDE.

19    And after he got CART and interpreters for himself, he did a

20    little bit better in some classes and worse in others.

21         Now, contrast that with "I'm close to failing" like he

22    said.  "He was close to failing," like his mom said.  Don't

23    you think if he was close to failing, they would want to get

24    the grades in front of you?  Doesn't add up.  Doesn't add up.

25    We wanted you to see the grades because that's the way you

DEFENDANT'S CLOSING ARGUMENT                                    1075

1      determine how someone is doing in school, their grades.

2              MS. VARGAS:  Objection, your Honor.  Mr. Moore -- may

3      we have a sidebar?

4              THE COURT:  All right.

5          (Bench conference on the record.)

6              MS. VARGAS:  Mr. Moore just told the jury about

7      evidence that was not admissible because it wasn't competent.

8      And he made the point that it wasn't admitted because we were

9      somehow trying to hide it.

10         It was the Court that ruled it was not competent evidence

11     to put before the jury and sustained our objection.  And

12     Mr. Moore just improperly made the point about evidence that

13     the jury didn't get to see because we tried to keep it out.

14     That's improper in closing argument.

15             MR. MOORE:  Dr. Kavan testified to everything I said.

16     He testified to the grade in anatomy.  He also testified that

17     he did better in some classes without -- better in some

18     classes and worse in some classes with.  That's all testimony

19     that was in.  And we wanted to get that in front of them.  I

20     just asked if the plaintiff was failing, then why didn't he

21     offer the grades.

22             MS. VARGAS:  That isn't what I objected to.  I

23     objected to the fact that you were commenting on the fact that

24     evidence wasn't admitted into court as somehow --

25             MR. MOORE:  I did not.

 1            MS. VARGAS:  -- that somehow -- that's improper.

 2            THE COURT:  There was evidence that came in about

 3     plaintiff's grades.

 4            MS. VARGAS:  He was talking about the evidence that

 5     didn't come in.

 6            THE COURT:  No, I didn't interpret it that way.  I

 7     understand how you might interpret it that way.  But I will

 8     tell you what I heard and how I interpreted it.  Evidence did

 9     come in regarding the plaintiff's grades -- some evidence did

10     not come in.  That's true.

11         And the evidence that was admitted regarding the

12     plaintiff's grades was offered through the defense, through

13     the presentation of the defendant's case.  It was not offered

14     in connection with the presentation of the plaintiff's case.

15     And I think that's all that counsel has said.

16            MS. VARGAS:  Your Honor, I maintain my objection,

17     that when he was referring to the fact about the evidence that

18     didn't come in, and it's improper to cast aspersions on

19     evidence that didn't come in because it didn't come in for a

20     reason.  Your Honor ruled that it shouldn't come in.

21         And for him to make suggestions that that somehow would

22     cast aspersions on us is totally improper in a closing

23     argument.

24            THE COURT:  And I can understand how you might

25     interpret his statements to mean that and because that's what

1    he was referring to which would be improper.

2         But I'll give him the benefit of the doubt that he was

3    referring to the evidence as I have earlier described here, so

4    we'll move on.

5         (End of bench conference.)

6              THE COURT:  You may proceed.

7              MR. MOORE:  As I mentioned, Dr. Kavan told you that

8    the grades were good and that some grades after he got the

9    CART and interpreters were worse.  The grades are what we had,

10   folks.  That's how a student is measured.  That's an objective

11   way to look at this.

12        Now, they say, "Don't pay attention to the grades."  They

13   make this argument that every time he was successful without

14   auxiliary aids and services or using what Creighton offered,

15   that it was an easy part of medical school.  That was the easy

16   part.  That's why he did well.

17        But every time he was using CART and interpreters,

18   apparently medical school got -- there was no problem.  But,

19   you know, if they were only using what Creighton offered, that

20   it was an easy part of medical school.  You be the judge of

21   that.

22        Now, there was no question, you have seen what the

23   medical school knew before M1.  And it's based upon what they

24   knew.  And based upon what they knew, they offered the

25   appropriate auxiliary aids and services that Mr. Argenyi

1    refused to even try.

2        Let's talk about M2.  What did Creighton know before M2?

3        Well, other than the letter from Dr. Thedinger, they had

4    all the other information from the previous year and what

5    Mr. Argenyi's conduct was.  But he didn't offer any new

6    evidence -- or new documentation.

7        Let's talk about the Dr. Thedinger letter just for a

8    minute.  In opening statement, I believe one of the questions

9    they needed to answer was why did they wait to present the

10   documentation from a qualified professional, which Creighton

11   is allowed to ask under the law, why did they wait until after

12   the M1 year?  Why did they wait?

13       I asked Mr. Argenyi, "Could you have gotten it done

14   before M1?"  "Yes."  "Could you have gotten it done during

15   M1?"  "Yeah."  So why did they wait?  They never answered that

16   question.  Was it a legal strategy?  Was it a gotcha?  Because

17   the lawyers were certainly involved at that time.  I don't

18   know, they didn't answer.

19       And now today in closing they say well, they could

20   have -- they could have sent him to one of Creighton's

21   doctors.  Can you imagine if they would have asked him to go

22   to one of Creighton's doctors?  Oh, that's just out of line;

23   that's unfair.  The law doesn't require Creighton to send him

24   to a doctor.  The law requires Mr. Argenyi to provide support

25   for what he's requesting.

DEFENDANT'S CLOSING ARGUMENT                                1079

1          And let's talk about Dr. Thedinger's letter because

2    Dr. Thedinger's letter shows how the law works and how

3    Creighton Medical School followed the law.  Once they had

4    documentation from a qualified professional, they reassessed

5    what they were offering and they changed and offered him more.

6    That's exactly how the law is supposed to work.

7          Once the person, who is asking for the benefits other

8    students don't get, provides an appropriate document,

9    professional documentation as you see in the jury

10   instructions, they made the change.

11         And they offered him oral interpreters.  Why did they

12   offer him oral interpreters?  Well, there's a couple reasons.

13   Number one is by Mr. Argenyi's own words oral interpreters and

14   CART are interchangeable.  And I asked him to point to any

15   evidence in the record, any evidence in the record where

16   Mr. Argenyi said oral interpreters were not effective in

17   lecture.

18         There's not a letter, there's not an e-mail, there's not

19   a phone call, there's not an in-person, there's not a doctor's

20   note or recommendation.  Nowhere in this record did he tell

21   Creighton Medical School at that time that an oral interpreter

22   was ineffective.  The first time he said it was in this trial

23   three years later.

24         Gotcha.

25         That's not what the law requires.  The law requires

1    Mr. Argenyi to provide the information so they can make the

2    decision based upon the information at that time, not what you

3    learn three years later.

4         So why not CART?  Why not CART?

5         Well, the law says that Creighton gets to choose between

6    two equally effective forms of communication when they're

7    interchangeable.

8         Now, let's talk about their numbers.  First of all, their

9    expert, Margaret Tyska Heaney, testified she charged $95 an

10   hour.  That's what she charged.  That's the actual charge.

11   She also said, what, for each hour of class time, there's an

12   hour of prep time at $50 an hour.  That's $145 an hour, folks,

13   for class time.

14        But even if we buy -- even if we take that estimate that

15   Creighton had the year before, that it might be around $75,

16   let's just take $75; $75 plus $50 prep time is $125 an hour.

17        Number two, when Mr. Argenyi was on the stand and when

18   Dr. Townley testified, what did you hear?  Michael Argenyi had

19   one interpreter; not two, one; one interpreter, which would

20   have been $40 an hour as compared to, even accepting their

21   numbers, 125.

22        Even if he had two, that's $125 using their numbers

23   compared to 80.  Can Creighton make that decision to provide

24   the less expensive one?  Absolutely they can.  And they did.

25   Read the -- the jury instructions will tell you.  Creighton

1     ultimately gets to make that decision.  And this is why:  So

2     they cannot spend 125 or $145 an hour, they can spend 40 or

3     $80 an hour.  That's why they made that decision.

4          And they also made the decision because Mr. Argenyi

5     himself said oral interpreters are interchangeable.  And

6     there's no evidence, nothing, that Creighton had that said it

7     wasn't.

8          Let's talk about longitudinal clinic because that was the

9     second change, right, the new class in M2.  Let's talk about

10    longitudinal clinic.

11         Again, Creighton had all the information that Mr. Argenyi

12    had provided, how he did well with clinical assessment, that

13    he did clinical assessment, he got clinical information

14    without any accommodation in the past.  Yes, they had that.

15         But they also had the OSCEs.  Now, folks, we've talked a

16    lot over this two weeks.  We've argued, they've argued,

17    everybody's talked a lot about could have, would have, should

18    have; maybe this could have.

19         But the OSCEs are unvarnished.  The OSCEs aren't what

20    deaf people might hear or what hearing impairment might hear

21    or what this test might show.  It is Michael Argenyi in a

22    clinical setting.

23         Yes, the audio has poor quality.  Okay, yeah.  Chuck

24    Lenosky says they have to replace it because it wasn't very

25    good, right?  The audio doesn't match up.

1        But that has no impact on viewing Mr. Argenyi and seeing

2     him do very well in that clinical setting.  Again we wanted

3     you to see everything; they wanted you to see with an

4     interpreter and without an interpreter.

5        We wanted you to see that, and we want you to watch it

6     again, if you want to, in the jury room because it shows that

7     Michael Argenyi does just as well with or without an

8     interpreter.  And again, remember it's not maximizing -- the

9     best he can possibly do, the best possible result, that's not

10    what's required.  It's effective communication.  It's a

11    balancing.

12       I know they want it, I know they want everything.  But

13    that's not what the law requires.

14       Now, he starts sending these e-mails, and I want to talk

15    about these e-mails to Dr. Hansen.  He sends, I think, four or

16    five of them.

17       He knows at that point that the lawyers are discussing

18    the accommodations.  Dianne DeLair had sent the letter, I had

19    responded, it was going through counsel.  Okay?

20       We had been in litigation for a year.  One of the e-mails

21    that was sent was just, like, a week before they were going to

22    depose Dr. Hansen.  So why did he send those e-mails?  If he

23    knew he didn't need to, why did he send them?

24       Well, I would surmise that when Ms. Vargas got up there

25    dramatically putting up all those letters, that's exactly what

 1    they wanted today.  They wanted to create a paper trail.  They

 2    wanted to create a paper trail.  The more Mr. Argenyi went on

 3    and on and on about what he claimed was the problem, the more

 4    we get in front of the jury.  That's the paper trail, folks.

 5        But there was no information from anyone but Mr. Argenyi

 6    in the midst of litigation when they're deposing Dr. Hansen.

 7    A paper trail.  When he knew the lawyers were communicating.

 8    Why did he send them?  For that moment.  Right there in front

 9    of the jury; right there in front of you.

10        And why didn't Dr. Hansen respond in addition to the fact

11    that the lawyers were talking?  Because he was talking to

12    Dr. Townley at the same time, the preceptor, who was saying,

13    "He's doing just as well as any other student."  You saw the

14    evaluations.  The evaluations will be back with you where

15    Dr. Townley says he does just as well with or without an

16    interpreter.

17        So, like the grades, the evaluations, something doesn't

18    add up.  Something don't add up.

19        Remember, this is education.  This is how he's doing in

20    medical school.  Not to maximize his result, not to get

21    honors; it's how is he being evaluated, how is he doing in

22    school?  Grades and evaluations, folks.  That's why Dr. Hansen

23    didn't respond, because it didn't add up.

24        Now, folks, he also said a couple things, that Creighton

25    wouldn't provide him interpreters even if he paid for them

1    himself.

2         Again, I give you more credit than that.  He was in

3    litigation, and what did he say?  "I would have just added it

4    on to the tab in the lawsuit."  That's what he wanted to do.

5    He wanted to get in there and have interpreters, not being

6    able to evaluate him without interpreters, pay for them

7    himself, and then send the bill to Creighton.

8         He also says -- or the plaintiff's team also said

9    Creighton wouldn't spend one dollar, one dollar.  Folks,

10   that's not true.  Creighton spent thousands of dollars to put

11   in the FM system.  Creighton paid for interpreters that

12   Michael Argenyi used during his M2 for the lab.  It wasn't

13   just in lectures, they offered in some labs interpreters.

14   Michael Argenyi used interpreters and submitted the bill to

15   Creighton, and Creighton paid it.  Creighton actually was

16   willing to spend money on those auxiliary aids and services

17   that were necessary, that he would at least try.

18        Now, let's talk about the loan.  He talked a lot about

19   that loan.  And then we learned -- and they still haven't said

20   it, but we point it out, the loan was from his parents.  The

21   loan was from his parents.  And the loan was taken out after

22   the lawsuit was filed.  And his parents are charging him 8

23   percent interest.  Do you not think the parents thought,

24   "We're just going to get this back in litigation; got a

25   guaranteed return of 8 percent."

 1           How necessary would these have been if Michael didn't

 2      have the same parents and he had to take out a loan from a

 3      bank that he definitely had to pay back?  How necessary would

 4      they have been then?

 5           They also said we're going to show you that Creighton

 6      said he can pass just by showing up.  Michael Argenyi said --

 7      he said, "Well, yeah, Creighton told me I could pass by just

 8      showing up."  He failed to identify who said that and you

 9      heard Dr. Townley:  Not in my class.  Not in my class.

10           They also promised you that we'll show you that Creighton

11      never tried to contact Dr. Backous or Stacey Watson.  Not

12      true.  Chuck Lenosky called Stacey Watson and Amy Bones called

13      Dr. Backous, and he didn't even call her back.

14           Gotcha.

15           That's what they're trying to do, folks.

16           Now, we never heard anything about this white coat

17      ceremony.  There was no evidence about any white coat

18      ceremony.  Then they go on and on how there were no

19      accommodations there.  The white coat is a ceremony, it's not

20      class.  He hadn't started class.  And he didn't request any

21      accommodations for the white coat ceremony; no CART, no

22      interpreter, just him.

23           Let's talk about undue burden.  You were instructed that

24      even if he proves they're necessary -- which the evidence

25      certainly doesn't show that -- that Creighton does not have to

DEFENDANT'S CLOSING ARGUMENT                1086

1    provide these if it's an undue burden.  An undue burden, which

2    is a significant -- let's read it.  I want to make sure I get

3    this right:  Which is a significant difficulty or expense; a

4    significant expense.

5        Well, we know what he paid.  We know what he's asking

6    for.  Creighton would have had to pay $110,000 for his

7    auxiliary aids and services for his first two years, which, by

8    the way, is $15,800 more than he paid in tuition.

9        The other factors -- in addition to the nature and the

10   cost, the other factors are the financial resources of the

11   medical school.  You heard the medical school doesn't get

12   money from the university; the medical school pays money to

13   the university.  And you heard they have two choices if they

14   spent this kind of money, cut services for students or jobs or

15   raise tuition.

16       Look at the jury instructions.  That's what you take into

17   consideration.  Now Creighton is not some big corporation

18   that's trying to make money for its shareholders or overpaid

19   CEO.  That's not what it is.  Creighton University is a

20   nonprofit educational institution that every dollar goes back

21   into the school to try to make it better, to try to make it a

22   shining star.

23       Nobody's getting -- no CEO is getting paid, no

24   shareholder is getting paid; every dollar goes back in.

25       Folks, if $110,000 for one student to provide

1    accommodations that he can't establish that he needs, that he

2    says, "I have a disability, you've got to pay it," if that's

3    not a significant expense, I don't know what is.

4         Requiring Creighton to pay that kind of money, based upon

5    the documentation and his own statements and his own

6    physician's statements, paying $110,000 when that evidence is

7    before them, when he wants to use it to maximize the results?

8    That's an undue burden, folks; an undue burden.

9         Now I'm just going to talk briefly about intentional

10   discrimination because you'll have to find that they were

11   necessary and it wasn't an undue burden.  If you find both

12   those things, you have to decide if there's intentional

13   discrimination; that Dr. Kavan, that Creighton Medical School

14   had an intent to discriminate against him.

15        And you'll look at the jury instructions that the

16   university believed it was a strong likelihood that its

17   conduct violated the ADA or Rehabilitation Act.  That there

18   was a strong likelihood they said, "Yeah, we know it's against

19   the law but we're going to do it anyway."

20        The MEMT is set up to comply with the law.  They have

21   processes and procedures because they take that law seriously.

22   They have forms, they have committees, they have Wade Pearson

23   because they take it very seriously.  They've given

24   accommodations and dealt with that before Mr. Argenyi and

25   they're going to deal with it after.

DEFENDANT'S CLOSING ARGUMENT                                    1088

1         There's no intentional discrimination.  Sure, they were

2    very deliberate, but they were deliberate in getting

3    information from Mr. Argenyi and documentation to make sure

4    they made the right decision.  And they did.

5         It's not intentional discrimination.  There's no intent

6    to discriminate against Mr. Argenyi.  In fact, not only did

7    Wade Pearson help, they also ran it by their legal counsel

8    because they were concerned about complying with the law.

9    That's why the MEMT was there.

10        This isn't anything where they said, "Yeah, Dr. Kavan --

11   nah, we're not going to give it to him."  That's not what

12   happened.  You heard Dr. Kavan testify, you heard Dr. Hansen

13   testify, you heard Wade Pearson testify.  They wanted to do

14   the right thing.  And they did do the right thing here.

15        In fact, as we talked about when they received

16   Dr. Thedinger's letter, they changed the accommodations

17   because he provided documentation that we don't know why he

18   waited a year for, but they took it into consideration, they

19   thought about it, what's best for Mr. Argenyi in the medical

20   school setting, and they made that decision.

21        Sure, there's -- there's no evidence of intentional

22   discrimination.

23        Now, I'm not sure as I sit here -- and I've sat here for

24   a long time, you've sat here for a long time.  I've been with

25   this case for a long time, and I'm not sure what it's about.

1    I'm not sure what it's about.

2        Mr. Argenyi believed he was entitled.  He talked about

3    his commitment to social jurisprudence.  He found lawyers from

4    the National Association of the Deaf and Disability Rights

5    Nebraska.  He found advocates.

6        And then I think this case became about more than

7    Mr. Argenyi.  Look around the courtroom.  And it really struck

8    me when Ms. Vargas stood up for the first time to talk to you

9    and there are four lawyers over there, I think.  And she

10   introduced the lawyers from the National Association of the

11   Deaf; she introduced the lawyers from the Nebraska Disability

12   Rights, and she had to be reminded to introduce Mr. Argenyi.

13       This has become about something other than Mr. Argenyi,

14   but it's not.  It's not about all deaf people.  It's not

15   about -- it's not about maybe their desire to set this

16   standard; the person who is hearing impaired comes in and gets

17   everything they want.  They may want to do that, but that's

18   not what this case is about.  It's about Mr. Argenyi and what

19   he needs.

20       Now, folks, at the beginning -- well, one more thing.

21   One more.

22       We could leave this courtroom today and have to go to the

23   Westroads.  We could go outside and get in my 2004 Jeep

24   Cherokee.  We can drive it up Dodge Street, and we can park

25   and go in and go shopping.

DEFENDANT'S CLOSING ARGUMENT                                      1090

1      We could also leave and get into a Porsche.  We could

2  drive that Porsche up Dodge Street.  And you know what, if I

3  did that, I'd feel a lot better.  I'd feel more confident.

4  I'd look good.  I'd be maximizing my experience.  But that

5  Grand Cherokee got me to the Westroads just as easy as a

6  Porsche would.  Mr. Argenyi wouldn't even get in the Cherokee.

7  He wants the Porsche without even trying the Cherokee.

8      Now, folks, I told you when I came up here that I was

9  going to ask you to enter a verdict in favor of Creighton

10  University because I strongly believe, I'm confident that the

11  evidence shows that they met their obligation under the ADA

12  and under the Rehabilitation Act.  And I'm going to ask you

13  that.

14      I'm going to ask you, as Ms. Balus will show you, to

15  check that Mr. Argenyi has not met his burden.  And I'm going

16  to ask you on question number 3 to enter a verdict in favor of

17  Creighton.  Write it out right there.

18      Because I think the evidence is very clear that Creighton

19  Medical School offered him the auxiliary aids and services

20  that were necessary for him to have access to his medical

21  education.  And certainly we can't sit here today and say

22  Creighton violated a disability rights law because Mr. Argenyi

23  refused to even try what they offered.

24      We believe the evidence shows that Creighton did not

25  violate the ADA or Rehab Act, and we ask for a verdict in

1    their favor.

2         Thank you.

3              THE COURT:  Thank you, Mr. Moore.

4         We will now hear rebuttal, Ms. Vargas.

5              MS. VARGAS:  Thank you, your Honor.

6         The truth matters.  The truth matters.

7         Mr. Moore just got up here and told you:  No idea why

8    Michael would have sent letters from his doctor in September

9    2009.  It must be because he got lawyers.  It must be that the

10   nonprofit lawyers from the National Association of the Deaf

11   and Disability Rights Nebraska charged by the State of

12   Nebraska with representing the rights of its citizens with

13   disabilities -- it must be because they were playing gotcha.

14        I'd ask you to look at this letter from Amy Bones, who

15   has not been in this courtroom, who was the general counsel

16   form Creighton University.  She sent this letter in September

17   to Dianne.  And what you've seen of Dianne, does she seem like

18   the kind of person that plays gotcha?

19        This letter asks for more documentation.  That is why the

20   medical letters were provided.

21        The truth matters.

22        Mr. Moore told you that they had Wade Pearson on the

23   MEMT.  And you know what?  I think Wade Pearson's a great guy.

24   I think Wade Pearson probably did his job very well in the

25   Office of Disability Services.  Wade Pearson was not on the

1    MEMT committee ever.  He was not allowed to vote.  Wade

2    Pearson, in his time working in the Office of Disability

3    Services, provided exactly the auxiliary aids that Mr. Argenyi

4    asked for to other students.  But not in the medical school.

5         They talk about how there's not documentation?  The truth

6    matters.

7         Dr. Hansen came into this courtroom and testified under

8    oath before the beginning of the M2 year, the second year of

9    medical school, in this room, he testified under oath.  And I

10   put his testimony up on the monitor we've been calling the

11   ELMO so you could see it.  And in that sworn testimony in

12   August of 2010, Dr. Hansen told Michael, in front of the

13   Court, "If you have any struggles in the clinic, come to me.

14   I'll help you.  Come talk to me.  Come tell me."  And that's

15   what he did.  And now that wasn't the right thing?  That

16   wasn't what he was supposed to do?

17        The truth matters.

18        We're not talking about a parking spot.  We're talking

19   about access to an education.  We're talking about access to

20   the words.  If you don't have access to the words that are in

21   the classroom, you don't have access to the education.  It's

22   that simple.

23        Read the letters.  Read all of the letters.  Read them in

24   context, where Mr. Argenyi said generally interpreters and

25   CART are interchangeable.  Look at the paragraph immediately

1    above that with an underlined heading that says specifically,

2    not generally, but specifically what he needed.

3        When my children get in trouble for doing something --

4    which is usually when I'm on the phone -- especially my

5    littlest, and it usually involves eating candy he wasn't

6    supposed to have; and I ask him about it -- he just turned

7    6 -- and he says, "Well, I didn't eat it right now."  It

8    wasn't right now, it was when I was on the phone.  A cute

9    answer, from a five-year-old.

10       It's not so cute when it's from a multimillion dollar

11   university that has accepted millions and millions and

12   millions of federal tax dollars conditioned on a promise.

13   That promise was already made, 408 times in 2010.  408 times

14   they signed a document called an Assurance of Compliance form

15   that said they would not discriminate on the basis of

16   disability; that said they would comply with the

17   Rehabilitation Act.  Ms. Madsen, vice president of finance,

18   oh, didn't know anything about that.

19       And let's talk about being able to review the evidence.

20   Remember, it's not a coincidence that you were given access to

21   some OSCE videos.  The rest of the OSCE videos?  The equipment

22   malfunctioned.  On multiple different days, it just happened

23   to malfunction when Michael was in the clinic; when Michael

24   was going for testing.  Just happened to malfunction.

25       Let's talk about the fact that the evaluation that

1   Creighton produced for the first time; that was never given to

2   Michael.  And you know what?  When Dr. Townley testified and

3   she said, "In my clinic a student wouldn't be told he passed

4   just for showing up in my clinic," she doesn't grade the

5   students in the clinic.  She's not the one who grades them.

6         The truth matters.

7         And you have the opportunity, after four years, to decide

8   whether this young man gets to be a doctor.  That decision is

9   in your hands.

10             THE COURT:  Thank you, Ms. Vargas.

11        We will now turn to the final jury instruction, number

12  18.

13        (Instruction number 18 read.)

14             THE COURT:  Thank you for your attention.  You will

15  decide your schedule.  You will decide if you want to take a

16  lunch break, which is probably a good idea at this juncture,

17  get some food, and then begin your deliberations after lunch,

18  if you wish.

19        So you are now excused to the jury room.  Thank you.

20        (Jury out at 12:31 p.m.)

21             THE COURT:  Please be seated.

22        As we discussed earlier, we will be in touch if there is

23  a question from the jury or if there is a verdict.  So please

24  be sure that Ms. Frahm has the telephone number at which you

25  want to be called in the event that either one of those things

1    happens.

2         I do want to thank the lawyers in this case for your very

3    thorough preparation over the last four years.  I know it's

4    been a very, very long time that you've all worked on this

5    case, and you've worked very hard.  And it's fair to say that

6    both parties in this case could not have had finer

7    representation.  So I appreciate that, and I appreciate your

8    courtesy to the Court and our staff.

9         And we will be in touch.  Thank you.

10        (Judge leaves the bench at 12:33 p.m.)

11        (At 12:44 p.m. following record made:)

12        COURTROOM DEPUTY:  Okay.  We're on the record.

13   Counsel introduce yourself.

14        MS. VARGAS:  My name is Mary Vargas.  I represent the

15   plaintiff, along with Dianne DeLair.

16        MS. BALUS:  Allison Balus on behalf of Creighton

17   University.

18        COURTROOM DEPUTY:  Okay.  We have gone over -- we

19   have looked at every exhibit, we've checked the numbers

20   against the exhibit list.

21        Counsel for the plaintiff, do you agree that all the

22   exhibits on the exhibit list are here and you've looked at

23   them?

24        MS. VARGAS:  Yes.

25        COURTROOM DEPUTY:  And you agree these should all go

1    to the jury?

2            MS. VARGAS:  I do, with the exception of 209A and B1

3    which I've asked for the opportunity to review, and defense

4    counsel is going to review with me.

5            MS. BALUS:  We didn't change 209B at all.  There was

6    nothing you guys asked to have cut off.

7            COURTROOM DEPUTY:  Counsel for the defendant, do you

8    agree we have looked at every exhibit, gone through them

9    individually, they all agree with what's on the exhibit list,

10   and this is what should go to the jury.

11           MS. BALUS:  I do.

12           COURTROOM DEPUTY:  Okay.  Thank you.

13

14           (Adjourned at 12:45 p.m.)

15

16

17

18           I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

19

20       _____*/s Brenda L. Fauber*_____        _____7-21-14_____
          Brenda L. Fauber, RDR, CRR                  Date

21

22

23

24

25